JEFFER MANGELS BUTLER & MITCHELL LLP
ROBERT B. KAPLAN, P.C. (Bar No. 76950)
*rbk@jmbm.com*
Two Embarcadero Center, 5th Floor
San Francisco, California 94111-3813
Telephone:    (415) 398-8080
Facsimile:    (415) 398-5584

JEFFER MANGELS BUTLER & MITCHELL LLP
THOMAS M. GEHER (Bar No. 130588)
*tmg@jmbm.com*
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
Telephone:    (310) 203-8080
Facsimile:    (310) 203-0567

Attorneys for UMPQUA BANK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:19-bk-14626-NB |
| XELAN PROP 1, LLC, | Chapter 11 |
| Debtors. | **DECLARATION OF ROBERT B. KAPLAN IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE WITH PREJUDICE [11 U.S.C. SECTION 1112(b)]** |
| | **VOLUME THREE** |
| | **EXHIBIT 7, PART 2 AND EXHIBIT 8** |
| | Date:    April 30, 2019 |
| | Time:    2:00 p.m. |
| | Place:    Courtroom 1545<br>255 East Temple Street<br>Los Angeles, CA |

JMBM | Jeffer Mangels Butler & Mitchell LLP

# EXHIBIT 8

*LOT 018 BLOCK 3583*

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

ATTN: COMMERCIAL LOAN SUPPORT
STERLING BANK
P.O. BOX 2131
SPOKANE, WASHINGTON 99201

San Francisco Assessor-Recorder
Carmen Chu, Assessor-Recorder
DOC- 2013-J697776-00
Acct 4-OLD REPUBLIC Title Company
Friday, JUN 28, 2013 08:00:00
Ttl Pd $168.00          Rcpt # 0004727555
REEL K928 IMAGE 0305
oar/AB/4-36

*(SPACE ABOVE THIS LINE FOR RECORDER'S USE)*

## DEED OF TRUST AND ABSOLUTE ASSIGNMENT OF RENTS AND LEASES AND SECURITY AGREEMENT (AND FIXTURE FILING)

The parties to this DEED OF TRUST AND ABSOLUTE ASSIGNMENT OF RENTS AND LEASES AND SECURITY AGREEMENT (AND FIXTURE FILING) ("Deed of Trust"), dated as of June 13, 2013 are XELAN PROP 1, LLC, a California limited liability company ("Trustor"), with a mailing address at P.O. BOX 691889, LOS ANGELES, California 90069, UPF INCORPORATED, a Washington corporation ("Trustee"), with a mailing address at 910 West Boone Avenue, Spokane, Washington 99201, and STERLING SAVINGS BANK, a Washington banking corporation, d/b/a Sterling Bank ("Beneficiary" or "Lender"), with a mailing address at 111 N. Wall Street, Spokane, Washington 99201.

### RECITALS

A.    Trustor proposes to borrow from Beneficiary, and Beneficiary proposes to lend to Trustor the principal sum of One Million Seven Hundred Thousand Dollars and No Cents ($1,700,000.00) ("Loan"). The Loan is evidenced by a promissory note ("Note") executed by Trustor, dated the date of this Deed of Trust, payable to the order of Beneficiary in the principal amount of the Loan.

B.    The loan documents include this Deed of Trust, the Note and the other documents described in the Note as Loan Documents ("Loan Documents").

C.    Trustor is sometimes referred to herein as "Borrower" and all references herein to Borrower or Trustor shall be deemed to be references to Trustor, and Beneficiary is sometimes referred to herein as "Lender" and all references herein to Lender or Trustee shall be deemed to be references to Beneficiary.

### ARTICLE 1
### DEED OF TRUST

**1.1    Grant.**    For the purposes of and upon the terms and conditions of this Deed of Trust, Trustor irrevocably grants, conveys and assigns to Trustee, in trust for the benefit of Lender, with power of sale and right of entry and possession, all estate, right, title and interest which Trustor now has or may hereafter acquire in, to, under or derived from any or all of the following:

(a)    That real property ("Land") located in San Francisco County, California, and more particularly described on Exhibit "A" attached hereto and, also commonly known as 4018-4022 19TH STREET, SAN FRANCISCO, CALIFORNIA, with the following assessor's parcel number(s): LOT 18; BLOCK 3583;

---

DOT (CA)                                        1                    4018-4022 19th Street (Loan No. 3720003627)
477049 (rev 03/27/13)

Exempt from real estate fraud fee under
GC 27388; recorded concurrently in
connection with a transfer subject to the
imposition of documentary transfer tax

176

(b)    All appurtenances, easements, rights of way, water and water rights, pumps, pipes, flumes and ditches and ditch rights, water stock, ditch and/or reservoir stock or interests, royalties, development rights and credits, air rights, minerals, oil rights, and gas rights, now or later used or useful in connection with, appurtenant to or related to the Land;

(c)    All buildings, structures, facilities, other improvements and fixtures now or hereafter located on the Land;

(d)    All apparatus, equipment, machinery and appliances and all accessions thereto and renewals and replacements thereof and substitutions therefor used in the operation or occupancy of the Land, it being intended by the parties that all such items shall be conclusively considered to be a part of the Land, whether or not attached or affixed to the Land;

(e)    All land lying in the right-of-way of any street, road, avenue, alley or right-of-way opened, proposed or vacated, and all sidewalks, strips and gores of land adjacent to or used in connection with the Land;

(f)    All additions and accretions to the property described above;

(g)    All licenses, authorizations, certificates, variances, consents, approvals and other permits now or hereafter pertaining to the Land and all estate, right, title and interest of Trustor in, to, under or derived from all trade names or business names relating to the Land or the present or future development, construction, operation or use of the Land; and

(h)    All proceeds of any of the foregoing.

All of the property described above is hereinafter collectively defined as the "Property". The listing of specific rights or property shall not be interpreted as a limitation of general terms. The Property is not used primarily or principally for agricultural purposes.

## ARTICLE 2
## OBLIGATIONS SECURED

2.1    Obligations Secured.  Trustor makes the foregoing grant and assignment for the purpose of securing the following obligations ("Secured Obligations"):

(a)    Full and punctual payment to Lender of all sums at any time owing under the Note;

(b)    Payment and performance of all covenants and obligations of Borrower under this Deed of Trust including, without limitation, indemnification obligations and advances made to protect the Property;

(c)    Payment and performance of all additional covenants and obligations of Borrower under the Loan Documents;

(d)    Payment and performance of all covenants and obligations, if any, which any rider attached as an exhibit to this Deed of Trust recites are secured hereby;

(e)    Payment and performance of all future advances and other obligations that the then record owner of all or part of the Property may agree to pay and/or perform (whether as principal, surety or guarantor) for the benefit of Lender, when the obligation is evidenced by a writing which recites that it is secured by this Deed of Trust;

(f)    All interest and charges on all obligations secured hereby including, without limitation, prepayment charges, late charges and loan fees; and

(g)    All modifications, extensions and renewals of any of the obligations secured hereby, however evidenced, including, without limitation: (i) modifications of the required principal payment dates or interest payment dates or both, as the case may be, deferring or accelerating payment dates wholly or partly; and (ii) modifications, extensions or renewals at a different rate of interest whether or not any such modification, extension or renewal is evidenced by a new or additional promissory note or notes.

However, the Secured Obligations shall not include the payment and performance of the covenants and obligations of Borrower under the Environmental Indemnity Agreement of even date herewith, which obligations and covenants are not, notwithstanding anything to the contrary contained herein, secured by this Deed of Trust.

2.2    **Obligations.**  The term "obligations" is used herein in its broadest and most comprehensive sense and shall be deemed to include, without limitation, all interest and charges, prepayment charges, late charges and loan fees at any time accruing or assessed on any of the Secured Obligations.

2.3    **Incorporation.**  All terms and conditions of the documents which evidence any of the Secured Obligations are incorporated herein by this reference.  All persons who may have or acquire an interest in the Property shall be deemed to have notice of the terms of the Secured Obligations and to have notice that the rate of interest on one or more Secured Obligation may vary from time to time.

### ARTICLE 3
### ABSOLUTE ASSIGNMENT OF RENTS AND LEASES

3.1    **Assignment.**  Trustor irrevocably assigns to Lender all of Trustor's right, title and interest in, to and under:

(a)    all present and future leases of the Property or any portion thereof, all licenses and agreements relating to the management, leasing or operation of the Property or any portion thereof, and all other agreements of any kind relating to the use or occupancy of the Property or any portion thereof, whether such leases, licenses and agreements are now existing or entered into after the date hereof ("Leases"); and

(b)    the rents, issues, deposits and profits of the Property, including, without limitation, all amounts payable and all rights and benefits accruing to Trustor under the Leases ("Payments").  The term "Leases" shall also include all Guaranties of and security for the tenants' performance thereunder, and all amendments, extensions, renewals or modifications thereto which are permitted hereunder.

This is a present and absolute assignment, not an assignment for security purposes only, and Lender's right to the Leases and Payments is not contingent upon, and may be exercised without possession of, the Property.

3.2    **Grant of License.**  Lender confers upon Trustor a revocable license ("License") to collect and retain the Payments as they become due and payable, until the occurrence of a "Default" (as hereinafter defined).  Upon a Default, the License shall be automatically revoked and Lender may collect and apply the Payments pursuant to the terms hereof without notice and without taking possession of the Property.  All Payments thereafter collected by Trustor shall be held by Trustor as trustee under a constructive trust for the benefit of Lender.  Trustor hereby irrevocably authorizes and directs the tenants under the Leases to rely upon and comply with any notice or demand by Lender for the payment to Lender of any rental or other sums which may at any time become due under the Leases, or for the performance of any of the tenants' undertakings under the Leases, and the tenants shall have no right or duty to inquire as to whether any Default has actually occurred or is then existing.  Trustor hereby relieves the tenants from any liability to Trustor by reason of relying upon and complying with any such notice or

demand by Lender. Lender may apply, in its sole discretion, any Payments so collected by Lender against any Secured Obligation or any other obligation of Borrower, Trustor or any other person or entity, under any document or instrument related to or executed in connection with the Loan Documents, whether existing on the date hereof or hereafter arising. Collection of any Payments by Lender shall not cure or waive any Default or notice of Default or invalidate any acts done pursuant to such notice.

3.3    **Effect of Assignment.** The foregoing irrevocable assignment shall not cause Lender to be:

(a)    a mortgagee in possession;

(b)    responsible or liable for the control, care, management or repair of the Property or for performing any of the terms, agreements, undertakings, obligations, representations, warranties, covenants and conditions of the Leases;

(c)    responsible or liable for any waste committed on the Property by the tenants under any of the Leases or by any other parties for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee, invitee or other person; or

(d)    responsible for or impose upon Lender any duty to produce rents or profits. Lender shall not directly or indirectly be liable to Trustor or any other person as a consequence of:

(i)    the exercise or failure to exercise any of the rights, remedies or powers granted to Lender hereunder; or

(ii)    the failure or refusal of Lender to perform or discharge any obligation, duty or liability of Trustor arising under the Leases.

3.4    **Covenants.** Trustor shall, at Trustor's sole cost and expense:

(a)    perform all obligations of the landlord under the Leases and use reasonable efforts to enforce performance by the tenants of all obligations of the tenants under the Leases;

(b)    use reasonable efforts to keep the Property leased at all times to tenants which Trustor in good faith believes are creditworthy, at rents not less than the fair market rental value (including, but not limited to, free or discounted rents to the extent the market so requires);

(c)    promptly upon Lender's request, deliver to Lender a copy of each requested Lease and all amendments thereto and waivers thereof;

(d)    promptly upon Lender's request, execute and record any additional assignments of landlord's interest under any Lease to Lender and specific subordinations of any Lease to this Deed of Trust, in form and substance satisfactory to Lender; and

(e)    [Reserved].

Unless consented to in writing by Lender or otherwise permitted under any other provision of the Loan Documents, Trustor shall not:

(f)    grant any tenant under any Lease any option, right of first refusal or other right to purchase all or any portion of the Property under any circumstances;

(g)    grant any tenant under any Lease any right to prepay rent more than one (1) month in advance;

(h)   except upon Lender's request, execute any assignment of landlord's interest in any Lease;

(i)   collect rent or other sums due under any Lease in advance, other than to collect rent one (1) month in advance of the time when it becomes due; or

(j)   execute any lease which materially modifies the terms of any Lease or which deviates materially from the standard form Lease approved by Lender in writing.

Any such attempted action in violation of the provisions of this section shall be null and void.

Lender's failure to deny any written request by Trustor for consent under this section within ten (10) "Business Days" (as defined in the Note) after Lender's receipt of such request (and all documents and information reasonably related thereto) shall be deemed to constitute Lender's consent to such request.

**3.5**   **Estoppel Certificates for Commercial Tenants.**  Within thirty (30) days after request by Lender, if Trustor shall enter into any commercial Lease with a commercial tenant for space within the Property, Trustor shall deliver to Lender and to any party designated by Lender, estoppel certificates relating to any such commercial Lease(s) executed by Lender and by each of the commercial tenants, in form and substance acceptable to Lender; provided, however, if any said commercial tenant shall fail or refuse to so execute and deliver any such estoppel certificate upon request, Trustor shall use reasonable efforts to cause such commercial tenant to execute and deliver such estoppel certificate but such commercial tenant's continued failure or refusal to do so, despite Trustor's reasonable efforts, shall not constitute a default by Trustor under this section.

**3.6**   **Right of Subordination.**  Lender may at any time and from time to time by specific written instrument intended for the purpose unilaterally subordinate the lien of this Deed of Trust to any Lease, without joinder or consent of, or notice to, Trustor, any tenant or any other person. Notice is hereby given to each tenant under a Lease of such right to subordinate. No subordination referred to in this section shall constitute a subordination to any lien or other encumbrance, whenever arising, or improve the right of any junior lien holder. Nothing herein shall be construed as subordinating this Deed of Trust to any Lease.

**3.7**   **Owner Occupied Provisions.**  In the event Borrower, or any affiliate owned or controlled by Borrower ("Affiliate"), rents, uses, occupies or otherwise possesses for its own residential use ("Owner Occupied Use") all or any portion of, any residential portion of the Property ("Subject Premises"), then Trustor agrees as follows:  (a) Borrower and/or Affiliate, as tenant, shall execute a written lease agreement relating to the Owner Occupied Use of the Subject Premises, which lease shall provide for a term of no less than a one year, which may be renewable annually, at a market rate of rent ("Owner Lease"); (b) the Owner Lease, and any tenant rights in, to and under the Owner Lease, are hereby subjected and subordinated to the lien of this Deed of Trust, it being understood and agreed that the foregoing subordination shall apply to any and all increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations of this Deed of Trust; (c) Trustor shall give notice to Lender of the termination, surrender or other release of the Owner Lease within 30 days of the date of such event, and Trustor shall promptly use its best efforts to lease all or any portion of the Subject Premises to a third party in an arm's length transaction for the then market rate of rent; (d) if Lender shall become the owner of the Property by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Property shall be conveyed to Lender by deed-in-lieu of foreclosure (each, a "Remedies Event"), the Owner Lease shall, only at Lender's election in its sole discretion, continue in full force and effect as a direct lease between Lender and Trustor or Affiliate, and said attornment shall be effective and self-operative upon written notice by Lender to Trustor or Affiliate without the execution of any further instruments; and (e) if Lender shall become the owner of the Property by reason of a Remedies Event and Lender elects to continue the Owner Lease as provided in subsection (d) above, Trustor or Affiliate agrees that after such Remedies Event, Lender shall have no personal liability to tenant under the Owner Lease and Lender shall only be liable for the obligations of the landlord under the Owner Lease accruing during the period of time that Lender is the owner of the Property.

## ARTICLE 4

### SECURITY AGREEMENT AND FIXTURE FILING

4.1   **Security Interest.** Trustor grants and assigns to Lender a security interest to secure payment and performance of all of the Secured Obligations, in all of the following described personal property in which Trustor now or at any time hereafter has any interest ("Collateral"):

(a)   All goods, building and other materials, supplies, work in process, equipment, machinery, fixtures, furniture, furnishings, signs and other personal property, wherever situated, which are or are to be incorporated into, used in connection with or appropriated for use on the Property;

(b)   all rents, issues, deposits and profits of the Property (to the extent, if any, they are not subject to the Absolute Assignment of Rents and Leases);

(c)   all inventory, accounts, cash receipts, deposit accounts, impounds, accounts receivable, contract rights, general intangibles, chattel paper, instruments, documents, notes, drafts, letters of credit, insurance policies, insurance and condemnation awards and proceeds, any other rights to the payment of money, trade names, trademarks and service marks arising from or related to the Property or any business now or hereafter conducted thereon by Trustor;

(d)   all permits, consents, approvals, licenses, authorizations and other rights granted by, given by or obtained from, any governmental entity with respect to the Property;

(e)   all deposits or other security now or hereafter made with or given to utility companies by Borrower with respect to the Property;

(f)   all advance payments of insurance premiums made by Borrower with respect to the Property;

(g)   all plans, drawings and specifications relating to the Property;

(h)   all loan funds held by Lender, whether or not disbursed;

(i)   all funds deposited with Lender pursuant to any Loan Document, including, without limitation, all "Restoration Funds" as defined herein;

(j)   all reserves, deferred payments, deposits, accounts, refunds, cost savings and payments of any kind related to the Property or any portion thereof, including, without limitation, (i) all "Impounds" as defined herein together with all replacements and proceeds of, and additions and accessions to, any of the foregoing, and (ii) all books, records and files relating to any of the foregoing. As to all of the above-described personal property which is or which hereafter becomes a "fixture" under applicable law, this Deed of Trust constitutes a fixture filing under the California Uniform Commercial Code, as amended or recodified from time to time ("UCC").

4.2   **Rights of Lender.** In addition to Lender's rights as a "secured party" under the UCC, Lender may, but shall not be obligated to, at any time without notice and at the expense of Borrower:

(a)   give notice to any person of Lender's rights hereunder and enforce such rights at law or in equity;

(b)   insure, protect, defend and preserve the Collateral or any rights or interests of Lender therein;

(c)   inspect the Collateral; and

(d)    endorse, collect and receive any right to payment of money owing to Borrower under or from the Collateral.

Notwithstanding the above, in no event shall Lender be deemed to have accepted any property other than cash in satisfaction of any obligation of Borrower to Lender unless Lender shall make an express written election of said remedy under the UCC or other applicable law.

**4.3    Additional Rights of Lender Upon Default.**    Upon the occurrence of a Default hereunder, then in addition to all of Lender's rights as a "secured party" under the UCC or otherwise at law:

(a)    Sale of Collateral.    Lender may:

(i)    upon written notice, require Trustor to assemble any or all of the Collateral and make it available to Lender at a place designated by Lender;

(ii)    without prior notice, enter upon the Property or other place where any of the Collateral may be located and take possession of, collect, sell and dispose of any or all of the Collateral, and store the same at locations acceptable to Lender at Trustor's expense; or

(iii)    sell, assign and deliver at any place or in any lawful manner all or any part of the Collateral and bid and become purchaser at any such sales; and

(b)    Other Rights.    Lender may, for the account of Trustor and at Trustor's expense:

(i)    operate, use, consume, sell or dispose of the Collateral as Lender deems appropriate for the purpose of performing any or all of the Secured Obligations;

(ii)    enter into any agreement, compromise or settlement including insurance claims, which Lender may deem desirable or proper with respect to any of the Collateral; and

(iii)    endorse and deliver evidences of title for, and receive, enforce and collect by legal action or otherwise, all indebtedness and obligations now or hereafter owing to Trustor in connection with or on account of any or all of the Collateral.

Trustor acknowledges and agrees that a disposition of the Collateral in accordance with Lender's rights and remedies as heretofore provided is a disposition thereof in a commercially reasonable manner and that five (5) days' prior notice of such disposition is commercially reasonable notice. Trustor further agrees that any sale or other disposition of all or any portion of the Collateral may be applied by Lender first to the reasonable expenses in connection therewith, including reasonable attorneys' fees and disbursements, and then to the payment of the Secured Obligations.

**4.4    Power of Attorney.**    Trustor hereby irrevocably appoints Lender as Trustor's attorney-in-fact (such power of attorney being coupled with an interest), and as such attorney-in-fact, Lender may, without the obligation to do so, in Lender's name or in the name of Trustor, prepare, execute, file and record financing statements, continuation statements, applications for registration and like papers necessary to create, perfect or preserve any of Lender's security interests and rights in or to any of the Collateral, and upon a Default hereunder, take any other action required of Trustor, provided, however, that Lender as such attorney-in-fact shall be accountable only for such funds as are actually received by Lender.

182

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

**5.1**    **Representations and Warranties.**    Trustor represents and warrants to Lender that, to Trustor's current actual knowledge after reasonable investigation and inquiry, the following statements are true and correct as of the "Closing Date" (as defined in the Note):

(a)    **Legal Status.**    Trustor is duly organized and existing and in good standing under the laws of the states in which Trustor is organized.    Trustor is qualified or licensed to do business in all jurisdictions in which such qualification or licensing is required.

(b)    **Permits.**    Trustor possesses all permits, franchises and licenses and all rights to all trademarks, trade names, patents and fictitious names, if any, necessary to enable Trustor to conduct the business(es) in which Trustor is now engaged in compliance with applicable law.

(c)    **Authorization and Validity.**    The execution and delivery of the Loan Documents have been duly authorized and the Loan Documents constitute valid and binding obligations of Trustor, Trustor or the party which executed the same, enforceable in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights, or by the application of rules of equity.

(d)    **Violations.**    The execution, delivery and performance by Trustor of each of the Loan Documents do not violate any provision of any law or regulation, or result in any breach or default under any contract, obligation, indenture or other instrument to which Trustor is a party or by which Trustor is bound.

(e)    **Litigation.**    There are no pending or threatened actions, claims, investigations, suits or proceedings before any governmental authority, court or administrative agency which may adversely affect the financial condition or operations of Trustor other than those previously disclosed in writing by Trustor to Lender.

(f)    **Financial Statements.**    The financial statements of Trustor and of each general partner (if Trustor is a partnership), of each managing member (if Trustor is a limited liability company) and of each guarantor, if any, previously delivered by Trustor to Lender:

(i)    are materially complete and correct;

(ii)    present fairly the financial condition of such party; and

(iii)    have been prepared in accordance with the same accounting standard used by Trustor to prepare the financial statements delivered to and approved by Lender in connection with the making of the Loan, or other accounting standards approved by Lender.

Since the date of such financial statements, there has been no material adverse change in such financial condition, nor have any assets or properties reflected on such financial statements been sold, transferred, assigned, mortgaged, pledged or encumbered except as previously disclosed in writing by Trustor to Lender and approved in writing by Lender.

(g)    **Reports.**    All reports, documents, instruments and information delivered to Lender in connection with the Loan:

(i)    are correct and sufficiently complete to give Lender accurate knowledge of their subject matter; and

(ii)    do not contain any misrepresentation of a material fact or omission of a material fact which omission makes the provided information misleading.

(h)    Income Taxes.  There are no pending assessments or adjustments of Trustor's or Trustor's income tax payable with respect to any year.

(i)    Subordination.  There is no agreement or instrument to which Trustor is a party or by which Trustor is bound that would require the subordination in right of payment of any of Trustor's obligations under the Note to an obligation owed to another party.

(j)    Title.  Trustor lawfully holds and possesses fee simple title to the Property, without limitation on the right to encumber same.  This Deed of Trust is a first lien on the Property prior and superior to all other liens and encumbrances on the Property except:

(i)    liens for real estate taxes and assessments not yet due and payable;

(ii)    senior exceptions previously approved by Lender and shown in the title insurance policy insuring the lien of this Deed of Trust; and

(iii)    other matters, if any, previously disclosed to Lender by Trustor in a writing specifically referring to this representation and warranty.

(k)    Mechanics' Liens.  There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to any such liens) affecting the Property which are or may be prior to or equal to the lien of this Deed of Trust.

(l)    Encroachments.  Except as shown in the survey, if any, previously delivered to Lender, none of the buildings or other improvements which were included for the purpose of determining the appraised value of the Property lies outside of the boundaries or building restriction lines of the Property and no buildings or other improvements located on adjoining properties encroach upon the Property.

(m)    Leases.  All existing Leases are in full force and effect and are enforceable in accordance with their respective terms.  No material breach or default by any party, or event which would constitute a material breach or default by any party after notice or the passage of time, or both, exists under any existing Lease.  None of the landlord's interests under any of the Leases, including, but not limited to, rents, additional rents, charges, issues or profits, has been transferred or assigned.  No rent or other payment under any existing Lease has been paid by any tenant for more than one (1) month in advance.

(n)    Collateral.  Trustor has good title to the existing Collateral.  Trustor has not previously assigned or encumbered Trustor's interest in any of the Collateral.  No financing statement covering any of the Collateral has been delivered to any other person or entity.  Trustor's principal place of business is located at the address shown in this Deed of Trust.

(o)    Condition of Property.  Except as shown in the property condition survey or other engineering reports, if any, previously delivered to or obtained by Lender, the Property is in good condition and repair and is free from any damage, waste or defect that would materially and adversely affect the value of the Property as security for the Loan or the intended use of the Property, and is not being owned, occupied and/or otherwise used in a manner which does not conform to all required building and occupancy laws, codes and regulations and all zoning and other entitlements applicable to the Property.

(p)    Wetlands.  No part of the Property consists of or is classified as wetlands, tidelands or swamp and overflow lands.

---

DOT (CA)
477049 (rev 03/27/13)

9

4018-4022 19th Street (Loan No. 3720003627)

(q)    **Compliance With Laws; ERISA.**

(i)    All federal, state and local laws, rules and regulations applicable to the Property, including, without limitation, all zoning and building requirements and all requirements of the Americans With Disabilities Act of 1990, as amended from time to time (42 U.S.C. Section 12101 et seq.) have been satisfied or complied with. Trustor is in possession of all certificates of occupancy and all other licenses, permits and other authorizations required by applicable law for the existing use of the Property. All such certificates of occupancy and other licenses, permits and authorizations are valid and in full force and effect;

(ii)    Trustor shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Deed of Trust and the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); and

(iii)    Trustor shall deliver to Lender such certifications or other evidence from time to time throughout the term of this Deed of Trust, as requested by Lender in its sole discretion, that Trustor is not:

(A)    an "employee benefit plan" as defined in Section 3(32) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA, and

(B)    subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans.

(r)    **Property Taxes and Other Liabilities.** All taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, and ground rents, if any, which previously became due and owing in respect of the Property have been paid.

(s)    **Condemnation.** There is no proceeding pending or threatened for the total or partial condemnation of the Property.

(t)    **Homestead.** There is no homestead or other exemption available to Trustor which would materially interfere with the right to sell the Property at a trustee's sale or the right to foreclose this Deed of Trust.

(u)    **Business Purposes.** The proceeds of the Loan shall be used exclusively for business purposes.

(v)    **Not Residential.** No portion of the Property is or will be occupied by Borrower as its principal residence.

## ARTICLE 6
## RIGHTS AND DUTIES OF THE PARTIES

6.1    **Maintenance and Preservation of the Property.** Trustor shall:

(a)    keep the Property in good condition and repair;

(b)    complete or restore promptly and in workmanlike manner the Property or any part thereof which may be damaged or destroyed (unless, if and to the extent permitted under Section 6.10, Lender elects to require that insurance proceeds be used to reduce the Secured Obligations and after such repayment the ratio of Secured Obligations to the value of the Property, as

---

DOT (CA)
477049 (rev 03/27/13)

10

4018-4022 19th Street (Loan No. 3720003627)

reasonably determined by Lender is the same as or lower than it was immediately before the loss or taking occurred);

(c)    comply and cause the Property to comply with (i) all laws, ordinances, regulations and standards, (ii) all covenants, conditions, restrictions and equitable servitudes, whether public or private, of every kind and character, and (iii) all requirements of insurance companies and any bureau or agency which establishes standards of insurability, which laws, covenants or requirements affect the Property and pertain to acts committed or conditions existing thereon, including, without limitation, any work of alteration, improvement or demolition as such laws, covenants or requirements mandate;

(d)    operate and manage the Property at all times in a professional manner and do all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value;

(e)    promptly after execution, deliver to Lender a copy of any management agreement concerning the Property and all amendments thereto and waivers thereof; and

(f)    execute and acknowledge all further documents, instruments and other papers as Lender or Trustee deems necessary or appropriate to preserve, continue, perfect and enjoy the benefits of this Deed of Trust and perform Trustor's obligations, including, without limitation, statements of the amount secured hereby then owing and statements of no offset.

Trustor shall not:

(g)    remove or demolish all or any material part of the Property;

(h)    alter either (i) the exterior of the Property in a manner which materially and adversely affects the value of the Property or (ii) the roof or other structural elements of the Property in a manner which requires a building permit;

(i)    initiate or acquiesce in any change in any zoning or other land classification which affects the Property;

(j)    materially alter the type of occupancy or use of all or any part of the Property; or

(k)    commit or permit waste of the Property.

Notwithstanding any other provision of this Deed of Trust or any other Loan Document to the contrary, Trustor covenants and agrees to apply any Rents (including without limitation any Rents and other lease payments received more than one (1) month in advance), royalties, accounts, revenues, income, issues, profits, sums received in consideration of any surrender or termination of any lease (or the release or discharge of any tenant thereunder) or material modification of any lease on the Property, and other benefits from the Property which are collected or received by Trustor (A) prior to the period of any Default, or prior to the occurrence of any event which with the giving of notice or the passage of time, or both, first for the payment of the ordinary and necessary expenses of owning and operating the Property, next to Lender for repayment of the Obligations, and finally, any remaining sums to Trustor, or (B) either during the period of any Default, or after the occurrence of any event which with the giving of notice or the passage of time, or both, would constitute a Default, or after acceleration of the indebtedness and other sums owing under the Loan Documents, only to the payment of either such Obligations or other sums, or the normal and necessary operating expenses of the Property.

6.2    **Compliance With Laws; ERISA.**

(a)    Trustor shall comply with all federal, state and local laws, rules and regulations applicable to the Property, including, without limitation, all zoning and building requirements and all

requirements of the Americans With Disabilities Act of 1990 (42 U.S.C. Section 12101 et seq.), as amended from time to time;

(b) Trustor shall possess and maintain or cause Trustor to possess and maintain in full force and effect at all times:

(i) all certificates of occupancy and other licenses, permits and authorizations required by applicable law for the existing use of the Property; and

(ii) all permits, franchises and licenses and all rights to all trademarks, trade names, patents and fictitious names, if any, required by applicable law for Trustor to conduct the business(es) in which Trustor is now engaged;

(c) Trustor is not or will not be an "employee benefit plan" as defined in Section 3(32) of ERISA, which is subject to Title I of ERISA, and the assets of Trustor do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; and

(d) Trustor is not or will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and transactions by or with Trustor are not and will not be subject to state statutes applicable to Trustor regulating investments of and fiduciary obligations with respect to governmental plans.

6.3 **Litigation.** Trustor shall promptly notify Lender in writing of any litigation pending or threatened against Trustor claiming damages in excess of $50,000 and of all pending or threatened litigation against Trustor if the aggregate damage claims against Trustor exceed $100,000.

6.4 **Merger, Consolidation, Transfer of Assets.** Trustor shall not

(a) merge or consolidate with any other entity or permit Trustor to merge or consolidate with any other entity;

(b) make any substantial change in the nature of Trustor's business or structure or permit Trustor to make any substantial change in the nature of Trustor's business or structure;

(c) acquire all or substantially all of the assets of any other entity or permit Trustor to acquire all or substantially all of the assets of any other entity; or

(d) sell, lease, assign, transfer or otherwise dispose of a material part of Trustor's assets except in the ordinary course of Trustor's business.

6.5 **Accounting Records.** Trustor shall maintain adequate books and records in accordance with the same accounting standard used by Trustor to prepare the financial statements delivered to and approved by Lender in connection with the making of the Loan or other accounting standards approved by Lender. Trustor shall permit any representative of Lender, at any reasonable time and from time to time and at Lender's expense, to inspect, audit and examine such books and records and make copies of same.

6.6 **Costs, Expenses and Attorneys' Fees.** Trustor shall pay to Lender the full amount of all costs and expenses, including, without limitation, reasonable attorneys' fees and expenses of Lender's in-house or outside counsel, incurred by Lender in connection with:

(a) appraisals and inspections of the Property or Collateral, or inspection of Trustor's books and records, required by Lender as a result of (i) a "Transfer" or proposed "Transfer" (as defined below), (ii) in connection with any sale or securitization of the Loan, or (iii) a Default;

---

DOT (CA)
477049 (rev 03/27/13)

12

4018-4022 19th Street (Loan No. 3720003627)

(b)    any acts performed by Lender at Trustor's request or wholly or partially for the benefit of Trustor (including, without limitation, the preparation or review of amendments, assumptions, waivers, releases, reconveyances, estoppel certificates or statements of amounts owing under any Secured Obligation).

Trustor shall pay all costs and expenses arising under this section immediately upon demand by Lender together with interest thereon following notice of such indebtedness at the rate of interest then applicable to the principal balance of the Note as specified therein.

**6.7    No Other Debt; Liens, Encumbrances and Charges.**

(a)    Without obtaining Lender's prior written consent (which consent shall be granted or withheld in Lender's sole and absolute discretion and at Trustor's sole cost and expense), Trustor shall not incur any debt, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation) related to and/or secured by the Collateral, other than the Loan and trade debt incurred in the ordinary course of Trustor's business (with any such trade debt to be paid within sixty (60) days of the date such debt was incurred and, in any event, prior to delinquency). In addition, without obtaining Lender's prior written consent (which consent shall be granted or withheld in Lender's sole and absolute discretion and at Trustor's sole cost and expense), Trustor shall not permit the encumbrance, hypothecation or pledge of any of the membership interests of Trustor; and

(b)    Trustor shall immediately discharge by bonding or otherwise any lien, charge or other encumbrance which attaches to the Property in violation of Section 6.14.

Subject to Trustor's right to contest such matters under this Deed of Trust or as expressly permitted in the Loan Documents, Trustor shall pay when due all obligations secured by or reducible to liens and encumbrances which shall now or hereafter encumber or appear to encumber all or any part of the Property or any interest therein, whether senior or subordinate hereto, including, without limitation, all claims for work or labor performed, or materials or supplies furnished, in connection with any work of demolition, alteration, repair, improvement or construction of or upon the Property, except such as Trustor may in good faith contest or as to which a bona fide dispute may arise (provided provision is made to the satisfaction of Lender for eventual payment thereof in the event that Trustor is obligated to make such payment and that any recorded claim of lien, charge or other encumbrance against the Property is immediately discharged by bonding or otherwise).

**6.8    Taxes and Other Liabilities.** Trustor shall pay and discharge when due any and all indebtedness, obligations, assessments and taxes, both real and personal and including federal and state income taxes and state and local property taxes and assessments. Trustor shall promptly provide to Lender copies of all tax and assessment notices pertaining to the Property. Trustor hereby authorizes Lender to obtain, at Trustor's expense, a tax service contract which shall provide tax information on the Property to Lender for the term of the Loan and any extensions or renewals of the Loan.

**6.9    Insurance Coverage.** At all times throughout the term hereof, Trustor shall, at its sole cost and expense, maintain insurance, and shall pay, as the same becomes due and payable, all premiums in respect thereto, including, but not necessarily limited to:

**6.9.1    General Liability Insurance.** Trustor shall, at its expense, obtain and keep in force until full payment of the Loan a policy of commercial general liability insurance in an occurrence form providing for broad form property damage coverage, broad form contractual coverage, personal injury, bodily injury, and products and complete operations coverage, insuring Trustor under such insurance policy arising out of or in connection with the Property. Such insurance policy shall have (a) a combined single limit for both bodily injury or death in an amount not less than Two Million Dollars ($2,000,000.00), (b) a limit for both bodily injury or death in any one accident or occurrence or for property damage in an amount not less than One Million Dollars ($1,000,000.00), which amounts shall be increased from time to time as reasonably required by Lender. Such insurance policy and each portion

thereof shall be in a form acceptable to Lender in its discretion, shall be for an insured period of not less than one calendar year, and shall include a deductible of not more than $10,000.00 per occurrence or claim.

6.9.2  **Fire Insurance.** Trustor shall, at its expense, obtain and keep in force on all of the Improvements until full payment of the Loan a policy of standard "all risk" fire and extended coverage insurance, with vandalism and malicious mischief endorsements, to the extent of one hundred percent (100%) of full replacement value against "all risks of physical loss" including without limitation a replacement cost and code compliance coverage endorsement including boiler and machinery insurance coverage, heating, air conditioning equipment, and other equipment of such nature, and insurance against loss or damage to personal property owned by Trustor and located on the Property by fire and other hazards covered by such insurance (without any deductible clause unless in accordance with market terms). All such insurance shall be payable to Lender under an attached Lender's Loss Payable Endorsement (Form 438 BFUNS or equivalent). Such insurance policy and each portion thereof shall be in form acceptable to Lender in its discretion. Such policy shall, if required by Lender, contain an agreed value clause sufficient (as determined by Lender) to eliminate any risk of coinsurance.

6.9.3  **Business Interruption.** Business interruption insurance (extra expense/loss of income insurance) in an amount sufficient to cover any loss of income from the Property in an amount of not less than actual income loss for a period of twelve (12) months.

6.9.4  **Flood.** A policy or policies of flood insurance in the maximum amount of flood insurance available with respect to the Property under the Flood Disaster Protection Act of 1973, as amended. This requirement will be waived upon presentation of evidence satisfactory to Lender that no portion of the site is located within an area identified by the U.S. Department of Housing and Urban Development as having special flood hazards.

6.9.5  **Other.** All insurance required shall be procured and maintained in financially sound and generally recognized responsible insurance companies selected by the Trustor and subject to the approval of Lender. Such companies should be authorized to write such insurance in the State of California. The company issuing the policies shall be rated "B++" Class VII or better by A.M. Best Co., in Bests' Key guide, or such other rating as may be acceptable to Lender in Lender's sole discretion. All property policies evidencing the insurance required shall name Lender as first mortgagee and all liability policies evidencing the insurance required shall name Lender as an additional insured, shall not be cancelable as to the interests of Lender due to the acts of the Trustor, and shall provide for at least thirty (30) days prior written notice of the cancellation or modification thereof to Lender.

6.9.6  **Evidence.** All such policies of insurance, or certificates of insurance evidencing that such insurance is in full force and effect, shall be delivered to Lender on or before the date hereof (together with proof of the payment of the premiums thereof). At least thirty (30) days prior to the expiration of each such policy, Trustor shall furnish Lender evidence that such policy has been renewed or replaced in the form of a certificate reciting that there is in full force and effect, with a term covering at least the next succeeding calendar year, insurance hereof of the types and in the amounts required.

6.9.7  **Earthquake.** Lender, at Lender's election, may only require earthquake insurance if all or any portion of the Property is or becomes located in an earthquake fault zone.

Neither Lender nor Trustee, by reason of accepting, rejecting, approving or obtaining insurance shall incur any liability for:

(i)   the existence, nonexistence, form or legal sufficiency of any insurances;

(ii)  the solvency of any insurer; or

(iii)    the payment of claims.

If Trustor fails to maintain and deliver to Lender the original policies or certificates of insurance required by this Deed of Trust, upon ten (10) days' prior notice to Trustor, Lender may procure such insurance at Trustor's sole cost and expense upon demand by Lender. Trustor agrees to deliver to Lender promptly upon receipt, but in any event no later than thirty (30) days prior to the termination of any of such insurance policies, a renewal policy (or certificate of insurance evidencing the same) satisfying the requirements of this Deed of Trust.

6.10    Insurance and Condemnation Proceeds.

(a)    Assignment of Claims. Trustor absolutely and irrevocably assigns to Lender all of the following rights, claims and amounts (collectively, "Claims"), all of which shall be paid to Lender:

(i)    all awards of damages and all other compensation payable directly or indirectly by reason of a condemnation or proposed condemnation for public or private use affecting all or any part of, or any interest in, the Property;

(ii)    all other claims and awards for damages to or decrease in value of all or any part of, or any interest in, the Property;

(iii)    all proceeds of any insurance policies payable by reason of loss sustained to all or any part of the Property; and

(iv)    all interest which may accrue on any of the foregoing.

Trustor shall give Lender prompt written notice of the occurrence of any casualty affecting, or the institution of any proceedings for eminent domain or for the condemnation of, the Property or any portion thereof. So long as no Default has occurred and is continuing at the time, Trustor shall have the right to adjust, compromise and settle any Claim of $100,000 or less without the consent of Lender, provided, however, all awards, proceeds and other sums described herein shall continue to be payable to Lender. Lender may commence, appear in, defend or prosecute any Claim exceeding $100,000, and may adjust, compromise and settle all Claims (except for Claims which Trustor may settle as provided herein), but shall not be responsible for any failure to commence, appear in, defend, prosecute or collect any such Claim regardless of the cause of the failure. All awards, proceeds and other sums described herein shall be payable to Lender.

(b)    Application of Proceeds. Lender may, at Lender's absolute discretion and regardless of any impairment of security or lack of impairment of security, but subject to applicable law governing use of the Proceeds, if any, apply all or any of the Proceeds to Lender's expenses in settling, prosecuting or defending the Claims and then apply the balance to the Secured Obligations in any order without suspending, extending or reducing any obligation of Trustor to make installment payments, and may release all or any part of the Proceeds to Trustor upon any conditions Lender chooses.

6.11    Impounds.

(a)    Post-Default Impounds. If required by Lender at any time after a Default occurs (and regardless of whether such Default is thereafter cured), Trustor shall deposit with Lender such amounts ("Post-Default Impounds") on such dates (determined by Lender as provided below) as will be sufficient to pay any or all "Costs" (as defined below) specified by Lender. Lender in its sole discretion shall estimate the amount of such Costs that will be payable or required during any period selected by Lender not exceeding one year and shall determine the fractional portion thereof that Trustor shall deposit with Lender on each date specified by Lender during such period. If the Post-Default Impounds paid by Trustor are not sufficient to pay the related Costs, Trustor shall deposit with Lender upon demand an amount equal to the deficiency. All Post-Default Impounds shall be payable by Trustor in addition to (but without duplication of) any other "Impounds" (as defined below).

(b)   All Impounds. Post-Default impounds and any other impounds that may be payable by Trustor under the Note are collectively called "impounds". All impounds shall be deposited into an account maintained by Lender or its servicing agent, which may be a commingled account, and Lender shall not be entitled to interest thereon. Lender shall not be trustees, special depositories or other fiduciaries for Trustor with respect to such account, and the existence of such account shall not limit Lender's rights under this Deed of Trust, any other agreement or any provision of law. If no Default exists, Lender shall apply all impounds to the payment of the related Costs, or in Lender's sole discretion may release any or all impounds to Trustor for application to and payment of such Costs. If a Default exists, Lender may apply any or all impounds to any Secured Obligation and/or to cure such Default, whereupon Trustor shall restore all impounds so applied and cure all Defaults not cured by such application. The obligations of Trustor hereunder shall not be diminished by deposits of impounds made by Trustor, except to the extent that such obligations have actually been met by application of such impounds. Upon any assignment of this Deed of Trust, Lender may assign all impounds in its possession to Lender's assignee, whereupon Lender and Trustee shall be released from all liability with respect to such impounds. Within sixty (60) days following full repayment of the Secured Obligations (other than as a consequence of foreclosure or conveyance in lieu of foreclosure) or at such earlier time as Lender may elect, Lender shall pay to Trustor all impounds in its possession, and no other party shall have any right or claim thereto. "Costs" means (i) all taxes and other liabilities payable by Trustor under Section 6.8, (ii) all insurance premiums payable by Trustor under Section 6.9, (iii) all other costs and expenses for which impounds are required under the Note, and/or (iv) all other amounts that will be required to preserve the value of the Property. Trustor shall deliver to Lender, promptly upon receipt, all bills for Costs for which Lender has required Post-Default Impounds.

6.12   Defense and Notice of Losses, Claims and Actions. Trustor shall protect, preserve and defend the Property and title to and right of possession of the Property, the security of this Deed of Trust and the rights and powers of Lender and Trustee hereunder at Trustor's sole expense against all adverse claims, whether the claim (a) is against a possessory or non-possessory interest; (b) arose prior or subsequent to the Closing Date; or (c) is senior or junior to Trustor's or Lender's rights. Trustor shall give Lender and Trustee prompt notice in writing of the assertion of any claim, of the filing of any action or proceeding, of the occurrence of any damage to the Property and of any condemnation offer or action.

6.13   Right of Inspection. Lender and its independent contractors, agents and employees may enter the Property from time to time at any reasonable time for the purpose of inspecting the Property and ascertaining Trustor's compliance with the terms of this Deed of Trust. Lender shall use reasonable efforts to assure that Lender's entry upon and inspection of the Property shall not materially and unreasonably interfere with the business or operations of Trustor or Trustor's tenants on the Property.

6.14   Prohibition of Transfer of Property or Interests in Trustor. Trustor acknowledges that Lender has relied upon the principals of Trustor and their experience in owning and operating properties similar to the Property in connection with the closing of the Loan. Accordingly, except with the prior written consent of Lender or as otherwise expressly permitted in the Note, Trustor shall not cause or permit any sale, exchange, mortgage, pledge, hypothecation, assignment, encumbrance or other transfer, conveyance or disposition, whether voluntarily, involuntarily or by operation of law ("Transfer") of all or any part of, or all or any direct or indirect interest in, the Property or the Collateral (except for equipment and inventory in the ordinary course of its business), or cause or permit a Transfer of any direct or indirect interest (whether general or limited partnership interest, stock, limited liability company interest, trust, or otherwise) in Trustor. In the event of any Transfer that is not expressly permitted in the Note and is without the prior written consent of Lender, Lender shall have the absolute right at its option, without prior demand or notice, to declare all of the Secured Obligations immediately due and payable, except to the extent prohibited by law, and pursue its rights and remedies under Section 7.3 herein. Trustor agrees to pay any prepayment fee as set forth in the Note in the event the Secured Obligations are accelerated pursuant to the terms of this Section. Consent to one such Transfer shall not be deemed to be a waiver of the right to require the consent to future or successive Transfers.

191

**6.15    Acceptance of Trust; Powers and Duties of Trustee.** Trustee accepts this trust when this Deed of Trust is recorded. From time to time upon written request of Lender and presentation of this Deed of Trust, or a certified copy thereof, for endorsement, and without affecting the personal liability of any person for payment of any indebtedness or performance of any Secured Obligation, Trustee may, without liability therefor and without notice:

(a)    reconvey all or any part of the Property;

(b)    consent to the making of any map or plat of the Property;

(c)    join in granting any easement on the Property;

(d)    join in any declaration of covenants and restrictions; or

(e)    join in any extension agreement or any agreement subordinating the lien or charge of this Deed of Trust.

Nothing contained in the immediately preceding sentence shall be construed to limit, impair or otherwise affect the rights of Trustor in any respect. Except as may otherwise be required by applicable law, Trustee or Lender as nominee for Lender may from time to time apply to any court of competent jurisdiction for aid and direction in the execution of the trusts hereunder and the enforcement of the rights and remedies available hereunder, and Trustee or Lender as nominee for Lender may obtain orders or decrees directing or confirming or approving acts in the execution of said trusts and the enforcement of said remedies. Trustee has no obligation to notify any party of any pending sale or any action or proceeding (including, without limitation, actions in which Trustor, Lender or Trustee shall be a party) unless held or commenced and maintained by Trustee under this Deed of Trust. Trustee shall not be obligated to perform any act required of it hereunder unless the performance of the act is requested in writing and Trustee is reasonably indemnified and held harmless against loss, cost, liability and expense.

**6.16    Compensation of Trustee.** Trustor shall pay to Trustee reasonable compensation and reimbursement for services and expenses in the administration of this trust, including, without limitation, reasonable attorneys' fees and costs. Trustor shall pay all indebtedness arising under this section immediately upon demand by Trustee, Lender together with interest thereon from the date the indebtedness arises at the rate of interest then applicable to the principal balance of the Note as specified therein.

**6.17    Exculpation.** Lender shall not directly or indirectly, be liable to Trustor or any other person as a consequence of:

(a)    the exercise of the rights, remedies or powers granted to Lender in this Deed of Trust;

(b)    the failure or refusal of Lender to perform or discharge any obligation or liability of Trustor under any agreement related to the Property or under this Deed of Trust; or

(c)    any loss sustained by Trustor or any third party resulting from Lender's failure to lease the Property after a "Default" (hereafter defined) or from any other act or omission of Lender in managing the Property after a Default unless the loss is caused by the willful misconduct and bad faith of Lender, and no such liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Trustor.

**6.18    Indemnity.** Without in any way limiting any other indemnity contained in this Deed of Trust, Trustor agrees to defend, indemnify and hold harmless Trustee and the "Lender Group" (as defined below) from and against any claim, loss, damage, cost, expense or liability directly or indirectly arising out of:

(a)    the making of the Loan, except for violations of banking laws or regulations by the Lender Group;

(b)    this Deed of Trust;

(c)    the execution of this Deed of Trust or the performance of any act required or permitted hereunder or by law;

(d)    any failure of Trustor to perform Trustor's obligations under this Deed of Trust or the other Loan Documents;

(e)    any alleged obligation or undertaking on the Lender Group's part to perform or discharge any of the representations, warranties, conditions, covenants or other obligations contained in any other document related to the Property;

(f)    any act or omission by Trustor or any contractor, agent, employee or representative of Trustor with respect to the Property; or

(g)    any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion, that Lender may incur, directly or indirectly, as a result of a Default under Sections 5.1(q) or 6.2.

The foregoing to the contrary notwithstanding, this indemnity shall not include any claim, loss, damage, cost, expense or liability directly or indirectly arising out of the gross negligence or willful misconduct of any member of the Lender Group or Trustee, or any claim, loss, damage, cost, expense or liability incurred by the Lender Group or Trustee arising from any act or incident on the Property occurring after the full reconveyance and release of the lien of this Deed of Trust on the Property. This indemnity shall include, without limitation:

(h)    all consequential damages (including, without limitation, any third-party tort claims or governmental claims, fines or penalties against Trustee or the Lender Group); and

(i)    all court costs and reasonable attorneys' fees (including, without limitation, expert witness fees) paid or incurred by Trustee or the Lender Group.    "Lender Group", as used herein, shall mean:

(i)    Lender (including, without limitation, Lender and any participant in the Loan),

(ii)    any entity controlling, controlled by or under common control with Lender,

(iii)    the directors, officers, employees and agents of Lender and such other entities, and

(iv)    the successors, heirs and assigns of the entities and persons described in foregoing clauses (i) through (iii).

Trustor shall pay immediately upon Trustee's or Lender's demand any amounts owing under this indemnity together with interest from the date the indebtedness arises until paid at the rate of interest applicable to the principal balance of the Note as specified therein.    Trustor agrees to use legal counsel reasonably acceptable to Trustee and the Lender Group in any action or proceeding arising under this indemnity.    THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION AND RECONVEYANCE OF THIS DEED OF TRUST, BUT TRUSTOR'S LIABILITY UNDER THIS INDEMNITY

SHALL BE SUBJECT TO THE PROVISIONS OF THE SECTION, IF ANY, IN THE NOTE ENTITLED "BORROWER'S LIABILITY."

6.19    Substitution of Trustee. From time to time, by a writing signed and acknowledged by Lender and recorded in the Office of the Recorder of the County in which the Property is situated, Lender may appoint another trustee to act in the place and stead of Trustee or any successor. Such writing shall set forth any information required by law. The recordation of such instrument of substitution shall discharge Trustee herein named and shall appoint the new trustee as the trustee hereunder with the same effect as if originally named trustee herein. A writing recorded pursuant to the provisions of this section shall be conclusive proof of the proper substitution of such new trustee.

6.20    Releases, Extensions, Modifications and Additional Security. Without notice to or the consent, approval or agreement of any persons or entities having any interest at any time in the Property or in any manner obligated under the Secured Obligations ("Interested Parties"), Lender may, from time to time:

(a)    fully or partially release any person or entity from liability for the payment or performance of any Secured Obligation;

(b)    extend the maturity of any Secured Obligation;

(c)    make any agreement with Trustor increasing the amount or otherwise altering the terms of any Secured Obligation;

(d)    accept additional security for any Secured Obligation; or

(e)    release all or any portion of the Property, Collateral and other security for any Secured Obligation.

None of the foregoing actions shall release or reduce the personal liability of any of said Interested Parties, or release or impair the priority of the lien of this Deed of Trust upon the Property.

6.21    Sale or Participation of Loan. Trustor agrees that Lender may at any time sell, assign, participate or securitize all or any portion of Lender's rights and obligations under the Loan Documents, and that any such sale, assignment, participation or securitization may be to one or more financial institutions or other entities, to private investors, and/or into the public securities market, in Lender's sole discretion. Trustor further agrees that Lender may disseminate to any such actual or potential purchasers, assignees or participants all documents and financial and other information heretofore or hereafter provided to or known to Lender with respect to (a) the Property and its operation; and/or (b) any party connected with the Loan (including, without limitation, Trustor, any partner or member of Trustor, any constituent partner or member of Trustor, any guarantor and any nonborrower Trustor).

In the event of any such sale, assignment, participation or securitization, Lender and the other parties to the same shall share in the rights and obligations of Lender set forth in the Loan Documents as and to the extent they shall agree among themselves. In connection with any such sale, assignment, participation or securitization, Trustor further agrees that the Loan Documents shall be sufficient evidence of the obligations of Trustor to each purchaser, assignee or participant, and Trustor shall, within fifteen (15) days after request by Lender, deliver an estoppel certificate verifying for the benefit of Lender and any other party designated by Lender the status and the terms and provisions of the Loan in form and substance acceptable to Lender, and enter into such amendments or modifications to the Loan Documents as may be reasonably required in order to facilitate any such sale, assignment, participation or securitization without impairing Trustor's rights or increasing Trustor's obligations. The indemnity obligations of Trustor under the Loan Documents shall also apply with respect to any purchaser, assignee or participant.

194

6.22    Reconveyance.    Upon Lender's written request, and upon surrender of this Deed of Trust or certified copy thereof and any note, instrument or instruments setting forth all obligations secured hereby to Trustee for cancellation, Trustee shall reconvey, without warranty, the Property or that portion thereof then held hereunder.    The recitals of any matters or facts in any reconveyance executed hereunder shall be conclusive proof of the truthfulness thereof.    To the extent permitted by law, the reconveyance may describe the Lender as "the person or persons legally entitled thereto".    Neither Lender nor Trustee shall have any duty to determine the rights of persons claiming to be rightful Lenders of any reconveyance.    When the Property has been fully reconveyed, the last such reconveyance shall operate as a reassignment of all future rents, issues and profits of the Property to the person or persons legally entitled thereto.

6.23    Subrogation.    Lender shall be subrogated to the lien of all encumbrances, whether released of record or not, paid in whole or in part by Lender pursuant to this Deed of Trust or by the proceeds of any loan secured by this Deed of Trust.

6.24    No Residence.    Trustor shall not occupy any portion of the Property as its principal residence and hereby waives the right to claim the Property as its principal residence.

## ARTICLE 7
## DEFAULT

7.1    Default.    For all purposes hereof, "Default" shall mean either an "Optional Default" (as defined below) or an "Automatic Default" (as defined below).

(a)    Optional Default.    An "Optional Default" shall occur, at Lender's option, upon the occurrence of any of the following events:

(i)    Monetary.    Borrower shall fail to:

(A)    pay when due any sums which by their express terms require immediate payment without any grace period or sums which are payable on the "Maturity Date" (as defined in the Note), or

(B)    pay within five (5) days when due any other sums payable under the Note, this Deed of Trust or any of the other Loan Documents, including, without limitation, any monthly payment due under the Note.

(ii)    Failure To Perform.    Borrower shall fail to observe, perform or discharge any of Borrower's obligations, covenants, conditions or agreements, other than Borrower's payment obligations, under the Note, this Deed of Trust or any of the other Loan Documents, and

(A)    such failure shall remain uncured for thirty (30) days after written notice thereof shall have been given to Borrower, as the case may be, by Lender or

(B)    if such failure is of such a nature that it cannot be cured within such 30-day period, Borrower shall fail to commence to cure such failure within such 30-day period or shall fail to diligently prosecute such curative action thereafter or shall fail to cure such default within ninety (90) days after written notice thereof was first given to Borrower.

(iii)    Representations and Warranties.    Any representation, warranty, certificate or other statement (financial or otherwise) made or furnished by or on behalf of Borrower, Borrower, or a guarantor, if any, to Lender in connection with any of the Loan Documents, or as an inducement to Lender to make the Loan, shall be false, incorrect, incomplete or misleading in any material respect when made or furnished.

(iv)    **Condemnation, Attachment.** The condemnation, seizure or appropriation of any material portion (as reasonably determined by Lender) of the Property, or the sequestration or attachment of, or levy or execution upon any of the Property, the Collateral or any other collateral provided by Borrower or Borrower under any of the Loan Documents, or any material portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released or dismissed within forty-five (45) days after its occurrence, or the sale of any assets affected by any of the foregoing.

(v)    **Uninsured Casualty.** The occurrence of an uninsured casualty with respect to any material portion (as reasonably determined by Lender) of the Property unless:

(A)    no other Default has occurred and is continuing at the time of such casualty or occurs thereafter;

(B)    Trustor promptly notifies Lender of the occurrence of such casualty; and

(C)    not more than forty-five (45) days after the occurrence of such casualty, Trustor delivers to Lender immediately available funds ("Restoration Funds") in an amount sufficient, in Lender's reasonable opinion, to pay all costs of the repair or restoration (including, without limitation, taxes, financing charges, insurance and rent during the repair period).

So long as no Default has occurred and is continuing at the time of Lender's receipt of the Restoration Funds and no Default occurs thereafter, Lender shall make the Restoration Funds available for the repair or restoration of the Property. Notwithstanding the foregoing, Lender shall have no obligation to make any Restoration Funds available for repair or restoration of the Property unless and until all the conditions set forth in clauses (ii) and (iii) of the second sentence of Section 6.10(b) of this Deed of Trust have been satisfied. Trustor acknowledges that the specific conditions described above are reasonable.

(vi)    **Key-Person or Entity.** The retirement, death, incapacity or withdrawal of ANNE KIHAGI as MANAGER OF THE BORROWER, and Trustor's failure to provide a substitute or replacement acceptable to Lender within sixty (60) days after the occurrence of any such event.

(b)    **Automatic Default.** An "Automatic Default" shall occur automatically upon the occurrence of any of the following events:

(i)    **Voluntary Bankruptcy, Insolvency, Dissolution.**

(A)    Borrower's filing a petition for relief under the Bankruptcy Reform Act of 1978, as amended or recodified ("**Bankruptcy Code**"), or under any other present or future state or federal law regarding bankruptcy, reorganization or other relief to debtors (collectively, "**Debtor Relief Law**"); or

(B)    Borrower's filing any pleading in any involuntary proceeding under the Bankruptcy Code or other Debtor Relief Law which admits the jurisdiction of a court to regulate Borrower or the Property or the petition's material allegations regarding Borrower's insolvency; or

(C)    Borrower's making a general assignment for the benefit of creditors; or

(D)    Borrower's applying for, or the appointment of, a receiver, trustee, custodian or liquidator of Borrower or any of its property; or

(E)    the filing by or against Borrower of a petition seeking the liquidation or dissolution of Borrower or the commencement of any other procedure to liquidate or dissolve Borrower.

(ii)    **Involuntary Bankruptcy.** Borrower's failure to effect a full dismissal of any involuntary petition under the Bankruptcy Code or other Debtor Relief Law that is filed against Borrower or in any way restrains or limits Borrower, Lender regarding the Loan or the Property, prior to the earlier of the entry of any order granting relief sought in the involuntary petition or forty-five (45) days after the date of filing of the petition.

(iii)    **Partners, Guarantors.** The occurrence of an event specified in sections (i) or (ii) as to Borrower, any general partner of Borrower, or any guarantor or other person or entity in any manner obligated to Lender under the Loan Documents.

7.2    **Acceleration.** Upon the occurrence of an Optional Default, Lender may, at its option, declare all sums owing to Lender under the Note and the other Loan Documents immediately due and payable. Upon the occurrence of an Automatic Default, all sums owing to Lender under the Note and the other Loan Documents shall automatically become immediately due and payable.

7.3    **Rights and Remedies.** In addition to the rights and remedies in Section 7.2 above, at any time after a Default, Lender and Trustee shall each have all of the following rights and remedies:

(a)    **Entry on Property.** With or without notice, and without releasing Borrower from any Secured Obligation, and without becoming a mortgagee in possession, to enter upon the Property from time to time and to do such acts and things as Lender or Trustee deem necessary or desirable in order to inspect, investigate, assess and protect the security hereof or to cure any Default, including, without limitation:

(i)    to take and possess all documents, books, records, papers and accounts of Borrower, Borrower or the then owner of the Property which relate to the Property;

(ii)    to make, terminate, enforce or modify leases of the Property upon such terms and conditions as Lender deems proper;

(iii)    to make repairs, alterations and improvements to the Property, necessary, in Trustee's or Lender's sole judgment, to protect or enhance the security hereof;

(iv)    to appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Lender or Trustee hereunder;

(v)    to pay, purchase, contest or compromise any encumbrance, charge, lien or claim of lien which, in the sole judgment of either Lender or Trustee, is or may be senior in priority hereto, the judgment of Lender or Trustee being conclusive, as between the parties hereto;

(vi)    to obtain insurance;

(vii)    to pay any premiums or charges with respect to insurance required to be carried hereunder; and/or

(viii)    to employ legal counsel, accountants, engineers, consultants, contractors and other appropriate persons to assist them;

(b)    **Appointment of Receiver.** To apply for and obtain, without regard to the adequacy of any security for the Obligations or the solvency of the Borrower or any other person or entity,

a receiver by any court of competent jurisdiction to take charge of all the Property, to manage, operate and carry on any business then being conducted or that could be conducted on the Property, to carry on, protect, preserve, replace and repair the Property, and receive and collect all rents and revenues and to apply the same to pay the receiver's expenses for the operation of the Trust Property and then payment of

    (i)    all taxes and assessments levied against the Property,

    (ii)    all amounts due and owing under the Obligations, and

    (iii)    current operating costs and expenses, in the order set forth herein.

Upon appointment of said receiver, Trustor shall immediately deliver possession of all of the Property to such receiver. Neither the appointment of a receiver for the Property by any court at the request of Lender or by agreement with Trustor nor the entering into possession of all or any part of the Property by such receiver shall constitute Lender a "mortgagee in possession" or otherwise make Lender responsible or liable in any manner with respect to the Property or the occupancy, operation or use thereof. Trustor agrees that Lender shall have the absolute and unconditional right to the appointment of a receiver in any independent and/or separate action brought by Lender regardless of whether Lender seeks any relief in such action other than the appointment of a receiver. In that respect, Trustor waives any express or implied requirement under applicable law that a receiver may be appointed only ancillary to other judicial or non-judicial relief. Trustor expressly waives any rights it may otherwise have under applicable law to require Lender to make any showing or establish any fact prior to the appointment of a receiver;

    (c)    **Judicial Foreclosure, Injunction.** To commence and maintain an action or actions in any court of competent jurisdiction to foreclose this instrument as a mortgage or to obtain specific enforcement of the covenants of Trustor hereunder, and Trustor agrees that such covenants shall be specifically enforceable by injunction or any other appropriate equitable remedy and that for the purposes of any suit brought under this subparagraph, Trustor waives the defense of laches and any applicable statute of limitations;

    (d)    **Nonjudicial Foreclosure.** To execute a written notice of such Default and of the election to cause the Property to be sold to satisfy the Secured Obligations. Trustee shall give and record such notice as the law then requires as a condition precedent to a trustee's sale. When the minimum period of time required by law after such notice has elapsed, Trustee, without notice to or demand upon Trustor except as required by law, shall sell the Property at the time and place of sale fixed by it in the notice of sale, at one or several sales, either as a whole or in separate parcels and in such manner and order, all as Lender in its sole discretion may determine, at public auction to the highest bidder for cash, in lawful money of the United States, payable at time of sale. Neither Trustor nor any other person or entity other than Lender shall have the right to direct the order in which the Property is sold. Subject to requirements and limits imposed by law, Trustee may, from time to time postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time may postpone the sale by public announcement at the time and place fixed by the preceding postponement. A sale of less than the whole of the Property or any defective or irregular sale made hereunder shall not exhaust the power of sale provided for herein. Trustee shall deliver to the purchaser at such sale a deed conveying the Property or portion thereof so sold, but without any covenant or warranty, express or implied. The recitals in the deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustee, Trustor or Lender may purchase at the sale;

Upon sale of the Property at any judicial or nonjudicial foreclosure, Lender may credit bid (as determined by Lender in its sole and absolute discretion) all or any portion of the Secured Obligations. In determining such credit bid, Lender may, but is not obligated to, take into account all or any of the following:

    (i)    appraisals of the Property as such appraisals may be discounted or adjusted by Lender in its sole and absolute underwriting discretion;

(ii)    expenses and costs incurred by Lender with respect to the Property prior to foreclosure;

(iii)    expenses and costs which Lender anticipates will be incurred with respect to the Property after foreclosure, but prior to resale, including, without limitation, costs of property inspections, structural reports and other due diligence, costs to carry the Property prior to resale, costs of resale (e.g., commissions, attorneys' fees, and taxes), costs of deferred maintenance, repair, refurbishment and retrofit, costs of defending or settling litigation affecting the Property, and lost opportunity costs (if any), including the time value of money during any anticipated holding period by Lender;

(iv)    declining trends in real property values generally and with respect to properties similar to the Property;

(v)    anticipated discounts upon resale of the Property as a distressed or foreclosed property;

(vi)    the fact of additional collateral (if any), for the Secured Obligations; and

(vii)    such other factors or matters that Lender (in its sole and absolute discretion) deems appropriate.

In regard to the above, Trustor acknowledges and agrees that:

(viii)    Lender is not required to use any or all of the foregoing factors to determine the amount of its credit bid;

(ix)    this paragraph does not impose upon Lender any additional obligations that are not imposed by law at the time the credit bid is made;

(x)    the amount of Lender's credit bid need not have any relation to any loan-to-value ratios specified in the Loan Documents or previously discussed between Trustor and Lender; and

(xi)    Lender's credit bid may be (at Lender's sole and absolute discretion) higher or lower than any appraised value of the Property;

(e)    **Multiple Foreclosures.**    To resort to and realize upon the security hereunder and any other security now or later held by Lender concurrently or successively and in one or several consolidated or independent judicial actions or lawfully taken nonjudicial proceedings, or both, and to apply the proceeds received upon the Secured Obligations all in such order and manner as Trustee and Lender or either of them determine in their sole discretion and in accordance with the statute then in effect;

(f)    **Rights to Collateral.**    To exercise all rights Trustee or Lender may have with respect to the Collateral under this Deed of Trust, the UCC or otherwise at law; and

(g)    **Other Rights.**    To exercise such other rights as Trustee or Lender may have at law or in equity or pursuant to the terms and conditions of this Deed of Trust or any of the other Loan Documents.

In connection with any sale or sales hereunder, Lender may elect to treat any of the Property which consists of a right in action or which is property that can be severed from the Property (including, without limitation, any improvements forming a part thereof) without causing structural damage thereto as if the same were personal property or a fixture, as the case may be, and dispose of the same in accordance

with applicable law, separate and apart from the sale of the Property. Any sale of Collateral hereunder shall be conducted in any manner permitted by the UCC.

7.4    **Application of Foreclosure Sale Proceeds.**  If any foreclosure sale is effected, Trustee shall apply the proceeds of such sale in the following order of priority: First, to the costs, fees and expenses of exercising the power of sale and of the sale, including, without limitation, the payment of the Trustee's fees and attorneys' fees permitted pursuant to subdivision (b) of California Civil Code Section 2924d and subdivision (b) of Section 2924k; Second, to the payment of the Secured Obligations which are secured by this Deed of Trust, in such order as Lender shall determine in its sole discretion; Third, to satisfy the outstanding balance of obligations secured by any junior liens or encumbrances in the order of their priority; and Fourth, to the Trustor or the Trustor's successor in interest, or in the event the Property has been sold or transferred to another, to the vested owner of record at the time of the Trustee's sale.

7.5    **Waiver of Marshaling Rights.**  Trustor, for itself and for all parties claiming through or under Trustor, and for all parties who may acquire a lien on or interest in the Property, hereby waives all rights to have the Property and/or any other property, including, without limitation, the Collateral, which is now or later may be security for any Secured Obligation, marshaled upon any foreclosure of this Deed of Trust or on a foreclosure of any other security for any of the Secured Obligations.

7.6    **No Cure or Waiver.**  Neither Lender's nor Trustee's nor any receiver's entry upon and taking possession of all or any part of the Property, nor any collection of rents, issues, profits, insurance proceeds, condemnation proceeds or damages, other security or proceeds of other security, or other sums, nor the application of any collected sum to any Secured Obligation, nor the exercise of any other right or remedy by Lender or Trustee or any receiver shall cure or waive any Default or notice of default under this Deed of Trust, or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid or performed and Borrower has cured all other Defaults hereunder), or impair the status of the security, or prejudice Lender or Trustee in the exercise of any right or remedy, or be construed as an affirmation by Lender of any tenancy, lease or option or a subordination of the lien of this Deed of Trust.

7.7    **Payment of Costs, Expenses and Attorneys' Fees.**  Trustor agrees to pay to Lender immediately and upon demand all costs and expenses incurred by Trustee and Lender in the enforcement of the terms and conditions of this Deed of Trust (including, without limitation, statutory trustee's fees, court costs and attorneys' fees, whether incurred in litigation or not) with interest from the date of expenditure until said sums have been paid at the rate of interest applicable to the principal balance of the Note as specified therein.

7.8    **Power to File Notices and Cure Defaults.**  Trustor hereby irrevocably appoints Lender and its successors and assigns, as its attorney-in-fact, which power of attorney is coupled with an interest, to perform any obligation of Trustor hereunder upon the occurrence of an event, act or omission which, with notice or passage of time or both, would constitute a Default, provided, however, that (i) Lender as such attorney-in-fact shall only be accountable for such funds as are actually received by Lender; and (ii) Lender shall not be liable to Trustor or any other person or entity for any failure to act under this section.

7.9    **Remedies Cumulative.**  All rights and remedies of Lender and Trustee provided hereunder are cumulative and are in addition to all rights and remedies provided by applicable law (including specifically that a foreclosure of this instrument as though it were a mortgage) or in any other agreements between Trustor and Lender. Lender may enforce any one or more remedies or rights hereunder successively or concurrently.

7.10    **Expenses During Redemption Period.**  If this Deed of Trust is foreclosed as a mortgage and the Property is sold at a foreclosure sale, the purchaser may, during any redemption period allowed, make such repairs or alterations of the Property as may be reasonably necessary for the proper operation, care, preservation, protection and insuring thereof. Any sums so paid, together with interest

200

thereon from the time of such expenditure at the lesser of the default rate under the Note, or the maximum rate permitted by law, shall be added to and become part of the amount required to be paid for redemption from such sale.

**7.11    Waiver of Appraisement, Valuation, One Action Rule.** Trustor hereby waives, to the full extent that it may lawfully do so, the benefit of all appraisement, valuation, stay and extension laws now or hereafter in force and all rights of marshalling of assets in the event of any sale of the Trust Property, any part thereof or any interest therein, and any court having jurisdiction to foreclose the lien hereof may sell the Trust Property (real or personal, or both) as an entirety or in such parcels, lots, manner or order as Lender, in its sole discretion, may elect. Trustor waives and agrees not to assert any right to require Lender to proceed against any guarantor, to proceed against or exhaust any other security for the obligations secured hereby, to pursue any other remedy available to Lender, or to pursue any remedy in any particular order or manner.

## ARTICLE 8
## MISCELLANEOUS PROVISIONS

**8.1    Additional Provisions.** The Loan Documents contain or incorporate by reference the entire agreement of the parties with respect to matters contemplated herein and supersede all prior negotiations. The Loan Documents grant further rights to Lender and contain further agreements and affirmative and negative covenants by Trustor which apply to this Deed of Trust and to the Property and such further rights and agreements are incorporated herein by this reference. THE OBLIGATIONS AND LIABILITIES OF TRUSTOR UNDER THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS ARE SUBJECT TO THE PROVISIONS OF THE SECTION, IF ANY, IN THE NOTE ENTITLED "BORROWER'S LIABILITY."

**8.2    Non-Waiver.** By accepting payment of any amount secured hereby after its due date or late performance of any other Secured Obligation, Lender shall not waive its right against any person obligated directly or indirectly hereunder or on any Secured Obligation, either to require prompt payment or performance when due of all other sums and obligations so secured or to declare default for failure to make such prompt payment or performance. No exercise of any right or remedy by Lender or Trustee hereunder shall constitute a waiver of any other right or remedy herein contained or provided by law. No failure by Lender or Trustee to exercise any right or remedy hereunder arising upon any Default shall be construed to prejudice Lender's or Trustee's rights or remedies upon the occurrence of any other or subsequent Default. No delay by Lender or Trustee in exercising any such right or remedy shall be construed to preclude Lender or Trustee from the exercise thereof at any time while that Default is continuing. No notice to nor demand on Trustor shall of itself entitle Trustor to any other or further notice or demand in similar or other circumstances.

**8.3    Consents and Approvals.** Wherever Lender's consent, approval, acceptance or satisfaction is required under any provision of this Deed of Trust or any of the other Loan Documents, such consent, approval, acceptance or satisfaction shall not be unreasonably withheld, conditioned or delayed by Lender unless such provision expressly so provides.

**8.4    Permitted Contests.** After prior written notice to Lender, Trustor may contest, by appropriate legal or other proceedings conducted in good faith and with due diligence, the amount, validity or application, in whole or in part, of any lien, levy, tax or assessment, or any lien of any laborer, mechanic, materialman, supplier or vendor, or the application to Trustor or the Property of any law or the validity thereof, the assertion or imposition of which, or the failure to pay when due, would constitute a Default; provided that

(a)    Trustor pursues the contest diligently, in a manner which Lender determines is not prejudicial to Lender, and does not impair the lien of this Deed of Trust;

(b)    the Property, or any part hereof or estate or interest therein, shall not be in any danger of being sold, forfeited or lost by reason of such proceedings;

(c)    in the case of the contest of any law or other legal requirement, Lender shall not be in any danger of any civil or criminal liability; and

(d)    if required by Lender, Trustor deposits with Lender any funds or other forms of assurance (including a bond or letter of credit) satisfactory to Lender to protect Lender from the consequences of the contest being unsuccessful.

Trustor's right to contest pursuant to the terms of this provision shall in no way relieve Trustor of its obligations under the Loan or to make payments to Lender as and when due.

8.5    **Further Assurances.**  Trustor shall, upon demand by Lender or Trustee, execute, acknowledge (if appropriate) and deliver any and all documents and instruments and do or cause to be done all further acts reasonably necessary or appropriate to effectuate the provisions hereof.

8.6    **Attorneys' Fees.**  In the event it is necessary for Lender to retain the services of an attorney or any other party to enforce or to commence any legal action to enforce the terms of this Note, Deed of Trust, or any of the other Loan Documents, or any portion hereof or thereof, Trustor agrees to pay to Lender, in addition to damages or other relief, any and all costs and expenses, including, without limitation, expert witness fees and reasonable attorneys' fees and costs incurred by Lender as a result thereof.

8.7    **Trustor and Lender Defined.**  The term "Trustor" includes both the original Trustor and any subsequent owner or owners of any of the Property, and the term "Lender" includes the original Lender and any future owner or holder, including assignees, pledges and participants, of the Note or any interest therein.

8.8    **Disclaimers.**

(a)    **Relationship of Parties.**  Notwithstanding any other provisions of this Deed of Trust and the other Loan Documents:

(i)    Lender is not, and shall not be construed to be, a partner, joint venturer, member, alter ego, manager, controlling person or other business associate or participant of any kind of Trustor, and Lender does not intend to ever assume such status;

(ii)    Lender does not intend to ever assume any responsibility to any person for the quality, suitability, safety or condition of the Property; and

(iii)    Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Trustor.

(b)    **No Liability.**  Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any person or property arising from any construction on, or occupancy or use of, the Property, whether caused by or arising from:

(i)    any defect in any building, structure, grading, fill, landscaping or other improvements thereon or in any on-site or off-site improvement or other facility therein or thereon;

(ii)    any act or omission of Borrower or any of Borrower's agents, employees, independent contractors, licensees or invitees;

(iii)    any accident in or on the Property or any fire, flood or other casualty or hazard thereon;

DOT (CA)    4018-4022 19th Street (Loan No. 3720003627)
477049 (rev 03/27/13)

(iv)    the failure of Borrower or any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain the Property in a safe condition; or

(v)    any nuisance made or suffered on any part of the Property.

8.9    **Severability.** If any term of this Deed of Trust, or the application thereof to any person or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Deed of Trust, or the application of such term to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term of this Deed of Trust shall be valid and enforceable to the fullest extent permitted by law.

8.10    **Relationship of Articles.** The rights, remedies and interests of Lender under the deed of trust established by Article 1 and the security agreement established by Article 4 are independent and cumulative, and there shall be no merger of any lien created by the deed of trust with any security interest created by the security agreement. Lender may elect to exercise or enforce any of its rights, remedies or interests under either or both the deed of trust or the security agreement as Lender may from time to time deem appropriate. The absolute assignment of rents and leases established by Article 3 is similarly independent of and separate from the deed of trust and the security agreement.

8.11    **Merger.** No merger shall occur as a result of Lender's acquiring any other estate in, or any other lien on, the Property unless Lender consents to a merger in writing.

8.12    **Obligations of Trustor, Joint and Several.** If more than one person has executed this Deed of Trust as "Trustor", the obligations of all such persons hereunder shall be joint and several.

8.13    **Separate and Community Property.** Any married person who executes this Deed of Trust as a Trustor agrees that any money judgment which Lender or Trustee obtains pursuant to the terms of this Deed of Trust or any other obligation of that married person secured by this Deed of Trust may be collected by execution upon any separate property or community property of that person.

8.14    **Integration; Interpretation.** The Loan Documents contain or expressly incorporate by reference the entire agreement of the parties with respect to the matters contemplated therein and supersede all prior negotiations or agreements, written or oral. The Loan Documents shall not be modified except by written instrument executed by all parties. Any reference in any of the Loan Documents to the Property or Collateral shall include all or any part of the Property or Collateral. Any reference to the Loan Documents includes any amendments, renewals or extensions now or hereafter approved by Lender in writing. When the identity of the parties or other circumstances make it appropriate, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

8.15    **Capitalized Terms.** Capitalized terms not otherwise defined herein shall have the meanings set forth in the Note.

8.16    **Successors in Interest.** The terms, covenants, and conditions herein contained shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties hereto. The foregoing sentence shall not be construed to permit Trustor to assign the Loan except as otherwise permitted under the Note or the other Loan Documents.

8.17    **Governing Law.** Trustor agrees, as provided below, the Loan Documents shall be governed by, and shall be construed and enforced in accordance with, the internal laws of the state in which the Property is located (without regard to conflicts of laws principles) as to interpretation, enforcement, validity, construction, effect and in all other respects (except as provided below). Trustor hereby:

(a)  consents and submits to the jurisdiction of any local, state or federal court located within the state in which the Property is located, and hereby irrevocably agrees that, subject to Beneficiary's election, all actions or proceedings in any way, manner or respect arising out of, from or relating to the Loan Documents, shall be litigated in such courts;

(b)  accepts, generally and unconditionally, the nonexclusive jurisdiction of such courts, waives any defenses of forum non conveniens, and irrevocably agrees to be bound by any final, nonappealable judgment rendered thereby in connection with any of the Loan Documents;

(c)  with respect to the foregoing choice of law, agrees that the state in which the Property is located has a substantial relationship to the parties, to the Loan and to the transactions evidenced by the Loan Documents; and

(d)  in all respects (including without limitation matters of construction, validity and performance), agrees that the Loan Documents and the obligations arising thereunder shall be governed by, and construed in accordance with, the laws of the state in which the Property is located applicable to contracts made and performed in such state and any applicable law of the United States of America; in addition, and not by way of limitation:

(i)  enforcement of the real property liens created pursuant to the Loan Documents on that portion of the collateral at any time securing payment of the loan which is subject to statutory real property and foreclosure laws and rules shall be governed by and construed according to the law(s) of the state(s) in which the applicable portion of such collateral is located;

(ii)  enforcement of the liens created pursuant to the Loan Documents on that portion of the collateral at any time securing payment of the loan which is not subject to the Uniform Commercial Code shall be governed by and construed according to the law(s) of the state(s) in which the applicable portion of such collateral is located; and

(iii)  enforcement of the liens and security interests created pursuant to the Loan Documents on that portion of the collateral at any time securing payment of the loan which is subject to the Uniform Commercial Code shall be governed and construed by the laws of the state in which the Property is located, but the provisions for the perfection of such liens shall be governed by and construed according to the laws of the state whose law is designated as the governing law pursuant to the Uniform Commercial Code of the state in which the Property is located;

it being understood that, to the fullest extent permitted by law, the laws of the state in which the Property is located shall govern the validity and the enforceability of the Loan Documents and the indebtedness and obligations arising thereunder. Trustor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

8.18  **Consent to Jurisdiction.**  Trustor irrevocably submits to the jurisdiction of: (a) any state or federal court sitting in the State of California over any suit, action, or proceeding, brought by Trustor against Lender, arising out of or relating to this Deed of Trust, the Note or the Loan; (b) any state or federal court sitting in the state where the Property is located or the state in which Trustor's principal place of business is located over any suit, action or proceeding, brought by Lender against Trustor, arising out of or relating to this Deed of Trust, the Note or the Loan; and (c) any state court sitting in the county of the state where the Property is located over any suit, action, or proceeding, brought by Lender to exercise its STATUTORY POWER OF SALE under this Deed of Trust or any action brought by Lender to enforce its rights with respect to the Collateral. Trustor irrevocably waives, to the fullest extent permitted by law, any objection that Trustor may now or hereafter have to the laying of venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

8.19    Exhibits. Exhibit "A" is incorporated into this Deed of Trust by this reference.

8.20    Addresses; Request for Notice. All notices and other communications that are required or permitted to be given to a party under this Deed of Trust shall be in writing, refer to the Loan number, and shall be sent to such party, either by personal delivery, by overnight delivery service, or by certified first-class mail, return receipt requested, to the addressee set forth below. All such notices and communications shall be effective upon receipt of such delivery or facsimile transmission. The addresses of the parties are set forth as follows:

| | |
|---|---|
| Name and Address of Trustor: | XELAN PROP 1, LLC<br>P.O. BOX 691889<br>LOS ANGELES, California 90069<br>Attention: Anne Kihagi |
| Name and Address of Lender: | STERLING BANK<br>P.O. Box 2131<br>Spokane, Washington 99201<br>Attention: Commercial Loan Support |
| With a copy to: | STERLING BANK<br>111 N. Wall Street<br>Spokane, Washington 99201<br>Attention: Legal Department |
| Name and Address of Trustee: | UPF INCORPORATED<br>910 West Boone Avenue<br>Spokane, Washington 99201<br>Attention: Mortgage Servicing Department |

Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by giving thirty (30) days' notice to the other parties in the manner set forth above.

8.21    Counterparts. This Deed of Trust may be executed in any number of counterparts, each of which, when executed and delivered, will be deemed an original and all of which taken together, will be deemed to be one and the same instrument.

8.22    DISPUTE RESOLUTION.    THIS SECTION CONTAINS A JURY WAIVER, ARBITRATION CLAUSE, AND A CLASS ACTION WAIVER. READ IT CAREFULLY.

(a)    Jury Trial Waiver. As permitted by applicable law, each party waives their respective rights to a trial before a jury in connection with any "Dispute" (as defined below), and Disputes shall be resolved by a judge sitting without a jury. If a court determines that this provision is not enforceable for any reason and at any time prior to trial of the Dispute, but not later than thirty (30) days after entry of the order determining this provision is unenforceable, any party shall be entitled to move the court for an order compelling arbitration and staying or dismissing such litigation pending arbitration ("Arbitration Order").

(b)    Arbitration. If a claim, dispute, or controversy arises between us with respect to this Deed of Trust, any Loan Document, related agreements, or any other agreement or business relationship between any of us whether or not related to the subject matter of this Deed of Trust (all of the foregoing, a "Dispute"), and only if a jury trial waiver is not permitted by applicable law or ruling by a court, any of us may require that the Dispute be resolved by binding arbitration before a single arbitrator at the request of any party. By agreeing to arbitrate a Dispute, each party gives up any right that party

---

DDT (CA)
477049 (rev 03/27/13)

30    4018-4022 19th Street (Loan No. 3720003627)

may have to a jury trial, as well as other rights that party would have in court that are not available or are more limited in arbitration, such as the rights to discovery and to appeal.

Arbitration shall be commenced by filing a petition with, and in accordance with the applicable arbitration rules of, JAMS or National Arbitration Forum ("**Administrator**") as selected by the initiating party. If the parties agree, arbitration may be commenced by appointment of a licensed attorney who is selected by the parties and who agrees to conduct the arbitration without an Administrator. Disputes include matters (i) relating to a deposit account, application for or denial of credit, enforcement of any of the obligations we have to each other, compliance with applicable laws and/or regulations, performance or services provided under any agreement by any party, (ii) based on or arising from an alleged tort, or (iii) involving either of our employees, agents, affiliates, or assigns of a party. However, Disputes do not include the validity, enforceability, meaning, or scope of this arbitration provision and such matters may be determined only by a court. If a third party is a party to a Dispute, we each will consent to including the third party in the arbitration proceeding for resolving the Dispute with the third party. Venue for the arbitration proceeding shall be at a location determined by mutual agreement of the parties or, if no agreement, in the city and state where lender or bank is headquartered.

After entry of an Arbitration Order, the non-moving party shall commence arbitration. The moving party shall, at its discretion, also be entitled to commence arbitration but is under no obligation to do so, and the moving party shall not in any way be adversely prejudiced by electing not to commence arbitration. The arbitrator: (i) will hear and rule on appropriate dispositive motions for judgment on the pleadings, for failure to state a claim, or for full or partial summary judgment; (ii) will render a decision and any award applying applicable law; (iii) will give effect to any limitations period in determining any Dispute or defense; (iv) shall enforce the doctrines of compulsory counterclaim, res judicata, and collateral estoppel, if applicable; (v) with regard to motions and the arbitration hearing, shall apply rules of evidence governing civil cases; and (vi) will apply the law of the state specified in the agreement giving rise to the Dispute. Filing of a petition for arbitration shall not prevent any party from (i) seeking and obtaining from a court of competent jurisdiction (notwithstanding ongoing arbitration) provisional or ancillary remedies including but not limited to injunctive relief, property preservation orders, foreclosure, eviction, attachment, replevin, garnishment, and/or the appointment of a receiver, (ii) pursuing non-judicial foreclosure, or (iii) availing itself of any self-help remedies such as setoff and repossession. The exercise of such rights shall not constitute a waiver of the right to submit any Dispute to arbitration.

Judgment upon an arbitration award may be entered in any court having jurisdiction except that, if the arbitration award exceeds $4,000,000, any party shall be entitled to a de novo appeal of the award before a panel of three arbitrators. To allow for such appeal, if the award (including Administrator, arbitrator, and attorney's fees and costs) exceeds $4,000,000, the arbitrator will issue a written, reasoned decision supporting the award, including a statement of authority and its application to the Dispute. A request for de novo appeal must be filed with the arbitrator within 30 days following the date of the arbitration award; if such a request is not made within that time period, the arbitration decision shall become final and binding. On appeal, the arbitrators shall review the award de novo, meaning that they shall reach their own findings of fact and conclusions of law rather than deferring in any manner to the original arbitrator. Appeal of an arbitration award shall be pursuant to the rules of the Administrator or, if the Administrator has no such rules, then the JAMS arbitration appellate rules shall apply.

Arbitration under this provision concerns a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. This arbitration provision shall survive any termination, amendment, or expiration of this Agreement. If the terms of this provision vary from the Administrator's rules, this arbitration provision shall control.

(c)    CLASS ACTION WAIVER.  EACH PARTY WAIVES THE RIGHT TO LITIGATE IN COURT OR ARBITRATE ANY CLAIM OR DISPUTE AS A CLASS ACTION, EITHER AS A MEMBER OF A CLASS OR AS A REPRESENTATIVE, OR TO ACT AS A PRIVATE ATTORNEY GENERAL.

(d)    Reliance.  Each party (i) certifies that no one has represented to such party that the other party would not seek to enforce jury and class action waivers in the event of suit, and (ii) acknowledges that it and the other party have been induced to enter into this Deed of Trust by, among other things, the mutual waivers, agreements, and certifications in this section.

8.23    Time is of the Essence.  Time is of the essence with respect to all of Trustor's obligations and agreements hereunder.

8.24    Deed of Trust .  Each term, condition and provision of this Deed of Trust shall be interpreted in such manner as to be effective and valid under applicable law but if any term, condition or provision of this Deed of Trust shall be held to be void or invalid, the same shall not affect the remainder hereof which shall be effective as though the void or invalid term, condition or provision had not been contained herein.  In addition, should this instrument be or become ineffective as a deed of trust, then these presents shall be construed and enforced as a realty deed of trust with the Trustor being the mortgagor and Lender being the mortgagee.  If the lien of this Deed of Trust is invalid or unenforceable as to any part of the debt, or if the lien is invalid or unenforceable as to any part of the Trust Property, the unsecured or partially secured portion of the debt shall be completely paid prior to the payment of the remaining and secured or partially secured portion of the debt, and all payments made on the debt, whether voluntarily or under foreclosure or other enforcement action or procedure, shall be considered to have been first paid on or applied to the full payment of that portion of the debt which is not secured or fully secured by the lien of this Deed of Trust.

## ARTICLE 9
## HAZARD INSURANCE DISCLOSURE

9.1.    HAZARD INSURANCE DISCLOSURE MADE PURSUANT TO CALIFORNIA CIVIL CODE SECTION 2955.5.  IMPORTANT.  DO NOT INITIAL BELOW UNTIL YOU HAVE CAREFULLY READ AND UNDERSTAND THE CONTENT OF THIS DISCLOSURE.
You have applied for a loan or credit accommodation that will be secured by real property.  As a condition of the loan or credit accommodation, Lender may require you to maintain hazard insurance coverage for the real property.  California law provides that Lender cannot require you, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the property (such as fire and other perils) in an amount exceeding the replacement value of the building or structures attached to the property.  BY INITIALING BELOW, YOU ACKNOWLEDGE THAT YOU HAVE READ, RECEIVED AND UNDERSTAND THIS HAZARD INSURANCE DISCLOSURE.

Trustor's Initials:

[The balance of this page is intentionally left blank.]

207

IN WITNESS WHEREOF, Trustor has executed this Deed of Trust as of the day and year set forth above.

"Trustor"

XELAN-PROP 1, LLC, a California limited liability company.

By: _____
ANNE KIRAGI, its managing member

208

CA - ALL PURPOSE ACKNOWLEDGMENT

STATE OF _California_

COUNTY OF _San Francisco CO_

On _Jun 25_, 20_13_ before me, _Y. Barrueta Digesti_ (here insert name and title of the notarizing officer), personally appeared _Kirk Kincgi_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Y. Barrueta Digesti_                    (Seal)

Y. BARRUETA-DIGESTI
Commission # 1893423
Notary Public - California
Alameda County
My Comm. Expires Jul 18, 2014

DOT (CA)                                              34          4018-4022 19th Street (Loan No. 3720003627)
477049 (rev 03/27/13)

209

## EXHIBIT "A"
## DESCRIPTION OF LAND

This Exhibit "A" is attached to and forms a part of the DEED OF TRUST AND ABSOLUTE ASSIGNMENT OF RENTS AND LEASES AND SECURITY AGREEMENT (AND FIXTURE FILING) ("Deed of Trust") among XELAN PROP 1, LLC, a California limited liability company, "Trustor", UPF INCORPORATED, a Washington corporation, as "Trustee", and STERLING SAVINGS BANK, a Washington banking corporation, d/b/a Sterling Bank, as "Beneficiary" or "Lender".

1.    **Description of Land.** The Land referred to in this Deed of Trust is situated in San Francisco County, California and is described as follows:

TO BE INSERTED

The land referred to is situated in the County of San Francisco, City of San Francisco, State of California, and is described as follows:

BEGINNING at a point on the Northerly line of 19th Street, distant thereon 83 feet Westerly from the Westerly line of Noe Street; running thence Westerly along said line of 19th Street 42 feet; thence at a right angle Northerly 145 feet; thence at a right angle Easterly 42 feet; thence at a right angle Southerly 145 feet to the point of beginning.

BEING a portion of Mission Block No. 115.

Assessor's Lot 18; Block 3583

# EXHIBIT "B"

INTENTIONALLY OMITTED

---

**EXHIBIT 9**

## ASSIGNMENT OF AGREEMENTS, PERMITS, LICENSES AND APPROVALS

This ASSIGNMENT OF AGREEMENTS, PERMITS, LICENSES AND APPROVALS ("**Assignment**") is made as of June 13, 2013, by XELAN PROP 1, LLC, a California limited liability company ("**Borrower**"), to STERLING SAVINGS BANK, a Washington banking corporation, d/b/a Sterling Bank ("**Lender**").

### RECITALS

**A.**    Borrower is justly indebted to Lender for money actually loaned or to be loaned and advanced to Borrower in the maximum sum of One Million Seven Hundred Thousand Dollars and No Cents ($1,700,000.00) ("**Loan**"). The Loan is evidenced by a Promissory Note Secured by Deed of Trust dated as of even date herewith in the amount of One Million Seven Hundred Thousand Dollars and No Cents ($1,700,000.00) executed by Borrower in favor of Lender ("**Note**"). All the terms, provisions, conditions, covenants, stipulations and agreements contained in the Note are hereby made a part of this Assignment to the same extent and with the same and like force and effect as if they were fully set forth herein. Any and all documents evidencing, relating to and/or securing obligations under the Loan collectively shall be referred to as the "**Loan Documents.**"

**B.**    The Note is secured by a Deed of Trust and Absolute Assignment of Rents and Leases and Security Agreement (and Fixture Filing) of even date herewith ("**Deed of Trust**") in favor of Lender covering certain real property more particularly described in Exhibit "**A**" to the Deed of Trust ("**Property**"), including all improvements (collectively "**Project**") constructed thereon.

**C.**    Lender requires as a condition to making the Loan to Borrower evidenced by the Note that Borrower assign to Lender all of Borrower's right, title and interest in and to:

(i)    all agreements and contracts between Borrower and any third parties, heretofore or hereafter entered into for the account of Borrower pertaining to any tenancy, construction, utilities, off-site improvements, services and other matters related to or in connection with the Project and/or the Property or which creates a right in Borrower as a result of its ownership or operation of all or any part of the Project and/or Property, together with any and all existing and future amendments, modifications, supplements, general conditions and addenda thereto (collectively "**Contracts**");

(ii)    all permits, licenses, warranties, indemnities and approvals (including without limitation all building permits and other governmental entitlements and approvals) now or hereafter issued to Borrower or to Borrower's predecessor(s)-in-interest from time to time with respect to the Property and/or the Project, together with any and all existing and future amendments, modifications, supplements and addenda thereto (collectively "**Property Rights**"); and

(iii)    all surveys, site plans, and plans and specifications for onsite and offsite improvements prepared in connection with the construction, operation and/or maintenance of the Project, together with any and all existing and future amendments, modifications, supplements, general conditions and addenda thereto heretofore or hereafter prepared by any architect and/or engineer for the account of Borrower (collectively "**Plans and Specifications**").

**D.**    For all purposes herein, the Contracts, Property Rights and Plans and Specifications collectively shall be referred to as the "**Assigned Documents.**" Borrower is willing to enter into this Assignment to effectuate the foregoing assignment so as to induce Lender to make the Loan to Borrower.

### TERMS AND CONDITIONS

NOW THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt whereof is hereby acknowledged:

---

Assignment of Agreements - ALL                1            4018-4022 19th Street (Loan No. 3720003627)
477040 (rev 2/29/12)

1.    **ASSIGNMENT OF ASSIGNED DOCUMENTS.**

1.1    **Assignment Clause.**  Borrower hereby assigns, transfers and conveys to Lender all of Borrower's right, title and interest in and to the Assigned Documents, and hereby creates in favor of Lender a security interest in the Assigned Documents under the California Uniform Commercial Code.

1.2    **Lender as Attorney–In–Fact for Borrower.**  Borrower hereby irrevocably appoints Lender as its attorney–in–fact with full power of substitution and authority, which appointment is coupled with an interest and is effective from and after the occurrence of any **"Default"** (as defined in the Loan Documents), to receive, demand, exercise and enforce any and all of Borrower's rights with respect to the Assigned Documents and to perform any and all acts in the name of Borrower or, at the option of Lender, in the name of Lender with the same force and effect as if performed by Borrower in the absence of this Assignment.

2.    **PURPOSE OF ASSIGNMENT.**  This Assignment is made for the purposes of securing:

2.1    **Note Payments.**  Payment of the principal sum, interest and indebtedness evidenced by the Note.

2.2    **Payment of Other Sums.**  Payment of all other sums with interest thereon becoming due and payable to Lender under the provisions of this Assignment or of the Note, the Deed of Trust, or the other Loan Documents.

2.3    **Performance of Other Obligations.**  The performance and discharge of each and every obligation, covenant and agreement of Borrower contained herein or in the Note, the Deed of Trust, or the other Loan Documents.

3.    **GENERAL PROVISIONS.**  This Assignment is made on the following terms, covenants and conditions:

3.1    **No Default.**  So long as no Default has occurred and continued beyond any applicable notice and cure period, Borrower shall have the right to enjoy all of the rights arising out of the Assigned Documents.

3.2    **Default.**  Upon or at any time after a Default has occurred and continued beyond any applicable notice and cure period, Lender shall have the right to enforce Borrower's rights and interest with respect to the Assigned Documents.  Upon the occurrence of any Default by Borrower and the expiration of any applicable notice and cure period, Lender may, without affecting any of Lender's rights and remedies against Borrower under any other instrument, document or agreement, exercise Lender's rights under this Assignment as Borrower's attorney–in–fact or in any other manner permitted by law.  In addition, Lender shall have and possess, without limitation, any and all rights and remedies of a secured party under the California Uniform Commercial Code or as otherwise provided by law.

3.3.    **Borrower's Representations and Warranties.**  Borrower hereby represents and warrants to Lender that:

3.3.1    **No Prior Assignment.**  No previous assignment of Borrower's interest in and to or rights under the Assigned Documents has been made.

3.3.2    **Performance Under the Assigned Documents.**  All covenants, agreements and conditions required to be performed or to occur under the Assigned Documents as of the date hereof by Borrower have been performed or occurred.

3.3.3    **No Modification or Transfer of Assigned Documents.**  Borrower agrees not to materially amend, assign, sell, pledge or otherwise transfer or encumber in any manner Borrower's

interest in or rights under and to the Assigned Documents without the prior written consent of Lender so long as this Assignment remains in effect.

**3.4    Indemnification of Lender.** Borrower hereby agrees to protect, indemnify, defend and hold Lender free and harmless from and against any and all claims, causes of action, demands, damages, liens, liabilities, losses, costs and expenses (including reasonable attorneys' fees) to which Lender may become exposed or which Lender may incur in exercising any of Lender's rights under this Assignment, except where caused by the gross negligence or willful misconduct of Lender. Borrower shall not indemnify Lender from and against any and all claims, causes of action, demands, damages, liens, liabilities, losses, costs and expenses arising (a) after Lender has exercised any of its rights hereunder, and (b) as a result of Lender's action or failure to act pursuant to such rights where such action or inaction was the result of Lender's gross negligence or willful misconduct.

**3.5    Termination of Assignment.** Upon payment in full of the principal sum, interest and indebtedness secured hereby and by said Note, Deed of Trust and the other Loan Documents, this Assignment shall become void and of no further force or effect, but the affidavit, certificate, letter or statement of any officer, agent or attorney of Lender showing any part of said principal, interest or indebtedness remains unpaid shall be and constitute conclusive evidence absent a contrary court order of the validity, effectiveness and continuing force of this Assignment, and any third person may, and is hereby authorized to, rely thereon.

**3.6    Binding Obligations Under This Assignment.** This Assignment, together with the covenants and warranties herein contained, shall inure to the benefit of Lender, to any lender participating in the Note, and to any subsequent holder of said Note, and shall be binding upon Borrower, its successors and assigns.

**3.7    Severability.** If any one or more of the provisions contained in this Assignment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Assignment, but this Assignment shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**3.8    Governing Law.** This Assignment shall be deemed to have been applied for, considered, approved, negotiated, executed, made and shall be performed in the State of Washington and shall be governed by its laws (without regard to conflicts of laws principles), except to the extent the laws of the state in which the collateral property and/or pledged assets are located affect enforceability of the liens granted in the Loan Documents, all as expressly set forth in the Governing Law provisions of Section 8.17 of the Deed of Trust executed in connection with this Assignment. Borrower irrevocably agrees that subject to Lender's sole and absolute election, Lender may bring suit, action, or other legal proceedings arising out of the Loan Documents in courts located in Washington or the state in which the collateral property and/or pledged assets are located, whether local, state, or federal. Borrower hereby submits to the jurisdiction of such court(s) and waives any right Borrower may have to request a change of venue or a removal to another court.

**3.9    Attorneys' Fees.** In the event of any dispute arising out of this Assignment or any action or proceeding to enforce the provisions of this Assignment, the prevailing party in such dispute, action or proceeding shall be entitled to recover from the losing party all costs and expenses incurred by the prevailing party in connection therewith, including without limitation court costs and reasonable attorneys' fees and expenses.

[The balance of this page is intentionally left blank.]

IN WITNESS WHEREOF, Borrower has executed this Assignment as of the date first above written.

**BORROWER**

**XELAN PROP 1, LLC**, a California limited liability company

By: _____
ANNE KIHAGI, its managing member

**EXHIBIT 10**

ORIGINAL

1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   YVONNE R. MERÉ, State Bar #173594
    Chief Attorney
3   Neighborhood and Resident Safety Division
    MICHAEL S. WEISS, State Bar #168378
4   VICTORIA L. WEATHERFORD, State Bar #267499
    Deputy City Attorneys
5   Fox Plaza
    1390 Market Street, Sixth Floor
6   San Francisco, California 94102-5408
    Telephone:   (415) 554-3824
7   Facsimile:   (415) 437-4644
    E-Mail:      michael.weiss@sfgov.org
8
    Attorneys for Plaintiffs
9   CITY AND COUNTY OF SAN FRANCISCO and
    PEOPLE OF THE STATE OF CALIFORNIA

**F I L E D**
Superior Court of California
County of San Francisco

JUN 04 2015

CLERK OF THE COURT
BY: _____
                  Deputy Clerk

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                    COUNTY OF SAN FRANCISCO

13                    UNLIMITED JURISDICTION

14

15   CITY AND COUNTY OF SAN
     FRANCISCO, a Municipal Corporation, and        Case No.  **CGC  15-546152**
16   the PEOPLE OF THE STATE OF
     CALIFORNIA, by and through DENNIS J.
17   HERRERA, City Attorney for the City and
     County of San Francisco,

18        Plaintiffs,                               COMPLAINT FOR INJUNCTIVE AND OTHER
                                                   RELIEF
19        vs.

20   ANNE KIHAGI aka ANNA KIHAGI aka               [REAL PROPERTY]
21   ANNA SWAIN aka ANNE KIHAGI SWAIN
     aka ANNA KIHAGI SWAIN, JULIA                  Type of Case:  (42) Other Complaint
22   MWANGI aka JULIA MUNENE,
     CHRISTINE MWANGI aka CHRISTINA
23   MWANGI aka CHRISTINE JOHNSON,
     XELAN PROP 1, LLC, RENKA PROP, LLC,
24   NOZARI 2, LLC, ZORIALL, LLC, and DOE
     ONE THROUGH DOE FIFTY,
25
          Defendants.
26

27

28

                                        1

COMPLAINT – CCSF v KIHAGI, et al.

1    The CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation, (hereinafter,

2  "SAN FRANCISCO" or "City"), and the PEOPLE OF THE STATE OF CALIFORNIA, by and

3  through DENNIS J. HERRERA, City Attorney for the City and County of San Francisco (hereinafter,

4  "PEOPLE"), (collectively, "Plaintiffs") file their complaint against ANNE KIHAGI aka ANNA

5  KIHAGI aka ANNA SWAIN aka ANNE KIHAGI SWAIN aka ANNA KIHAGI SWAIN (hereinafter,

6  "KIHAGI"), JULIA MWANGI aka JULIA MUNENE (hereinafter, "J. MWANGI"), CHRISTINE

7  MWANGI aka CHRISTINA MWANGI aka CHRISTINE JOHNSON (hereinafter, "C. MWANGI"),

8  XELAN PROP-1, LLC (hereinafter, "XELAN"), RENKA PROP, LLC (hereinafter, "RENKA"),

9  NOZARI 2, LLC (hereinafter, "NOZARI"), ZORIALL, LLC (hereinafter, "ZORIALL"), and DOE

10  ONE through DOE FIFTY (collectively "Defendants").

11    Since 2013, Defendants have acquired more than 50 rent-controlled residential units in San

12  Francisco, most of which were occupied by long-term tenants. In defiance of numerous state and local

13  laws protecting these tenants and capping rents, Defendants have waged a war of harassment,

14  intimidation, and retaliation using unlawful, unfair and fraudulent practices designed to force them out

15  to make room for new tenants who pay market rent. The victims of Defendants' relentless campaign

16  include a public school teacher, a cabinet maker, a professional skydiver, and at least six elderly and

17  disabled tenants, including a 71-year-old retired school crossing guard, a 65-year-old Army veteran

18  who is battling cancer, a 68-year-old employee of Saints Peter and Paul Church, and a 91-year-old

19  great grandmother, who is bedridden.

20    Plaintiffs hereby allege as set forth below:

## INTRODUCTION

22    1.    San Francisco is currently in the midst of a historic housing crisis. According to real

23  estate blog Curbed SF, the median rent in San Francisco "now sits at a terrifying $4,225/month."

24  http://sf.curbed.com/archives/2015/05/22/san_franciscos_median_rent_climbs_to_a_whopping_4225.

25  php. Because of skyrocketing rents in today's white-hot real estate market, San Francisco residents

26  who lose their rent-controlled apartments have few options but to move out of the City they call home.

27    2.    In 1979, San Francisco established the San Francisco Rent Stabilization and Arbitration

28  Ordinance, codified as San Francisco Administrative Code § 37 ("Rent Ordinance"). The Rent

2

COMPLAINT — CCSF v KIHAGI, et al.

1    Ordinance was enacted in response to a critical housing shortage, in which tenants were displaced as a

2    result of their inability to pay increased rents, and were forced to relocate because they were unable to

3    find decent, safe, and sanitary housing at affordable rent levels. This situation had a detrimental effect

4    on a substantial numbers of San Francisco renters, especially creating hardships on senior citizens,

5    persons on fixed incomes and low- and moderate-income households. San Francisco Administrative

6    Code Section 37.1(b)(2).

7        3.    It has long been settled that the police power of municipalities extends to objectives in

8    furtherance of the public peace, safety, morals, health and welfare, and is not a circumscribed

9    prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular

10    mind of the need for its application, capable of expansion to meet existing conditions of modern life.

11    The municipal police power justifies reasonable regulations upon private property rights to serve the

12    larger public good. *Birkenfeld v. City of Berkeley*, 17 Cal.3d 129 (1976).

13        4.    The Rent Ordinance covers approximately 172,000 residential units. Designed to

14    stabilize San Francisco's housing market, the Rent Ordinance caps annual rent increases and permits

15    evictions only under limited circumstances. The Rent Ordinance furthers the legitimate objectives of

16    promoting the public health and welfare in San Francisco.

17        5.    By 2008, some landlords, frustrated by the limitations on rent increases imposed by the

18    Rent Ordinance, were using strong-arm and unlawful tactics such as harassment, threats, reduction in

19    services, retaliation, and false accusations to hasten natural or lawful attrition. The City's voters,

20    many of whom are tenants, clearly perceived a need to prohibit such abuse, to ensure that tenants are

21    treated fairly, and to prevent landlords from undermining the City's rent control laws. In 2008, the

22    voters responded by passing Proposition M, codified as San Francisco Administrative Code Section

23    37.10B, which prohibits residential landlords from harassing their tenants in bad faith.

24        6.    Since June 2013, Defendants have been rampantly violating the letter and spirit of the

25    Rent Ordinance, and in particular, Section 37.10B, by harassing, retaliating, and intimidating their

26    tenants into surrendering their rent-controlled units.

27        7.    Defendants have spent more than $24 million acquiring nine multi-unit residential

28    rental properties (over 50 rent-controlled residential units) in San Francisco, including the following:

3

1  3947 18th Street (hereinafter, "18th Street"), 1000-1022 Filbert Street (hereinafter, "Filbert"), 195

2  Eureka Street (hereinafter, "Eureka"), 1135-1139 Guerrero Street (hereinafter, "Guerrero"), 69-75 Hill

3  Street (hereinafter, "Hill"), and 650 Church Street (hereinafter, "Church"), collectively, the

4  "Properties." The Properties are discussed in greater detail below. Defendants' acquisitions also

5  include the following properties: 4018-4022 19th Street (hereinafter, "19th Street"), 1378-1382

6  Alabama Street (hereinafter, "Alabama"), and 3328-3330 26th Street (hereinafter, "26th Street").

7      8.      Defendants have engaged in a series of unlawful, unfair, fraudulent and deceptive

8  business practices to systematically displace and recover possession of rent-controlled units in

9  violation of state and local law. Defendants accomplish this displacement through deliberate,

10  malicious, and oppressive acts, including, but not limited to, harassment, retaliation, intimidation,

11  fraud, abuse, false accusations, reduction of services, refusal to timely and properly perform repairs,

12  bullying, invasion of privacy, and willful destruction of the tenants' guarantee of quiet enjoyment.

13  Once Defendants have successfully terrorized the tenants out of the units, they quickly renovate the

14  units, in many cases without first obtaining the proper City permits and attendant inspections, and then

15  advertise the units for rent online, seeking to rent the units at substantially increased rents.

16      9.      By engaging in these acts, Defendants are violating the law to achieve a financial gain

17  at the expense of their tenants. The victims of such practices are not only Defendants' tenants, but

18  also other owners of residential property who operate their buildings following local and state law. As

19  a result, Defendants gain an unfair competitive advantage over other property owners and/or

20  management companies.

21                              **PARTIES**

22      10.      Plaintiff SAN FRANCISCO is a municipal corporation organized and existing under

23  and by virtue of the laws of the State of California. SAN FRANCISCO brings this action under San

24  Francisco Administrative Code Section 37.10B, California Health and Safety Code Sections 17910-

25  17998.3, California Civil Code Section 3294, and California Code of Civil Procedure Section 526.

26      11.      Plaintiff PEOPLE, by and through Dennis J. Herrera, City Attorney for the City and

27  County of San Francisco, brings this action pursuant California Civil Code Sections 3479 and 3480,

28  California Code of Civil Procedure Section 731, and California Business and Professions Code

                                4

COMPLAINT – CCSF v KIHAGI, et al.

Sections 17200-17210.

12.     Defendant KIHAGI is, and at all relevant times has been, a resident of California, and an owner, manager, operator, maintainer, controller, affiliate and/or agent of one or more of the Properties, either in her name, or as a member of one or more of the limited liability companies named as Defendants in this action. Defendant KIHAGI, as an individual, and/or as a member of one or more of the limited liability companies named as Defendants in this action, is sued in her capacity as the past or present owner, lessor and/or manager of one or more of the Properties, or the agent of the owner, lessor, and/or manager of one or more of the Properties, and as the person committing the acts alleged in this Complaint, or the person allowing or directing the commission of the acts alleged in this Complaint. Defendant KIHAGI is a prolific professional real estate investor and landlord in the San Francisco and Los Angeles markets. Defendant KIHAGI, as an individual, and/or as a member of one or more of the limited liability companies named as Defendants in this action, has, since June 2013, purchased at least nine multi-unit residential properties in San Francisco, for a total purchase price of approximately twenty-four million dollars ($24,000,000.00). Defendant KIHAGI is a member of numerous California limited liability companies, including those named as Defendants herein. Defendant KIHAGI's business address as listed with the San Francisco Assessor's Office is: P.O. Box 691889, Los Angeles CA, 90069.

13.     Defendant J. MWANGI is, and at all relevant times has been, a resident of California, and an owner, manager, operator, maintainer, controller, affiliate and/or agent of one or more of the Properties, either in her name, or as a member of one or more of the limited liability companies named as Defendants in this action. Defendant J. MWANGI, as an individual, and/or as a member of one or more of the limited liability companies named as Defendants in this action, is sued in her capacity as the past or present owner, lessor, and/or manager of one or more of the Properties, or the agent of the owner, lessor, and/or manager of one or more of the Properties, and as the person committing the acts alleged in this Complaint, or the person allowing or directing the commission of the acts alleged in this Complaint. Defendant J. MWANGI is the alleged sister of Defendant KIHAGI and an active participant in KIHAGI's real estate investment business.

5

COMPLAINT – CCSF v KIHAGI, et al.

14.    Defendant C. MWANGI is, and at all relevant times has been, a resident of California, and an owner, manager, operator, maintainer, controller, affiliate and/or agent of one or more of the Properties, either in her name, or as a member of one or more of the limited liability companies named as Defendants in this action. Defendant C. MWANGI, as an individual and/or as a member of one or more of the limited liability companies named as Defendants in this action, is sued in her capacity as the past or present owner, lessor, and/or manager of one or more of the Properties, or the agent of the owner, lessor, and/or manager of one or more of the Properties, and as the person committing the acts alleged in this Complaint, or the person allowing or directing the commission of the acts alleged in this Complaint. Defendant C. MWANGI is the alleged sister of Defendant KIHAGI, and an active participant in KIHAGI's real estate investment business.

15.    Defendant XELAN is, and at all relevant times was, a limited liability company formed and operating under the laws of the State of California. Defendant KIHAGI formed Defendant XELAN on or about May 21, 2013. At all relevant times, Defendant XELAN has also been a legal owner, manager, operator and maintainer of one or more of the Properties. XELAN is sued in its capacity as the past or present owner, lessor, and/or manager of one or more of the Properties, and as the entity responsible for committing the acts alleged in this Complaint, or the entity allowing or directing the commission of the acts alleged in this Complaint. Defendant XELAN's business address as registered with the Secretary of State's Office is: 1220 North Formosa Avenue, West Hollywood, California 90046. Defendant XELAN's business address as listed with the San Francisco Assessor's Office is: P.O. Box 691889, Los Angeles CA, 90069. Defendant XELAN's only member is Defendant KIHAGI. Defendant KIHAGI owns 100% of Defendant XELAN.

16.    Defendant RENKA is, and at all relevant times was, a limited liability company formed and operating under the laws of the State of California. Defendant KIHAGI formed Defendant RENKA on or about December 3, 2013. At all relevant times, Defendant RENKA has also been a legal owner, manager, operator and maintainer of one or more of the Properties. Defendant RENKA is sued in its capacity as the past or present owner, lessor, and/or manager of one or more of the Properties, and as the entity responsible for committing the acts alleged in this Complaint, or the entity allowing or directing the commission of the acts alleged in this Complaint. Defendant RENKA's

6

1    business address as registered with the Secretary of State's Office is: 1220 North Formosa Avenue,

2    West Hollywood, California 90069. Defendant RENKA's business address as listed with the San

3    Francisco Assessor's Office is: P.O. Box 691889, Los Angeles CA, 90069. Defendant RENKA's

4    members include Defendants KIHAGI (75% owner) and J. MWANGI (25% owner).

5        17.    Defendant NOZARI is, and at all relevant times was, a limited liability company

6    formed and operating under the laws of the State of California. Defendant KIHAGI formed Defendant

7    NOZARI on or about September 15, 2014. At all relevant times, Defendant NOZARI has been a legal

8    owner, manager, operator and maintainer of one or more of the Properties. Defendant NOZARI is

9    sued in its capacity as the past or present owner, lessor, and/or manager of one or more of the

10   Properties, and as the entity responsible for committing the acts alleged in this Complaint, or the entity

11   allowing or directing the commission of the acts alleged in this Complaint. Defendant NOZARI's

12   business address as registered with the Secretary of State's Office is: 458 North Doheny Drive #1889,

13   West Hollywood, CA 90069. NOZARI's business address as listed with the San Francisco Assessor's

14   Office is: P.O. Box 690889, Los Angeles CA, 90069. Defendant NOZARI's only member is

15   Defendant KIHAGI. Defendant KIHAGI owns 100 % of Defendant NOZARI.

16       18.    Defendant ZORIALL is, and at all relevant times was, a limited liability company

17   formed and operating under the laws of the State of California. Defendant KIHAGI formed Defendant

18   ZORIALL on or about May 29, 2014. At all relevant times, Defendant ZORIALL has been a legal

19   owner, manager, operator and maintainer of one or more of the Properties. Defendant ZORIALL is

20   sued in its capacity as the past or present owner, lessor, and/or manager of one or more of the

21   Properties, and as the entity responsible for committing the acts alleged in this Complaint, or the entity

22   allowing or directing the commission of the acts alleged in this Complaint. Defendant ZORIALL's

23   business address as registered with the Secretary of State's Office is: P.O. Box 691889, Los Angeles

24   CA, 90069. Defendant ZORIALL's members include Defendants KIHAGI (73% owner) and

25   C. MWANGI (27% owner).

26       19.    DOE ONE through DOE FIFTY are sued herein under fictitious names. Plaintiffs do

27   not at this time know the true names or capacities of said Defendants, but pray that the same may be

28   alleged herein when ascertained.

7

COMPLAINT – CCSF v KIHAGI, et al.

20.    At all times herein mentioned, each Defendant was an agent, servant, employee, partner, franchisee and/or joint venturer of each other Defendant, and at all times was acting within the course and scope of said agency, service, employment, partnership, franchise and/or joint venture. Whenever reference is made in this Complaint to any act of "Defendants" each such allegation shall mean that each defendant acted both individually and jointly with other defendants.

21.    Actions taken, or omissions made, by Defendants' employees or agents in the course of their employment or agency are considered to be actions or omissions of Defendants for the purposes of this Complaint.

22.    Whenever reference is made in this Complaint to any act or omission of "Defendants" such allegation shall mean that each Defendant did or authorized or permitted the act or omission, or recklessly and carelessly failed to supervise, control, or direct other persons who engaged in the act or omission.

23.    Defendants are, and at all relevant times were, actively engaged in the business of owning, operating, and managing multi-unit residential rental properties within San Francisco, California.

## GENERAL ALLEGATIONS

24.    Since June 2013, Defendants have acquired at least nine tenant-occupied, multi-unit, residential rental properties located in the City and County of San Francisco. All of the Properties and the tenancies therein are subject to the Rent Ordinance.

25.    Defendants' business model involves buying a residential building whose price reflects its occupation by long-term, rent-controlled tenants, and then unlawfully recovering possession of units as quickly as possible, remodeling the vacant units without the requisite building, electrical and plumbing permits, and then reletting the remodeled units at market rate, maximizing profit from the higher rents.

26.    Impatient to wait for typical tenant attrition or vacancy, Defendants, upon acquiring title, unfairly and unlawfully use a number heavy-handed techniques designed to upset, terrorize and ultimately displace as many below-market-rent-paying tenants as possible, thereby circumventing the

8

COMPLAINT – CCSF v KIHAGI, et al.

225

1  legal restrictions and regulations imposed by state law and the Rent Ordinance and defeating their

2  purpose.

3      27.    After acquiring a building, Defendant KIHAGI typically introduces herself to tenants as

4  a representative of the owner or the owner's hired manager, when in fact, she is the owner.  In one

5  case, she falsely represented herself as an inspector for Paragon Real Estate.  Tenants uniformly

6  describe their initial experience with Defendants as "intimidating," "perplexing," and/or

7  "disconcerting."

8      28.    Defendants typically impose new house rules that have the effect of upsetting

9  longstanding arrangements enjoyed by tenants with past landlords, such as keeping of pets, use of and

10  access to storage rooms, use of and access to backyards, use of and access to garages, use of and

11  access to laundry facilities, and the storage of large items, such as bicycles.  Those tenants who do not

12  accept the new house rules are informed that they refuse "at their peril."

13      29.    Tenants are requested to produce copies of their lease as well as any addendums or

14  agreements or estoppels.  Defendants demand information from the tenants including detailed personal

15  information, relationship status with guests/visitors, personal habits, employment, etc.  Defendants

16  also conduct intrusive investigations of tenants by contacting neighbors and former landlords in an

17  attempt to obtain personal information about their tenants.  In some cases, Defendants have their

18  laborers spy on tenants while they are on site, and report back their observations.

19      30.    Often, Defendants attempt to buy-out long-term tenants.  When a tenant rejects the

20  offer, Defendants begin a pattern and practice of harassing and/or retaliating against the tenant in

21  various forms.  For example, Defendant KIHAGI told an elderly Guerrero tenant who rejected her

22  buyout effort:  "I'm going to kick you out of the house."  Using hostile and surreptitious acts,

23  Defendants destroy the tenants' quiet enjoyment and make life miserable for them, effectively bullying

24  the tenants into eventually surrendering their units.

25      31.    Defendants also employ a variety of other harassment tactics, including, but not limited

26  to:  interrupting mail service, interrupting gas, electric, water, and cable service, backdating

27  correspondence and notices, failing and refusing to cash rent checks, falsely claiming that rent

28  payments were untimely, violating tenant privacy, sending harassing text messages, abusing the

9

COMPLAINT – CCSF v KIHAGI, et al.

1  landlord's right of access by failing to give the required notice before entering, even yelling and

2  screaming at tenants.

3      32.    Defendants also fail to maintain the Properties, fail to timely correct conditions at the

4  properties which are unsafe and threatening to the health and safety of the occupants, and react to

5  tenant complaints with hostility and scorn.  For example when a 71-year-old disabled tenant at

6  Guerrero complained to Defendant KIHAGI that something in the building needed fixing, Defendant

7  KIHAGI stated:  "F**k off....for the peanuts you pay me I'm not going to do anything."  When a

8  tenant at Hill reported a water leak from the unit above him, Defendant KIHAGI told him:  "That is

9  not my priority."  When the Hill tenant mentioned necessary sidewalk repair, Defendant KIHAGI

10  responded that she was "not putting any money into that building."

11      33.    When tenants have reported unsafe or substandard conditions to the City, Defendants

12  ignore the City's efforts to follow up on the complaints, refuse access to the City's inspectors, refuse

13  to timely perform the required work, perform work without required permits, hire unlicensed workers

14  to perform work requiring a license, and retaliate or threaten retaliation against the tenants for

15  reporting the problems.

16      34.    When the City attempted to conduct noticed building inspections of Defendants'

17  properties in response to the numerous tenant complaints, Defendants refused access, and even hired

18  security guards to intimidate and disrupt the inspections.  When tenants at the Guerrero, Hill and

19  Eureka properties invited the City inspectors to enter their units, Defendants retaliated against the

20  cooperative tenants by installing video surveillance equipment aimed at their front doors, decreasing

21  services, and inflicting other forms of retribution.

22      **The 18th Street Property.**

23      35.    3947 18th Street, a tenant-occupied, six-unit, rent-controlled residential building in the

24  Castro neighborhood of San Francisco, was purchased for approximately two million eight hundred

25  thousand dollars ($2,800,000.00) on or about June 19, 2013, by Defendant KIHAGI through

26  Defendant XELAN.  18th Street, also known as Assessor's Block 3584, Lot 086 in the City and

27  County of San Francisco, State of California, is more particularly described in Exhibit A, attached

28  hereto and incorporated as part of this Complaint.

10

COMPLAINT – CCSF v KIHAGI, et al.

36.  On information and belief, at the time Defendants purchased 18th Street, three of the six units were occupied by rent-controlled tenants (Units 1, 2 and 5), while three were vacant (Units 3, 4 and 6).

37.  Defendants immediately began a campaign to unlawfully and in bad faith force out the rent-controlled tenants in Units 1 and 5. Defendants initially claimed they were going to create a tenants-in-common ownership structure, and would be conducting buyouts. When the tenants did not accept buyouts, Defendants threatened to evict under the Ellis Act, and take the units off the rental market. Defendants took no steps to invoke the Ellis Act. Instead, Defendants then changed their approach. Under the ruse that Defendants KIHAGI, J. MWANGI and C. MWANGI each needed places to live, and, *notwithstanding the fact that there were three available vacant units at the time*, Defendants took a series of steps towards initiating an Owner Move-In eviction ("OMI") of Unit 5, and a Relative Move-In eviction ("RMI") for Unit 1.

38.  The tenant in Unit 1 had lived in the rent-controlled apartment since August 2004 and was paying below-market rent of $1,423.26 per month. After acquiring the property, Defendant KIHAGI began harassing the tenant in Unit 1. Defendant KIHAGI initially introduced herself as a representative of the new owner, inquired about the tenant's cat, and remarked that the tenant should be careful "because someone might let her out."

39.  The tenant in Unit 5 had lived in the rent-controlled unit since June 2003 and was paying below-market rent of $1626.61 per month.

40.  Before initiating the OMI and RMI, Defendants first had to transfer title to an individual because OMI and RMI evictions are only available to individuals, not LLCs. On or about July 30, 2013, Defendant XELAN transferred title to 18th Street to Defendant KIHAGI. No transfer tax was paid because Defendant KIHAGI, in a sworn affidavit submitted to the San Francisco Assessor/Recorder's Office, claimed to be exempt from transfer tax because the ownership interest before and after the transfer remained exactly the same, meaning that Defendant KIHAGI was the sole member (and 100% owner) of Defendant XELAN.

///
///

11

**Unit 1.**

41.    On August 15, 2013, Defendant KIHAGI served the tenant in Unit 1 with a 60-day Notice of Termination of Tenancy for a Relative Move-In (RMI) eviction for her alleged sister "Julia Munene" (aka Defendant J. MWANGI), and provided the Rent Board with a copy of the documentation. In the 60-day Notice, Defendant KIHAGI stated that she was the sole owner of record, with a recorded 100% undivided ownership interest, and wanted to move her sister into Unit 1. However, at the time, two remodeled units (Units 3 and 4) and another unit (Unit 6) were vacant and available. Defendant KIHAGI then falsely claimed that she had no ownership interest in any other residential property, intentionally concealing the fact that through her 100% ownership of Defendant XELAN she owned two other multi-unit residential rental properties in San Francisco.[1] In the 60-day notice, Defendant KIHAGI purported to "offer" either of the remodeled units as a replacement unit, but as furnished and for three times the tenant's existing rent-controlled rent.[2] Defendant KIHAGI did not offer vacant Unit 6 as a replacement unit.[3] The Rent Board subsequently recorded against title a Notice of Constraints on Real Property as to Unit 1. The Notice of Constraints on Real Property required Defendant J. MWANGI to reside in this unit as her primary residence until August 15, 2016—three years from the date of service of the RMI paperwork on the tenant in Unit 1. The RMI ultimately failed.

42.    Undeterred, Defendants continued their harassing efforts to get rid of the tenant in Unit 1. Defendants first refused to cash the tenant's rent check for October 2013, and then months later complained that the October 2013 rent had not been timely paid. In addition, Defendants confronted the tenant's friend who was visiting from Palm Springs, California. Defendants accused the friend of living in the unit, and went so far as to hire a private investigator to visit the friend's Palm Springs residence and photograph his mailbox. Based on the fact that the friend's name was not printed on the

---

[1] As of August 15, 2013, Defendant KIHAGI, through her 100% ownership of Defendant XELAN, owned two multi-unit residential buildings: the six-unit 19th Street property (acquired on June 20, 2013), and the seven-unit Filbert property (acquired on August 14, 2013).

[2] On information and belief, after the tenant in Unit 1 surrendered her unit and left, Units 3 and 4 were rented to new tenants, unfurnished and at a lower rent.

[3] In sworn Declarations later submitted to the Rent Board, Defendant KIHAGI claimed that she moved her sister Christine (aka Defendant C. MWANGI) into Unit 6.

12

COMPLAINT – CCSF v KIHAGI, et al.

1  Palm Springs mailbox, Defendants claimed the tenant in Unit 1 was maintaining an illegal sublet in

2  violation of her lease. The tenant in Unit 1, frightened by Defendants' aggressive tactics, and lacking

3  the financial resources to continue defend herself, subsequently surrendered Unit 1 in spring or early

4  summer 2014. To date, on information and belief, Defendant J. MWANGI has not moved-in to Unit 1

5  or made it her primary residence.

6  **Unit 5.**

7  　　　43.　　On August 15, 2013, the same day the tenant in Unit 1 was served with her 60-day

8  Notice, Defendant KIHAGI served the tenant in Unit 5 with a 60-day Notice of Termination of

9  Tenancy for an Owner Move-In eviction for herself, and provided the Rent Board with a copy of the

10  documentation. In the 60-day Notice, Defendant KIHAGI stated that she was the sole owner of

11  record, with a recorded 100% undivided ownership interest, and wanted to move herself into Unit 5.

12  However, two remodeled units (Units 3 and 4) and another unit (Unit 6) were vacant and available.

13  Defendant KIHAGI then falsely claimed that she had no ownership interest in any other residential

14  property, intentionally concealing the fact that through her 100% ownership of Defendant XELAN she

15  owned two other multi-unit residential rental properties in San Francisco.[4] In the 60-day notice,

16  Defendant KIHAGI purported to "offer" either of the remodeled units as a replacement unit, but as

17  furnished and for three times the tenant's existing rent-controlled rent.[5] Defendant KIHAGI did not

18  offer vacant Unit 6 as a replacement unit.[6] This OMI eventually failed.

19  　　　44.　　Defendant KIHAGI served the tenant in Unit 5 with another OMI in February 2014,

20  and provided the Rent Board with a copy. Defendant KIHAGI's new 60-day notice, dated February 6,

21  2014, falsely stated: "The Owner ANNE KIHAGI owns no other residential properties. Therefore she

22  owns no other vacant, available, incomparable and comparable units anywhere else to offer you for

23  rent when this Notice expires." In her supporting declaration, Defendant KIHAGI falsely declared

---

24  　　[4] As of August 15, 2013, Defendant KIHAGI, through her 100% ownership of Defendant XELAN, owned two
25  multi-unit residential buildings: the six-unit 19th Street property (acquired on June 20, 2013), and the seven-unit Filbert
　　property (acquired on August 14, 2013).

26  　　[5] On information and belief, after the tenant in Unit 1 surrendered her unit and left, Units 3 and 4 were rented to
　　new tenants, unfurnished and at a lower rent.

27  　　[6] In sworn Declarations later submitted to the Rent Board, Defendant KIHAGI claimed that she (conveniently)
28  moved her sister Christine (aka Defendant C. MWANGI) into Unit 6.

13

COMPLAINT – CCSF v KIHAGI, et al.

1   under penalty of perjury: "I do not own, and my name is not on title to any other real property."

2   Defendant KIHAGI further falsely declared under penalty of perjury: "I am a co-member (with

3   others) of a limited liability company that owns residential properties in San Francisco at 1000-1022

4   Filbert Street and 4020 19th Street." In fact, title to the Filbert and 19th Street properties were held by

5   Defendant XELAN. As the sole member and 100% owner of Defendant XELAN, Defendant KIHAGI

6   was the 100% owner of the Filbert and 19th Street properties. In addition, Defendant KIHAGI

7   deliberately concealed the fact that she also owned at least 75% of Defendant RENKA which at that

8   time held title to the Eureka property, making Defendant KIHAGI a 75% owner of that multi-unit

9   residential rental property. In her supporting Declaration, Defendant KIHAGI stated that she was

10  currently living in Unit #6 at the 18th Street property with her sister, Christine Mwangi aka Defendant

11  C. MWANGI.

12       45.    When the tenant in Unit 5 did not vacate the unit, Defendant KIHAGI filed an unlawful

13  detainer action in April 2014. In the unlawful detainer action, on June 24, 2014, Defendant KIHAGI

14  filed with the San Francisco Superior Court a Declaration under penalty of perjury, falsely stating in

15  pertinent part: "Furthermore, in addition with [sic] complying with the requirements of Section

16  37.9(a)(8), I also truthfully informed Defendant [tenant in unit 5] in the Notice of the following

17  information in writing: ...(4) *A description of all residential properties owned, in whole or in part, by*

18  *the landlord...for whom possession is being sought.*" [emphasis added] In fact, Defendant KIHAGI

19  deliberately concealed the other residential properties she owned and controlled. Defendant KIHAGI

20  lost the unlawful detainer action on summary judgment, and was ordered to pay the tenant in Unit 5

21  nearly $7,000. That did not stop her from continuing her harassment, intimidation, and retaliation

22  against the tenant in Unit 5.

23       46.    On June 28, 2014, Defendant KIHAGI served the tenant in Unit 5 with a third OMI and

24  provided the Rent Board with a copy. In the third OMI Defendant KIHAGI stated that she had been

25  living in Unit #6 with her sister Christine Johnson (aka Christine Mwangi aka Defendant

26  C. MWANGI). Defendant KIHAGI again falsely declared under penalty of perjury, "I do not own,

27  and my name is not on title to any other real property." Defendant KIHAGI again falsely declared

28  under penalty of perjury, "I am a co-member (with others) of a limited liability company that owns

14

COMPLAINT – CCSF v KIHAGI, et al.

1  residential properties in San Francisco at 1000-1022 Filbert and 4020 19th Street." In fact, title to the

2  Filbert and 19th Street properties were held by Defendant XELAN. As the sole member and 100%

3  owner of Defendant XELAN, Defendant KIHAGI was in fact the 100% owner of the Filbert and 19th

4  Street properties. In addition, Defendant KIHAGI deliberately concealed the fact that she also owned

5  at least 75% of Defendant RENKA, which by that time held title to the Eureka property and the

6  Guerrero property, making Defendant KIHAGI a 75% owner of both of those multi-unit residential

7  rental properties in San Francisco. In addition, by then, Defendant KIHAGI, as sole member and

8  100% owner of her newly created entity Jambax 2, LLC, had also acquired the Alabama property, a

9  three-unit residential rental property.

10       47.    The tenant in Unit 5, exhausted and depleted from the battle with Defendants, and

11  lacking the financial resources to continue, surrendered Unit 5 in November 2014. After the tenant in

12  Unit 5 finally relented and surrendered the unit, Defendants inquired whether the tenant would be

13  willing to accept a buyout so Defendant KIHAGI would not be required to live in the unit. The out-of-

14  possession tenant declined to accept the buyout. A Notice of Constraints on Real Property was

15  recorded against title to Unit 5. The Notice of Constraints on Real Property requires Defendant

16  KIHAGI to reside in this unit as her primary residence until June 28, 2017—three years from the date

17  of service of the OMI paperwork on the tenant in Unit 5. To date, more than six months after the

18  tenant in Unit 5 vacated, on information and belief, Defendant KIHAGI has not moved in to Unit 5

19  and made it her primary residence.

20       48.    On September 14, 2014, after successfully evicting Units 1 and 5, Defendant KIHAGI

21  transferred title to 18th Street to her newly created entity, Defendant NOZARI. In documentation filed

22  with the San Francisco Assessor/Recorder's Office, Defendant KIHAGI claimed to be exempt from

23  transfer tax because she was the sole member (100% owner) of Defendant NOZARI, and the

24  percentage ownership would be exactly the same before and after the transfer.

25       49.    In addition to wrongfully terminating the tenancies of Units 1 and 5 in bad faith through

26  intimidation, harassment and retaliation, Defendants have also performed construction, including

27  building, plumbing, and electrical work, without the required City permits or in excess of the scope of

28  the City permits.

15

COMPLAINT – CCSF v KIHAGI, et al.

50.   Defendants have also denied City inspectors access to the building to conduct lawful inspections. As an example, on March 4, 2015, City inspectors showed up at the 18th Street property for a noticed building inspection. City inspectors were met by Defendant KIHAGI and three bulky, paramilitary-type security guards, who flatly refused access to the 18th Street property.

**The Filbert Property.**

51.   1000-1022 Filbert, a tenant-occupied, seven-unit, rent-controlled residential building in the Russian Hill neighborhood of San Francisco, was purchased for over three million dollars ($3,025,000.00) on or about August 14, 2013, by Defendant KIHAGI through Defendant XELAN. Filbert, also known as Assessor's Block 0093, Lot 010 in the City and County of San Francisco, State of California, is more particularly described in Exhibit B, attached hereto and incorporated as part of this Complaint. It is comprised of five apartments at 1000-1008 Filbert and an attached two-flat residence at 1020-1022 Filbert.

52.   On information and belief, at the time Defendants purchased Filbert, six of the seven units were occupied by rent-controlled tenants.

53.   Shortly after Defendants purchased Filbert, Defendants also began harassing tenants into relinquishing their leases. In addition, Defendant KIHAGI, angry that tenants had complained to the San Francisco Department of Building Inspection ("DBI") about unpermitted and unlawful construction, threatened to retaliate by initiating owner move-in and owner relative move-in evictions, and threatened to install video surveillance that invaded her tenants' privacy.

54.   By April 2014, as a result of Defendants' unlawful, unfair, deceptive and fraudulent business practices, all the units at Filbert were vacated except one. The lone holdouts were the elderly tenants in Unit 1020: a husband and wife each of whom is older than 65, and the wife's 91-year-old mother, a great-grandmother who is bedridden. Determined to remove the elderly tenants who pay substantially below-market rent as a result of their forty-year tenancy, Defendant KIHAGI began a scorched-earth campaign to harass and bully them out of the unit.

55.   On March 27, 2014, Defendants issued a 60-day Notice of Termination of Tenancy to the tenants in Unit 1020 and provided a copy to the San Francisco Rent Board. In the Notice of Termination of Tenancy, Defendant KIHAGI falsely claimed that Unit 1020 was an illegal unit and

16

COMPLAINT – CCSF v KIHAGI, et al.

1    that she intended to demolish the unit and "transform the structure back into the Single Family House

2    as it was originally and legally built." In furtherance of her plans to evict the tenants in Unit 1020,

3    Defendant KIHAGI obtained an over-the-counter permit from DBI for the demolition work on March

4    20, 2014.

5        56.    The elderly tenants in Unit 1020 challenged DBI's issuance of the demolition permit to

6    the Board of Permit Appeals. They demonstrated that 1020-1022 Filbert as originally built in 1912

7    had always been a two-unit flat and was never a single-family home as Defendant KIHAGI claimed to

8    DBI, the Rent Board, and to the tenants in Unit 1020. The permit to demolish the tenant's unit was

9    suspended on May 23, 2014.

10       57.    Despite the suspended permit, Defendants have engaged in construction, including

11   building, plumbing, and electrical construction, at 1000-1008 and 1022 Filbert without and/or

12   exceeding the scope of City permits. On information and belief, Defendants have undertaken a

13   complete "to the studs" remodel of Unit 1022 without the necessary City permits. Defendant KIHAGI

14   attempted to withdraw or cancel the permit to remove Unit 1020, but DBI insisted on inspecting the

15   building to see if work had already been done. Defendant KIHAGI refused DBI access to conduct

16   inspections.

17       58.    Defendants repeatedly denied City inspectors access to the building to conduct lawful

18   inspections. As an example, on March 5, 2015, City inspectors noticed an inspection of the property,

19   but Defendant KIHAGI and two of her security guards on site flatly denied access.

20       59.    Determined to harass and intimidate the elderly tenants in Unit 1020 to give up

21   possession of their unit, Defendant KIHAGI switched gears, and began making wild and

22   unsubstantiated claims of nuisance and lease violations against this family, in an ongoing effort to

23   bully them into vacating the unit.

24   **The Eureka Property.**

25       60.    195 Eureka Street, a tenant-occupied, five-unit, rent-controlled residential building with

26   additional commercial space in the Castro neighborhood of San Francisco, was purchased for

27   approximately two million two hundred thousand dollars ($2,200,000.00) on or about December 27,

28   2013, by Defendant KIHAGI through Defendant RENKA. Eureka, also known as Assessor's Block

17

COMPLAINT – CCSF v KIHAGI, et al.

2693, Lot 021 in the City and County of San Francisco, State of California, is more particularly described in Exhibit C, attached hereto and incorporated as part of this Complaint.

61.     On information and belief, at the time Defendants purchased Eureka, at least four of the five residential units were occupied by rent-controlled tenants.

62.     In August 2014, Defendants issued new "House Rules" to all tenants which unilaterally purported to change the terms of the tenancies, and reduce services and rights and privileges that the tenants had come to enjoy at Eureka. Defendants back-dated the House Rules by approximately one week to July 30, 2014.

63.     Defendant KIHAGI misled tenants at Eureka about their rights to reject the House Rules, warning tenants who did not accept the new House Rules that they did so "at your peril."

64.     Defendants violated the right to privacy and abused the landlord's right of entry to the former tenant in Unit 3, when construction workers hired by Defendant KIHAGI illegally entered that tenant's unit without proper notice or consent on or about September 6, 2014.

65.     On September 24, 2014, Defendant RENKA transferred 25% of Eureka to Defendant J. MWANGI. Defendants paid no transfer tax, claiming to be exempt because the ownership interest before and after the transfer remained exactly the same. In support, Defendants submitted sworn affidavits to the San Francisco Assessor/Recorder's Office stating that J. MWANGI was a 25% owner of Defendant RENKA.

66.     On October 25, 2014, Defendant J. MWANGI served the tenants in Unit 4 at Eureka with a 60-day Notice of Termination of Tenancy for an Owner Move-In eviction, and provided a copy to the Rent Board. Contradicting her earlier sworn statement to the Assessor/Recorder's Office that she was a 25% owner of Defendant RENKA, Defendant J. MWANGI falsely stated under penalty of perjury in her Declaration in support of the 60 Day Notice of Termination of Tenancy, that she owned no other property and that she was not a co-member of Defendant RENKA.[7]

67.     Defendant J. MWANGI also stated under penalty of perjury that she intended to move-in to Unit 4 within three months and make it her primary residence. Defendant J. MWANGI's

---

[7] As a 25% owner of Defendant RENKA, Defendant J. MWANGI was also an owner of the Eureka and Guerrero properties.

18

COMPLAINT – CCSF v KIHAGI, et al.

1  declaration was submitted approximately one year after Defendant KIHAGI initiated the RMI eviction

2  of the tenant at 18th Street Unit 1 so Defendant J. MWANGI could make that unit her primary

3  residence for at least thirty-six continuous months.

4          68.    The tenants in Eureka Unit 4 vacated in January 2015. To date, on information and

5  belief, Defendant J. MWANGI has not moved-in to Unit 4 and made it her primary residence.

6          69.    On March 6, 2015—one day after the City's March 5, 2015 inspection of Eureka—

7  Defendant J. MWANGI transferred her 25% interest in Eureka back to Defendant RENKA.

8  Defendants paid no tax on the property transfer by claiming the ownership interest before and after the

9  transfer remained exactly the same, and by submitting documents to the San Francisco

10 Assessor/Recorder's Office, stating that J. MWANGI was a 25% owner of Defendant RENKA.

11         70.    Defendant KIHAGI sent threatening and harassing text messages to the tenants in Unit

12 2, including text messages in December 2014 in which Defendant KIHAGI threatened to install video

13 surveillance cameras in retaliation for the tenants filing a complaint with the City regarding the front

14 door to the building at Eureka being unsecure and in need of repair.

15         71.    On or about March 5, 2015, the City conducted a noticed code enforcement inspection

16 of Eureka. Defendant KIHAGI refused city inspectors' entry to Eureka, but several tenants gave their

17 consent and requested the city inspectors enter their units. Defendant KIHAGI was present during the

18 inspections, along with two physically imposing security guards, who took photographs and videos of

19 the inspectors, and made their presence known to the inspectors as well as the cooperative tenants.

20         72.    In retaliation against the tenants at Eureka who cooperated with City's inspection,

21 Defendant KIHAGI installed video surveillance cameras the **very next day**, on March 6, 2015,

22 directly outside the tenants' units in the interior hallways of the Eureka property. Defendant KIHAGI

23 installed additional video surveillance cameras directly facing the front and back doors to the tenants'

24 units on or about March 19, 2015.

25         73.    In retaliation against the tenant in Unit 2 for cooperating with the City's inspection and

26 for organizing the tenants at Eureka and at Defendants' other properties, Defendant KIHAGI has

27 continued to send the tenant threatening and harassing text messages, has yelled and screamed at the

28 tenant, and has intimidated, harassed, and violated the tenant's right to quiet enjoyment and the

19

COMPLAINT – CCSF v KIHAGI, et al.

1  tenant's right to privacy by contacting the tenant's prior landlord seeking personal information about

2  the tenant. As an example, Defendant KIHAGI sent the tenant in Unit 2 a text message stating "stop

3  being so pathetic" and further warning her not to speak to Defendant KIHAGI's other tenants. In a

4  subsequent encounter, Defendant KIHAGI told the tenant in Unit 2 that she was "watching [her] on

5  the surveillance cameras."

6      74.    In retaliation against the tenants at Eureka for cooperating with the City's inspection,

7  Defendant KIHAGI caused the water service at Eureka to be shut-off in March 2015, shortly after the

8  City's noticed inspection. The water service was disrupted for approximately two days.

9      75.    Defendant KIHAGI has engaged in unlawful, unfair, fraudulent, and deceptive business

10  practices by performing construction, including building, plumbing, and electrical construction at

11  Eureka, including in Unit 4 and Unit 5, without and/or exceeding the scope of City permits. When

12  Defendant KIHAGI is caught by City inspectors for illegal work without permits as a result of tenant

13  complaints, Defendant KIHAGI then obtains a permit after the fact. Instead of conforming her work

14  to the permit, Defendant KIHAGI then performs work exceeding the scope of the permit, engaging in

15  a complete remodel of Units 4 and 5. As a result of additional tenant complaints and City inspections,

16  Defendant KIHAGI has been cited by the City for performing construction work exceeding the scope

17  of her permits. Despite receiving multiple citations, Defendant KIHAGI continues to perform illegal

18  and unsafe electrical, plumbing, and construction work at Eureka.

19      76.    On information and belief, Defendant KIHAGI operates and maintains an illegal

20  dwelling unit in the garage at Eureka, which Defendant KIHAGI uses to house day laborers and other

21  unlicensed construction workers who perform work at Defendant KIHAGI's properties without the

22  proper licenses or City permits.

23      77.    Defendants have also denied City inspectors access to the building to conduct lawful

24  inspections.

25      **The Guerrero Property.**

26      78.    1135-1139 Guerrero Street, a tenant-occupied, six-unit, rent-controlled residential

27  building in the Mission neighborhood of San Francisco, was purchased for approximately two million

28  six hundred thousand dollars ($2,600,000.00) on or about June 13, 2014, by Defendant KIHAGI

20

COMPLAINT – CCSF v KIHAGI, et al.

1   through Defendant RENKA.  Guerrero Street, also known as Assessor's Block 3646, Lot 014 in the

2   City and County of San Francisco, State of California, is more particularly described in Exhibit D,

3   attached hereto and incorporated as part of this Complaint.

4         79.    On information and belief, at the time Defendants purchased Guerrero, at least four of

5   the six units were occupied by rent-controlled tenants.

6         80.    Shortly after Defendants purchased Guerrero, in July 2014, Defendant KIHAGI issued

7   new "House Rules" to all tenants which unilaterally purported to change the terms of the tenancies,

8   reduce services and rights and privileges that the tenants had come to enjoy at Guerrero.

9         81.    In initial contacts with the Guerrero tenants, Defendant KIHAGI falsely and

10   misleadingly held herself out alternatively as a representative or inspector from Paragon Real Estate,

11   and as the hired manager of the building, concealing her true status as the majority (75%) owner of

12   Defendant RENKA and owner of the Guerrero property.

13         82.    Defendant KIHAGI unilaterally reduced the longstanding services enjoyed by the

14   tenants, by changing the locks to the common backyard to the building on or about August 12, 2014,

15   thereby denying tenants access and use to the backyard and back porch.  Tenants at Guerrero were also

16   denied use of storage units at Guerrero as they had been accustomed.  Defendant KIHAGI changed the

17   locks to the storage area for the garbage bins, so that tenants could not provide the trash collectors with

18   access to the bins for disposal.  Defendant KIHAGI also began diminishing the quality of life at

19   Guerrero by removing decorative finishes and making the place look shabby, run down and dirty.

20   When a tenant complained to Defendant KIHAGI about the conditions of the building, she told them

21   to "F**k off…for the peanuts you pay me I'm not going to do anything."

22         83.    Defendants have also caused the utilities to be shut-off at Guerrero due to failure to pay

23   the utility bills.  Defendants' failure to pay the water bill resulted in water to the building being

24   temporarily shut-off on or about August 6, 2014.  Defendants' failure to pay the power bill resulted in

25   dangerous and unsafe conditions at Guerrero for two to three weeks in September 2014 due to a lack

26   of lighting and power in the common areas of the building, lack of front outdoor lighting, and

27   inoperable fire alarm and front door bells.  Tenants and their visitors had to use their cell phones to

28   provide light in order to safely navigate the stairways, and several individuals "missed a step" and hurt

21

1 themselves, although not seriously, in the darkness. During that period of time, at least one tenant

2 could not invite a wheelchair-using friend to her apartment because of the extra difficulty in using the

3 stairs in the extreme darkness.

4     84.   Defendants deprived tenants' access to the mail for approximately two months in

5 December 2014 and January 2015, by failing to replace a "missing" master key used by the postal

6 carrier to gain access to the tenants' mailboxes. As a result, the postal carrier could not deliver the

7 mail to tenants at Guerrero. During this time, all of the tenants were forced to travel to the post office

8 to retrieve their mail, including those tenants who receive their needed prescription medications by

9 mail, such as the 71-year-old disabled tenant who has lived in Unit 1139 for 41 years, and the elderly

10 and disabled couple who have lived in Unit 1139A for 21 years.

11     85.   As is her business practice, Defendant KIHAGI has also terminated, threatened, or

12 attempted to terminate the tenancies of several rent-controlled tenants at Guerrero.

13     86.   On or about November 20, 2014, Defendant KIHAGI slipped under the door to Unit

14 1137A a "second" warning notice for allegedly harboring an unapproved occupant and for breaking

15 the lock on the back door to the property. This notice was in fact the first such communication to the

16 tenants in Unit 1137A, and was back-dated to approximately November 11, 2014.

17     87.   In December 2014, Defendant KIHAGI accused the tenants of deliberately withholding

18 the full amount of their rent, which had recently increased. Defendant KIHAGI refused to accept any

19 checks for the alleged shortfall, and returned the checks to the tenants.

20     88.   On or about December 20, 2014, Defendant KIHAGI falsely accused the disabled and

21 elderly tenant in Unit 1139 of trumped-up violations of the terms of her lease and the July 2014 House

22 Rules. On information and belief, Defendant KIHAGI made the baseless accusations in retaliation

23 against the tenant for rejecting her $20,000 offer to vacate the unit. After the tenant rejected the offer,

24 Defendant KIHAGI stated: "I'm going to kick you out of the house." This tenant had lived in the

25 rent-controlled unit for forty-one years, since approximately 1974, and was paying below-market rent

26 of $1004.54 per month for a two bedroom apartment. This tenant lives in Unit 1139 with her grandson

27 and godson.

28

COMPLAINT – CCSF v KIHAGI, et al.

89.     Among other things, Defendant KIHAGI has falsely accused this elderly and disabled grandmother, who is a retired school crossing guard of a local elementary school, of the following: housing unauthorized subtenants, using her unit as an unauthorized business and failing to declare that income to the tax authorities, smoking, selling, and distributing marijuana on the premises, harassing the owner's contractors and refusing them access to her unit to make repairs, "deliberately and regularly damaging the Premises and sabotaging the Premises in order to lodge complaints with government agencies as if the conditions were caused by the landlord's neglect, for the purposes of harassing the landlord, and to get financial and undue benefits by making such complaints," "acting in bad faith by complaining about the condition of the Premises to the Owner in order to get upgrades after renting and accepting the Premises with the older conditions complained of," and "showing no respect for the Owner or the applicable laws, statutes, and reasonable rules of conduct and procedures that are known to you, and have always been known to you during your tenancy." Defendant KIHAGI refused to cash the tenant's December 2014 and January 2015 rent checks.

90.     Defendant KIHAGI has harassed tenants, abused the landlord's right to access tenants' units, and violated the tenants' right to quiet enjoyment and to privacy at Guerrero, by entering or having her contractors or hired laborers enter or attempt to enter tenants' units without 24-hours' advanced notice as required by law. Specifically, Defendant KIHAGI twice entered the unit of the tenants in Unit 1139A between June 2014 and December 2014, and on at least one occasion entered the unit of the elderly and disabled tenant in Unit 1139, without the proper 24-hours' notice. Defendant KIHAGI also demands excessive access to tenants' units to complete minor repairs, by putting tenants on notice that she intends to access their units for entire days, for several days in a row or longer, for simple repairs. As a result, tenants have been forced to miss work or school, to be present when Defendant KIHAGI or her workers enter their units.

91.     On March 4, 2015, the City conducted a noticed code enforcement inspection of Guerrero. Defendant KIHAGI defiantly refused city inspectors' entry to Guerrero, but several tenants gave consent and invited City inspectors into their units. Defendant KIHAGI was present with three physically imposing bodyguards, who loudly disrupted the inspection, verbally accosted the city inspectors and accused them of trespassing, and made their menacing presence felt and known to the

23

COMPLAINT – CCSF v KIHAGI, et al.

1  city inspectors and the cooperating tenants during the inspections by lurking in the hallways directly

2  outside the tenants' units.

3      92.    As a result of the City's inspection on March 4, 2015, Defendants received multiple

4  Notices of Violation for habitability and plumbing issues throughout the building.

5      93.    In retaliation against the tenants at Guerrero who cooperated with City's inspection, and

6  in retaliation against the tenant in Unit 1139 who was fighting the unlawful detainer action brought

7  against her, Defendant KIHAGI installed video surveillance cameras on or about March 23, 2015,

8  directly facing the front doors to Units 1139 and 1139A, units occupied by elderly and disabled long-

9  term tenants.

10      94.    Defendant KIHAGI has engaged in unlawful, unfair, fraudulent, and deceptive business

11  practices by maintaining an unsafe building in violation of the health and safety codes.

12      95.    Defendants have also denied City inspectors access to the building to conduct lawful

13  inspections, including inspections of Unit 1137.

14  **The Hill Property.**

15      96.    69-75 Hill Street, a tenant-occupied, five-unit, rent-controlled residential building in the

16  Castro neighborhood of San Francisco, was purchased for approximately two million five hundred

17  thousand dollars ($2,500,000.00) on or about July 22, 2014, by Defendant ZORIALL. Hill, also

18  known as Assessor's Block 3617, Lot 036 in the City and County of San Francisco, State of

19  California, is more particularly described in Exhibit E, attached hereto and incorporated as part of this

20  Complaint.

21      97.    On information and belief, at the time Defendants purchased Hill, all five units were

22  occupied by rent-controlled tenants.

23      98.    Shortly after Defendants purchased Hill, Defendant KIHAGI began slipping back-dated

24  correspondence under the doors to the tenants' units. On or about August 1, 2014, "Anna Swain" aka

25  Defendant KIHAGI, issued a Notice of Change of Ownership and Management under the door to

26  tenants' units, which was back dated to approximately June 26, 2014. On or about August 10, 2014,

27  Defendant KIHAGI issued a 30-day notice of Change in Terms of Tenancy under the door to tenants'

28  units, also back-dated to June 26, 2014. On or about August 15, 2014, Defendant KIHAGI issued new

24

COMPLAINT – CCSF v KIHAGI, et al.

1   "House Rules" under the door to the tenants' units, which unilaterally purported to change the terms of

2   the tenancies, and reduce services and rights and privileges that the tenants had come to enjoy at Hill.

3   The House Rules were also back-dated to June 26, 2014.

4      99.   Defendant KIHAGI unilaterally reduced the longstanding services enjoyed by the

5   tenants, by demanding tenants remove items from storage in the garage in November 2014, and by

6   terminating and/or attempting to terminate the use of the parking garage for the tenants in Units 73 and

7   73a in December 2014 and January 2015. The leases for Units 73 and 73a provided tenants the use of

8   the parking garage.

9      100.   Defendant KIHAGI also began diminishing the quality of life at Hill by reducing the

10   number of trash and recycling bins to one each, for nine tenants, on or about August 2, 2014, resulting

11   in an overflow of recyclable materials in the garage. When asked in August 2014 by the tenant in Unit

12   71 about necessary sidewalk repair, Defendant KIHAGI responded that she was "not putting any

13   money into that building."

14      101.   Defendants failed to timely perform needed repairs at Hill, specifically by failing to fix

15   a leaking water heater in a timely manner in September 2015.

16      102.   Defendants caused the power to the common areas at Hill to be shut-off for

17   approximately five days in November 2014 and again in approximately February 2015, resulting in

18   dangerous and unsafe conditions due to a lack of lighting in the exterior common areas of the building;

19   in the passageway leading to the garbage facilities, in the stairway, and garage. The lack of power also

20   disrupted the tenants' use of the shared, third-party provided laundry facilities located the garage.

21      103.   Defendants disrupted the tenants' access to and security in their mail for approximately

22   one month, by installing a 6-unit mailbox for the 5-unit building on or about November 17, 2015, and

23   failing to provide tenants with keys to their individual boxes.

24      104.   On March 4, 2015, the City conducted a noticed building inspection of Hill. Defendant

25   KIHAGI and her three security guards refused City inspectors' entry to the property, and physically

26   blocked the front gate to the building. The tenant in Unit 71 ultimately provided access to the building

27   by coming out of his unit, walking past Defendant KIHAGI, and opening the gate to grant City

28   inspectors access. All of the tenants gave their consent and requested the City inspectors enter their

25

COMPLAINT – CCSF v KIHAGI, et al.

1  units. Defendant KIHAGI along with her three security guards, remained on premises for the duration

2  of the inspections, took photographs and videos of the inspectors, and made their presence known to

3  the inspectors as well as the cooperative tenants.

4      105.   Defendant KIHAGI swiftly began retaliating against the tenants who cooperated with

5  the City inspectors. During the inspection, Defendant KIHAGI pointed to Unit 73, one of the

6  cooperating tenants' units, and said in earshot of the tenant, "I'm going to move my sister in there."

7      106.   As another example of Defendant KIHAGI's intimidation tactics, during the inspection,

8  the tenant in Unit 71 wanted to show the inspectors the garage commonly used by the tenants for

9  laundry and storage. When the tenant attempted to access the garage via the back stairway from his

10  unit, he was met by Defendant KIHAGI's security guards who refused him access to the garage.

11      107.   In retaliation for the tenants' cooperating with the City, within hours after the

12  inspection, Defendant KIHAGI's workers showed up with large quantities of construction materials

13  and, under the direction of Defendant KIHAGI, physically boarded up access to the laundry room and

14  garage from the rear stairs and changed the locks to the main garage door, thereby preventing tenants

15  from accessing the garage, laundry, and their personal property such as bicycles and the vehicle

16  belonging to the tenant in Unit 73A. Defendant KIHAGI told the cooperative tenants, "the laundry is

17  done," and, within earshot of tenants, placed a telephone call to have video surveillance cameras

18  installed at Hill.

19      108.   In retaliation against the tenants for cooperating with the City's inspection, Defendant

20  KIHAGI installed the video surveillance cameras at Hill.

21      109.   On March 13, 2015, multiple tenants at Hill sent letters to Defendant KIHAGI and

22  Defendant ZORIALL outlining the harassment, retaliation, and violations of the right to quiet

23  enjoyment they had experienced, and demanding that it stop.

24      110.   On March 19, 2015, Defendant ZORIALL transferred 27 percent of the Hill Property to

25  Defendant C. MWANGI. Defendants paid no tax on the property transfer by claiming the ownership

26  interest before and after the transfer remained the same, and by submitting documents to the San

27  Francisco Tax Assessor's Office stating that C. MWANGI was a 27% owner of Defendant ZORIALL.

28

26

COMPLAINT – CCSF v KIHAGI, et al.

111. In retaliation against the tenants for cooperating with the City's inspection and for demanding that the harassment against them stop, on March 20, 2015, Defendant KIHAGI brought a tow truck to Hill and had the vehicle belonging to the tenant in Unit 73A towed from the garage and into the street. The tenant in Unit 71 called the Police. When the tenant in Unit 69 began taking photographs of the towing incident from the front steps of Hill, Defendant KIHAGI warned him that loitering in the public space and common areas was prohibited, forcing the tenant to relocate to the street to avoid additional confrontation. At the same time, a pickup truck with two of Defendant KIHAGI's workers arrived at Hill, removed the shared third-party-provided laundry machines from the garage, and boarded-up access to the garage from the outside and installed a "private property" sign warning "all unauthorized vehicles will be impounded at owner's expense."

112. During the March 20, 2015 incident, Defendant KIHAGI continued with her harassment and intimidation of tenants by taking multiple photographs of the tenants in Units 69 and 71, by demanding that the vehicle belonging to the tenant in Unit 73A be removed from the garage within twenty-four hours, and by warning the tenants that she was looking forward to getting to know them "far better than originally intended."

113. In the evenings of March 25, 2015, and April 2, 2015, Defendant KIHAGI posted a notice of intent to enter multiple units at Hill the following morning for the purpose of making repairs related to violations found by City inspectors during the March 4, 2015 inspection. Defendant KIHAGI back-dated each notice by one day and failed to provide 24-hours' notice as required by law.

114. Defendant KIHAGI violated the Hill tenants' right to quiet enjoyment by repeatedly posting notices of intent to enter multiple units at Hill in early April, and failing to appear or have her workers appear to perform repairs on the dates stated in the notices. As a result, multiple tenants needlessly missed work in their attempts to ensure they would be home when Defendant KIHAGI or her workers entered their units to perform repairs.

115. The tenant in Unit 73, tired of living with the harassment by Defendant KIHAGI and fearful that an owner move-in eviction was imminent after hearing Defendant KIHAGI threaten to move-in her sister to his unit, surrendered the unit on April 15, 2015.

27

116.   On April 17, 2015, Defendant C. MWANGI served the tenant of 71 Hill Street with a 60-day Notice of Termination of Tenancy for an Owner Move-In eviction. The tenant had lived in Unit 71 since 1993 and was paying below-market rent of $1,261.35. In a declaration submitted under penalty of perjury in support of the 60-day Notice of Termination of Tenancy, Defendant C. MWANGI stated that she lived at 18th Street Unit 6, that she owned 27% of Hill, that Defendant ZORIALL owned 73% of Hill, and that she intended to move-in to Unit 71 within three months and make it her permanent residence for at least thirty-six continuous months. Defendant C. MWANGI also stated that Unit 73 (which had been surrendered by the previous tenant only two days earlier due to Defendants' hostile and bullying tactics) was not comparable, that she did not want to move into it or designate it as the owner's unit for the future, and that it would not be available to offer to the tenants in Unit 71 for four to five months as the owners intended to renovate the unit. Defendant C. MWANGI offered Unit 73 to the tenants in Unit 71, once it was renovated in four to five months, for a monthly rent of $4,250.00. Defendant C. MWANGI also stated that she owned a single-family house in Fremont, California, where her mother resides, and that she was a less than five percent owner of Katoka 5, LLC, which owned 26th Street. Defendant C. MWANGI further stated under penalty of perjury that she did not own, or co-own, any vacant, available, comparable or incomparable units anywhere else.

117.   As a result of the City's inspection on March 4, 2015, Defendants received multiple Notices of Violation for habitability, electrical, and plumbing issues throughout the building.

118.   Defendant KIHAGI has engaged in unlawful, unfair, fraudulent, and deceptive business practices by performing construction at Hill without obtaining the necessary City permits. Specifically, Defendant KIHAGI has begun construction on an illegal dwelling unit in the basement and garage space.

119.   Defendants have also denied City inspectors access to the building to conduct lawful inspections, including inspections of the basement and garage spaces.

**The Church Property**

120.   650 Church Street, a tenant-occupied, twelve-unit, rent-controlled residential building in the Castro/Mission/Dolores neighborhood of San Francisco, was purchased for approximately six

28

COMPLAINT – CCSF v KIHAGI, et al.

million six hundred thousand dollars ($6,600,000.00) on or about January 21, 2015, by Defendant KIHAGI through Defendant NOZARI. Church Street, also known as Assessor's Block 3585, Lot 007 in the City and County of San Francisco, State of California, is more particularly described in Exhibit F, attached hereto and incorporated as part of this Complaint.

121.    On information and belief, at the time Defendants purchased the Church property most units were occupied by rent-controlled tenants.

122.    Shortly after purchasing the Church property, in February 2015, Defendant KIHAGI issued new "House Rules," which unilaterally purported to change the terms of the tenancies, and reduce services and rights and privileges that the tenants had come to enjoy at Church.

123.    Shortly after purchasing the Church property, in February 2015, Defendant KIHAGI began eviction proceedings against a tenant who is a US Army veteran and is currently being treated for advanced-stage prostate cancer.

124.    Defendants also began their typical campaign of harassment against at least some tenants. For example, the veteran tenant's February 2015 rent check was uncashed for the entire month. He sent her several more checks which she refused to cash. In another example, the same tenant received a letter from Defendant KIHAGI falsely accusing him of having an "illegal sublet." A neighboring tenant received the same false accusation.

125.    The veteran tenant also received a harassing letter from Defendants' attorney, Karen Uchiyama, accusing him of "defaming" Defendant KIHAGI when he spoke to local newspaper, "the Castro Courier."

126.    Defendants installed video surveillance equipment with cameras pointing at tenants' front doors. The veteran tenant described the surveillance camera's presence as "intrusive" and "disturbing."

127.    Defendants' actions described above in relation to specific properties are merely examples. At the time of trial, Plaintiffs will move the Court to amend this Complaint to include any conditions or acts discovered after the filing of this Complaint.

/ / /

/ / /

COMPLAINT – CCSF v KIHAGI, et al.

# FIRST CAUSE OF ACTION

## VIOLATION OF SAN FRANCISCO ADMINISTRATIVE CODE BY PLAINTIFF CITY AND COUNTY OF SAN FRANCISCO AGAINST ALL DEFENDANTS
### (San Francisco Administrative Code Sections 37.10B *et seq.*)

128.   SAN FRANCISCO hereby incorporates by reference all preceding paragraphs of this Complaint and make them a part of this First Cause of Action, as though fully set forth herein.

129.   SAN FRANCISCO brings this action pursuant to San Francisco Administrative Code Section 37.10B(c)(3)-(5).

130.   Defendants are now, and for a considerable period of time have been, unlawfully harassing their tenants in violation of Administrative Code Section 37.10B(a).

131.   Defendants unlawfully committed numerous acts prohibited by Administrative Code Section 37.10B, including, but not limited to the following:  interrupted, terminated or failed to provide housing services as required by state and local health and safety laws, failed to perform repairs and maintenance required by state and local health and safety laws, failed to exercise due diligence in performing repairs and maintenance, abused the landlord's right to access into rental housing units, influenced or attempted to influence a tenant to vacate a rental housing unit through fraud, intimidation or coercion, attempted to coerce tenants to vacate with offers of payments to vacate accompanied by threats or intimidation,

132.   SAN FRANCISCO has no adequate remedy at law in that damages are insufficient to protect the public from the harm caused by the conduct described herein.

133.   Unless said conduct is ordered abated, other tenants and occupants, and other residents of SAN FRANCISCO will suffer irreparable injury and damage, in that said conduct will continue to be injurious to the continuous enjoyment of life and the free use of property of said residents.

134.   By their conduct, Defendants have repeatedly violated, disobeyed, omitted, neglected, and refused to comply with the San Francisco Administrative Code, and should be enjoined as contemplated by San Francisco Administrative Code Section 37.10B(c)(4), and ordered to pay statutory damages of $1,000 per offense, as set forth in San Francisco Administrative Code Section 37.10B(c)(5).

30

COMPLAINT – CCSF v KIHAGI, et al.

1    135.   Because Defendants' conduct was despicable and carried out with a willful and

2    conscious disregard for the rights of the tenants and their safety, and was committed with malice,

3    oppression and fraud within the meaning of California Civil Code Section 3294(c), Defendants should

4    also be ordered to pay punitive damages as provided by San Francisco Administrative Code Section

5    37.10B(c)(5).

6

7                         **SECOND CAUSE OF ACTION**

8    **VIOLATIONS OF THE STATE HOUSING LAW BROUGHT BY PLAINTIFF**
     **CITY AND COUNTY OF SAN FRANCISCO AGAINST ALL DEFENDANTS**
9                **(California Health & Safety Code Sections 17920-17980.9)**

10    136.   SAN FRANCISCO hereby incorporates by reference all preceding paragraphs of this

11    Complaint and make them a part of this Second Cause of Action, as though fully set forth herein.

12    137.   Defendants now are, and for a considerable period of time heretofore and at all times

13    herein mentioned have been, maintaining and operating properties in the City and County of San

14    Francisco as substandard buildings within the meaning of Health and Safety Code Section 17920.3.

15    138.   Defendants are now, and for a considerable period of time and at all times herein

16    mentioned have been maintaining the 18th Street, Eureka, Guerrero, Filbert and Hill properties in

17    violation of San Francisco Building Code Sections 102A and 103A and/or San Francisco Housing

18    Code Sections 204(c) and 1001. Defendants have repeatedly failed to file and secure requisite permits

19    before commencing construction at the above properties and/or performed work exceeding the scope

20    of issued permits, in violation of the aforementioned sections of the San Francisco Building Code.

21    Defendants also perform work exceeding the scope of any issued permits. Defendants also fail to

22    properly maintain the Properties and/or fail to timely cure cited conditions, in violation of the

23    aforementioned section of the San Francisco Housing Code.

24    139.   The conditions creating said substandard buildings are Defendants' repeated refusal to

25    obtain the proper building, plumbing and electrical permits prior to performing the construction work.

26    The unpermitted work, performed by unlicensed workers, is a violation of the San Francisco Building

27    Code, Sections 102A and 103A.

28

                                    31

COMPLAINT – CCSF v KIHAGI, et al.

140. Performing electrical, plumbing or other work without permits or in excess of permits, creates unsafe and substandard buildings, public nuisances, and conditions which substantially endanger the health and safety of occupants and neighbors and the general public.

141. When Defendants are caught by the City, and Notices of Violation are issued, they obtain some permits, but then will perform work in excess of the permits, have unlicensed workers perform work, refuse to provide access to the subject properties for inspection by City inspectors, and fail to timely abate cited violations.

142. At all times herein mentioned Defendants had notice and knowledge that 18th Street, Eureka, Guerrero, Filbert and Hill properties constituted public nuisances because they were served with the administrative notices issued by DBI, but failed to take reasonable steps to timely abate the nuisances.

143. Plaintiffs have no adequate remedy at law in that damages are insufficient to protect the public from the harm caused by the conditions described herein.

144. Unless said substandard conditions are abated, the occupants of the properties and the residents and citizens of the City and County of San Francisco, will suffer irreparable injury and damage, in that said conditions will continue to endanger the health and safety of the occupants of the properties and the occupants of the adjacent properties and the general public.

145. Unless Defendants are enjoined from continuing their practices of performing construction without required and proper permits, they will continue to endanger the health and safety of the occupants of the properties and the occupants of the adjacent properties and the general public.

146. Defendants should be ordered to pay all SAN FRANCISCO's reasonable and actual costs, including, but not limited to, inspection costs, investigation costs, enforcement costs, attorney fees or costs, and all costs of prosecution as provided by California Health and Safety Code Section 17980.7(d).

147. Defendants should also be ordered not to claim any deduction with respect to state taxes for interest, taxes, expenses, depreciation, or amortization paid or incurred with respect to the properties mentioned herein for the taxable years of Defendants' violations of the State Housing Law as provided by California Health and Safety Code Section 17980.7(b)(1).

32

COMPLAINT – CCSF v KIHAGI, et al.

### THIRD CAUSE OF ACTION

**FOR GENERAL PUBLIC NUISANCE BY PLAINTIFF PEOPLE OF
THE STATE OF CALIFORNIA AGAINST ALL DEFENDANTS
(Civil Code Sections 3479, 3480; Code of Civil Procedure Section 731)**

148.     Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint and make them a part of this Third Cause of Action, as though fully set forth herein.

149.     Plaintiff brings this cause of action pursuant to Civil Code Sections 3479 and 3480.

150.     As described above, Defendants are now, and for a considerable period of time, and all times herein mentioned have been, maintaining the aforementioned properties in a manner as to constitute a continuing public nuisance within the meaning of Civil Code Sections 3479 and 3480. The conditions giving rise to said public nuisances are the violations of the municipal codes at the properties. The practices described above are injurious to the health and safety of the residents and the community, are offenses to the senses, and interfere with the comfortable enjoyment of life and properties. The practices described above also affect a considerable number of persons and an entire community or neighborhood.

151.     At all times herein mentioned, Defendants knew or should have known that the aforementioned properties were being maintained as public nuisances, but failed to take reasonable steps to timely abate the nuisance.

152.     Unless enjoined, Defendants will continue to operate the properties in the above-described public nuisance conditions.

153.     Plaintiffs have no adequate remedy at law in that damages are insufficient to protect the public from the harm caused by the conditions described above. Unless injunctive relief is granted to enjoin Defendants, the public will suffer irreparable injury and damage.

154.     Unless this nuisance is abated, the community, neighborhood, and the residents and citizens of the City and County of San Francisco will suffer irreparable injury and damage, in that said conditions will continue to be injurious to the enjoyment and the free use of the life and property of said residents and citizens of the City and County of San Francisco and the People of the State of California.

33

## FOURTH CAUSE OF ACTION

### FOR UNFAIR AND UNLAWFUL BUSINESS PRACTICES BROUGHT BY PLAINTIFF PEOPLE OF THE STATE OF CALIFORNIA AGAINST ALL DEFENDANTS
#### (California Business and Professions Code §§ 17200-17210)

155.    The PEOPLE hereby incorporate by reference all preceding paragraphs of this Complaint and make them part of this Fourth Cause of Action, as though fully set forth herein.

156.    City Attorney Dennis J. Herrera, acting to protect the public as consumers and competitors from unlawful, unfair, and fraudulent practices, brings this cause of action in the public interest in the name of the PEOPLE, pursuant to Business and Professions Code §§ 17200-17209.

157.    The violations of law described herein, including the illegal harassment of rent-controlled tenants, the illegal evictions of rent-controlled tenants, and the illegal remodeling of units without first obtaining required permits. By not following the rules under the Rent Ordinance, Defendants have unlawfully and unfairly circumvented the protections of the Rent Ordinance, deprived SAN FRANCISCO of affordable housing units, and have had a detrimental effect on the City's dwindling inventory of affordable housing stock.

158.    The violations of law described herein have been and are being carried out wholly, or in part, within the City and County of San Francisco.

159.    The actions of Defendants are in violation of the laws and public policies of SAN FRANCISCO and the State of California, and are inimical to the rights and interest of the general public. Unless enjoined and restrained by an order of this Court, Defendants will continue to engage in the unlawful and unfair acts and courses of conduct described herein.

160.    Through the conduct described above, Defendants have engaged, or aided and abetted in unlawful, unfair, and/or fraudulent business practices prohibited by California Business and Professions Code §§ 17200-17209 including but not limited to the following:

- Harassing and intimidating lawful tenants in violation of San Francisco Administrative Code Section 37.10B;
- Retaliating against tenants in violation of San Francisco Administrative Code Section 37.9 and Civil Code Section 1942.5;
- Abusing the lawful right of entry in violation of Civil Code Section 1954;

34

COMPLAINT – CCSF v KIHAGI, et al.

- Remodeling and doing construction work without first obtaining the requisite building, plumbing and electrical permits;

- Remodeling and doing construction work in excess of permits obtained;

- Refusing to comply with numerous Notices and Orders issued by the San Francisco Department of Building Inspection;

- Refusing to allow City inspections on complaints of work without permit;

- Refusing to allow City inspections to provide oversight to work allegedly being performed under issued permits;

- Providing false information to the San Francisco Rent Board under penalty of perjury in an attempt to unlawfully take possession of a rent-controlled unit;

- Providing false information to the San Francisco Assessor/Recorder's Office under penalty of perjury;

- Providing false information to the Superior Court under penalty of perjury in order to unlawfully take possession of a rent-controlled unit;

- Impeding, interrupting, and attempting to disrupt lawful and noticed health and safety inspections; and

- Refusing and failing to register their businesses with the City and County of San Francisco as required by Business and Tax Regulation Code Section 853.

161.    The PEOPLE are informed and believe, and based upon such information and belief, allege that as a direct result of these acts and omissions, Defendants have received or will receive income and other benefits which they would not have received if they had not engaged in the violations of Business and Professions Code §§ 17200 *et* seq. described in this Complaint.

162.    The PEOPLE have no adequate remedy at law in that damages are insufficient to protect the public from the present danger and harm caused by the conditions described in this Complaint.

163.    The PEOPLE are informed and believe, and based on such information and belief, allege that unless enjoined and restrained Defendants will continue to engage in unfair and unlawful business practices.

35

COMPLAINT – CCSF v KIHAGI, et al.

164.    Unless injunctive relief is granted to enjoin Defendants' unfair and unlawful business practices, the PEOPLE will suffer irreparable injury and damage.

165.    Defendants are subject to civil penalties of up to $2,500 per violation of the Business and Professions Code for each act of unfair or unlawful competition, pursuant to Business and Professions Code § 17206, and an additional $2,500 per violation of the Business and Professions Code for each act of unfair or unlawful competition directed at an elderly or disabled person.

**PRAYER**

WHEREFORE, Plaintiffs pray that:

1.    Defendants be declared to have violated the San Francisco Administrative Code, Health & Safety Code, Civil Code, and Business and Professions Code §§ 17200-17209;

2.    Pursuant to Civil Code Sections 526 and 731, the Court issue a permanent injunction, ordering Defendants to permanently cease the unlawful harassment of their tenants, cease the unlawful evictions of rent-controlled tenants, cease making baseless accusations against tenants, obtain all required permits to remove all illegally performed construction, obtain all required permits to legalize work illegally performed, abate all health and safety code violations, immediately register the businesses with the City and County of San Francisco, and cease all unlawful or unfair business practices in San Francisco, California;

3.    Defendants, and each of them, their agents, officers, managers, representatives, employees, and anyone acting on their behalf, and their heirs and assignees, be preliminarily and permanently enjoined from maintaining, operating, conducting, using, occupying, or in any way permitting the use of any of their Properties in San Francisco, California, until the Property conforms to law;

4.    Defendants, and each of them, their agents, officers, managers, representatives, employees, and anyone acting on their behalf, and their heirs and assignees, be preliminarily and permanently enjoined from maintaining, operating, conducting, using, occupying, or in any way permitting the use of any of their Properties in San Francisco, California, as an unfair and/or unlawful business practice in violation of California Business and Professions Code §§ 17200-17209.

36

COMPLAINT – CCSF v KIHAGI, et al.

5.   Defendants, and each of them, their agents, officers, managers, representatives, employees, and anyone acting on their behalf, and their heirs and assignees, be ordered to cause all of the Properties and all parts thereof, to conform to law, and to maintain each in such conformity at all times;

6.   Pursuant to San Francisco Administrative Code Section 37.10B, Defendants, and each of them, be ordered to pay statutory damages of $1,000 for each and every violation of Administrative Code Section 37.10B;

7.   Pursuant to San Francisco Administrative Code Section 37.10B, Defendants, and each of them, be ordered to pay punitive damages;

8.   Pursuant to Business and Professions Code § 17206, Defendants, and each of them, be ordered to pay a civil penalty of $2,500 for each unfair and/or unlawful business act alleged in this Complaint;

9.   Pursuant to Business and Professions Code § 17206.1, Defendants, and each of them, be ordered to pay an additional civil penalty of $2,500 for each unfair and/or unlawful business act alleged in this Complaint, which was directed at an elderly or disabled person;

10.   Pursuant to Business and Professions Code § 17203, Defendants, and each of them, be ordered to make restitution of any money or property, real or personal, obtained through their unfair and/or unlawful business acts and practices;

11.   Defendants, and each of them, be preliminarily and permanently enjoined from spending, transferring, encumbering, or removing from California any real or personal property or money received from the Property or in payment for the unfair and unlawful acts alleged in this Complaint;

12.   Plaintiffs be authorized to have a lien upon the Property in the amount expended pursuant to said authority and to have judgment in said amount against said Defendants, and their successors and assigns;

13.   Plaintiffs be authorized to record an Abstract of Judgment that constitutes a prior lien over any lien that any Defendants in this case may hold on the Property;

COMPLAINT – CCSF v KIHAGI, et al.

14.    Defendants, and each of them, be ordered to pay Plaintiffs' costs of enforcement

pursuant to California Health & Safety Code Section 17980.7(d) and San Francisco Administrative

Code Section 37.10B(c)(5);

15.    Defendants, and each of them, be ordered to pay Plaintiffs' reasonable attorney's fees

and costs incurred in bringing this civil action, pursuant to California Health & Safety Code Section

17980.7(d) and San Francisco Administrative Code Section 37.10B(c)(5); and

16.    Other and further relief be ordered as this Court should find just and proper.

Dated:  6-4-15

DENNIS J. HERRERA
City Attorney
YVONNE R. MERE
Chief Attorney
MICHAEL S. WEISS
VICTORIA L. WEATHERFORD
Deputy City Attorneys

By: _____
MICHAEL S. WEISS
Attorneys for Plaintiffs
CITY AND COUNTY OF SAN FRANCISCO and
PEOPLE OF THE STATE OF CALIFORNIA

38

COMPLAINT -- CCSF v KIHAGI, et al.

1

## INDEX TO EXHIBITS

2

**Exhibit**   **Description**

3

   A      Property Description of 3947 18th Street

4

   B      Property Description of 1000-1022 Filbert Street

5

   C      Property Description of 195 Eureka Street

6

   D      Property Description of 1135-1139 Guerrero Street

7

   E      Property Description of 69-75 Hill Street

8

   F      Property Description of 650 Church Street

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - CCSF v. KIHAGI, et al.

# EXHIBIT "A"

The land referred to is situated in the County of San Francisco, City of San Francisco, State of California, and is described as follows:

Beginning at a point on the Southerly line of 18th Street, distant thereon 280 feet Easterly from the Easterly line of Noe Street; running thence Easterly along the said Southerly line of 18th Street 25 feet; thence at a right angle Southerly 114 feet; thence at a right angle Westerly 25 feet; and thence at a right angle Northerly 114 feet to the Southerly line of 18th Street and the point of beginning.

Being a portion of Mission Block No. 106.

Assessor's Lot 086; Block 3584

258

EXHIBIT "B"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN FRANCISCO, COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

BEGINNING at a point of intersection of the Northerly line of Filbert Street and the Westerly line of Jones Street; running thence Westerly along said line of Filbert Street 105 feet and 3 inches; thence at a right angle Northerly 52 feet; thence at a right angle Easterly 36 feet and 3 inches; thence at a right angle Southerly 25 feet; thence at a right angle Easterly 70 feet to the Westerly line of Jones Street; thence at a right single Southerly along said line of Jones Street 27 feet to the point of beginning.

BEING part of 50 Vara Block No. 237.

APN: Lot 10, Block 93

# EXHIBIT "C"

The property referred to is situated in the County of San Francisco, City of San Francisco, State of California, and is described as follows:

An undivided 25% interest, fractional interest in Lot 021 and Block 2693, commencing at the point of intersection of the northerly line of 19th Street and the easterly line of Eureka Street; running thence easterly and along the said line of 19th Street 25 Feet; Thence at a right angle northerly 75 Feet; thence at a right angle westerly 25 feet to the easterly line of Eureka Street; thence at a right angle southerly along said line of Eureka Street 75 Feet to the point of commencement.

Being part of Horner's Addition, Block No. 207.

262

# EXHIBIT "D"



## Legal Description

The land referred to is situated in the County of San Francisco, City of San Francisco, State of California, and is described as follows:

Commencing at a point on the Easterly line of Guerrero Street distant thereon 42 feet 9 inches Northerly from the Northerly line of Elizabeth Street; running thence Northerly and along said Easterly line of Guerrero Street 30 feet; thence at a right angle Easterly 100 feet; thence at a right angle Southerly 30 feet; thence at a right angle Westerly 100 feet to the Easterly line Guerrero Street and the point of commencement.

Being part of Horner's Addition Block No. 11

Assessor's Lot 14; Block 3646

22892973v1

264

# EXHIBIT "E"

 

### DESCRIPTION OF THE LAND

THE LAND REFERRED TO HEREIN IS SITUATED IN SAN FRANCISCO COUNTY, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Beginning at a point on the Southerly line of Hill Street, distant thereon 130 feet Easterly from the Easterly line of Guerrero Street; running thence Easterly along said line of Hill Street, 40 feet; thence at a right angle Southerly 114 feet; thence at a right angle Westerly 40 feet; thence at a right angle Northerly 114 feet to the point of beginning.

Being a portion of Mission Block No. 74.

APN: Lot 038; Block 3617

PROPERTY ADDRESS: 69-75 HILL STREET, SAN FRANCISCO, CALIFORNIA 94110

California Deed of Trust
Exhibit "A" – Legal Description

Page A-1

EXHIBIT "F"

The land referred to is situated in the County of San Francisco, City of San Francisco, State of California, and is described as follows:

Commencing at the point of intersection of the Southerly line of Hancock Street with the Westerly line of Church Street; running thence Southerly along said line of Church Street 28 feet 4 inches; thence at a right angle Westerly 100 feet; thence at a right angle Northerly 26 feet 4 inches to the Southerly line of Hancock Street; and thence Easterly along said line of Hancock Street 100 feet to the Westerly line of Church Street and the point of Commencement.

Being a portion of Mission Block No. 93.

Assessor's Lot 007; Block 3585

268

# EXHIBIT 11

1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   PETER J. KEITH, State Bar #206482
    Chief Attorney
3   Neighborhood and Resident Safety Division
    MICHAEL S. WEISS, State Bar #168378
4   VICTORIA L. WEATHERFORD, State Bar #267499
    Deputy City Attorneys
5   Fox Plaza
    1390 Market Street, Sixth Floor
6   San Francisco, California 94102-5408
    Telephone:    (415) 554-4287
7   Facsimile:    (415) 437-4644
    E-Mail:    michael.weiss@sfgov.org
8   E-Mail:    victoria.weatherford@sfgov.org

9   Attorneys for Plaintiffs
    CITY AND COUNTY OF SAN FRANCISCO and
10  PEOPLE OF THE STATE OF CALIFORNIA

                                            **FILED**
                                    San Francisco County Superior Court

                                            OCT 26 2017

                                      CLERK OF THE COURT
                                    BY: _R. Michael Dil_____
                                                      Deputy Clerk

11            SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                    COUNTY OF SAN FRANCISCO

13                      UNLIMITED JURISDICTION

14  CITY AND COUNTY OF SAN            Case No. CGC-15-546152
15  FRANCISCO, a Municipal Corporation, and
    the PEOPLE OF THE STATE OF
16  CALIFORNIA, by and through DENNIS J.
    HERRERA, City Attorney for the CITY AND
17  COUNTY OF SAN FRANCISCO,

18            Plaintiffs,                [PROPOSED] AMENDED JUDGMENT

19       vs.                            Judge:      Hon. Angela Bradstreet
                                        Place:      Dept. 624
20  ANNE KIHAGI aka ANNA KIHAGI aka
    ANNA SWAIN aka ANNE KIHAGI SWAIN       Date Action Filed:   June 4, 2015
21  aka ANNA KIHAGI SWAIN, JULIA           Trial Date:          October 31, 2016
    MWANGI aka JULIA MUNENE,
22  CHRISTINE MWANGI aka CHRISTINA
    MWANGI aka CHRISTINE JOHNSON,
23  XELAN PROP 1, LLC, RENKA PROP, LLC,
    NOZARI 2, LLC, ZORIALL, LLC, and DOE
24  ONE through DOE FIFTY,

25            Defendants.

26

27

28

                                    1

Amended Judgment, CASE CGC-15-546152          n:\codenf\li2016\151349\01196624.docx

1    The Court having entered its original judgment on June 12, 2017 with the proviso that said

2  judgment may be amended for the sole purpose of including the amounts of attorneys' fees and costs,

3  and the Court having issued its Order Order Granting Plaintiff City and County of San Francisco's

4  Motion for Attorneys' Fees on October 18, 2017, which awarded attorneys fees and costs to and in

5  favor of Plaintiff CITY AND COUNTY OF SAN FRANCISCO, to have and recover an award of

6  $2,737,276.54 (the sum of $2,503,141 in attorneys' fees and $234,135.54 in costs) against Defendant

7  ANNE KIHAGI, an individual, against Defendant JULIA MWANGI aka JULIA MUNENE, an

8  individual, against Defendant CHRISTINE MWANGI aka CHRISTINA MWANGI aka CHRISTINE

9  JOHNSON, an individual, against Defendant XELAN PROP 1, LLC, a California Limited Liability

10  Company, against Defendant RENKA PROP, LLC, a California Limited Liability Company, against

11  Defendant NOZARI 2, LLC, a California Limited Liability Company; and against Defendant

12  ZORIALL, LLC, a California Limited Liability Company, jointly and severally, the Court hereby

13  enters this Amended Judgment.

14    IT IS HEREBY ORDERED ADJUDGED AND DECREED THAT Plaintiff CITY AND

15  COUNTY OF SAN FRANCISCO shall recover judgment totaling $3,854,776.54, as follows:

16    (1) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant

17  ANNE KIHAGI, an individual, against Defendant JULIA MWANGI aka JULIA MUNENE, an

18  individual, against Defendant CHRISTINE MWANGI aka CHRISTINA MWANGI aka CHRISTINE

19  JOHNSON, an individual, against Defendant XELAN PROP 1, LLC, a California Limited Liability

20  Company, against Defendant RENKA PROP, LLC, a California Limited Liability Company, against

21  Defendant NOZARI 2, LLC, a California Limited Liability Company, and against Defendant

22  ZORIALL, LLC, a California Limited Liability Company, jointly and severally, the sum of

23  $2,503,141 in attorneys' fees and $234,135.54 in costs, for a total amount of $2,737,276.54;

24    (2) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant

25  ANNE KIHAGI aka ANNA KIHAGI aka ANNA SWAIN aka ANNE KIHAGI SWAIN aka ANNA

26  KIHAGI SWAIN, an individual, alone, the amount of $23,000.00;

27

28

2

Amended Judgment, CASE CGC-15-546152                    n:\codenf\li2016\151349\01196624.docx

271

(3) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant ANNE KIHAGI, an individual, and against Defendant XELAN PROP 1, LLC, a California Limited Liability Company, jointly and severally, the amount of $393,750.00;

(4) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant ANNE KIHAGI, an individual, and against Defendant RENKA PROP, LLC, a California Limited Liability Company, jointly and severally, the amount of $397,000.00;

(5) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant ANNE KIHAGI, an individual, against Defendant JULIA MWANGI aka JULIA MUNENE, an individual, and against Defendant RENKA PROP, LLC, a California Limited Liability Company, jointly and severally, the amount of $40,500.00;

(6) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant ANNE KIHAGI, an individual, and against Defendant ZORIALL, LLC, a California Limited Liability Company, jointly and severally, the amount of $158,250.00;

(7) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant ANNE KIHAGI, an individual, against Defendant CHRISTINE MWANGI aka CHRISTINA MWANGI aka CHRISTINE JOHNSON, an individual, and against Defendant ZORIALL, LLC, a California Limited Liability Company, jointly and severally, the amount of $47,000.00;

(8) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant ANNE KIHAGI, an individual, and against Defendant NOZARI 2, LLC, a California Limited Liability Company, jointly and severally, the amount of $58,000.00.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED THAT Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis J. Herrera, City Attorney for the City and County of San Francisco, shall recover judgment totaling $1,612,029.00 as follows:

(1) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera, City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI aka ANNA KIHAGI aka ANNA SWAIN aka ANNE KIHAGI SWAIN aka ANNA KIHAGI SWAIN, an individual, alone, the amount of $5000.00;

3

Amended Judgment, CASE CGC-15-546152

n:\codenf\li2016\151349\01196624.docx

(2) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera, City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual, and against Defendant XELAN PROP 1, LLC, a California Limited Liability Company, jointly and severally, the amount of $178,009.00;

(3) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera, City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual, and against Defendant RENKA PROP, LLC, a California Limited Liability Company, jointly and severally, the amount of $945,012.00;

(4) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera, City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual, against Defendant JULIA MWANGI aka JULIA MUNENE, an individual, and against Defendant RENKA PROP, LLC, a California Limited Liability Company, jointly and severally, the amount of $96,002.00;

(5) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera, City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual, and against Defendant ZORIALL, LLC, a California Limited Liability Company, jointly and severally, the amount of $149,004.00;

(6) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera, City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual, against Defendant CHRISTINE MWANGI aka CHRISTINA MWANGI aka CHRISTINE JOHNSON, an individual, and against Defendant ZORIALL, LLC, a California Limited Liability Company, jointly and severally, the amount of $136,001.00;

(7) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera, City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual, and against Defendant NOZARI 2, LLC, a California Limited Liability Company, jointly and severally, the amount of $103,001.00.

Interest shall accrue on the total amount of the amended judgment, including the principal of the June 12, 2017 judgment and the award of costs and pre-judgment attorneys' fees herein, from June

4

n:\codenf\li2016\l51349\01196624.docx

1    12, 2017 to the date of entry of an amended judgment, at the rate of 10% per annum pursuant to C.C.P.

2    section 685.010(a):

3

4

5    Dated: October 26 2017

6    _____

7    HON. ANGELA BRADSTREET

8    JUDGE OF THE SUPERIOR COURT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

Amended Judgment, CASE CGC-15-546152                     n:\codenf\lf2016\151349\01196624.docx

274

**EXHIBIT 12**

FILED
SAN FRANCISCO COUNTY
~~~~~~~~~~~

DEC 26 2017

CLERK OF THE COURT

BY: _____

1  DENNIS HERRERA, ESQ. SBN 139669, City Attorney
   PETER KEITH, ESQ. SBN 206482, Chief Attorney
2  Neighborhood & Residential Safety Division
   VICTORIA L. WEATHERFORD, ESQ. SBN 267499
3  Deputy City Attorney
   MICHAEL WEISS, ESQ. SBN 168378, Deputy City Attorney
4  OFFICE OF THE CITY ATTORNEY
   1390 Market Street, Seventh Floor
5  San Francisco, CA 94102-5408
   Telephone: (415) 554-4700
6
   DAVID J. COOK, ESQ. SBN 060859
7  COOK COLLECTION ATTORNEYS
   A PROFESSIONAL LAW CORPORATION
8  165 Fell Street, San Francisco, CA 94102
   P.O. Box 270, San Francisco, CA 94104-0270
9  Telephone: (415) 989-4730
   Facsimile: (415) 989-0491
10 Our File No. 57,080

11 Attorneys for Plaintiffs CITY AND COUNTY OF SAN FRANCISCO,
   a Municipal Corporation, and the PEOPLE OF THE STATE
12 OF CALIFORNIA, by and through DENNIS J. HERRERA,
   City Attorney for the CITY AND COUNTY OF SAN FRANCISCO
13
                SUPERIOR COURT FOR THE STATE OF CALIFORNIA
14
                         COUNTY OF SAN FRANCISCO
15
   CITY AND COUNTY OF SAN              )  CASE NO. CGC-15-546152
16 FRANCISCO, a Municipal Corporation, )
   and the PEOPLE OF THE STATE        )  [PROPOSED] ORDER GRANTING
17 OF CALIFORNIA, by and through       )  RENOTICED MOTION FOR ASSIGNMENT
   DENNIS J. HERRERA, City Attorney    )  OF RIGHTS, RESTRAINING ORDER AND
18 for the CITY AND COUNTY OF SAN      )  TURNOVER ORDER PURSUANT TO C.C.P.
   FRANCISCO,                          )  § 708.510(a), C.C.P. § 708.520(a) AND C.C.P. §
19                                     )  699.040
                Plaintiffs,            )
20                                     )  [RENTS AND LEASE PAYMENTS OWED TO
   vs.                                 )  XELAN PROP 1, LLC, RENKA PROP, LLC,
21                                     )  NOZARI 2, LLC, AND ZORIALL, LLC]
   ANNE KIHAGI aka ANNA KIHAGI aka     )
22 ANNA SWAIN aka ANNE KIHAGI          )
   SWAIN aka ANNA KIHAGI SWAIN,        )
23 JULIA MWANGI aka JULIA MUNENE,      )
   CHRISTINE MWANGI aka                )
24 CHRISTINA MWANGI aka                )
   CHRISTINE JOHNSON, XELAN PROP       )
25 1, LLC, RENKA PROP, LLC, NOZARI     )  Date:   December 26, 2017
   2, LLC, ZORIALL, LLC, and DOE ONE   )  Time:   9:30 a.m.
26 through DOE FIFTY,                  )  Dept.:  501
                                       )  Judge:  Lynn O'Malley Taylor
27              Defendants.            )
                                       )
28

   _____
   [PROPOSED] ORDER GRANTING RENOTICED MOTION FOR ASSIGNMENT OF RIGHTS, RESTRAINING ...

1    Said NOTICE OF MOTION AND MOTION FOR ASSIGNMENT OF RIGHTS,

2    RESTRAINING ORDER AND TURNOVER ORDER PURSUANT TO C.C.P. § 708.510(a),

3    C.C.P. § 708.520(a) AND C.C.P. § 699.040 [RENTS AND LEASE PAYMENTS OWED TO

4    XELAN PROP 1, LLC, RENKA PROP, LLC, NOZARI 2, LLC, AND ZORIALL, LLC] having

5    come on regularly for hearing this 26th day of December, 2017 at the hour of 9:30 a.m. in Dept.

6    501 of the above-entitled court, before the Honorable Lynn O'Malley Taylor, Judge of the

7    Superior Court, and Peter Keith, Esq., Deputy City Attorney, and David J. Cook, Esq., appearing

8    on behalf of Plaintiffs CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation,

9    and the PEOPLE OF THE STATE OF CALIFORNIA, by and through DENNIS J. HERRERA,

10    City Attorney for the CITY AND COUNTY OF SAN FRANCISCO ("Plaintiffs"), and

11    _____, Esq., appearing on behalf of Defendants XELAN PROP 1, LLC, RENKA

12    PROP, LLC, NOZARI 2, LLC, ZORIALL, LLC ("Defendant LLC's), and the court having

13    considered the moving, opposing, and reply papers, and after argument of counsel, and the court

14    having issued the following Tentative Ruling:

15    PLAINTIFFs CITY AND COUNTY OF SAN FRANCISCO and THE PEOPLE

16    OF THE STATE OF CALIFORNIA's Renotice Of Motion For Assignment Etc.

17    GRANTED as follows: (1) Motion for assignment of rents, retraining order and

18    turnover order is granted as requested with the effective date of January 1, 2018;

19    (2) if Defendants post the undertaking for the full amount of the amended judgment

20    as claimed in the opposition by December 31, 2017 (the Court notes that the last

21    Court date this year is December 29, 2017) (Opposition 2:7), the order shall not go

22    into effect; (3) if defendants receive any rental payments for January 2018 before

23    the effective date of the order, those payments shall be turned over by no later than

24    January 5, 2018 and then on on-going basis within 2 business days of receipt of

25    payment until all payments are made directly to the Plaintiff by the obligors

26    (tenants, lessees, etc.) The Court will not make any priority determinations at this

27    time. If and when priority is claimed by a third party, a motion may be made to the

28

2

[PROPOSED] ORDER GRANTING RENOTICED MOTION FOR ASSIGNMENT OF RIGHTS, RESTRAINING ...

277

1    Court to resolve the matter. The Court also notes that in the event Defendants wish

2    to sell any on the affected properties, they may apply (regularly noticed motion) for

3    the approval of the Court and for the determination of the distribution of the sale

4    proceeds.

5        And no claim of exemption having been filed therein, and for good cause appearing,

6    therefore,

7        IT IS HEREBY ORDERED that the motion for assignment of rights, turnover order, and

8    restraining order is granted, with an effective date of January 1, 2018.

9        IT IS FURTHER ORDERED that if Defendants post the undertaking based ~~on the full~~

10    amount of ~~the monetary judgment~~, as claimed in the opposition by December 31, 2017 (the

11    Court notes that the last Court date this year is December 29, 2017) (Opposition 2:7), the

12    order shall not go into effect.

13        IT IS FURTHER ORDERED that if defendants receive any rental payments for ~~the month of~~

14    ~~January 2018 before the effective date of the order, those payments shall be turned over by~~

15    ~~no later than January 5, 2018 and then on on-going basis within 2 business days of receipt of~~

16    ~~payment until all payments are made directly to the Plaintiff by the obligors~~ (tenants,

17    lessees, etc.).

18        IT IS FURTHER ORDERED that the Court will not make any priority determinations

19    at this time. If and when priority is claimed by a third party, a motion may be made to the

20    Court to resolve the matter. The Court also notes that in the event Defendants wish to sell

21    any on the affected properties, they may apply (regularly noticed motion) for the approval of

22    the Court and for the determination of the distribution of the sale proceeds.

23        IT IS FURTHER ORDERED that all of the rents, lease payments, lease obligations,

24    general intangibles, rights to payment of money, contract rights, deposits and deposit accounts,

25    claims against third parties, monies due from third parties, due and in favor of and for the benefit

26    of the Defendant LLC's arising out of their ownership, management, control, rental of, lease of,

27    real properties in the name of or under the control specifically of Defendants XELAN PROP 1,

28

3

[PROPOSED] ORDER GRANTING RENOTICED MOTION FOR ASSIGNMENT OF RIGHTS, RESTRAINING ...

1  LLC, RENKA PROP, LLC, NOZARI 2, LLC, ZORIALL, LLC ("RIGHTS TO PAYMENT OF

2  RENTAL INCOME"), are hereby assigned, transferred, and payable to Plaintiffs CITY AND

3  COUNTY OF SAN FRANCISCO, a Municipal Corporation, and the PEOPLE OF THE STATE

4  OF CALIFORNIA, by and through DENNIS J. HERRERA, City Attorney for the CITY AND

5  COUNTY OF SAN FRANCISCO, care of its attorney, Victoria L. Weatherford, Esq., Deputy

6  City Attorney, for and on behalf of DENNIS J. HERRERA, City Attorney for the CITY AND

7  COUNTY OF SAN FRANCISCO, 1390 Market Street, Seventh Floor, San Francisco, CA 94102-

8  5408, for purposes of payment of the Judgment in the total amount of $5,466,585.51, plus interest

9  and costs as may be allowed, for the amounts and against the parties as set forth below:

| Defendant LLC's | Amount due under the Amended Judgment |
|---|---|
| Nozari 2 LLC | $2,898,277.54 |
| Xelan Prop 1, LLC | $3,309,035.54 |
| Renka Prop LLC | $4,215,790.54 |
| Zoriall LLC | $3,227,531.54, |

15  and that the addresses where the obligors under the rights to payment of rental income are the

16  following for each of the Defendant LLC's:

| Property | Title Holder |
|---|---|
| 3947 18th Street<br>San Francisco, CA 94114 | Nozari 2, LLC |
| 17 Hancock Street<br>San Francisco, CA 94114<br>(650 Church Street) | Nozari 2, LLC |
| 4018-4022 – 19th Street<br>San Francisco, CA 94114 | Xelan Prop 1, LLC |
| 1000-1022 Filbert Street<br>San Francisco, CA 94133 | Xelan Prop 1, LLC |
| 195 Eureka Street<br>San Francisco, CA 94114 | Renka Prop, LLC |
| 1135-1139 Guerrero Street<br>San Francisco, CA 94110 | Renka Prop LLC |
| 69-75 Hill Street<br>San Francisco, CA 94110 | Zoriall LLC, |

4

[PROPOSED] ORDER GRANTING RENOTICED MOTION FOR ASSIGNMENT OF RIGHTS, RESTRAINING ...

1    But subject to the limitations incorporated into this order, including the effective date

2    of January 1, 2018, the right of the Defendants to post a bond, the obligation of the

3    Defendants to turn over the January 2018 rents before the effective date of the order, and

4    that the payments shall be turned over by no later than January 5, 2018, and then on an

5    ongoing basis within two business days of the receipt of payment until all payments are

6    made directly to the Plaintiff by the obligors.

7    IT IS FURTHER ORDERED that the Defendant LLC's are hereby stayed, prohibited and

8    enjoined, from selling, assigning, transferring, encumbering, circumventing, advancing, or

9    otherwise interfering with the assignment of the RIGHTS TO PAYMENT OF RENTAL

10    INCOME, the payment undertaken by the tenants and/or lessees pursuant to this order herein and

11    as a result of the granting of this assignment motion, and the enforcement of this assignment order

12    under C.C.P. § 708.320(a), in which the RIGHTS TO PAYMENT OF RENTAL INCOME are

13    assigned to Plaintiffs CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation,

14    and the PEOPLE OF THE STATE OF CALIFORNIA, by and through DENNIS J. HERRERA,

15    City Attorney for the CITY AND COUNTY OF SAN FRANCISCO.

16    IT IS FURTHER ORDERED that rent checks should be written to: "City and County of

17    San Francisco" Re: line on check should state: "Kihagi Rent for [building name and apartment

18    number]" Rent checks should be mailed or hand delivered to:

19    Office of the City Attorney
      Attn: Victoria Weatherford

20    1390 Market Street, 7th Floor
      San Francisco, CA 94102[1]

21

22    DATED: _December 26, 2017_    _Lynn O. Taylor_
                                       LYNN O'MALLEY TAYLOR

23                                         JUDGE OF THE SUPERIOR COURT

24

25

26    [1] Please retain a copy of each rent check for your records. Please include with each rent

27    check a separate piece of paper that is dated, stating your name and full address (building and

28    apartment number), the amount of rent that is being paid and for which month.

<div align="center">5</div>

[PROPOSED] ORDER GRANTING RENOTICED MOTION FOR ASSIGNMENT OF RIGHTS, RESTRAINING ...

1    ## NOTICE TO JUDGMENT DEBTORS

2    PLEASE TAKE NOTICE THAT THE COURT HAS ENTERED AN ORDER

3    ASSIGNING CERTAIN RIGHTS AND PROVIDING FOR A RESTRAINING ORDER, AND

4    OTHER RELIEF. FAILURE TO COMPLY WITH THIS ORDER MAY RESULT IN

5    CONTEMPT IN WHICH YOU MAY BE INCARCERATED IN THE COUNTY JAIL OF NOT

6    MORE THAN 5 DAYS AND PAYMENT OF NOT MORE THE SUM OF $1,000 PURSUANT

7    TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1209.

8    PLEASE TAKE FURTHER NOTICE UNDER C.C.P. § 708.520(d), as follows:

9    ... FAILURE TO COMPLY WITH THE ORDER MAY SUBJECT THE
     JUDGMENT DEBTOR TO BEING HELD IN CONTEMPT OF COURT.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

[PROPOSED] ORDER GRANTING RENOTICED MOTION FOR ASSIGNMENT OF RIGHTS, RESTRAINING ...

## PROOF OF SERVICE

GREGORY R. DE LA PENA
DE LA PENA AND HOLIDAY, LLP
One Embarcadero Center, Suite 2860
San Francisco, CA 94111-3758
By Email: gdelapena@diphlaw.com & U.S. Mail

ISAAC R. ZFATY
ZFATY | BURNS
660 Newport Center Drive, Suite 470
Newport Beach, CA 92660
By Email: irz@zfatyburns.com & U.S. Mail

SAM B. MARALAN
ZFATY | BURNS
660 Newport Center Drive, Suite 470
Newport Beach, CA 92660
By Email: sm@zfatyburns.com & U.S. Mail

KAREN Y. UCHIYAMA
LAW OFFICES OF KAREN Y.
UCHIYAMA
1439 Baker Street
San Francisco, CA 94115
By Email: karen@uchlegal.com & & U.S. Mail

XELAN PROP 1, LLC
c/o LEGALZOOM.COM, INC.
c/o UNITED STATES CORPORATION
AGENTS, INC. (C2555502)
101 N. BRAND BLVD., 11TH FLOOR
GLENDALE CA 91203
By Federal Express

RENKA PROP, LLC
c/o LEGALZOOM.COM, INC.
c/o UNITED STATES CORPORATION
AGENTS, INC. (C2555502)
101 N. BRAND BLVD., 11TH FLOOR
GLENDALE CA 91203
By Federal Express

NOZARI 2, LLC
c/o LEGALZOOM.COM, INC.
c/o UNITED STATES CORPORATION
AGENTS, INC. (C2555502)
101 N. BRAND BLVD., 11TH FLOOR
GLENDALE CA 91203
By Federal Express

ZORIALL, LLC
c/o LEGALZOOM.COM, INC.
c/o UNITED STATES CORPORATION
AGENTS, INC. (C2555502)
101 N. BRAND BLVD., 11TH FLOOR
GLENDALE CA 91203
By Federal Express

I declare:

I am employed in the County of San Francisco, California. I am over the age of eighteen (18) years and not a party to the within cause. My business address is 165 Fell Street, San Francisco, CA 94102. On the date set forth below, I served the attached:

NOTICE OF ENTRY OF ORDER

on the above-named persons by:

__XXX__ (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the person(s) served above.



1    __XXX__   (BY EMAIL) at the email addresses listed above.

2    __XXX__   (BY FEDERAL EXPRESS) Placing a true copy thereof, enclosed in a sealed envelope
3    with postage thereon fully prepaid, in the Federal Express Office at San Francisco, California,
     addressed to the person(s) served above.

4
        I declare under penalty of perjury under the laws of the State of California that the
5    foregoing is true and correct.  Executed on December 26, 2017 at San Francisco, California.

6

7                                                    David J. Cook

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 13**

**NOTICE OF JUDGMENT LIEN**
FOLLOW INSTRUCTIONS CAREFULLY (front and back of form)

A. NAME & PHONE OF FILER'S CONTACT (optional)
David Cook    (415) 989-4730

B. SEND ACKNOWLEDGMENT TO: (NAME AND ADDRESS)

Return To:

**CLAS** WORLDWIDE INFORMATION SERVICES
www.clasinfo.com
2020 Hurley Way, Suite 350
Sacramento, CA 95825
Tel: 916.564.7600 / 800.952.9696
Fax: 916.564.7800

account number: 5184AMJDC

17-7617083727
11/16/2017 14:12

**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS

65434330003    UCC 3 FILING

THIS SPACE FOR FILING OFFICE USE ONLY

**1. JUDGMENT DEBTOR'S EXACT LEGAL NAME**—Insert only one name, either 1a or 1b. Do not abbreviate or combine names.

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| KIHAGI | ANNE | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PO BOX 691889 | LOS ANGELES | CA | 90069 | US |

**2. JUDGMENT CREDITOR'S NAME**— Do not abbreviate or combine names.

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CITY AND COUNTY OF SAN FRANCISCO | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS c/o, Dennis J. Herrera, Esq. City Attorney, 1390 Market Street | CITY San Francisco | STATE CA | POSTAL CODE 94102 | COUNTRY US |
|---|---|---|---|---|

**3. ALL PROPERTY SUBJECT TO ENFORCEMENT OF A MONEY JUDGMENT AGAINST THE JUDGMENT DEBTOR TO WHICH A JUDGMENT LIEN ON PERSONAL PROPERTY MAY ATTACH UNDER SECTION 697.530 OF THE CODE OF CIVIL PROCEDURE IS SUBJECT TO THIS JUDGMENT LIEN.**

A. Title of court where judgment was entered: SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO

B. Title of the action: City and County of San Francisco et al. v. Anne Kihagi et al.

C. Number of this action: CGC-15-546152

D. Date judgment was entered: 10/26/2017

E. Date of subsequent renewals of judgment (if any):

F. Amount required to satisfy judgment at date of this notice: $ 83,131,026.54

G. Date of this notice: 11/16/2017

**4. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct:**

Dated: Nov 16 2017
(If not indicated, use same as date in Item 3G.)

SIGNATURE-- SEE INSTRUCTION NO. 4

FOR: CITY AND COUNTY OF SAN FRANCISCO

FILING OFFICE COPY

NOTICE OF JUDGMENT LIEN (FORM JL1) (Rev. 6/01)
Approved by the Secretary of State

# JUDGMENT LIEN ADDENDUM
FOLLOW INSTRUCTIONS CAREFULLY (FRONT AND BACK OF FORM)

65434330003

**5. NAME OF JUDGMENT DEBTOR:** (NAME OF FIRST DEBTOR ON RELATED JUDGMENT LIEN)

| 5a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 5b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| KIHAGI | ANNE | | |

**6. ADDITIONAL JUDGMENT DEBTOR** – insert only one name (6a or 6b):

| 6a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| KIHAGI | ANNA | | | | |
| 6c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |
| PO BOX 691889 | LOS ANGELES | CA | 90089 | US | |

**7. ADDITIONAL JUDGMENT DEBTOR** – insert only one name (7a or 7b):

| 7a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| SWAIN | ANNA | | | | |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |
| PO BOX 691889 | LOS ANGELES | CA | 90089 | US | |

**8. ADDITIONAL JUDGMENT DEBTOR** – insert only one name (8a or 8b):

| 8a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 8b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| SWAIN | ANNE | | KIHAGI | | |
| 8c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |
| PO BOX 691889 | LOS ANGELES | CA | 90089 | US | |

**9. ADDITIONAL JUDGMENT CREDITOR** – insert only one name (9a or 9b):

| 9a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| | | | | | |
| 9c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |
| | | | | | |

**10. ADDITIONAL JUDGMENT CREDITOR** – insert only one name (10a or 10b):

| 10a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 10b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| | | | | | |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |
| | | | | | |

(1) FILING OFFICER COPY – JUDGMENT LIEN ADDENDUM FORM (REV. 6/01)

CA Secretary of State

**JUDGMENT LIEN ADDENDUM**
FOLLOW INSTRUCTIONS CAREFULLY (FRONT AND BACK OF FORM)

65434330003

**5. NAME OF JUDGMENT DEBTOR:** (NAME OF FIRST DEBTOR ON RELATED JUDGMENT LIEN)

| 5a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 5b. INDIVIDUAL'S LAST NAME<br>KIHAGI | FIRST NAME<br>ANNE | MIDDLE NAME | SUFFIX |

**6. ADDITIONAL JUDGMENT DEBTOR – Insert only one name (6a or 6b):**

| 6a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 6b. INDIVIDUAL'S LAST NAME<br>SWAIN | FIRST NAME<br>ANNA | MIDDLE NAME<br>KIHAGI | | SUFFIX | |
| 6c. MAILING ADDRESS<br>PO BOX 691889 | CITY<br>LOS ANGELES | STATE<br>CA | POSTAL CODE<br>90069 | COUNTRY<br>US | |

**7. ADDITIONAL JUDGMENT DEBTOR – Insert only one name (7a or 7b):**

| 7a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 7b. INDIVIDUAL'S LAST NAME<br>KIHAGI SWAIN | FIRST NAME<br>ANNE | MIDDLE NAME | | SUFFIX | |
| 7c. MAILING ADDRESS<br>PO BOX 691889 | CITY<br>LOS ANGELES | STATE<br>CA | POSTAL CODE<br>90069 | COUNTRY<br>US | |

**8. ADDITIONAL JUDGMENT DEBTOR – Insert only one name (8a or 8b):**

| 8a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 8b. INDIVIDUAL'S LAST NAME<br>KIHAGI SWAIN | FIRST NAME<br>ANNA | MIDDLE NAME | | SUFFIX | |
| 8c. MAILING ADDRESS<br>PO BOX 691889 | CITY<br>LOS ANGELES | STATE<br>CA | POSTAL CODE<br>90069 | COUNTRY<br>US | |

**9. ADDITIONAL JUDGMENT CREDITOR – Insert only one name (9a or 9b):**

| 9a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX | |
| 9c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |

**10. ADDITIONAL JUDGMENT CREDITOR – Insert only one name (10a or 10b):**

| 10a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 10b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX | |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |

(1) FILING OFFICER COPY – JUDGMENT LIEN ADDENDUM FORM (REV. 6/01)

CA Secretary of State

65434330003

## JUDGMENT LIEN ADDENDUM
**FOLLOW INSTRUCTIONS CAREFULLY (FRONT AND BACK OF FORM)**

**5. NAME OF JUDGMENT DEBTOR:** (NAME OF FIRST DEBTOR ON RELATED JUDGMENT LIEN)

| 5a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 5b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| KIHAGI | ANNE | | |

**6. ADDITIONAL JUDGMENT DEBTOR – insert only one name (6a or 6b):**

| 6a. ORGANIZATION'S NAME   XELAN PROP 1, LLC | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 6c. MAILING ADDRESS<br>458 DOHENY DRIVE, #1669 | CITY<br>LOS ANGELES | STATE<br>CA | POSTAL CODE<br>90048 | COUNTRY<br>US |

**7. ADDITIONAL JUDGMENT DEBTOR – insert only one name (7a or 7b):**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**8. ADDITIONAL JUDGMENT DEBTOR – insert only one name (8a or 8b):**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 8c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**9. ADDITIONAL JUDGMENT CREDITOR – insert only one name (9a or 9b):**

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 9c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**10. ADDITIONAL JUDGMENT CREDITOR – insert only one name (10a or 10b):**

| 10a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 10b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

(1) FILING OFFICER COPY – JUDGMENT LIEN ADDENDUM FORM (REV. 6/01)

CA Secretary of State

288



**NOTICE OF JUDGMENT LIEN**
FOLLOW INSTRUCTIONS CAREFULLY (front and back of form)

17-7608941720
10/03/2017 14:28

**A. NAME & PHONE OF FILER'S CONTACT (optional)**
David Cook    (415) 989-4730

**B. SEND ACKNOWLEDGMENT TO: (NAME AND ADDRESS)**

Return To:

**CLAS**
WORLDWIDE INFORMATION SERVICES
www.clasinfo.com
2020 Hurley Way, Suite 350
Sacramento, CA 95825
Tel: 916.554.7800 / 800.952.5696
Fax: 916.554.7900

account number  5184-AMDC

FILED
CALIFORNIA
SECRETARY OF STATE
SOS

64441960002  UCC 1 FILING

THIS SPACE FOR FILING OFFICE USE ONLY

**1. JUDGMENT DEBTOR'S EXACT LEGAL NAME** –Insert only one name, either 1a or 1b. Do not abbreviate or combine names.

**1a. ORGANIZATION'S NAME**

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| KIHAGI | ANNE | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PO BOX 691689 | LOS ANGELES | CA | 90069 | US |

**2. JUDGMENT CREDITOR'S NAME**– Do not abbreviate or combine names.

**2a. ORGANIZATION'S NAME**  PEOPLE OF THE STATE OF CALIFORNIA

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS c/o, Dennis J. Herrera, Esq., City Attorney, 1390 Market Street | CITY San Francisco | STATE CA | POSTAL CODE 94102 | COUNTRY US |
|---|---|---|---|---|

**3. ALL PROPERTY SUBJECT TO ENFORCEMENT OF A MONEY JUDGMENT AGAINST THE JUDGMENT DEBTOR TO WHICH A JUDGMENT LIEN ON PERSONAL PROPERTY MAY ATTACH UNDER SECTION 697.530 OF THE CODE OF CIVIL PROCEDURE IS SUBJECT TO THIS JUDGMENT LIEN.**

A. Title of court where judgment was entered: SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN

FRANCISCO

B. Title of the action: City and County of San Francisco v. Anne Kihagi et al.

C. Number of this action: CGC-15-548152

D. Date judgment was entered: 06/12/2017

E. Date of subsequent renewals of judgment (if any): _____

F. Amount required to satisfy judgment at date of this notice: $ 178,009.00

G. Date of this notice: 10/02/2017

**4. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

Dated: 10/2/2017
(If not indicated, use same as date in Item 3G.)

SIGNATURE – SEE INSTRUCTION NO. 4

FOR:  PEOPLE OF THE STATE OF CALIFORNIA

FILING OFFICE COPY

NOTICE OF JUDGMENT LIEN (FORM JL1) (Rev. 6/01)
Approved by the Secretary of State

64441960002

# JUDGMENT LIEN ADDENDUM
**FOLLOW INSTRUCTIONS CAREFULLY (FRONT AND BACK OF FORM)**

**5. NAME OF JUDGMENT DEBTOR: (NAME OF FIRST DEBTOR ON RELATED JUDGMENT LIEN)**

| 5a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 5b. INDIVIDUAL'S LAST NAME<br>KIHAGI | FIRST NAME<br>ANNE | MIDDLE NAME | SUFFIX |

**6. ADDITIONAL JUDGMENT DEBTOR -- insert only one name (6a or 6b):**

| 6a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 6b. INDIVIDUAL'S LAST NAME<br>KIHAGI | FIRST NAME<br>ANNA | MIDDLE NAME | | SUFFIX |
| 6c. MAILING ADDRESS<br>PO BOX 691869 | CITY<br>LOS ANGELES | STATE<br>CA | POSTAL CODE<br>90069 | COUNTRY<br>US |

**7. ADDITIONAL JUDGMENT DEBTOR -- insert only one name (7a or 7b):**

| 7a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 7b. INDIVIDUAL'S LAST NAME<br>SWAIN | FIRST NAME<br>ANNA | MIDDLE NAME | | SUFFIX |
| 7c. MAILING ADDRESS<br>PO BOX 691869 | CITY<br>LOS ANGELES | STATE<br>CA | POSTAL CODE<br>90069 | COUNTRY<br>US |

**8. ADDITIONAL JUDGMENT DEBTOR -- insert only one name (8a or 8b):**

| 8a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 8b. INDIVIDUAL'S LAST NAME<br>SWAIN | FIRST NAME<br>ANNE | MIDDLE NAME<br>KIHAGI | | SUFFIX |
| 8c. MAILING ADDRESS<br>PO BOX 691869 | CITY<br>LOS ANGELES | STATE<br>CA | POSTAL CODE<br>90069 | COUNTRY<br>US |

**9. ADDITIONAL JUDGMENT CREDITOR -- insert only one name (9a or 9b):**

| 9a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 9c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**10. ADDITIONAL JUDGMENT CREDITOR -- insert only one name (10a or 10b):**

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 10b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

(1) FILING OFFICER COPY -- JUDGMENT LIEN ADDENDUM FORM (REV. 6/01)

CA Secretary of State

290

## JUDGMENT LIEN ADDENDUM
**FOLLOW INSTRUCTIONS CAREFULLY (FRONT AND BACK OF FORM)**

64441960002

**5. NAME OF JUDGMENT DEBTOR:** (NAME OF FIRST DEBTOR ON RELATED JUDGMENT LIEN)

| 5a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 5b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| KIHAGI | ANNE | | |

**6. ADDITIONAL JUDGMENT DEBTOR – insert only one name (6a or 6b):**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| SWAIN | ANNA | KIHAGI | |
| 6c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO BOX 691889 | LOS ANGELES | CA | 90069 | US |

**7. ADDITIONAL JUDGMENT DEBTOR – insert only one name (7a or 7b):**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| KIHAGI SWAIN | ANNE | | |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO BOX 691889 | LOS ANGELES | CA | 90069 | US |

**8. ADDITIONAL JUDGMENT DEBTOR – insert only one name (8a or 8b):**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| KIHAGI SWAIN | ANNA | | |
| 8c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO BOX 691889 | LOS ANGELES | CA | 90069 | US |

**9. ADDITIONAL JUDGMENT CREDITOR – insert only one name (9a or 9b):**

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |
| 9c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

**10. ADDITIONAL JUDGMENT CREDITOR – insert only one name (10a or 10b):**

| 10a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 10b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

(1) FILING OFFICER COPY -- JUDGMENT LIEN ADDENDUM FORM (REV. 6/01)

CA Secretary of State

291

**JUDGMENT LIEN ADDENDUM**
FOLLOW INSTRUCTIONS CAREFULLY (FRONT AND BACK OF FORM)

64441960002

**5. NAME OF JUDGMENT DEBTOR:** (NAME OF FIRST DEBTOR ON RELATED JUDGMENT LIEN)

| 5a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 5b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| KIHAGI | ANNE | | |

**6. ADDITIONAL JUDGMENT DEBTOR – insert only one name (6a or 6b):**

| 6a. ORGANIZATION'S NAME   XELAN PROP 1, LLC | | | | | |
|---|---|---|---|---|---|
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 6c. MAILING ADDRESS<br>458 DOHENY DRIVE, #1889 | CITY<br>LOS ANGELES | STATE<br>CA | POSTAL CODE<br>90048 | COUNTRY<br>US | |

**7. ADDITIONAL JUDGMENT DEBTOR – insert only one (7a or 7b):**

| 7a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |

**8. ADDITIONAL JUDGMENT DEBTOR – insert only one name (8a or 8b):**

| 8a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 8b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 8c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |

**9. ADDITIONAL JUDGMENT CREDITOR – insert only one name (9a or 9b):**

| 9a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 9c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |

**10. ADDITIONAL JUDGMENT CREDITOR – insert only one name (10a or 10b):**

| 10a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 10b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |

(1) FILING OFFICER COPY – JUDGMENT LIEN ADDENDUM FORM (REV. 5/01)

CA Secretary of State

**NOTICE OF JUDGMENT LIEN**
FOLLOW INSTRUCTIONS CAREFULLY (front and back of form)

A. NAME & PHONE OF FILER'S CONTACT (optional)
David Cook   (415) 989-4730

B. SEND ACKNOWLEDGMENT TO: (NAME AND ADDRESS)

Return To:



**CLAS**
WORLDWIDE INFORMATION SERVICES
www.clasinfo.com
2020 Hurley Way, Suite 350
Sacramento, CA 95825
Tel: 916.564.7800 / 800.952.5696
Fax: 916.564.7900

account number   5184 AMDc

17-7608945764
10/03/2017 14:28

**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS

54442160002  UCC 1 FILING

THIS SPACE FOR FILING OFFICE USE ONLY

**1. JUDGMENT DEBTOR'S EXACT LEGAL NAME** – Insert only one name, either 1a or 1b. Do not abbreviate or combine names.

1a. ORGANIZATION'S NAME

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| KIHAGI | ANNE | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO BOX 691889 | LOS ANGELES | CA | 90069 | US |

**2. JUDGMENT CREDITOR'S NAME** – Do not abbreviate or combine names.

2a. ORGANIZATION'S NAME   CITY AND COUNTY OF SAN FRANCISCO

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE | SUFFIX |
|---|---|---|---|
| 2c. MAILING ADDRESS  c/o, Dennis J. Herrera, Esq | CITY San Francisco | STATE CA | POSTAL CODE 94102 | COUNTRY US |
| City Attorney, 1390 Market Street | | | | |

**3. ALL PROPERTY SUBJECT TO ENFORCEMENT OF A MONEY JUDGMENT AGAINST THE JUDGMENT DEBTOR TO WHICH A JUDGMENT LIEN ON PERSONAL PROPERTY MAY ATTACH UNDER SECTION 697.530 OF THE CODE OF CIVIL PROCEDURE IS SUBJECT TO THIS JUDGMENT LIEN.**

A.  Title of court where judgment was entered:  SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN

FRANCISCO

B.  Title of the action:  City and County of San Francisco et al. v. Anne Kihagi et al.

C.  Number of this action:  CGC-15-546152

D.  Date judgment was entered:  08/12/2017

E.  Date of subsequent renewals of judgment (if any): _____

F.  Amount required to satisfy judgment at date of this notice: $  393,750.00

G.  Date of this notice:  10/02/2017

**4.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct:**

SIGNATURE – SEE INSTRUCTION NO. 4

Dated:  10/2/2017
(If not indicated, use same as date in item 3G.)

FOR:  CITY AND COUNTY OF SAN FRANCISCO

FILING OFFICE COPY

NOTICE OF JUDGMENT LIEN (FORM JL1) (Rev. 501)
Approved by the Secretary of State

293

## JUDGMENT LIEN ADDENDUM

64442160002

**FOLLOW INSTRUCTIONS CAREFULLY (FRONT AND BACK OF FORM)**

**5. NAME OF JUDGMENT DEBTOR:** (NAME OF FIRST DEBTOR ON RELATED JUDGMENT LIEN)

| 5a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 5b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| KIHAGI | ANNE | | |

**6. ADDITIONAL JUDGMENT DEBTOR -- insert only one name (6a or 6b):**

| 6a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| KIHAGI | ANNA | | | | |
| 6c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO BOX 691889 | LOS ANGELES | CA | 90069 | US |

**7. ADDITIONAL JUDGMENT DEBTOR -- insert only one name (7a or 7b):**

| 7a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| SWAIN | ANNA | | | | |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO BOX 691889 | LOS ANGELES | CA | 90069 | US |

**8. ADDITIONAL JUDGMENT DEBTOR -- insert only one name (8a or 8b):**

| 8a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 8b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| SWAIN | ANNE | | KIHAGI | | |
| 8c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO BOX 691889 | LOS ANGELES | CA | 90069 | US |

**9. ADDITIONAL JUDGMENT CREDITOR -- insert only one name (9a or 9b):**

| 9a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |
| 9c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

**10. ADDITIONAL JUDGMENT CREDITOR -- insert only one name (10a or 10b):**

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 10b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

(1) FILING OFFICER COPY -- JUDGMENT LIEN ADDENDUM FORM (REV. 6/01)

CA Secretary of State

294

**64442160002**

## JUDGMENT LIEN ADDENDUM
FOLLOW INSTRUCTIONS CAREFULLY (FRONT AND BACK OF FORM)

**5. NAME OF JUDGMENT DEBTOR:** (NAME OF FIRST DEBTOR ON RELATED JUDGMENT LIEN)

| 5a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **5b. INDIVIDUAL'S LAST NAME** KIHAGI | **FIRST NAME** ANNE | **MIDDLE NAME** | **SUFFIX** |

**6. ADDITIONAL JUDGMENT DEBTOR – insert only one name (6a or 6b):**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **6b. INDIVIDUAL'S LAST NAME** SWAIN | **FIRST NAME** ANNA | **MIDDLE NAME** KIHAGI | **SUFFIX** |
| **6c. MAILING ADDRESS** PO BOX 691889 | **CITY** LOS ANGELES | **STATE** CA | **POSTAL CODE** 90069 | **COUNTRY** US |

**7. ADDITIONAL JUDGMENT DEBTOR – insert only one name (7a or 7b):**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **7b. INDIVIDUAL'S LAST NAME** KIHAGI SWAIN | **FIRST NAME** ANNE | **MIDDLE NAME** | **SUFFIX** |
| **7c. MAILING ADDRESS** PO BOX 691889 | **CITY** LOS ANGELES | **STATE** CA | **POSTAL CODE** 90069 | **COUNTRY** US |

**8. ADDITIONAL JUDGMENT DEBTOR – insert only one name (8a or 8b):**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **8b. INDIVIDUAL'S LAST NAME** KIHAGI SWAIN | **FIRST NAME** ANNA | **MIDDLE NAME** | **SUFFIX** |
| **8c. MAILING ADDRESS** PO BOX 691889 | **CITY** LOS ANGELES | **STATE** CA | **POSTAL CODE** 90069 | **COUNTRY** US |

**9. ADDITIONAL JUDGMENT CREDITOR – insert only one name (9a or 9b):**

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **9b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
| **9c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**10. ADDITIONAL JUDGMENT CREDITOR – insert only one name (10a or 10b):**

| 10a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **10b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
| **10c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

(1) FILING OFFICER COPY – JUDGMENT LIEN ADDENDUM FORM (REV. 6/01)

CA Secretary of State

295

## JUDGMENT LIEN ADDENDUM
FOLLOW INSTRUCTIONS CAREFULLY (FRONT AND BACK OF FORM)

64442160002

**5. NAME OF JUDGMENT DEBTOR:** (NAME OF FIRST DEBTOR ON RELATED JUDGMENT LIEN)

| 5a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 5b. INDIVIDUAL'S LAST NAME<br>KIHAGI | FIRST NAME<br>ANNE | MIDDLE NAME | SUFFIX |

**6. ADDITIONAL JUDGMENT DEBTOR – Insert only one name (6a or 6b):**

| 6a. ORGANIZATION'S NAME  XELAN PROP 1, LLC | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 6c. MAILING ADDRESS<br>458 DOHENY DRIVE, #1889 | CITY<br>LOS ANGELES | STATE<br>CA | POSTAL CODE 90048  COUNTRY US |

**7. ADDITIONAL JUDGMENT DEBTOR – Insert only one name (7a or 7b):**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE  COUNTRY |

**8. ADDITIONAL JUDGMENT DEBTOR – Insert only one name (8a or 8b):**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 8c. MAILING ADDRESS | CITY | STATE | POSTAL CODE  COUNTRY |

**9. ADDITIONAL JUDGMENT CREDITOR – Insert only one name (9a or 9b):**

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 9c. MAILING ADDRESS | CITY | STATE | POSTAL CODE  COUNTRY |

**10. ADDITIONAL JUDGMENT CREDITOR – Insert only one name (10a or 10b):**

| 10a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 10b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE  COUNTRY |

(1) FILING OFFICER COPY – JUDGMENT LIEN ADDENDUM FORM (REV. 1/01)

CA Secretary of State

296

# EXHIBIT 14

1    JEFFER MANGELS BUTLER & MITCHELL LLP
      ROBERT B. KAPLAN, P.C. (Bar No. 76950)

2    *rbk@jmbm.com*
      Two Embarcadero Center, 5th Floor

3    San Francisco, California 94111-3813
      Telephone:   (415) 398-8080

4    Facsimile:    (415) 398-5584

5    Attorneys for Proposed Intervenor UMPQUA
      BANK

6

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10

11    CITY AND COUNTY OF SAN
       FRANCISCO, a Municipal Corporation and

12    the PEOPLE OF THE STATE OF
       CALIFORNIA, by and through DENNIS J.

13    HERRERA, City Attorney for the City and
       County of San Francisco,

14              Plaintiffs,

15

16          v.

17    ANNE KIHAGI aka ANNE KIHAGI aka
       ANNA SWAIN aka ANNA KIHAGI SWAIN,

18    JULIA MWANGI aka JULIA MUNENE,
       CHRISTINE MWANGI aka CHRISTINA

19    MXANGI aka CHRISTINE JOHNSON,
       XELAN PROP 1, LLC, RENKA PROP, LLC,

20    NOZARI 2, LLC, ZORIALL LLC and DOES
       ONE through DOE FIFTY,

21              Defendants.

22

Case No. CGC-15-546152

**NOTICE OF MOTION AND MOTION TO
DETERMINE LIEN PRIORITY**

Date:         February 22, 2018
Time:        1:30 p.m.
Place:       Dept. 514

Action Filed:    May 4, 2015
Trial Date:      October 31, 2016

ELECTRONICALLY
**FILED**
*Superior Court of California,*
*County of San Francisco*
**01/29/2018**
Clerk of the Court
BY:JUDITH NUNEZ
Deputy Clerk

23   **TO:   PLAINTIFFS AND DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

24        PLEASE TAKE NOTICE that on February 22, 2018 at 1:30 p.m., in Department 514 of

25   the above-entitled Court, Umpqua Bank, proposed Intervenor ("Bank") will move this Court for an

26   Order to determine that the Absolute Assignment of Rents and Leases set forth in Article 3 of (1)

27   that certain Deed of Trust and Absolute Assignment of Rents and Leases and Security Agreement

28   (And Fixture Filing) executed by Renka Prop, LLC in favor of the Bank's predecessor-in-interest

61674465v1

298

1    and recorded on December 27, 2013 in the Official Records of the San Francisco County

2    Recorder's Office, and (2) those certain Deeds of Trust and Absolute Assignment of Rents and

3    Leases and Security Agreement (And Fixture Filing) executed by XELAN Prop 1, LLC and

4    recorded on August 14, 2013 and June 29, 2013 in the Official Records of the San Francisco

5    County Recorder's Office grants the Bank a first priority interest, assignment and lien in the rents,

6    lease payments, lease obligations, general intangibles, rights to payment on money, contract rights,

7    deposit accounts, claims against third parties and money due and owing from third parties arising

8    out of XELAN Prop 1, LLC and Renka Prop, LLC's ownership, management control, rental and

9    lease of the real properties, known as 195 Eureka Street, San Francisco, California, 4018-4022

10    19th Street, San Francisco, California and 1000-1022 Filbert Street, San Francisco, California

11    **superior to** any interest which has been assigned to the City and County of San Francisco and the

12    People of the State of California pursuant to that certain Order Granting Renotice Motion for

13    Assignment of Rents, Restraining Order and Turnover Order pursuant to C.C.P § 708.150(a),

14    C.C.P. § 708.520(a) and C.C.P. § 699.040 [Rents and Lease Payments owed to XELAN Prop,

15    LLC, Renka Prop, LLC, Nozari 2, LLC and Zoriall, LLC] filed on December 26, 2017 in this

16    action.

17       PLEASE TAKE FURTHER NOTICE that any opposition to the Motion must be filed and

18    served on or before February 7, 2018 and any Reply to this Motion must be filed and served on or

19    before February 14, 2018.

20       This Motion will be based upon this Notice of Motion, the Memorandum of Points and

21    Authorities, and the Declarations of Robert B. Kaplan and Beverly Tengco served and filed

22    concurrently herewith, upon the pleadings, files and records in the above-entitled action, and upon

23    the oral argument of counsel to be presented at the time of the hearing.

24    //

25

26    //

27

28    //

JMBM | Jeffer Mangels Butler & Mitchell LLP

61674465v1

2

NOTICE OF MOTION AND MOTION TO DETERMINE LIEN PRIORITY

1  DATED: January 29, 2018

JEFFER MANGELS BUTLER & MITCHELL LLP

By: _____
ROBERT B. KAPLAN, ESQ.
Attorneys for Proposed Intervenor UMPQUA
BANK

61674465v1

3

NOTICE OF MOTION AND MOTION TO DETERMINE LIEN PRIORITY

1  JEFFER MANGELS BUTLER & MITCHELL LLP
   ROBERT B. KAPLAN, P.C. (Bar No. 76950)
2  *rbk@jmbm.com*
   Two Embarcadero Center, 5th Floor
3  San Francisco, California 94111-3813
   Telephone:    (415) 398-8080
4  Facsimile:    (415) 398-5584

5  Attorneys for Proposed Intervenor UMPQUA
   BANK

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10

11  CITY AND COUNTY OF SAN              Case No. CGC-15-546152
    FRANCISCO, a Municipal Corporation and
12  the PEOPLE OF THE STATE OF          **MEMORANDUM OF POINTS AND**
    CALIFORNIA, by and through DENNIS J. **AUTHORITIES IN SUPPORT OF**
13  HERRERA, City Attorney for the City and **MOTION TO DETERMINE LIEN**
    County of San Francisco,            **PRIORITY**
14
                                        
15             Plaintiffs,
                                        Date:        February 22, 2018
16        v.                            Time:        1:30 p.m.
                                        Place:       Department 501
17  ANNE KIHAGI aka ANNA KIHAGI aka
    ANNA SWAIN aka ANNE KIHAGI SWAIN    Action Filed:   May 4, 2015
18  aka ANNA KIHAGI SWAIN, JULIA        Trial Date:     October 31, 2016
    MWANGI aka JULIA MUNENE,
19  CHRISTINE MWANGI aka CHRISTINA
    MWANGI aka CHRISTINE JOHNSON,
20  XELAN PROP 1, LLC, RENKA PROP, LLC,
    NOZARI 2, LLC, ZORIALL, LLC and DOE
21  ONE through DOE FIFTY,

22             Defendants.

23

24

25

26

27

28

ELECTRONICALLY
F I L E D
*Superior Court of California,*
*County of San Francisco*
**01/29/2018**
Clerk of the Court
BY:JUDITH NUNEZ
Deputy Clerk

# TABLE OF CONTENTS

|  | **Page** |
|---|---|
| SUMMARY OF ARGUMENT | 4 |
| STATEMENT OF RELEVANT FACTS | 6 |
| A. The Bank's Loans to Renka and XELAN | 6 |
|    1. The Renka Loan | 6 |
|    2. The XELAN Loans | 7 |
| B. The Bank's Lien in the Payments Generated From the Eureka Street Property, the Filbert Street Property, and the 19th Street Property | 8 |
| C. Defaults in the Renka and XELAN Loans | 9 |
| D. Procedural History of this Action | 11 |
| ARGUMENT | 13 |
| A. The Law Governing the Perfection and Priority of Written Assignments of Interest in Leases, Rents, Issues and Profits | 13 |
| B. The Bank Has a First Priority Perfected Security Interest in the Payments and is Entitled to All Payments Generated on or After January 29, 2018 | 15 |
| CONCLUSION | 16 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

# TABLE OF AUTHORITIES

Page

**Cases**

MDFC Loan Corporation v. Greenbrier Plaza Partners (1994)
 21 Cal.App.4th 1045 .................................................................................................14

**Statutes**

California Civil Code
 § 1214 .......................................................................................................................16
 § 2938 .................................................................................................5, 13, 14, 15
 § 2938(a) .............................................................................................................5, 15
 § 2938(b) .............................................................................................................5, 15
 § 2938(c)(4) .......................................................................................................5, 15

California Code of Civil Procedure
 § 708.510(a) et seq. .................................................................................................5
 § 708.530(b) .....................................................................................................15, 16

**Treatises**

Ahart, California Practice Guide Enforcing Judgments and Debts, Chapter 6, at
 § 6.1453 (Rutter Group 2017)...............................................................................16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

61674510v1

MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DETERMINE LIEN PRIORITY

## SUMMARY OF ARGUMENT

Proposed Intervenor Umpqua Bank, successor-in-interest by merger to Sterling Savings Bank for the loans which are the subject of this action ("Bank") is the holder of a first priority deed of trust executed by Defendant Renka Prop LLC ("Renka"), with respect to the real property commonly known as 195 Eureka Street, San Francisco, California ("Eureka Street Property"), repayment of which secures a Promissory Note dated December 18, 2013 in the original principal amount of $1,325,000.00, a first priority deed of trust executed by XELAN Prop 1, LLC ("XELAN") the real property commonly known as 1000-1022 Filbert Street, San Francisco, California ("Filbert Street Property"), which secures repayment of a Promissory Note dated July 31, 2013 in the original principal amount of $1,960,000.00 and a first priority Deed of Trust executed by XELAN on the real property commonly known 4018-4022 19th Street ("19th Street Property"), which secures repayment of the Promissory Note dated June 13, 2013 in the original principal amount of $1,700,000.00. Each of these deeds of trust irrevocably assigned to the Bank all of Renka's and XELAN's right, title, leases, and interest to all, _inter alia_, leases, rents, issues, deposits and profits ((defined as "Payments" in those deeds of trust and also referred to hereinafter from time to time as "Rents") ") of the Eureka Street Property, the Filbert Street Property and the 19th Street Property.

Each of the Promissory Notes executed by Renka and XELAN (collectively the "Borrowers") contain an Exhibit A entitled "Additional Terms and Conditions" which requires Renka and XELAN (collectively, the "Borrowers") to deliver certain financial statements to the Bank. The Borrowers failed to do so. Therefore, on November 27, 2017, the Bank sent a letter to the Borrowers demanding that those financial statements be provided by December 10, 2017. The Borrowers failed to do so. Subsequently, on January 26, 2018, the Bank declared an Optional Default (as that term is defined in the deeds of trust) under the deeds of trust. As a result, the license provided by the Bank to the borrowers in the deeds of trust to utilize the Payments was automatically revoked. Thereafter, on January 29, 2018, the Bank demanded that the Borrowers pay to the Bank all of the Payments.

///

1    As will be discussed below, (1) pursuant to the provisions of Civil Code § 2938(a), a

2  written assignment of an interest in rents is effective to create a present security interest in existing

3  and future rents, (2) pursuant to Civil Code § 2938(b) this assignment is perfected upon the

4  recording of the deeds of trust, and (3) pursuant to Civil Code § 2938(c)(4), as a result of the

5  Optional Default that occurred under the deeds of trust, the Bank was entitled to demand the

6  Borrowers pay to it the Payments and, as result, **the Bank was entitled to collect and receive all**

7  **Payments generated from the Eureka Street Property, the Filbert Street Property and the**

8  **19th Street Property that accrued and remained unpaid on and after the date of its demand**

9  **for payment of the Payments.**

10    In June of 2017, the Plaintiff, the City and County of San Francisco and the People of the

11  State of California by and through Dennis J. Herrera, City Attorney for the City and County of San

12  Francisco ("City") obtained a Judgment After Court Trial against multiple Defendants including

13  XELAN and Renka. Subsequently, in October of 2017, an Amended Judgment was entered

14  against the Defendants which included attorneys' fees awards, in amounts in excess of

15  $3,300,000.00.

16    On December 26, 2017, this Court granted the City's Renoticed Motion for Assignment

17  Order of Rights, Restraining Order and Turnover Order pursuant to Code of Civil Procedure

18  § 708.510(a) et seq. with respect to all Payments which were owed to Defendants, including

19  Renka and XELAN pursuant to an Order which was filed on that date (the "Assignment Order").

20  The Assignment Order provided that all Payments of XELAN and Renka, et al. were assigned and

21  transferred to the City for purposes of satisfying the judgments against the Defendants including

22  the Rents generated from the 19th Street Property, the Filbert Street Property and the Eureka Street

23  Property and further required that all Rent checks be mailed or hand delivered to the office of the

24  City Attorney. **However, the Assignment Order also provided on page 3, lines 18-20 "that the**

25  **Court will not make any priority determinations at this time. If and when priority is**

26  **claimed by a third party, a motion can be made to the Court to resolve the matter."**

27    Through this Motion to Determine Lien Priority (the "Motion"), the Bank seeks an order

28  from this Court determining pursuant to Civil Code § 2938 that the Bank has alwasys first priority

MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DETERMINE LIEN PRIORITY

1  lien on the Payments and that the Bank is entitled to possession of all Payments paid on or after

2  January 29, 2018 and that provisions of the Assignment Order which require the Payments to be

3  paid to the City are not effective with respect to the 19th Street Property, the Filbert Street

4  Property and the Eureka Street Property.[1]

5  <div align="center">**STATEMENT OF RELEVANT FACTS**</div>

6  The evidence in support of this Motion is set forth in the accompanying Declarations of

7  Declaration of Robert B. Kaplan in Support of (1) Motion for Order Granting Leave to File

8  Complaint in Intervention for Declaratory Relief; and (2) Motion to Determine Lien Priority

9  ("Kaplan Decl.") and Declaration of Beverly Tengco in Support of (1) Motion for Order Granting

10  Leave to File Complaint in Intervention for Declaratory Relief; and (2) Motion to Determine Lien

11  Priority ("Tengco Decl.").

12  A.    **The Bank's Loans to Renka and XELAN**

13  1.    **The Renka Loan**

14  On or about December 18, 2013, Renka executed that certain Promissory Note Secured by

15  Deed of Trust in the principal amount of $1,325,000, having a final payment maturity date of

16  January 1, 2044 ("Renka Note"). Tengco Decl., ¶ 3, **Exhibit L**.

17  Repayment of the outstanding obligations owed by Renka to the Bank evidenced by the

18  Renka Note are secured by, inter alia, that certain Deed of Trust and Absolute Assignment of

19  Rents and Leases and Security Agreement (and Fixture Filing) dated as of December 18, 2013 (the

20  "Renka Deed of Trust"), executed by Renka in favor of UPF Incorporated, as trustee, for the

21  benefit of Bank, as beneficiary, with respect to the real property commonly known as 195 Eureka

22  Street, San Francisco, California ("Eureka Street Property"). The Renka Deed of Trust was

23  recorded on December 27, 2013 in the Official Records of the San Francisco County Recorder's

24

25  [1] This Motion is being filed concurrently with the Bank's Motion for Order Granting Leave to File
   Complaint in Intervention for Declaratory Relief as the Bank believes it must be a party to this
26  action in order to file this Motion. However, if the Motion for Order Granting Leave to File
   Complaint in Intervention is denied, but this Court nevertheless believes it has jurisdiction to
27  entertain this Motion, then the Bank respectfully requests that the Court do so, so that the Bank
   does not have to commence a separate action against the City et al. to determine the lien priority
28  issues which are the subject of this Motion.

JMBM  Jeffer Mangels
      Butler & Mitchell LLP

1   Office.  Tengco Decl., ¶ 4, <u>Exhibit 2</u>.

2       As of January 12, 2018, the outstanding obligations owed by Renka to the Bank pursuant

3   to the Renka Note was the principal sum of $1,227,304.85, plus accrued interest, attorneys' fees

4   and costs.  Tengco Decl., ¶ 5.

5       **2.**   **The XELAN Loans**

6       On or about July 31, 2013, XELAN executed that certain Promissory Note Secured by

7   Deed of Trust in the principal amount of $1,960,000, having a final payment maturity date of

8   September 1, 2043 ("XELAN Note No. 1").  Tengco Decl., ¶ 6, <u>Exhibit 3</u>.

9       Repayment of the outstanding obligations owed by XELAN to the Bank evidenced by the

10  XELAN Note No. 1 are secured by, inter alia, that certain Deed of Trust and Absolute Assignment

11  of Rents and Leases and Security Agreement (and Fixture Filing) dated as of July 31, 2013 (the

12  "XELAN Deed of Trust No. 1"), executed by XELAN in favor of UPF Incorporated, as trustee, for

13  the benefit of Bank, as beneficiary, with respect to the real property commonly known as 1000-

14  1022 Filbert Street, San Francisco, California ("Filbert Street Property").  The XELAN Deed of

15  Trust No. 1 was recorded on August 14, 2013 in the Official Records of the San Francisco County

16  Recorder's Office.  Tengco Decl., ¶ 7, <u>Exhibit 4</u>.

17      As of January 12, 2018, the outstanding obligations owed by XELAN to the Bank pursuant

18  to the XELAN Note No. 1 was the principal sum of $1,801,113.27, plus accrued interest,

19  attorneys' fees and costs.  Tengco Decl., ¶ 8.

20      On or about June 13, 2013, XELAN executed that certain Promissory Note Secured by

21  Deed of Trust in the principal amount of $1,700,000, having a final payment maturity date of July

22  1, 2043 ("XELAN Note No. 2").  Tengco Decl., ¶ 9, <u>Exhibit 5</u>.

23      Repayment of the outstanding obligations owed by XELAN to the Bank evidenced by the

24  XELAN Note No. 2 are secured by, inter alia, that certain Deed of Trust and Absolute Assignment

25  of Rents and Leases and Security Agreement (and Fixture Filing) dated as of June 13, 2013 (the

26  "XELAN Deed of Trust No. 2"), executed by XELAN in favor of UPF Incorporated, as trustee, for

27  the benefit of Bank, as beneficiary, with respect to the real property commonly known as 4018-

28  4022 19th Street, San Francisco, California ("19th Street Property").  The XELAN Deed of Trust

1   No. 2 was recorded on June 28, 2013 in the Official Records of the San Francisco County

2   Recorder's Office.  Tengco Decl., ¶ 10, Exhibit 6.

3          As of January 12, 2018, the outstanding obligations owed by XELAN to the Bank pursuant

4   to the XELAN Note No. 2 was the principal sum of $1,554,058.00, plus accrued interest,

5   attorneys' fees and costs.  Tengco Decl., ¶ 11.

6   **B.    The Bank's Lien in the Payments Generated From the Eureka Street**
        **Property, the Filbert Street Property, and the 19th Street Property**

7

8          The Renka Deed of Trust, the XELAN Deed of Trust No. 1 and the XELAN Deed of Trust

9   No. 2 state as follows in Section 3.1:

10         3.1   Assignment.   Trustor **irrevocably assigns** to Lender all of
        Trustor's right, title and interest in, to and under:

11

12         (a)   **all present and future leases of the Property** . . . and all
        other agreements of any kind relating to the use or occupancy of the
        Property or any portion thereof, whether such leases, licenses and

13      agreements are now existing or entered into after the date hereof
        ("Leases"); and

14

15         (b)   **the rents, issues, deposits and profits of the Property,**
        including, without limitation, all amounts payable and all rights and
        benefits accruing to Trustor under the Leases ("**Payments**"). . . .

16

17      **This is present and absolute assignment,** not an assignment for
        security purposes only, and Lender's right to the Leases and
        payments is not contingent upon, and may be exercised without

18      possession of, the Property.

19         3.2   Grant of License.   Lender confers upon Trustor a revocable
        license ("**License**") to collect and retain the Payments as they

20      become due and payable, until the occurrence of a "Default" (as
        hereinafter defined).   **Upon a Default, the License shall be**

21      **automatically revoked and Lender may collect and apply the**
        **Payments pursuant to the terms hereof without notice and**
        **without taking possession of the Property.**   All Payments

22      thereafter collected by Trustor shall be held by Trustor as trustee

23      under a constructive trust for the benefit of Lender.  Trustor hereby
        irrevocably authorizes and directs the tenants under the Leases to

24      rely upon and comply with any notice or demand by Lender for the
        payment to Lender of any rental or other sums which may at any

25      time become due under the Leases, or for the performance of any of
        the tenants' undertakings under the Leases, and the tenants shall

26      have no right or duty to inquire as to whether any Default has
        actually occurred or is then exiting.  Trustor hereby relieves the

27      tenants from any liability to Trustor by reason of relying upon and
        complying with any such notice demand by Lender. (Emphasis

28      added.)

MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DETERMINE LIEN PRIORITY

Thus, the Bank holds a lien on the Payments generated from the Eureka Street Property, the

Filbert Street Property, and the 19th Street Property (collectively the "Properties").

C.    Defaults in the Renka and XELAN Loans

Exhibit A to the Renka Note, the XELAN Note No. 1 and the XELAN Note No. 2

(collectively, the "Notes") all require Renka and XELAN (collectively, the "Borrowers") to

provide various financial statements to the Bank as follows:

2.    **Financial Statements.**

2.1    **Statements Required.**  During the term of the Loan or while any liabilities of Borrower to Lender under any of the Loan Documents remain outstanding and unless Lender otherwise consents in writing, Borrower shall provide to Lender, each in a form acceptable to Lender, the following:

(a)    **Rent Roll.**  An annual "**Rent Roll**" (as defined below) not later than thirty (30) days after and as of the end of each fiscal year. For purposes of this provision, a "**Rent Roll**" shall mean a schedule which shall include without limitation the following lease information with regard to each tenant – the name of the tenant, unit number and unit type, any other income or reimbursement amounts, a description of the demised premises, occupancy percentage, monthly or other periodic rental amount, dates of commencement and expiration of the lease, and payment status – and which shall be certified by a principal, managing member or general partner of Borrower as being true, correct and complete.

(b)    **Property Operating Statement.**  An annual "**Property Operating Statement**" (as defined below) not later than thirty (30) days after and as of the end of each fiscal year. For purposes of this provision, a "**Property Operating Statement**" shall mean an unaudited operating statement for the Property, which statement shall include a schedule showing all revenues and expenses relating to the Property during the period in question **and for the year-to-date** and shall be certified by a principal, managing member or general partner of Borrower as being true, correct and complete.

(c)    **Annual Financial Statement of Borrower and Guarantor(s).**  Not later than thirty (30) days after and as of the end of each fiscal year, the following:

(i)    **For Borrower** – an annual balance sheet showing all assets and liabilities of Borrower, which shall be certified by a principal, managing member or general partner of Borrower as being true, correct and complete or, upon the reasonable request of Lender, audited by an independent certified public accountant (which audited statement shall be provided to Lender within ninety (90) days following such request by Lender). . . .

(d)    **Tax Return.**  Not later than fifteen (15) days after the date of filing, copies of all tax returns filed by Borrower and any guarantor (provided, however, that in the event that Borrower and/or guarantor has filed a request for extension in connection with the filing of any tax return, Borrower and/or guarantor shall provide Lender with a copy of said extension no later than fifteen (15) days

1 | following the filing of said extension, with copies of said tax return to be provided
2 | to Lender within fifteen (15) days after the date of said extended filing).

3 |       **(e)   Other Information.** Upon the occurrence of a Default, such
other information with regard to Borrower, principals of Borrower, guarantors or
the Property in such form and within such time period(s) as Lender may reasonably
4 | request in writing; and

5 |       **(f)   Monthly Reporting.** Upon the occurrence of a Default,
Lender may request monthly reporting of the Financial Statements described in this
6 | paragraph 2.1 on an as needed basis.

7 |       **(g)   Failure to Timely Deliver Financial Statements.**
Borrower and guarantor each acknowledge the importance to Lender of the timely
8 | delivery of each of the items required by Sections 2.1(a)(b)(c)(d) (each, a
"**Required Financial Item**" and collectively, the "**Required Financial Items**"). In
9 | the event any reporting party fails to deliver to Lender any of the Required
Financial Items within the time frame specified herein (each such event, a
10 | "**Reporting Failure**"), shall constitute a Default under the Loan Documents.

11 |       On November 27, 2017, the Bank sent a letter to the Borrowers, Tengco Decl., ¶ 12,

12 | Exhibit 7, demanding that the Borrowers deliver the financial statements required by the Notes by

13 | December 10, 2017. The Borrowers failed to do so. Tengco Decl., ¶ 12. Thereafter, the Bank

14 | declared an Optional Default pursuant to the terms of the Note and Deed of Trust, as authorized

15 | under Section 7.1(a)(ii)(A) (Tengco Decl.,  ¶ 12, Exhibit 8)  thereof which provides as follows:

16 | <div align="center">**DEFAULT**</div>

17 |       **7.1**   **Default.** For all purposes hereof, "**Default**" shall mean either an
"**Optional Default**" (as defined below) or an "**Automatic Default**" (as defined
18 | below) . . . .

19 |       **(ii)   Failure to Perform.** Borrower shall fail to observe, perform
or discharge any of Borrower's obligations, covenants, conditions or
20 | agreements, other than Borrower's payment obligations, under the Note, this
Deed of Trust or any of the other Loan Documents, and

21 |       **(A)**   such failure shall remain uncured for thirty (30) days
22 | after written notice thereof shall have been given to Borrower, as the case
may be, by Lender . . . .

23 |

24 | On January 29, 2018, the Bank caused to be sent to the Borrowers a letter demanding that the

25 | Borrowers immediately pay to the Bank the Payments (i.e. the Rents) from the Properties.  Tengco

26 | Decl.,  ¶ 13, Exhibit 9.

27 | / / /

28 | / / /

### D.   Procedural History of this Action

On January 4, 2015, the City filed a Complaint for Injunctive and Other Relief against multiple Defendants, (Kaplan Decl., ¶ 2) including Defendant XELAN and Renka. Thereafter, on October 26, 2017, an Amended Judgment was entered in this action against Defendants including XELAN and Renka. Kaplan Decl., ¶ 7.

On December 26, 2017, the City's Notice of Motion and Motion for Assignment of Rents, Restraining Order and Turnover Order Pursuant to C.C.P. § 708.510(a), C.C.P. § 708.520(a) and C.C.P. § 699.040 [Rents and Lease Payments owed to XELAN Prop 1 LLC, Renka Prop, LLC, Nozari 2, LLC and Zoriall, LLC] was heard and granted by this Court. Thereafter, the Court entered the Order Granting Renoticed Motion for Assignment of Rights, Restraining Order and Turnover Order Pursuant to C.C.P. § 708.510(a), C.C.P. § 708.520(a) and C.C.P. § 699.040 [Rents and Lease Payments owed to XELAN Prop 1 LLC, Renka Prop, LLC, Nozari 2, LLC and Zoriall, LLC] (the "Assignment Order"). Kaplan Decl., ¶ 3, Exhibit 2.

The Bank first became aware of the existence of the Assignment Order when it was attached to an Exhibit to two Motions For Relief From the Stay filed by the City on **January 11, 2018** in the In re Renka Prop LLC Chapter 11 case, United States Bankruptcy Court for the Northern District of California, Case No. 17-31301 and the In re XELAN Prop 1. LLC Chapter 11 case, United States Bankruptcy Court for the Northern District of California, Case No. 17-31302. These Chapter 11 cases were filed on December 29, 2017 and subsequently dismissed by the Bankruptcy Court on January 18, 2018. Kaplan Decl., ¶ 4.

The Assignment Order provides in part as follows:

IT IS FURTHER ORDERED that all of the rents, lease payments, lease obligations, general intangibles, rights to payment of money, contract rights, deposits and deposit accounts, claims against third parties, monies due from third parties, due and in favor of and for the benefit of the Defendant LLC's arising out of their ownership, management, control, rental of, lease of, real properties in the name of or under the control specifically of Defendants XELAN PROP 1, LLC, RENKA PROP LLC . . . ("RIGHTS TO PAYMENT OF RENTAL INCOME"), are hereby assigned, transferred, and payable to Plaintiffs CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation, and the PEOPLE OF THE STATE OF CALIFORNIA, by and through DENNIS J. HERRERA, City Attorney for the CITY AND COUNTY OF SAN FRANCISCO, care of its attorney, Victoria L. Weatherford, Esq., Deputy City Attorney, for and on behalf of DENNIS J. HERRERA, City Attorney for the CITY AND COUNTY OF SAN FRANCISCO,

1390 Market Street, Seventh Floor, San Francisco, CA 94102-5408, for purposes of payment of the Judgment in the total amount of $2,109,529, plus interest and costs as may be allowed, for the amounts and against the parties as set forth below:

| Defendant LLC's | Amount due under the Amended Judgment |
|---|---|
| Nozari 2, LLC | $2,898,277.54 |
| XELAN Prop 1, LLC | $3,309,354.54 |
| Renka Prop LLC | $4,215,790.54 |
| Zoriall, LLC | $3,227,531.54 |

and that the addresses where the obligors under the rights to payment of rental income are following for each of the Defendant LLC's:

| Property | Title Holder |
|---|---|
| 3947 18th Street<br>San Francisco, CA 94114 | Nozari 2, LLC |
| 17 Hancock Street<br>San Francisco, CA 94114<br>(650 Church Street) | Nozari 2, LLC |
| 4018-4022 – 19th Street<br>San Francisco, CA 94114 | XELAN Prop 1, LLC |
| 1000-1022 Filbert Street<br>San Francisco, CA 94133 | XELAN Prop 1, LLC |
| 195 Eureka Street<br>San Francisco, CA 94114 | Renka Prop LLC |
| 1135-1139 Guerrero Street<br>San Francisco, CA 94110<br>69-75 Hill Street<br>San Francisco, CA 94110 | Zoriall, LLC, Kaplan Decl., ¶ 8. |

The Assignment Order further provides:

IT IS FURTHER ORDERED that the Court will not make any priority determinations at this time. If and when priority is claimed by a third party, a motion may be made to the Court to resolve the matter. The Court also notes that in the event Defendants wish to sell any on [sic] the affected properties, they may apply (regularly noticed motion) for the approval of the Court and for the determination of the distribution of the sale proceeds. Kaplan Decl. ¶ 9.

///

///

///

JMBM | Jeffer Mangels
Butler & Mitchell LLP

# ARGUMENT

**A.**    **The Law Governing the Perfection and Priority of Written Assignments of Interest in Leases, Rents, Issues and Profits**

Civil Code § 2938 governs the perfection and priority of written rent and lease assignments made in connection with an obligation secured by real property and provides as follows:

> **2938.** (a) A written assignment of an interest in leases, rents, issues, or profits of real property made in connection with an obligation secured by real property, irrespective of whether the assignment is denoted as absolute, absolute conditioned upon default, additional security for an obligation, or otherwise, **shall, upon execution and delivery by the assignor, be effective to create a present security interest in existing and future leases, rents, issues, or profits of that real property.** As used in this section, "leases, rents, issues, and profits of real property" includes the cash proceeds thereof. "Cash proceeds" means cash, checks, deposit accounts, and the like.

> (b) An assignment of an interest in leases, rents, issues, or profits of real property may be recorded in the records of the county recorder in the county in which the underlying real property is located in the same manner as any other conveyance of an interest in real property, whether the assignment is in a separate document or part of a mortgage or deed of trust, and when so duly recorded in accordance with the methods, procedures, and requirements for recordation of conveyances of other interests in real property, (1) the assignment shall be deemed to give constructive notice of the content of the assignment with the same force and effect as any other duly recorded conveyance of an interest in real property and (2) **the interest granted by the assignment shall be deemed fully perfected as of the time of recordation with the same force and effect as any other duly recorded conveyance of an interest in real property, notwithstanding a provision of the assignment or a provision of law that would otherwise preclude or defer enforcement of the rights granted the assignee under the assignment until the occurrence of a subsequent event, including, but not limited to, a subsequent default of the assignor, or the assignee's obtaining possession of the real property or the appointment of a receiver.**

> (c) **Upon default of the assignor under the obligation secured by the assignment of leases, rents, issues, and profits, the assignee shall be entitled to enforce the assignment in accordance with this section.** On and after the date the assignee takes one or more of the enforcement steps described in this subdivision, the assignee shall be entitled to collect and receive all rents, issues, and profits that have accrued but remain unpaid and uncollected by the assignor or its agent or for the assignor's benefit on that date, and all rents, issues, and profits that accrue on or after the date. The assignment shall be enforced by one or more of the following:

> . . . .

> (4) **Delivery to the assignor of a written demand for the rents, issues, or profits,** a copy of which shall be mailed to all other assignees of record of the leases, rents, issues, and profits of the real property at the address for notices provided in the assignment or, if none, to the address to which the recorded assignment was to be mailed after recording. (Emphasis added.)

MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DETERMINE LIEN PRIORITY

1    In <u>MDFC Loan Corporation v. Greenbrier Plaza Partners</u> (1994) 21 Cal.App.4th 1045, the

2  Court interpreted the provisions of Civil Code § 2938 in connection with a dispute which arose

3  between MDFC Loan Corporation ("MDFC") as lender and Greenbrier Plaza Partners as borrower

4  ("Greenbrier").  Greenbrier had borrowed $9,500,000 from MDFC Loan Corporation and executed

5  a deed of trust which was recorded and **contained language almost identical to the language**

6  **involved in the Deeds of Trust executed by the Borrowers:**

7       Trustor hereby absolutely and unconditionally assigns and transfers to Beneficiary
        all the income . . . of the Property whether now due, past due or to become due and

8       hereby gives to and confers upon Beneficiary the right, power and authority to
        collect such income . . .

9
        Notwithstanding anything to the contrary . . . , so long as no default by Trustor in

10      the payment of any indebtedness secured hereby . . . shall exist and be continuing,
        Trustor shall have the right to collect all income . . . from the Property and to retain,

11      use and enjoy the same. <u>Id.</u> at 1048.

12      MDFC's loan to Greenbrier went into default and MDFC filed a lawsuit and was successful

13  in having a receiver appointed over the real property in question.  Subsequently, MDFC

14  commenced and completed nonjudicial foreclosure proceedings pursuant to its deed of trust.

15  Thereafter, a dispute arose between MDFC and Greenbrier as to the disposition of rents which had

16  been collected by the receiver.  The <u>MDFC</u> Court, citing Civil Code § 2938(a) and (b), reversed

17  the decision of the trial court awarding the rents to the borrower and stated as follows:

18      Paragraphs 1.18 and 1.19 of the trust deed provided for an absolute assignment of
        rents contingent upon the occurrence of a default.  **Once Greenbrier defaulted on**

19      **the loan, a perfected transfer of the property's income arose in favor of
        plaintiff and it sought to enforce the transfer by filing this action and seeking**

20      **the appointment of a receiver.**  The plaintiff is entitled to all of the rents held by
        the receiver when the receivership was terminated.  <u>Id.</u> at 1052-53. (Emphasis

21      added.)

22  In so doing, the <u>MDFC</u> Court noted as follows:

23      Paragraph 1.18 of the trust deed states Greenbrier 'absolutely and unconditionally
        assigns and transfers to Beneficiary all of the income . . . of the Property . . . and

24      hereby gives to and confers upon Beneficiary the right, power and authority to
        collect such income . . .'  **The trust deed was recorded in July 1988 when the**

25      parties entered into the loan transaction.  **Consequently, plaintiff obtained a
        perfected interest in these funds at that time.**  <u>Id.</u> at 1050. (Emphasis added.)

26

27      Thus, under Civil Code § 2938, as interpreted by the <u>MDFC</u> Court, a real property secured

28  creditor holding a recorded written assignment of rents and lease which exercises an enforcement

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    action is entitled to all rents generated from the real property subsequent to the date of the exercise

2    of its enforcement action.

3    **B.    The Bank Has a First Priority Perfected Security Interest in the Payments and**
     **is Entitled to All Payments Generated on or After January 29, 2018**

4

5    The Borrowers failed to provide the Bank with their financial statements required by

6    Exhibit A to the Notes. The Bank demanded that financial reporting on November 27, 2017 and

7    required it be delivered to the Bank by December 10, 2017. The Borrowers failed to do so.

8    Thereafter, on January 26, 2018, the Bank declared an Optional Default under the Notes and

9    Deeds of Trust as a result of the Borrower's failure to timely deliver the financial statements.

10   Finally, on January 29, 2018, the Bank demanded possession of the Payments (i.e., Rents

11   generated from the Properties).

12   Pursuant to the provisions of Civil Code § 2938(a), the written assignment of Payments

13   generated from the Properties was "effective to create a present security interest in existing and

14   future leases, rents, issues or profits" of the Properties. Furthermore, the assignment of Payments

15   to the Bank in the Deeds of Trust which were subsequently recorded was, pursuant to Civil Code

16   § 2938(b), "deemed fully perfected as of the time of the recordation . . . ."

17   Finally, the January 29, 2018 written demand made by the Bank to pay the Payments (i.e.,

18   Rents) to the Bank was an enforcement step provided for by Civil Code § 2938(c)(4) **as a result**

19   **of which the Bank was "entitled to collect and receive all rents, issues and profits that**

20   **accrued but remained unpaid and uncollected by the [Borrowers] . . . on that date, and all**

21   **rents, issues and profits that accrue on or after that date."**

22   In light of the foregoing, the Assignment Order does not trump the first priority security

23   interest held by the Bank in the Payments, as the City does not have any special status under Civil

24   Code § 2938 or any other provision of California law. Moreover, Code of Civil Procedure

25   § 708.530(b), which governs the Assignment Order obtained by the City, provides as follows:

26   An assignment of the right to future rent ordered under this article is recordable as
     an instrument affecting real property and the priority of such an assignment is

27   governed by Section 1214 of the Civil Code.

28   The California Law Revision Comments to Civil Code § 708.530(b) provide:

61674510v1                                    15

JMBM    Jeffer Mangels
        Butler & Mitchell LLP

1  Section 708.530 is amended to provide a specific rule governing assignments of
2  rights to future rent. Subdivision (b) recognizes such assignments as instruments
**affecting real property subject to the recording act.** (Emphasis added.)

3  Civil Code § 1214 provides as follows:

4  Every conveyance of real property . . . is void as against any subsequent purchaser
or mortgagee of the same property, or any part thereof, in good faith and for a
5  valuable consideration, whose conveyance is first duly recorded, and as against any
judgment affecting the title, unless the conveyance shall have been duly recorded
6  prior to the record of notice of action.

7  Ahart, <u>California Practice Guide Enforcing Judgments and Debts</u>, Chapter 6, at § 6:1453 (Rutter

8  Group 2017) states:

9  An assignment of the right to future rent from real property is recordable as an
instrument affecting real property. The priority of such an instrument is governed
10  by Civ.C. § 1214 [CCP § 708.530(b)].

11  If properly recorded, the judgment creditor's assignment has priority over
**subsequent** purchasers or mortgagees, over subsequent judgments affecting title to
12  the property and over subsequent assignment orders. The assignment order will
have priority over prior *unrecorded* liens. (Emphasis added.)

13

14      To the best knowledge of the Bank, the Assignment Order was never recorded by the City.

15  Moreover, even if the Assignment Order had been recorded by the City, such a recording would

16  have occurred years **after** the Bank's Deeds of Trust were recorded. Therefore, the Bank's Deeds

17  of Trust clearly have priority over the Assignment Order under Civil Code § 708.530(b).

18      For all of the foregoing reason, the Court should determine that the Borrowers are not

19  required to comply with the provisions of the Assignment Order with respect to any Payments

20  (i.e., Rents) generated from the Properties on or after January 29, 2018.

21                                    **CONCLUSION**

22      For the foregoing reasons, the Bank's Motion should be granted and the Court should order

23  that the Bank has a first priority and perfected security interest in the Payments generated from the

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DETERMINE LIEN PRIORITY

JMBM | Jeffer Mangels Butler & Mitchell LLP

1 | Properties on and after January 29, 2018 and the Borrowers do not need to comply with the

2 | provisions of the Assignment Order which require those Payments to be paid to the City.

3 |

4 | DATED: January 29, 2018            JEFFER MANGELS BUTLER & MITCHELL LLP

5 |

6 |                                    By:

7 |                                          ROBERT B. KAPLAN, ESQ.
                                          Attorneys for Proposed Intervenor UMPQUA
8 |                                          BANK

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

JMBM | Jeffer Mangels Butler & Mitchell LLP

# EXHIBIT 15

1 | JEFFER MANGELS BUTLER & MITCHELL LLP
2 | ROBERT B. KAPLAN, P.C. (Bar No. 76950)
  | *rbk@jmbm.com*
  | Two Embarcadero Center, 5th Floor
3 | San Francisco, California 94111-3813
  | Telephone:    (415) 398-8080
4 | Facsimile:    (415) 398-5584

5 | Attorneys for Proposed Intervenor UMPQUA
  | BANK

6

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10

**ENDORSED**
**F I L E D**
*San Francisco County Superior Court*

FEB 28 2018

CLERK OF THE COURT
BY: _____ ALVIN MOK _____
                    Deputy Clerk

11 | CITY AND COUNTY OF SAN
   | FRANCISCO, a Municipal Corporation and
12 | the PEOPLE OF THE STATE OF
   | CALIFORNIA, by and through DENNIS J.
13 | HERRERA, City Attorney for the City and
   | County of San Francisco,
14 |
   |                    Plaintiffs,
15 |
   |        v.
16 |
   | ANNE KIHAGI aka ANNA KIHAGI aka
17 | ANNA SWAIN aka ANNE KIHAGI SWAIN
   | aka ANNA KIHAGI SWAIN, JULIA
18 | MWANGI aka JULIA MUNENE,
   | CHRISTINE MWANGI aka CHRISTINA
19 | MWANGI aka CHRISTINE JOHNSON,
   | XELAN PROP 1, LLC, RENKA PROP, LLC,
20 | NOZARI 2, LLC, ZORIALL, LLC and DOE
   | ONE through DOE FIFTY,
21 |
   |                    Defendants.
22 |

Case No. CGC-15-546152

**ORDER GRANTING MOTION TO
DETERMINE LIEN PRIORITY**

Date:          February 22, 2018
Time:          1:30 p.m.
Place:         Department 503
Judge:         Lynn O'Malley Taylor

Action Filed:  May 4, 2015
Trial Date:    October 31, 2016

Taylor

23

24 | The Motion of Umpqua Bank for an Order Granting Motion to Determine Lien Priority

25 | (the "Motion") arising from that certain Order Granting Renoticed Motion for Assignment of

26 | Rights, Restraining Order and Turnover Order Pursuant to C.C.P. § 708.510(a), C.C.P.

27 | § 708.520(a), and C.C.P. § 699.040 [Rents and Lease Payments Owed to XELAN Prop 1, LLC,

28 | Renka Prop LLC, Nozari 2, LLC and Zoriall, LLC] filed on December 26, 2017 (the "Assignment

1  Order") came on regularly for hearing on February 22, 2018 at 1:30 p.m. in Department 514 of

2  the above-entitled Court, the Honorable Judge Lynn O'Malley Taylor, presiding. Robert B.

3  Kaplan, Esq. of Jeffer Mangels Butler & Mitchell LLP appeared for Proposed Intervenor Umpqua

4  Bank (the "Bank"), Peter Keith, Deputy City Attorney and David J. Cook, Esq. appeared for

5  Plaintiff City and County of San Francisco and the People of the State of California (collectively,

6  the "City) and other appearances, if any, were as noted in the record.[1]

7       The Court, having considered the Bank's Motion, the Opposition filed thereto by the City

8  and the Bank's Reply, and having heard the oral argument of counsel and good cause appearing

9  therefor:

10       IT IS ORDERED as follows:

11       1.      Defendants XELAN and Renka (collectively, the "Borrowers") are excused from

12  complying with the Assignment Order to the extent the Assignment Order requires the rents, lease

13  payments, lease obligations, general intangibles, rights to payment of money, contract rights,

14  deposits and deposit accounts, claims against third parties, monies due from third parties, due and

15  in favor of and for the benefit of the Borrowers (collectively, the "Rents") due, received, and/or

16  paid to the Borrowers on or after January 29, 2018 arising out of their ownership, management,

17  control, rental of, lease of the real properties commonly known as 4018-4022 19th Street, San

18  Francisco, California, 1000-1022 Filbert Street, San Francisco, California, and 195 Eureka Street,

19  San Francisco, California (collectively, the "Subject Properties") to be paid to the City;

20       2.      All Rents due, received and/or paid to the Borrowers on or after January 29, 2018

21  shall no longer be paid by the Borrowers to the City pursuant to the Assignment Order and the

22  Borrowers are hereby excused from complying with any of the provisions of the Assignment

23  Order that so require;

24       3.      The Bank has a first-priority lien and perfected security interest in the Rents of the

25  Subject Properties and the Bank shall be entitled to enforce that first priority lien and perfected

26  security interest in the Rents with respect to any Rents paid by tenants of the Subject Properties on

27  _____

28  [1] All capitalized terms not otherwise defined in this Order shall have the meanings ascribed to
   them in the Motion filed on January 29, 2018.

61741154v2                                      2

1  or after January 29, 2018;

2      4.    The City shall turn over to the Bank, in kind, on or before five court days have

3  elapsed from the date of the filing of this Order, all uncashed checks for Rents from tenants of the

4  Subject Properties which have been received by the City on or after January 29, 2018 by

5  delivering said checks to the Bank's counsel of record as follows:

6          Robert B. Kaplan, P.C.

7          Jeffer Mangels Butler & Mitchell LLP
        Two Embarcadero Center, 5th Floor

8          San Francisco, CA  94111

9      5.    To the extent the City has already cashed checks for Rents due from tenants of the

10  Subject Properties on or after January 29, 2018, the City shall deliver to the Bank the City's check

11  equal to the amount of said cashed checks to the Bank's counsel at the address set forth in

12  paragraph 4 above on or before ten court days have elapsed from the date of the filing of this

13  Order;

14      6.    On or before five court days have elapsed from the date of the filing of this Order,

15  the City shall deliver a written accounting to the Bank's counsel to the address set forth in

16  paragraph 4 above, of all uncashed checks the City has received and/or checks cashed by the City

17  on or after January 29, 2018 for Rents from the Subject Properties;

18      7.    Subject to further Order of this Court, all Rents paid by tenants of the Subject

19  Properties on or after January 29, 2018 shall be paid to the Bank at the following address, with a

20  reference to the Special Assets Department on each check for Rents sent to the Bank:

21          Umpqua Bank
        Special Assets OR 0050

22          P.O. Box 1820
        Roseburg, OR  97470

23

24      8.    All Rents paid by tenants of the Subject Properties to the Bank on or after January

25  29, 2018 shall not be paid by the Bank to the Borrowers, or any of them;

26      9.    Upon payment to the Bank of all Secured Obligations (as that term is defined in the

27  XELAN Deed of Trust No. 1) owed by XELAN to the Bank pursuant to XELAN Note No. 1 and

28  XELAN Deed of Trust No. 1, all Rents generated from the Filbert Street Property shall thereafter

ORDER GRANTING MOTION TO DETERMINE LIEN PRIORITY

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    be paid to the City pursuant to the Assignment Order;

2          10.    Upon payment to the Bank of all Secured Obligations (as that term is defined in the

3    XELAN Deed of Trust No. 2) owed by XELAN to the Bank pursuant to XELAN Note No. 2 and

4    XELAN Deed of Trust No. 2, all Rents generated from the 19th Street Property shall thereafter be

5    paid to the City pursuant to the Assignment Order; and

6          11.    Upon payment to the Bank of all Secured Obligations (as that term is defined in the

7    Renka Deed of Trust) owed by Renka to the Bank pursuant to Renka Note and Renka Deed of

8    Trust, all Rents generated from the Eureka Street Property shall thereafter be paid to the City

9    pursuant to the Assignment Order.

10
                                                       LYNN O'MALLEY-TAYLOR
11

12   DATED: February 26, 2018          _____
                                                       JUDGE OF THE SUPERIOR COURT
13                                                     LYNN O'MALLEY-TAYLOR

14   APPROVED AS TO FORM:

15   COOK COLLECTION ATTORNEYS,
     a Professional Law Corporation
16

17   by:

18   David J. Cook, Esq. Attorneys for
     Plaintiffs CITY AND COUNTY OF
19   SAN FRANCISCO, a Municipal Corporation,
     and the PEOPLE OF THE STATE OF CALIFORNIA
20   by and through DENNIS J. HERRERA, City Attorney
     for the City and County of San Francisco
21

22

23

24

25

26

27

28

61741154v2
                                          4
                    ORDER GRANTING MOTION TO DETERMINE LIEN PRIORITY

**EXHIBIT 8**

1  JEFFER MANGELS BUTLER & MITCHELL LLP
   ROBERT B. KAPLAN, P.C. (Bar No. 76950)
2  *rbk@jmbm.com*
   Two Embarcadero Center, 5th Floor
3  San Francisco, California 94111-3813
   Telephone:   (415) 398-8080
4  Facsimile:   (415) 398-5584

5  Attorneys for Plaintiff UMPQUA BANK

**ENDORSED**
**F I L E D**
*San Francisco County Superior Court*

APR 0 6 2018

CLERK OF THE COURT
BY: _____ERICKA LARNAUTI_____
Deputy Clerk

6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SAN FRANCISCO

10

11  UMPQUA BANK, a state chartered bank,           Case No. CGC-18-564941

12              Plaintiff,                          **ORDER APPOINTING RECEIVER; AND**
                                                    **PRELIMINARY INJUNCTION IN AID OF**
13      v.                                          **RECEIVER**

14  XELAN PROP 1, LLC, a California limited
    liability company; and DOES 1-30, inclusive,   Date:        April 6, 2018
15                                                  Time:        2:00 p.m.
                Defendants.                         Place:       Dept. 501
16
                                                    Action Filed:   March 12, 2018
17                                                  Trial Date:     None Set

18

19      Upon a reading of the Verified Complaint ("Complaint") of Plaintiff Umpqua Bank

20  ("Plaintiff" or "Bank") on file in the above-captioned action (the "Action") and the Ex Parte

21  Application for Immediate Appointment of Receiver and Preliminary Injunction in Aid of

22  Receiver ("Application") with all supporting declarations filed by the Bank, and good cause

23  appearing for the appointment of a receiver:

24                    **ORDER APPOINTING RECEIVER**

25      IT IS HEREBY ORDERED that Kevin Singer be and is hereby appointed as receiver (in

26  such capacity, the "Receiver") in this action over the real properties commonly known as 1000-

27  1022 Filbert Street, San Francisco, California and 4018-4022 19th Street San Francisco, California

28  (collectively, the "Subject Properties") subject to the condition that, before entering upon his

61794883v1                                1

1   duties as a receiver, he shall take the oath and file a bond with a surety thereon approved by this

2   Court in the sum of $70,000.00 to secure the faithful performance of his duties as such receiver.

3        IT IS FURTHER ORDERED that the Receiver shall have the following powers and

4   responsibilities:

5        1.     To enter, gain access to and take possession of the Subject Properties, to exclude

6   and evict XELAN Prop 1, LLC (the "Defendant" or "Borrower"), or anyone claiming under or

7   through Defendant therefrom who are not under valid leases or rental agreements to use, operate,

8   manage and control the Subject Properties to recover the rents, issues, income, profits, revenues,

9   royalties, lease payments, security deposits and profits therefrom; to care for, preserve, protect,

10   secure, maintain, care for, preserve, finish construction of and maintain the Subject Properties, and

11   to receive the rents and incur the expenses necessary for such care, preservation and maintenance;

12   and to do all things and to incur the risks and obligations ordinarily incurred by the Borrower,

13   managers and operators of similar businesses and properties, as such Receiver, and no risks or

14   obligations so incurred shall be at the personal risk or obligation of the Receiver, but shall be a

15   risk or obligation of the receivership estate;

16        2.     To demand, collect and receive the rents, issues, income, profits, revenues, prepaid

17   rent, percentage rent based on gross annual sales or the like, tenant improvement deposits,

18   royalties, lease payments and security deposits in the possession of Defendant, or now due and

19   hereafter coming due from the tenants or lessees of any portion of the Subject Properties;

20        3.     To let, rent or lease from time to time any part of Subject Properties and the

21   Personal Property and to keep the buildings thereon insured and in good repair;

22        4.     To take possession of and receive from any and all banks, savings and loan

23   associations and/or any financial institutions any monies and funds on deposit in said banks,

24   savings and loan associations and/or any financial institutions in the name of the Borrower, to the

25   extent that said accounts contain the rents, issues, income, profits, revenues, storage unit rentals,

26   royalties, lease payments or security deposits generated by or arising out of the Subject Properties,

27   and the Receiver's receipt of said monies and funds shall discharge said banks, savings and loan

28   associations and/or any financial institutions from further responsibility for accounting to said

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1  account holder for monies and funds for which the Receiver shall give his receipt;

2      5.    To take possession of all the books and records pertaining to the Subject Properties

3  including, without limitation, construction contracts, bids, subcontracts, permits, licenses,

4  blueprints, architectural documents, plans, and specifications, list of historical common area

5  maintenance charges and operating expenses, computer equipment, software, management files,

6  equipment files, supply files and all passwords needed to access all software and computer files

7  maintained at onsite and offsite management offices from the Defendant, wherever located, as the

8  Receiver deems necessary for the proper administration, management and/or control of the estate,

9  but said books and records shall be made available to said Defendant as is reasonably necessary;

10      6.    To execute and prepare all documents and to perform all acts, either in the name of

11  the Defendant or in the Receiver's own name, which are necessary or incidental to preserving,

12  protecting, managing and/or controlling the Subject Properties and the receivership estate;

13      7.    To employ agents, servants, employees, guards, clerks, accountants, on-site

14  managers and management consultants to administer the receivership estate and to collect said

15  rents, issues, income, profits, revenues, storage unit rentals, royalties, lease payments and security

16  deposits and profits therefrom, manage the Subject Properties, and keep the same insured and in

17  good repair, if the Receiver shall deem the same necessary, and to pay the reasonable value of said

18  services out of the rents received;

19      8.    To require the Defendant to notify the Receiver upon the Receiver's taking

20  possession of the Subject Properties whether or not there is sufficient insurance coverage on the

21  Subject Properties, to provide the Receiver with the identity of the Borrower's insurance company,

22  insurance agent's name and contact information and to provide the Receiver with copies of all its

23  insurance policies relating to the Subject Properties. If sufficient insurance coverage does exist,

24  the Defendant shall be responsible for naming, and is hereby ordered to name, the Receiver as an

25  additional insured on the insurance policy(ies) for the period that the Receiver shall be in

26  possession of the Subject Properties. If there is insufficient insurance coverage, it is hereby

27  ordered that the Receiver shall have thirty (30) working days to procure said insurance on the

28  Subject Properties, provided that the Receiver has funds available to do so. If the Receiver does

61794883v1

3

ORDER APPOINTING RECEIVER; AND PRELIMINARY INJUNCTION IN AID OF RECEIVER [XELAN]

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  not have sufficient funds to do so, the Receiver shall seek instructions for the Court with regard to

2  whether insurance shall be obtained and how it is paid for;

3      9.      To hold the monies coming into possession of the Receiver pursuant to his

4  operation of the business thereto, and not expended for any of the purposes herein authorized,

5  shall be held by said Receiver for the payment of the Borrower's obligations to Plaintiff sued upon

6  in the Complaint. Notwithstanding the foregoing, after reserving sufficient funds as the Receiver

7  deems reasonable to cover expenses of the receivership, the Receiver may pay, at its discretion,

8  any remaining amounts owing to Plaintiff by Defendant to reduce the amounts due and owing

9  unpaid by Defendant and reduce the accrual of interest on such amounts;

10     10.     To establish bank accounts for the deposit of monies and funds collected and

11  received in connection with the Receiver's administration of the receivership estate, at any

12  financial institution the Receiver deems appropriate, provided that any funds on deposit at said

13  financial institution are fully insured by an agency of the United States government;

14     11.     To institute ancillary proceedings in this state or other states and countries as are

15  necessary to preserve and protect the receivership estate, and the Receiver may engage the

16  services of legal counsel, if necessary, upon prior approval of the above-entitled Court and notice

17  to the Plaintiff as required by California Rule of Court ("CRC") Rule 3.1180. The Receiver may

18  pay for such services from the funds of the receivership estate;

19     12.     To the extent feasible, the Receiver shall, within thirty (30) days of his qualification

20  hereunder, file in this action an inventory of the Subject Properties which he shall have taken

21  possession pursuant to this order per CRC Rule 3.1181 and shall file supplemental inventories as

22  needed;

23     13.     To prepare periodic interim statements reflecting the Receiver's fees and

24  administrative costs and expenses incurred for said period in the operation and administration of

25  the Receivership estate. The Receiver shall provide and file with the Court a monthly report with

26  details as required by CRC Rule 3.1182. Upon completion of an interim statement, and the

27  mailing of such statement to the parties' respective attorneys of record, or any other designated

28  person or agent, and if no objection is received within 10 calendar days after the mailing of the

Jeffer Mangels Butler & Mitchell LLP
JMBM

1    interim statement, the Receiver shall pay from the estate funds, if any, the amount of said

2    statement based upon the fee schedule set forth in the Declaration of the Receiver filed in support

3    of Plaintiff's Ex Parte Application for Immediate Appointment of a Receiver, etc. Despite the

4    periodic statement of Receiver's fees and administrative expenses, such fees and expenses shall be

5    submitted to the Court for its approval and confirmation, in the form of a stipulation among the

6    parties, or the Receiver's Final Accounting and Report;

7           14.    To take possession of all the books and records of Defendant wherever located, as

8    the Receiver deems necessary for the proper administration, management and/or control of the

9    receivership estate;

10           15.    If there are insufficient funds in the receivership estate to pay expenses of the

11    receivership, the expenses of the receivership estate may be paid by the Plaintiff or advanced to

12    the Receiver by the Plaintiff, in its sole and absolute discretion, opinion and judgment of the

13    Plaintiff, and the Receiver shall issue receiver's Certificates of Indebtedness to the Plaintiff in the

14    amount of any such payments or advances, all subject to the right of the Receiver or the Plaintiff,

15    in their discretion, to seek further orders of this Court with respect thereto.   Any such Certificates

16    of Indebtedness issued by the Receiver to the Plaintiff shall not be the personal obligation of the

17    Receiver but the obligation of the receivership estate;

18           16.    The Receiver shall not be responsible for payment of any real property taxes, utility

19    bills, unpaid payroll expenses or other unpaid invoices for services or utilities incurred by the

20    Borrower, or for the benefit of, the Subject Properties prior to the Receiver's taking possession of

21    the Subject Properties provided, however, the Receiver is authorized to pay operating expenses of

22    the Subject Properties that were incurred prior to the date of this Order if such payment is

23    reasonably necessary or beneficial to enable the Receiver to continue to operate the Subject

24    Properties as determined by the Receiver in its sole discretion including, without limitation, the

25    payment of utility bills dated prior to the date of this Order. No utility or other vendor may

26    terminate service or the provision of other goods or services to the Subject Properties as a result of

27    the non-payment of pre-receivership obligations, without prior order of this Court;

28    ///

JMBM | Jeffer Mangels Butler & Mitchell LLP

17.    The Defendant, its agents, servants, employees or representatives, or all persons or entities acting under or in concert with the Defendant, on receipt of a copy of this Order shall provide the Receiver with the Tax Identification number utilized by the Borrower for the operation of the Subject Properties.  The Receiver shall be entitled to utilize the aforementioned Tax Identification number during his operation of the Subject Properties;

18.    The Receiver shall be authorized to open all mail addressed to the Borrower, its agents, servants, employees or representatives, or all persons or entities acting under or in concert with the Defendant at the Subject Properties.  The Receiver is authorized to make copies of this mail, and then forward this mail to the addressed to the Defendant, their agents, servants, employees or representatives, or all persons or entities acting under or in concert with the Defendant at the address provided by the Defendant;

19.    The Receiver and the parties to this case may, at any time, apply to this Court for further or other instructions or orders and for further powers necessary to enable the Receiver to perform the Receiver's duties properly;

20.    The Receiver is authorized to endorse checks payable to the Defendant, to send notice to accounts receivable debtors of the Borrower directing the same to make payments due to the Defendant which are part of the Subject Properties or the proceeds thereof to the Receiver, to undertake whatever actions are reasonable or necessary to collect the accounts receivable of the Borrower, and to compromise the amounts owing from account debtors of the Borrower if in the Receiver's reasonable business judgment it is appropriate to do so;

21.    The Receiver is authorized to institute ancillary proceedings in this or in other states as are reasonable or necessary to preserve and protect the Subject Properties and receivership estate, to collect upon accounts receivable which are part of Subject Properties to obtain possession and collect any other part of the Subject Properties, and to defend himself from the action of others;

22.    The Receiver shall have no responsibility for filing federal and state income tax returns or federal or state payroll tax returns and shall not be responsible for paying any unpaid federal and state payroll taxes and expenses of the Borrower.  The responsibility for such filings

1  and payments lie exclusively with the Defendant and their agents, servants, employees and

2  representatives;

3       23.     The Receiver shall not be obligated to upgrade the Subject Properties or make any

4  improvements thereto, unless and until ordered to do so by the above entitled Court;

5       24.     The Receiver shall not be obligated to contribute personal funds in the performance

6  of his duties hereunder;

7       25.     Any security or other deposits which tenants have paid to the Borrower or its

8  agents and which are not paid to the Receiver and over which the Receiver has no control, shall be

9  obligations of the Borrower and may not be refunded by the Receiver without an order of the

10  above entitled Court.  Any other security or other deposits which tenants have paid or may pay to

11  the Receiver, if otherwise refundable under the terms of their leases or agreements with the

12  Receiver, shall be refundable by the Receiver in accordance with such leases or agreements;

13       26.     The Receiver shall have the right to file an application with this Court for the sale

14  of the Subject Properties, or any portion thereof, on such terms as the Court may authorize;

15       27.     The Defendant is ordered to promptly notify the Receiver of the names, addresses

16  and telephone numbers of all parties and their counsel who appear in the above-entitled action, so

17  that the Receiver may give notice to all parties of any matters affecting the receivership estate;

18       28.     To have the authority to engage the services of one or more environmental

19  consultants to perform environmental reviews as necessary, including a Phase I, II or III

20  Environmental Audits at the Subject Properties.  The Receiver may pay for such services from the

21  funds of the receivership estate;

22       29.     Notwithstanding any provision in this Order to the contrary, the Receiver does not

23  assume and is not obligated to assume and will not be obliged to pay, perform or otherwise

24  discharge any Employment-Related Liability (as defined below) of Defendant.  Defendant is and

25  will be solely and exclusively liable with respect to any Employment-Related Liability.

26  "Employment-Related Liability" includes all of Defendant's liabilities to any former or current

27  employee in any way related to the employee's employment with or separation from Defendant or

28  its management company for the Subject Properties, including, but not limited to, any claims:  (a)

ORDER APPOINTING RECEIVER; AND PRELIMINARY INJUNCTION IN AID OF RECEIVER  [XELAN]

1  for salary, wages, commissions, bonuses, benefits, vacation, or any other form of compensation;

2  (b) arising out of any acts or omissions of Defendant or any of its agents or representatives with

3  respect to any benefit plan, employee practices or employee programs, including employee claims

4  of discrimination, retaliation or other wrongful conduct or discharge decisions; (c) severance

5  liabilities; (d) obligations under employment contracts or any other related agreements with

6  employees; (e) any change of control amounts payable to any employees; (f) all liabilities under

7  the Worker Adjustment and Retraining Notification Act (WARN) 29 U.S.C. § 210 et seq., or

8  similar state statute or regulation; and (g) any other statutory or common law claim; and

9      30.    Notwithstanding the provisions of Section 7 of that certain Order Granting Motion

10  to Determine Lien Priority filed on February 28, 2018 in the action entitled City and County of

11  San Francisco, etc. v. Anne Kihagi, etc., et al., San Francisco County Superior Court Case No.

12  CGC-15-546152, the tenants of the Subject Properties shall now forthwith pay all rents due and

13  owing to the Borrower to the Receiver.

14          **PRELIMINARY INJUNCTION IN AID OF RECEIVER**

15      IT IS FURTHER ORDERED that the Defendant, and all persons and entities now in

16  possession of any part of the Subject Properties and not holding under valid leases, or rental

17  agreements, shall forthwith surrender their possession thereof to said Receiver, and that all tenants

18  or lessees in possession of any part of the Subject Properties, and such other persons or entities as

19  may be lawfully in possession thereof, are hereby directed to attorn as tenants, or lessees to said

20  Receiver, and until further order of this Court, to pay over to said Receiver all rents, issues,

21  income profits, revenues, and lease payments of the Subject Properties now due and unpaid or that

22  may hereafter become due, and all persons and entities liable for such rents, issues, income,

23  profits, revenues, royalties or lease payments are hereby enjoined and restrained from paying any

24  rents, issues, income, profits, revenues, royalties, storage unit rentals or lease payments for the

25  Subject Properties to the Defendant, its agents, servants or attorneys.

26      IT IS FURTHER ORDERED that the Defendant and its agents, employees and

27  representatives, and all persons or entities acting under or in concert with the Defendant, are

28  restrained and enjoined from engaging in or performing, directly or indirectly, any or all of the

61794883v1                          8

ORDER APPOINTING RECEIVER; AND PRELIMINARY INJUNCTION IN AID OF RECEIVER  [XELAN]

1  following acts:

2      1.      Demanding, collecting, receiving or in any other way diverting or using any of the

3  rents, issues, income, profits, revenues, royalties or lease payments emanating from the Subject

4  Properties;

5      2.      Interfering with or hindering in any way whatsoever the Receiver in the

6  performance of the Receiver's duties herein described and in the performance of any duties

7  incident thereto;

8      3.      Interfering in any manner with the Subject Properties, including its possession;

9      4.      Transferring, conveying, assigning, pledging, deeding, selling, renting, leasing,

10  encumbering, changing ownership of, vesting of title to, or otherwise disposing of the Subject

11  Properties; and

12      5.      Terminating or otherwise affecting any of the utilities which service the Subject

13  Properties.

14      IT IS FURTHER ORDERED that:

15      1.      All rents, security deposits, issues, income, profits, revenues, royalties and lease

16  payments of the Subject Properties which are received, or have been received, by the Defendant

17  shall be turned over to the Receiver within five (5) days, and the Defendant shall simultaneously,

18  upon said turnover, deliver to the Receiver written verification of the source of all said monies

19  being turned over;

20      2.      The Defendant, its agents, servants, employees or representatives, or any persons or

21  entities acting under or in concert with Defendant, shall immediately turn over to the Receiver

22  possession of all records, books of account, ledgers, and all documents and papers pertaining to

23  the operation of the Subject Properties and the rents or lease payments due therefor; and

24      3.      Plaintiff and its officers, employees and agents shall have immediate access to the

25  Subject Properties to enable them to view and inspect Subject Properties for the purposes of

26  appraisal.

27  / / /

28  / / /

61794883v1

9

ORDER APPOINTING RECEIVER; AND PRELIMINARY INJUNCTION IN AID OF RECEIVER  [XELAN]

1       IT IS FURTHER ORDERED that Plaintiff file an Undertaking pursuant to Code of Civil

2 Procedure § 529 in the amount of $1,000.00.

3

4 DATED:       APR 0 6 2018

LYNN O'MALLEY-TAYLOR

JUDGE OF THE SUPERIOR COURT

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JMBM | Jeffer Mangels Butler & Mitchell LLP

61794883v1

ORDER APPOINTING RECEIVER; AND PRELIMINARY INJUNCTION IN AID OF RECEIVER [XELAN]