1  JEFFER MANGELS BUTLER & MITCHELL LLP
   ROBERT B. KAPLAN, P.C. (Bar No. 76950)
2  *rbk@jmbm.com*
   Two Embarcadero Center, 5th Floor
3  San Francisco, California 94111-3813
   Telephone:    (415) 398-8080
4  Facsimile:    (415) 398-5584

5  JEFFER MANGELS BUTLER & MITCHELL LLP
   THOMAS M. GEHER (Bar No. 130588)
6  *tmg@jmbm.com*
   1900 Avenue of the Stars, 7th Floor
7  Los Angeles, California 90067-4308
   Telephone:    (310) 203-8080
8  Facsimile:    (310) 203-0567

9  Attorneys for UMPQUA BANK

10

11

12              UNITED STATES BANKRUPTCY COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                  LOS ANGELES DIVISION

15

16  In re                          Case No. 2:19-bk-14626-NB

17  XELAN PROP 1, LLC,             Chapter 11

18              Debtors.           **DECLARATION OF ROBERT B.
                                   KAPLAN IN SUPPORT OF MOTION TO
19                                 DISMISS CHAPTER 11 CASE WITH
                                   PREJUDICE [11 U.S.C. SECTION 1112(b)]**
20
                                   **VOLUME FOUR**
21
                                   **EXHIBIT 9**
22
                                   Date:        April 30, 2019
23
                                   Time:        2:00 p.m.
24
                                   Place:       Courtroom 1545
25                                              255 East Temple Street
                                                Los Angeles, CA
26

27

28

# Exhibit 9

1  JEFFER MANGELS BUTLER & MITCHELL LLP
   ROBERT B. KAPLAN, P.C. (Bar No. 76950)
2  *rbk@jmbm.com*
   Two Embarcadero Center, 5th Floor
3  San Francisco, California 94111-3813
   Telephone:    (415) 398-8080
4  Facsimile:    (415) 398-5584

5  Attorneys for Plaintiff UMPQUA BANK

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**03/05/2019**
Clerk of the Court
BY:SANDRA SCHIRO
Deputy Clerk

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10

11  UMPQUA BANK, a state chartered bank,

12                Plaintiff,

13          v.

14  XELAN PROP 1, LLC, a California limited
    liability company; and DOES 1-30, inclusive,

15

16                Defendants.

17

18

19

20

| | |
|---|---|
| Case No. CGC-18-564941 | |

**NOTICE OF MOTION AND MOTION
FOR ORDER:**

**(1) INSTRUCTING RECEIVER TO SELL
REAL PROPERTY ASSET OF
RECEIVERSHIP ESTATE; AND**

**(2) CONFIRMING SALE OF REAL
PROPERTY [4018-4022 19TH STREET,
SAN FRANCISCO, CA]**

| | |
|---|---|
| Date: | April 3, 2019 |
| Time: | 9:30 a.m. |
| Dept.: | 501 |

| | |
|---|---|
| Action Filed: | March 12, 2018 |
| Trial Date: | None Set |

21  **TO: DEFENDANT XELAN PROP 1, LLC AND OTHER PARTIES IN INTEREST:**

22          PLEASE TAKE NOTICE that on April 3, 2019 at 9:30 a.m. or as soon thereafter as the

23  matter may be heard in Department 501 of the above-referenced court located at 400 McAllister

24  Street, San Francisco, California, Plaintiff Umpqua Bank ("Bank") will move this court for an

25  order (1) instructing and authorizing Kevin Singer, the court-appointed receiver herein

26  ("Receiver"), to sell the real property asset of the receivership estate, located at 4018-4022 19th

27  Street, San Francisco, California ("19th Street Property") to Kenneth M. Kaplan and/or assignee,

28  and Brandon Kaplan, and/or assignee, or to such other interested person making a better and

63378258v1                                      1

1  higher bid therefor (the "Buyer"), pursuant to the terms of the San Francisco Purchase Agreement

2  dated February 1, 2019, Addendum to San Francisco Purchase Agreement, Addendum to SFAR

3  Purchase Sale Agreement dated January 30, 2019, Seller Counter Offer 1 dated February 6, 2019,

4  Contingency Removal #1 dated March 1, 2019, and Addendum A (Addendum to Contingency

5  Removal and Approval of Documents) dated February 28, 2019 (collectively, the "PSA"),

6  attached to the accompanying Declaration of Kevin Singer ("Singer Decl.") as <u>Exhibit 3</u> and made

7  a part hereof, or such as other terms as the Court may prescribe; (2) confirming the sale of the 19th

8  Street Property to the best and highest bid as determined by the Court after conducting a public

9  overbid for the 19th Street Property.

10       This Motion will be based upon this Notice of Motion and Motion, the Singer Decl., the

11  accompanying Declarations of Beverly Tengco and Edward Deleski, and the Memorandum of

12  Points and Authorities, all served and filed herewith and the complete files and records of this

13  action.

14       1.    <u>Terms Of Sale.</u>

15       The terms of the proposed sale of the 19th Street Property are set forth in the PSA entered

16  into between the Receiver and Buyer, a true and correct copy of which is attached as <u>Exhibit 3</u> to

17  the accompanying Singer Decl. Interested parties should carefully read the PSA for the complete

18  and exact terms of sale. These terms are summarized as follows:

| | |
|---|---|
| 19  **Assets to be Sold:** | The 19th Street Property |
| 20  **Condition:** | To be sold free of liens, encumbrances, and interests, sold "AS IS, WHERE IS" |
| 21 | |
| 22  **Proposed Buyer:** | Kenneth M. Kaplan, and or assignee, and Brandon Kaplan, and/or assignee |
| 23  **Purchase Price:** | $3,650,000 ("Purchase Price") |
| 24  **Closing Date:** | On or before 20 days after the above-entitled Court has issued an order approving of the PSA and confirming that the seller of the 19th Street Property is the Receiver and is empowered to deliver the deed and convey title to the 19th Street Property as provided for in the PSA, or April 24, 2019 whichever is earlier, and as is further provided in the PSA. |
| 25 | |
| 26 | |
| 27 | |
| 28  **Brokers/Commissions:** | Vanguard Properties is to receive a commission of 5.0% of the Purchase Price. |

NOTICE OF MOTION AND MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL ETC. [19TH STREET]

JMBM | Jeffer Mangels Butler & Mitchell LLP

| | | |
|---|---|---|
| 1 | **Overbids:** | An initial overbid shall be $150,000 above the Purchase Price, with subsequent overbids to be $150,000 in excess of each prior bid, with the Buyer having the right to match any overbid. Any successful over bidder must deliver to the Receiver on April 3, 2019 a non-refundable deposit in the amount of $114,000 (i.e., 3 percent of the first overbid amount) in the form of cashier's check payable to Orange Coast Title Insurance Company. If the overbid buyer defaults in its obligations to purchase the 19th Street Property pursuant to an overbid purchase agreement, then to Receiver shall cancel the overbid purchase agreement and Buyer shall have the right to purchase the 19th Street Property for $3,650,000, with a Closing Date which is 20 days after Buyer receives written notice from Receiver of such cancellation. |

2.  Sale To Discharge and Clear Of Liens, Encumbrances, And Interests

(a)  Liens of Record. To the best knowledge and information of the Receiver, the 19th Street Property to be sold currently is subject to liens, encumbrances, and interests as set forth herein. Attached to the Singer Decl. as Exhibit 6 is a Preliminary Title Report issued by Orange Coast Title Insurance Company, identifying as of January 23, 2019 all liens, encumbrances and interests filed of record in the San Francisco County Recorder's Office against the 19th Street Property.

(b)  Discharge of Liens. The sale of the 19th Street Property is contingent on the Receiver's ability to deliver title to the 19th Street Property to the Buyer free and clear of all liens, encumbrances, and interests. By the manner and method of sale employed by the Receiver, all liens, encumbrances, and interests are to be discharged.

3.  Sale Proceeds

The Receiver projects the proceeds derived from the sale of the 19th Street Property to benefit the receivership estate will be sufficient to pay off the outstanding obligations owed by XELAN Prop 1, LLC to Umpqua Bank secured by that certain Deed of Trust and Assignment of Rents and Leases and Security Agreement (and Fixture Filing) dated as of June 13, 2013 executed by XELAN Prop 1, LLC and recorded on June 28, 2013 in the Official Records of the San Francisco County Recorder's Office as Document No. DOC-2013-J13697776-00 and to satisfy the unpaid amounts owed, if any, on the following liens, encumbrances and interests which have been recorded against the 19th Street Property: (i) Abstract of Judgment recorded by David and Caroline Green on April 23, 2018 in the Official Records of the San Francisco County Recorder's

1   Office as DOC-2018-K604682-00; (ii) Abstract of Judgment recorded by the City and County of

2   San Francisco and the People of the State of California on June 7, 2018 in the Official Records of

3   the San Francisco County Recorder's Office as Document No. DOC-2018-K623991-00; (iii)

4   Abstract of Judgment recorded by City and County of San Francisco and the People of the State of

5   California on October 17, 2018 in the Official Records of the San Francisco County Recorder's

6   Office as Document No. DOC-2018-K683730-00; and (iv) any other liens which the Receiver

7   determines, in the exercise of his business judgment, must be paid in order to close the sale of the

8   19th Street Property to the Buyer on the terms set forth in the PSA (collectively, the "Liens"). The

9   remaining proceeds of sale will be held by the Receiver until further order of this Court to, inter

10  alia, pay all allowed claims filed against the receivership estate, to pay all unpaid Receiver's fees

11  and expenses due and owing to the Receiver until discharge of the Receiver and approval of his

12  final accounting pursuant to California Rule of Court 3.1184, to pay all amounts, if any, ordered

13  by this Court to Dale Duncan and Marta Munoz Mendoza pursuant to that certain Order on

14  Motion for Charging Orders, Assignment Orders, Restraining Order and for Appointment of

15  Receiver [On Judicial Foreclosure of Two Properties Held by Debtor Anne Kihagi's LLC:

16  XELAN Prop 1, LLC] and that certain Order on Motion for Charging Orders, Assignment Orders,

17  Restraining Order and for Appointment of Receiver [On Pending Non-Judicial Foreclosure of

18  Property Held by Debtor Anne Kihagi's LLC(s)] filed in the action entitled Dale Duncan, etc. v.

19  Anne Kihagi, etc., et al., San Francisco County Superior Court Case No. CGC-15-545655 and,

20  thereafter, to pay the remaining proceeds of sale, if any, to XELAN Prop 1, LLC.

21       4.    Sale Procedures To Be Employed By Receiver Prior To Hearing To Confirm Sale

22       The Receiver proposes to employ the following sale procedures prior to the public overbid

23  and sale confirmation hearing on April 3, 2019.

24            (a)    Notice

25                   (1)    The Receiver shall have caused to have notified those parties that

26  heretofore have expressed an interest in purchasing the 19th Street Property regarding the pending

27  sale and have invited them to participate in the public overbid process by causing a notice of sale

28  complying with the provisions of California Code of Civil Procedure § 701.540(a) and of the right

1  to overbid ("Notice of Sale") in substantially the form attached as <u>Exhibit 4</u> to the Singer Decl. to

2  be posted on the 19th Street Property, at a public place in the City of San Francisco, and published

3  in a newspaper of general circulation for the City and County of San Francisco at least three times

4  prior to the hearing of this Motion, by emailing the Notice of Sale to all potential buyers of the

5  19th Street Property, as set forth in the Declaration of Edward Deleski filed in support of the

6  Motion, at least 20 days prior to the hearing of the Motion;

7          (2)    The Receiver shall comply with the applicable procedures outlined

8  in the Code of Civil Procedure § 701.540 with respect to the Notice of Sale of the 19th Street

9  Property, including delivering the Notice of Sale to a tenant at the 19th Street Property, posting a

10  Notice of Sale on the 19th Street Property, and at a public place in the City of San Francisco, and

11  shall file a reply Declaration prior to the hearing on this Motion to demonstrate compliance with

12  Code of Civil Procedure § 701.540;

13          (3)    The Receiver shall have caused the Notice of Sale to be posted in

14  the San Francisco Association of Realtors Multiple Listing Service; and

15          (4)    The Receiver shall have caused to have served this Notice of Motion

16  and Motion and Notice of Sale on Defendant XELAN Prop 1, LLC's and its attorneys of record by

17  mail and on the attorneys of record for the holders of the Liens (or the holders of the Liens if there

18  are no attorneys of record) at least 20 calendar days before the date of the hearing scheduled in this

19  Court to approve the PSA.

20          (b)    <u>Date and Procedures for Public Overbid</u>.  The Receiver has set April 3,

21  2019 at 9:30 a.m., in Department 501 of this Court as the date, time, and place for public overbids

22  for the 19th Street Property to be made before the Court so that there can be an immediate

23  evaluation and determination of the best and highest public overbid made for the 19th Street

24  Property by a qualified bidder, and an order made and entered confirming the sale. The proposed

25  date, time, and location is convenient to the Court and the parties because the parties already are

26  scheduled to come before the Court at that date, time, and location for further hearing on the

27  Receiver's request for instructions and hearing on this Motion.

28  ///

1    With regard to the public overbid sale, the Receiver requests that parties interested

2  in participating be proven to the Receiver and to the Court to be financially qualified, able to make

3  any deposits required under the PSA, and prepared to make overbids in increments of $150,000

4  initially, with subsequent overbids of $150,000 thereafter until a winning bidder is determined,

5  with a successful overbid buyer required to deliver a non-refundable deposit in the amount of

6  $114,000 in the form of a cashier's check payable to Orange Coast Title Insurance Company

7  delivered to the Receiver.  If the overbid buyer defaults on its obligations to purchase the 19th

8  Street Property pursuant to an overbid purchase agreement, then the Receiver shall cancel the

9  overbid purchase agreement and the Buyer shall have the right to purchase the 19th Street

10  Property for $3,650,000, with a closing date which is 20 days after the Buyer receives written

11  notice from the Receiver of such cancellation.

12    (c)    Date for Hearing re Confirmation of Sale.  A receiver's sale is not final until

13  confirmed by the Court. The public overbid sale process will be used in this case in order to

14  determine if there is a person willing to make a better and higher bid for purchase of the 19th

15  Street Property.  It is a way to test the sale of the 19th Street Property in the marketplace and

16  insures that the sale is made at arm's length and in good faith.

17    The Receiver has also set April 3, 2019 at 9:30 a.m., in Department 501 of this Court, or

18  as soon thereafter as the public overbid process has been concluded by the Court, as the date and

19  time for hearing to confirm the sale of 19th Street Property as described herein to the best and

20  highest qualified bidder. The proposed date, time, and location is convenient to the Court and the

21  parties because the parties already are scheduled to come before the Court at that date, time, and

22  location for further hearing on the Receiver's request for instructions and hearing on this Motion.

23    WHEREFORE, the Bank requests that this Motion be granted, pursuant to the proposed

24  Order attached hereto as Exhibit 1[1] and that the Receiver be instructed, authorized, and

26  [1] The proposed Order has been prepared to account for the possibility that a successful overbid is
27  made at the time of the April 3, 2019 hearing on this Motion and that the successful over bidder
has signed a purchase and sale agreement in favor of the Receiver.  The alternative provisions of
28

1   empowered to sell the 19th Street Property as set forth herein, with a public overbid to be

2   conducted before the court on April 3, 2019 at 9:30 a.m., with a hearing to confirm the sale of 19th

3   Street Property based on the best and highest bid, to immediately follow the public overbid.

4

5   DATED:  March 5, 2019            JEFFER MANGELS BUTLER & MITCHELL LLP

6

7                               By:

8                                   ROBERT B. KAPLAN

                            Attorneys for Plaintiff UMPQUA BANK

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   the proposed Order which will apply to a successful over bidder are set forth in boldface inserts.

    Moreover, the Bank reserves the right to make edits to their proposed Order prior to the hearing

27   scheduled on the Motion, once the proposed Order has been reviewed by Orange Coast Title

    Company.

28

63378258v1

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# <u>EXHIBIT 1</u>

63378258v1

NOTICE OF MOTION AND MOTION FOR ORDER:  (1) INSTRUCTING RECEIVER TO SELL ETC. [19TH
STREET]

1 | JEFFER MANGELS BUTLER & MITCHELL LLP
ROBERT B. KAPLAN, P.C. (Bar No. 76950)
2 | *rbk@jmbm.com*
Two Embarcadero Center, 5th Floor
3 | San Francisco, California 94111-3813
Telephone:   (415) 398-8080
4 | Facsimile:   (415) 398-5584

5 | Attorneys for Plaintiff UMPQUA BANK

6

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10

11 | UMPQUA BANK, a state chartered bank,

12 |           Plaintiff,

13 |       v.

14 | XELAN PROP 1, LLC, a California limited
liability company; and DOES 1-30, inclusive,

15

16 |           Defendants.

Case No. CGC-18-564941

**[PROPOSED] ORDER ON MOTION FOR
ORDER:**

**(1) INSTRUCTING RECEIVER TO SELL
REAL PROPERTY ASSET OF
RECEIVERSHIP ESTATE; AND**

**(2) CONFIRMING SALE OF REAL
PROPERTY [4018-4022 19th STREET,
SAN FRANCISCO, CA]**

| | |
|---|---|
| Date: | April 3, 2019 |
| Time: | 9:30 a.m. |
| Dept.: | 501 |

| | |
|---|---|
| Action Filed: | March 12, 2018 |
| Trial Date: | None Set |

21 |     The Motion of Plaintiff Umpqua Bank ("Bank") for an Order: (1) Instructing Receiver to

22 | Sell Real Property Assets of Receivership Estate; and (2) Confirming Sale of Real Property Asset

23 | (the "Motion"), came on regularly for hearing on April 3, 2019 at 9:30 a.m. in Department 501 of

24 | the above-entitled Court. Robert B. Kaplan, Esq. of Jeffer Mangels Butler & Mitchell LLP

25 | appeared for Plaintiff Bank and other appearances were as noted in the record at the time of the

26 | hearing.

27 | ///

28 | ///

63502580v1

1

[PROPOSED] ORDER ON MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-19th STREET]

344

1    The Court, having reviewed the Motion, makes the following findings, conclusions and

2    order.[1]

3        1.    Notice. Based upon the evidence before the Court, the Court finds that the Bank:

4            (a)    Timely served the Notice of Motion and Motion on XELAN Prop 1, LLC,

5    on its counsel of record; and

6            (b)    The Receiver has caused to be notified those parties that heretofore have

7    expressed an interest in purchasing 4018-4022 19th Street, San Francisco, California (the "19th

8    Street Property"), legally described in Exhibit A attached hereto and incorporated herein by this

9    reference as though set forth in full, regarding the pending sale and has invited them to participate

10    in the public overbid process by having a notice of sale complying with the provisions of

11    California Code of Civil Procedure § 701.540(a) and of the right to overbid ("Notice of Sale")

12    served on Defendant XELAN Prop 1, LLC and its attorneys of record and on all persons having

13    recorded liens, encumbrances and interests on the 19th Street Property as of January 23, 2019 by

14    at least 20 calendar days before the date of the hearing scheduled in this Court on this Motion and

15    has caused the Notice of Sale to be posted on the 19th Street Property, at a public place in the City

16    of San Francisco, to be delivered to a tenant at the 19th Street Property and published in a

17    newspaper of general circulation for the City and County of San Francisco at least three times

18    prior to the hearing of this Motion and by emailing the Notice of Sale to all potential buyers of the

19    19th Street Property, as set forth in the Declaration of Edward Deleski filed in support of the

20    Motion, at least 20 days prior to the hearing of the Motion.

21        Based upon the foregoing findings, the Court concludes that the Receiver has employed all

22    procedures and given all notices required by law to effect the sale of the 19th Street Property and

23    shall convey good and clear title to the assets to Kenneth M. Kaplan, and/or assignee, and Brandon

24    Kaplan, and/or assignee (the "Original Buyer"), [_____, **who was the highest over**

25    **bidder (the "Overbid Buyer) for the purchase price of $**_____ **(the Overbid**

26    _____

27    _____

[1] All terms not defined in this Order shall have the meanings ascribed to them in the Motion.

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    **Purchase Price").]**  In the event Original Buyer does not close the sale within the time limits

2    provided for in the PSA (as that term is defined below), _____ which submitted the

3    last overbid immediately prior the successful over bid made by the Original Buyer to purchase the

4    19th Street Property of $_____ shall have the right to purchase the 19th Street Property

5    for its final overbid by executing the Original Buyer's PSA, as modified by its last over bid and

6    this Order, and shall close the sale within 20 calendar days of the Receiver cancelling in writing

7    the Original Buyer's PSA.  **[In the event the Overbid Buyer does not close the sale within the**

8    **time limits provided in the Overbid PSA (as that term is defined below) Kenneth M. Kaplan,**

9    **and/or assignee, and Brandon Kaplan, and/or assignee, may purchase the 19th Street**

10   **Property for $3,650,000, and shall close the sale within 20 calendar days of the Receiver**

11   **cancelling in writing the Overbid Buyer's PSA.]**

12           2.    <u>Best Interests</u>.  The Court further finds that:

13           (a)    The proposed sale of the 19th Street Property as set forth in the Motion was

14   negotiated in good faith and at arm's length between the Receiver the Original Buyer **[Overbid**

15   **Buyer]** and upon the closing of escrow for the sale of the 19th Street Property, the Receiver shall

16   be authorized to pay the amounts owed to holders of any liens, encumbrances and interests which

17   have been recorded against the 19th Street Property as set forth in the Preliminary Title Report

18   attached as <u>Exhibit 6</u> to the Declaration of Kevin Singer in support of the Motion ("Singer Decl.")

19   and to transfer title to the 19th Street Property as provided for in the San Francisco Purchase

20   Agreement dated February 1, 2019, Addendum to San Francisco Purchase Agreement, Addendum

21   to SFAR Purchase Sale Agreement dated January 30, 2019, Seller Counter Offer 1 dated February

22   6, 2019, Contingency Removal #1 dated March 1, 2019, and Addendum A (Addendum to

23   Contingency Removal and Approval of Documents) dated February 28, 2019 (collectively, the

24   "PSA") attached as <u>Exhibit</u> 3 to the Singer Decl. for the purchase price of $3,650,000 set forth in

25   the PSA (the "Purchase Price") **[as provided for in the San Francisco Purchase Agreement**

26   **dated January 30, 2019, [CONFORM] (the "Overbid PSA") for the Overbid Purchase Price.**

27   **The Overbid Buyer shall purchase the 19th Street Property on the same terms as the**

28   **Original Buyer as set forth in the Overbid PSA with no contingencies.];**

63502580v1

3

JMBM | Jeffer Mangels Butler & Mitchell LLP

1      (b)      The offer of the Original Buyer [**Overbid Buyer**] on the terms set forth in

2   PSA [**Overbid PSA**] is the best and highest bid for the 19th Street Property. No better or higher

3   bids for the assets to be sold by the receiver were made during the public overbid conducted by the

4   Court;

5      (c)      The proposed sale of the 19th Street Property is in the best interests of the

6   parties to this action and the receivership estate;

7      (d)      By closing escrow and taking title to the 19th Street Property, the Original

8   Buyer [**Overbid Buyer**] acknowledges that: (i) the Original Buyer [**Overbid Buyer**] has no

9   recourse against the Receiver (or his agents) for any claim or cause of action; (ii) the Original

10  Buyer [**Overbid Buyer**]'s sole and only recourse is against the Original Buyer [**Overbid Buyer**]'s

11  title insurance policy, if applicable; and (iii) any actions taken by the Receiver to sell the 19th

12  Street Property shall not constitute a representation and warranty by the Receiver as to any aspects

13  of the sale of the 19th Street Property and the sale shall be "as is"; "where is" with no

14  representations and/or warranties, shall not be subject to the provisions of Civil Code §§ 896 and

15  897, and shall be without risk or liability to the Receiver and/or the receivership estate. The

16  above-entitled Court retains jurisdiction over any dispute that may arise involving the Receiver

17  with the sale of the 19th Street Property pursuant to the terms of the PSA [**Overbid PSA**]

18  approved of by the Court; and

19      (e)      That certain Order Granting Motion of Umpqua Bank for Order:

20  (1) Instructing and Authorizing Receiver to Sell Real Property Assets of Receivership Estate; and

21  (2) Confirming Sale Procedures filed on October 12, 2018 (the "Sale Order") is hereby modified

22  to authorize overbids of at least $150,000 above the Purchase Price, with subsequent overbids to

23  be at least $150,000 in excess of the prior bid, with the Original Buyer having the right to match

24  any overbid, with the successful Overbid Buyer required to deliver a non-refundable deposit in the

25  amount of $114,000 in the form of a cashier's check payable to Orange Coast Title Company to

26  the Receiver. [**If the Overbid Buyer defaults on its obligations to purchase the 19th Street**

27  **Property pursuant to the Overbid PSA, then the Receiver shall cancel the Overbid PSA and**

28  **the Buyer shall have the right to purchase the 19th Street Property for $3,650,000 with a**

63502580v1

4

1    **closing date which is 20 days after the Buyer receives written notice from the Receiver of**

2    **such cancellation.]**

3        Based upon the foregoing findings, the Court concludes that sale of the 19th Street

4    Property as proposed by the Receiver's Motion should be confirmed by the Court.

5        3.    <u>Receiver's Actions</u>. The Court further finds that the Receiver has acted in good

6    faith and pursuant to the instructions of the Court in carrying out the duties of his office in relation

7    to the proposed sale.

8        4.    <u>Orders and Instructions</u>. Based upon the foregoing findings and conclusions, the

9    Court instructs, authorizes, and orders as follows:

10        (a)    Notice of the Motion was proper to Defendant XELAN Prop 1, LLC and all

11    other parties in interest. The Motion is granted, any opposition to the Motion has been withdrawn

12    or is overruled and the sale to the Original Buyer **[Overbid Buyer]** on the terms set forth in the

13    PSA **[Overbid PSA]** is confirmed.

14        (b)    The Original Buyer's **[Overbid Buyer's]** purchase of the 19th Street

15    Property was conducted as authorized by this Court pursuant to the Sale Order.

16        (c)    The Receiver shall execute any and all documents necessary to complete the

17    sale to the Original Buyer **[Overbid Buyer]** pursuant to the PSA **[Overbid PSA]** and shall pay the

18    proceeds of sale paid by the Original Buyer **[Overbid Buyer]** pursuant to the PSA **[Overbid**

19    **PSA]** as follows: (i) the unpaid delinquent real estate taxes and pro-rata real estate taxes owed by

20    XELAN Prop 1, LLC to the City and County of San Francisco on the 19th Street Property; (ii) to

21    pay real estate commissions payable to Vanguard Properties in the amount equal to 5.0% of the

22    Purchase Price at closing of escrow; (iii) for reasonable closing costs and escrow fees and title fees

23    owed with respect to the sale of the 19th Street Property pursuant to the PSA **[Overbid PSA]**; (iv)

24    the amounts owed by XELAN Prop 1, LLC to Umpqua Bank secured by that certain Deed of

25    Trust and Assignment of Rents and Security Agreement (and Fixture Filing) dated as of June 13,

26    2013 executed by XELAN Prop 1, LLC and recorded on June 28, 2013 in the Official Records of

27    the San Francisco County Recorder's Office as Document No. DOC-2013-J69776; (v) the amounts

28    owed, if any, to the holders of the following liens, encumbrances, and interests recorded against

[PROPOSED] ORDER ON MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-19th STREET]

*Jeffer Mangels Butler & Mitchell LLP*   JMBM

1   the 19th Street Property: (A) Abstract of Judgment recorded by David and Caroline Green on

2   April 23, 2018 in the Official Records of the San Francisco County Recorder's Office as DOC-

3   2018-K604682-00; (B) Abstract of Judgment recorded by the City and County of San Francisco

4   and the People of the State of California on June 7, 2018 in the Official Records of the San

5   Francisco County Recorder's Office as Document No. DOC-2018-K623991-00; and (C) Abstract

6   of Judgment recorded by City and County of San Francisco and the People of the State of

7   California on October 17, 2018 in the Official Records of the San Francisco County Recorder's

8   Office as Document No. DOC-2018-K683730-00; and (vi) any other liens which the Receiver

9   determines, in the exercise of his business judgment, must be paid in order to close the sale of the

10   19th Street Property to the Original Buyer [**Overbid Buyer**] on the terms set forth in the PSA

11   [**Overbid PSA**], with the remaining proceeds of sale to be held by the Receiver until further order

12   of this Court to, inter alia, pay all allowed claims filed against the receivership estate, to pay all

13   unpaid Receiver's fees and expenses due and owing to the Receiver until discharge of the Receiver

14   and approval of his final accounting pursuant to California Rule of Court 3.1184, , to pay all

15   amounts, if any, ordered by this Court to Dale Duncan and Marta Munoz Mendoza pursuant to

16   that certain Order on Motion for Charging Orders, Assignment Orders, Restraining Order and for

17   Appointment of Receiver [on judicial foreclosure of two properties held by Debtor Anne Kihagi's

18   LLC: XELAN Prop 1, LLC] and that certain Order on Motion for Charging Orders, Assignment

19   Orders, Restraining Order and for Appointment of Receiver [on pending non-judicial foreclosure

20   of property held by Debtor Anne Kihagi's LLC(s)] filed in the action entitled Dale Duncan, etc. v.

21   Anne Kihagi, etc., et al., San Francisco County Superior Court Case No. CGC-15-545655 and,

22   thereafter, to pay the remaining proceeds of sale, if any, to XELAN Prop 1, LLC.

23        (d)    The Original Buyer [**Overbid Buyer**] shall take good and clear title to the

24   19th Street Property sold by the Receiver.

25        (e)    The Receiver is instructed, authorized, and ordered to forthwith complete

26   the sale of assets to the Original Buyer [**Overbid Buyer**] pursuant to the terms of the PSA

27   [**Overbid PSA**].

28   / / /

1    (f)    Original Buyer's **[Overbid Buyer's]** purchase of the 19th Street Property

2  results from a legally authorized properly noticed, non-collusive, non-fraudulent arms' length

3  transaction, the Purchase Price **[Overbid Purchase Price]** for the 19th Street Property (including

4  under the terms of the PSA **[Overbid PSA]**) is fair and reasonable and constitutes the highest and

5  best Purchase Price **[Overbid Purchase Price]** for the 19th Street Property and the Original Buyer

6  **[Overbid Buyer]** is a good faith purchaser for value of the 19th Street Property.

7    (g)    The Receiver is instructed, authorized, and ordered to forthwith complete

8  the sale of assets to the Original Buyer **[Overbid Buyer]** pursuant to the terms of the PSA

9  **[Overbid PSA]**. The PSA **[Overbid PSA]** or any documents or instruments related thereto

10  maybe amended, or supplemented by the Original Buyer **[Overbid Buyer]** and the Receiver

11  without further order of this Court, provided such modifications, amendments or supplements do

12  not have a material adverse effect on the receivership estate.

13    (h)    Any licensed title insurer and the Original Buyer **[Overbid Buyer]** may

14  rely on this Order as authorizing the Receiver to transfer legal title to the 19th Street Property free

15  and clear of all liens and encumbrances.

16    (i)    In the event a timely and proper appeal is filed from this Order, the

17  Receiver is authorized and directed to defend any such appeal, without further order of Court if he

18  elects to do so in the exercise of his business judgment.

19

20  DATED:                          JUDGE OF THE SUPERIOR COURT

21

22

23

24

25

26

27

28

**LEGAL DESCRIPTION OF**
**4018-4022 19th Street, San Francisco, California**

Beginning at a point on the Northerly line of 19th Street, distant thereon 83 feet Westerly from the Westerly line of Noe Street; running thence Westerly along said line of 19th Street 42 feet; thence at a right angle Northerly 145 feet; thence at a right angle Easterly 42 feet; thence at a right angle Southerly 145 feet to the point of beginning, in the City of San Francisco, County of San Francisco, State of California.

Being a portion of Mission Block No. 115.

# EXHIBIT A

63502580v1

[PROPOSED] ORDER ON MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-19th STREET]

1   JEFFER MANGELS BUTLER & MITCHELL LLP
    ROBERT B. KAPLAN, P.C. (Bar No. 76950)
2   *rbk@jmbm.com*
    Two Embarcadero Center, 5th Floor
3   San Francisco, California 94111-3813
    Telephone:    (415) 398-8080
4   Facsimile:     (415) 398-5584

5   Attorneys for Plaintiff UMPQUA BANK

ELECTRONICALLY
**FILED**
*Superior Court of California,
County of San Francisco*
**03/05/2019**
Clerk of the Court
BY:SANDRA SCHIRO
Deputy Clerk

6

7

8         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9       COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10

11   UMPQUA BANK, a state chartered bank, | Case No. CGC-18-564941

12         Plaintiff, | **DECLARATION OF KEVIN SINGER IN SUPPORT OF MOTION FOR ORDER:**

13      v. | **(1) INSTRUCTING RECEIVER TO SELL**

14   XELAN PROP 1, LLC, a California limited | **REAL PROPERTY ASSET OF**
    liability company; and DOES 1-30, inclusive, | **RECEIVERSHIP ESTATE; AND**

15 | **(2) CONFIRMING SALE OF REAL**
        Defendants. | **PROPERTY [4018-4022 19TH STREET,**

16 | **SAN FRANCISCO, CA]**

17 | Date:         April 3, 2019

18 | Time:         9:30 a.m.
    | Dept.:         501

19

20 | Action Filed:    March 12, 2018
    | Trial Date:     None Set

21

22      I, Kevin Singer, declare:

23       1.     I have been acting as a Superior Court Receiver for the last 18 years and served in

24   over 349 cases. I have sold or transitioned over a billion dollars of real estate through court orders.

25   If called upon to testify as to the matters set forth in this declaration, I could and would

26   competently testify thereto as the facts herein set forth are personally known to me to be true.

27       2.     I was appointed as receiver ("Receiver") in the above-entitled action pursuant to

28   this Court's Order Appointing Receiver and Preliminary Injunction in Aid of Receiver filed on

63378013v2

DECL. OF KEVIN SINGER ISO MOTION FOR ORDER INSTR. RECEIVER TO SELL REAL PROPERTY
ASSET, ETC. [19TH STREET]

352

1    April 6, 2018 ("Receiver Order") over the real property commonly known as 4018-4022 19th

2    Street, San Francisco, California ("19th Street Property"), and have been in possession of the 19th

3    Street Property pursuant to the Receiver Order since April of 2018.

4          3.    On September 23, 2018, Umpqua Bank ("Bank") filed its Motion for Order: (1)

5    Instructing and Authorizing Receiver to Sell Real Property Assets of Receivership Estate; and (2)

6    Confirming Sale Procedures which was set for hearing on October 12, 2018.  Subsequently, on

7    October 12, 2018, an Order Re: Granting Motion of Umpqua Bank for Order: (1) Instructing and

8    Authorizing Receiver to Sell Real Property Assets of Receivership Estate; and (2) Confirming

9    Sale Procedures was filed in this action (the "Sale Order"), a true and correct copy of which is

10   attached hereto as Exhibit 1.

11                **SALE OF THE 19TH STREET PROPERTY**

12         4.    Pursuant to the terms of the Sale Order, the Receiver was authorized to list the 19th

13   Street Property for sale with Vanguard Properties, pursuant to that certain Commercial and

14   Residential Income Listing Agreement ("Listing Agreement"), a true and correct executed copy of

15   which is attached hereto as Exhibit 2.  Pursuant to the Sale Order, the Receiver was authorized to

16   list the 19th Street Property for $3,600,000.

17         5.    Attached hereto as Exhibit 3 is a true and correct copy of the San Francisco

18   Purchase Agreement dated February 1, 2019, Addendum to San Francisco Purchase Agreement,

19   Addendum to SFAR Purchase Sale Agreement dated January 30, 2019, Seller Counter Offer 1

20   dated February 6, 2019, Contingency Removal #1 dated March 1, 2019, and Addendum A

21   (Addendum to Contingency Removal and Approval of Documents) dated February 28, 2019

22   (collectively, the "PSA") which has been executed by me as Receiver and Kenneth M. Kaplan,

23   and/or assignee, and Brandon Kaplan and/or assignee (the "Buyer") with respect to the purchase of

24   the 19th Street Property for $3,650,000 (the "Purchase Price").

25         6.    I have marketed the 19th Street Property pursuant to the Listing Agreement, as

26   authorized in the Sale Order.

27         7.    I believe that the PSA is the best offer presented to the Receiver for the purchase of

28   the 19th Street Property and that it is in the best interest of the receivership estate that the PSA be

63378013v2                                    2
DECL. OF KEVIN SINGER ISO MOTION FOR ORDER INSTR. RECEIVER TO SELL REAL PROPERTY
ASSET, ETC. [19TH STREET]

353

1   confirmed, as more specifically set forth in the Notice of Motion and Motion for Order: (1)

2   Instructing and Authorizing Receiver to Sell Real Property Assets of Receivership Estate; and (2)

3   Confirming Sale of Real Property ("Sale Motion") filed and served herewith. The Purchase Price

4   set forth in the PSA is $50,000 in excess of the listing price of the 19th Street Property. I am also

5   requesting that any successful over bidder must deliver to the Receiver on the date of the hearing

6   of the Sale Motion, a non-refundable deposit in the amount of $114,000 in the form of a cashier's

7   check payable to Orange Coast Title, and that if any overbid buyer defaults on its obligation to

8   purchase the 19th Street Property pursuant to an overbid purchase agreement, then the Receiver

9   shall cancel the overbid purchase agreement and the Buyer will have the right to purchase the 19th

10  Street Property for $3,600,000 with a closing date which is 20 days after the Buyer receives

11  written notice from the Receiver of such cancellation.

12       8.     The sale proposed in the PSA will be tested by the public overbid process which

13  will take place at the time of the hearing on the Sale Motion where higher and better bids will be

14  sought. The PSA will generate the most amount for the receivership estate in the least amount of

15  time and will relieve the receivership estate of the risk of continuing to protect and preserve the

16  19th Street Property.

17       9.     The Sale Motion sets forth the procedures I intend to employ in order to actively

18  encourage interested persons to inspect the 19th Street Property and to attend and bid at the public

19  overbidding which will be held in the above-entitled Court.

20       10.    I will file a reply declaration in the above-entitled action with the Court prior to the

21  time of the hearing on the Sale Motion verifying that the sales procedures set forth in the Sale

22  Motion have been complied with in all respects.

23       11.    Attached hereto as Exhibit 4 is a true and correct copy of a Notice of Sale ("Notice

24  of Sale"), which has been prepared pursuant to the Sale Order which constitutes the Notice of

25  Sale, as that term is defined in the Sale Order. I will cause the Notice of Sale to be posted on the

26  19th Street Property and at a public place located in the City of San Francisco, to be delivered to a

27  tenant at the 19th Street Property and published at least three times before the hearing on the Sale

28  Motion in a newspaper of general circulation for the City and County of San Francisco.

JMBM | Jeffer Mangels Butler & Mitchell LLP

1      12.    Pursuant to the statutes governing receivership sales, the Receiver's proposed sale

2 to the Buyer is subject to judicial confirmation. Based upon my past experience with receivership

3 sales, the public overbid sale has been set to take place in the above-entitled Court on April 3,

4 2019, immediately before the sale confirmation hearing, and will be conducted by this Court, so

5 there can be an immediate evaluation and determination of the best and highest bid made for the

6 19th Street Property and the qualifications of the bidder, and an order made confirming the sale of

7 the confirmation hearing that will include the public overbid process.

8      13.    The Sale Order provided that overbids be in an initial increment of not less than

9 $10,000. I am requesting that the initial overbid to the Purchase Price set forth in the PSA be

10 $150,000, because it is less than 5% of the Purchase Price set forth in the PSA with subsequent

11 overbids to be $150,000 over the prior overbid, with the Buyer having the right to match the

12 amount of any overbid. Any successful over bidder will need to deliver a non-refundable deposit

13 in the amount of $114,000 in the form of a cashier's check payable to Orange Coast Title

14 Company delivered to the Receiver at the time of the hearing on the Motion. This initial overbid

15 amount will also be fair to the Buyer, who has spent money and time doing due diligence, but still

16 a small enough amount to encourage overbidding. If any overbid buyer defaults on its obligation

17 to purchase the 19th Street Property, then the Receiver shall cancel the overbid buyer's purchase

18 agreement and the Buyer shall have the right to purchase the 19th Street Property for $3,650,000,

19 with a closing date which is 20 days after the Buyer receives written notice from the Receiver of

20 such cancellation.

21      14.    Given the fact that over four months have elapsed from the date I was originally

22 authorized to sell the 19th Street Property, I believe I have negotiated the best sales price possible

23 with the Buyer with the fastest closing time. In the event that the Court does not approve the PSA,

24 it is my understanding that the Bank will proceed to foreclose on the 19th Street Property, making

25 it likely that holders of junior liens against the 19th Street Property will not receive anything on

26 account of those liens and XELAN Prop 1, LLC, the owner of the 19th Street Property, will not

27 receive anything on account of the equity which exists in the 19th Street Property.

28    / / /

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1        15.    In the event the sale of the 19th Street Property is consummated and authorized by

2 this Court pursuant to the PSA, I request that the Court authorize payment of a broker's

3 commission at the time of the closing of sale to Vanguard Properties in the amount equal to 5.0%

4 of the Purchase Price.

5        16.    Attached hereto as Exhibit 5 is a true and correct copy of an opinion filed on

6 December 3, 2018 by the Court of Appeal of the State of California for the First Appellate District

7 in the action entitled City and County of San Francisco, etc., v. Anne Kihagi, et al., Court of

8 Appeal Case No. A151719 (the "Opinion") which affirms a judgment obtained by the City and

9 County of San Francisco against various landlords "for illegally harassing their tenants and

10 violating state and local building and housing laws".  Opinion page 1.  This declarant respectfully

11 directs the Court's attention to pages 31 to 32 and pages 40 to 41 of the Opinion which discusses

12 violations of municipal law and state housing law engaged in by XELAN Prop 1, LLC and

13 harassment of tenants at the 19th Street Property.  Opinion page 40.

14        17.    Attached hereto as Exhibit 6 is a true and correct copy of an updated Preliminary

15 Title Report dated January 23, 2019 which I obtained from Orange Coast Title Company which

16 sets forth the current liens, encumbrances and interests which have been recorded against the 19th

17 Street Property.

18        18.    I will cause to pay the amounts, if any, ordered by this Court to Dale Duncan and

19 Marta Munoz Mendoza pursuant to that certain Order on Motion for Charging Orders, Assignment

20 Orders, Restraining Order and for Appointment of Receiver [On Judicial Foreclosure of Two

21 Properties held by Debtor Anne Kihagi's LLC: XELAN Prop 1, LLC] and that certain Order on

22 Motion for Charging Orders, Assignment Orders, Restraining Order and for Appointment of

23 Receiver [On Pending Non-Judicial Foreclosure of Property held by Debtor Anne Kihagi's

24 LLC(s)] filed in the action entitled Dale Duncan, etc. v. Anne Kihagi, etc., et al., San Francisco

25 County Superior Court Case No. CGC-15-545655, true and correct copies of which are attached

26 hereto as Exhibits 7 and 8, respectively.

27        19.    I will have caused to have notified those parties that heretofore have expressed an

28 interest in purchasing the 19th Street Property regarding the pending sale and have invited them to

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  participate in the public overbid process as required by Section 4(a)(1) of the Sale Motion by

2  having the Notice of Sale posted in the San Francisco Association of Realtors Multiple Listing

3  Service and by emailing the Notice of Sale to all potential buyers of the 19th Street Property, as

4  set forth in the accompanying Declaration of Edward Deleski at least 20 days prior to the hearing

5  on the Sale Motion.

6       20.   I will have caused to be given written notice of the proposed sale and right to

7  overbid to all parties who appeared in the above-entitled action by their counsel of record by way

8  of the service of the Sale Motion.

9       21.   I will have caused to be served the Notice of Sale on Defendant XELAN Prop 1,

10  LLC and its attorneys of record, and any attorneys of record for the holders of the Liens (as that

11  term is defined in Section 3 of the Sale Motion) on the 19th Street Property as of January 23, 2019

12  by mail not less than 20 calendar days before the date of the hearing scheduled in this Court on the

13  Sale Motion.

14  **PRIOR ORDER ENTERED BY THIS COURT AUTHORIZING THE RECEIVER TO SELL THE REAL PROPERTY COMMONLY KNOWN AS 1000-1022 FILBERT STREET, SAN FRANCISCO, CALIFORNIA**

15

16       22.   On January 18, 2019, Umpqua Bank filed its Notice of Motion and Motion for

17  Order: (1) Instructing Receiver to Sell Property Asset of Receivership Estate; and (2) Confirming

18  Sale of Real Property [1000-1022 Filbert Street, San Francisco, CA] (the "Filbert Street Sale

19  Motion"), a true and correct copy of which is attached hereto as Exhibit 9. Defendant XELAN

20  Prop 1, LLC filed opposition to the Filbert Street Sale Motion, a true and correct copy of which is

21  attached as Exhibit 10.

22       23.   At a hearing held on the Filbert Street Sale Motion on February 21, 2019, the

23  Honorable Richard B. Ulmer Jr. granted the Filbert Street Sale Motion, pursuant two Orders which

24  were filed in this action on February 21, 2019, true and correct copies of which are attached hereto

25  collectively as Exhibit 11.

26  ///

27  ///

28  ///

1     I declare under penalty of perjury under the laws of the State of California that the

2   foregoing is true and correct.

3

4   DATED: March 4, 2019

                            KEVIN SINGER, Declarant

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6337801372

DECL. OF KEVIN SINGER ISO MOTION FOR ORDER INSTR. RECEIVER TO SELL REAL PROPERTY
ASSET; ETC. [19TH STREET]

# EXHIBIT 1

1 | JEFFER MANGELS BUTLER & MITCHELL LLP
ROBERT B. KAPLAN, P.C. (Bar No. 76950)

2 | rbk@jmbm.com
Two Embarcadero Center, 5th Floor

3 | San Francisco, California 94111-3813
Telephone:    (415) 398-8080

4 | Facsimile:    (415) 398-5584

**F I L E D**
San Francisco County Superior Court

OCT 12 2018

CLERK OF THE COURT
BY: _____
Deputy Clerk

5 | Attorneys for Plaintiff UMPQUA BANK

6 |

7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10 |

11 | UMPQUA BANK, a state chartered bank,

12 | Plaintiff,

13 | v.

14 | XELAN PROP 1, LLC, a California limited
liability company; and DOES 1-30, inclusive,

15 | Defendants.

16 |

17 |

18 |

Case No. CGC-18-564941

**ORDER RE: GRANTING MOTION OF
UMPQUA BANK FOR ORDER:  (1)
INSTRUCTING AND AUTHORIZING
RECEIVER TO SELL REAL PROPERTY
ASSETS OF RECEIVERSHIP ESTATE;
AND (2) CONFIRMING SALES
PROCEDURES**

Date:    October 12, 2018
Time:    9:30 a.m.
Dept.:    501

Action Filed:    March 12, 2018
Trial Date:    None Set

19 |

20 |     The Motion of Plaintiff Umpqua Bank ("Bank") for an Order (1) Instructing and

21 | Authorizing Receiver to Sell Real Property Assets of Receivership Estate; and (2) Confirming

22 | Sales Procedures ("Motion") came on regularly for hearing on October 12, 2018.  Robert B.

23 | Kaplan, Esq. of Jeffer Mangels Butler & Mitchell LLP appeared for Plaintiff Bank and other

24 | appearances were as noted in the record at the time of the hearing.  The Court, having reviewed

25 | the Motion, and good cause appearing therefor:

26 |     IT IS ORDERED:

27 |     1.    Kevin Singer (the "Receiver"), shall employ the following sale procedures with

28 | respect to the sale of the real property commonly known as 1000-1022 Filbert Street, San

62395849v3

1

[PROPOSED] ORDER RE: GRANTING MOTION OF UMPQUA BANK FOR ORDER:  (1) INSTRUCTING ETC.

1   Francisco, California ("Filbert Street Property") and 4018-4022 19th Street, San Francisco,

2   California ("19th Street Property").

3            a.      The Receiver shall list the Filbert Street Property and 19th Street Property

4   for sale with Vanguard Properties ("Vanguard"), pursuant to the terms of the Commercial and

5   Residential Income Listing Agreement attached hereto as Exhibit A (the "Listing Agreement").

6   The Receiver shall be authorized to execute the Listing Agreement upon the entry of the order;

7            b.      All offers to purchase the Filbert Street Property and/ or the 19th Street

8   Property shall be presented in writing by Vanguard to the Receiver. On or before two business

9   days have elapsed from the date of the Receiver's receipt of any offer to purchase the Filbert Street

10  Property and/or the 19th Street Property (each a "Sale Offer"), the Receiver shall deliver a copy of

11  the Sale Offer to Robert B. Kaplan, Esq., counsel for the Bank by way of electronic mail to

12  rbk@jmbm.com for informational purposes. For the avoidance of doubt, nothing contained in this

13  Order shall require the Receiver to sell the Filbert Street Property and the 19th Street Property to

14  the same buyer;

15           c.      The Receiver shall have the absolute right, in his sole and absolute

16  discretion, opinion and judgment, to reject, and/or make a counteroffer to any Sale Offer and shall

17  provide notice in the manner set forth in section 1.b. above of any rejection and/or counteroffer to

18  counsel for the Bank by way of electronic mail to rbk@jmbm.com, for informational purposes,

19  within two business days after the delivery of same to any proposed buyer;

20           d.      The Receiver shall have the authority, in his sole and absolute discretion,

21  opinion and judgment, to accept any Sale Offer, by executing a Purchase and Sale Agreement

22  ("PSA") and to perform such acts as reasonably may be required to sell the Filbert Street Property

23  and/or the 19th Street Property and to execute all documents and instruments reasonably necessary

24  related thereto to close any escrow established for the sale of the Filbert Street Property and/or the

25  19th Street Property, and to transfer title to the Filbert Street Property and/or 19th Street Property

26  to a buyer;

27           e.      After the buyer designated in the PSA pays into escrow all deposits required

28  by the PSA and removes all contingencies to closing, the Receiver or the Bank shall file a noticed

62395849v3

2

[PROPOSED] ORDER RE: GRANTING MOTION OF UMPQUA BANK FOR ORDER: (1) INSTRUCTING ETC.

361

1  motion with this Court seeking instructions to approve of the PSA for and confirm the sale of the

2  Filbert Street Property and/or the 19th Street Property to the buyer designated in the PSA (the

3  "Confirmation Hearing"). Any persons seeking to overbid the sale offer set forth in the PSA must

4  prequalify by presenting proof to the Receiver of sufficient financing and/or cash resources to pay

5  the purchase price set forth in the PSA and overbids must be made in increments of no less than

6  $10,000.

7          f.       The Receiver shall serve a Notice of Sale compliant with the provisions of

8  California Code of Civil Procedure § 701.540 ("Notice of Sale") and a right to overbid by no less

9  than 20 days before the date of the Confirmation Hearing by mail on (i) on Defendant XELAN

10 Prop 1, LLC and its attorneys of record, and (ii) on all persons having recorded liens on the Filbert

11 Street Property and/or 19th Street Property which is the subject of the PSA as of the date of

12 hearing of this Motion;

13         g.       Any actions taken by the Receiver to sell the Filbert Street Property and/or

14 the 19th Street Property shall not constitute or create a representation or warranty by the Receiver

15 as to any aspect of the sale of the Filbert Street Property and/or the 19th Street Property and any

16 such sale shall be "as is," "where is," with no representations and/or warranties, shall not be subject

17 to the provisions of California Civil Code §§ 896 and 897, and shall be without risk or liability to

18 the Receiver and/or the receivership estate;

19         h.       The Receiver may proceed to close a sale of the Filbert Street Property

20 and/or the 19th Street Property pursuant to any PSA approved of by the above-entitled Court

21 subject to the terms and conditions set forth in the PSA;

22         i.       The Receiver shall have the right to perform such acts reasonably necessary

23 to sell the Filbert Street Property and/or the 19th Street Property pursuant to the Court-approved

24 PSA and to execute all documents and instruments reasonably necessary related thereto to close

25 any escrow established for the sale of the Filbert Street Property and/or the 19th Street Property

26 and to transfer title to the Filbert Street Property and/or the 19th Street Property as provided for in

27 the PSA;

28         j.       The Receiver shall be authorized to pay, at the close of and directly from

6239P5845v0

3

[PROPOSED] ORDER RE: GRANTING MOTION OF UMPQUA BANK FOR ORDER: (1) INSTRUCTING ETC.

1  any escrow established pursuant to the PSA approved of by this Court after the Confirmation

2  Hearing, the amounts owed to holders of any liens which have been recorded against the Filbert

3  Street Property and/or the 19th Street Property, as appropriate, and to transfer title to the Filbert

4  Street Property and/or the 19th Street Property as provided for in the PSA, approved of by this

5  Court. The Receiver may, in his discretion, negotiate with any lien claimants to release their liens

6  in exchange for agreed upon payments from escrow for amounts less than their liens as the

7  Receiver sees fit;

8  　　　　k.　　By closing escrow and taking title to the Filbert Street Property and/or the

9  19th Street Property, the buyer identified in the PSA acknowledges that: (i) the buyer has no

10  recourse against the Receiver (or his agents) for any claim or cause of action; and (ii) the buyer's

11  sole and only recourse is against buyer's title insurance policy, if applicable, except as expressly

12  permitted by any PSA approved of by the above-entitled Court. The above-entitled Court retains

13  jurisdiction over any dispute that may arise involving Receiver with the sale of the Filbert Street

14  Property and/or the 19th Street Property pursuant to the terms of any PSA approved of by the

15  above-entitled Court;

16  　　　　l.　　Any licensed title insurer may rely upon this order as authorizing the

17  Receiver to transfer legal title to the Filbert Street Property and/or the 19th Street Property;

18  　　　　m.　　A certified copy of this order may be recorded concurrently with or any

19  time before the close of escrow for the sale of the Filbert Street Property and/or the 19th Street

20  Property pursuant to the PSA providing, however, the failure to record this order will not affect

21  the enforceability of this order or the validity of the deed transferring title of the Filbert Street

22  Property and/or the 19th Street Property to the buyer set forth in the PSA; and

23  //
24  //
25  //
26  //
27  //
28  //

62395849v3

4

[PROPOSED] ORDER RE: GRANTING MOTION OF UMPQUA BANK FOR ORDER: (1) INSTRUCTING ETC.

1     n.    Nothing contained in this Order shall constitute an agreement by the Bank

2   to forbear from exercising its state law foreclosure rights and remedies pursuant to that certain

3   Deed of Trust and Absolute Assignment of Rents and Leases and Security Agreement (and Fixture

4   Filing) dated as of July 31, 2013 executed by XELAN Prop 1, LLC in favor of the Bank and that

5   certain Deed of Trust and Absolute Assignment of Rents and Leases and Security Agreement (and

6   Fixture Filing) dated as of June 13, 2013 executed by XELAN Prop 1, LLC in favor of the Bank

7   which are the subject of the above-entitled action, and the Bank shall be free to commence and/or

8   complete foreclosure proceedings pursuant to thereto at any time the Bank decides to do so in the

9   Bank's sole and absolute discretion, opinion and judgment.

10

11   DATED:   10 - 12 - 2018

JUDGE OF THE SUPERIOR COURT
CHARLES F. HAINES

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

62395849v3

5

[PROPOSED] ORDER RE: GRANTING MOTION OF UMPQUA BANK FOR ORDER:  (1) INSTRUCTING ETC.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

62395849v3

6

[PROPOSED] ORDER RE: GRANTING MOTION OF UMPQUA BANK FOR ORDER: (1) INSTRUCTING ETC.



**CALIFORNIA
ASSOCIATION
OF REALTORS®**

**COMMERCIAL AND RESIDENTIAL INCOME
LISTING AGREEMENT**
(C.A.R. Form CLA, Revised 6/17)

Date Prepared: _____

1. **EXCLUSIVE AUTHORIZATION:** _____ Kevin Singer, Court Receiver ("Owner")
hereby employs and grants _____ Vanguard Properties ("Broker")
beginning (date) _____ and ending at 11:59 P.M. on (date) _____ ("Listing Period")
the exclusive and irrevocable right to: ☒ SELL, ☐ LEASE, ☐ EXCHANGE, ☐ OPTION, or ☐ OTHER _____
the real property in the City of _____ San Francisco _____, County of _____ San Francisco _____
California, Assessor's Parcel No.: _____ 0093010 and 3563018 _____, described as: _____ Xclan: 1000-1022 Filbert St. and 4018-4022 19th St
("Property").

2. **ITEMS EXCLUDED AND INCLUDED:** Unless otherwise specified in an agreement between Owner and transferee, all fixtures and fittings that are attached to the Property are included, and personal property items are excluded from the price.
ADDITIONAL ITEMS EXCLUDED: _____
ADDITIONAL ITEMS INCLUDED: _____
Owner intends that the above items be excluded or included in listing the Property, but understands that: (i) the Agreement between Owner and transferee supersedes any intention expressed above and will ultimately determine which items are excluded and included in the transaction; and (ii) Broker is not responsible for and does not guarantee that the above exclusions and/or inclusions will be in the Agreement between Owner and transferee.

3. **LISTING PRICE AND TERMS:**
A. The listing price shall be Nine Million, Three Hundred Fifty Thousand
Dollars ($ 9,350,000.00 ).
B. Additional Terms: Listing price for 1000-1022 Filbert to be: $5,750,000; Listing Price for 4018 - 4022 19th Street to be $3,800,000

4. **COMPENSATION TO BROKER:**
Notice: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and may be negotiable between Owner and Broker (real estate commissions include all compensation and fees to Broker).
A. Owner agrees to pay to Broker as compensation for services irrespective of agency relationship(s): ☒ 5.000 percent of the listing price (or if an agreement is entered into, of the contract price); ☐ $_____, OR ☐ in accordance with Broker's attached schedule of compensation, as follows:
(1) If during the Listing Period, or any extension, Broker, cooperating broker, Owner or any other person procures a ready, willing, and able Transferee(s) whose offer on the Property on any price and terms is accepted by Owner, provided the Transferee completes the transaction or is prevented from doing so by Owner. (Broker is entitled to compensation whether any escrow resulting from such offer closes during or after the expiration of the Listing Period, or any extension.)
(2) If within 90 calendar days after the end of the Listing Period or any extension, Owner enters into a contract to sell, lease, exchange, option, convey or otherwise transfer the Property to anyone ("Prospective Transferee") or that person's related entity: (i) who physically entered and was shown the Property during the Listing Period, or any extension by Broker or a cooperating broker; or (ii) for whom Broker or any cooperating broker submitted to Owner a signed, written offer to acquire, lease, exchange or obtain an option on the Property. Owner, however, shall have no obligation to Broker under this paragraph 4A(2) unless, not later than the end of the Listing Period or any extension or cancellation, Broker has given Owner a written notice of the names of such Prospective Transferees.
(3) If, without Broker's prior written consent, the Property is withdrawn from sale, lease, exchange, option or other, as specified in paragraph 1, or is sold, conveyed, leased, rented, exchanged, optioned or otherwise transferred, or made unmarketable by a voluntary act of Owner during the Listing Period, or any extension thereof.
B. If completion of the transaction is prevented by a party to the transaction other than Owner, then compensation due under paragraph 4A shall be payable only if and when Owner collects damages by suit, arbitration, settlement, or otherwise, and then in an amount equal to the lesser of one-half of the damages recovered or the above compensation, after first deducting title and escrow expenses and the expenses of collection, if any.
C. In addition, Owner agrees to pay Broker: _____
D. (1) Broker is authorized to cooperate and compensate brokers participating through the multiple listing service(s) ("MLS"): (i) by offering MLS brokers either: ☒ 2.500 percent of the purchase price, or ☐ $_____; OR (ii) (if checked) ☐ as per Broker's policy.
(2) Broker is authorized to cooperate and compensate brokers operating outside the MLS as per Broker's policy.
E. Owner hereby irrevocably assigns to Broker the above compensation from Owner's funds and proceeds in escrow. Broker may submit this Listing Agreement, as instructions to compensate Broker pursuant to paragraph 4A, to any escrow regarding the Property involving Owner and a buyer, transferee or Prospective Transferee.
F. (1) Owner represents that Owner has not previously entered into a listing agreement with another broker regarding the Property, unless specified as follows: _____
(2) Owner warrants that Owner has no obligation to pay compensation to any other broker regarding the Property unless the Property is transferred to any of the following Prospective Transferees: _____
(3) If the Property is transferred to anyone listed above during the time Owner is obligated to compensate another broker: (i) Broker is not entitled to compensation under this Listing Agreement; and (ii) Broker is not obligated to represent Owner in such transaction.

Owner's Initials (_____) (_____)

© 2017, California Association of REALTORS®, Inc.

CLA REVISED 6/17 (PAGE 1 OF 4)
**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 1 OF 4)**

Vanguard Properties, 2501 Mission St. San Francisco CA 94110     Phone: 4150370000  Fax:
Edward Deleski     Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

366

Property Address: Xelan 1000-1022 Fifth and 4018-4022 19th St., San Francisco, CA 94133 94114   Date: _____

**5.  MULTIPLE LISTING SERVICE:**

**A.**  Broker is a participant/subscriber to _____ SFAR _____ Multiple Listing Service (MLS) and possibly others. Unless otherwise instructed in writing the Property will be listed with the MLS(s) specified above. That MLS is (or if checked ☐ is not) the primary MLS for the geographic area of the Property. All terms of the transaction, including sales price and financing, if applicable, (i) will be provided to the MLS in which the property is listed for publication, dissemination and use by persons and entities on terms approved by the MLS and (ii) may be provided to the MLS even if the Property is not listed with the MLS.

---

**BENEFITS OF USING THE MLS; IMPACT OF OPTING OUT OF THE MLS; PRESENTING ALL OFFERS**

**WHAT IS AN MLS?** The MLS is a database of properties for sale that is available and disseminated to and accessible by all other real estate agents who are participants or subscribers to the MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Seller's property is offered for sale (including but not limited to the listing broker's offer of compensation to other brokers). It is likely that a significant number of real estate practitioners in any given area are participants or subscribers to the MLS. The MLS may also be part of a reciprocal agreement to which other multiple listing services belong. Real estate agents belonging to other multiple listing services that have reciprocal agreements with the MLS also have access to the information submitted to the MLS. The MLS may further transmit the MLS database to internet sites that post property listings online.

**EXPOSURE TO BUYERS THROUGH MLS:** Listing property with an MLS exposes a seller's property to all real estate agents and brokers (and their potential buyer clients) who are participants or subscribers to the MLS or a reciprocating MLS.

**CLOSED/PRIVATE LISTING CLUBS OR GROUPS:** Closed or private listing clubs or groups are not the same as the MLS. The MLS referred to above is accessible to all eligible real estate licensees and provides broad exposure for a listed property. Private or closed listing clubs or groups of licensees may have been formed outside the MLS. Private or closed listing clubs or groups are accessible to a more limited number of licensees and generally offer less exposure for listed property. Whether listing property through a closed, private network - and excluding it from the MLS - is advantageous or disadvantageous to a seller, and why, should be discussed with the agent taking the Seller's listing.

**NOT LISTING PROPERTY IN A LOCAL MLS:** If the Property is listed in an MLS which does not cover the geographic area where the Property is located then real estate agents and brokers working that territory, and Buyers they represent looking for property in the neighborhood, may not be aware the Property is for sale.

**OPTING OUT OF MLS:** If Seller elects to exclude the Property from the MLS, Seller understands and acknowledges that: (a) real estate agents and brokers from other real estate offices, and their buyer clients, who have access to that MLS may not be aware that Seller's Property is offered for sale; (b) information about Seller's Property will not be transmitted to various real estate internet sites that are used by the public to search for property listings; (c) real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property.

**REDUCTION IN EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers and negatively impact the sales price.

**PRESENTING ALL OFFERS:** Seller understands that Broker must present all offers received for Seller's Property unless Seller gives Broker written instructions to the contrary.

Owner's Initials _____ / _____   Broker's/Agent's Initials _____ / _____

---

**B.**  MLS rules generally provide that residential real property and vacant lot listings be submitted to the MLS within 2 days or some other period of time after all necessary signatures have been obtained on the listing agreement. Broker will not have to submit this listing to the MLS if, within that time, Broker submits to the MLS a form signed by Seller (C.A.R. Form SELM or the local equivalent form).

**C.**  MLS rules allow MLS data to be made available by the MLS to additional internet sites unless Broker gives the MLS instructions to the contrary. Seller acknowledges that for any of the below opt-out instructions to be effective, Seller must make them on a separate instruction to Broker signed by Seller (C.A.R. Form SELI or the local equivalent form). Specific information that can be excluded from the internet as permitted by (or in accordance with) the MLS is as follows:

  **(1)** Property Availability: Seller can instruct Broker to have the MLS not display the Property on the internet.

  **(2)** Property Address: Seller can instruct Broker to have the MLS not display the Property address on the internet. Seller understands that the above opt-outs would mean consumers searching for listings on the internet may not see the Property or Property's address in response to their search.

  **(3)** Feature Opt-Outs: Seller can instruct Broker to advise the MLS that Seller does not want visitors to MLS Participant or Subscriber Websites or Electronic Displays that display the Property listing to have the features below. Seller understands (i) that these opt-outs apply only to Websites or Electronic Displays of MLS Participants and Subscribers who are real estate broker and agent members of the MLS; (ii) that other internet sites may or may not have the features set forth herein; and (iii) that neither Broker nor the MLS may have the ability to control or block such features on other internet sites.

  **(a)** Comment And Reviews: The ability to write comments or reviews about the Property on those sites; or the ability to link to another site containing such comments or reviews if the link is in immediate conjunction with the Property.

  **(b)** Automated Estimate Of Value: The ability to link to another site containing such automated estimate of value if the link is in immediate conjunction with the Property.

Owner's Initials ( _____ ) ( _____ )

---

CLA REVISED 6/17 (PAGE 2 OF 4)

**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 2 OF 4)**

Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

367

Property Address: Xelan- 1000-1022 Fillm____, and 4018-4922 19th St., San Francisco, CA 94133____94114    Date: ____

6. **OWNER REPRESENTATIONS:** Owner represents that, unless otherwise specified in writing, Owner is unaware of: (i) any Notice of Default recorded against the Property; (ii) any delinquent amounts due under any loan secured by, or other obligation affecting, the Property; (iii) any bankruptcy, insolvency or similar proceeding affecting the Property; (iv) any litigation, arbitration, administrative action, government investigation, or other pending or threatened action that affects or may affect the Property or Owner's ability to transfer it; and (v) any current, pending or proposed special assessments affecting the Property. Owner shall promptly notify Broker in writing if Owner becomes aware of any of these items during the Listing Period or any extension thereof.

7. **BROKER'S AND OWNER'S DUTIES:** Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Listing Agreement. Unless Owner gives Broker written instructions to the contrary, Broker is authorized to order reports and disclosures as appropriate or necessary, and advertise and market the Property in any method and medium, including the internet, selected by Broker, and, to the extent permitted by these media, including MLS, control the dissemination of the information submitted to any medium. Owner agrees to consider offers presented by Broker, and to act in good faith toward accomplishing the transfer of the Property by, among other things, making the Property available for showing at reasonable times and referring to Broker all inquiries of any party interested in the Property. Owner agrees to provide Broker that affects the Property, including, but not limited to, any past or current generation, storage, release, threatened release, disposal, and presence and transferee(s) all written disclosures, as required by law. Owner further agrees to immediately disclose in writing any condition known to Owner and location of asbestos, PCB transformers, petroleum products, flammable explosives, underground storage tanks and other hazardous, toxic or contaminated substances of conditions in, on, or about the Property. Owner shall maintain public liability and property damage insurance on the Property during the Listing Period or any extension. Owner waives all subrogation rights under any insurance against Broker, cooperating brokers or employees. Owner is responsible for determining at what price to list and transfer the Property. Owner further agrees to indemnify, defend and hold Broker harmless from all claims, disputes, litigation, judgments and attorney's fees arising from any incorrect information supplied by Owner, or from any material facts that Owner knows but fails to disclose including dangerous or hidden conditions on the Property. ☐ (If checked) The attached property disclosure is part of this Listing Agreement and may be provided to Prospective Transferees.

8. **DEPOSIT:** Broker is authorized to accept and hold on Owner's behalf any deposits to be applied toward the contract price.

9. **AGENCY RELATIONSHIPS:**
   A. **Disclosure:** Owner acknowledges receipt of (C.A.R. Form "AD") "Disclosure Regarding Real Estate Agency Relationship" form which is required to be provided to Owner prior to entering into this Listing Agreement.
   B. **Owner Representation:** Broker shall represent Owner in any resulting transaction, except as specified in paragraph 4F.
   C. **Possible Dual Agency With Buyer:** Depending upon the circumstances, it may be necessary or appropriate for Broker to act as an agent for both Owner and buyer—exchange party, or one or more additional parties ("Buyer"). Broker shall, as soon as practicable, disclose to Owner any election to act as a dual agent representing both Owner and Buyer. If a Buyer is procured directly by Broker or an associate licensee in Broker's firm, Owner hereby consents to Broker acting as a dual agent for Owner and such Buyer. In the event of an exchange, Owner hereby consents to Broker collecting compensation from additional parties for services rendered, provided there is disclosure to all parties of such agency and compensation. Owner understands and agrees that: (i) Broker, without the prior written consent of Owner, will not disclose to Buyer that Owner is willing to transfer the Property at a price less than the listing price; (ii) Broker, without the prior written consent of Buyer, will not disclose to Owner that Buyer is willing to pay a price greater than the offered price; and (iii) except for (i) and (ii) above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.
   D. **Other Owners:** Owner understands that Broker may have or obtain listings on other properties, and that potential buyers may consider, make offers on, or acquire through Broker, property the same as or similar to Owner's Property. Owner consents to Broker's representation of owners and buyers of other properties before, during, and after the end of this Listing Agreement.
   E. **Confirmation:** Broker shall confirm the agency relationship described above, or as modified, in writing, prior to or concurrent with Owner's execution of an agreement to sell.

10. **SECURITY AND INSURANCE:** Broker is not responsible for loss of or damage to personal or real property or person, whether attributable to use of a keysafe/lockbox, a showing of the Property, or otherwise. Third parties, including but not limited to, appraisers, inspectors, brokers and prospective buyers, may have access to, and take videos and photographs of the interior of the Property. Owner agrees: (i) to take reasonable precautions to safeguard and protect valuables that might be accessible during showings of the Property; and (ii) to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Owner.

11. **KEYSAFE/LOCKBOX:** A keysafe/lockbox is designed to hold a key to the Property to permit access to the Property by Broker, cooperating brokers, MLS participants, their authorized licensees and representatives, authorized inspectors and accompanying prospective buyers. Broker, cooperating brokers, MLS and Associations/Boards of REALTORS® are not insurers against injury, theft, loss, vandalism, or damage attributed to the use of a keysafe/lockbox. Owner does (or ☐ if checked ☐ does not) authorize Broker to install a keysafe/lockbox. If Owner does not occupy the Property, Owner shall be responsible for obtaining occupant(s) written permission for use of a keysafe/lockbox.

12. **SIGN:** Owner authorizes Broker to install a FOR SALE/SOLD/LEASE sign on the Property unless otherwise indicated in writing.

13. **EQUAL HOUSING OPPORTUNITY:** The Property is offered in compliance with federal, state, and local anti-discrimination laws.

14. **ATTORNEY'S FEES:** In any action, proceeding, or arbitration between Owner and Broker regarding the obligation to pay compensation under this Listing Agreement, the prevailing Owner or Broker shall be entitled to reasonable attorney's fees and costs, except as provided in paragraph 18A.

15. **ADDITIONAL TERMS:** ☐ REOL ☐ SSIA See attached ADDENDUM TO COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT
_____
_____
_____
_____
_____
_____

Owner's Initials (____) (____)

Property Address: Xelap 1009-1022 Filbert~~~~ and 4018-4022 19th St., San Francisco, CA 94133 ~~~~ 4114    Date: _____

**16. MANAGEMENT APPROVAL:** If an associate-licensee in Broker's office (salesperson or broker-associate) enters into this Listing Agreement on Broker's behalf, and Broker or Manager does not approve of its terms, Broker or Manager has the right to cancel this Listing Agreement, in writing, within 5 days after its execution.

**17. SUCCESSORS AND ASSIGNS:** This Listing Agreement shall be binding upon Owner and Owner's successors and assigns.

**18. DISPUTE RESOLUTION:**

A. **MEDIATION:** Owner and Broker agree to mediate any dispute or claim arising between them regarding the obligation to pay compensation under this Agreement, before resorting to arbitration or court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party (i) commences an action without first attempting to resolve the matter through mediation, or (ii) before commencement of an action, refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. Exclusions from this mediation agreement are specified in paragraph 18B.

B. **ADDITIONAL MEDIATION TERMS:** The following matters shall be excluded from mediation: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver or violation of the mediation provisions.

C. **ADVISORY:** If Owner and Broker desire to resolve disputes arising between them through arbitration rather than court, they can document their agreement by attaching and signing an Arbitration Agreement (C.A.R. Form ARB)

**19. ENTIRE CONTRACT:** All prior discussions, negotiations, and agreements between the parties concerning the subject matter of this Listing Agreement are superseded by this Listing Agreement, which constitutes the entire contract and a complete and exclusive expression of their agreement, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. This Listing Agreement and any supplement, addendum, or modification, including any photocopy or facsimile, may be executed in counterparts.

**20. OWNERSHIP, TITLE AND AUTHORITY:** Owner warrants that: (i) Owner is the owner of the Property; (ii) no other persons or entities have title to the Property, and (iii) Owner has the authority to both execute this Listing Agreement and transfer the Property.

Exceptions to ownership, title and authority are as follows: _____

By signing below, Owner acknowledges that Owner has read, understands, received a copy of and agrees to the terms of this Listing Agreement and any attached schedule of compensation.

Date _____    at _____

Owner _Kevin Singer, Court Receiver_    Title _____

By _____    City _____    State _____ Zip _____

Address _____    E-mail _____

Telephone _____ Fax _____    at _____

Date _____    at _____

Owner _____    Title _____

By _____    City _____    State _____ Zip _____

Address _____    E-mail _____

Telephone _____ Fax _____    at _____

Date _____    at _____

Owner _____    Title _____

By _____    City _____    State _____ Zip _____

Address _____    E-mail _____

Telephone _____ Fax _____    at _____

Date _____    at _____

Owner _____    Title _____

By _____    City _____    State _____ Zip _____

Address _____    E-mail _____

Telephone _____ Fax _____    DRE Lic. # _01486075_

Real Estate Broker (Firm) _Vanguard Properties_    _Edward R. Deleski_ DRE Lic. # _01450309_    Date _____

By (Agent) _____    City _San Francisco_    State _CA_ Zip _94110_

Address _2501 Mission St._    E-mail _rd@vanguardsf.com_

Telephone _(415)350-9083_    Fax _____

© 2017, California Association of REALTORS®, Inc.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

**CLA REVISED 8/17 (PAGE 4 OF 4)**

**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 4 OF 4)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com

**CALIFORNIA ASSOCIATION OF REALTORS®**

**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP**
(Listing Firm to Seller)
(As required by the Civil Code)
(C.A.R. Form AD, Revised 12/14)

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(k), (l) and (m).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**
A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.
To the Buyer and the Seller:
  (a)  Diligent exercise of reasonable skill and care in performance of the agent's duties.
  (b)  A duty of honest and fair dealing and good faith.
  (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**
A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
  (a)  Diligent exercise of reasonable skill and care in performance of the agent's duties.
  (b)  A duty of honest and fair dealing and good faith.
  (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.
An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**
A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
  (a)  A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
  (b)  Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, the agent may not, without the express permission of the respective party, disclose to the other party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered.
The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.
Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).

☐ Buyer  ☒ Seller ☐ Landlord ☐ Tenant _____ Date _____
                                           *Kevin Singer, Court Receiver*

☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant _____ Date _____

Agent _____*Vanguard Properties*_____ DRE Lic. # *01486075* _____
         *Real Estate Broker (Firm)*

By _____ DRE Lic. # *01450369* _____ Date _____
    (Salesperson or Broker-Associate)  *Edward R. Deleski*

**Agency Disclosure Compliance (Civil Code §2079.14):**
•  When the listing brokerage company also represents Buyer/Tenant: The Listing Agent shall have one AD form signed by Seller/Landlord and a different AD form signed by Buyer/Tenant.
•  When Seller/Landlord and Buyer/Tenant are represented by different brokerage companies: (i) the Listing Agent shall have one AD form signed by Seller/Landlord and (ii) the Buyer's/Tenant's Agent shall have one AD form signed by Buyer/Tenant and either that same or a different AD form presented to Seller/Landlord for signature prior to presentation of the offer. If the same form is used, Seller may sign here:

(SELLER/LANDLORD: DO NOT SIGN HERE)                 (SELLER/LANDLORD: DO NOT SIGN HERE)
_____      _____
Seller/Landlord             Date              Seller/Landlord             Date

© 1991-2014, California Association of REALTORS®, Inc.

AD REVISED 12/14 (PAGE 1 OF 2)
**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)**

Vanguard Properties, 2501 Mission St. San Francisco CA, 94110         Phone: 4153127403     Fax:
Edward Deleski          Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

370

## CIVIL CODE SECTIONS 2079.24 (2079.16 APPEARS ON THE FRONT)

2079.13 As used in Sections 2079.14 to 2079.24, inclusive, the following terms have the following meanings: (a) "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. (b) "Associate licensee" means a person who is licensed as a real estate broker or salesperson under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code and who is either licensed under a broker or has entered into a written contract with a broker to act as the broker's agent in connection with acts requiring a real estate license and to function under the broker's supervision in the capacity of an associate licensee. The agent in the real property transaction bears responsibility for his or her associate licensees who perform as agents of the agent. When an associate licensee owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the associate licensee functions. (c) "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee. (d) "Commercial real property" means all real property in the state, except single-family residential real property, dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, mobilehomes, as defined in Section 798.3, or recreational vehicles, as defined in Section 799.29. (e) "Dual agent" means an agent acting, either directly or through an associate licensee, as agent for both the seller and the buyer in a real property transaction. (f) "Listing agreement" means a contract between an owner of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer. (g) "Listing agent" means a person who has obtained a listing of real property to act as an agent for compensation. (h) "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the listing agent. (i) "Offering price" is the amount expressed in dollars specified in the offer to purchase for which the buyer is willing to buy the real property. (j) "Offer to purchase" means a written contract executed by a buyer acting through a selling agent that becomes the contract for the sale of the real property upon acceptance by the seller. (k) "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property that constitutes or is improved with one to four dwelling units, any commercial real property, any leasehold in these types of property exceeding one year's duration, and mobilehomes, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. (l) "Real property transaction" means a transaction for the sale of real property in which an agent is employed by one or more of the principals to act in that transaction, and includes a listing or an offer to purchase. (m) "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer, and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. (n) "Seller" means the transferor in a real property transaction, and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor. (o) "Selling agent" means a listing agent who acts alone, or an agent who acts in cooperation with a listing agent, and who sells or finds and obtains a buyer for the real property, or an agent who locates property for a buyer or who finds a buyer for a property for which no listing exists and presents an offer to purchase to the seller. (p) "Subagent" means a person to whom an agent delegates agency powers as provided in Article 5 (commencing with Section 2349) of Chapter 1 of Title 9. However, "subagent" does not include an associate licensee who is acting under the supervision of an agent in a real property transaction.

2079.14 Listing agents and selling agents shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and, except as provided in subdivision (c), shall obtain a signed acknowledgement of receipt from the seller or buyer, except as provided in this section or Section 2079.15, as follows: (a) The listing agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. (b) The selling agent shall provide the disclosure form to the seller as soon as practicable prior to presenting the seller with an offer to purchase, unless the selling agent previously provided the seller with a copy of the disclosure form pursuant to subdivision (a). (c) Where the selling agent does not deal on a face-to-face basis with the seller, the disclosure form prepared by the selling agent may be furnished to the seller (and acknowledgement of receipt obtained for the selling agent from the seller) by the listing agent, or the selling agent may deliver the disclosure form by certified mail addressed to the seller at his or her last known address, in which case no signed acknowledgement of receipt is required. (d) The selling agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase, except that if the offer to purchase is not prepared by the selling agent, the selling agent shall present the disclosure form to the buyer not later than the next business day after the selling agent receives the offer to purchase from the buyer.

2079.15 In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent, or an associate licensee acting for an agent, shall set forth, sign, and date a written declaration of the facts of the refusal.

2079.16 Reproduced on Page 1 of this AD form.

2079.17 (a) As soon as practicable, the listing agent shall disclose to the buyer and seller whether the selling agent is acting in the real property transaction exclusively as the buyer's agent, exclusively as the seller's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the selling agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. (b) As soon as practicable, the listing agent shall disclose to the seller whether the listing agent is acting in the real property transaction exclusively as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the listing agent prior to or coincident with the execution of that contract by the seller.

(c) The confirmation required by subdivisions (a) and (b) shall be in the following form.

_____ (DO NOT COMPLETE. SAMPLE ONLY)     is the agent of (check one): □ the seller exclusively; or □ both the buyer and seller.
(Name of Listing Agent)

_____ (DO NOT COMPLETE. SAMPLE ONLY)     is the agent of (check one): □ the buyer exclusively; or □ the seller exclusively; or
(Name of Selling Agent if not the same as the Listing Agent)     □ both the buyer and seller.

(d) The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14.

2079.18 No selling agent in a real property transaction may act as an agent for the buyer only, when the selling agent is also acting as the listing agent in the transaction.

2079.19 The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

2079.20 Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

2079.21 A dual agent shall not disclose to the buyer that the seller is willing to sell the property at a price less than the listing price, without the express written consent of the seller. A dual agent shall not disclose to the buyer that the buyer is willing to pay a price greater than the offering price, without the express written consent of the buyer. This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

2079.22 Nothing in this article precludes a listing agent from also being a selling agent, and the combination of these functions in one agent does not, of itself, make that agent a dual agent.

2079.23 A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

2079.24 Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

© 1991-2010, California Association of REALTORS®, Inc. (THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

AD REVISED 12/14 (PAGE 2 OF 2)

## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com



**CALIFORNIA
ASSOCIATION
OF REALTORS®**

**EXEMPT SELLER DISCLOSURE**
(C.A.R. Form ESD, Revised 12/16)

1. Seller ( ☐ Landlord) makes the following disclosures with regard to the real property or manufactured home described as __Xelan-1000-1022 Filbert St. and 4018-4022 19th St.__, situated in __San Francisco__ (City), __San Francisco__ (County), California, __94133 and__ (Zip Code), Assessor's Parcel No. __0093010 and 3553010__ ("Property").

2. **A.** Under California law (Civil Code §1102, et seq.) most Sellers of real property containing 1-4 residential units are required to provide prospective Buyers with a completed Real Estate Transfer Disclosure Statement ("TDS"). Certain Sellers are exempt from completing the TDS but not exempt from making other disclosures. Sellers who are not legally required to complete a TDS can use this form to make other required disclosures, including the disclosure of material facts of which they are aware.
   **B.** Under Civil Code Section 1101.4(b), on or before January 1, 2017 non-compliant plumbing fixtures in any single family residential real property built before January 1, 1994 shall be replaced by the Property owner with water-conserving plumbing fixtures.

3. THE FOLLOWING ARE REPRESENTATIONS MADE BY THE SELLER AND ARE NOT THE REPRESENTATIONS OF THE AGENT(S), IF ANY. THIS DISCLOSURE STATEMENT IS NOT A WARRANTY OF ANY KIND BY THE SELLER OR ANY AGENT(S) AND IS NOT A SUBSTITUTE FOR ANY INSPECTIONS OR WARRANTIES THE PRINCIPAL(S) MAY WISH TO OBTAIN. A REAL ESTATE BROKER IS QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF SELLER OR BUYER DESIRE LEGAL ADVICE, CONSULT AN ATTORNEY.

4. Are you (Seller) aware of any of the following? (Explain any "yes" answers below.)
   **A.** Within the last 3 years, the death of an occupant of the Property upon the Property . . . . . . . . . . . . ☐ Yes ☐ No
   **B.** An Order from a government health official identifying the Property as being contaminated by methamphetamine. (If yes, attach a copy of the Order.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No
   **C.** The release of an illegal controlled substance on or beneath the Property . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No
   **D.** Whether the Property is located in or adjacent to an "industrial-use" zone . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No
   (In general, a zone or district allowing manufacturing, commercial or airport uses.)
   **E.** Whether the Property is affected by a nuisance created by an "industrial use" zone . . . . . . . . . . ☐ Yes ☐ No
   **F.** Whether the Property is located within 1 mile of a former federal or state ordinance location . . . . ☐ Yes ☐ No
   (In general, an area once used for military training purposes that may contain potentially explosive munitions.)
   **G.** Whether the Property is a condominium or located in a planned unit development or other common interest subdivision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No
   **H.** Insurance claims affecting the Property within the past 5 years . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No
   **I.** Matters affecting title of the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No
   **J.** Material facts or defects affecting the Property not otherwise disclosed to Buyer . . . . . . . . . . . . ☐ Yes ☐ No
   **K.** Plumbing fixtures on the Property that are non-compliant plumbing fixtures as defined by Civil Code Section 1101.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No
   Explanation, or ☐ (if checked) see attached: _____
   _____
   _____
   _____

5. Seller represents that the information herein is true and correct to the best of Seller's knowledge as of the date signed by Seller. Seller hereby authorizes any agent(s) representing any principal(s) in this transaction to provide a copy of this statement to any person or entity in connection with any actual or anticipated sale of the Property.
   Seller/Landlord _____ *Kevin Singer, Court Receiver* Date _____
   Seller/Landlord _____ Date _____

6. By signing below, Buyer acknowledges Buyer has received, read, and understands this Exempt Seller Disclosure form.
   Buyer/Tenant _____ Date _____
   Buyer/Tenant _____ Date _____

© 2002-2016, California Association of REALTORS®, Inc. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

ESD REVISED 12/16 (PAGE 1 OF 1)

**EXEMPT SELLER DISCLOSURE (ESD PAGE 1 OF 1)**

Vanguard Properties, 2501 Mission St. San Francisco CA 94110                    Phone: 4153337000          Fax:
Edward Deleski                              Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com

372



**SAN FRANCISCO
ASSOCIATION of REALTORS®**

# GENERAL INFORMATION STATEMENT
# REGARDING TENANTS' RIGHTS DISCLOSURE
# REQUIRED BY SELLERS AND BUYERS

SAN FRANCISCO ASSOCIATION OF REALTORS® STANDARD FORM
This form is intended for use in San Francisco

**PROPERTY ADDRESS:** *Xelan- 1000-1022 Filbert St. and 4018-4022 19th St., San Francisco, CA  94133 and 94114*

This General Information Statement is provided for use in connection with the disclosure required by San Francisco law regarding certain "tenants' rights." See attached *Tenants' Rights Disclosure Required by Sellers before Selling and Buyers after Buying,* at page 3 of this form. This Statement is not meant to be a complete source of information on all matters which can become issues in San Francisco residential rental real property sale and purchase transactions. It is strongly recommended that sellers and buyers having any questions in this regard consult with a qualified real estate attorney.

For Sellers of San Francisco Residential Rental Real Property: "*Before*" real property in the City and County of San Francisco "containing *rental units* subject to" San Francisco Administrative Code §37.9 "may be sold," San Francisco law requires the "*owner/seller*" disclose in writing in bold type of at least 12 points "*to tenants*" at any such property certain "rights of tenants." (San Francisco Administrative Code §37.9(k)(1)) (IMPORTANT: This law does not say precisely *when* "before" the sale the disclosure must be provided. Seller is urged to provide the necessary disclosure shortly after listing their rental real property for sale or, if it is not listed, shortly after entering into a contract to sell with buyer and well before Close of Escrow. It is solely Seller's responsibility to timely provide this pre-sale disclosure to tenants. No real estate broker/agent has any such responsibility.)

For Buyers of San Francisco Residential Rental Real Property: "*Within [thirty] 30 days of acquiring title*" to real property in the City and County of San Francisco containing "*rental units* subject to" San Francisco Administrative Code §37.9, San Francisco law requires the "*new purchaser/owner*" disclose in writing in bold type of at least 12 points "*to tenants*" at any such property certain "rights of tenants." (San Francisco Administrative Code §37.9(k)(2)) (IMPORTANT: Generally, the date of recordation of the Grant or Quitclaim Deed conveying the rental real property to Buyer will be the date of acquisition of title. It is solely Buyer's responsibility to timely provide this post-sale disclosure to tenants. No real estate broker/agent has any such responsibility.)

For Both Sellers and Buyers:

### *Two Separate Disclosures Required*

Under this law, **both** the Seller and Buyer must **each** timely make the required disclosures. Disclosure by the Seller, for example, does **not** satisfy the Buyer's independent disclosure obligation.

### *Definition of "Rental Unit"*

San Francisco Administrative Code §37.2(r) defines "*rental units*" that are subject to the above-referenced disclosure law as: "*All residential dwelling units in the City and County of San Francisco together with the land and appurtenant buildings thereto, and all housing services, privileges, furnishings and facilities supplied in connection with the use or occupancy thereof, including garage and parking facilities.*"

Certain "rental units" are exempt from the above definition. According to the San Francisco Rent Board (Rent Board) in its *Fact Sheet 4* (http://www.sfrb.org/index.aspx?page=946):



Copyright © 2015 San Francisco Association of REALTORS®

Vanguard Properties, 2501 Mission St. San Francisco CA 94110          Phone: 4152217920          Fax:
Edward Deleski          Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

"Exempt units include those in buildings constructed after June 13, 1979. This a very limited number of units exempted by the Ordinance and/or Regulations or through a Rent Board petition process. (See Ordinance Section 37.2(r) and Rules and Regulations Section 1.17 for a complete list of exemptions.)...Some tenancies that are exempt from the rent increase limitations of the Ordinance are still subject to the eviction provisions of the Ordinance. Tenants in these categories can only be evicted for one of the "just cause" reasons listed in the Ordinance. This includes tenancies that are eligible for an unlimited rent increase under the Costa-Hawkins Rental Housing Act or Rules and Regulations Section 1.21 because the unit is not the tenant's principal place of residence, and tenancies where the rent is regulated by another government agency, including Section 8 vouchers, Section 8 certificates and HOPWA (Housing Opportunities for Persons With AIDS). In addition, effective April 25, 2010, any tenant who was in possession of an exempt rental unit at the time of foreclosure may not be evicted by the person or entity who took title through foreclosure except for a "just cause" reason under the Rent Ordinance and only after expiration of the tenant's existing lease term. [Ordinance Section 37.9D(b)]"

### Definition of "Tenant"

San Francisco Administrative Code §37.2(t) defines "*Tenant*" as a "*person entitled by written or oral agreement, sub-tenancy approved by the landlord, or by sufferance, to occupy a residential dwelling unit to the exclusion of others.*" (Note: A "tenancy at sufferance" is one that arises when a "...lease expires but the lessee holds over without the owner's consent...." *Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 740.)

### Providing Disclosure to Tenants

The above-referenced disclosure law does not say how the disclosure is to be provided to "tenants." While any method of delivery would appear to be sufficient to comply with the law (e.g., U.S. mail), delivery by a method resulting in proof of delivery or receipt is strongly recommended (e.g., FedEx). Also, the above-referenced law requires disclosure to "tenants." There is no language in this law limiting the disclosure to some but not all of the tenants. It is thus strongly recommended that Seller and Buyer provide the disclosure to *all* of the tenants at a property subject to this law.

BY SIGNING BELOW I/WE CONFIRM (A) RECEIPT OF THIS STATEMENT AND THE ATTACHED SFAR FORM ENTITLED "TENANTS' RIGHTS DISCLOSURE REQUIRED BY SELLERS BEFORE SELLING AND BUYERS AFTER BUYING" (B) THE OBLIGATION TO PROVIDE TENANTS WITH THE ATTACHED DISCLOSURE IS SOLELY THE SELLER'S "BEFORE PROPERTY...MAY BE SOLD" AND THE BUYER'S "WITHIN 30 DAYS AFTER ACQUIRING TITLE" AND (C) REAL ESTATE BROKERS/AGENTS ARE NOT OBLIGATED TO ENSURE TIMELY DELIVERY OF THE ATTACHED DISCLOSURE TO TENANTS EITHER BEFORE OR AFTER ESCROW CLOSES.

Buyer _____ Date _____ Buyer _____ Date _____

Seller _____ Date _____ Seller _____ Date _____
    Kevin Singer, Court Receiver

(Attach additional signature pages as necessary.)

NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY INFORMATION IN THIS STATEMENT FOR ANY SPECIFIC TRANSACTION. BROKERS/AGENTS CAN ADVISE ON REAL ESTATE TRANSACTIONS ONLY. FOR LEGAL OR TAX ADVICE, CONSULT A QUALIFIED ATTORNEY OR CPA.

Copyright © 2015 San Francisco Association of REALTORS®

Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com



**TENANTS' RIGHTS DISCLOSURE REQUIRED BY SELLERS
BEFORE SELLING AND BUYERS AFTER BUYING**
(San Francisco Administrative Code §37.9(k))

San Francisco
ASSOCIATION of REALTORS

SAN FRANCISCO ASSOCIATION OF REALTORS® STANDARD FORM
This form is intended for use in San Francisco

PROPERTY ADDRESS: Xelan- 1000-1022 Filbert St. and 4018-4022 19th St., San Francisco, CA 94133 and 94114

By "Owner/Seller" to "Tenants" at the above-referenced Property given "before" sale of the Property (§37.9(k)(1)):

(A) "[T]enants cannot be evicted or asked to move solely because a property is being sold or solely because a new owner has purchased that property."

(B) "[T]enants cannot have their rent increased above that permitted by Chapter 37 solely because a property is being sold or solely because a new owner has purchased that property."

(C) "[T]he rental agreements of tenants cannot be materially changed solely because a property is being sold or solely because a new owner has purchased that property."

(D) "[T]he owner's right to show units to prospective buyers is governed by California Civil Code section 1954, including...tenants must receive notice as provided by Section 1954, and a statement that a showing must be conducted during normal business hours unless the tenant consents to an entry at another time."

(E) "[T]enants are not required to complete or sign any estoppel certificates or estoppel agreements, except as required by law or by the tenant's rental agreement....[T]enant rights may be affected by an estoppel certificate or agreement and...tenants should seek legal advice before completing or signing an estoppel certificate or agreement."

(F) "[I]nformation on these and other tenants' rights are available at the San Francisco Rent Board, 25 Van Ness Ave, San Francisco, California, and at the counseling telephone number of the Rent Board and at its web site."

By "New Purchaser/Buyer" to "Tenants" at the above-referenced Property given "within [thirty] 30 days of acquiring title" to the Property (§37.9(k)(2)):

(A) "[T]enants cannot be evicted or asked to move solely because a new owner has purchased that property."

(B) "[T]enants cannot have their rent increased above that permitted by Chapter 37 solely because a new owner has purchased that property."

(C) "[T]he rental agreements of tenants cannot be materially changed solely because a new owner has purchased that property."

(D) "[A]ny tenants, sub-tenants or roommates who were lawful occupants at the time of the sale remain lawful occupants."

(E) "[T]enants' housing services as defined in Section 37.2(r) first paragraph cannot be changed or severed from the tenancy solely because a new owner has purchased that property; and...tenants' housing services as defined in Section 37.2(r) second paragraph that were supplied in connection with the use or occupancy of a unit at the time of sale (such as laundry rooms, decks, or storage space) cannot be severed from the tenancy by the new purchaser/owner without just cause as required by Section 37.9(a)."

Disclosing Owner/Seller _____   Date _____

Disclosing Owner/Seller _____   Date _____

Disclosing New Purchaser/Buyer _____   Date _____

Disclosing New Purchaser/Buyer _____   Date _____

(Attach additional signature pages as necessary.)

NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF THIS DISCLOSURE IN ANY SPECIFIC TRANSACTION. BROKERS/AGENTS CAN ADVISE ON REAL ESTATE TRANSACTIONS ONLY. FOR LEGAL OR TAX ADVICE, CONSULT A QUALIFIED ATTORNEY OR CPA.

Copyright © 2015 San Francisco Association of REALTORS®

Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

375

## ADDENDUM TO COMMERICAL AND RESIDENTIAL INCOME LISTING AGREEMENT

**Seller:**   Kevin Singer, Superior Court Receiver for Superior Court of California, County of San Francisco, Case No. CGC-18-564941

**Broker:**   Vanguard Properties, Inc. ("Broker")

**Property:** 1000-1022 Filbert Street and 4018-4022 19th Street, San Francisco, California (the "Property")

This Addendum to Commercial and Residential Income Listing Agreement ("Addendum"), is attached and made a part of that certain Commercial and Residential Income Listing Agreement (the "Agreement") dated as of _____, 2018, entered into concurrently herewith, by and between Kevin Singer, in his sole capacity as Superior Court Receiver ("Seller") in the Superior Court of California, County of San Francisco ("Court"), Case No. CGC-18-564941 (the "Case") and Vanguard Properties, Inc., a California corporation ("Broker"). In the event of any conflict between this Addendum and the provisions of the Agreement, the provisions of this Addendum shall prevail. The parties hereby modify and supplement the Agreement as follows:

1. **Additional Provisions.** Broker acknowledges and agrees to all the following terms and conditions:

   A) Seller is not the owner and/or original developer of the Property and that Seller intends to sell the Property solely in his capacity as the appointed superior court receiver and through his authorization as the receiver in the Case. Seller is not acting in his personal capacity and no liability or obligations shall accrue to him personally or any of his managers, attorneys, accountants, employees, agents, representatives, heirs, partners, other advisors, or lenders that directly or indirectly caused him to be appointed as receiver in the Case.

   B) As used in the Agreement and this Addendum, the terms "Owner" or "Seller" shall mean and refer to Seller herein named, acting solely in his capacity as receiver in the Case. As of the date of this Addendum, the record owner of the Property is Xelan Prop I, LLC, a California limited liability company.

   C) All information regarding the Property which has previously been, or is hereafter, provided by Seller to Broker is for informational purposes only, and Seller makes no representations or warranties with regards to any of such information provided to Broker.

   D) Broker understands and agrees that any sale of the Property must be approved by order of the Court and include all-cash terms, and title will not be transferred subject to any indebtedness secured by the Property (other than real property secured taxes and assessments). The sale of the Property will be made on an "As-Is" basis and with all faults. The form and content of the agreement of

1

Addendum to Commercial and Residential Income Listing Agreement - Xelan

purchase and sale will also be subject to Seller's express written approval as to form, content and all material covenants, terms and conditions, in Seller's sole opinion and judgment. In light of the foregoing, the following provisions of the Agreement are hereby deleted and shall be of no force or effect: paragraphs 4.A(3), 4.C, 4.E, 6, 7 (but only as to those obligations thereunder imposed on Seller), 8, 10 (but only as to those obligations thereunder imposed on Seller), 14, 18, and 20.

E)  Broker, Broker's successors, agents, assigns, affiliates and heirs hereby agree not to make any claim and/or seek any recourse against any of the following persons for any actual or alleged liability claimed by Broker against Seller arising out of the Agreement and/or this Addendum: the Seller personally; Seller's personal assets; Seller's partners (either general or limited); Seller's shareholders, members, managers, officers, directors, attorneys, advisors, accountants, agents, employees, heirs, or lenders that directly or indirectly caused, moved, applied for or requested Seller's appointment as receiver in the Case.

F)  The Agreement is assignable to and shall bind any affiliate of Seller and any successor court-appointed receiver for the Property. Broker shall not assign the Agreement or delegate any obligations of Broker under the Agreement to anyone without Seller's prior written consent. Broker has no authority to bind Seller to any obligation. The Agreement (including this Addendum) can be modified only by a writing signed by both parties and, if so determined by Seller, with the approval of the Court.

2.  **Seller Disclosure.** Broker acknowledges that Seller is a duly licensed California Real Estate broker.

3.  **Waiver of Jury Trial and Jurisdiction For Any Legal Disputes.** Broker waives any and all right to a jury trial as to any legal dispute, proceeding or action arising out of the Agreement and/or this Addendum. Broker agrees that if there is any legal dispute, proceeding or action arising out of the Agreement and/or this Addendum, the court presiding over the Case at the time of filing any such legal dispute, proceeding or action, said court shall have full jurisdiction over any such legal dispute, proceeding or action. In addition, the court presiding over the Case retains jurisdiction to cancel the Agreement and/or this Addendum in entirety and or amend its terms. In the unlikely event that the court does cancel the Agreement and/or this Addendum, Broker shall be paid pursuant to the terms of the Agreement and this Addendum.

5.  **Attorney's Fees.** In any dispute, action or proceeding between Broker and Seller arising out of the Agreement and/or this Addendum, the prevailing Broker or Seller shall be entitled to reasonable attorneys' fees and costs from the non-prevailing Broker or Seller.

6.  **Severability.** If any term, provision, covenant or condition of the Agreement and/or this Addendum is held by a court of competent jurisdiction to be invalid, void or

2.

Addendum to Commercial and Residential Income Listing Agreement - Kohn

unenforceable, the rest of the Agreement and/or this Addendum shall remain in full force and effect, and shall in no way be affected, impaired or invalidated.

7. **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California.

8. **Counterparts.** The Agreement and this Addendum, and any amendment hereof, may be signed in counterparts, all of which taken together shall constitute one original and may be delivered electronically in the form of executed scanned and/or faxed signatures, each of which shall have the same force and effect as the original signature.

Effective as of the date first mentioned above, the parties hereto agree to be bound by the covenants, terms and conditions set forth herein.

BROKER-

Vanguard Properties, Inc.

By: _____
        — Edward R. Deleski
Title:

SELLER

By: _____
        Kevin Singer in his sole capacity as
        Receiver in Superior Court of California,
        County of San Francisco Case No: CGC-18-564941

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JMBM | Jeffer Mangels
        Butler & Mitchell LLP

## PROOF OF SERVICE

### STATE OF CALIFORNIA, CITY AND COUNTY OF SAN FRANCISCO

I am employed in the City and County of San Francisco, State of California. I am over the age of 18 and not a party to the within action; my business address is: Two Embarcadero Center, 5th Floor, San Francisco, California 94111.

On October 16, 2018 I served the document(s) described as

**NOTICE OF ENTRY OF ORDER RE: GRANTING MOTION OF UMPQUA BANK FOR ORDER: (1) INSTRUCTING AND AUTHORIZING RECEIVER TO SELL REAL PROPERTY ASSETS OF RECEIVERSHIP ESTATE; AND (2) CONFIRMING SALES PROCEDURES;**

in this action addressed as follows:

Isaac R. Zfaty, Esq.
Sam B. Maralan, Esq.
ZFATY | BURNS
660 Newport Center Drive, Suite 470
Newport Beach, CA 92660
Email: irz@zfatyburns.com
sm@zfatyburns.com

David J. Cook, Esq.
Cook Collection Attorneys
165 Fell Street
San Francisco, CA 94102
Email: davidcook@cookcollectionattorneys.com

Dennis Herrera, Esq., City Attorney
Peter Keith, Esq., Chief Attorney
Victoria L. Weatherford, Esq.,
   Deputy City Attorney
Michael Weiss, Esq., Deputy City Attorney
Office of the City Attorney
1390 Market Street, Seventh Floor
San Francisco, CA 94102-5408
Email: peter.keith@sfgov.org
victoria.weatherford@sfgov.org
michael.weiss@sfgov.org

Karen Y. Uchiyama
Law Offices of Karen Y. Uchiyama
733 Webster Street
San Francisco, CA 94117
Email: karen@uchlegal.com

Paul Manasian, Esq.
1310 65th Street
Emeryville, CA 94608
Email: manasian@mrlawsf.com

Caroline L. Green
David Green
4102 Lusk Street
Oakland, CA 94608

City and County of San Francisco
Department of Building Inspection
Code Enforcement Section
1660 Mission Street, 6th Floor
San Francisco, CA 94103-2414

Anne Kihagi, Manager
XELAN Prop 1, LLC
P.O. Box 691889
Los Angeles, CA 90069

Kevin Singer, Receiver
111500 W. Olympic Blvd., Suite 810
Los Angeles, CA 90064

San Francisco Department of Public Health
Environmental Health, Solid Waste Program
Attn: Refuse Lien Unit
1390 Market Street, Suite 210
San Francisco, Ac 94102

62851991v1

3

NOTICE OF ENTRY OF ORDER RE: GRANTING MOTION FOR ORDER: (1) INSTRUCTING AND
AUTHORIZING RECEIVER TO SELL REAL PROPERTY ASSETS, ETC.

379

1

2  ☒  (BY MAIL) I am "readily familiar" with the business' practice for collection and
processing correspondence for mailing. Under that practice true and correct copies of the
3  aforementioned document(s) was deposited, in a sealed envelope with postage thereon
fully prepaid, with the U.S. Postal Service on that same day to be mailed via first class
4  mail at Los Angeles, California in the ordinary course of business. I am aware that on
motion of the party served, service is presumed invalid if postal cancellation date or
5  postage meter date is more than one day after date of deposit for mailing in affidavit.

6  ☒  Via the One Legal e-serving notification system.

7  Executed on October 16, 2018 at San Francisco, California.

8  I declare under penalty of perjury under the laws of the State of California and the United
States of America that the above is true and correct.

9

10                                                        Donna Schmidt

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

62851991 v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

4

NOTICE OF ENTRY OF ORDER RE: GRANTING MOTION FOR ORDER: (1) INSTRUCTING AND
AUTHORIZING RECEIVER TO SELL REAL PROPERTY ASSETS, ETC.

# EXHIBIT 2

CALIFORNIA
ASSOCIATION
OF REALTORS®

COMMERCIAL AND RESIDENTIAL INCOME
LISTING AGREEMENT
(C.A.R. Form CLA, Revised 6/17)

Date Prepared: _____

1.  **EXCLUSIVE AUTHORIZATION:** _____ Kevin Singer, Court Receiver _____ ("Owner")
    hereby employs and grants _____ Vanguard Properties _____ ("Listing Broker")
    beginning (date) __1 / 1 / 19__ and ending at 11:59 P.M. on (date) __3 / 31 / 19__ ("Listing Period")
    the exclusive and irrevocable right to: [X] SELL, [ ] LEASE, [ ] EXCHANGE, [ ] OPTION, or [ ] OTHER _____
    the real property in the City of _____ San Francisco _____, County of _____ San Francisco _____,
    California, Assessor's Parcel No.: __0093010 and 3583018__, described as: Xelan- 1000-1022 Filbert St. and 4018-4022 19th St.
    _____ ("Property").

2.  **ITEMS EXCLUDED AND INCLUDED:** Unless otherwise specified in an agreement between Owner and transferee, all fixtures and fittings that are
    attached to the Property are included, and personal property items are excluded from the price.
    ADDITIONAL ITEMS EXCLUDED: _____
    ADDITIONAL ITEMS INCLUDED: _____
    Owner intends that the above items be excluded or included in listing the Property, but understands that: (i) the Agreement between Owner and
    transferee supersedes any intention expressed above and will ultimately determine which items are excluded and included in the transaction; and
    (ii) Broker is not responsible for and does not guarantee that the above exclusions and/or inclusions will be in the Agreement between Owner and
    transferee.

3.  **LISTING PRICE AND TERMS:**
    A.  The listing price shall be: Nine Million, Three Hundred Fifty Thousand
        _____ Dollars ($ 9,350,000.00 _____).
    B.  Additional Terms: Listing price for 1000-1022 Filbert to be: $5,750,000; Listing Price for 4018 - 4022 19th Street to be $3,600,000

4.  **COMPENSATION TO BROKER:**
    Notice: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and may be
    negotiable between Owner and Broker (real estate commissions include all compensation and fees to Broker).
    A.  Owner agrees to pay to Broker as compensation for services irrespective of agency relationship(s): [X] 5.000 percent of the listing price,
        (or if an agreement is entered into, or the contract price,) [ ] $ _____, OR [ ] in accordance with Broker's attached
        schedule of compensation as follows:
        (1) if during the Listing Period, or any extension, Broker, cooperating broker, Owner or any other person procures a ready, willing, and able
            Transferee(s) whose offer on the Property on any price and terms is accepted by Owner, provided the Transferee completes the transaction
            or is prevented from doing so by Owner. (Broker is entitled to compensation whether any escrow resulting from such offer closes during or
            after the expiration of the Listing Period, or any extension.)
        (2) if within __90__ calendar days after the end of the Listing Period or any extension, Owner enters into a contract to sell, lease, exchange,
            option, convey or otherwise transfer the Property to anyone ("Prospective Transferee") or that person's related entity: (i) who physically
            entered and was shown the Property during the Listing Period, by Broker or a cooperating broker, or (ii) for whom Broker
            or any cooperating broker submitted to Owner a signed, written offer to acquire, lease, exchange or obtain an option on the Property.
            Owner, however, shall have no obligation to Broker under this paragraph 4A(2) unless, not later than the end of the Listing Period or any
            extension or cancellation, Broker has given Owner written notice of the names of such Prospective Transferees.
        (3) if, without Broker's prior written consent, the Property is withdrawn from sale, lease, exchange, option or other, as specified in paragraph 1,
            or is sold, conveyed, leased, rented, exchanged, optioned or otherwise transferred, or made unmarketable by a voluntary act of Owner
            during the Listing Period, or any extension thereof.
    B.  If completion of the transaction is prevented by a party to the transaction other than Owner, then compensation due under paragraph 4A shall
        be payable only if and when Owner collects damages by suit, arbitration, settlement, or otherwise, and then in an amount equal to the lesser of
        one-half of the damages recovered or the above compensation, after first deducting title and escrow expenses and the expenses of collection, if
        any.
    C.  In addition, Owner agrees to pay Broker: _____
    D.  (1) Broker is authorized to cooperate and compensate brokers participating through the multiple listing service(s) ("MLS"): (i) by offering MLS
            brokers either: [X] 2.500 percent of the purchase price, or [ ] $ _____; OR (ii) (if checked) [ ] as per Broker's policy.
        (2) Broker is authorized to cooperate and compensate brokers operating outside the MLS as per Broker's policy.
    E.  Owner hereby irrevocably assigns to Broker the above compensation from Owner's funds and proceeds in escrow. Broker may submit this
        Listing Agreement, as instructions to compensate Broker pursuant to paragraph 4A, to any escrow regarding the Property involving Owner and
        a buyer, transferee or Prospective Transferee.
    F.  (1) Owner represents that Owner has not previously entered into a listing agreement with another broker regarding the Property, unless
            specified as follows: _____
        (2) Owner warrants that Owner has no obligation to pay compensation to any other broker regarding the Property unless the Property is
            transferred to any of the following Prospective Transferees: _____
        (3) If the Property is transferred to anyone listed above during the time Owner is obligated to compensate another broker: (i) Broker is not
            entitled to compensation under this Listing Agreement; and (ii) Broker is not obligated to represent Owner in such transaction.

Owner's Initials ( _____ ) ( _____ )

© 2017, California Association of REALTORS®, Inc.

CLA REVISED 6/17 (PAGE 1 OF 4)
**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 1 OF 4)**

Vanguard Properties, 2501 Mission St. San Francisco CA 94110                          Phone: 4153337080          Fax:
Edward Deleski                                Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

382

Property Address: <u>Xelan- 1000-1022 Filbert St. and 4018-4022 19th St., San Francisco, CA 94133 and 94114</u>    Date: _____

**5.    MULTIPLE LISTING SERVICE:**
A.    Broker is a participant/subscriber to _____ SFAR _____ Multiple Listing Service (MLS) and possibly others. Unless otherwise instructed in writing the Property will be listed with the MLS(s) specified above. That MLS is (or if checked ☐ is not) the primary MLS for the geographic area of the Property. All terms of the transaction, including sales price and financing, if applicable, (i) will be provided to the MLS in which the property is listed for publication, dissemination and use by persons and entities on terms approved by the MLS and (ii) may be provided to the MLS even if the Property is not listed with the MLS.

BENEFITS OF USING THE MLS; IMPACT OF OPTING OUT OF THE MLS; PRESENTING ALL OFFERS

**WHAT IS AN MLS?** The MLS is a database of properties for sale that is available and disseminated to and accessible by all other real estate agents who are participants or subscribers to the MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Seller's property is offered for sale (including but not limited to the listing broker's offer of compensation to other brokers). It is likely that a significant number of real estate practitioners in any given area are participants or subscribers to the MLS. The MLS may also be part of a reciprocal agreement to which other multiple listing services belong. Real estate agents belonging to other multiple listing services that have reciprocal agreements with the MLS also have access to the information submitted to the MLS. The MLS may further transmit the MLS database to Internet sites that post property listings online.

**EXPOSURE TO BUYERS THROUGH MLS:** Listing property with an MLS exposes a seller's property to all real estate agents and brokers (and their potential buyer clients) who are participants or subscribers to the MLS or a reciprocating MLS.

**CLOSED/PRIVATE LISTING CLUBS OR GROUPS:** Closed or private listing clubs or groups are not the same as the MLS. The MLS referred to above is accessible to all eligible real estate licensees and provides broad exposure for a listed property. Private or closed listing clubs or groups of licensees may have been formed outside the MLS. Private or closed listing clubs or groups are accessible to a more limited number of licensees and generally offer less exposure for listed property. Whether listing property through a closed, private network - and excluding it from the MLS - is advantageous or disadvantageous to a seller, and why, should be discussed with the agent taking the Seller's listing.

**NOT LISTING PROPERTY IN A LOCAL MLS:** If the Property is listed in an MLS which does not cover the geographic area where the Property is located then real estate agents and brokers working that territory, and Buyers they represent looking for property in the neighborhood, may not be aware the Property is for sale.

**OPTING OUT OF MLS:** If Seller elects to exclude the Property from the MLS, Seller understands and acknowledges that: (a) real estate agents and brokers from other real estate offices, and their buyer clients, who have access to that MLS may not be aware that Seller's Property is offered for sale; (b) information about Seller's Property will not be transmitted to various real estate Internet sites that are used by the public to search for property listings; (c) real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property.

**REDUCTION IN EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers and negatively impact the sales price.

**PRESENTING ALL OFFERS:** Seller understands that Broker must present all offers received for Seller's Property unless Seller gives Broker written instructions to the contrary.        Owner's Initials ( ____ / ____ )        Broker's/Agent's Initials ( ____ / ____ )

B.    MLS rules generally provide that residential real property and vacant lot listings be submitted to the MLS within 2 days or some other period of time after all necessary signatures have been obtained on the listing agreement. Broker will not have to submit this listing to the MLS if, within that time, Broker submits to the MLS a form signed by Seller (C.A.R. Form SELM or the local equivalent form).
C.    MLS rules allow MLS data to be made available by the MLS to additional Internet sites unless Broker gives the MLS instructions to the contrary. Seller acknowledges that for any of the below opt-out instructions to be effective, Seller must make them on a separate instruction to Broker signed by Seller (C.A.R. Form SELI or the local equivalent form). Specific information that can be excluded from the Internet as permitted by (or in accordance with) the MLS is as follows:
(1) Property Availability: Seller can instruct Broker to have the MLS not display the Property on the Internet.
(2) Property Address: Seller can instruct Broker to have the MLS not display the Property address on the Internet.
Seller understands that the above opt-outs would mean consumers searching for listings on the Internet may not see the Property or Property's address in response to their search.
(3) Feature Opt-Outs: Seller can instruct Broker to advise the MLS that Seller does not want visitors to MLS Participant or Subscriber Websites or Electronic Displays that display the Property listing to have the features below. Seller understands (i) that these opt-outs apply only to Websites or Electronic Displays of MLS Participants and Subscribers who are real estate broker and agent members of the MLS; (ii) that other Internet sites may or may not have the features set forth herein; and (iii) that neither Broker nor the MLS may have the ability to control or block such features on other Internet sites.
(a) Comment And Reviews: The ability to write comments or reviews about the Property on those sites; or the ability to link to another site containing such comments or reviews if the link is in immediate conjunction with the Property.
(b) Automated Estimate Of Value: The ability to link to another site containing such automated estimate of value if the link is in immediate conjunction with the Property.

Owner's Initials ( ____ ) ( ____ )

CLA REVISED 6/17 (PAGE 2 OF 4)

COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 2 OF 4)

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com

Property Address: <u>Xelan- 1000-1022 Filbert St. and 4018-4022 19th St., San Francisco, CA 94133 and 94114</u>   Date: _____

6.  **OWNER REPRESENTATIONS:** Owner represents that, unless otherwise specified in writing, Owner is unaware of: (i) any Notice of Default recorded against the Property; (ii) any delinquent amounts due under any loan secured by, or other obligation affecting, the Property; (iii) any bankruptcy, insolvency or similar proceeding affecting the Property; (iv) any litigation, arbitration, administrative action, governmental investigation, or other pending or threatened action that affects or may affect the Property or Owner's ability to transfer it; and (v) any current, pending or proposed special assessments affecting the Property. Owner shall promptly notify Broker in writing if Owner becomes aware of any of these items during the Listing Period or any extension thereof.

7.  **BROKER'S AND OWNER'S DUTIES:** Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Listing Agreement. Unless Owner gives Broker written instructions to the contrary, Broker is authorized to order reports and disclosures as appropriate or necessary, and advertise and market the Property in any method and medium, including the Internet, selected by Broker, and, to the extent permitted by these media, including MLS, control the dissemination of the information submitted to any medium. Owner agrees to consider offers presented by Broker, and to act in good faith toward accomplishing the transfer of the Property by, among other things, making the Property available for showing at reasonable times and referring to Broker all inquiries of any party interested in the Property. Owner agrees to provide Broker and transferee(s) all written disclosures, as required by law. Owner further agrees to immediately disclose in writing any condition known to Owner that affects the Property, including, but not limited to, any past or current generation, storage, release, threatened release, disposal, and presence and location of asbestos, PCB transformers, petroleum products, flammable explosives, underground storage tanks and other hazardous, toxic or contaminated substances or conditions in, on, or about the Property. Owner shall maintain public liability and property damage insurance on the Property during the Listing Period or any extension. Owner waives all subrogation rights under any insurance against Broker, cooperating brokers or employees. Owner is responsible for determining at what price to list and transfer the Property. Owner further agrees to indemnify, defend and hold Broker harmless from all claims, disputes, litigation, judgments and attorney's fees arising from any incorrect information supplied by Owner, or from any material facts that Owner knows but fails to disclose including dangerous or hidden conditions on the Property. ☐ (If checked) The attached property disclosure is part of this Listing Agreement and may be provided to Prospective Transferees.

8.  **DEPOSIT:** Broker is authorized to accept and hold on Owner's behalf any deposits to be applied toward the contract price.

9.  **AGENCY RELATIONSHIPS:**
    A.  **Disclosure:** Owner acknowledges receipt of (C.A.R. Form AD) "Disclosure Regarding Real Estate Agency Relationship" form which is required to be provided to Owner prior to entering into this Listing Agreement.
    B.  **Owner Representation:** Broker shall represent Owner in any resulting transaction, except as specified in paragraph 4F.
    C.  **Possible Dual Agency With Buyer:** Depending upon the circumstances, it may be necessary or appropriate for Broker to act as an agent for both Owner and buyer, exchange party, or one or more additional parties ("Buyer"). Broker shall, as soon as practicable, disclose to Owner any election to act as a dual agent representing both Owner and Buyer. If a Buyer is procured directly by Broker or an associate licensee in Broker's firm, Owner hereby consents to Broker acting as a dual agent for Owner and such Buyer. In the event of an exchange, Owner hereby consents to Broker collecting compensation from additional parties for services rendered, provided there is disclosure to all parties of such agency and compensation. Owner understands and agrees that: (i) Broker, without the prior written consent of Owner, will not disclose to Buyer that Owner is willing to transfer the Property at a price less than the listing price; (ii) Broker, without the prior written consent of Buyer, will not disclose to Owner that Buyer is willing to pay a price greater than the offered price; and (iii) except for (i) and (ii) above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.
    D.  **Other Owners:** Owner understands that Broker may have or obtain listings on other properties, and that potential buyers may consider, make offers on, or acquire through Broker, property the same as or similar to Owner's Property. Owner consents to Broker's representation of owners and buyers of other properties before, during, and after the end of this Listing Agreement.
    E.  **Confirmation:** Broker shall confirm the agency relationship described above, or as modified, in writing, prior to or concurrent with Owner's execution of an agreement to sell.

10. **SECURITY AND INSURANCE:** Broker is not responsible for loss or damage to personal or real property or person, whether attributable to use of a keysafe/lockbox, a showing of the Property, or otherwise. Third parties, including but not limited to, appraisers, inspectors, brokers and prospective buyers, may have access to, and take videos and photographs of the interior of the Property, Owner agrees: (i) to take reasonable precautions to safeguard and protect valuables that might be accessible during showings of the Property; and (ii) to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Owner.

11. **KEYSAFE/LOCKBOX:** A keysafe/lockbox is designed to hold a key to the Property to permit access to the Property by Broker, cooperating brokers, MLS participants, their authorized licensees and representatives, authorized inspectors and accompanying prospective buyers. Broker, cooperating brokers, MLS and Associations/Boards of REALTORS® are not insurers against injury, theft, loss, vandalism, or damage attributed to the use of a keysafe/lockbox. Owner does (or if checked ☐ does not) authorize Broker to install a keysafe/lockbox. If Owner does not occupy the Property, Owner shall be responsible for obtaining occupant(s)' written permission for use of a keysafe/lockbox.

12. **SIGN:** Owner authorizes Broker to install a FOR SALE/SOLD/LEASE sign on the Property unless otherwise indicated in writing.

13. **EQUAL HOUSING OPPORTUNITY:** The Property is offered in compliance with federal, state, and local anti-discrimination laws.

14. **ATTORNEY'S FEES:** In any action, proceeding, or arbitration between Owner and Broker regarding the obligation to pay compensation under this Listing Agreement, the prevailing Owner or Broker shall be entitled to reasonable attorney's fees and costs, except as provided in paragraph 18A.

15. **ADDITIONAL TERMS:** ☐ REOL ☐ SSIA  <u>See attached ADDENDUM TO COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT</u>

_____
_____
_____
_____
_____
_____

Owner's Initials ( ~~/~~ ) ( ___ )

CLA REVISED 6/17 (PAGE 3 OF 4)
**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 3 OF 4)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Property Address: _Xelan- 1000-1022 Filbert St. and 4016-4022 19th St., San Francisco, CA 94133 and 94114_   :Date: _____

16. **MANAGEMENT APPROVAL:** If an associate-licensee in Broker's office (salesperson or broker-associate) enters into this Listing Agreement on Broker's behalf, and Broker or Manager does not approve of its terms, Broker or Manager has the right to cancel this Listing Agreement, in writing, within 5 days after its execution.

17. **SUCCESSORS AND ASSIGNS:** This Listing Agreement shall be binding upon Owner and Owner's successors and assigns.

18. **DISPUTE RESOLUTION:**
   A. **MEDIATION:** Owner and Broker agree to mediate any dispute or claim arising between them regarding the obligation to pay compensation under this Agreement, before resorting to arbitration or court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party (i) commences an action without first attempting to resolve the matter through mediation, or (ii) before commencement of an action, refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. Exclusions from this mediation agreement are specified in paragraph 18B;
   B. **ADDITIONAL MEDIATION TERMS:** The following matters shall be excluded from mediation: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver or violation of the mediation provisions.
   C. **ADVISORY:** If Owner and Broker desire to resolve disputes arising between them through arbitration rather than court, they can document their agreement by attaching and signing an Arbitration Agreement (C.A.R. Form ARB)

19. **ENTIRE CONTRACT:** All prior discussions, negotiations, and agreements between the parties concerning the subject matter of this Listing Agreement are superseded by this Listing Agreement, which constitutes the entire contract and a complete and exclusive expression of their agreement, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. This Listing Agreement and any supplement, addendum, or modification, including any photocopy or facsimile, may be executed in counterparts.

20. **OWNERSHIP, TITLE AND AUTHORITY:** Owner warrants that: (i) Owner is the owner of the Property; (ii) no other persons or entities have title to the Property; and (iii) Owner has the authority to both execute this Listing Agreement and transfer the Property.
   Exceptions to ownership, title and authority are as follows: _____

By signing below, Owner acknowledges that Owner has read, understands, received a copy of, and agrees to the terms of this Listing Agreement and any attached schedule of compensation.

Date _____  at _____
Owner _Kevin Singer, Court Receiver_
By _____ Title _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

Date _____  at _____
Owner _____
By _____ Title _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

Date _____  at _____
Owner _____
By _____ Title _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

Date _____  at _____
Owner _____
By _____ Title _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

Real Estate Broker (Firm) _Vanguard Properties_                                 DRE Lic. # _01480075_
By (Agent) _____ _Edward R. Deleski_ DRE Lic. # _01480369_  Date _0.16.2018_
Address _2501 Mission St_                 City _San Francisco_       State _CA_  Zip _94110_
Telephone _(415)360-9083_  Fax _____ E-mail _ed@vanguardsf.com_

© 2017, California Association of REALTORS®, Inc.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

CLA REVISED 6/17 (PAGE 4 OF 4)
**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 4 OF 4)**

Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

385



**CALIFORNIA
ASSOCIATION
OF REALTORS®**

**DISCLOSURE REGARDING
REAL ESTATE AGENCY RELATIONSHIP**
(Listing Firm to Seller)
(As required by the Civil Code)
(C.A.R. Form AD, Revised 12/14)

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(k), (l) and (m).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:

To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.

To the Buyer and the Seller:
(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**

A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:

To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.

To the Buyer and the Seller:
(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.

An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**

A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.

In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
(a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
(b) Other duties to the Seller and the Buyer as stated above in their respective sections.

In representing both Seller and Buyer, the agent may not, without the express permission of the respective party, disclose to the other party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).

| ☐ Buyer ☒ Seller ☐ Landlord ☐ Tenant | _Kevin Singer, Court Receiver_ | Date 10-18-18 |
|---|---|---|
| ☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant | | Date |

Agent _Vanguard Properties_      DRE Lic. # _01486076_
Real Estate Broker (Firm)

By _____     DRE Lic. # _01450369_     Date 10.18.2018
(Salesperson or Broker-Associate) _Edward R. Deleski_

**Agency Disclosure Compliance (Civil Code §2079.14):**
• When the listing brokerage company also represents Buyer/Tenant: The Listing Agent shall have one AD form signed by Seller/Landlord and a different AD form signed by Buyer/Tenant.
• When Seller/Landlord and Buyer/Tenant are represented by different brokerage companies: (i) the Listing Agent shall have one AD form signed by Seller/Landlord and (ii) the Buyer's/Tenant's Agent shall have one AD form signed by Buyer/Tenant and either that same or a different AD form presented to Seller/Landlord for signature prior to presentation of the offer. If the same form is used, Seller may sign here:

| [SELLER/LANDLORD: DO NOT SIGN HERE] | | [SELLER/LANDLORD: DO NOT SIGN HERE] | |
|---|---|---|---|
| Seller/Landlord | Date | Seller/Landlord | Date |

© 1991-2016, California Association of REALTORS®, Inc.

AD REVISED 12/14 (PAGE 1 OF 2)

**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)**

Vanguard Properties, 2501 Marlon St. San Francisco CA 94114     Phone: 4153357600     Fax:
Edward Deleski     Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

## CIVIL CODE SECTIONS 2079.24 (2079.16 APPEARS ON THE FRONT)

2079.13 As used in Sections 2079.14 to 2079.24, inclusive, the following terms have the following meanings: (a) "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person whose license is a listing is executed or an offer to purchase is obtained. (b) "Associate licensee" means a person who is licensed as a real estate broker or salesperson under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code and who is either licensed under a broker or has entered into a written contract with a broker to act as the broker's agent in connection with acts requiring a real estate license and to function under the broker's supervision in the capacity of an associate licensee. The agent in the real property transaction bears responsibility for his or her associate licensees who perform as agents of the agent. When an associate licensee owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the associate licensee functions. (c) "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee. (d) "Commercial real property" means all real property in this state, except single-family residential real property, dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, mobilehomes, as defined in Section 798.3, or recreational vehicles, as defined in Section 799.29. (e) "Dual agent" means an agent acting, either directly or through an associate licensee, as agent for both the seller and the buyer in a real property transaction. (f) "Listing agreement" means a contract between an owner of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer. (g) "Listing agent" means a person who has obtained a listing of real property to act as an agent for compensation. (h) "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the listing agent. (i) "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. (j) "Offer to purchase" means a written contract executed by a buyer acting through a selling agent that becomes the contract for the sale of the real property upon acceptance by the seller. (k) "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property that constitutes or is improved with one to four dwelling units, any commercial real property, any leasehold in these types of property exceeding one year's duration, and mobilehomes, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. (l) "Real property transaction" means a transaction for the sale of real property in which an agent is employed by one or more of the principals to act in that transaction, and includes a listing or an offer to purchase. (m) "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer, and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. (n) "Seller" means the transferor in a real property transaction, and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor. (o) "Selling agent" means a listing agent who acts alone, or an agent who acts in cooperation with a listing agent, and who sells or finds and obtains a buyer for the real property, or an agent who locates property for a buyer or who finds a buyer for a property for which no listing exists and presents an offer to purchase to the seller. (p) "Subagent" means a person to whom an agent delegates agency powers as provided in Article 5 (commencing with Section 2349) of Chapter 1 of Title 9. However, "subagent" does not include an associate licensee who is acting under the supervision of an agent in a real property transaction.

2079.14 Listing agents and selling agents shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and, except as provided in subdivision (c), shall obtain a signed acknowledgement of receipt from that seller or buyer, except as provided in this section or Section 2079.15, as follows: (a) The listing agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. (b) The selling agent shall provide the disclosure form to the seller as soon as practicable prior to presenting the seller with an offer to purchase, unless the selling agent previously provided the seller with a copy of the disclosure form pursuant to subdivision (a). (c) Where the selling agent does not deal on a face-to-face basis with the seller, the disclosure form prepared by the selling agent may be furnished to the seller (and acknowledgement of receipt obtained for the selling agent from the seller) by the listing agent, or the selling agent may deliver the disclosure form by certified mail addressed to the seller at his or her last known address, in which case no signed acknowledgement of receipt is required. (d) The selling agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase, except that if the offer to purchase is not prepared by the selling agent, the selling agent shall present the disclosure form to the buyer not later than the next business day after the selling agent receives the offer to purchase from the buyer.

2079.15 In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent, or an associate licensee acting for an agent, shall set forth, sign, and date a written declaration of the facts of the refusal.

2079.16 Reproduced on Page 1 of this AD form.

2079.17 (a) As soon as practicable, the selling agent shall disclose to the buyer and seller whether the selling agent is acting in the real property transaction exclusively as the buyer's agent, exclusively as the seller's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the selling agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. (b) As soon as practicable, the listing agent shall disclose to the seller whether the listing agent is acting in the real property transaction exclusively as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the listing agent prior to or coincident with the execution of that contract by the seller.

(c)    The confirmation required by subdivisions (a) and (b) shall be in the following form.

| (DO NOT COMPLETE. SAMPLE ONLY) | is the agent of (check one): ☐ the seller exclusively; or ☐ both the buyer and seller. |
|---|---|
| (Name of Listing Agent) | |
| (DO NOT COMPLETE. SAMPLE ONLY) | is the agent of (check one): ☐ the buyer exclusively; or ☐ the seller exclusively; or |
| (Name of Selling Agent if not the same as the Listing Agent) | ☐ both the buyer and seller. |

(d)    The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14.

2079.18 No selling agent in a real property transaction may act as an agent for the buyer only, when the selling agent is also acting as the listing agent in the transaction.

2079.19 The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

2079.20 Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

2079.21 A dual agent shall not disclose to the buyer that the seller is willing to sell the property at a price less than the listing price, without the express written consent of the seller. A dual agent shall not disclose to the seller that the buyer is willing to pay a price greater than the offering price, without the express written consent of the buyer. This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

2079.22 Nothing in this article precludes a listing agent from also being a selling agent, and the combination of these functions in one agent does not, of itself, make that agent a dual agent.

2079.23 A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

2079.24 Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
• 525 South Virgil Avenue, Los Angeles, California 90020

AD REVISED 12/14 (PAGE 2 OF 2)

© 1991-2010, California Association of REALTORS®, Inc. (THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.



**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com



**CALIFORNIA**
**ASSOCIATION**
**OF REALTORS** ®

**EXEMPT SELLER DISCLOSURE**
(C.A.R. Form ESD, Revised 12/16)

1. Seller ( ☐ Landlord) makes the following disclosures with regard to the real property or manufactured home described as <u>Xelan 1000-1022 Filbert St. and 4018-4022 19th St.</u>, situated in <u>San Francisco</u> (City), <u>San Francisco</u> (County), California, <u>94133 and</u> (Zip Code), Assessor's Parcel No. <u>0083010 and 3563010</u> ("Property").

2. A. Under California law (Civil Code §1102, et. seq.) most Sellers of real property containing 1-4 residential units are required to provide prospective Buyers with a completed Real Estate Transfer Disclosure Statement ("TDS"). Certain Sellers are exempt from completing the TDS but not exempt from making other disclosures. Sellers who are not legally required to complete a TDS can use this form to make other required disclosures, including the disclosure of material facts of which they are aware.
   B. Under Civil Code Section 1101.4(b), on or before January 1, 2017 non-compliant plumbing fixtures in any single-family residential real property built before January 1, 1994 shall be replaced by the Property owner with water-conserving plumbing fixtures.

3. THE FOLLOWING ARE REPRESENTATIONS MADE BY THE SELLER AND ARE NOT THE REPRESENTATIONS OF THE AGENT(S), IF ANY. THIS DISCLOSURE STATEMENT IS NOT A WARRANTY OF ANY KIND BY THE SELLER OR ANY AGENT(S) AND IS NOT A SUBSTITUTE FOR ANY INSPECTIONS OR WARRANTIES THE PRINCIPAL(S) MAY WISH TO OBTAIN. A REAL ESTATE BROKER IS QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF SELLER OR BUYER DESIRE LEGAL ADVICE, CONSULT AN ATTORNEY.

4. Are you (Seller) aware of any of the following? (Explain any "yes" answers below.)
   A. Within the last 3 years, the death of an occupant of the Property upon the Property. . . . . . . . . . . . ☐ Yes ☒ No
   B. An Order from a government health official identifying the Property as being contaminated by methamphetamine. (If yes, attach a copy of the Order.) . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No
   C. The release of an illegal controlled substance on or beneath the Property . . . . . . . . . . . . . . . ☐ Yes ☒ No
   D. Whether the Property is located in or adjacent to an "industrial use" zone . . . . . . . . . . . . . . . ☐ Yes ☒ No
      (In general, a zone or district allowing manufacturing, commercial or airport uses.)
   E. Whether the Property is affected by a nuisance created by an "industrial use" zone . . . . . . . . . . ☐ Yes ☒ No
   F. Whether the Property is located within 1 mile of a former federal or state ordinance location . . . . . ☐ Yes ☒ No
      (In general, an area once used for military training purposes that may contain potentially explosive munitions.)
   G. Whether the Property is a condominium or located in a planned unit development or other common interest subdivision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No
   H. Insurance claims affecting the Property within the past 5 years . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No
   I. Matters affecting title of the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No
   J. Material facts or defects affecting the Property not otherwise disclosed to Buyer . . . . . . . . . . . . ☐ Yes ☒ No
   K. Plumbing fixtures on the Property that are non-compliant plumbing fixtures as defined by Civil Code Section 1101.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No
   Explanation, or ☐ (If checked) see attached: _____
   _____
   _____
   _____

5. Seller represents that the information herein is true and correct to the best of Seller's knowledge as of the date signed by Seller. Seller hereby authorizes any agent(s) representing any principal(s) in this transaction to provide a Copy of this statement to any person or entity in connection with any actual or anticipated sale of the Property.
   Seller/Landlord _____ _Kevin Singer, Court Receiver_ Date <u>16-18-16</u>
   Seller/Landlord _____ Date _____

6. By signing below, Buyer acknowledges Buyer has received, read, and understands this Exempt Seller Disclosure form.
   Buyer/Tenant _____ Date _____
   Buyer/Tenant _____ Date _____

© 2002-2016, California Association of REALTORS®, Inc. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

ESD REVISED 12/16 (PAGE 1 OF 1)

**EXEMPT SELLER DISCLOSURE (ESD PAGE 1 OF 1)**

Vanguard Properties, 1201 Minties St. San Francisco CA 94115    Phone: 4152317041    Fax:
Edward Deleski    Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com

388



**SAN FRANCISCO
ASSOCIATION of REALTORS'**

## GENERAL INFORMATION STATEMENT
## REGARDING TENANTS' RIGHTS DISCLOSURE
## REQUIRED BY SELLERS AND BUYERS
SAN FRANCISCO ASSOCIATION OF REALTORS® STANDARD FORM
This form is intended for use in San Francisco

PROPERTY ADDRESS: *Xelan- 1000-1022 Filbert St. and 4018-4022 19th St., San Francisco, CA 94133 and 94114*

This General Information Statement is provided for use in connection with the disclosure required by San Francisco law regarding certain "tenants' rights." See attached *Tenants' Rights Disclosure Required by Sellers before Selling and Buyers after Buying*, at page 3 of this form. This Statement is not meant to be a complete source of information on all matters which can become issues in San Francisco residential rental real property sale and purchase transactions. **It is strongly recommended that sellers and buyers having any questions in this regard consult with a qualified real estate attorney.**

For Sellers of San Francisco Residential Rental Real Property: *"Before"* real property in the City and County of San Francisco "containing *rental units* subject to" San Francisco Administrative Code §37.9 "may be sold," San Francisco law requires the *"owner/seller"* disclose in writing in bold type of at least 12 points *"to tenants"* at any such property certain "rights of tenants." (San Francisco Administrative Code §37.9(k)(1)) (IMPORTANT: This law does not say precisely *when* "before" the sale the disclosure must be provided. Seller is urged to provide the necessary disclosure shortly after listing their rental real property for sale or, if it is not listed, shortly after entering into a contract to sell with buyer and well before Close of Escrow. It is solely Seller's responsibility to timely provide this pre-sale disclosure to tenants. No real estate broker/agent has any such responsibility.)

For Buyers of San Francisco Residential Rental Real Property: *"Within [thirty] 30 days of acquiring title"* to real property in the City and County of San Francisco containing *"rental units* subject to" San Francisco Administrative Code §37.9, San Francisco law requires the *new purchaser/owner"* disclose in writing in bold type of at least 12 points *"to tenants"* at any such property certain "rights of tenants." (San Francisco Administrative Code §37.9(k)(2)) (IMPORTANT: Generally, the date of recordation of the Grant or Quitclaim Deed conveying the rental real property to Buyer will be the date of acquisition of title. It is solely Buyer's responsibility to timely provide this post-sale disclosure to tenants. No real estate broker/agent has any such responsibility.)

For Both Sellers and Buyers:

*Two Separate Disclosures Required*

Under this law, **both** the Seller and Buyer must **each** timely make the required disclosures. Disclosure by the Seller, for example, does **not** satisfy the Buyer's independent disclosure obligation.

*Definition of "Rental Unit"*

San Francisco Administrative Code §37.2(r) defines *"rental units"* that are subject to the above-referenced disclosure law as: "*All residential dwelling units in the City and County of San Francisco together with the land and appurtenant buildings thereto, and all housing services, privileges, furnishings and facilities supplied in connection with the use or occupancy thereof, including garage and parking facilities.*"

Certain "rental units" are exempt from the above definition. According to the San Francisco Rent Board (Rent Board) in its *Fact Sheet 4* (http://www.sfrb.org/index.aspx?page=946):



Page 1 of 3
(Rev. 12/15)                    Copyright © 2015 San Francisco Association of REALTORS®

Vanguard Properties, 2501 Mission St. San Francisco CA 94110                                              Phone: 4153317033          Fax:
Edward Delski                          Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

"Exempt units include those in buildings constructed after June 13, 1979 plus a very limited number of units exempted by the Ordinance and/or Regulations or through a Rent Board petition process. (See Ordinance Section 37.2(r) and Rules and Regulations Section 1.17 for a complete list of exemptions.)...Some tenancies that are exempt from the rent increase limitations of the Ordinance are still subject to the eviction provisions of the Ordinance. Tenants in these categories can only be evicted for one of the "just cause" reasons listed in the Ordinance. This includes tenancies that are eligible for an unlimited rent increase under the Costa-Hawkins Rental Housing Act or Rules and Regulations Section 1.21 because the unit is not the tenant's principal place of residence, and tenancies where the rent is regulated by another government agency, including Section 8 vouchers, Section 8 certificates and HOPWA (Housing Opportunities for Persons With AIDS). In addition, effective April 25, 2010, any tenant who was in possession of an exempt rental unit at the time of foreclosure may not be evicted by the person or entity who took title through foreclosure except for a "just cause" reason under the Rent Ordinance and only after expiration of the tenant's existing lease term. [Ordinance Section 37.9D(b)]"

### Definition of "Tenant"

San Francisco Administrative Code §37.2(t) defines *"Tenant"* as a *"person entitled by written or oral agreement, sub-tenancy approved by the landlord, or by sufferance, to occupy a residential dwelling unit to the exclusion of others."* (Note: A "tenancy at sufferance" is one that arises when a "...lease expires but the lessee holds over without the owner's consent...." *Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 740.)

### Providing Disclosure to Tenants

The above-referenced disclosure law does not say how the disclosure is to be provided to "tenants." While any method of delivery would appear to be sufficient to comply with the law (e.g., U.S. mail), delivery by a method resulting in proof of delivery or receipt is strongly recommended (e.g., FedEx). Also, the above-referenced law requires disclosure to "tenants." There is no language in this law limiting the disclosure to some but not all of the tenants. It is thus strongly recommended that Seller and Buyer provide the disclosure to *all* of the tenants at a property subject to this law.

BY SIGNING BELOW I/WE CONFIRM (A) RECEIPT OF THIS STATEMENT AND THE ATTACHED SFAR FORM ENTITLED "TENANTS' RIGHTS DISCLOSURE REQUIRED BY SELLERS BEFORE SELLING AND BUYERS AFTER BUYING" (B) THE OBLIGATION TO PROVIDE TENANTS WITH THE ATTACHED DISCLOSURE IS SOLELY THE SELLER'S "BEFORE PROPERTY...MAY BE SOLD" AND THE BUYER'S "WITHIN 30 DAYS AFTER ACQUIRING TITLE" AND (C) REAL ESTATE BROKERS/AGENTS ARE NOT OBLIGATED TO ENSURE TIMELY DELIVERY OF THE ATTACHED DISCLOSURE TO TENANTS EITHER BEFORE OR AFTER ESCROW CLOSES.

Buyer _____ Date _____ Buyer _____ Date _____

Seller _____ Date 10-18-16 Seller _____ Date _____
      *Kevin Singer, Court Receiver*

(Attach additional signature pages as necessary.)

NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY INFORMATION IN THIS STATEMENT FOR ANY SPECIFIC TRANSACTION. BROKERS/AGENTS CAN ADVISE ON REAL ESTATE TRANSACTIONS ONLY. FOR LEGAL OR TAX ADVICE, CONSULT A QUALIFIED ATTORNEY OR CPA.

Page 2 of 3
(Rev. 12/15)

Copyright © 2015 San Francisco Association of REALTORS®

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com

## TENANTS' RIGHTS DISCLOSURE REQUIRED BY SELLERS BEFORE SELLING AND BUYERS AFTER BUYING

(San Francisco Administrative Code §37.9(k))

SAN FRANCISCO ASSOCIATION OF REALTORS® STANDARD FORM

This form is intended for use in San Francisco

**SAN FRANCISCO**
**ASSOCIATION of REALTORS®**

**PROPERTY ADDRESS:** *Xelan- 1000-1022 Filbert St. and 4018-4022 19th St., San Francisco, CA 94133 and 94114*

By "Owner/Seller" to "Tenants" at the above-referenced Property given *"before"* sale of the Property (§37.9(k)(1)):

(A) "[T]enants cannot be evicted or asked to move solely because a property is being sold or solely because a new owner has purchased that property."

(B) "[T]enants cannot have their rent increased above that permitted by Chapter 37 solely because a property is being sold or solely because a new owner has purchased that property."

(C) "[T]he rental agreements of tenants cannot be materially changed solely because a property is being sold or solely because a new owner has purchased that property."

(D) "[T]he owner's right to show units to prospective buyers is governed by California Civil Code section 1954, including...tenants must receive notice as provided by Section 1954, and a statement that a showing must be conducted during normal business hours unless the tenant consents to an entry at another time."

(E) "[T]enants are not required to complete or sign any estoppel certificates or estoppel agreements, except as required by law or by the tenant's rental agreement...[T]enant rights may be affected by an estoppel certificate or agreement and...tenants should seek legal advice before completing or signing an estoppel certificate or agreement."

(F) "[I]nformation on these and other tenants' rights are available at the San Francisco Rent Board, 25 Van Ness Ave, San Francisco, California, and at the counseling telephone number of the Rent Board and at its web site."

By "New Purchaser/Buyer" to "Tenants" at the above-referenced Property given *"within [thirty] 30 days of acquiring title"* to the Property (§37.9(k)(2)):

(A) "[T]enants cannot be evicted or asked to move solely because a new owner has purchased that property."

(B) "[T]enants cannot have their rent increased above that permitted by Chapter 37 solely because a new owner has purchased that property."

(C) "[T]he rental agreements of tenants cannot be materially changed solely because a new owner has purchased that property."

(D) "[A]ny tenants, sub-tenants or roommates who were lawful occupants at the time of the sale remain lawful occupants."

(E) "[T]enants' housing services as defined in Section 37.2(r) first paragraph cannot be changed or severed from the tenancy solely because a new owner has purchased that property; and...tenants' housing services as defined in Section 37.2(r) second paragraph that were supplied in connection with the use or occupancy of a unit at the time of sale (such as laundry rooms, decks, or storage space) cannot be severed from the tenancy by the new purchaser/owner without just cause as required by Section 37.9(a)."

Disclosing Owner/Seller _____WSJ – Court Receiver_____ Date 10-18-18

Disclosing Owner/Seller _____ Date _____

Disclosing New Purchaser/Buyer _____ Date _____

Disclosing New Purchaser/Buyer _____ Date _____

(Attach additional signature pages as necessary.)

NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF THIS DISCLOSURE IN ANY SPECIFIC TRANSACTION. BROKERS/AGENTS CAN ADVISE ON REAL ESTATE TRANSACTIONS ONLY. FOR LEGAL OR TAX ADVICE, CONSULT A QUALIFIED ATTORNEY OR CPA.

## ADDENDUM TO COMMERICAL AND RESIDENTIAL INCOME LISTING AGREEMENT

Seller:    Kevin Singer, Superior Court Receiver for Superior Court of California, County of San Francisco, Case No. CGC-18-564941

Broker:    Vanguard Properties, Inc. ("Broker")

Property:    1000-1022 Filbert Street and 4018-4022 19th Street, San Francisco, California (the "Property")

This Addendum to Commercial and Residential Income Listing Agreement ("Addendum"), is attached and made a part of that certain Commercial and Residential Income Listing Agreement (the "Agreement") dated as of OCT 16, 2018, entered into concurrently herewith, by and between Kevin Singer, in his sole capacity as Superior Court Receiver ("Seller") in the Superior Court of California, County of San Francisco ("Court"), Case No. CGC-18-564941 (the "Case") and Vanguard Properties, Inc., a California corporation ("Broker"). In the event of any conflict between this Addendum and the provisions of the Agreement, the provisions of this Addendum shall prevail. The parties hereby modify and supplement the Agreement as follows:

1. **Additional Provisions.** Broker acknowledges and agrees to all the following terms and conditions:

    A) Seller is not the owner and/or original developer of the Property and that Seller intends to sell the Property solely in his capacity as the appointed superior court receiver and through his authorization as the receiver in the Case. Seller is not acting in his personal capacity and no liability or obligations shall accrue to him personally or any of his managers, attorneys, accountants, employees, agents, representatives, heirs, partners, other advisors, or lenders that directly or indirectly caused him to be appointed as receiver in the Case.

    B) As used in the Agreement and this Addendum, the terms "Owner" or "Seller" shall mean and refer to Seller herein named, acting solely in his capacity as receiver in the Case. As of the date of this Addendum, the record owner of the Property is Xelan Prop I, LLC, a California Limited liability company.

    C) All information regarding the Property which has previously been, or is hereafter, provided by Seller to Broker is for informational purposes only, and Seller makes no representations or warranties with regards to any of such information provided to Broker.

    D) Broker understands and agrees that any sale of the Property must be approved by order of the Court and include all-cash terms, and title will not be transferred subject to any indebtedness secured by the Property (other than real property secured taxes and assessments). The sale of the Property will be made on an "As-Is" basis and with all faults. The form and content of the agreement of

1

Addendum to Commercial and Residential Income Listing Agreement - Xelan

purchase and sale will also be subject to Seller's express written approval as to form, content and all material covenants, terms and conditions, in Seller's sole opinion and judgment. In light of the foregoing, the following provisions of the Agreement are hereby deleted and shall be of no force or effect: paragraphs 4.A(3), 4.C, 4.E, 6, 7 (but only as to those obligations thereunder imposed on Seller), 8, 10 (but only as to those obligations thereunder imposed on Seller), 14, 18, and 20.

E) Broker, Broker's successors, agents, assigns, affiliates and heirs hereby agree not to make any claim and/or seek any recourse against any of the following persons for any actual or alleged liability claimed by Broker against Seller arising out of the Agreement and/or this Addendum: the Seller personally; Seller's personal assets; Seller's partners (either general or limited); Seller's shareholders, members, managers, officers, directors, attorneys, advisors, accountants, agents, employees, heirs, or lenders that directly or indirectly caused, moved, applied for or requested Seller's appointment as receiver in the Case.

F) The Agreement is assignable to and shall bind any affiliate of Seller and any successor court-appointed receiver for the Property. Broker shall not assign the Agreement or delegate any obligations of Broker under the Agreement to anyone without Seller's prior written consent. Broker has no authority to bind Seller to any obligation. The Agreement (including this Addendum) can be modified only by a writing signed by both parties and, if so determined by Seller, with the approval of the Court.

2. **Seller Disclosure.** Broker acknowledges that Seller is a duly licensed California Real Estate broker.

3. **Waiver of Jury Trial and Jurisdiction For Any Legal Disputes.** Broker waives any and all right to a jury trial as to any legal dispute, proceeding or action arising out of the Agreement and/or this Addendum. Broker agrees that if there is any legal dispute, proceeding or action arising out of the Agreement and/or this Addendum, the court presiding over the Case at the time of filing any such legal dispute, proceeding or action, said court shall have full jurisdiction over any such legal dispute, proceeding or action. In addition, the court presiding over the Case retains jurisdiction to cancel the Agreement and/or this Addendum in entirety and or amend its terms. In the unlikely event that the court does cancel the Agreement and/or this Addendum, Broker shall be paid pursuant to the terms of the Agreement and this Addendum.

5. **Attorney's Fees.** In any dispute, action or proceeding between Broker and Seller arising out of the Agreement and/or this Addendum, the prevailing Broker or Seller shall be entitled to reasonable attorneys' fees and costs from the non-prevailing Broker or Seller.

6. **Severability.** If any term, provision, covenant or condition of the Agreement and/or this Addendum is held by a court of competent jurisdiction to be invalid, void or

2

Addendum to Commercial and Residential Income Listing Agreement - Xclan

unenforceable, the rest of the Agreement and/or this Addendum shall remain in full force and effect, and shall in no way be affected, impaired or invalidated.

7. **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California.

8. **Counterparts.** The Agreement and this Addendum, and any amendment hereof, may be signed in counterparts, all of which taken together shall constitute one original and may be delivered electronically in the form of executed scanned and/or faxed signatures; each of which shall have the same force and effect as the original signature.

Effective as of the date first mentioned above, the parties hereto agree to be bound by the covenants, terms and conditions set forth herein.

**BROKER**

Vanguard Properties, Inc.

By: _____
        Edward R. Deleski

Title:

**SELLER**

By: _____
        Kevin Singer in his sole capacity as
        Receiver in Superior Court of California,
        County of San Francisco Case No. CGC-18-564941

3



**CALIFORNIA
ASSOCIATION
OF REALTORS®**

**SELLER INSTRUCTION TO EXCLUDE LISTING
FROM THE MULTIPLE LISTING SERVICE**
(C.A.R. Form SELM, 7/13)

This is an addendum ("Addendum") to the ☒ Listing Agreement ☐ Other _____ ("Agreement")
dated _____ on property known as _____ Xelan- 1000-1022 Filbert St., & 4018-4022 19th St., _____
("Property"), in which _____ Kevin Singer, Court Receiver _____ is referred to as Seller
and _____ Vanguard Properties _____ is referred to as Broker.

1. **MULTIPLE LISTING SERVICE:** Broker is a participant/subscriber to the _____ SFAR _____ Multiple Listing Service (MLS). The MLS is a database of properties for sale that is available and accessible by all other real estate agents who are participants or subscribers to the MLS or a reciprocal MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Seller's Property is offered for sale.

2. **MANDATORY SUBMISSION TO MLS:** The MLS generally requires brokers participating in the service to submit all exclusive right to sell and exclusive agency listings for residential real property or vacant lots to the MLS within 2 (or ☐ _____ ) Days of obtaining all necessary signatures of the seller(s) on the listing agreement unless Broker submits to the MLS an instruction signed by Seller (such as this form or a local equivalent form) excluding the listing from the MLS.

3. **EXPOSURE TO BUYERS THROUGH MLS:** Listing property with an MLS exposes a seller's property to all real estate agents and brokers who are participants or subscribers to the MLS, or a reciprocal MLS, and potential buyer clients of those agents and brokers. The MLS may further transmit the MLS database to Internet sites that post property listings online.

4. **CLOSED/PRIVATE LISTING CLUBS OR GROUPS:** The MLS provides broad exposure for a listed property. Closed or private listing clubs or groups are not the same as the MLS: They are accessible to a much more limited number of licensees and provide less exposure for listed property. Whether listing property through a closed, private network – and excluding it from the MLS - is advantageous or disadvantageous to a seller, and why, should be discussed with the agent taking the seller's listing.

5. **IMPACT OF EXCLUSION OF PROPERTY FROM MLS:** If Property is excluded from the MLS, Seller understands and acknowledges that: (a) real estate agents and brokers from other real estate offices who have access to that MLS , and their buyer clients, may not be aware that Seller's Property is offered for sale; (b) information about Seller's Property will not be transmitted to various real estate Internet sites used by the public to search for property listings; and (c) real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property.

6. **IMPACT/REDUCTION OF EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers made and negatively impact the sales price.

7. **SELLER OPT-OUT:** Seller certifies that Seller understands the implications of not submitting Property to the MLS and instructs Broker as follows (Check one):
   A. ☐ Do not submit Property to the MLS for a period of _____ calendar days from the commencement of the listing.
   B. ☐ Do not submit Property to the MLS until _____ (date).
   C. ☒ Do not submit Property to the MLS during the entire listing period provided for in the Agreement.

**By signing below, Seller acknowledges that Seller has read, understands, accepts and has received a copy of this Addendum.**

Seller _____(signature)_____ Kevin Singer, Court Receiver Date 10-15-14
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

Seller _____ Date _____
Address _____ City _____ State _____ Zip 95448
Telephone _____ Fax _____ E-mail _____

Real Estate Broker (Firm) _____ Vanguard Properties _____ DRE Lic. # 01486075
By (Broker or Office Manager) _____ Edward Deleski DRE Lic. # 01450369 __ Date _____
Address 2501 Mission St _____ City San Francisco _____ State CA Zip 94110-2511
Telephone (415)350-9083 ____ Fax _____ E-mail _____

© 2013, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC,
a subsidiary of the California Association of REALTORS®,
525 South Virgil Avenue, Los Angeles, California 90020

SELM 7/13 (PAGE 1 OF 1)
SELLER INSTRUCTION TO EXCLUDE LISTING FROM MLS (SELM PAGE 1 OF 1)

Vanguard Properties, 2501 Mission St, San Francisco CA 94110      Phone: 4153217000      Fax:      1000 Filbert St
Edward Deleski      Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

# EXHIBIT 3

DocuSign Envelope ID: 2DB4D944-4360-4794-BF82-ABE279013687
DocuSign Envelope ID: 2CD1093C-8C74-466C-9D2C-B6AF048BF4CA

 **SAN FRANCISCO ASSOCIATION of REALTORS**

# SAN FRANCISCO PURCHASE AGREEMENT
SAN FRANCISCO ASSOCIATION OF REALTORS® STANDARD FORM
This is intended to be a legally binding contract for the purchase of real property in San Francisco.

_January 30, 2019_ _____ (Date Prepared)

_Kenneth M. Kaplan and/or Assignee, Brandon Kaplan, and/or Assignee_ ("Buyer")
offers to purchase the real property known as _4018 - 4022 19th Street, San Francisco, CA 94114_
or ☐ (if checked) this is a purchase of a _____ %-undivided interest in the entire Tenants-in-Common (TIC) property above pursuant
to the attached TIC Purchase Addendum (the "Property") for the Purchase Price of _Three Million, Six Hundred Fifty Thousand_
Dollars (**$3,650,000.00**) and upon the following TERMS and CONDITIONS.

**1. FINANCIAL TERMS:**

A. $ _109,500.00_ **INITIAL DEPOSIT** by electronic funds transfer or ☐ _____ check payable to Escrow Holder or to _____ ("Payee"); which Buyer or ☐ Buyer's Broker/Agent shall deposit with Payee within 2 or _____ business days of Acceptance of this Contract.

B. $ _____ **ADDITIONAL DEPOSIT** to be deposited with Escrow Holder ☐ within _____ days after Acceptance or ☐ on or before _____

C. $ _____ **NEW FIRST LOAN:** This Contract is contingent upon Buyer obtaining a new conventional or ☐ FHA ☐ VA ☐ other _____ first loan for a term of 30 or _____ years at an initial annual rate of interest not to exceed _____ % for a loan which is fixed for the entire term or ☐ fixed for an initial period of ☐ _____ year(s) or ☐ _____ month(s) and thereafter adjustable according to the lender's predetermined schedule, secured by a first deed of trust on the Property, with a loan fee of zero or not more than _____ points and on other terms and conditions satisfactory to Buyer. For an FHA/VA loan, an Amendatory Clause Addendum is attached.

D. $ _____ **OTHER FINANCING:** This Contract is contingent upon Buyer obtaining a new second loan or other additional financing on the following terms: ☐ Assumed Financing Addendum and/or ☐ Seller Financing Addendum are attached if checked.

E. $ _2,920,000.00_ **NON-CONTINGENT FINANCING:** Buyer intends to obtain new financing in the amount specified. Buyer acknowledges that the full amount may not be obtainable and that the terms and availability of loans are subject to change. Buyer acknowledges that obtaining financing is not a contingency of this Contract.

F. $ _620,500.00_ **CASH BALANCE** which shall be deposited by Buyer with Escrow Holder prior to Close of Escrow ("COE").

G. $ _3,650,000.00_ **PURCHASE PRICE, EXCLUDING CLOSING COSTS** (Total of A through F).

**2. ESCROW:** Escrow shall close on ☒ _20 Days after Confirmation_ (date) or ☐ (if checked) _____ days after Acceptance. If COE falls on a weekend or legal holiday, it shall be extended to the next business day. This Contract, including any addenda and counter offers, shall constitute escrow instructions of Buyer and Seller (the "Parties"). The Parties shall execute additional instructions consistent with this Contract and deliver them to _Orange Coast Title/Escrow_ ("Escrow Holder").

**3. FINANCING PROVISIONS:** Buyer affirms that only the loan(s) specified in Paragraph 1 are needed to complete this purchase and shall act diligently and in good faith to obtain them. If Buyer does not remove this financing contingency within 21 or _____ days after Acceptance, either Party may terminate this Contract. Brokers/Agents urge Buyer to personally confirm loan(s) will fund before removing the financing contingency. Buyer further represents that the funds required for the Deposits, Cash Balance and Closing Costs are available at Buyer's disposal, and that obtaining these funds is not a contingency of this Contract. Any credits to Buyer from any source shall be disclosed to Buyer's lenders. If the total credits exceed the lenders' limits then they shall be reduced accordingly with no adjustment in Purchase Price to make up the difference. Seller agrees to provide prompt access to the Property for appraisal purposes, but has no obligation to cooperate with Buyer's efforts to obtain any financing other than as specified herein.

**4. APPRAISAL:** This Contract is ☐ (if checked) subject to written appraisal at no less than the Purchase Price or $ _____. If Buyer does not remove this contingency within 15 or _____ days after Acceptance, either Party may terminate this Contract.

**5. AGENCY RELATIONSHIPS CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction:
Listing Agent ( _Vanguard Properties_ )     Selling Agent ( _Vanguard Properties_ )
is the agent of (check one)                 (if not the same as Listing Agent) is the agent of (check one)
☐ the Seller exclusively; or               ☐ the Buyer exclusively; or
☒ both the Buyer and Seller.               ☐ the Seller exclusively; or
                                           ☒ both the Buyer and Seller.

**DUAL AGENCY:** The Parties understand that if the same Brokerage company is designated as the Listing Agent and the Selling Agent, then that Brokerage is representing both Parties as a Dual Agent, to which the Parties consent.

**6. PHYSICAL POSSESSION:** Physical possession of the Property shall be delivered to Buyer upon recordation of the deed or ☐ (if checked) by 10 a.m. on _____ (time) on _____ (date). ☐ (if checked) An Addendum setting forth terms upon which Seller may continue to use the Property after COE is attached to and made a part of this Contract.

**7. OCCUPANCY:** Buyer intends (or ☒ does not intend) to occupy the Property as Buyer's residence.

Buyer's Initials _KMK_ _BSK_     Seller's Initials _L_/_ /_

Page 1 of 7
(Rev. 06/18)          Copyright © 2018 San Francisco Association of REALTORS®

397

DocuSign Envelope ID: 2D84D944-4360-4794-BF82-ABE279013687
DocuSign Envelope ID: 2CD1093C-6C74-486C-9D2C-B6AF04B5F4CA

Property: _____ 4018 - 4022 19th Street, San Francisco _____ Date: January 30, 2019

8.  **TITLE REVIEW:** Within 3 days after Acceptance, Buyer, at Buyer's expense, shall order a Preliminary Report ("Prelim") from Escrow Holder. A Prelim is only an offer to issue a policy of title insurance and may not contain every item affecting title. Buyer shall take title to the Property subject to all encumbrances, easements, rights, covenants, conditions, restrictions and other matters, whether of record or not, as of the day of Acceptance except (1) monetary liens which, unless otherwise agreed in writing, Seller will pay off from Seller's proceeds at COE; and (2) any matters which Seller has agreed in writing to remove prior to COE. Within 3 days after Acceptance, Seller shall disclose to Buyer all matters known to Seller affecting title, whether those matters are of record or not. Buyer's review and approval of the Prelim, and of all matters affecting title, is a contingency of this Contract. If Buyer does not remove this contingency within 5 or ____ days after receipt of the Prelim, either Party may terminate this Contract. At COE Buyer shall receive a grant deed conveying title including any acquired rights owned by Seller. (If the Property is a cooperative apartment Buyer shall receive a pledge or assignment of the stock and an assignment of the leasehold interest.) Title shall vest as specified by Buyer. The manner of taking title may have significant legal and tax consequences. Buyer should consult with their legal and tax advisors. Buyer should direct all questions regarding title insurance coverage, its cost, and the availability of enhanced coverages, such as those offered by an ALTA policy, to the Escrow Holder or Title Company.

9.  **ITEMS INCLUDED IN THE SALE:** To the extent owned by Seller, unless excluded in Paragraph 10 below, all existing fixtures and fittings attached to the Property and major appliances for which custom openings or encasements have been made are included, free of liens, in the Purchase Price, including electrical, lighting, plumbing and heating fixtures, hardware, solar systems, screens, awnings, shutters, window coverings, attached floor coverings, television antennas/satellite dishes and related equipment, water softening systems, air coolers or conditioners, pool and spa equipment, mailbox, garage door openers and transmitters, trees, shrubs and outdoor plants planted in the ground, private telephone systems, security systems and home automation systems, together with any dedicated hardware and/or applicable software and passwords needed to operate them.

A.  **PERSONAL PROPERTY ITEMS INCLUDED:** Items listed in the MLS, disclosures or marketing materials, are not included in the sale unless specified in this Contract. The personal property checked below, on the Property at Acceptance, is included in the sale, free of liens, but with no warranty of condition:

| | | | |
|---|---|---|---|
| ☒ All refrigerators | ☒ Washers and dryers | ☒ Microwave | |
| ☒ All ranges/stoves | ☐ Wine cooler | ☒ Freezer | ☐ See Additional Terms |

B.  **LEASED OR LIENED ITEMS:** If any included items are leased or liened, Seller shall identify them within 3 days of Acceptance and deliver to Buyer all leases, contracts, terms of use, and warranties, which shall be subject to Buyer's reasonable approval. If Buyer does not remove this contingency within 12 or ____ days after receipt of documents, either Party may terminate this Contract.

10. **ITEMS EXCLUDED FROM THE SALE:** All items owned by the staging company, which may include window coverings and mirrors; furniture attached only for earthquake safety; externally mounted audio-visual equipment (e.g. flat panel screens) and brackets (when removed, holes shall be repaired but not painted); and these additional exclusions:

11. **PRORATIONS AND EXPENSES:** The following shall be paid current and then prorated between Buyer and Seller as of COE: real property taxes (based upon the latest information available regarding the assessed value of the Property and the applicable tax rate); bonds and assessments; Homeowners' Association ("HOA") dues and assessments; interest on any loan(s) secured by the Property assumed by Buyer; premiums for any insurance on the Property assumed by Buyer; rents; and operating expenses. Buyer shall pay the escrow fee, title insurance premiums, any community enhancement fee, and any HOA transfer, certification and move-in fees. Seller shall pay the City and County transfer tax, any HOA move-out fee, and any prepayment penalty or other fees or charges imposed by lenders for loans being paid off through escrow. Unless specified in this Contract, all other prorations and expenses shall be paid by either Buyer or Seller in accordance with local custom. Buyer and Seller understand that the Property will be reassessed upon change of ownership. Supplemental tax bills will be sent to Buyer which will reflect a change in property taxes based on the Purchase Price becoming the new assessed value. Any tax bills issued after COE, for periods of time before COE, shall be paid by Seller.

12. **BUYER'S DUE DILIGENCE:** Brokers/Agents strongly recommend that Buyer obtain the inspection reports provided by Paragraph A and any further inspections recommended in those reports.

A.  **PROPERTY INSPECTIONS:** Buyer's obligations under this Contract are contingent upon Buyer's written approval, at Buyer's sole discretion, of the physical condition of the Property, including parking and storage availability, neighborhood issues, and any other matter reasonably affecting the Property. Within the time specified below, Buyer shall have the right to conduct inspections of the Property by contractors, engineers, architects, and/or other experts retained by Buyer, which inspections may include, but are not limited to, a general property inspection, a structural pest control inspection, the foundation, framing, roof, plumbing, sewer lines, heating, air conditioning, electrical and mechanical systems, built-in appliances, retaining walls, geologic conditions, pool/spa and related equipment, environmental hazards (such as asbestos, mold, electromagnetic fields, radon gas, lead-based paint or lead hazards, fuel or chemical storage tanks, and other materials or products), noise transmission, water/utility use restrictions, and location of property lines. Brokers/Agents do not certify or verify lot size, boundary lines or interior square footage, information contained in inspection reports, advertising, or representations of others. Seller shall permit the inspections upon receiving reasonable advance notice from Buyer. Buyer shall provide Seller with copies of all written reports received. During the due diligence period, Buyer may request that Seller make repairs or credit Buyer for the estimated costs of identified repair work, but Seller shall not be obligated to agree to any such request. If Buyer does not remove this contingency within 15 or ____ days after Acceptance, either Party may terminate this Contract.

Buyer's Initials   KML  BSL

Seller's Initials ____

Page 2 of 7
(Rev. 06/18)

Copyright © 2018 San Francisco Association of REALTORS®   (Contract)
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com   Kaplan PSA

398

DocuSign Envelope ID: 2D84D944-43694794-BF82-ABE279013687
DocuSign Envelope ID: 2CD1093C-6C74-466C-9D2C-B6AF6485F4CA

Property: _____ 4018 - 4022 19th Street, San Francisco _____ Date: January 30, 2019

**B. WAIVER OF PROPERTY INSPECTIONS:** If initialed below, Buyer waives the contingency established in Paragraph 12A above and the right to perform inspections. Buyer is aware that all real property and improvements contain defects and conditions which are not readily apparent and which may affect the value and/or desirability of the Property. Buyer and Seller acknowledge that Broker/Agents do not guarantee and in no way assume responsibility for the condition of the Property. Buyer also is aware of Buyer's own affirmative duty to exercise due diligence in observing the condition of and inspecting the Property to protect Buyer's interests. Buyer understands, acknowledges and agrees that any reports Buyer may have received from any source do not constitute representations or warranties by either Seller or Broker/Agents as to the past, present or future condition, use or development potential of the Property. Brokers/Agents strongly recommend that Buyer retain Buyer's own contractors and other appropriate experts to investigate the condition and suitability of all aspects of the Property including, but not limited to, all matters affecting its use, value and desirability for the purposes intended by Buyer. If Buyer waives any or all rights to perform the inspections as specified in Paragraph 12A above, then Buyer is proceeding against the advice of Brokers/Agents, and Buyer agrees to release Seller and Brokers/Agents from all claims, demands, and liabilities which in any way relate to or arise from any issue which might have been disclosed, detected and/or evaluated by such inspections.

Buyer's Initials _____ / _____ .   Buyer hereby waives the inspection contingency established by Paragraph 12A above.

13. **CONDOMINIUM / COOPERATIVE APARTMENT DISCLOSURE:** If the Property is a condominium or cooperative apartment, this Contract is contingent upon Buyer's review of the documents described below. Within 10 or _____ days after Acceptance, Seller, at Seller's expense, shall furnish Buyer with copies of the Property's legal description (including parking and storage spaces, if any), covenants, conditions and restrictions, articles of incorporation, bylaws, rules and regulations currently in force, the most recent financial statements of the HOA, a current operating budget, 1 year's minutes of HOA meetings, a Condominium Financial Disclosure Statement prepared by the HOA or its management company, and any other documents required by law. Seller shall also advise Buyer within this time of any delinquent or special but uncollected assessments, any anticipated extraordinary maintenance or repair expenses and any pending or anticipated litigation affecting the Property. Seller shall promptly notify Buyer of any new or revised HOA documents received by Seller prior to COE. If Buyer does not remove this contingency within 5 or _____ days after receipt of the documents, either Party may terminate this Contract. Buyer is hereby advised that any structural pest control or other inspections of common areas may be subject to the approval of, and limited in scope by, the HOA. If the Property is new construction or newly converted to condominiums, and this is the first sale of this unit, Buyer shall pay a pro-rata share of any new insurance policy placed on the entire building; otherwise Seller will not receive any credit for insurance, other than through a proration of the established periodic HOA fee for this unit as of COE.

☐ (If checked) The attached Cooperative Apartment Purchase Addendum is made a part of this Contract and the time frames specified in this Paragraph shall apply to that Addendum.

14. **RENTAL PROPERTY:** Buyer purchases the Property subject to existing leases and the rights of parties in possession. If it is intended that one or more tenant-occupied units be delivered vacant, the Parties should consult with a qualified San Francisco landlord-tenant attorney. Prior to COE, Seller agrees that no new (or changes to those existing) leases or rental agreements shall be entered into without Buyer's prior written consent, which consent shall not be unreasonably withheld. Within 3 days after Acceptance, Seller shall deliver all tenants written Rental Information Questionnaires, requesting from each tenant acknowledgment of the terms and conditions of the tenant's rental. Protected Tenant Status Information forms shall also be delivered by Seller to all eligible tenants. Within 7 or _____ days after Acceptance, Seller shall deliver to Buyer copies of all leases, rental agreements, applications and §6.14 notices as well as copies of all outstanding notices sent to tenants and Seller shall complete a Rental Property Statement which shall include: (1) any and all oral agreements with tenants; (2) uncured defaults by Seller or tenants; (3) claims made by Seller against tenants or by tenants against Seller in any court of law or to the San Francisco Rent Board or other government agencies, whether pending, threatened or resolved; (4) all tenants' deposits held by Seller, including any claimed offsets against those deposits; (5) any pass-throughs which constitute part of the existing rent, including the nature of the pass-through, the amount, and the period of time for which it is in effect; (6) which units include parking or storage spaces as part of the rent, whether any parking or storage spaces are rented to non-tenants, the amount received for each space, and the terms of any rental agreement or lease for the space; (7) each unit's rental status, with a disclosure and information on any buyouts if vacant or, from the start of the current tenant's occupancy, notices of rent increases, reductions, and/or changes to the terms of the tenancy; (8) any Default or Termination Notices served on tenants and, if the notices have been filed with the San Francisco Rent Board, proof of such filing; and (9) any requests from tenants for repairs, defective conditions, concessions or rent reductions, new services, or substitution of roommates. No later than 10 or _____ days after Acceptance, Seller shall deliver to Buyer all completed Rental Information Questionnaires and Protected Tenant Status Information forms returned by tenants to Seller. If any forms are returned after that day, Seller agrees to provide them to Buyer within 2 days of Seller's receipt. This contract is contingent upon Buyer's approval of the above documents, at Buyer's sole discretion. If Buyer does not remove this contingency within 7 or _____ days after receipt of the documents, either Party may terminate this Contract. Seller shall deliver to Escrow Holder prior to COE: (1) all tenant deposits, including security deposits, last month's rents, cleaning, key or other deposits, and any required interest accrued thereon through COE, which deposits and interest shall be disbursed to Buyer at COE; and (2) copies of any notice(s) of the transfer of deposits given by Seller to tenants.

Buyer's Initials [KAL] [BSL]

Seller's Initials [✓] / _____ (Contract)

Page 3 of 7
(Rev. 06/18)

Copyright © 2018 San Francisco Association of REALTORS®

Kaplan PSA

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

399

DocuSign Envelope ID: 2D84D944-4360-4794-BF82-ABE278013687
DocuSign Envelope ID: 2CD10B3C-8C74-466C-8D2C-B6AF04B5F4CA

Property: _____ 4018 - 4022 19th Street, San Francisco _____ Date: January 30, 2019

15. **INCOME AND EXPENSE STATEMENT:** [X] (If checked) Within 7 or ____ days after Acceptance, Seller shall deliver to Buyer a true and complete statement of the income and expenses of the Property for the current year and calendar years _____. This contract is contingent upon Buyer's approval of the statement(s), at Buyer's sole discretion. If Buyer does not remove this contingency within 7 or ____ days after receipt of the statement(s), either Party may terminate this Contract.

16. **RENTAL PERSONAL PROPERTY:** [X] (If checked) All personal property on the Property at Acceptance owned by Seller and used in operation of the Property is included. Seller shall provide, within 7 or ____ days after Acceptance, an inventory of the personal property.

17. **INTENT TO EXCHANGE PROPERTY:** [X] Buyer and/or [ ] Seller intends to include this Property in an IRC §1031 exchange, subject to the terms of the attached Addendum. Any exchange is not a contingency of this Contract unless specified as such in the Addendum or elsewhere. The other Party consents to an exchange on the condition that they incur no additional expense or liability.

18. **SALE OF BUYER'S PROPERTY:** [ ] This Contract is contingent upon the sale of another property owned by Buyer, as stated in the attached Addendum.

19. **SELLER'S MANDATED AND CONTRACTUAL DISCLOSURES:** The following disclosures shall be delivered to Buyer within 3 days of Acceptance. This Contract is contingent upon Buyer's review of these disclosures. If Buyer does not remove these contingencies within 5 or ____ days after Buyer's receipt of the disclosures or any amendment, either Party may terminate this Contract. Buyer shall return to Seller signed copies of all documents within 7 or ____ days of receipt. If prior to COE, Seller becomes aware of any inaccurate or undisclosed material facts, Seller shall amend Seller's disclosure accordingly. No amendment is required for any conditions of which Buyer is or becomes otherwise aware, or which are contained in reports given to or ordered by Buyer.

   A. **REAL ESTATE TRANSFER DISCLOSURE STATEMENT ("TDS"):** (Applies to properties with 1 to 4 residential units.) Unless exempt, Seller shall complete and deliver to Buyer a statutory TDS (Civil Code §1102), which shall be deemed complete when Seller has answered all questions and signed Section II, and the listing Broker/Agent has completed and signed Section III. If the TDS is provided to Buyer prior to Acceptance, there are no termination rights based on items disclosed.

   B. **SAN FRANCISCO SELLER DISCLOSURE:** (Applies to all properties.) Even if exempt from delivery of a TDS, Seller shall complete and deliver to Buyer the San Francisco Seller Disclosure, which shall be deemed complete when Seller has answered all applicable questions and initialed/signed each page.

   C. **NATURAL HAZARDS DISCLOSURE ("NHD"):** (Applies to all properties.) Seller shall provide an NHD report disclosing if the Property is located in a flood, fire, seismic hazard or other zone for which disclosure is required by law. If a TDS is required, the NHD report shall also disclose if the Property is in a special tax district or area.

   D. **EARTHQUAKE HAZARDS DISCLOSURE:** (Applies only to properties with 1 to 4 residential units built prior to 1960.) Seller shall deliver to Buyer the "Homeowner's Guide to Earthquake Safety" and complete a disclosure in compliance with Gov. Code §§897.

   E. **LEAD-BASED PAINT HAZARDS DISCLOSURE:** (Applies to all properties with residential units built prior to 1978.) Seller shall complete and deliver to Buyer a Lead-Based Paint Hazards Disclosure and Addendum in compliance with 42 U.S.C. §4852d.

   F. **BUILDING PERMIT HISTORY:** (Applies to all properties with residential units, except new construction.) Seller shall provide to Buyer a current Report of Residential Building Record ("3R"). Brokers/Agents do not investigate or verify the accuracy of the information contained in a 3R. Buyer is advised to investigate to Buyer's own satisfaction the status of zoning, permits or code compliance with the local planning department and not rely on the 3R to determine if the Property meets Buyer's intended uses.

   G. **OTHER DISCLOSURES:** Seller shall provide Buyer with all documents in Seller's possession needed to complete Seller's disclosure obligation.

20. **COMPLIANCE WITH OTHER LOCAL, STATE AND FEDERAL LAWS:** Buyer is advised to consult with the appropriate authorities to determine the extent to which other local, State and federal laws may affect the ownership and use of the Property.

   A. **SMOKE AND CARBON MONOXIDE DETECTORS:** Unless an exemption applies, State and local law requires that every residential property be properly equipped with approved and functioning smoke (or heat) and carbon monoxide detectors. If such detectors are not installed on the Property in accordance with applicable law, Seller shall install and pay for the detectors prior to COE.

   B. **WATER HEATERS:** California law requires water heaters to be strapped, braced or anchored to resist falling or displacement. The State Uniform Plumbing Code also requires that new or replacement water heaters located in a garage area be installed such that their ignition point is at least 18 inches above the floor. Different local authorities may have more stringent requirements. Seller shall bring water heaters into compliance prior to COE.

   C. **UNDERGROUND STORAGE TANKS ("USTs"):** The Parties acknowledge that Article 21 of the San Francisco Health Code requires owners of real property in San Francisco with USTs located on or immediately adjacent to the Property to file a plan for their closure within 30 days of discovery. If Seller has not provided Buyer with a written report by a licensed contractor specializing in USTs stating that no such tanks can be located, then Buyer is advised to conduct Buyer's own professional inspection, which Seller shall permit, irrespective of para. 12B. If the inspection reveals the existence of USTs, then Seller shall, at Seller's expense, remove them and complete any necessary remedial work to the Property prior to COE. Buyer may be responsible for USTs found after COE.

   D. **ENERGY AND WATER CONSERVATION:** Unless exempt, Seller shall order an energy and/or water conservation inspection. Seller shall pay for all requisite energy/water remediation work, not to exceed the maximum amount set by local law. Seller shall complete the work by COE and comply with all filing, recordation and other requirements.

**Buyer's Initials**

_LMb_ _BSb_

**Seller's Initials**

_JV_

Copyright © 2018 San Francisco Association of REALTORS®     (Contract)
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com       Kaplan PSA

DocuSign Envelope ID: 2D64D944-4360-4794-BF82-ABE279013687
DocuSign Envelope ID: 2CD1093C-6C74-466C-BD2C-B6AF0485F4CA

Property: _____ 4018 - 4022 19th Street, San Francisco _____ Date: _January 30, 2019_

21. **ILLEGAL UNITS OR ROOMS:** Buyer understands that units, rooms, or additions to the Property may not have been legally permitted. They may violate zoning ordinances, may have been built without building permits, and a certificate of final completion and occupancy may not have been issued. Buyer may be required to bring them into compliance or to remove kitchens or other facilities at Buyer's expense. A substantial fine may be imposed and Buyer may be prevented from renting any illegal units. Buyer is advised to obtain legal advice from a qualified San Francisco real estate attorney with respect to potential claims tenants renting illegal units may have.

22. **RESIDENTIAL RENT CONTROL ORDINANCE:** If the Property is located in San Francisco, Buyer is advised that there is in effect a Residential Rent Stabilization and Arbitration Ordinance, amended from time to time, which may severely affect Buyer's rights of ownership and right to move into the Property. Buyer is advised to research documents filed with the San Francisco Rent Board pertaining to the Property and to obtain legal advice from a qualified San Francisco landlord-tenant attorney.

23. **MEGAN'S LAW:** Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet website maintained by the Department of Justice at http://www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

24. **NOTICE REGARDING GAS AND HAZARDOUS LIQUID TRANSMISSION PIPELINES:** This notice is being provided simply to inform you that information about the general location of gas and hazardous liquid transmission pipelines is available to the public via the National Pipeline Mapping System (NPMS) Internet website maintained by the United States Department of Transportation at http://www.npms.phmsa.dot.gov. To seek further information about possible transmission pipelines near the Property, you may contact your local gas utility or other pipeline operators in the area. Contact information for pipeline operators is searchable by ZIP Code and county on the NPMS Internet website.

25. **RISK OF LOSS:** (Civil Code §1662) If the Property is materially destroyed prior to the transfer of title or delivery of possession to Buyer, Seller cannot enforce this Contract and Buyer is entitled to recover deposits already made.

26. **CONDITION OF PROPERTY:** Seller shall maintain this Property in the same general condition as when this Contract was signed by both Parties until possession is delivered to Buyer. Seller shall deliver the Property free of debris and in broom-clean condition and provide Buyer, at possession, with keys to all locks, mail boxes, alarms and garage doors; garage door remote controls and any codes or passwords. Buyer and Seller agree that Broker/Agents shall not be responsible for Seller's performance under this Paragraph.

27. **WALK-THROUGH:** Buyer shall have the right to make a final inspection of the Property within 5 or ___ days prior to COE, not as a condition of the sale but solely to confirm that: (a) the Property is in substantially the same condition as on the Date of Acceptance, unless otherwise agreed to in writing; and (b) Seller has complied with all additional written obligations regarding the condition of the Property.

28. **HOME WARRANTY PLANS:** Buyer and Seller acknowledge they are aware of the availability of home warranty plans which provide limited coverage against system and appliance failures, but have not relied upon any representation by Brokers/Agents regarding the extent of coverage of any such plan. ☐ (If checked) A 1-year home warranty plan shall be purchased at a cost not to exceed $_____, to be paid by _____, with the cost of any additional coverage borne by Buyer. Or ☐ A home warranty plan is declined by Buyer.

29. **BROKERS/AGENTS:** No Brokers or Agents are parties to this Contract between Buyer and Seller. The term "Brokers/Agents" as used in this Contract shall mean the licensees who have served as real estate brokers or agents for either the Buyer or the Seller in the preparation, negotiation and review of this Contract.

30. **TAX WITHHOLDING:** The California Revenue and Taxation Code §18662 requires Buyer to withhold from Seller's proceeds 3 1/3% of the gross sale price, unless Seller signs an affidavit stating that the Property has been Seller's principal residence as defined in IRC §121, or another exemption applies. Further, if Seller is a foreign person or corporation, as defined in the Foreign Investment in Real Property Tax Act (FIRPTA), Buyer must, unless an exemption applies, withhold from Seller's proceeds up to 10% of the gross sale price of the Property. At least 7 or ___ days prior to COE, the Parties shall deliver to Escrow Holder, acting as a Qualified Substitute under IRC §1445 and a State REEP, all documentation necessary to carry out the provisions of these laws. The Parties instruct Escrow Holder to deduct from Seller's proceeds any amounts required. If Escrow Holder receives a Non-Foreign affidavit from Seller, they shall give Buyer a Qualified Substitute Statement attesting to that, under penalty of perjury, prior to COE.

31. **NON-CONFIDENTIALITY OF OFFERS:** Buyer is advised that Seller or Seller's representatives may not treat the existence, terms or conditions of offers as confidential unless such is required by law, regulation or a pre-existing agreement between the Parties.

32. **TIME:** Time is of the essence. All references to "days" shall mean calendar days, expiring at 11:59 p.m., unless otherwise specified.

33. **DELIVERY OF DOCUMENTS:** All documents to be delivered by a Party under this Contract, including but not limited to the Acceptance, contingency removals, and/or any termination notice issued by Buyer or Seller, shall be in writing and effective only upon personal receipt by the other Party or that Party's Broker/Agent. Delivery by any method (e.g. personal, mail, fax, e-mail, etc.) is effective.

34. **MULTIPLE LISTING SERVICE:** The Parties hereby grant to the San Francisco Association of REALTORS® Multiple Listing Service ("MLS") the right to publish and disseminate the sales price, terms of this Contract and other information about the Property and authorize their respective Brokers/Agents to submit such information under the applicable MLS rules.

Page 5 of 7 (Rev. 06/18)

Buyer's Initials: _LML_ _BSK_     Seller's Initials: _/ /_     (Contract)

Copyright © 2018 San Francisco Association of REALTORS®
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com
Kaplan PSA

DocuSign Envelope ID: 2D84D944-4360-4794-BFB2-ABE279013687
DocuSign Envelope ID: 2DD1083C-6C74-486C-9B2C-B6AF0485F4CA

Property: _____ 4018 - 4022 19th Street, San Francisco _____ Date: January 30, 2019

35. **MEDIATION OF DISPUTES:** If a dispute arises regarding this Contract, Buyer and Seller agree to first attempt to settle the dispute by non-binding mediation before resorting to court action or binding arbitration. In mediation, a mutually acceptable resolution is sought rather than a settlement being imposed on the Parties. Mediation fees shall be paid equally by Buyer and Seller. The C.A.R. Real Estate Mediation Center for Consumers (www.consumermediation.org) shall be used, unless another mediation provider is mutually agreed to by the Parties. This Paragraph shall not apply to any disputes within the jurisdictional limits of Small Claims Court. Any Party who fails or refuses to mediate as required by this Paragraph, shall not be entitled to any attorney's fees award under this Contract. A court action filed to obtain a provisional remedy, including a notice of pending action or to stop the expiration of a statute of limitations, shall not be a violation of this Paragraph provided the Party commencing the action agrees, pending mediation, to a stay of the court action. This Paragraph shall apply regardless of whether the Parties also agree to arbitration.

36. **ARBITRATION OF DISPUTES:** Any dispute or claim in law or equity arising out of this Contract or any resulting transaction shall be decided by neutral binding arbitration in accordance with the rules of JAMS and not by court action, except as provided by California law for judicial review of arbitration proceedings. The Parties shall have the right to discovery in accordance with Code of Civil Procedure §1283.05. Arbitrators can award compensatory damages, punitive damages, and/or order specific performance, injunctive relief and declaratory relief. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The following matters are excluded from arbitration hereunder: (a) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or real property sales contract as defined in Civil Code §2985; (b) an unlawful detainer action; (c) the filing or enforcement of a mechanic's lien; (d) any matter which is within the jurisdiction of a probate court or a Small Claims Court; or (e) an action for bodily injury or wrongful death. The filing of a judicial action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the right to arbitrate under this provision.

"NOTICE: BY INITIALLING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALLING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."

"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."

Buyer's Initials /     Seller's Initials /

37. **LIQUIDATED DAMAGES:** If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than 3% of the Purchase Price. Any excess shall be returned to Buyer. Release of funds will require mutual, signed release instructions from both Buyer and Seller, judicial decision or arbitration award. BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES AGREEMENT FOR ANY INCREASED DEPOSIT.

Buyer's Initials /     Seller's Initials /

38. **LEGAL ADVICE ON ARBITRATION AND LIQUIDATED DAMAGES:** Buyer and Seller acknowledge that they have not received or relied upon any representation by Brokers/Agents regarding Arbitration and Liquidated Damages and that they have been advised by Brokers/Agents to seek legal advice from a qualified real estate attorney. In the event only one Party initials either clause (Arbitration or Liquidated Damages), that clause shall not be part of this Contract as formed.

39. **ATTORNEYS' FEES:** In any action, proceeding or arbitration between Buyer and Seller arising out of this Contract, the prevailing Party shall be entitled to reasonable attorney fees and costs from the non-prevailing Party.

40. **ACCEPTANCE:** Under this Contract, Acceptance occurs only when Seller signs Buyer's original offer and Addenda without any changes and a signed copy is delivered to Buyer or Buyer's Broker/Agent, OR when the last of any counter-offers has been signed by the receiving Party without any changes and a signed copy of that counter-offer is delivered to the issuing Party. Signed means by application of a written signature or, to the fullest extent allowed by California law, an electronic signature on an original document, counterpart, photocopy or electronic copy. The Parties agree that electronic means will not be used by either of them to alter the content or integrity of the Contract.

41. **REMOVAL OF CONTINGENCIES:** Buyer's removal of contingencies established in this Agreement requires a written Contingency Removal, ☐ attached if checked.

Page 6 of 7    Buyer's Initials /     Copyright © 2018 San Francisco Association of REALTORS®    Seller's Initials /   (Contract)
(Rev. 06/18)

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com   Kaplan PSA

402

DocuSign Envelope ID: 2D84D944-4360-4794-BF82-ABE279013687
DocuSign Envelope ID: 2CD1093C-6C74-468C-9D2C-B6AF0485F4CA

Property: _____ 4018 - 4022 19th Street, San Francisco _____    Date: January 30, 2019

**42. TERMINATION:** The following provisions apply except for a good faith exercise by either Party of a contractual contingency or a statutory right to terminate which can be done unilaterally by notice by a Party. Termination of this Contract by Seller shall be effected only after delivery of a Notice to Perform to Buyer which provides at least 2 days to perform contractual terms or remove contingencies. In the event that Buyer does not perform as noticed, Seller may terminate this Contract. Termination of this contract due to Seller's failure to perform contractual terms or remove contingencies, including Seller's failure to provide documents or reports mandated by this Contract or otherwise required by law, or Seller's failure to remove a Seller contingency, shall be effected only after delivery of a Notice to Perform to Seller which provides at least 2 days to perform as noticed. In the event that Seller does not perform as noticed, Buyer may terminate this Contract. Either Party may issue a Notice to Perform no sooner than 2 days prior to the contractual deadline. The obligation to close escrow will require mutually consistent signed instructions from both Buyer and Seller, or the rendering of a judicial decision or arbitration award authorizing the release.

**43. BROKERS' COMPENSATION:** The Parties irrevocably instruct Escrow Holder to disburse to Brokers at COE compensation from funds in escrow in accordance with the terms set forth in the listing agreement for the Property or other compensation agreement. Compensation instructions can be amended or revoked only with the written consent of Listing and Selling Brokers.

**44. GENERAL PROVISIONS:** This Contract contains the entire agreement of the Parties. Any purported or prior agreement or representation respecting the Property or the duties of Buyer and Seller in relation thereto which is not expressly set forth herein is null and void. No amendment to or modification of this Contract shall be valid or enforceable unless in writing and signed by Buyer and Seller. This Contract shall be binding upon, and inure to the benefit of, the Parties' respective heirs, successors and assigns.

**45. REPRESENTATIVE CAPACITY:** The Parties acknowledge and accept that ☐ a Buyer and/or ☒ a Seller is signing this Agreement and the related transaction disclosures and documents as a representative, not as an individual, and agrees to provide a Representative Capacity Signature Disclosure form, with evidence of the authority to so act, to the other Party within 3 days of Acceptance.

**46. WIRE FRAUD:** The Parties acknowledge the risk of wire fraud and agree they are solely responsible for their own funds.

**47. ACKNOWLEDGMENT OF RECEIPT:** The Parties hereby acknowledge receipt of a copy of this Contract and represent that they have read, and that they understand, its provisions.

**48. ADDITIONAL TERMS AND CONDITIONS** including all attached Addenda signed by Buyer and Seller shall be deemed a part of this Contract. _Addendum to Purchase Sale Agreement Dated January 30th, 2019._

**49. EXPIRATION:** This offer shall be deemed revoked unless a copy of this Contract with Seller's signature accepting it is delivered to Buyer or Buyer's Broker/Agent within 24 or _____ hours of presentation to Seller, or ☐ (if checked) not later than _____ (time) on _____ (date).

NO REPRESENTATION IS MADE AS TO THE LEGAL SUFFICIENCY OR VALIDITY OF ANY PROVISION OF THIS CONTRACT FOR ANY SPECIFIC TRANSACTION. BROKERS/AGENTS CAN ADVISE ON REAL ESTATE TRANSACTIONS ONLY. FOR LEGAL OR TAX ADVICE, CONSULT A QUALIFIED ATTORNEY OR CPA.

Buyer _Kenneth M Kaplan_    Date 1/30/2019    Buyer _(signature)_    Date 1/30/2019
_Kenneth M. Kaplan and/or Assignee_    _Brandon Ehrlich and/or Assignee_

**ACCEPTANCE**

The undersigned Seller hereby accepts the foregoing offer and agrees to sell the Property on the terms and conditions set forth herein, OR ☒ (if checked) accepts the above terms and conditions as amended by Seller's Counter Offer and ☐ Back-Up Offer Addendum.

Seller _(signature)_    Date 2-1-19    Seller _____    Date _____
_Kevin Singer, Court Appointed Receiver_

---

**BROKER/AGENT COMPENSATION AGREEMENT AND ACKNOWLEDGMENT OF AGENCY RELATIONSHIPS**

Listing Broker agrees to assign and pay to Selling Broker from the commission as set forth in a separate written listing agreement between Seller and Listing Broker, the amount specified in the MLS, or ☐ (if checked) in a separate written agreement between the Brokers. Any percentages shown shall be based upon the Purchase Price, unless otherwise specified. Broker(s) hereby agree to the terms and conditions for compensation stated above and acknowledge the agency relationships confirmed in this Contract.

Selling Broker _Vanguard Properties_    DRE License # _01486075_

By (Broker/Agent for Buyer) _(signature)_    Date 1/30/2019    DRE License # _01450369_
_Edward Deleski_

Listing Broker _Vanguard Properties_    DRE License # _01486075_

By (Broker/Agent for Seller) _(signature)_    Date 1/30/2019    DRE License # _01450369_
_Edward Deleski_

Reviewed by Managing Broker _____    Date _____

Page 7 of 7
(Rev. 06/18)

Copyright © 2018 San Francisco Association of REALTORS®    (Contract)
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com    Kaplan PSA.

DocuSign Envelope ID: 05CEED5E-18CF-485B-BA34-F6A5E630D529

## ADDENDUM TO SAN FRANCISCO PURCHASE AGREEMENT

**Seller: Kevin Singer, Superior Court Receiver for Superior Court of California, County of San Francisco, Case No. CGC-18-564941**

**Buyer: Kenneth M. Kaplan and Brandon Kaplan ("Buyer")**

**Address: 4018-4022 19th Street, San Francisco California 94114 (the "Property")**

This *Addendum To San Francisco Purchase Agreement* ("Addendum"), is attached and made a part of that certain *San Francisco Purchase Agreement* with a prepared date of January 30, 2019, as supplemented by (i) Addendum to SFAR Purchase Sale Agreement of same date, and (ii) Seller Counter Offer 1 of same date (collectively, the "Agreement") entered into concurrently herewith by and between Kevin Singer ("Seller"), solely in his capacity as Superior Court Receiver in the Superior Court of California, County of San Francisco (the "Court"), Case No. CGC-18-564941 (the "Case"), and Kenneth M. Kaplan and Brandon Kaplan (jointly, the "Buyer"). In the event of any conflict between this Addendum and provisions of the Agreement, the provisions of this Addendum shall prevail. The parties hereby modify and supplement the Agreement as follows:

1.  **No Liability by Seller.** Buyer acknowledges and agrees to the following terms and conditions:

    A)  Seller is not the owner or original developer of the Property. Seller is selling the Property solely in his capacity as the appointed receiver through his authorization to sell the Property in the Case. Seller is not acting in his personal capacity and no liability or obligations shall accrue to him personally or to any of his managers, attorneys, accountants, employees, agents, representatives, heirs, partners, other advisors, or lenders that directly or indirectly caused him to be appointed receiver in the Case.

    B)  As used in the Agreement and this Addendum, the term "Seller" shall mean and refer to Seller herein named, acting solely in his capacity as receiver in the Case. As of the date of this Addendum, the record owner of the Property is Xelan Prop I, LLC, a California Limited liability company ("Owner").

    C)  Buyer acknowledges that the Owner's existing loan that is secured by a deed of trust encumbering the Property is in default and is the subject of the receivership action in the Case, and that the Owner and certain other persons may have the right to reinstate the loan, or repay the loan in full, and retake possession of the Property. Buyer acknowledges and agrees that upon any such reinstatement or repayment of the Loan prior to the close of escrow for Buyer's purchase of the Property, the Agreement and Buyer's right to purchase the Property shall automatically be terminated and be of no further force or effect, and Buyer's deposit shall be returned to Buyer. Upon any such termination, Seller shall not be liable for any damages, loss, cost, expense or liability incurred or suffered by Buyer arising out of or in connection with the Agreement or its termination or any of the proceedings under or connected with the Case.

63365077v2

404

· DocuSign Envelope ID: 05CEED5E-18CF-485B-BA34-F6A5E630D529

D) All information regarding the Property that has previously been or is hereafter provided by Seller to Buyer is for informational purposes only and Seller makes no representations or warranties with regard to any of such information provided to Buyer.

E) Buyer, Buyer's successors, agents, assigns, affiliates and heirs hereby agree not to make any claim and/or seek any recourse for any actual or alleged liability against Seller arising out of the Agreement and/or this Addendum, either to Seller personally, or against Seller's personal assets, Seller's partners (either general or limited), shareholders, members, managers, officers, directors, attorneys, accountants, agents, employees, advisors, heirs, or lenders that directly or indirectly caused or motioned Seller's appointment as Receiver.

2.  **Other Modifications.** The Agreement is further modified as follows:

A) The following provisions of the Agreement are hereby deleted and shall be of no force or effect: (i) Paragraph 14, except the first sentence thereof; and (ii) Paragraphs 35 (Mediation of Disputes), 36 (Arbitration of Disputes), and all other provisions and clauses that refer to arbitration or mediation.

B) In the Agreement, wherever a specific number has been inserted in a line or other space of the Agreement and is immediately preceded by another preprinted number (in boldface type) and the word "or", the preceding preprinted number shall be disregarded.

3.  **Seller Disclosure.** Buyer acknowledges that the Seller is a duly licensed California Real Estate Broker.

4.  **No Warranties.** BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PROPERTY IN ITS "AS-IS/WHERE-IS" CONDITION, "WITH ALL FAULTS," SOLELY IN RELIANCE ON BUYER'S OWN INDEPENDENT INVESTIGATION, ANALYSIS AND EVALUATION OF THE PROPERTY AND ALL OTHER ASPECTS OF THE TRANSACTION CONTEMPLATED BY THE AGREEMENT AND/OR THIS ADDENDUM AND NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, HAVE BEEN MADE BY SELLER, SELLER'S AGENTS, OR ANY OTHER PERSON OR ENTITY ACTING FOR OR ON BEHALF OF SELLER, INCLUDING, WITHOUT LIMITATION, THE STRUCTURAL INTEGRITY OF ANY IMPROVEMENTS ON THE LAND; THE CONFORMITY OF THE IMPROVEMENTS TO ANY PLANS OR SPECIFICATIONS FOR THE PROPERTY THAT MAY BE PROVIDED TO BUYER; THE CONFORMITY OF THE PROPERTY TO APPLICABLE ZONING OR BUILDING CODE REQUIREMENTS; THE EXISTENCE OF SOIL INSTABILITY; PAST SOIL REPAIRS; SUSCEPTIBILITY TO LANDSLIDES; SUFFICIENCY OF SHORING OR FOUNDATIONS; SUFFICIENCY OF DRAINAGE; OR ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE PROPERTY OR ANY IMPROVEMENTS SITUATED THEREON. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT WITH RESPECT TO ALL INFORMATION, WHETHER WRITTEN, ORAL, OR IN THE FORM OF MAPS, SURVEYS, PLATS, SOIL SPECIFICATIONS, OR ANY OTHER INFORMATION WHATSOEVER, WITHOUT EXCEPTION, PERTAINING TO THE PROPERTY, ANY AND ALL RECORDS AND OTHER DOCUMENTS PERTAINING TO THE USE AND OCCUPANCY OF THE PROPERTY, THE INCOME THEREOF, THE COST AND EXPENSE OF MAINTENANCE THEREOF, AND ANY AND ALL OTHER MATTERS CONCERNING THE CONDITION, SUITABILITY, INTEGRITY,

2

6336507722

DocuSign Envelope ID: 05CEED5E-18CF-485B-BA34-F6A5E630D529

MARKETABILITY, COMPLIANCE WITH LAW, OR OTHER ATTRIBUTES OR ASPECTS OF THE PROPERTY PROVIDED TO BUYER, SELLER HAS NEITHER VERIFIED THE ACCURACY OF SAME NOR THE QUALIFICATIONS OF THE PERSONS PREPARING SUCH INFORMATION, AND SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT THERETO. BUYER ASSUMES ANY AND ALL LIABILITY ARISING FROM ANY RELIANCE THAT BUYER PLACES THEREON IN MAKING THE PURCHASE CONTEMPLATED BY THE AGREEMENT AND/OR THIS ADDENDUM. BUYER ASSUMES ALL RISKS WITH RESPECT TO ALL ATTRIBUTES AND CONDITIONS OF THE PROPERTY, INCLUDING THE LAND AND ANY IMPROVEMENTS THEREON, AND BUYER EXPRESSLY ASSUMES ALL RISK AND LIABILITY FOR DAMAGES ARISING THEREFROM. THESE PROVISIONS SHALL SUPERSEDE ANY AND ALL INCONSISTENT PROVISIONS RELATING TO THE SUBJECT MATTER HEREOF AND SHALL SURVIVE THE CLOSE OF ESCROW.

5. **Waiver of Jury Trial and Jurisdiction For Any Legal Disputes.** Buyer waives any and all right to a jury trial as to any legal dispute, proceeding or action between Buyer and Seller arising out of the Agreement, this Addendum, and/or the sale of Property. Buyer agrees that if there is any legal dispute, proceeding or action between Buyer and Seller arising out of the Agreement, this Addendum, and/or the sale of Property, the Court presiding over the Case at the time of the filing any such legal dispute, proceeding or action, shall have full jurisdiction over any such legal dispute, proceeding or action. In addition, the Court presiding over the Case also retains jurisdiction to cancel the Agreement or sale of the Property in its entirety and/or amend the terms of the sale.

6. **Attorneys Fees.** In any dispute, action or proceeding between Buyer and Seller arising out of the Agreement, this Addendum, and/or the sale of the Property, the prevailing Buyer or Seller shall be entitled to reasonable attorneys' fees and costs from the non-prevailing Buyer or Seller.

7. **Court Confirmation; Closing.** Buyer understands and agrees that any sale of the Property must be approved by order of the Court. Buyer also acknowledges and agrees that if an overbid is submitted by another prospective purchaser of the Property in any hearing to approve the Agreement and the Court in the Case approves an overbid by such purchaser, and enters an order in the Case approving such overbid, then the Agreement and Buyer's right to purchase the Property shall automatically be terminated and be of no further force or effect. Upon any such termination, Seller shall not be liable for any damages, loss, cost, expense or liability incurred or suffered by Buyer arising out of or in connection with the Agreement or its termination or any of the proceedings under or connected with the Case. However, Seller agrees to a $25,000 break-up fee at close of escrow if Buyer is overbid during confirmation proceedings and, as a result is not the successful purchaser of the property. Buyer shall close the sale within twenty (20) days after the court confirmation and overbid hearing. If Buyer fails to close the sale within said time frame, Buyer will forfeit Buyer's non-refundable deposit if the failure to timely close the sale is through no fault of Seller.

8. **Severability.** If any term, provision, covenant or condition of the Agreement and/or this Addendum is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of the Agreement and/or this Addendum shall remain in full force and effect, and shall in no way be affected, impaired or invalidated.

DocuSign Envelope ID: 05CEED5E-18CF-485B-BA34-F6A5E630D529

9. **Counterparts**. The Agreement and this Addendum may be signed in counterparts, all of which taken together shall constitute one original and may be executed with scanned and/or faxed signatures, each of which shall have the same force and effect as the original signature.

*[Signatures of the parties, including in counterpart, appear on the following page(s)]*

ADDENDUM TO SAN FRANCISCO PURCHASE AGREEMENT

4

63365077v2

DocuSign Envelope ID: 05CEED5E-18CF-485B-BA34-F6A5E630D529

The parties hereto, agree to be bound to the terms and conditions set forth herein.

Buyer:

Kenneth M. Kaplan

Kenneth M. Kaplan

Brandon Kaplan

Seller:

Kevin Singer, solely in his capacity as
Receiver in Superior Court of California,
County of San Francisco, Case No.
CGC-18-564941

ADDENDUM TO SAN FRANCISCO PURCHASE AGREEMENT

5

63363077v2

DocuSign Envelope ID: 2D84D944-4360-4794-BF82-ABE279013687
DocuSign Envelope ID: 2CB1093C-6C74-488C-9D2C-B8AF0486F4CA

## ADDENDUM TO SFAR PURCHASE SALE AGREEMENT

**Purchase Sale Agreement:** 4018-4022 19th Street, San Francisco CA 94114

**Date:** January 30th, 2019

**Buyer:** Kenneth Kaplan, and/or Assignee and Brandon Kaplan, and/or Assignee

**Seller:** Kevin Singer, Court Receiver

1. Overbid shall be set at $200,000 above current purchase price, and $200,000 increments, thereafter. In the event of an overbid, Buyer shall have the right to match the amount of the overbid.

2. Seller agrees to a $25,000 break-up fee if Buyer is overbid during confirmation proceedings and, as a result, is not the successful purchaser of the property, within 25 days after such confirmation proceedings.

3. Unit 4 to be delivered vacant, not leased, and free of personal property at close of escrow.

4. Seller shall cure all open Notices of Violation and Notices of Abatement, and correct items identified by San Francisco Department of Building Inspection (SF DBI) Complaints, 201793151, 701791811, 201604631, and any additional complaints which may arise prior to close of escrow. Correction of Violations and Abatements to be reflected on SF DBI's 3R Report and website, no less than 5 business days prior to close of escrow. If Seller does not comply and correct items identified as Notice of Violations and Notice of Abatement, and/or if unit 2 is not legalized, no less than 5 business days prior to the date on which escrow is scheduled to close, then the Purchase Price shall be reduced by $700,000.

5. Regarding Section 8: Seller agrees to remove items 11, 13, 14, 21, 26, 27, 29, 30 and 31 as described in Orange Coast Title Company's Preliminary Title Report, Order No. 150-1945655-07, dated January 4th 2019, prior to close of escrow.

6. All other terms and conditions to remain.

_____
Kenneth Kaplan, and/or Assignee    1/30/2019

_____
Brandon Kaplan, and/or Assignee    1/30/2019

_____
Kevin Singer, Court Receiver

DocuSign Envelope ID: 2D84D944-4360-4794-BF82-ABE279013687

## SELLER COUNTER OFFER 1

With reference to the San Francisco Purchase Agreement prepared on January 30th, 2019 for the property known as 4018-4022 19th Street, San Francisco CA 94114, between Kenneth Kaplan, and/or Assignee and Brandon Kaplan, and/or Assignee ("Buyer") and Kevin Singer, Court Receiver ("Seller").

1.   TERMS: The terms and conditions of the Offer and preceding Counter Offers are accepted subject to the following:

   A.   Paragraphs in the Offer which require initials by all parties, but are not initialed by all parties, are excluded from the final agreement unless specifically referenced below or in another counter offer.

   B.   Unless otherwise agreed in writing below or in another counter offer, the sum of the initial and additional deposits, and the new first loan amount will be maintained in the same percentages of the purchase price as in the original offer.

   C.

      1.   Seller does not agree to item 4 of Addendum to Purchase Sale Agreement Dated January 30th, 2019.

      2.   Seller shall cure all open Notices of Violation and Notices of Abatement, and correct items identified by San Francisco Department of Building Inspection (SF DBI) Complaints, 201793151, 701791811, 201604631, and any additional complaints which may arise prior to close of escrow. Correction of Violations and Abatements to be reflected on SF DBI's 3R Report and website, no less than 5 business days prior to close of escrow.

      3.   If Notices of Violation and/or Notices of Abatement related to legalization of unit no. 7 are not cured, and unit no. 7 is not "legalized", no less than 5 business days prior to the date on which escrow is scheduled to close, purchase price shall be reduced by $400,000.

      4.   If Notices of Violation and/or Notices of Abatement related to issues other than the legalization of unit no. 7 are not cured, no less than 5 business days prior to the date on which escrow is scheduled to close, purchase price shall be reduced by $100,000.

      5.   All other terms and conditions to remain.

DocuSigned by:
_Kenneth M. Kaplan_
Kenneth Kaplan, and/or Assignee   2/6/2019

DocuSigned by:
_BK_
Brandon Kaplan, and/or Assignee   2/6/2019

_Kevin Singer_
Kevin Singer, Court Receiver

DocuSign Envelope ID: AFD33780-8E4E-4D94-AE7F-54E4D80D827A

 **SAN FRANCISCO**
**ASSOCIATION of REALTORS**

# CONTINGENCY REMOVAL # 1
### SAN FRANCISCO ASSOCIATION OF REALTORS ® STANDARD FORM
This form is intended for use in San Francisco

Contingency Removal for the San Francisco Purchase Agreement dated _____**February 1, 2019**_____ (Date Prepared)
for the Property known as _____**4018-4022 19th Street, San Francisco, CA 94114**_____
between _____**Kenneth Kaplan, and/or Assignee, Brandon Kaplan, and/or Assignee**_____ ("Buyer")
and _____**Kevin Singer, Court Receiver**_____ ("Seller").

By checking a box below, Buyer acknowledges that Buyer (a) has had the opportunity to inspect or has received documents pursuant to the referenced items in the San Francisco Purchase Agreement (Buyer has signed, or agrees to sign, copies of said documents for Broker/Agent's transaction file) and (b) is fully satisfied with the matters addressed in the referenced paragraph of the Contract. Except for information contained in Seller's and Broker/Agent's Disclosure Statements, Buyer has not relied upon Seller's or Broker/Agent's representations as to the condition of the Property.

| Check | Contract Paragraph and Terms |
|---|---|
| ☐ | 1 — Financing Provisions |
| ☐ | 4 — Appraisal |
| ☐ | 8 — Title Review (subject to the Exceptions noted below) |
| ☐ | 9B — Leased or Liened Items |
| ☐ | 12A — Property Inspections (subject to the Exceptions noted below) |
| ☐ | 13 — Condominium Disclosure (including parking and storage spaces, CC&Rs, Bylaws, Articles of Incorporation, rules and regulations, budget, financial statements of the Homeowners Association, one year's minutes of the Homeowners Association meetings, and any other condominium documents required by law or this Contract) |
| ☐ | 14 — Rental Property (including copies of all leases and rental agreements, copies of all outstanding notices sent to tenants, notification of any pass-throughs which constitute part of the existing rent, which units include parking as part of the rent, whether or not any parking spaces are rented to non-tenants, vacant unit disclosures, any buyout agreements, the rental history of each unit from the date of each tenant's occupancy to the present, notices of rent increases, rental information questionnaires and protected tenant status forms received back from tenants) |
| ☐ | 15 — Income and Expense Statement (for the current year and prior requested years) |
| ☐ | 18 — Sale of Buyer's Property |
| ☐ | 19A — Real Estate Transfer Disclosure Statement |
| ☐ | 19B — San Francisco Seller Disclosure |
| ☐ | 19C — Natural Hazards Disclosure Statement/Report |
| ☐ | 19D — Earthquake Hazards Disclosure |
| ☐ | 19E — Lead-Based Paint Hazards Disclosure |
| ☐ | 19F — Building Permit History (Report of Residential Building Record – 3R) |
| ☐ | 19G — Other Disclosures: |
| ☒ | 4S — Additional Terms: *See attached Addendum A to Contingency Removal, dated February 28th 2019* |
| ☐ | Addenda: ☐ TIC Purchase ☐ 1031 Exchange ☐ Other:_____ ☐ Other:_____ |
| ☒ | All — Remaining Buyer contingencies established by the Agreement. (Note: This alternative is not a requirement of the Agreement, but a convenience for Buyer.) |

Exceptions (attach separate sheet, if necessary): _____

---

Do not use this form to renegotiate the terms of the Agreement. If Buyer is only willing to remove contingencies in exchange for Seller concessions, Broker/Agent recommends that Buyer use a Request for Repair form or an Amendment of Existing Agreement Terms form.

| Buyer | *Kenneth M Kaplan* | Date | 2/28/2019 | Buyer | *[signature]* | Date | 2/28/2019 |
|---|---|---|---|---|---|---|---|
| | **Kenneth Kaplan, and/or Assignee** | | | | **Brandon Kaplan, and/or Assignee** | | |

Confirmation of Receipt of this Removal of Contingencies:    Seller's Initials: *[initials]*    Date 3-1-19

BROKERS/AGENTS CAN ADVISE ON REAL ESTATE TRANSACTIONS ONLY. FOR LEGAL OR TAX ADVICE, CONSULT A QUALIFIED ATTORNEY OR CPA.

Page 1 of 1
(Rev. 03/18)    Copyright © 2018 San Francisco Association of REALTORS®

Vanguard Properties, 2501 Mission St. San Francisco CA 94118        Phone: 415.321.7000    Fax:        4018-4022 19th
Edward Deleski        Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

411

DocuSign Envelope ID: AFD33780-8E4E-4D94-AE7F-64E4D80D827A

**ADDENDUM A (ADDENDUM TO CONTINGENCY REMOVAL AND APPROVAL OF DOCUMENTS)**

**Purchase Sale Agreement: 4018-4022 19th Street, San Francisco CA 94114**

**Buyer:** Kenneth Kaplan, and/or Assignee and Brandon Kaplan, and/or Assignee

**Seller:** Kevin Singer, Court Receiver

1.   Overbid shall be set at $150,000 above current purchase price, and $150,000 increments thereafter. In the event of an overbid, (i) Buyer shall have the right to match the amount of all overbids, without the necessity of increasing Buyer's deposit, and (ii) if Buyer elects not to match an overbid (A) the successful over bidder (the "Overbid Buyer") must deliver to Seller on the date of the Hearing (as defined below) a non-refundable deposit in the amount of $114,000 (3% of First Overbid Amount) in the form of a cashier's check payable to Orange Coast Title, (B) execute a purchase agreement substantially in the form of this Agreement, including a waiver of all contingencies (the "Overbid Purchase Agreement") on the date of the Hearing, and (C) if the Overbid Buyer defaults in its obligation to purchase the Property pursuant to the Overbid Purchase Agreement, then Seller shall cancel the Overbid Purchase Agreement and Buyer shall have the right to purchase the Property for $3,650,000.00, with a closing date which is 20 days after Buyer receives written notice from Seller of such cancellation. A

2.   Seller acknowledges that Buyer is acquiring the Property with 1031 exchange funds and must close escrow on or before a date certain in order to satisfy its exchange requirements. Seller and Buyer agree that the date for the close of escrow shall be the earlier of (i) 20 calendar days after the date of the court confirmation and any overbid hearing (collectively, the "Hearing") or (ii) April 24, 2019 (the "Outside Date"). Seller shall endeavor to schedule the Hearing as soon after the Addendum Execution Date as is reasonably practicable, provided that if the Hearing has not taken place on April 3, 2019, Buyer may elect in writing, delivered to Seller during the period commencing on April 3, 2019 and ending 3 business days following receipt of written notice from Seller of the date to which the Hearing is rescheduled, to extend the Outside Date to a date up to 20 calendar days after date on which the Hearing has been rescheduled to occur (the "Extended Outside Date"). If this transaction does not close on or before the Outside Date or, if Buyer has timely elected to extend the Outside Date, the Extended Outside Date, for any reason other than a default by Buyer, Buyer shall have the right to terminate this Agreement by written notice delivered to Seller during the period commencing on the Outside Date or the Extended Outside Date, if applicable, and ending 3 business days following receipt of notice thereof from Seller, in which event the Deposit shall be immediately returned to Buyer.

3.   All other terms and conditions to remain.

_Kenneth M. Kaplan_ _____   2/28/2019     _BK_ _____   2/28/2019
Kenneth Kaplan, and/or Assignee                Brandon Kaplan, and/or Assignee

_Kevin Singer_ _____
Kevin Singer, Court Receiver

4916
6350)423 v2

# EXHIBIT 4

## LEGAL AND PUBLIC NOTICE OF SALE OF REAL
## PROPERTY PURSUANT TO COURT ORDER

**PLEASE TAKE NOTICE** that Kevin Singer, Receiver appointed in that certain action pending in the Superior Court of California for the County of San Francisco ("Receiver") entitled Umpqua Bank, etc. v. XELAN Prop I, LLC etc., et al., San Francisco County Superior Court Case No. CGC-18-564941 ("San Francisco Superior Court Action"), shall seek approval of the San Francisco County Superior Court of a San Francisco Purchase Agreement dated February 1, 2019, Addendum to San Francisco Purchase Agreement, Addendum to SFAR Purchase Sale Agreement dated January 30, 2019, Seller Counter Offer 1 dated February 6, 2019, Contingency Removal #1 dated March 1, 2019, and Addendum A (Addendum to Contingency Removal and Approval of Documents) dated February 28, 2019 (collectively, the "PSA") to sell the real property commonly known as 4018-4022 19th Street, San Francisco, California and legally described in Exhibit A attached hereto ("19th Street Property") for the sales price of $3,650,000, at a hearing to be held in Department 501 of San Francisco County Superior Court on April 3, 2019 at 9:30 a.m.  This sale is to be conducted pursuant to that certain Order Re: Granting Motion of Umpqua Bank for Order:  (1) Instructing Receiver to Sell Real Property Assets of Receivership Estate; and (2) Confirming Sale of Real Property (the "Sale Order") filed on October 12, 2018 in the San Francisco Superior Court Action.

**PLEASE TAKE FURTHER NOTICE** that any person seeking to overbid the PSA must pre-qualify by presenting proof to the Receiver of sufficient financing and/or cash resources to pay the purchase price and that overbids must be made increments of $150,000, or such other amount as may be approved of by the San Francisco County Superior Court at the time of the hearing. Any successful over bidder must deliver to the Receiver on April 3, 2019 a non-refundable deposit in the amount of $114,000.  If any overbid buyer defaults on its obligation to purchase the 19th Street Property, then the Receiver shall cancel the overbid purchase agreement, and the Buyer will have the right to purchase the 19th Street Property for $3,650,000, with a closing date which is 20 days after the Buyer receives written notice from the Receiver of such cancellation. Further, prospective bidders should review the terms of the Sale Order for a more detailed description of the terms and conditions of the sale.

For additional information regarding the sale, please contact Kevin Singer, Receiver, by calling (415) 848-2984 or by email at Kevin@receivershipspecialists.com.

**PLEASE TAKE FURTHER NOTICE** that overbids to the PSA are invited and encouraged and will be made in public and will be received by the San Francisco County Superior Court on April 3, 2019 at 9:30 a.m. in Department 501.

DATED: March 4, 2019

Kevin Singer, Receiver

1

[19th Street]

**LEGAL DESCRIPTION OF**
**4018-4022 19th Street, San Francisco, California**

Beginning at a point on the Northerly line of 19th Street, distant thereon 83 feet Westerly from the Westerly line of Noe Street; running thence Westerly along said line of 19th Street 42 feet; thence at a right angle Northerly 145 feet; thence at a right angle Easterly 42 feet; thence at a right angle Southerly 145 feet to the point of beginning, in the City of San Francisco, County of San Francisco, State of California.

Being a portion of Mission Block No. 115.

# EXHIBIT A

2

[19th Street]

6267820613

# EXHIBIT 5

Filed 12/3/18  City and County of San Francisco v. Kihagi CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>ANNE KIHAGI et al.,<br><br>     Defendants and Appellants. | A151719<br><br>(City and County of San Francisco Super. Ct. No. CGC-15-546152) |

The City and County of San Francisco sued appellant landlords for illegally harassing their tenants and violating state and local building and housing laws.  During discovery, the landlords were extremely uncooperative, and they violated at least 10 court orders.  The trial court declined to enter default against the landlords as a sanction, but it imposed issue and evidentiary sanctions.  After a nearly month-long trial, the court ruled against the landlords, awarded the City substantial penalties, and required the landlords to hire an independent entity to manage the properties for five years.  The landlords challenge these rulings.  We affirm.

1

# I.
## FACTUAL AND PROCEDURAL
## BACKGROUND

Appellants Anne Kihagi, Julia Mwangi (J. Mwangi), and Christine Mwangi (C. Mwangi) are affiliated with several limited liability companies (LLCs), which in turn own, manage, operate, and maintain various properties in San Francisco. Specifically: Kihagi and C. Mwangi are members and managers, and Kihagi is an agent, of Xelan Prop 1, LLC (Xelan); Kihagi and J. Mwangi are members, and Kihagi is a manager and agent, of Renka Prop, LLC (Renka); Kihagi is the sole owner and member, and manager and agent, of Nozari 2, LLC (Nozari); and Kihagi and C. Mwangi are members, and Kihagi is the managing member and agent, of Zoriall, LLC (Zoriall). We will sometimes refer collectively to all appellants as the landlords.

The LLCs own seven apartment buildings in San Francisco that are the subject of these proceedings. For years, the landlords bought apartment buildings, evicted longtime tenants who lived in rent-controlled units, remodeled units without necessary permits, and re-rented the units at higher market rates. In doing so, they wrongfully harassed, retaliated against, and evicted a number of their tenants.

The City and County of San Francisco (City)[1] initiated this lawsuit in June 2015, and it filed an amended complaint in September 2015. The City alleged causes of action against the landlords for (1) violating a provision of the City's Residential Rent Stabilization and Arbitration Ordinance (hereafter Rent Ordinance) governing tenant harassment (S.F. Admin. Code § 37.10B, hereafter Admin. Code), (2) violating the State Housing Law (Health & Saf. Code, §§ 17910, 17920-17980.9), (3) engaging in a public nuisance in violation of the City's Housing Code and Building Code as well as Civil Code sections 3479 and 3480, and (4) violating the Unfair Competition Law (Bus. & Prof. Code, §§ 17200-17210).

---

[1] The People of the State of California also were a plaintiff, acting by and through the City Attorney's office for the City. We refer collectively to the plaintiffs as the City.

2

After the landlords disobeyed at least 10 discovery orders, the City asked the trial court to impose terminating sanctions by striking the landlords' answer and entering default against them. The trial court found that there had been "a continuous, repeated willful failure to follow and comply with numerous Court orders," but it declined to issue terminating sanctions. Instead, as discussed in more detail below, the court limited the evidence the landlords were permitted to introduce at trial.

Following a court trial that spanned about 28 days, the trial court issued a 151-page statement of decision on May 23, 2017, concluding that the landlords harassed tenants in bad faith; fraudulently evicted tenants; and facilitated hazardous, unpermitted construction at their apartment buildings. The court ordered the landlords to pay civil penalties.

The court also issued an injunction against the landlords. The court (1) ordered the landlords to disclose to the City all San Francisco properties they own, as well as an accurate rent roll for each property, (2) ordered the landlords to hire a City-approved independent management company to be responsible for day-to-day management of the properties for 60 months, (3) invalidated certain pending evictions, and (4) barred the landlords from initiating any new evictions without the independent manager's authorization.

The court entered judgment in June 2017, and the landlords appealed. The landlords filed a petition in this court asking that their disclosure obligations be stayed, but this court denied the petition. (*City and County of San Francisco et al. v. Kihagi et al.* (Aug. 16, 2017, A151719 [petn. den.].) The City, meanwhile, sought calendar preference in this court because the injunction had been at least partially stayed pending the appeal, and the court granted the request. It later filed a motion to dismiss, arguing that this appeal as well as the landlords' appeal of the trial court's order awarding attorney fees (A152933) should be dismissed based on the disentitlement doctrine. This court denied the motion on June 19, 2018, and we now address the merits of A151719.

3

## II.
### DISCUSSION

*A. The Landlords' Procedural Challenges to the Judgment Lack Merit.*

In their 134-page opening brief, the landlords first attack the judgment on procedural grounds, going so far as to argue that the proceedings violated their due process rights in several respects. We conclude that these arguments either were forfeited or lack merit.

> 1. The Trial Court Did Not Abuse Its Discretion When It Advanced the Date of Trial.

> > a.  Additional background.

After initiating this lawsuit, the City sought a preliminary injunction to stop the landlords from continuing to harass and intimidate their tenants. The City presented evidence that the Department of Building Inspection had issued multiple citations for unpermitted building, plumbing, and electrical work at the landlords' properties. In its moving papers, the City stated that although the landlords later cured most violations, several violations were not timely cured and others remained outstanding. In their opposition to the preliminary injunction (which is not included in the appellate record), the landlords claimed that the City had conceded that they had cured violations and that there was therefore nothing to enjoin. In its reply, the City argued that an injunction was warranted even if most violations were abated because the landlords' entire business model was to unlawfully profit at their tenants' expense, and it accused the landlords of misleading the trial court by misstating the City's position on the landlords' abatement of violations.

The trial court denied the request for a preliminary injunction, concluding that (1) much of the conduct alleged by the City was historical, not ongoing, and the City had conceded that the landlords had cured most violations and that most of the tenants who complained about the landlords' behavior had since moved out, (2) the City unduly delayed seeking a preliminary injunction, which undercut the need for immediate action, (3) the scope of the City's proposed preliminary injunction was overly broad, and (4) the

4

evidence was heavily disputed such that it would be inappropriate to grant an injunction based on witness declarations.

In March 2016, shortly after the denial of the preliminary injunction, the City filed an amended case management statement requesting a trial date in September 2016. On the same day the statement was filed, and presumably before reading the City's request for a September trial date, the trial court issued a case-management order setting trial for the following year (February 6, 2017), and directed any party that objected to file written notice of the objection. Within a month (in April 2016), the City filed a motion to advance the trial date to September 9, 2016, or another date that was convenient for the court before October 11, 2016. The City argued that the landlords continued their unlawful practices, and the only way to protect the tenants in the absence of a preliminary injunction was to try the case as soon as possible. The landlords opposed the City's motion, arguing, among other things, that they would need additional time to review the nearly 8,000 pages of documents that the City had produced during discovery. The landlords also disputed that there were ongoing violations, and pointed to the portion of the order denying a preliminary injunction stating that most of landlords' violations were historical, as opposed to ongoing.

A hearing was held on the City's motion on May 3, but no transcript of the hearing appears in the record on appeal. The trial court granted the City's motion and set the matter for trial on October 17, 2016, which at the time of the court's order was more than five months away. The court found there was good cause to advance the trial date based on "the evidence presented, the complete file in this matter, [and] the oral argument of the parties." (Cal. Rules of Court, rule 3.1335(b) [motion to advance trial date must establish good cause].)

b. Discussion.

The landlords argue that there was no good cause to advance the date of trial. We review the trial court's decision for abuse of discretion (*Jurado v. Toys "R" Us, Inc.* (1993) 12 Cal.App.4th 1615, 1617-1618 [determination of whether good cause supports motion for trial continuance]), and it is the landlords' burden to demonstrate from the

5

record that such abuse occurred (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 985). They have failed to satisfy this burden.

The landlords argue that this was a complex case with several witnesses, factors that the trial court no doubt took into account when ruling on the City's motion. They also repeat the claim that the City had "acknowledged on the record" that they had cured most violations, meaning that the claim of ongoing harm warranting an advanced trial date was "untrue," but the only support for their argument is the briefing on the earlier request for a preliminary injunction. And without a transcript of the hearing on the motion (which apparently was unreported), we have no way of knowing what other evidence the trial court might have considered.

We cannot conclude on this record that the trial court violated any legal principle or otherwise abused its discretion. (*Forthmann v. Boyer, supra*, 97 Cal.App.4th at p. 984.) Because we conclude that the trial court acted within its discretion, we need not consider the landlords' argument that they suffered prejudice as a result of advancing the trial date.

> 2. The Trial Court Made Appropriate Rulings Related to the Landlords' Failure to Comply with Discovery Orders.

>> a. Additional background.

After the trial court advanced the trial date, the parties continued to engage in discovery, but the landlords repeatedly violated orders for them to comply with "even the most basic discovery." They repeatedly refused entry to any of their units for inspection, failed to show up for scheduled depositions despite multiple court orders, and declined to respond to written discovery or to produce responsive documents.[2] When some of the

---

[2] Among the discovery sought were documents regarding "the LLC's membership, management records, writings between the LCC and the Secretary of State, communications with various types of contractors and the tenants relating to the subject properties, writings relating to constructional repair work on each of the properties since 2013 . . . , communications in any way relating to owner or relative move-in evictions relating to the subject properties . . . , [and] writings regarding any work performed without permit."

landlords did appear for their depositions, defense counsel would make repeated objections and direct the landlords not to respond to questions, resulting in the discovery referee having to issue an order establishing rules for the depositions. And when Kihagi appeared for her deposition, she refused to answer almost every single question, including one about what her full name was as it appeared on her birth certificate. The landlords also delayed noticing any depositions of their own. As of mid-September 2016, they had willfully failed to comply with at least 10 court orders regarding discovery. A discovery referee provided the landlords with additional time to comply, but they again failed to do so. At one point, the discovery referee warned the landlords' counsel that if the landlords failed to provide tenant information by September 22 and thereafter failed to allow site-inspections on September 26, the court could interpret these actions to constitute intentional noncompliance with discovery orders that could result in monetary, evidentiary, or terminating sanctions. The landlords still did not comply.

Kihagi fired her attorney of record in August 2016 and substituted herself in propria persona in September, yet the attorney continued to represent the other landlords, and Kihagi continued to file motions that "were clearly prepared by counsel." A different law firm briefly associated in as counsel but also left. A new attorney substituted in for the landlords in October 2016.

Also in October, the City filed a motion requesting terminating sanctions, monetary sanctions, and reimbursement for the City's discovery costs. Specifically, the City asked that the court strike the landlords' answer to the City's first amended complaint and enter the landlords' default as a remedy for their persistent misuse of the discovery process "by refusing to comply with their discovery obligations or [the trial court's] orders." The City contended that lesser sanctions would not adequately address the prejudice to them, because the landlords had not responded to previous monetary and evidentiary sanctions or the court's repeated threat of terminating sanctions. The landlords opposed the motion.

At a hearing on October 28, 2016, the trial court first considered a number of defense motions that had been submitted before the landlords' new attorney had

7

substituted in. Among them was a motion to continue the trial date. The landlords' new attorney argued that the landlords' previous attorney had been able to work on the case for only about one week during July and August because she had been out of the country helping her family. Now that the new attorney was on the case, he was faced with a complex case involving 80 witnesses and 25,000 documents. Counsel further explained that he and four other attorneys were working on "fully responding to all the discovery, 35 sets of discovery and a production of documents that I think probably go—14 inches tall." Counsel requested "a short continuance, or some continuance in order to at least have me be able to get up to speed sufficiently in order to help my clients properly." He further acknowledged that "[i]f I was there at the beginning, it [discovery] would have been handled differently, and I would just request that, at least some time be allowed so that we can depose these witnesses, properly have the City be able to review and be ready to litigate based upon the discovery I've set, to depose my clients, which they want to do."

The City opposed a continuance, arguing that the landlords failed to establish good cause. Counsel noted that the landlords' previous attorney had scheduled her vacation before the motion to advance the trial date and had not cited scheduled time away as a reason to schedule a later trial. And counsel further argued that the landlords should not be permitted to rely on their own lack of diligence in pursuing discovery as good cause to continue trial. The City would be prejudiced if trial were delayed, counsel argued, because "extreme effort" had gone into ensuring that witnesses were available, and it would be "very challenging to put back together" if trial were continued.

The trial court concluded that the landlords had failed to establish good cause for a continuance under rule 3.1332 given all their delays and abuses of the discovery process, and denied their motion. The court acknowledged, however, that the landlords' new attorney had worked hard to get up to speed on the case, and as a courtesy allowed extra time for counsel "to get up to speed." The court therefore continued the trial for two weeks, so that opening statements would begin on November 15 instead of October 31.

8

After hearing a number of other motions, the trial court considered the City's motion for terminating sanctions. The landlords' counsel again stressed the efforts he was making to comply with outstanding discovery, he attributed deficiencies to previous counsel's lack of diligence, and he represented that Kihagi was being cooperative with him. Counsel for the City countered that Kihagi was responsible for the discovery abuse and not the former attorney, because Kihagi had refused access to her properties when she was represented by a second attorney, and she had refused to answer deposition questions when she was representing herself.

The trial court found that there had been "a continuous, repeated[,] willful failure to follow and comply with numerous Court orders regarding discovery as to documents, requests for admissions, interrogatories, site inspections and depositions." As for an appropriate penalty, the trial court said it was "well within [its] discretion to terminate the entire case and strike the answer," but that it would not impose such a "drastic penalty." Instead, the court imposed the following evidentiary and issue sanctions:

- Because the landlords had disregarded repeated court orders allowing the City to timely inspect the properties, the court ordered that if the City met its burden at trial of proving its claims that the landlords created unlawful, substandard, or unsafe conditions, the court would find that such conditions still existed at the time of trial, and that the landlords would be prohibited from presenting evidence that any such unlawful conditions had been cured or abated.

- Because the landlords failed to permit meaningful depositions, each landlord would be precluded from testifying at trial unless the City elected to call any of them as an adverse witness.

- Because the landlords failed to comply with various requests for admission, they would not be permitted to dispute that Kihagi did not receive any monetary compensation from Zoriall, Nozari, or Xelan.

- Because the landlords failed to produce various documents, they would be prohibited from introducing any documents that had not been produced as of the date of the hearing.

9

- Because the landlords failed to produce categories of financial documents, the court gave the LLCs until 2:00 p.m. on November 1, 2016, to provide documents regarding their financial information. After they failed to provide the documents by that deadline, the court imposed an issue sanction that each landlord's assets and net worth would be jointly and severally deemed to be at least $25 million (the amount they were alleged to have paid for the subject properties) for purposes of calculating any civil penalties under the Business and Professions Code.

After the trial court issued its ruling, counsel for the City then asked the trial court for clarification and for further issue sanctions. The court asked for input from the landlords' attorney, who stated, "Your Honor, all I can say is that your sanctions were very serious, and I understand that completely. [¶] I would request that you stay with— you know, do nothing other than stay with what you already thought out and not go on to consider any more sanctions. [¶] I think they are rather severe for my clients and what they can do at trial." Counsel for the City again asked for further clarification, and the landlords' attorney stated, "Your honor gave her order, and my request is simply [to] leave it at that." The trial court confirmed there would be no additional issue sanctions, the parties proceeded to discuss issues relating to the upcoming trial, and the hearing ended a short time later without further discussion of the sanctions order.

      b. The trial court did not abuse its discretion when it denied the landlords' requested continuance.

The landlords argue that the trial court abused its discretion in denying their request for a continuance. We disagree. The trial court's order denying the continuance detailed all the ways the landlords had obstructed basic discovery obligations. It also weighed factors for granting a continuance set forth in rule 3.1332(c) and (d), such as the fact the landlords had not exercised diligence (*id.*, subd. (c)(6)), the case was entitled to preference (*id.*, subd. (d)(6)), and the interests of justice favored the City (*id.*, subd. (d)(10)). On appeal, the landlords do not address any of the court's findings. Instead, they state that their trial attorneys "were scrambling to meet their discovery obligations while trying to deal with the eighty (80) witnesses and 25,000 documents

10

related to the case," but they ignore the trial court's specific findings that they had defied discovery orders and had failed to exercise diligence in seeking their own discovery. In their reply brief and at oral argument, counsel for the landlords suggested that the landlords were falsely led to believe that they would receive a continuance, but the record does not support this suggestion. True, the appointed referee stated during a hearing with the parties on August 25, 2016, that he would recommend to the assigned judge that the trial date be postponed until the following January, because Kihagi had just fired her attorney and the referee wanted to give a new attorney time to comply with discovery. But the attorney representing the City said he would oppose any such continuance because there were insufficient assurances that a change in attorney would end Kihagi's resistance to legitimate discovery. We see no abuse of discretion by the judge who ultimately agreed with the City that a continuance was unwarranted.

The landlords' reliance on *Hamilton v. Orange County Sheriff's Dept.* (2017) 8 Cal.App.5th 759 is misplaced. There, citing the plaintiff's lack of diligence, the trial court rejected the parties' stipulation to continue a hearing on a motion for summary judgment so that the plaintiff could take depositions of witnesses who had submitted declarations in support of the pending motion. (*Id.* at pp. 761, 766.) *Hamilton* concluded that the trial court abused its discretion, because the plaintiff's lack of diligence was "relatively minor," and the denial of a continuance resulted in a "substantial injustice" because the grant of summary judgment was based not on the merits but on plaintiff's inability to take depositions. (*Id.* at p. 766.) Here, by contrast, in addition to there being no stipulation to continue, the landlords' lack of diligence was extreme, and the interests of justice favored the City. We have little trouble concluding that the trial court acted well within its discretion in denying the motion to continue, especially considering that the court had substantially narrowed the scope of the trial with the evidentiary and issue sanctions, which meant there was less preparation needed, and had given the landlords two additional weeks for such preparation.

c. The landlords' objections to the evidentiary and issue sanctions
were forfeited and lack merit.

The landlords argue for the first time on appeal that evidentiary and issue
sanctions were imposed "without any notice to Appellants whatsoever," which denied the
landlords their right to a fair trial and constituted "per se reversible error." They contend
that because they were only on notice that they faced possible terminating sanctions, the
sanctions actually imposed amounted to a penalty issued sua sponte with **"zero notice"** to
them. We are not persuaded. To begin with, the landlords' counsel never raised such a
due process challenge below; instead, the attorney asked only that the trial court go no
further than what it imposed. Having failed to object below, the landlords forfeited the
objection. (*Reedy v. Bussell* (2007) 148 Cal.App.4th 1272, 1288-1289.)[3]

Furthermore, even if the landlords had preserved the argument, we would reject it.
True enough, a trial court may not order discovery sanctions ex parte, "and an order
purporting to do so is void." (*Sole Energy Co. v. Hodges* (2005) 128 Cal.App.4th 199,
208.) When two defendants in *Sole Energy* twice failed to appear at their depositions,
plaintiffs applied ex parte for orders shortening time for a hearing on motions to compel
the defendants to attend the depositions and produce documents, and for sanctions. (*Id.*
at pp. 203-204.) Plaintiffs served the motions by mail on the same day of an ex parte
hearing where the trial court conducted the hearing on sanctions and ordered that the two
defendants' answers be stricken along with the answer of a third defendant, and ordered
the entry of their defaults. (*Id.* at p. 204.) The trial court later held a prove-up hearing
and entered default judgments against all three defendants. (*Id.* at p. 205.) The appellate
court held that the defaults were void because the sanctions motions did not include all
the information required by the statute governing sanctions (former Code Civ. Proc.,

---

[3] Since the issue was forfeited, we need not reach the landlords' argument that
they were prejudiced by the sanctions imposed. We likewise need not address the
landlords' two challenges to specific provisions of the sanctions ruling that they raised
for the first time in their reply brief. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656
[raising issue for first time in reply brief deprives opposing party of an opportunity to
respond].)

12

§ 2023, now § 2023.030), provided insufficient notice as to two defendants, and provided no notice whatsoever to the third defendant who was not even named in the sanctions motions. (*Sole Energy*, at pp. 207-209; see also *O'Brien v. Cseh* (1983) 148 Cal.App.3d 957, 961 [application for sanctions "is not an ex parte matter"].)

Here, by contrast, the landlords do not contend that the motion for terminating sanctions was procedurally defective, and they acknowledge that the trial court had the authority to grant the City's motion. But while they concede that they had adequate notice of the sanctions motion, they contend that they had no notice of the specific discovery and issue sanctions that the court ultimately imposed. In their opposition to the City's motion, however, the landlords themselves recognized the possibility of sanctions less severe than terminating sanctions by pointing out that a sanctions order "may go no further than necessary to achieve the purpose of discovery." They expressly asked the trial court not to "deny Defendants their day in court when *lesser remedies will suffice*, and where the entry [of a] default judgment would not suffice to protect Defendants' constitutional rights to due process." (Italics added.) In other words, the landlords recognized that the trial court could take measures less severe than striking their answer, and they suggested it do so. Their position was entirely consistent with the principle that, absent a manifest abuse of discretion exceeding the bounds of reason, a trial court may choose from various options when imposing a discovery sanction. (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 388; *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1545.)

On appeal, the landlords rely on the general rule that "the trial court may consider only the grounds stated in the notice of motion." (*Luri v. Greenwald* (2003) 107 Cal.App.4th 1119, 1125 [trial court not required to consider sua sponte granting relief not requested in motion brought under Code Civ. Proc., § 473]; see also Code Civ. Proc., § 1010 [notice of motion must state grounds upon which motion is made].) In doing so, they confuse grounds for granting relief with forms of relief. The City set forth all the *grounds* for sanctions in its moving papers by detailing all the ways the landlords repeatedly had abused the discovery process. The City thus "sufficiently define[d] the

13

issues for the information and attention of the adverse party and the court," as the landlords stress the City was required to do. (*Hernandez v. National Dairy Products* (1954) 126 Cal.App.2d 490, 493 [trial court was limited to considering only whether defendant was not corporation licensed in state and had not been served; motion cannot be expanded by affidavits or oral argument].) *Gonzales v. Superior Court* (1987) 189 Cal.App.3d 1542, another case upon which the landlords rely, also is distinguishable because it did not involve a motion for terminating or other discovery sanctions and was governed by a specific statutory scheme that is inapplicable here. (*Id.* at pp. 1544-1546 [reversible error to summarily adjudicate issues of fact where defendants had moved only for summary judgment and Code Civ. Proc., § 437c, subd. (f) requires notice that summary adjudication is sought].)

The long-established principle is that a demand for relief in a complaint necessarily includes a prayer for lesser relief. (See *West v. U.L.C. Corp.* (1965) 232 Cal.App.2d 85, 89 ["The greater relief demanded necessarily included a prayer to carry lesser relief into effect"]; *Hurt v. Pico Inv. Co.* (1932) 127 Cal.App. 106, 114 [" '[T]here is no rule that would prevent the court from granting less relief than that demanded' "].) This principle applies here, and there is no basis for us to conclude that the trial court erred in awarding evidentiary and issue sanctions in lieu of finding the landlords to be in default.

*B. The Landlords' Belated Objections to Expert Testimony Is Meritless.*

Citing *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), the landlords argue for the first time on appeal that an expert witness's testimony violated their due process rights under the Fifth and Fourteenth Amendment as well as their right to confrontation guaranteed under the Sixth Amendment. These issues were forfeited and lack merit in any event.

The chief housing inspector for the City's Department of Building Inspection testified as an expert in the area of code enforcement. She testified, without objection, about various code violations at the landlords' properties based on documents prepared by others, as she had not personally inspected the properties. Relying on *Sanchez*, the

14

landlords on appeal contend that this testimony was hearsay admitted in violation of their

due process and confrontation rights because it was "case-specific, fact-based opinion . . .

based on the complied [*sic*] reports of others." But *Sanchez* was issued months before the

trial here, and counsel had both the opportunity and obligation to assert any *Sanchez*

objection at the trial. (See *People v. Black* (2007) 41 Cal.4th 799, 811 ["In determining

whether the significance of a change in the law excuses counsel's failure to object at trial,

we consider the 'state of the law as it would have appeared to competent and

knowledgeable counsel at the time of the trial.' "]) Because counsel failed to object

below, the landlords' challenges were forfeited. (*Santantonio v. Westinghouse*

*Broadcasting Co.* (1994) 25 Cal.App.4th 102, 113.)

Even if the objections had not been forfeited, they lack merit. The trial court ruled

that the complaints upon which the expert relied were not hearsay because they were

business records and official records under Evidence Code sections 1271 and 1280, a

ruling the landlords do not challenge in their opening brief.[4] We reject the landlords'

challenge to the expert's testimony.

### C. The Trial Court Properly Awarded Civil Penalties.

#### 1. Additional Background.

The San Francisco Building Code (hereafter Building Code) defines what

constitutes an "unsafe" building.[5] The Building Code further provides that any property

owner who violates the code shall be liable for a civil penalty not to exceed $500 for each

day such violation is committed or permitted to continue. (Build. Code, § 103A.) The

San Francisco Housing Code (hereafter Housing Code) defines 12 conditions, including a

"[s]ubstandard building," as nuisances. (Hous. Code, § 400.) Section 1001,

subdivision (a) of the Housing Code, in turn, lists several conditions that constitute a

substandard building when that condition "endangers the life, limb, health, property,

---

[4] In a lengthy argument in the landlords' reply brief, they claim that their hearsay
objections to another witness's testimony about the records sufficiently put the trial court
on notice regarding their constitutional confrontation rights. We disagree and reject this
belatedly raised argument. (*Keyes v. Bowen, supra,* 189 Cal.App.4th at p. 656.)

15

safety[,] or welfare of the public or the occupants" of the building.  The Housing Code

provides for civil penalties of up to $1,000 for each day that a violation is committed or

permitted to continue.  (Hous. Code, § 204, subd. (c)(2).)

Building Code section 102A.3 authorizes a City building official to inspect

buildings to determine whether they are unsafe under section 102A.  If, after a building

inspection, a building official determines a building is unsafe, the official shall serve the

building owner with a written notice of violation and post a copy of the notice at the

building.  (Build. Code, § 102A.4, subd. (c).)  If the unsafe condition is not corrected

within the period specified in the notice, the matter shall be set for hearing.  Hearings

currently are governed by Building Code section 105A.5.  Building Code section 103A

authorizes civil penalties of up to $500 a day "for each day such violation is committed or

permitted to continue."

Under the current version of the Building Code, the remedies recoverable through

the administrative hearing process for unsafe buildings procedure are nonexclusive and

"the City Attorney may institute civil proceedings for injunctive and monetary relief,

*including civil penalties*, against a building owner for violations of the Municipal Code

under any circumstances, without regard to whether a complaint has been filed or the

Building Official has issued a NOV [notice of violation] or an Administrative Order."

(Build. Code, § 102A.8, italics added.)

The Housing Code, meanwhile, provides that abatement procedures to cure

violations shall be done under the same procedures as under the Building Code.  (Hous.

---

[5] Specifically, the Building Code provides: "All buildings, structures, property, or parts thereof, regulated by this code that are structurally unsafe or not provided with adequate egress, or that constitute a fire hazard, or are otherwise dangerous to human life, safety, or health of the occupants or the occupants of adjacent properties or the public by reason of inadequate maintenance, dilapidation, obsolescence or abandonment, or by reason of occupancy or use in violation of law or ordinance, or were erected, moved, altered, constructed or maintained in violation of law or ordinance are, for purpose of this chapter, unsafe.  [¶] . . . [¶] All such unsafe buildings, structures, property, or portions thereof, are hereby declared to be public nuisances and shall be vacated, repaired, altered or demolished as hereinafter provided."  (Build. Code, § 102A.)

16

Code, § 201, subd. (e).) The Housing Code further provides that people who violate the code shall be liable for fines, and that remedies in the code "are in addition to any other remedies provided by law." (Hous. Code, § 204, subds. (a), (c)(3).)

The City's complaint as amended did not allege causes of action under the Building Code or the Housing Code, and its 16 prayers for relief did not specifically mention fines under the codes. But the complaint's allegations heavily relied on their provisions. The second cause of action in the City's amended complaint was for violations of the State Housing Law (Health & Saf. Code, § 17920 et seq.). The cause of action included allegations that the landlords had been maintaining properties in substandard, unsafe conditions "in violation of San Francisco Building Code Sections 102A and 103A and/or San Francisco Housing Code Sections 204, 401 and 1001" by failing to secure required construction permits on their properties, performing work exceeding the scope of issued permits, and failing to timely cure cited conditions. According to the complaint, the landlords repeatedly refused to obtain proper permits before performing construction work, and the unpermitted work, which was performed by unlicensed workers, violated Building Code sections 102A and 103A. The City's third cause of action, for public nuisance, was brought "pursuant to the San Francisco Housing and Building Codes." The amended complaint summarized Building Code section 102A and Housing Code sections 401 and 1001, and alleged that the landlords had maintained one or more of their properties as unsafe buildings and public nuisances in violation of those sections. And the City's fourth cause of action, for violation of the Unfair Competition law, alleged that various unfair, unlawful, and fraudulent conduct by the landlords amounted to unfair business practices. This conduct included allegedly remodeling units without obtaining required building, plumbing, and electrical permits; refusing to comply with several notices and orders issued by the City's Department of Building Inspection; refusing inspections after complaints of work being done without permits or in excess of issued permits; and impeding, interrupting, and attempting to disrupt lawful and noticed health and safety inspections.

17

433

The City sought a permanent injunction; statutory damages of $1,000 for each violation of the Rent Ordinance; punitive damages under the Rent Ordinance; civil penalties of $2,500 for each unfair or unlawful business practice alleged under the Unfair Competition Law (Bus. & Prof. Code, §§ 17206, 17206.1); restitution; costs of enforcement and attorney fees under Health and Safety Code section 17980.7, subdivision (d) and the Rent Ordinance (Admin. Code § 37.10B, subd. (c)(5)); and "[o]ther and further relief . . . as this Court should find just and proper."

The trial court bifurcated trial so that punitive damages would be heard after the first phase of trial, and the City reserved its right to have a jury consider punitive damages.  On the first day of two court days of closing arguments following the first phase of trial, the City filed a "Trial Brief Re Notice of Election of Remedies" stating it elected to pursue civil remedies instead of punitive damages under the Rent Ordinance. The City argued that where the purpose of civil penalties and punitive damages is the same, a plaintiff may plead both but must eventually elect between them. (*Marshall v. Brown* (1983) 141 Cal.App.3d 408, 418-419.)  According to the City, the civil penalties the City sought served both punitive and deterrent purposes, and the City elected the civil penalties, which would eliminate the need for a jury trial.  Specifically, the City sought civil penalties under the Building Code, the Housing Code, and the Business and Professions Code.

At the beginning of closing argument, an attorney for the City listed the City's causes of action and noted that prevailing on the claim of public nuisance would entitle plaintiffs to injunctive relief as well as daily civil penalties under the Building Code and the Housing Code.  At the start of the defense closing arguments, the landlords' attorney objected to any penalties under the Housing Code or the Building Code, because "[n]one of that is alleged anywhere in the complaint."  An attorney for the City countered that the relevant Housing Code and Building Code sections had been cited in the City's amended complaint in relation to the cause of action for public nuisance.

Toward the end of closing argument on the following day, the City again argued that it was "entitled to recover both under the San Francisco housing and building code

18

434

for civil penalties there, as well as under the unfair competition law, which is in the plain language of both the unfair competition law and the San Francisco housing code." After some discussion about assessing penalties, the trial court returned to the issue of the City's entitlement to penalties and stated that "as far as I can tell from looking at the complaint, there is no actual prayer for penalties under the San Francisco building or housing code requested as a separate item, even though there is no doubt that they were discussed as predicate acts, as well as they were—they were pled as both predicate acts under the unfair business practices act and they were also pled as constituting a nuisance under the third cause of action." The court said it would return to the issue at the close of argument.

After argument ended, the court reiterated that the City's proposed penalties were not specifically included in the amended complaint's prayer for relief but noted that both pertinent sections of the Building Code and the Housing Code "were quoted and cited extensively" in the complaint in both the second and third causes of action (for violations of the State Housing Law and for public nuisance). The City then made an oral motion to amend the complaint to add to the prayer for relief daily penalties under the Building Code and the Housing Code, "as supported by the remainder of the complaint's allegations as well as the testimony in court and the evidentiary record." Over the landlords' objection, the trial court granted the City's motion to amend. It noted that the trial court has broad discretion to permit amendment of pleadings before judgment and concluded that the amendment did not change the facts or legal theories in the case. The court further observed that "the issues raised by the proposed amendment were fully tried. All the evidence is before the court. It doesn't involve any new evidence, any new legal theories, nothing."

The trial court's statement of decision was roughly divided into two sections. One section made findings of fact as to the landlords' harassment of tenants, which we discuss in more detail in section II.D.

The other section addressed the notices of code violations as to each property. The trial court noted that the City had pleaded its cause of action for public nuisance in

19

435

two counts. As for the count for public nuisance per se, the court stated that the Building Code defines work done without a permit as a public nuisance (Build. Code, § 102A), and Housing Code section 401 also defines what constitutes a nuisance. As for the count for general public nuisance, the trial court noted that the Civil Code defines a nuisance as "[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." (Civ. Code, § 3479; see also *id.*, § 3480 ["A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."].) The trial court made findings of fact as to the code violations at each property and concluded that they amounted to public nuisances. As to each property, the trial court calculated how many days the building was out of compliance and concluded that being out of compliance amounted to public nuisances as well as violations of the Unfair Competition Law.

Based on all its findings of fact regarding the code violations, the trial court proceeded to calculate the civil penalties the landlords owed. The trial court concluded that the City was entitled to recover penalties for violations of the Building Code and Housing Code under the causes of action for violations of the State Housing Law and for public nuisance. The court noted that the City's Building Code, Electrical Code, Plumbing Code, and Mechanical Code each included provisions for awarding up to $500 in mandatory daily civil penalties; and the Housing Code provided for civil penalties of up to $1,000 for each day a violation was committed or permitted to continue. The City sought a penalty of $500 per day that a building was out of compliance with the City's Building, Plumbing, Mechanical, or Electrical Codes. The trial court found that the landlords' buildings were noncompliant with state and municipal laws for 4,470 days and assessed $250 per day in civil penalties (half of what the City sought) under the municipal codes for a total of $1,117,500. The trial court also found 29 violations of the Unfair Competition Law for the same offenses. Because penalties under the Unfair

20

Competition Law were mandatory, the court awarded a nominal and additional $1 penalty for each violation, for a total of $29.[6]

The trial court found the total penalties awarded to be a "relatively small percentage" (between 10 and 11 percent) of the landlords' net worth, which had been deemed to be at least $25 million. The court specifically noted that the amount did not violate the excessive fines clause of the Eight Amendment. (*City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1319, 1322 (*Sainez*).)

2. The Trial Court Did Not Abuse Its Discretion When It Permitted the Amendment.

The landlords argue that the trial court erred when it allowed the City to amend the complaint at the close of trial to include penalties, a question we review for an abuse of discretion. (*Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1377.) The trial court may allow "an amendment to any pleading or proceeding in other particulars." (Code Civ. Proc., § 473, subd. (a)(1).) The court must liberally allow amendments at any stage of proceedings, including during trial, unless there is unwarranted delay or the opposing party would be prejudiced. (*Duchrow*, at p. 1377.) A party may amend a pleading to conform to proof at trial unless the variance between a pleading's allegation and proof "has actually misled the adverse party to his or her prejudice in maintaining his or her action or defense upon the merits." (Code Civ. Proc., § 469.) Amendments of pleadings to conform to proof should not be allowed when they raise new issues and the adverse party had no opportunity to defend against those issues. (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; *Duchrow*, at p. 1378.) " 'The cases on amending pleadings during trial suggest trial courts should be guided by two general principles: (1) whether facts or legal theories are being changed and (2) whether the opposing party will be prejudiced by the proposed amendment. Frequently, each principle represents a different side of the same

---

[6] Separate from the penalties under the Building Code and Housing Code, the trial court also found 1,612 additional violations of the Unfair Competition Law related to the landlords' unlawful, harassing, and retaliatory conduct against their tenants. It calculated $1,000 per violation, for a total penalty under the Unfair Competition Law of $1,612,000, meaning the total awarded in penalties was $2,729,529.

21

coin: If new facts are being alleged, prejudice may easily result because of the inability of the other party to investigate the validity of the factual allegations while engaged in trial or to call rebuttal witnesses. If the same set of facts supports merely a different theory . . . no prejudice can result.' [Citation.] 'The basic rule applicable to amendments to conform to proof is that the amended pleading must be based upon the same general set of facts as those upon which the cause of action or defense as originally pleaded was grounded.' " (*Garcia v. Roberts* (2009) 173 Cal.App.4th 900, 910.)

The landlords' arguments here are misplaced because the City did not seek to change a single allegation in its amended complaint following trial. The City specifically alleged that the landlords' properties were substandard and unsafe as defined by the Building Code and the Housing Code and that this conduct violated the State Housing Law and constituted a public nuisance. The landlords' arguments on appeal fall flat that they somehow had no notice of the claims and were "deprived" of their ability to "properly prepare for the case."

What the City clarified after trial was its intent to seek the statutory *penalties* it was entitled to seek if it prevailed on its claims. We first reject the landlords' argument that the City "affirmatively represented" that it was not seeking penalties under the Building Code or the Housing Code. True, in its opposition to the landlords' motion to strike certain allegations in the first amended complaint, the City noted that it had not pleaded a separate cause of action for violating the Housing Code and the Building Code. But it did not, as the landlords now claim, specifically represent that it was not seeking (or would not seek) penalties under those codes. And since the landlords' original motion to strike does not appear in our record, we are unable in any event to evaluate fully the context of the City's response.

The landlords contend that had they known before trial that the City would seek penalties under the Building Code and the Housing Code, "the facts and evidence would likely have been very different," but we disagree. They claim that they "would have engaged in detailed questioning of the inspectors and Building Department officials about the actual length of time in abating each of the violations, the reasons for that time period,

22

the <u>typical time periods</u> for abating similar conditions, and <u>the reasonable time period</u> required. That evidence could have made a huge difference in the number of penalty days the Court could legitimately count, and hence the penalty totals." We are unpersuaded. Given the trial court's sanctions order, much of this questioning would have been disallowed. Even so, the landlords had strong incentives to question the witnesses as best they could within the contours of the discovery order because they faced significant other penalties and legal liabilities from an adverse ruling.

The landlords further strain credulity by claiming that had they been aware that the City would seek civil penalties under the Building Code and the Housing Code, they would have sought additional discovery and might have changed their "overall approach to the case and even their settlement strategy." But their actions in the trial court proceedings speak louder than their appellate assertions. Given their extreme defiance of discovery obligations and court orders, we simply cannot accept that they would have conducted themselves differently had they been specifically told that the City was opting against seeking punitive damages and instead would seek penalties under the Building Code and Housing Code if it prevailed on the claims alleged in the amended complaint.

The calculation of the penalties was discussed at length during closing argument. On appeal, the landlords argue that they were prejudiced by the amendment of the complaint because it increased the *potential* damages they faced. But the only support they cite is the portion of the City's closing argument where the attorney argued that the landlords should pay more than $10 million in civil penalties.[7] Again, though, the trial court ordered far less than that: $2,729,529, $1,117,500 of which was attributable to penalties under the Building Code and Housing Code. Given that the City elected to

_____

[7] Counsel argued: "So $6,557,500 [for tenant-harassment claims]. [¶] So we believe it's within this Court's discretion to give a [Business and Professions Code section] 17200 penalty for violations of the building and housing codes, yielding a penalty of around $2 million, in addition to the tenant harassment violations. So the recommended penalty payable to the People of the State of California is $8,684,000. And the recommended penalty to the City and County, which we have already discussed, is around $2 million."

forego seeking punitive damages, the landlords have not even established that they faced *potentially* more damages with the amendment of the complaint, let alone that they were prejudiced by the amount in fact awarded.

The landlords' reliance on *Duchrow v. Forrest, supra,* 215 Cal.App.4th 1359, is misplaced. In *Duchrow,* a plaintiff sued his former client for breach of a specific paragraph of the parties' retainer agreement that provided plaintiff was entitled to a combined hourly and contingency based rate for work on a lawsuit. (*Id.* at p. 1362.) After plaintiff presented evidence at a jury trial and then rested, he sought to amend his complaint based on a new theory of liability on a different paragraph of the retainer agreement (stating he was entitled to recover for all time spent on the lawsuit) that was not mentioned in the original complaint. (*Ibid.*) The trial court granted the motion to amend, but the appellate court reversed, concluding that there was no reason given for the delay and that the defendant client was prejudiced because he was severely limited in how to respond to the new theory of the case. (*Id.* at p. 1363.) Here, by contrast, the City did not change the theory of its case but merely stated it would seek penalties under codes that were cited in its amended complaint.

Finally, we reject the landlords' brief argument that the penalties levied against them somehow were barred by the doctrine of the election of remedies. "Broadly speaking, election of remedies is the act of choosing between two or more concurrent but inconsistent remedies based upon the same state of facts. Ordinarily a plaintiff need not elect, and cannot be compelled to elect, between inconsistent remedies during the course of a trial prior to judgment. [Citations.] However, if a plaintiff has unequivocally and knowledgeably elected to proceed on one of the remedies he is pursuing, he may be barred recourse to the other." (*Roam v. Koop* (1974) 41 Cal.App.3d 1035, 1039.) Such a situation arises, for example, where a plaintiff permissibly files a complaint sounding in both tort and contract but then secures the issuance of a writ of attachment, available only as a remedy in a contract action, thus gaining an advantage over the defendant and equitably estopping plaintiff from later seeking the inconsistent remedy of punitive damages under a tort theory. (*Id.* at pp. 1039-1040; but see *id.* at p. 1044 [equitable

24

estoppel barred defense of election of remedies where defense was not raised in trial court].) Here, at no time did the City take an action or assert a legal position that was inconsistent with pursuing penalties under the Building Code and the Housing Code.

### 3. The City Is Entitled to Recover Daily Penalties.

The landlords also apparently contend that either the penalties were calculated improperly or the City followed improper procedures in obtaining them. They advance this contention in a brief section titled "The City Is Estopped From Claiming Daily Civil Penalties for Time Periods When [the Department of Building Inspection], In Failing to Set a Director's Hearing, Necessarily Implied Defendants Were Making Substantial Progress Toward Abatement." (Bold omitted.) They first cite to *City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 912-913 (*Gonzalez*), which held that an enforcement agency's failure to fully comply with notice requirements under the state's statutory scheme to remedy substandard residential housing did not invalidate the receivership orders that followed. There can be no doubt here that the landlords were provided ample notice of the present lawsuit and the opportunity to defend themselves.

What the landlords really appear to contend is that the penalties against them cannot be upheld because the City's Department of Building Inspection "implicitly found substantial progress toward abatement." According to the landlords, such a finding can be implied because they were never given notice of an administrative hearing, and no administrative hearing was held, as required under the State Housing Law. (Health & Saf. Code, § 17980.6.) They contend that for the Department of Building Inspection "to find a violation and impose penalties, it was necessary to follow these hearing and decision procedures."

The City counters that section 102A.8 of the Building Code and Housing Code section 204, subdivision (c), state that their remedies are not exclusive. For the first time in their reply brief, the landlords complain that the portion of the Building Code that permits the City Attorney to seek civil penalties against a building owner whether or not an administrative order has been secured (Build. Code, § 102A.8) only became effective on January 1, 2017, and appears to have been passed in response to the present lawsuit.

25

In support of this belatedly raised argument, they ask the court to augment the record with a City and County of San Francisco Tails Ordinance, passed November 15, 2016, and effective January 1, 2017. The document is an improper subject of augmentation because it was not filed or lodged in the superior court. (Cf. Rule 8.155(a)(1)(A).) We nonetheless judicially notice the document. (Evid. Code, §§ 451, subd. (a) [judicial notice of public law], 459, subd. (a).) And we also, on our own motion, take judicial notice of the two exhibits submitted in support of the City's opposition to the landlords' motion to augment, which provide more context to the amendments to the Building Code. As the landlords' own "tails ordinance" explains, the state adopts a new Building Standards Code every three years. In response to this cycle, the San Francisco Board of Supervisors repealed the 2013 Building Code and enacted the 2016 Building Code. The new Code included the 2016 version code that had been effective since June 1, 2016 (before trial started in this case). As set forth in a City exhibit that we judicially notice, that 2016 version of the Building Code included section 102A.8, regarding the non-exclusivity of remedies.

Notwithstanding the effective date of section 102A.8, there is nothing in the former Building Code to suggest that the administrative process was the exclusive means for the City to seek penalties. (E.g., *Sainez, supra*, 77 Cal.App.4th at pp. 1306-1308 [penalties imposed under Housing Code and Building Code at trial based on code violations constituting unfair business practices, not at administrative hearing]; see also *Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 531-532 [violation of local ordinance may be used as basis for finding violation of Unfair Competition Law].)

The landlords' argument here is similar to one rejected in *Sainez*. The landlords claim they were put in a worse position than they would have been if an administrative hearing had been held because they were "made worse off by continuing their voluntary abatement than they would have been if a hearing had been held. The City is thus estopped from seeking daily penalties for periods of time during which [the Department of Building Inspection]'s decision not to send [notices of violation] for a Director's hearing was an implied finding that 'substantial progress' on abatement had

commenced." The court in *Sainez* observed: "Defendants depict themselves as victims of a system in which one can become trapped by whimsical or capricious inaction by the City between the time that [a notice of violation] issues and a certificate of completion issues—the period during which the clock runs on mounting, confiscatory penalties of $1,000 a day. They even urge that this poses a hopeless conflict of interest for the City, which both controls the extent of penalties and gains from them. We find this interesting in theory and showing some *potential* for abuse. However, in the end defendants point to no instances *on this record* where any good faith efforts at remediation or compliance were impeded by unreasonable inaction or demands by the City." (*Sainez, supra,* 77 Cal.App.4th at p. 1314.) This is all the more true here, where the landlords repeatedly refused inspection of their properties. We reject their claim of error.

We also reject the landlords' related contention that failure to hold administrative hearings deprived them of the due process protections afforded under the State Housing Law. They were provided ample notice and an opportunity to be heard in a trial on the merits before the trial court issued its statement of decision and imposed penalties.

4. The Landlords' Reliance on a Statute Governing Attorney Fees Is Misplaced.

The landlords also claim that the City was not entitled to penalties for violations that were already abated at the time of trial. This argument is based on the State Housing Law's procedure to abate code violations and nuisances, which is unrelated to the awards of civil penalties at issue here. An enforcement agency shall provide notice of violation and shall "institute appropriate action or proceeding to prevent, restrain, correct, or abate the violation or nuisance" after providing 30 days' notice to abate. (Health & Saf. Code, § 17980, subd. (a).) Where violations are so extensive and "of such a nature that the health and safety of residents or the public is substantially endangered," an enforcement agency may issue an order or notice to repair or abate. (Health & Saf. Code, § 17980.6.) Notice under the statute must be given to property residents. (*Ibid.*) If the owner fails to comply the enforcement agency may seek the appointment of a receiver. (Health & Saf. Code, § 17980.7, subd. (c).) And if the trial court finds that a building is in a condition

27

that substantially endangers the health and safety of residents under Health and Safety Code section 17980.6, the trial court shall take various actions, including award reasonable attorney fees. (Health & Saf. Code, § 17980.7, subd. (d)(1).)

The trial court did not award civil penalties under section 17980.7. Instead, it concluded that the conditions at the landlords' buildings substantially endangered the safety or welfare of the occupants and the general public, entitling the City to recover their attorney fees and other costs under Health and Safety Code section 17980.7, subdivision (d). But instead of challenging the City's entitlement to attorney fees and costs, the landlords argue that the City was barred from seeking penalties for code violations that were already abated because "[t]he State Housing Law statutes show that a present endangerment is required at the time suit is filed." They argue that the State Housing Law's procedural mechanism for seeking abatement of code violations applies where violations "are" (as opposed to "were") so extensive that residents' safety "is" (as opposed to "was") substantially endangered. The argument is unavailing because the City was not awarded penalties under Health and Safety Code section 17980.7.

In any event, the landlords' argument is another way of challenging the trial court's sanctions order, which we already have rejected. Again, after the landlords repeatedly failed to allow inspections at their properties, the court ruled that if the City met its burden at trial of proving that the landlords created unlawful, substandard, or unsafe conditions at the subject properties, the court would determine that such conditions still existed at the time of trial. Thus, the sanctions order precludes the landlords from claiming that the City was required and failed to prove that the substandard conditions remained unabated at the time of trial.

5. The City Is Entitled to Penalties Through the End of Trial.

The landlords briefly challenge the City's entitlement to penalties calculated as of the date of the close of evidence instead of as of the opening day of trial. We reject their argument. Without providing a pin citation, they claim that *Sainez, supra,* 77 Cal.App.4th, provided a "directive" to calculate penalties as of the opening day of trial, but they are mistaken. It is unclear whether the trial court in *Sainez* calculated

28

penalties based on the opening or closing day of trial, and the appellate court did not address the issue in any event. (*County of Riverside v. Public Employment Relations Bd.* (2016) 246 Cal.App.4th 20, 32 [well established that cases are not authority for propositions not addressed].) And the general rule is that damages may be awarded in a judicial proceeding "for detriment resulting *after* the commencement thereof." (Civ. Code, § 3283, italics added.)

> 6. The Landlords Forfeited Constitutional Challenges to the Award of Penalties.

For the first time, the landlords also claim that the penalties imposed are unconstitutionally excessive under both the federal and state constitutions and that this excessiveness also violated their due process rights, but they have forfeited these claims. On appeal, they briefly contend, without citation to the record, that the combined amount of penalties and attorney fees awarded represented around a quarter of their net worth, contrary to the trial court's findings that the total amount was between 10 and 11 percent of their net worth. They then provide a lengthy, general overview of Eighth Amendment jurisprudence, followed by a summary of due process jurisprudence under the Fourteenth Amendment. But we already have upheld the trial court's issue sanction determining that each landlord's assets and net worth were jointly and severally deemed to be at least $25 million. (*Ante*, § II.A.2.c.) And because the landlords never raised their constitutional concerns below and failed to move for a new trial to challenge the excessiveness of the award—even after the trial court specifically noted that the award met constitutional muster under *Sainez, supra,* 77 Cal.App.4th 1302—we are precluded from considering the issue. (*Campbell v. McClure* (1986) 182 Cal.App.3d 806, 808, 811-812.)

> 7. The Landlords' Challenge to the Calculation of Penalties Fails.

The landlords also challenge the calculation of penalties. We review the facts supporting the imposition of penalties for substantial evidence (*People ex rel. Van de Kamp v. Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 765) and the trial court's decision to award penalties for abuse of discretion (*People ex rel. Bill Lockyer v. Fremont Life Ins.*

*Co.* (2002) 104 Cal.App.4th 508, 523). But the landlords mostly stop short of arguing that insufficient evidence supports the findings supporting the award of penalties or that the trial court abused its discretion when it awarded them. Instead, they argue that the court's findings of fact "were contrary to the very records the Court purported to rely on" and that therefore "the penalties were substantially overstated." As we explain, the challenges essentially are repackaged legal challenges to the awards, which we again reject.

                a.   The 18th Street Property.

      Kihagi owns an apartment building on 18th Street in the City's Castro neighborhood. One of the apartments was gutted "down to the studs" without permits, in violation of the City's Building, Housing, Plumbing, and Electrical Codes. A resident testified that the gutting took place in June 2014, and the trial court treated the start date as June 15. The Department of Building Inspection issued a notice of violation on October 10, 2014, citing the landlords for proceeding with construction work without a permit and gave them a 90-day grace period (until January 8, 2015) to obtain permits and to complete work to abate code violations. The landlords did not abate the violations until August 3, 2015—207 days after the abatement deadline. The court concluded that the landlords maintained the property as a public nuisance in violation of municipal law and the State Housing Law for a total of 324 days, calculated as follows: the property was out of compliance from June 15, 2014, through August 3, 2015 (414 days), minus a 90-day grace period to cure violations that were not counted as days in violation (so 117 days before the Department of Building Inspection cited the landlords, and 207 days after the 90-day grace period expired).

      On appeal, the landlords contend that a court may not find a violation of the Building Code unless a building official personally observes it and the property owner is provided with notice under Building Code section 102A.3, which did not happen here until October 10, 2014, meaning that the trial court improperly found that the property was out of compliance for 117 days. This is another way of arguing that the only way to find a violation of the municipal codes was to follow the administrative procedures set

30

forth in the Building Code, which we already have rejected. (*Ante*, § II.C.3.) And their contention that an inspector must personally observe the violation is deeply disingenuous given their pattern of refusing lawful inspections of their property. We are satisfied that the trial court properly calculated penalties in relation to this property.

   b.  The 19th Street Property.

   Xelan owns a six-apartment residential building on 19th Street in the Castro. A former resident testified at trial that when he toured the building as a prospective tenant in 2014, the two units he was shown appeared to be in the process of being remodeled because the "[f]inishings were new" and "[t]here were certain things that didn't look like they were completely done yet in terms of the apartments being finished." The work appeared to be "potentially still being done, but close to completion." When asked if he would have been able to move into the unit that day, the resident testified, "I probably would not be able to say that. I can't recall the details specifically. Seems like there was still work going on in all the units. Cosmetic maybe only at that point." No permit was applied for or obtained to perform work for those units. The resident noticed shortly after moving in that the heater did not work, and it was not completely fixed for about six months. The building also included a basement unit that was accessible from the back of the building, and it was vacant and under construction for most of the time the tenant was a resident of one of the upstairs units for about a year. An application to legalize a unit in the basement area was filed on April 1, 2016, but no permit was issued.

   The trial court found that the landlords performed remodeling work in one of the apartments of the building beginning in June 2014 without the required permits and as of the time of trial still had not obtained them, in violation of the Building, Housing, Electrical, and Plumbing Codes. The court treated the start date of construction as June 15, 2014, and found that the landlords had maintained code violations at the property through the end of trial on January 12, 2017, a total of 943 days. The court further concluded that the landlords also performed construction on the basement of the property without permits in violation of the Building, Housing, Electrical, and Plumbing Codes between June 2014 and June 2015. The court treated the start date of construction

31

as July 15, 2015 and found that the landlords maintained code violations through the conclusion of evidence, for a total of 548 days. The court concluded that the property was out of compliance with municipal codes from at least June 15, 2014, through at least January 12, 2017, for a total of 943 days.

On appeal, the landlords acknowledge that "lay and expert testimony" was presented to support the dates the property was out of compliance, but they argue that the trial court erred because no notices of violation were issued and because the City did not follow the proper administrative procedures, an argument that, again, this court already has rejected. (*Ante*, § II.C.3.)

The landlords also contend that the evidence presented did not support a finding of a violation because "[m]any types of 'remodeling work,' such as installation of appliances, new cabinets, and a long list of other improvements do not require permits" under "[s]ection R105 of the California Building Code." (Underline and bold omitted.) But the landlords apparently did not claim below that permits were not required for the remodeling work. Indeed, the resident of the building who testified about remodeling was never questioned on cross-examination about the work. In light of the fact the landlords repeatedly failed to allow inspection of their properties, we reject their argument that the tenant's testimony about what he observed in the apartment where he lived for a year was insufficient to establish that unpermitted remodeling work took place in the unit.

c. The Filbert Street Property.

Xelan owns a seven-apartment building on Filbert Street in the Russian Hill neighborhood. The trial court found that seven violations of the Unfair Competition Law occurred at the property because the building's units were out of compliance with various municipal codes for hundreds of days, mostly because of work performed without, or in excess of, required permits. The court determined that the landlords maintained the Filbert Street property as a public nuisance in violation of municipal law and the State Housing Law for a total of 632 days, which excluded any days while permits were suspended pending a determination by the City's Board of Appeals, any grace periods,

and any days in violation that preceded the one-year statute of limitations. The landlords take issue with the calculation of the number of days they were in violation, claiming that the trial court did not exclude additional "permit suspensions" in effect pending a tenant's appeal of those permits to the Board of Permit Appeals. They fail, however, to demonstrate reversible error.

First, the landlords sometimes fail to cite to the record when they claim error. For example, they state without citation to the record that the testimony of the chief electrical inspector established that violations in four units were corrected in June 2014 and in another unit in April 2015. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [where there are no citations to the record to support an argument, we treat issue as waived].) Elsewhere they cite to "Ex. P. ___" to support statements about electric permits.

Second, even when they cite to the record, the landlords fail to connect their statements with a particular claim of error. They summarize correspondence that they claim show when permits were suspended and terminated. But then they simply assert that permit appeals "resulted in permit suspensions, which in turn required corrective work and new permits" and thus the trial court "should not have counted penalty days." They do not, however, specify precisely how many days should be subtracted from the total for the purpose of calculating penalties. And it is unclear whether subtracting days would matter in any event since the trial court aggregated the total number of days the building was out of compliance instead of calculating penalties cumulatively. (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286-287 [no error warrants reversal unless appellant can show injury from the error].)

d.  The Eureka Street Property.

Renka owns a five-unit apartment building on Eureka Street in the Castro. Citing to trial exhibits and testimony, the trial court found five violations of the Unfair Competition Law and that the property was maintained as a public nuisance and in violation of municipal law and the State Housing Law for a total of 920 days.

As for one of the violations of the Unfair Competition Law, the trial court noted that the Department of Building Inspection's building division issued a notice of violation

at the property on March 19, 2014, for being an "unsafe building" under the Building Code. The department gave the landlords a 28-day grace period to obtain a structural engineer's report, then issued a second notice of violation on August 21, 2014, after the landlords failed to comply with the first notice. The landlords failed to abate the violations until February 24, 2015, which meant that violations of the Building Code existed at the property for 314 days (excluding the department's grace period). Citing only to a complaint data sheet, and without addressing the testimony cited by the trial court, the landlords claim that no penalties should have been awarded for this notice of violation because "there never was any physical defect or hazard." The landlords have not established that the finding is unsupported by substantial evidence.

The landlords' challenges to the other findings as to this property suffer the same deficiencies. Citing only various complaint data sheets and notices of violations, they claim that the trial court miscalculated the days the property was in violation. They go so far as to claim that a tenant lied under oath, yet they do not provide a citation to the tenant's testimony. And nowhere do the landlords explain how any miscalculation of some days would even matter given that the trial court did not calculate the penalties cumulatively.

### e. The Guerrero Street Property.

Renka owns a six-unit apartment building on Guerrero Street in the Mission district. The trial court concluded that nine violations of the Unfair Competition Law occurred on the property and that the property was a public nuisance and in violation of municipal laws and the State Housing Law for a total of 830 days. Once again, the landlords attack these factual findings but fail to provide citations to the record or to address the testimony on which the trial court relied. For example, they assert that the "heating system work was essential and done with permits." The only record citation they provide is a complaint data sheet regarding "Unsafe Flues For Water Heaters And Wall Heaters" whose dates and notations do not match what the landlords represent in their brief. They also claim, without citation to the record, that "to the extent this construction had any impact on the tenants, it was a temporary and minor one, for

34

installation of a vital building component, the furnace." The landlords again fail to establish error.

> f.  The Hill Street Property.

Finally, we reject the landlords' challenge to the trial court's findings regarding a five-unit apartment building on Hill Street in the Castro owned by Zoriall. Again, the landlords do not address all the evidence presented below, make various assertions without citation to the record, and repeat legal arguments we already have rejected.

> D.  *The Law and Substantial Evidence Support the Trial Court's Findings of Tenant Harassment.*

The trial court concluded that the City proved by clear and convincing evidence that the landlords had "engaged in conduct that violated municipal and state tenant harassment laws and evictions laws, and therefore, also California's unfair business practices law." The court listed the acts of harassment that occurred at each property and totaled the violations of the Unfair Competition Law. The landlords challenge the award as both a matter of law and fact.

1.  The Trial Court Applied the City's Rent Ordinance Consistent with Its
    Terms.

The landlords first challenge whether certain conduct actually amounted to
harassment, a question of law we review de novo. (*Golden Gateway Center v. San
Francisco Residential Rent Stabilization & Arbitration Bd.* (1999) 73 Cal.App.4th 1204,
1207.) "Our primary duty when interpreting a statute is to determine and effectuate the
Legislature's intent. [Citations.] 'When the language of a statute is clear and
unambiguous, there is no need for interpretation and we must apply the statute as
written.' " (*Bohbot v. Santa Monica Rent Control Bd.* (2005) 133 Cal.App.4th 456, 462.)
"However, if the statutory language is not so clear, '[i]t is our task to construe, not to
amend, the statute.' [Citation.] In construing a statute, it is the role of the judiciary to
simply ascertain and declare what is in terms or in substance contained in the statute, not
to insert what has been omitted or omit what has been included. In other words, the
courts 'may not, under the guise of construction, rewrite the law or give the words an
effect different from the plain and direct import of the terms used.' " (*Scripps Health v.
Marin* (1999) 72 Cal.App.4th 324, 331.) " 'The same rules of statutory interpretation that
apply to statutory provisions also apply to local charter provisions.' " (*Bohbot*, at p. 462.)

The Rent Ordinance defines "housing services" as including "repairs;
replacement; maintenance; painting; light; heat; water; elevator service; laundry facilities
and privileges; janitor service; refuse removal; furnishings; telephone; parking; rights
permitted the tenant by agreement; including the right to have a specific number of
occupants, whether express or implied, and whether or not the agreement prohibits
subletting and/or assignment; and any other benefits, privileges or facilities." (Admin.
Code, § 37.2, subd. (g).) By voters' passage of Proposition M in November 2008, this
definition was expanded to include "quiet enjoyment of the premises, without harassment
by the landlord as provided in Section 10B." (*Ibid.*; see *Larson v. City and County of San
Francisco* (2011) 192 Cal.App.4th 1263, 1272-1273.) Section 37.10B of the Rent
Ordinance, in turn, lists 15 activities that amount to tenant harassment when done "in bad
faith or with ulterior motive or without honest intent." (Admin. Code, § 37.10B,

36

subd. (a); but see *Larson*, at pp. 1283, 1296 [subd. (a)(7) impermissibly restricts constitutionally protected speech].) The City is authorized under the code to file a superior court action for any acts of harassment and to recover damages therefor. (Admin. Code, § 37.10B, subd. (c)(5); *Larson*, at p. 1282.)

The landlords contend that tenant harassment under the Rent Ordinance must be conduct that is "substantial and continuing" so as to avoid "an 'absurd or anomalous result.' " True, where two statutes are in conflict, the court should construe a statute with reference to the whole system of law so as to harmonize it and to "seek to avoid absurd or anomalous results." (*Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 531.) The courts should not blindly apply the plain meaning of a statute where literal interpretation would defeat the Legislature's purpose. (*Id.* at p. 532.) "To put it another way, the ' "language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." ' " (*Ibid.*) But the landlords identify no such literal interpretation that would lead to absurd consequences absent a requirement that conduct be "substantial and continuing" to amount to harassment.

For example, the landlords point to the part of the Rent Ordinance that provides that a landlord shall not "[i]nterrupt, terminate or fail to provide housing services required by contract or by State, County or local housing, health or safety laws." (Admin. Code § 37.10B, subd. (a)(1).) The landlords claim it would be absurd to construe this subdivision as including a single interruption in housing services, because a relatively minor event such as a single power failure would amount to harassment. But the ordinance specifies that the landlord may not interrupt services "in bad faith or with ulterior motive or without honest intent." (Admin. Code, § 37.10B, subd. (a).) Such a requirement of ill motive would preclude liability where a tenant's power was interrupted because of a single power outage that was accidental or outside the landlord's control. But if a landlord caused a power failure at one of its properties in bad faith or with ill intent, we would not hesitate to conclude that this amounted to harassment, even if it were a single occurrence.

37

Cases interpreting "harassment" as that term is defined in statutes other than the Rent Ordinance do not help the landlords. For example, before someone may secure a civil anti-harassment injunction, a petitioner must establish that a person has engaged in a "course of conduct" of unlawful violence or threats of violence, which is "a series of acts over a period of time." (Code Civ. Proc., § 527.6, subd. (b)(1), (3).) Given this statutory definition, it is not surprising that courts have required more than one act before the issuance of an injunction. (E.g., *Leydon v. Alexander* (1989) 212 Cal.App.3d 1, 4 [because statute explicitly states that multiple acts are required, single incident insufficient to show harassment].) This is consistent with the purpose of the an anti-harassment statute, which is to protect an individual against future harm. (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 401, 403.) Because an injunction is aimed at future and not past conduct, establishing a course of conduct is probative of whether it is likely to continue absent an injunction. (*Id.* at p. 403; but see *id.* at p. 404 ["There may well be cases in which the circumstances surrounding *a single act* of violence may support a conclusion that future harm is highly probable."], italics added.) By contrast, the purpose of the Rent Ordinance is to impose penalties on past conduct that interferes with a tenant's enjoyment of his or her housing.

The landlords also stress that in order for an employee to prove harassment under the Fair Employment and Housing Act (FEHA, Gov. Code, § 12900 et seq.), he or she must prove that the harassment was " 'sufficiently severe or pervasive' to alter the conditions of the victim's employment." (*Etter v. Veriflo Corp.* (1998) 67 Cal.App.4th 457, 463.) In order to prove harassment under FEHA, a plaintiff must prove that the conduct was more than "occasional, isolated, sporadic, or trivial." (*Id.* at p. 466.) There is nothing inconsistent with this standard and the standard we apply with respect to the Rent Ordinance. Because the ordinance requires a showing of bad faith or ill motive, no liability would flow from a "trivial" incident. If, on the other hand, a single act were "sufficiently severe" to establish harassment, the court may well find there was harassment. We reject the landlords' argument that a court must necessarily find that a

38

landlord committed multiple acts over a period of time in order to conclude that the landlord engaged in harassment.

    2.  Substantial Evidence Supports the Trial Court's Findings.

The landlords next challenge the trial court's individual findings regarding tenant harassment. We review the trial court's factual determinations for substantial evidence. (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489.)

    a.  The 18th Street Property.

A former resident of the 18th Street property testified, without objection, about eviction notices that both he and another former resident, Darcy Harris, received while living at the property. Harris, who at the time of trial lived on the East Coast, did not testify. The resident who testified at trial paid $1,628 in monthly rent in summer 2014 for his unit, and Harris paid monthly rent of around $1,423.26 in June 2014 for her separate unit. Harris had lived in her apartment at that point for at least six to seven years, and she worked for Wells Fargo. In August 2013, the two residents were both served with 60-day notices of termination of tenancy for their separate units. The notices stated that one unit was being vacated so an owner could move in, and the other was being vacated so that a relative could move in. Both residents were offered different units in the same building with a rent of $4,250, an increase of more than $2,600 each. The residents both paid for an attorney to fight the notices, and the notices were withdrawn. The resident who testified received another notice of termination in February 2014 based on owner move-in, again consulted with an attorney, and again had the notice withdrawn. Harris also received an eviction notice around this time, but hers was an unlawful-detainer eviction based on "a missed rent payment and she was also being accused of running a business out of her apartment." No evidence was presented at trial that Harris was in fact running a business out of her apartment. Harris lost her case and moved to North Carolina or South Carolina because she could no longer afford to live in San Francisco. The process "turned [her life] upside down" and was "[v]ery intrusive" because "her financial situation, her personal situation" was "totally investigated."

Based on this testimony, the trial court found that Kihagi served Harris with a notice of eviction for having run a commercial business out of her apartment and for having missed a rent payment, but that "the unrefuted evidence shows that Harris worked at Wells Fargo Bank at the time, and there was not a scintilla of evidence that she was engaging in any unlawful commercial business out of her apartment." The court concluded that the eviction was "unlawful, unfair, and fraudulent" and imposed penalties under the Unfair Competition Law for each month Harris was out of possession of her apartment from June 2014 through January 2017 (31 months).

Although the landlords did not object below to any of the former resident's testimony, they claim on appeal that it was "ridiculous hearsay" that could not support the trial court's conclusions. Having failed to object below, the landlords forfeited any hearsay objections. (*People v. Nugent* (1971) 18 Cal.App.3d 911, 917.)

The landlords further complain that the trial court did not address Harris's alleged failure to pay rent as a basis to evict her, a valid ground for eviction under both the Rent Ordinance (Admin. Code, § 37.9, subd. (a)(1)(A)) and Code of Civil Procedure section 1161, subdivision 2. We are not persuaded. Harris had a regular income from her work at Wells Fargo. Even if we assume that she withheld a rent payment, her attempted eviction could still have been unfair and fraudulent for purposes of the Unfair Competition Law given the evidence of Kihagi's repeated and improper efforts to evict her and increase the rent. Substantial evidence supports the trial court's findings.

    b.  The 19th Street Property.

The same resident who testified about remodeling at the 19th Street property also testified about the conditions at his apartment when he and his wife lived there, as well as his "trying" and "confrontational" relationship with Kihagi. The trial court concluded several acts of harassment by Kihagi amounted to a constructive eviction of the tenant and his wife: the couple went without adequate central heat for eight months and Kihagi ignored several requests for repairs, thus failing to exercise due diligence in violation of the Rent Ordinance's harassment provision; two of the landlords' workers entered the apartment without prior notice or consent in October 2014 in violation of the Rent

40

Ordinance's harassment provisions and Civil Code section 1954, subdivision (d)(1) [landlord may enter residence only if given proper notice]; Kihagi and another man also entered the apartment without prior notice or consent in October 2014 in violation of harassment provisions and the Civil Code; the apartment lacked a working doorbell during their entire tenancy, and Kihagi ignored requests to repair it in violation of harassment provisions; Kihagi listed the apartment for rent after the residents said they intended to move but before they moved out and did not provide notice to the couple that it was listed as available for showings, in violation of harassment provisions; and during one open house, Kihagi told the husband he could not sit on the front steps of the building in violation of harassment provisions.

On appeal, the landlords do not dispute any of these facts and only quibble about whether they amounted to harassment. But in so doing, they fail to even cite to the harassment provisions they were found to have violated. For example, they acknowledge that the heater did not work properly for about six months and that the doorbell never worked. But they do not address the trial court's finding that these deficiencies violated the Rent Ordinance (Admin. Code § 31.10B, subds. (a)(1) [failure to provide housing services], (a)(2) [failure to perform repairs and maintenance], (a)(3) [failure to exercise due diligence in completing repairs], and (a)(10) [interference with tenant's right to quiet use and enjoyment of rental housing]). Instead, they claim that "[a]ny fair reading of [the resident's] testimony shows that he was a good tenant who left for his and [his] wife's own reasons." We disagree. Substantial evidence supports the trial court's findings, and we decline to set them aside. (*Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [court may disregard conclusory argument that is unsupported by relevant legal authority].)

c. The Eureka Street Property.

The trial court found that there were 143 predicate acts of harassment at the Eureka Street property for which it would assess civil penalties under the Unfair Competition Law. These acts were sometimes directed to all tenants collectively and sometimes directed to individual tenants. The acts aimed at all tenants included: (1)

41

requiring all tenants to remove stored items out of the garage, a privilege permitted by the previous owner, without a downward adjustment in rent, (2) reducing the garbage, composting, and recycling services by half, (3) engaging in unpermitted construction in one of the units that "ripped out the whole apartment" and involved frequently cutting off power to the other units, (4) dumping construction debris from the illegal construction in the already overflowing trash receptacles, (5) interrupting water services three or four times, with each interruption lasting several hours, in retaliation for the tenants exercising protected rights, and (6) dumping a large amount of construction debris near the water heater in retaliation for exercising protected rights. The acts aimed at individual tenants were identified in a listing covering 11 pages of the trial court's statement of decision.

On appeal, the only act directed against all the tenants challenged by the landlords is the finding that they decreased housing services for the entire building by requiring the tenants to move their stored items out of the garage without a downward adjustment of rent. They do not dispute that the previous owner permitted the storage. They simply contend that the tenants' access to the garage was not provided for in the written leases and that "[a]s a matter of law, any verbal permission by the previous owner did not alter the lease obligations or create new rights for the tenants. (Citation)."[8] To the contrary, " 'in some cases a court will imply that the tenant also has such additional easements in the property owned by the landlord as are reasonably necessary for the tenant's beneficial enjoyment of the premises leased. . . . The easements may be implied even though they are outside of the demised premises described in the lease, but they are not implied if the express provisions of the lease exclude them.' " (*Dubin v. Robert Newhall Chesebrough Trust* (2002) 96 Cal.App.4th 465, 473, italics omitted.) True, the leases here apparently stated that storage was not allowed outside of the tenants' living units. But "[w]hen one party has, through oral representations and conduct or custom, subsequently behaved in a

---

[8] The landlords later contend it "is virtually hornbook law that a contract provision requiring changes be made only in writing cannot be waived or orally modified," but they rely on a case distinguishing private contracts and *public contracts*, where written change orders cannot be modified orally through the parties' conduct. (*G. Voskanian Construction, Inc. v. Alhambra Unified School Dist.* (2012) 204 Cal.App.4th 981, 990.)

42

manner antithetical to one or more terms of an express written contract, he or she has induced the other party to rely on the representations and conduct or custom. In that circumstance, it would be equally inequitable to deny the relying party the benefit of the other party's apparent modification of the written contract." (*Wagner v. Glendale Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1388.) The landlords do not address the inequity in denying the tenants a use they previously enjoyed or in not offering a rent reduction when the use was taken away. We reject their arguments.

Of the dozens of acts of harassment of individual tenants at the Eureka Street property, the landlords challenge only a few. These involved findings about Kihagi questioning a tenant about such things as an agreement with the previous landlord about keeping a dog and whether the other tenant in the unit was the tenant's registered domestic partner. The landlords claim that Kihagi's questions were "perfectly reasonable" and "normal for a new owner." But these acts are properly considered in the context of all the evidence presented. After having previously argued that a plaintiff must prove a course of conduct of harassment (*ante*, § II.D.1.), the landlords now appear to complain that harassment cannot be inferred from earlier acts even though they concede that later acts constituted harassment, such as making an explicit threat. The landlords essentially ask this court to reweigh the evidence and the inferences to be drawn from it, an inappropriate task for the appellate court.

d. The Filbert Street Property.

The trial court found that the landlords committed 102 predicate acts of tenant harassment at the Filbert Street property. The landlords purport to challenge the sufficiency of the evidence as to three of them, but their challenge is more accurately characterized as another request for us to improperly reweigh the evidence.

The landlords first point to the trial court's findings that when the landlords bought the property in mid-August 2013 they falsely claimed that three tenants had not paid their August 2013 rent, and that one of the tenants (a 65-year-old disabled woman) made a second payment out of an abundance of caution but was never reimbursed for it. The court found that these acts amounted to harassment in violation of the Rent

43

Ordinance. (Admin. Code § 37.10B, subds. (a)(11) [refusal to accept or acknowledge receipt of tenant's lawful rent payment], (a)(12) [refusal to cash a rent check for more than 30 days].) On appeal, the landlords do not dispute the findings, but claim, without citation to legal authority, that it is "obvious that errors about tenant payments can happen in a change of ownership," and that there was "no basis for inferring that Defendant's claim for rent was 'false,' nor was the failure to correct the double payment." Because the trial court drew reasonable inferences from the evidence, we reject the landlords' argument.

The same goes for their challenge to two incidents where the trial court found that Kihagi harassed her elderly, disabled tenant to move and later yanked the screen door from her apartment. Again, the landlords simply assert that these incidents did not amount to harassment, a characterization we reject.

e. The Guerrero Street Property.

The trial court found that the landlords engaged in 890 acts of harassment at the Guerrero Street property, including against tenants who were elderly and disabled. The landlords claim that the penalties imposed were "arrived at in large part by imposing double punishments for the same conduct." As examples, they point to the trial court's finding that the Guerrero Street tenants lost electrical service in the common area for 11 to 15 days in September 2014 after the landlords failed to pay the electrical bill for which they were responsible, creating an unsafe environment, especially for older and mobility-impaired tenants who were forced to navigate the stairs to their apartments in the dark. The tenants reported the outage to the landlords several times in writing and by phone but received no response, and eventually reported the problem to the Department of Building Inspection. The landlords do not dispute these findings but claim it amounted to "double punishment" for the trial court to also impose penalties for the fact that the building's alarm system went off constantly for 11 to 15 days as a result of the power outage. But they do not cite any authority for the conclusory statement that the penalties were "double punishment for the same conduct since the loss of electricity and the alarm going off are two consequences of the same power outage." We are not persuaded that loss of light

44

and exposure to alarm noises are truly the "same conduct." Given that the landlords present this argument so perfunctorily, "[w]e will not develop the appellants' arguments for them." (*Dills v. Redwoods Associates, Ltd., supra,* 28 Cal.App.4th at p. 890, fn. 1.) The same is true for additional examples the landlords cite as double punishment, given that they do not provide legal authority or anything more than conclusory arguments.

The landlords likewise perfunctorily address the trial court's finding that the tenants' electrical service was shut off on a separate occasion. The trial court found that the electrical service to the common areas "was shut off" in retaliation for the tenants exercising their protected rights. The landlords assert that the trial court failed to point to "evidence that this was an act by Defendants, let alone that it was in retaliation for anything," and thus there was not substantial evidence to support the resulting penalty assessment. But a statement of decision "need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124-1125; see also Code Civ. Proc., § 632.) The landlords fall far short of overcoming the presumption of the judgment's correctness and establishing that insufficient evidence supported the court's findings. At most, they merely note that the statement of decision might not have listed all evidentiary facts, when in fact all that is required are ultimate facts. (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.)

The trial court also found that within a month of buying the Guerrero Street property, the landlords, without notice or a rent reduction, denied the tenants access to a common area that was previously usable. They did so by locking the access door and throwing away the tenants' patio furniture and barbeque pit. As they did in relation to their argument about the Eureka Street property, the landlords focus on the fact that the leases did not specifically provide for access to the area. But again, the trial court could properly find that it was inequitable for the landlords to take away a privilege previously established through an oral modification to a written agreement without providing a decrease in rent.

45

Finally, the landlords challenge the trial court's finding that three roommates (one of whom was disabled) were forced to leave their unit because of the constant interruptions in utilities and basic services, reductions of services, and the landlords' repeated refusals to respond. One of the three roommates testified at trial over two days about her tenancy after Renka purchased the building from the previous landlord. The new landlord provided new house rules that were inconsistent with the tenants' existing leases and started unpermitted construction in the basement that shook the building and often woke up the resident. She testified that it affected her sleep and "was just stressful, not knowing what was happening in your house." The tenant described the loss of electricity in the common area, the alarm that sounded nonstop for several days, the fact she lost access to her mailbox for a couple months because the landlord removed the key to the mailbox, an insect infestation that started after construction began, and other issues. She further testified that the landlord installed a camera pointed at her apartment's interior front door, which made her feel as if she was being watched.

When asked why she left the Guerrero Street property, the tenant testified, "After all the complaints, not having heat, not having water, paying the amount of rent I paid, not being able to sleep, not ever really knowing—it was a really stressful situation. I am sorry." After the trial judge asked the witness whether she would like to take a break, the witness responded, "I'm okay. I think, thinking about it now, it was a really stressful situation. [¶] My ex-partner [one of the women who also lived at the apartment] broke up with me. [¶] I mean, constantly, constantly trying to communicate things that needed to be fixed. And living in San Francisco for 20-something years and having to be displaced and getting to the point where I was like, I can't live like this. [¶] And not being able to have a job and work and just kind of trying to get back on my feet. I just needed to get back and healthy and go back to work. And having a living situation being stressful and having everybody else in the building be stressed about it was kind of a really scary thing. Something that I read about; oh, my God, I am one of these people. [¶] So it was one of those things where it's just like, what do you do? And integrity-wise it was just kind of like, it wasn't worth it to me living in a situation like that, knowing that every

46

time I sent a rent check, was she going to cash it or was I going to get a notice on my door and be evicted for something that—when I didn't do anything wrong." She further testified that "I had to choose to either fight or cut my losses and just focus on me getting healthy. So that's what I did. So I moved. [¶] I had nowhere to go, but, you know, I couched for a few months," meaning she stayed with friends because she did not have another place to live right away. The tenant was asked on cross-examination whether the reason she moved out was because she broke up with her girlfriend. The tenant acknowledged that her girlfriend broke up with her but explained that she wanted to keep the apartment but "wouldn't have been able to under the circumstances we were living under." She further explained that her girlfriend also "didn't want to live under those circumstances" and that "[t]he living situation caused a lot of stress in our relationship." When pressed further about the stress they were under, the resident testified that sometimes her ex-girlfriend did not have a good night's sleep because of the construction noise. In response to the question, "So her irritability caused you to move out?" the resident testified, "My relationship was a whole separate issue. We were grownups. It was about having a healthy living situation, and for her, she felt moving out would be healthy."

On appeal, the landlords pluck selective quotes from the foregoing testimony and claim that the tenant's testimony "shows she chose to leave after breakup of a romantic relationship" and that as to the other roommate, "there is no evidence as to her motivation for leaving, and it would be speculation to assume it was because of building conditions rather than because the other two were going their separate ways." We believe that the resident's full testimony, in context, speaks for itself. She described stressful living conditions caused by the landlords' actions at the Guerrero Street property and testified that all residents in the building were affected by the conditions there. Substantial evidence supports the trial court's findings.

f. The Hill Street Property.

The trial court concluded that the landlords committed 281 predicate acts of harassment at the Hill Street property. The landlords challenge only the finding that the

47

landlords, without a corresponding rent reduction, reduced the number of recycling bins at the property by 50 percent, from two bins to one bins for all nine tenants, causing the single bin to overflow and forcing tenants to save their recyclables in their apartments for later disposal. The trial court found that the unilateral reduction in services violated the Rent Ordinance. (Admin. Code § 37.10B, subds. (a)(1) [termination of housing services required by health laws], (a)(10) [interference with tenants' right to quiet use and enjoyment of housing unit].)

The landlords ignore the finding that the single recycling bin overflowed and that residents were forced to keep their recyclables in their apartments and argue there was insufficient evidence because no one from "Recology, the City Health Department or other sources" testified that one bin was inadequate. Given the substantial evidence that was presented, additional evidence was unnecessary. The landlords also point to Health and Safety Code section 17920.3, subdivision (a)(16), which provides that a building is substandard if it lacks "adequate garbage and rubbish storage and removal facilities as determined by a health officer." The landlords claim that because there was "no such finding by a health officer," there was no substantial evidence to support the trial court's finding. Even if we accept that the lack of finding by a health officer means, as a matter of law, that the trial court could not find that the landlords ended a housing service required by health laws, the landlords do not address the alternative basis for assessing penalties: that the conduct interfered with tenants' right to the quiet use and enjoyment of the building. Sufficient evidence was presented that the reduction in recycling bins, without a corresponding reduction in rent, amounted to an interference with the tenants' rights.

Having rejected the landlords' evidentiary challenges to the award of penalties, we also reject their related, but baseless, argument that the harassment allegations were part of a "concerted and ethically dubious effort to drive [the landlords] out of business in San Francisco." (Unnecessary capitalization and bold omitted.) They cite a series of emails that they claim showed that the City Attorney's Office "became an active participant" in a "private agenda of destroying Defendants' business." Given our conclusion that the

48

residents' claims of harassment were supported by substantial evidence in the record, we need not further address the landlords' claims that the City or the tenants were driven by an improper motive.

### E. The Trial Court Correctly Held the Mwangis Liable for Their Wrongdoing.

#### 1. Additional Background.

As set forth above, Kihagi had a role in all four of the landlord LLCs. J. Mwangi and C. Mwangi's roles, on the other hand, were more limited. J. Mwangi and Kihagi were members of Renka, and C. Mwangi and Kihagi were members in Zoriall. C. Mwangi also was a manager (along with Kihagi) of Xelan.

When the trial court made its specific findings about tenant harassment and code violations, it specified which defendant was responsible for which violation. For example, the trial court found that Xelan and Nozari were liable for the acts of tenant harassment, retaliation, and wrongful evictions during their respective periods of ownership of the 18th Street property, and that Kihagi was liable for all acts of tenant harassment, retaliation, and wrongful evictions committed at the property while she owned it, as well as during Xelan and Nozari's period of ownership, in addition to those she personally committed or participated in.

Commensurate with their smaller roles in the landlord LLCs, there were fewer findings of liability as to the Mwangis.

#### a. The Eureka Street Property.

Renka (of which J. Mwangi was a member) purchased the Eureka Street property in December 2013. Renka transferred 25 percent of its ownership interest to J. Mwangi in September 2014, which gave her sufficient individual ownership to perform an owner move-in eviction. In November 2014, two residents of one of the units at the property were served with a 60-day notice of termination of tenancy, purportedly so that J. Mwangi could move into their unit, even though two comparable units were vacant at the property. The landlords fraudulently changed the date of the notice as well as the proof of service to cut short the residents' 60 days. And they falsely represented to the City's rent board that J. Mwangi was not a member of Renka, which also owned six

49

465

apartments at the Guerrero Street property. Moreover, J. Mwangi did not in good faith intend to use the apartment as her principal residence for a minimum of 36 consecutive months, as required for a lawful owner move-in eviction under the Rent Ordinance. In fact, her principal place of residence was in Fremont, and she had applied for a one-year residency program in Portland in April 2016 that she would have had to apply for much earlier, at a time when she would have known that she would not be planning to live at the Eureka Street property. The residents were evicted from their apartment on January 10, 2015. The following month, February 2015, J. Mwangi transferred her 25 percent ownership of Eureka Street back to Renka. The trial court found that J. Mwangi's owner move-in eviction was an unlawful, unfair, and fraudulent eviction, and that there had been 48 violations of the Unfair Competition Law (two for each of the tenants who were wrongfully evicted, multiplied by 24 for each of the months the tenants were out of possession of the apartment).

Of the 143 total predicate acts of harassment that violated the Unfair Competition Law at the Eureka Street property, the court found that there was joint and several liability for Kihagi, Renka, and J. Mwangi for 94 of them (those acts during J. Mwangi's periods of ownership, as well as those she committed or participated in).

As for code violations, the court found Kihagi (as agent) and Renka (as owner of record) were jointly and severally liable for 758 of the days the Eureka Street property was out of compliance. Kihagi (as agent) and Renka and J. Mwangi (as owners of record) were found to be jointly and severally liable for far fewer days—162.

b. The Hill Street Property.

Zoriall purchased the Hill Street property in July 2014. After enduring several acts of harassment, the tenants of the property formed a tenants' union by December 2014. In March 2015, Zoriall transferred 27 percent of its ownership interest to C. Mwangi. On April 7, 2015, the tenants' union wrote the landlords a letter, signed by all then-current residents of the property, that they were aware that the landlords had transferred title from Zoriall to C. Mwangi, and that two residents were leaving one of the units in response to Kihagi's threat of an owner move-in eviction. The tenants wrote that

50

any owner move-in eviction by C. Mwangi would show a lack of good faith and an improper ulterior motive, given that one of the units at the property would soon be vacant. C. Mwangi nonetheless served a couple and their eight-year-old daughter a 60-day notice of termination of tenancy for an owner move-in eviction. She falsely represented to the City's rent board that she had been living at the 18th Street property for the previous two years, when in fact her principal residence was in Fremont, and she also falsely represented that the other apartment that recently had been vacated was not immediately available for the family to rent as an alternative to having to vacate the building. The family was forced to vacate at the end of August 2015 and was not paid a second relocation payment of $10,177 that they had been promised, and the unit was left vacant for at least a year after the family moved out. C. Mwangi transferred her 27 percent ownership interest back to Zoriall in September 2015. The trial court found that C. Mwangi's owner move-in eviction was an unlawful, unfair, and fraudulent eviction, and that there had been 48 violations of the Unfair Competition Law (three for each of the tenants who were wrongfully evicted, multiplied by 16 for each of the months the tenants were out of possession of the apartment).

Of the 281 predicate acts of harassment that violated the Unfair Competition Law at the Hill Street property, the court found that there was joint and several liability for Kihagi, Zoriall, and C. Mwangi for 135 violations (those acts during C. Mwangi's period of ownership as well as those she committed or participated in).

As for code violations, the trial court found that Kihagi (as agent) and Zoriall (as owner of record) were jointly and severally liable for 633 days the property was out of compliance. Kihagi (as agent) and Zoriall and C. Mwangi (as owners of record) were found to be jointly and severally liable for far fewer days—188.

    c.  Failure to Register Businesses.

The trial court also found that the landlords failed to register their businesses with the City, in violation of the City's Business and Tax Regulations Code, and it assessed one violation of the Unfair Competition Law for each property for each year that the landlords failed to register. Kihagi, Renka, and J. Mwangi thus were held jointly and

51

467

severally liable for two of the three violations for the Eureka Street property; and Kihagi,
Zoriall, and C. Mwangi were held jointly and severally liable for one of the three
violations for the Hill Street property.

### d. Trial Court's Conclusions.

After the trial court made its findings as to each of the various properties for
harassment and code violations, it summarized the law as follows: " '[P]arties may be
held jointly and severally liable for unfair competition and for making false and
misleading statements.' [(*People v. First Federal Credit Corp.* (2002) 104 Cal.App.4th
721, 734.)] Every defendant that owned part of a building is jointly and severally liable
for the penalties associated with the property. [(*People v. Witzerman* (1972)
29 Cal.App.3d 169, 180-181; *First Federal*, at p. 735] [finding that defendants need not
participate in a wrongful act directly; allowing it to occur from a 'position of control' is
sufficient to trigger joint and several liability]; *Myrick v. Mastagni* (2010)
185 Cal.App.4th 1082, 1091 [explaining that defendants are liable for all obligations of
partnership or object of joint venture, regardless of share of ownership].) Further,
liability under the [Unfair Competition Law] may be imposed where a defendant aided
and abetted one or more other defendants. [(*People v. Toomey* (1984) 157 Cal.App.3d 1,
15.)] A defendant who aids and abets is equally liable with those who directly violate the
UCL, even if that defendant takes only a small profit or leaves the actual unlawful acts to
others. [(*People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 918-919.)]"

As a factual matter, the trial court concluded that because Kihagi was a manager,
agent, or owner of every defendant LLC and had engaged in "virtually all of the
harassing conduct testified to at trial," she was individually liable for all penalties while
she was the sole owner of record of a property, and jointly and severally liable for all
other penalties. As for J. Mwangi and C. Mwangi, the trial court concluded that they
were "jointly and severally liable for all penalties the Court imposes as to unlawful acts
that they contributed to or participated in, as well as all penalties associated with a
property during their periods of ownership." Kihagi was ordered to pay far more than
J. Mwangi and C. Mwangi, based on the latter two women's smaller role. Out of the total

52

$1,117,500 ordered to be paid to the City, J. Mwangi was ordered to pay $40,500 (jointly and severally with Kihagi and Renka), and C. Mwangi was ordered to pay $47,000 (jointly and severally with Kihagi and Zoriall). Out of the total $1,612,029 ordered to be paid to the State of California, J. Mwangi was ordered to pay $96,002 (jointly and severally with Kihagi and Renka), and C. Mwangi was ordered to pay $136,001 (jointly and severally with Kihagi and Zoriall).

    2.  The Trial Court Did Not Err in Holding the Mwangis Liable.

The landlords contend that the Mwangis cannot be held jointly and severally liable for the City's claims against Kihagi or the other LLC defendants because "they were mere passive holders of equity who did not participate in the control or management of the buildings at issue." They acknowledge that J. Mwangi and C. Mwangi had ownership interests in the landlord LLCs, but they assert that the women lacked the requisite control over the relevant LLCs to be held liable for the actions committed by co-owner Kihagi. As with so many of the landlords' arguments, they do not tie their complaints to any specific finding that the trial court made. They claim that they lacked the ability to "interact with the City," without addressing the factual findings that both J. Mwangi and C. Mwangi made false statements to the City's rent board in connection with their fraudulent owner move-in evictions. They further claim the Mwangis were "mere passive minority stake holders in the equity," without addressing the fact they transferred ownership back and forth between the relevant landlord LLCs in order to qualify for the owner move-in evictions. And it is simply not the case, given those fraudulent evictions, that the Mwangis were held liable for Kihagi's torts or those of the landlord LLCs "simply by virtue of co-ownership, without more."

The landlords' reliance on *Connor v. Grosso* (1953) 41 Cal.2d 229 is misplaced. There, the court concluded that a defendant could not be held liable for her spouse's tort of dumping on adjacent land simply by virtue of the fact they were spouses and held property together as joint tenants, without evidence that she actively participated in the tort or ratified her spouse's conduct. (*Id.* at p. 230.) First, the nature of spouses holding property in joint tenancy is distinguishable from partners co-owning a limited liability

corporation. Second, and more importantly, the trial court did not hold the Mwangis liable solely because of their ownership interests, given their fraudulent owner move-in evictions. The landlords complain that there was no evidence as to any conduct by the Mwangis "[o]ther than" those two evictions, but given their fraudulent statements to the rent board and the transfer of ownership interests in their LLCs to qualify for the move-ins, we can hardly discount this conduct as the basis for finding joint and several liability.

       3. Substantial Evidence Supports the Trial Court's Factual Findings.

      The landlords also claim that neither of the Mwangis participated in an owner move-in in bad faith. They point to various pieces of evidence that are favorable to them. The City, for its part, points to overwhelming evidence favorable to the judgment. It is settled that we must view the evidence in the light most favorable to the prevailing party and give it the benefit of every reasonable inference, resolving all conflicts in its favor. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.) This is true whether or not the evidence below was contradicted or uncontradicted. (*Ibid.*) Given this standard of review and the overwhelming evidence that supports the trial court's findings, we will not disturb them.

     *F.  The Trial Court's Injunction Was Not an Abuse of Discretion.*

       1. The Injunction Does Not Violate the Landlords' Due Process Rights.

      The landlords challenge the portion of the permanent injunction entered after trial that directs an independent entity to assume management duties at the landlords' properties. The injunction stated it was entered under the authority granted by (1) the State Housing Law (Health & Saf. Code, § 17980, subd. (a)) [enforcement action to cure code violations], (2) the Unfair Competition Law (Bus. & Prof. Code, § 17203 [injunctive relief]), (3) Civil Code sections 3491 and 3494 [abatement of a public nuisance], and (4) the Rent Ordinance (Admin. Code § 37.10B, subd. (c)(4) [injunction to prevent tenant harassment]). The landlords argue that the trial court violated their right to due process "by appointing the functional equivalent of a receiver in the guise of a property manager," but they are mistaken.

The landlords are correct insofar as they summarize the law regarding receiverships under the State Housing Law. That is, "[s]ections 17980.6 and 17980.7 of the Health and Safety Code com[prise] a statutory scheme providing certain remedies to address substandard residential housing that is unsafe to occupy. Pursuant to section 17980.6, an enforcement agency may issue a notice to an owner to repair or abate property conditions that violate state or local building standards and substantially endanger the health and safety of residents or the public. Section 17980.7 provides that, if the owner fails to comply with the notice despite having been afforded a reasonable opportunity to do so, the enforcement agency may seek judicial appointment of a receiver to assume control over the property and remediate the violations or take other appropriate action." (*Gonzalez*, *supra*, 43 Cal.4th at p. 912, fn. omitted.) The powers of a receiver are set by statute (Health & Saf. Code, § 17980.7, subd. (c)) and include all the powers granted to receivers under Code of Civil Procedure section 568. (Health & Saf. Code, § 17980.7, subd. (c)(4)(H).) A receiver is the agent of the court and not of any party and as such (1) is neutral, (2) acts for the benefit of all who may have an interest in the subject property, and (3) holds assets for the court and not for the plaintiff or defendant. (Cal. Rules of Court, rule 3.1179(a).)

The landlords contend that provisions of the permanent injunction were "tantamount to appointment of a receiver." Even if we accept that as true, no error flows from this premise. The landlords stress that the statutory scheme governing receiverships "seeks to ensure that property owners are afforded due process *before* judicial appointment of a receiver." (*Gonzalez*, *supra*, 43 Cal.4th at p. 926, italics added.) The landlords do not suggest, however, that they were deprived of notice and an opportunity to be heard before the entry of the injunction. Instead, they claim that the portion of the injunction governing its enforcement creates a "fast-track path to a receiver." Section IV of the injunction is titled "**ENFORCEMENT.**" Paragraph A provides that a violation of the injunction constitutes contempt of court and that if the trial court determines "after [a] hearing" that the landlords violated the injunction, the landlords shall be liable for civil penalties. Paragraph C provides that if the landlords fail to comply with the injunction,

the City "may return to [the trial court] to seek appropriate relief, including, but not limited to, seeking the appointment of a receiver to manage any of the PROPERTIES and abate the violations and the nuisance, and/or sell any of the PROPERTIES." The landlords claim that this provision requires "[n]o specified notice, opportunity to cure, or other due process protections . . . just ask for the relief." (Bold omitted.) But the injunction specifically provides that the City must return to court in order to seek further relief—i.e., that the landlords shall receive notice and an opportunity to be heard.

The landlords do not specifically address the notion that the egregious actions they took against their tenants justify an injunction that delegates management of their properties to an independent manager. The trial court has broad discretion to issue injunctive relief to enjoin acts found to have violated the Unfair Competition Law, as the trial court did here, and the landlords have failed to establish that the trial court abused that discretion. (*People ex rel. Harris v. Aguayo* (2017) 11 Cal.App.5th 1150, 1161.)

> 2. The Trial Court Properly Enjoined the Landlords from Pursuing Pending Evictions.

The landlords also challenge two portions of the injunction that prohibit the landlords from proceeding with pending evictions. The first challenged provision addresses temporary evictions for capital improvements. The trial court found that the landlords had "engaged in multiple unlawful and/or deceptive independent acts in connection with alleged Temporary Evictions for Capital Improvements," and it declared invalid all such pending notices or evictions and enjoined the landlords from proceeding with any such pending notices or evictions. The other challenged provision addresses pending owner move-in evictions, relative move-in evictions, and evictions under the Ellis Act (Gov. Code, § 7060 et seq.). The trial court found that the landlords had engaged in multiple unlawful and deceptive acts with respect to these types of evictions, and it declared invalid "all such pending notices or evictions" and enjoined the landlords from proceeding with them.

On appeal, the landlords claim that the trial court lacked authority to enjoin a legal process, because the injunction violated "the general rule that one trial court judge may

56

not reconsider and overrule an interim ruling of another judge." (*Ziller Electronics Lab GmbH v. Superior Court* (1988) 206 Cal.App.3d 1222, 1232; see also *Morite of California v. Superior Court* (1993) 19 Cal.App.4th 485, 492-493 [court lacked authority to order case to trial when it did not revisit previous order staying the case]; *Ford v. Superior Court* (1986) 188 Cal.App.3d 737, 741-742 [superior court is one tribunal, and one department lacks jurisdiction to interfere with power of different department that ruled in same case].) The landlords do not, however, identify any interim rulings with which the injunction interferes. They point to three units at the Guerrero Street property identified in the statement of decision where eviction notices were pending as of the effective date of the pending-evictions provisions. But each of those notices was in the *pre-litigation* phase as of the issuance of the statement of decision, as the landlords acknowledge. The people living in the three units at issue had been served with eviction notices but were still in possession of their apartments as of the time of trial, and no lawsuit had yet been filed with respect to those notices. Again, the landlords fall far short of demonstrating that the trial court abused its vast discretion when entering the injunction. (*People ex rel. Harris v. Aguayo, supra,* 11 Cal.App.5th at p. 1161; *Hernandez v. Stabach* (1983) 145 Cal.App.3d 309, 313, 315 [upholding preliminary injunction that restrained landlord evicting tenants without prior showing of good cause being made the superior court].)

Finally, we reject as forfeited the argument raised for the first time in the landlords' reply brief that the injunction was overly broad. (*Keyes v. Bowen, supra,* 189 Cal.App.4th at p. 656.)

G. No "Cumulative Error" Occurred.

Finally, we reject the landlords' argument that the errors they identify amounted to cumulative error requiring reversal. Because we have rejected their individual errors, we reject their argument based on cumulative error as well.

## III.

### DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

58

_____

Humes, P.J.


We concur:


_____

Banke, J.


_____

Kelly, J. *


*Judge of the Superior Court of the City and County of San Francisco, assigned by the
Chief Justice pursuant to article VI, section 6 of the California Constitution.


59

475

*City and County of San Francisco et al. v. Kihagi et al.*  A151719

60

# EXHIBIT 6

Order No. 150-1945653-07



# Orange Coast Title Company

2411 W. La Palma Ave #300
Anaheim, CA 92801
714-822-3211

**[PreliminaryReportTitle]**

Sunset Equity Funding
6125 Washington Blvd., 3rd Floor
Culver City, CA 90232

| | | | |
|---|---|---|---|
| **Attention:** | Navid Lavi | **Your no.:** | 19th |
| **Property address:** | 4018 19th Street #4022, San Francisco, CA 94114 | **Order no.:** | 150-1945653-07 |

**Dated:** January 23, 2019

In response to the above referenced application for a policy of title insurance, **Orange Coast Title Company** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Exhibit B attached. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit B. Copies of the policy forms should be read. They are available from the office which issued this report.

ease read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit B of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters, which are not covered under the terms of the title insurance policy and should be carefully considered.

**It is important to note that this preliminary report is not a written representation as the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of November 9, 2018 at 7:30 AM

Steve Fernando, Title Officer
Ph: 714-822-3211
Email: stevef@octitle.com

Page 1

478

Order No. 150-1945653-07

The form of policy of title insurance contemplated by this report is:

_.T.A. Standard Coverage Policy – 1990 (Owners Policy or Joint Protection)

The Policy of Title Insurance, if issued, will be underwritten by: Real Advantage Title Insurance Company, a subsidiary of Orange Coast Title Company.  See attached disclosure.

## Schedule "A"

The estate or interest in the land hereinafter described or referred to covered by this report is:

A Fee.

Title to said estate or interest at the date hereof is vested in:

Xelan Prop 1, LLC, a California Limited Liability Company

The land referred to in this report is situated in the City of San Francisco, the County of San Francisco, State of California, and is described as follows:

Beginning at a point on the Northerly line of 19th Street, distant thereon 83 feet Westerly from the Westerly line of Noe Street; running thence Westerly along said line of 19th Street 42 feet; thence at a right angle Northerly 145 feet; thence at a right angle Easterly 42 feet; thence at a right angle Southerly 145 feet to the point of beginning, in the City of San Francisco, County of San Francisco, State of California.

Being a portion of Mission Block No. 115.

Assessor's Parcel Numbers(s): 24-3583-018-01

Page 2

479

Order No. 150-1945653-07

## Schedule "B"

At the date hereof exceptions to coverage in addition to the printed exceptions and exclusions contained in said policy form would be as follows:

1   General and Special taxes for the fiscal year 2018-2019, including any assessments collected with taxes.  A lien not yet payable.

   First installment due and payable November 1, 2018, delinquent if not paid by 12/10/18
   Second installment due and payable February 1, 2019, delinquent if not paid by 4/10/19

2   General and Special taxes for the fiscal year 2018-2019, including any assessments collected with current taxes.
   Total amount           $32,780.70
   1st installment         $16,390.35, Paid
   Penalty                 $1,639.03 (after 12/10/2018)
   2nd installment         $16,390.35, Open
   Penalty                 $1,684.03 (after 4/10/2019)
   Code area               01-000 - City of San Francisco
   Parcel No.              24-3583-018-01
   Exemption               $0

3   Omitted intentionally

4   Mello Roos assessments, collected and included within the taxes shown above:
   Fund          Description                      Amount
   89            SF Unified School District CFD   $110.40

5   A Special Tax Lien of Community Facilities District No. 90-1 of San Francisco Unified School District.
   Said assessment is payable with and in like manner as the taxes of the City and County of San Francisco.
   With respect to the above Special Tax, please note that the document recorded July 5, 1990, in Book F160, Page 1044 and by Supplemental Notice of Special Tax Lien recorded July 11, 1990 in Book F165, Page 1, et seq., of Official Records, recites, in part, as follows:

   Tax liability of owners or purchasers of real property subject to this special tax lien, interested persons should contact:

   San Francisco Unified School District
   135 Van Ness Avenue
   San Francisco, CA 94102
   Attention:  Dr. John Bayless

6   Any unpaid amounts now owing, for delinquent refuse, in favor of The City and County of San Francisco, Department of Public Health-Environment Health, please contact:

   Department of Public Health-Environmental Health
   1390 Market Rm 210, San Francisco, CA 94102
   Phone No.: (415) 252-3800

7   Any unpaid amounts now owing, for delinquent water, utility and sewer service charges, in favor of The City and County of San Francisco, Water Department, please contact:

   Water Department
   1155 Market St.
   San Francisco, CA 94103
   Phone No.: (415) 351-3399

8   The Lien of future supplemental taxes, if any, assessed pursuant to the provisions of section 75, et seq of the revenue and taxation code of the state of California

Page 3

480

Order No. 150-1945653-07

9    An easement as set forth in an instrument
     Recorded:        4/16/1962 as Instrument No. 62-K81382, of Official Records.
     For:             Ingress and egress for pedestrians and vehicles and incidental purposes
     Affects:         The location of said easement is set forth therein.

10   An instrument, upon the terms and conditions contained therein
     Entitled:        Notice of Special Restrictions under the City Planning Code
     Recorded:        2/6/1992, as Instrument No. 92-65505, Official Records

     And recorded 4/28/1993 as Instrument No. 93-345199, Official Records

11   A Deed of Trust to secure the indebtedness of
     Amount:          $1,700,000.00
     Trustor:         Xelan Prop 1, LLC, a California Limited Liability Company
     Trustee:         UPF Incorporated, a Washington Corporation
     Beneficiary:     Sterling Savings Bank, a Washington Banking Corporation
     Dated:           6/23/2013
     Recorded:        6/28/2013, as Instrument No. 13-697776, Official Records

12   Omitted intentionally

13   An action commenced, notice of which
     Recorded:        6/1/2015 as Instrument No. 2015-K077111-00 , Official Records
     Court:           Superior Court of the State of California, County of San Francisco
     Case no.:        CGC-15-546152
     Judicial District:  Unlimited Civil
     Plaintiff:       City of San Francisco, a Municipal Corporation and the People of the State of
                      California, by and through Dennis J. Herrera, City Attorney for the City and County of
                      San Francisco
     Defendant:       Anne Kihagi aka Anna Kihagi aka Anna Swain aka Anna Kihagi Swain, Julia Mwangi
                      aka Julia Munene, Christine Mwangi aka Christina Mwangi aka Christine Johnson,
                      Xelan Prop a, LLC, Renka Prop, LLC, Nozari 2 LLC, Zoriall, LLC and Doe One
                      Through Doe Fifty.
     Purpose of action:  Notice of Pendency of Action (LIS PENDENS)

14   An instrument, upon the terms and conditions contained therein
     Entitled:        Permanent Injunction After Trial
     Recorded:        5/31/2017, as Instrument No., 17-457845, Official Records

15   Omitted intentionally

16   Omitted intentionally

17   Omitted intentionally

18   Omitted intentionally

19   Omitted intentionally

20   Omitted intentionally

Page 4

Order No. 150-1945653-07

21    An instrument, upon the terms and conditions contained therein

Entitled: Notice of Lien
Executed by: San Francisco Department of Public Health Environmental Health, Solid Waste Program
Amount: $463.96, together with penalties and costs, if any
Recorded: 3/22/2018, as Instrument No., 18-592668, Official Records.

For additional information please contact:
San Francisco Department of Public Health
Environmental Health, Sold Waste Program
Attn: Refuse Lien Unit
1390 Market Street, Suite 210
San Francisco, CA 94102

22    The requirement that we be provided:

(1) A copy of the filed articles of organization of Xelan Prop 1, LLC, a limited liability company.

(2) A current list of the names of said limited liability company members.

(3) A copy of said limited liability company's operating agreement, with a verified certificate that the operating agreement is a true and correct copy of the agreement now in effect.

23    Rights of parties in possession of said land by reason of unrecorded leases, if any.  Please forward said leases for our examination.

24    Matters which may be disclosed by inspection and/or survey of said land or by inquiry of parties in possession thereof.

We will inform you as to whether C.L.T.A. endorsement 100 can be included in the policy when our inspection of the land or other investigation has been completed.

25    Any facts, rights, interest or claims which may be shown by an inspection of the land or which may be disclosed by inquiry of persons in possession of said land.

26.    An Abstract of Judgment

Recorded: 4/23/2018 as instrument No. 2018-K604682-00 , Official Records.
Entered: 11/17/2017
Case no.: CSM-17-855499
Court: Superior Court of California, County of San Francisco
Judicial District: San Francisco
Amount: $6,325.00 plus interest and costs.
In favor of: David Green et, al.
Against: **Xelan Prop 1, LLC, et al.**

Attorney for judgment creditor or mailing address:
Name: Carolina Green
Address: 4102 Lusk Street
Oakland, CA 94608
617-852-4724

Page 5

Order No. 150-1945653-07

27  An Abstract of Judgment
    Recorded:               **6/7/2018** as Instrument No. <u>2018-K623991-00</u> , Official Records.
    Entered:                 4/30/2018
    Case no.:              CGC-15-546152
    Court:                   Superior Court of California, County of San Francisco
    Judicial District:     Unlimited Civil Jurisdiction
    Amount:               **$59,730.50** plus interest and costs.
    In favor of:          City and County of San Francisco, a Municipal Corporation, and the People of the State
    Against:            **Anne Kihagi aka Anna Kihagi aka Anna Swain aka Anne Kihagi Swain aka Anna Kihagi Swain**

    Attorney for judgment creditor or mailing address:
    Name:               Dennis J. Herrera, Esq., City Attorney, SBN 139669
                        Peter J. Keith, Esq., Chief Attorney, SBN 206482
                        Victoria L. Weatherford, Esq., Deputy City Attorney, SBN 267499
    Address:             1390 Market Street, Seventh Floor
                        San Francisco, CA 94102-5408
                        415-554-3824
                        Fax# 714-437-4644
                        victoria.weatherford@sfgov.org

28  Omitted intentionally

29  An instrument, upon the terms and conditions contained therein
    Entitled:             Order of Abatement
    Recorded:          7/11/2018 as Instrument No., <u>2018-K638038-00</u>, Official Records.

30  An instrument, upon the terms and conditions contained therein
    Entitled:             Abatement Appeals Board - Notice of Decision
    Recorded:          7/11/2018 as Instrument No., <u>2018-K638039-00</u>, Official Records.

31  An Abstract of Judgment
    Recorded:          **10/17/2018** as Instrument No. <u>2018-K683730-00</u> , Official Records.
    Entered:              October 16, 2018
    Case no.:             CGC-15-546152
    Court:                  Superior Court of California, County of San Francisco
    Judicial District:     Unlimited Civil Jurisdiction
    Amount:             **$9,328.75** plus interest and costs.
    In favor of:         City and County of San Francisco, a Municipal Corporation, and the People of the State
    Against:           **Anne Kihago aka Anna Kihagi aka Anna Swain aka Anne Kihagi Swain aka Anna Kihagi Swain**

    Attorney for judgment creditor or mailing address:
    Name:               Dennis J. Herrera, Esq., City Attorney, SBN 139669
                        Peter J. Keith, Esq., Deputy City Attorney, SBN 206482
                        Victoria L. Weatherford, Esq., Deputy City Attorney, SBN 267499
    Address:             1390 Market Street, Seventh Floor
                        San Francisco, CA 94102-5408
                        415-554-3824
                        Fax3 415-437-4644
                        michael.weiss@sfcityatty.org

32  Omitted intentionally

33  Omitted intentionally

Page 6

Order No. 150-1945653-07

34    The requirement that we be provided:

(1) A copy of the filed articles of organization of Streets 12, LLC, a limited liability company.

(2) A current list of the names of said limited liability company members.

(3) A copy of said limited liability company's operating agreement, with a verified certificate that the operating agreement is a true and correct copy of the agreement now in effect.

35    (a)  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records;
(b)  Proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

36    Any facts, rights, interests, or claims which are not shown by the public records which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

37    Easements, liens or encumbrances, or claims thereof, not shown by the public records.

38    Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

39    (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.

40    Any lien or right to a lien for services, labor or material not shown by the public records.

41    1. Lack of possession by any Insured of the original promissory note secured by the Insured Mortgage.
2. The absence from the original promissory note of a proper endorsement if the Insured named in Schedule A is an assignee of said note.
3. Any claim which arises out of the transaction creating the interest of the Insured by reason of federal or state securities law.
4. Any interest of (insert name of Broker or Servicer)

42    This transaction may be subject to a Federal Regulation. Information necessary to comply with the Federal Regulation must be provided prior to the closing. This transaction will not be insured until this information is submitted, reviewed and found to be complete. The form to submit the required information may be obtained by clicking on this link:

**End of Schedule B**

Order No. 150-1945653-07

### "NOTES AND REQUIREMENTS SECTION"

LENDER SERVICES GROUP

## NOTE NO. 1

## AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE STATEMENT NOTICE

This is to give you notice that Orange Coast Title Company owns an interest in Real Advantage Title Insurance Company.  This underwriter may be chosen by Orange Coast Title Company and this referral may provide Orange Coast Title Company a financial or other benefit.

You are NOT required to use the listed provider as a condition for settlement of your loan or purchase, sale or refinance of the subject property and you have the opportunity to select any of the Orange Coast Title Company title insurance underwriters for your transaction.  THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES

Notes section continued on next page…

Order No. 150-1945653-07

## NOTE NO. 2

California Revenue and Taxation Code Section 18662, effective January 1, 1994 and by amendment effective January 1, 2003, provides that the buyer in all sales of California Real Estate may be required to withhold 3 and 1/3% of the total sales price as California State Income Tax, subject to the various provisions of the law as therein contained.

## NOTE NO. 3 PAYOFF INFORMATION:

Note: this company does require current beneficiary demands prior to closing.
If the demand is expired and a correct demand cannot be obtained, our requirements will be as follows:

A.    If this company accepts a verbal update on the demand, we may hold an amount equal to one monthly mortgage payment. The amount of this hold will be over and above the verbal hold the lender may have stipulated.

B.    If this company cannot obtain a verbal update on the demand, will either pay off the expired demand or wait for the amended demand, at the discretion of the escrow.

C.    In the event that a payoff is being made to a servicing agent for the beneficiary, this company will require a complete copy of the servicing agreement prior to close.

## NOTE NO. 4

If this company is requested to disburse funds in connection with this transaction, chapter 598, statutes of 1989 mandates hold periods for checks deposited to escrow or sub-escrow accounts. The mandatory hold is one business day after the day deposited. Other checks require a hold period from three to seven business days after the day deposited.

### Notice Regarding Your Deposit of Funds

California Insurance Code Sections 12413 *et. Seq.* Regulates the disbursement of escrow and sub-escrow funds by title companies. The law requires that funds be deposited in the title company escrow and sub-escrow accounts and be available for withdrawal prior to isbursement. Funds deposited with the Company by wire transfer may be disbursed upon receipt. Funds deposited with the Company via cashier's checks drawn on a California based bank may be disbursed the next business day after the day of deposit. If funds are deposited with by other methods, recording or disbursement may be delayed. All escrow and sub-escrow funds received by the Company will be deposited with other funds in one or more non-interest bearing escrow accounts of the Company in a financial institution selected by the Company. The Company and/or its parent company may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with the financial institution, and the Company shall have no obligation to account to the depositing party in any manner for the value of, or to pay such party, any benefit received by the Company and/or its parent Company. Those benefits may include, without limitation, credits allowed by such financial institution on loans to the Company and/or its parent company and earnings on investments made on the proceeds of such loans, accounting, reporting and other services and products of such financial institution. Such benefits shall be deemed additional compensation of the Company for its services in connection with the escrow or sub-escrow. If funds are to be deposited with **Orange Coast Title Company** by wire transfer, they should be wired to the following bank/account:

Wiring Instructions for This Office:

**Community Bank**
**460 Sierra Madre Villa Ave**
**Pasadena, CA  91107**
**Account Name:  Orange Coast Title Company - LSG Escrow Trust Account**
**Account Number 14-04005293**
**ABA Number 122203471**
**Reference Order No.150-1945653-07**
**Steve Fernando, Title Officer**

**Note No. 5:**  The premium for the requested title work shall be split between the agent and underwriter 88%-12%.

Page 9

Order No. 150-1945653-07



# Orange Coast Title Company

2411 W. La Palma Ave #300
Anaheim, CA 92801
714-822-3211

Sunset Equity Funding
6125 Washington Blvd., 3rd Floor
Culver City, CA 90232

**Attention:**    **Navid Lavi**
**Borrower:**

**Lenders supplemental report**

The above numbered report (including any supplements or amendments thereto) is hereby modified and/or supplemented in order to reflect the following additional items relating to the issuance of an American Land Title Association loan policy form as follows:

A.    This report is preparatory to this issuance of an American Land Title Association loan policy of title insurance. This report discloses nothing, which would preclude the issuance of said American land title association loan policy of title insurance with endorsement no. 100 attached thereto.

B.    The improvements on said land are designated as:

A multiple family residence

4018 19th Street #4022, in the City of San Francisco, County of San Francisco, State of California.

C.    The only conveyance(s) affecting said land recorded within 24 months of the date of this report are as follows:

Grantor:        Xelan Prop 1, LLC
Grantee:        Streets 12, LLC a Wyoming Limited Liability Company
Recorded:       6/20/2018 as Instrument No. 2018-K627800-00, Official Records.

Grantor:        Streets 12 LLC
Grantee:        Xelan Prop 1, LLC a California Limited Company
Recorded:       7/18/2018 as Instrument No. 2018-K640312-00, Official Records.

Page 10

487

Order No. 150-1945653-07

## Attention

.ease note that this preliminary report now has an extra copy of the legal description on a separate sheet of paper. There are no markings on the page. The idea is to provide you with a legal description that can be attached to other documents as needed. That legal description page immediately follows this page.

Thank you for your support of **Orange Coast Title Company**. We hope that this makes your job a little easier.

488

Order No. 150-1945653-07

## Exhibit "A"

Beginning at a point on the Northerly line of 19th Street, distant thereon 83 feet Westerly from the Westerly line of Noe Street; running thence Westerly along said line of 19th Street 42 feet; thence at a right angle Northerly 145 feet; thence at a right angle Easterly 42 feet; thence at a right angle Southerly 145 feet to the point of beginning, in the City of San Francisco, County of San Francisco, State of California.

Being a portion of Mission Block No. 115.

Order No. 150-1945653-07

## CLTA Preliminary Report Form – Exhibit B (06-03-11)

### CLTA STANDARD COVERAGE POLICY – 1990
#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy. (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant; (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy; (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy; or (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

#### EXCEPTIONS FROM COVERAGE – SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

### CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (02/03/10)
#### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning: a. building, b. zoning, c. land use d. improvements on the Land, e. land division; and , f. environmental protection. This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks: a. that are created, allowed, or agreed to by You, whether or not they recorded in the Public Records; b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date; c. that result in no loss to You; or d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e, 25, 26, 27, or 28.
5. Failure to pay value for Your Title.
6. Lack of a right: a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and b. in streets, alleys, or waterways that touch the Land. This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7. The transfer of the Title to You is invalid as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

#### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
- For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
  The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1 % of Policy Amount shown in Schedule A or $ 2,500 (whichever is less) | $ 10,000 |
| Covered Risk 18: | 1 % of Policy Amount shown in Schedule A or $ 5,000 (whichever is less) | $ 25,000 |
| Covered Risk 19: | 1 % of Policy Amount shown in Schedule A or $ 5,000 (whichever is less) | $ 25,000 |
| Covered Risk 21: | 1 % of Policy Amount shown in Schedule A or $ 2,500 (whichever is less) | $ 5,000 |

### ALTA RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)
#### EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning: * land use * improvements on the land * land division * environmental protection. This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date. This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.
2. The right to take the land by condemning it, unless: * a notice of exercising the right appears in the public records * on the Policy Date - the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking.
3. Title Risks: * that are created, allowed, or agreed to by you * that are known to you, but not to us, on the Policy Date - unless they appeared in the public records * that result in no loss to you * that first affect your title after the Policy Date - this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks.
4. Failure to pay value for your title.
5. Lack of a right: * to any land outside the area specifically described and referred to in Item 3 of Schedule A OR * in streets, alleys, or waterways that touch your land. This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

### 2006 ALTA LOAN POLICY (06-17-06)
#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees or expenses that arise by reason of:
1. (a) Any law, ordinance or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement erected on the land; (iii) the subdivision of land; or (iv) environmental protection; or the effect of any violation of these laws, ordinances or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
(b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims or other matters (a) created, suffered, assumed or agreed to by the Insured Claimant; (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy; (c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state in which the land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is (a) a fraudulent conveyance or fraudulent transfer, or (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

#### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1.(a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests or claims which are not shown by the Public Records but which could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5.(a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

### 2006 ALTA OWNER'S POLICY (06-17-06)
#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

Page 13

490

Order No. 150-1945653-07

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to: (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions, or location of any improvement erected on the Land; (iii) the subdivision of land; or (IV) environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5. (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

ights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;(c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is (a) a fraudulent conveyance or fraudulent transfer; or (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6. Any lien or right to a lien for services, labor or material not shown by the public records.

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (07-26-10)

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including but not limited to building and zoning) restricting, regulating, prohibiting, or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement erected on the Land; (iii) the subdivision of the land; or (iv) environmental protection; or the effect of any violation of these laws, ordinances or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risks 5, 6, 13(c), 13(d), 14, and 16.(b) Any governmental police power. This Exclusion 1(b)does not modify or limit the coverage provided under Covered Risks 5, 6, 13(c), 13(d), 14, and 16.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims or other matters (a) created, suffered, assumed or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;(c) resulting in no loss or damage to the Insured Claimant;(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risks 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 26); or (e)resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured to comply with applicable doing-business laws of the state in which the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth in lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.

6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is (a) a fraudulent conveyance or fraudulent transfer, or (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

Page 14

Order No. 150-1945653-07

# Orange Coast Title Company
## PRIVACY POLICY

## We Are Committed to Safeguarding Customer Information

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information – particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information that you provide to us. Therefore, we have adopted this Privacy Policy to govern the use and handling of your personal information.

## Applicability

This Privacy Policy governs our use of the information which you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity.

## Types of Information

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means.

- Information we receive from providers of services to us, such as appraisers, appraisal management companies, real estate agents and brokers and insurance agencies (this may include the appraised value, purchase price and other details about the property that is the subject of your transaction with us).

- Information about your transactions with us, our Affiliated Companies, or others; and

- Information we receive from a consumer reporting agency.

## Use of Information

We request information from you for our own legitimate business purposes and not for benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis.

## Former Customers

**Even if you are no longer our customer, our Privacy Policy will continue to apply to you.**

## Confidentiality and Security

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

## Other Important Information

We reserve the right to modify or supplement this Privacy Policy at any time. If our Privacy Policy changes, we will provide the new Privacy Policy before the new policy becomes effective.

Page 15

Order No. 150-1945653-07



# Orange Coast Title Company
### 2411 W. La Palma Ave #300
### Anaheim, CA 92801
### 714-822-3211

## DECLARATION OF OCCUPANCY
### (Loan Transaction)

The undersigned, _____,
(owner's name) depose(s) and say(s) as follows:

1.     The undersigned is/are the owner(s) of certain real property situated in the City of San Francisco, County of San Francisco and State of California, commonly known as 4018 19th Street #4022, herein referred to as "Property":

2.     The undersigned is/are obtaining a loan from _____ to be secured by a Deed of Trust against the Property, which is the subject of this transaction.

3.     The undersigned currently occupy the Property as the undersigned's principal address, and intend to continue to occupy the same as the undersigned's principal residence following the close of this transaction.

4.     The undersigned understand(s) that Orange Coast Title Company is relying on this information in calculating the recording fees for all real estate instruments, papers, and notices recorded in connection with this transaction in accordance with *California Government Code §27388.1(a)(2)*.

5.     The undersigned agree(s) to indemnify and hold Orange Coast Title Company harmless from and against, and to pay any additional recording fees and/or penalties arising out of, or in connection with, the inaccuracy of the information set forth herein.

The undersigned declare(s) under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Declaration was executed on _____, at _____, _____.

By: _____      By: _____
Name: _____    Name: _____

Page 16



# ASSESSOR-RECORDER'S OFFICE

© COPYRIGHT SAN FRANCISCO
CITY & COUNTY ASSESSOR 1996

**3583**

MISSION BLK.113

REVISED '02

**LOTS MERGED**

lot48 into lots96to98 for 1998 roll
lot15 into lots102&103 for 1999 roll
lot45& into lots106&107 for 2001 roll
lot49 into lots110&111 for 2002 roll
lot149 into lots108&109 for 2002 roll
lot45 into lots104&105 for 2002 roll
lot126 into lots114to117 for 2008 roll
lot49 into lots123&124 for 2009 roll
lot98 into lots102&103 for 2012 roll

### 117 HARTFORD STREET
### A CONDOMINIUM

| LOT NO. | UNIT NO. | % COMMON AREA |
|---------|----------|---------------|
| 89 | A | 25 |
| 90 | B | 25 |
| 91 | C | 25 |
| 92 | D | 25 |

THIS MAP SHOULD BE USED FOR REFERENCE PURPOSES ONLY. NO LIABILITY
IS ASSUMED FOR THE ACCURACY OF THE DATA SHOWN. PARCELS MAY NOT COMPLY
WITH LOCAL SUBDIVISION OR BUILDING ORDINANCES.

### 172-174-174A HARTFORD ST.
### A CONDOMINIUM

| LOT | UNIT | % COMM. AREA |
|-----|------|--------------|
| 96 | 172 | 37 |
| 97 | 174 | 41 |
| 98 | 174A | 22 |

### 576-578 NOE ST.
### A CONDOMINIUM

| LOT | UNIT | % COMM. AREA |
|-----|------|--------------|
| 102 | 576 | 53.02 |
| 103 | 578 | 46.98 |

### 173-173A HARTFORD ST.
### A CONDOMINIUM

| LOT | UNIT | % COMM. AREA |
|-----|------|--------------|
| 110 | 173 | 50.00 |
| 111 | 173A | 50.00 |

### 514-516 NOE ST.
### A CONDOMINIUM

| LOT | UNIT | % COMM AREA |
|-----|------|-------------|
| 94 | 514 | 47.99 |
| 95 | 516 | 52.01 |

### 542-544-544A NOE ST.
### A CONDOMINIUM

| LOT | UNIT | % COMM. AREA |
|-----|------|--------------|
| 99 | 542 | 40.70 |
| 100 | 544 | 37.70 |
| 101 | 544A | 21.60 |

### 4060-4062 19TH ST.
### A CONDOMINIUM

| LOT | UNIT | % COMM. AREA |
|-----|------|--------------|
| 106 | 4060 | 59.30 |
| 107 | 4062 | 40.70 |

### 180-180 1/2 HARTFORD ST.
### A CONDOMINIUM

| LOT | UNIT | % COMM. AREA |
|-----|------|--------------|
| 108 | 180 | 50 |
| 109 | 180 1/2 | 50 |

### 4021-4023 EIGHTEENTH ST.
### A CONDOMINIUM

| LOT | UNIT | % COMM. AREA |
|-----|------|--------------|
| 104 | 4021 | 43 |
| 105 | 4023 | 57 |

CASTRO

HARTFORD

NOE

18TH

19TH

1998 96to98

2002 108&109

2002 114to117

2008 114to117

2002 110&111

'99 102&103

2001 106&107

494

# EXHIBIT 7

**F I L E D**
Superior Court of California
County of San Francisco

DEC 26 2018

CLERK OF THE COURT
BY: _____
Deputy Clerk

1   Steven J. McDonald, SBN 178655
    Ariel Gershon, SBN 242326
2   GREENSTEIN & McDONALD
    300 Montgomery Street, Suite 621
3   San Francisco, CA 94104
    Telephone: (415) 773-1240
4   Facsimile: (415) 773-1244

5   Attorneys for Judgment Creditors
    DALE DUNCAN and MARTA MUNOZ MENDOZA
6

7          SUPERIOR COURT OF STATE OF CALIFORNIA
           COUNTY OF SAN FRANCISCO - UNLIMITED CIVIL JURISDICTION
8

9   DALE DUNCAN, MARTA MUNOZ          )   CIVIL CASE NO. CGC 15-545655
    MENDOZA,                          )        HK
10                                    )   [Proposed] Order on Motion for Charging
              Plaintiffs,             )   Orders, Assignment Orders, Restraining
11                                    )   Order, and for Appointment of Receiver
        vs.                           )
12                                    )   [ON JUDICIAL FORECLOSURE OF TWO
                                      )   PROPERTIES HELD BY DEBTOR ANNE
13  ANNE KIHAGI (aka ANNE KIHAGI-     )   KIHAGI'S LLC: XELAN PROP 1, LLC]
    SWAIN, ANNE SWAIN, ANNA KIHAGI,   )
14  ANNA KIHAGI-SWAIN, ANNA SWAIN),   )   Date: December 11, 2018
    ZORIALL LLC, CHRISTINA MWANGI,    )   Time: 9:30 a.m.
15  and DOES 1- 10, inclusive,        )   Dept.: 302
                                      )
16            Defendants.             )
                                      )
17  _____)

18          On December 11, 2018 at 9:30 a.m., in Department 302 of this Court, before Hon. Harold

19  E. Kahn presiding, this matter came on regularly for hearing on judgment creditors' DALE

20  DUNCAN and MARTA MUNOZ MENDOZA's Motion for Charging Orders, Assignment

21  Orders, Restraining Order, and for Appointment of Receiver.

22          Attorneys Richard Diestel and Ariana Cardoza appeared for the defendants/judgment

23  debtors and moving party.

24          Attorney Ariel Gershon appeared for the plaintiffs/judgment creditors.

25          The matter was argued and submitted and good cause appearing therefore, IT IS

26  HEREBY ORDERED that judgment creditors' Motion is hereby GRANTED as set forth herein.

27          Plaintiffs Dale Duncan and Marta Mendoza's motion for charging order, assignment

28  order, restraining order and for appointment of receiver is granted. Plaintiffs have shown good

                                      -1-
    Order on Motion for Charging & Assignment Orders, Restraining Order, and for Appointment of Receiver

1  cause for all the relief they seek. Plaintiffs have a substantial judgment in their favor and have

2  not yet received any money from any of the defendants toward satisfaction of that judgment.

3  Since there is no stay regarding judgment collection efforts, there is no persuasive reason why

4  plaintiffs should be deprived of the ability to access the full range of judgment collection

5  remedies available to them under California law.

6      **A. CHARGING ORDER – XELAN PROP 1, LLC**

7      Pursuant to C.C.P. §708.310-708.320 and Corporations §17705.03: (1) Judgment Debtor

8  ANNE KIHAGI's membership interest in the limited liability company known as XELAN PROP

9  1, LLC is charged with payment of the unpaid balance of the judgment entered in this action; and

10  (2) the LLC and all members thereof are to pay any money or property due or to become due to

11  the Judgment Debtor ANNE KIHAGI directly to Judgment Creditors DALE DUNCAN and

12  MARTA MUNOZ MENDOZA until the amount remaining due on the judgment, plus all

13  accrued interest and post judgment costs thereon, is paid in full.

14
15      **B. ORDER FOR ASSIGNMENT OF RIGHTS AND PAYMENT ON JUDICIAL FORECLOSURE OF 1000-1022 FILBERT STREET, SAN FRANCISCO, CA**

16      Pursuant to C.C.P. § 708.510 all rights to payment of money, contingent rights, contract

17  rights, deposits and deposit accounts, claims against third parties, and monies due from third

18  parties, which are due or shall become due in favor of and for the benefit of Judgment Debtor

19  ANNE KIHAGI, are hereby assigned to Judgment Creditors DALE DUNCAN and MARTA

20  MUNOZ MENDOZA until the amount remaining due on the judgment, plus all accrued interest

21  and post judgment costs thereon, is paid in full. This assignment specifically includes all rights

22  to payment of money and all payments due or which may come due from the judicial foreclosure

23  and sale of the following property – known by the street address **1000-1022 Filbert Street, San**

24  **Francisco CA** ("Filbert Street Property") ("RIGHTS TO PAYMENT OF EXCESS

25  FORECLOSURE SALE PROCEEDS – FILBERT ST").

26
27      **C. ORDER FOR ASSIGNMENT OF RIGHTS AND PAYMENT ON JUDICIAL FORECLOSURE OF 4018-4022 19TH STREET, SAN FRANCISCO, CA**

28      As set forth above, pursuant to C.C.P. § 708.510 all rights to payment of money,

-2-
Order on Motion for Charging & Assignment Orders, Restraining Order, and for Appointment of Receiver

1  contingent rights, contract rights, deposits and deposit accounts, claims against third parties, and

2  monies due from third parties, which are due or shall become due in favor of and for the benefit

3  of Judgment Debtor ANNE KIHAGI, are hereby assigned to Judgment Creditors DALE

4  DUNCAN and MARTA MUNOZ MENDOZA until the amount remaining due on the judgment,

5  plus all accrued interest and post judgment costs thereon, is paid in full. This assignment also

6  specifically includes all rights to payment of money and all payments due or which may come

7  due from the judicial foreclosure and sale of the following property – known by the street

8  address <u>4018-4022 19th Street, San Francisco CA</u> ("19th Street Property") ("RIGHTS TO

9  PAYMENT OF EXCESS FORECLOSURE SALE PROCEEDS – 19TH ST").

10       Collectively, the RIGHTS TO PAYMENT OF EXCESS FORECLOSURE SALE

11  PROCEEDS – FILBERT ST and the RIGHTS TO PAYMENT OF EXCESS FORECLOSURE

12  SALE PROCEEDS – 19TH ST shall herein be referred to as the "RIGHTS TO PAYMENT OF

13  EXCESS FORECLOSURE SALE PROCEEDS DUE TO DEBTOR").

14       **D. RESTRAINING ORDER**

15       Pursuant to C.C.P. §708.520(a) this Restraining Order hereby issues against Judgment

16  Debtor ANNE KIHAGI – personally and in her management capacity for XELAN PROP 1,

17  LLC. Judgment Debtor shall take no steps in connection with the sale, alienation, mortgage, lien,

18  encumbrance, advancement, cashing or negotiation, or receipt or exploitation of the RIGHTS TO

19  PAYMENT OF EXCESS FORECLOSURE SALE PROCEEDS DUE TO DEBTOR.

20       **E. ORDER FOR APPOINTMENT OF RECEIVER**

21       Pursuant to C.C.P. §708.620 and §564 and Corporations §17705.03, the Court shall

22  appoint a limited Receiver via separate Order, to collect on the Judgment Debtor ANNE

23  KIHAGI's RIGHTS TO PAYMENT OF EXCESS FORECLOSURE SALE PROCEEDS DUE

24  TO DEBTOR, specifically to collect for the LLC the share of profits and other monies so due or

25  so becoming due, and to distribute same in accordance with this Order.

26

27  DATED: 12/21/18

28                                    Hon. Harold E. Kahn
                                      JUDGE OF THE SUPERIOR COURT

-3-
Order on Motion for Charging & Assignment Orders, Restraining Order, and for Appointment of Receiver

# EXHIBIT 8

1  Steven J. McDonald, SBN 178655
   Ariel Gershon, SBN 242326
2  GREENSTEIN & McDONALD
   300 Montgomery Street, Suite 621
3  San Francisco, CA 94104
   Telephone: (415) 773-1240
4  Facsimile: (415) 773-1244

F I L E D
Superior Court of California
County of San Francisco

DEC 2 6 2018

CLERK OF THE COURT
BY: _____
          Deputy Clerk

5  Attorneys for Judgment Creditors
   DALE DUNCAN and MARTA MUNOZ MENDOZA
6

7           SUPERIOR COURT OF STATE OF CALIFORNIA
         COUNTY OF SAN FRANCISCO - UNLIMITED CIVIL JURISDICTION

8

9  DALE DUNCAN, MARTA MUNOZ                )    CIVIL CASE NO. CGC 15-545655
   MENDOZA,                               )
10                                         )    [Proposed] Order on Motion for Charging
                  Plaintiffs,              )    Orders, Assignment Order, Restraining
11                                         )    Order, and for Appointment of Receiver
          vs.                              )
12                                         )    [ON PENDING NON-JUDICIAL
   ANNE KIHAGI (aka ANNE KIHAGI-           )    FORECLOSURE OF PROPERTY HELD BY
13 SWAIN, ANNE SWAIN, ANNA KIHAGI,         )    DEBTOR ANNE KIHAGI'S LLC(S)]
   ANNA KIHAGI-SWAIN, ANNA SWAIN),         )
14 ZORIALL LLC, CHRISTINA MWANGI,          )
   and DOES 1- 10, inclusive,              )    Date: December 11, 2018
15                                         )    Time: 9:30 a.m.
                  Defendants.              )    Dept.: 302
16                                         )
                                           )
17 _____)

18        On December 11, 2018 at 9:30 a.m., in Department 302 of this Court, before Hon. Harold

19 E. Kahn presiding, this matter came on regularly for hearing on judgment creditors' DALE

20 DUNCAN and MARTA MUNOZ MENDOZA's Motion for Charging Orders, Assignment

21 Order, Restraining Order, and for Appointment of Receiver.

22        Attorneys Richard Diestel and Ariana Cardoza appeared for the defendants/judgment

23 debtors and moving party.

24        Attorney Ariel Gershon appeared for the plaintiffs/judgment creditors.

25        The matter was argued and submitted and good cause appearing therefore, IT IS

26 HEREBY ORDERED that judgment creditors' Motion is hereby GRANTED as set forth herein.

27        Plaintiffs Dale Duncan and Marta Mendoza's motion for charging order, assignment

28 order, restraining order and for appointment of receiver is granted. Plaintiffs have shown good

-1-
Order on Motion for Charging Orders, Assignment & Restraining Order, and for Appointment of Receiver

500

3

1  cause for all the relief they seek. Plaintiffs have a substantial judgment in their favor and have

2  not yet received any money from any of the defendants toward satisfaction of that judgment.

3  Since there is no stay regarding judgment collection efforts, there is no persuasive reason why

4  plaintiffs should be deprived of the ability to access the full range of judgment collection

5  remedies available to them under California law.

6      **A. CHARGING ORDER – NOZARI 2, LLC**

7      Pursuant to C.C.P. §708.310-708.320 and Corporations §17705.03: (1) Judgment Debtor

8  ANNE KIHAGI's membership interest in the limited liability company known as NOZARI 2,

9  LLC is charged with payment of the unpaid balance of the judgment entered in this action; and

10  (2) the LLC and all members thereof are to pay any money or property due or to become due to

11  the Judgment Debtor ANNE KIHAGI directly to Judgment Creditors DALE DUNCAN and

12  MARTA MUNOZ MENDOZA until the amount remaining due on the judgment, plus all

13  accrued interest and post judgment costs thereon, is paid in full.

14      **B. CHARGING ORDER – XELAN PROP 1, LLC**

15      Pursuant to C.C.P. §708.310-708.320 and Corporations §17705.03: (1) Judgment Debtor

16  ANNE KIHAGI's membership interest in the limited liability company known as XELAN PROP

17  1, LLC is charged with payment of the unpaid balance of the judgment entered in this action; and

18  (2) the LLC and all members thereof are to pay any money or property due or to become due to

19  the Judgment Debtor ANNE KIHAGI directly to Judgment Creditors DALE DUNCAN and

20  MARTA MUNOZ MENDOZA until the amount remaining due on the judgment, plus all

21  accrued interest and post judgment costs thereon, is paid in full.

22      **C. ORDER FOR ASSIGNMENT OF RIGHTS AND PAYMENT**

23      Pursuant to C.C.P. § 708.510 all rights to payment of money, contingent rights, contract

24  rights, deposits and deposit accounts, claims against third parties, and monies due from third

25  parties, which are due or shall become due in favor of and for the benefit of Judgment Debtor

26  ANNE KIHAGI, are hereby assigned to Judgment Creditors DALE DUNCAN and MARTA

27  MUNOZ MENDOZA until the amount remaining due on the judgment, plus all accrued interest

28  and post judgment costs thereon, is paid in full. This assignment specifically includes all rights

-2-
Order on Motion for Charging Orders, Assignment & Restraining Order, and for Appointment of Receiver

1   to payment of money and all payments due or which may come due from the non-judicial

2   foreclosure and trustee's sale of the following property – (San Francisco APN#: Block 3584, Lot

3   086) known by the street address 3947 18ᵗʰ St., San Francisco, CA 94114 ("RIGHTS TO

4   PAYMENT OF EXCESS FORECLOSURE SALE PROCEEDS DUE TO DEBTOR").

5        **D. RESTRAINING ORDER**

6        Pursuant to C.C.P. §708.520(a) this Restraining Order hereby issues against Judgment

7   Debtor ANNE KIHAGI – personally and in her management capacity for NOZARI 2, LLC and

8   XELAN PROP 1, LLC. Judgment Debtor shall take no steps in connection with the sale,

9   alienation, mortgage, lien, encumbrance, advancement, cashing or negotiation, or receipt or

10  exploitation of the RIGHTS TO PAYMENT OF EXCESS FORECLOSURE SALE PROCEEDS

11  DUE TO DEBTOR.

12       **E. ORDER FOR APPOINTMENT OF RECEIVER**

13       Pursuant to C.C.P. §708.620 and §564 and Corporations §17705.03, the Court shall

14  appoint a limited Receiver via separate Order, to collect on the Judgment Debtor ANNE

15  KIHAGI's RIGHTS TO PAYMENT OF EXCESS FORECLOSURE SALE PROCEEDS DUE

16  TO DEBTOR, specifically to collect for the LLC(s) the share of profits and other monies so due

17  or so becoming due, and to distribute same in accordance with this Order.

18

19  DATED: 12/21/18

20                                    Hon. Harold E. Kahn
                                      JUDGE OF THE SUPERIOR COURT

21

22

23

24

25

26

27

28

-3-

Order on Motion for Charging Orders, Assignment & Restraining Order, and for Appointment of Receiver

502

# EXHIBIT 9

1    JEFFER MANGELS BUTLER & MITCHELL LLP
     ROBERT B. KAPLAN, P.C. (Bar No. 76950)
2    *rbk@jmbm.com*
     Two Embarcadero Center, 5th Floor
3    San Francisco, California 94111-3813
     Telephone:   (415) 398-8080
4    Facsimile:   (415) 398-5584

5    Attorneys for Plaintiff UMPQUA BANK

6

7

ELECTRONICALLY
**F I L E D**
Superior Court of California,
County of San Francisco

**01/18/2019**
Clerk of the Court
BY:CAROL BALISTRERI
Deputy Clerk

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9      COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10

11    UMPQUA BANK, a state chartered bank,

12             Plaintiff,

13        v.

14    XELAN PROP 1, LLC, a California limited
     liability company; and DOES 1-30, inclusive,

15

16           Defendants.

| Case No. CGC-18-564941 |
| --- |
| **NOTICE OF MOTION AND MOTION FOR ORDER:** |
| **(1) INSTRUCTING RECEIVER TO SELL REAL PROPERTY ASSET OF RECEIVERSHIP ESTATE; AND** |
| **(2) CONFIRMING SALE OF REAL PROPERTY [1000-1022 FILBERT STREET, SAN FRANCISCO, CA]** |

| | |
| --- | --- |
| Date: | February 21, 2019 |
| Time: | 9:30 a.m. |
| Dept.: | 501 |
| | |
| Action Filed: | March 12, 2018 |
| Trial Date: | None Set |

21    **TO: DEFENDANT XELAN PROP 1, LLC AND OTHER PARTIES IN INTEREST:**

22        PLEASE TAKE NOTICE that on February 21, 2019 at 9:30 a.m. or as soon thereafter as

23    the matter may be heard in Department 501 of the above-referenced court located at 400

24    McAllister Street, San Francisco, California, Plaintiff Umpqua Bank ("Bank") will move this court

25    for an order (1) instructing and authorizing Kevin Singer, the court-appointed receiver herein

26    ("Receiver"), to sell the real property asset of the receivership estate, located at 1000-1022 Filbert

27    Street, San Francisco, California ("Filbert Street Property") to Kenneth M. Kaplan and/or assignee,

28    and Brandon Kaplan, and/or assignee, or to such other interested person making a better and

---

62892479v4

1

NOTICE OF MOTION AND MOTION FOR ORDER:  (1) INSTRUCTING RECEIVER TO SELL ETC. [XELAN-
FILBERT]

1  higher bid therefor (the "Buyer"), pursuant to the terms of the San Francisco Purchase Agreement

2  dated December 5, 2018, Addendum No. 1 dated December 5, 2018, Buyer's Intent to Exchange

3  Supplement dated December 5, 2018, Disclosure Regarding Real Estate Agency Relationship

4  dated December 5, 2018, Disclosure Regarding Real Estate Agency Relationship dated December

5  5, 2018, Possible Representation of More Than One Buyer or Seller -- Disclosure and Consent

6  dated December 5, 2018, "As-Is" Addendum dated December 5, 2018, Counter Offer No. 1 dated

7  December 8, 2018, Addendum to San Francisco Purchase Agreement dated December 8, 2018,

8  Contingency Removal #1 dated January 11, 2019, and Addendum A (Addendum to Contingency

9  Removal and Approval of Documents) dated January 15, 2019  (collectively, the "PSA"), attached

10  to the accompanying Declaration of Kevin Singer ("Singer Decl.") as Exhibit 3 and made a part

11  hereof, or such as other terms as the Court may prescribe; (2) confirming the sale of the Filbert

12  Street Property to the best and highest bid as determined by the Court after conducting a public

13  overbid for the Filbert Street Property.

14      This Motion will be based upon this Notice of Motion and Motion, the Singer Decl., the

15  accompanying Declarations of Beverly Tengco and Edward Deleski, and the Memorandum of

16  Points and Authorities, all served and filed herewith and the complete files and records of this

17  action.

18      1.    Terms Of Sale.

19      The terms of the proposed sale of the Filbert Street Property are set forth in the PSA

20  entered into between the Receiver and Buyer, a true and correct copy of which is attached as

21  Exhibit 3 to the accompanying Singer Decl.  Interested parties should carefully read the PSA for

22  the complete and exact terms of sale.  These terms are summarized as follows:

| | |
|---|---|
| 23  **Assets to be Sold:** | The Filbert Street Property |
| 24  **Condition:** | To be sold free of liens, encumbrances, and interests, sold "AS IS, WHERE IS" |
| 25-26  **Proposed Buyer:** | Kenneth M. Kaplan, and or assignee, and Brandon Kaplan, and/or assignee |
| 27  **Purchase Price:** | $4,975,000.00 ("Purchase Price") |
| 28  **Closing Date:** | On or before 20 days after the above-entitled Court has issued an |

62892479v4

2

NOTICE OF MOTION AND MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL ETC. [XELAN-FILBERT]

1    order approving of the PSA and confirming that the seller of the
     Filbert Street Property is the Receiver and is empowered to
2    deliver the deed and convey title to the Filbert Street Property as
     provided for in the PSA, or March 14, 2019 whichever is earlier,
3    and as is further provided in the PSA.

4    **Brokers/Commissions:**    Vanguard Properties is to receive a commission of 5.0% of the
     Purchase Price.

5

6

     **Overbids:**    An initial overbid shall be $200,000 above the Purchase Price,
7    with subsequent overbids to be $200,000 in excess of each prior
     bid, with the Buyer having the right to match any overbid.

8

     **Breakup Fee:**    None

9

10        2.    Sale To Discharge and Clear Of Liens, Encumbrances, And Interests

11            (a)    Liens of Record. To the best knowledge and information of the Receiver,

12   the Filbert Street Property to be sold currently is subject to liens, encumbrances, and interests as

13   set forth herein. Attached to the Singer Decl. as Exhibit 6 is a Preliminary Title Report issued by

14   Orange Coast Title Insurance Company, identifying as of January 4, 2019 all liens, encumbrances

15   and interests filed of record in the San Francisco County Recorder's Office against the Filbert

16   Street Property.

17            (b)    Discharge of Liens. The sale of the Filbert Street Property is contingent on

18   the Receiver's ability to deliver title to the Filbert Street Property to the Buyer free and clear of all

19   liens, encumbrances, and interests. By the manner and method of sale employed by the Receiver,

20   all liens, encumbrances, and interests are to be discharged.

21        3.    Sale Proceeds

22        The Receiver projects the proceeds derived from the sale of the Filbert Street Property to

23   benefit the receivership estate will be sufficient to pay off the outstanding obligations owed by

24   XELAN Prop 1, LLC to Umpqua Bank secured by that certain Deed of Trust and Assignment of

25   Rents and Leases and Security Agreement (and Fixture Filing) dated as of July 31, 2013 executed

26   by XELAN Prop 1, LLC and recorded on August 13, 2013 in the Official Records of the San

27   Francisco County Recorder's Office as Document No. DOC-2013-J729297-00 and to satisfy the

28   following liens, encumbrances and interests which have been recorded against the Filbert Street

62892479v4                                    3

NOTICE OF MOTION AND MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL ETC. [XELAN-
FILBERT]

1  Property:  (i) Abstract of Judgment recorded by David and Caroline Green on April 23, 2018 in

2  the Official Records of the San Francisco County Recorder's Office as DOC-2018-K604682-00;

3  (ii) Abstract of Judgment recorded by the City and County of San Francisco and the People of the

4  State of California on June 7, 2018 in the Official Records of the San Francisco County Recorder's

5  Office as Document No. DOC-2018-K623991-00; (iii) Abstract of Judgment recorded by City and

6  County of San Francisco and the People of the State of California on October 17, 2018 in the

7  Official Records of the San Francisco County Recorder's Office as Document No. DOC-2018-

8  K683730-00; and (iv) any other liens which the Receiver determines, in the exercise of his

9  business judgment, must be paid in order to close the sale of the Filbert Street Property to the

10  Buyer on the terms set forth in the PSA (collectively, the "Liens").  The remaining proceeds of

11  sale will be held by the Receiver until further order of this Court to, inter alia, pay all allowed

12  claims filed against the receivership estate, to pay all unpaid Receiver's fees and expenses due and

13  owing to the Receiver until discharge of the Receiver and approval of his final accounting

14  pursuant to California Rule of Court 3.1184, to pay all amounts, if any, ordered by this Court to

15  Dale Duncan and Marta Munoz Mendoza pursuant to that certain Order on Motion for Charging

16  Orders, Assignment Orders, Restraining Order and for Appointment of Receiver [On Judicial

17  Foreclosure of Two Properties Held by Debtor Anne Kihagi's LLC: XELAN Prop 1, LLC] and

18  that certain Order on Motion for Charging Orders, Assignment Orders, Restraining Order and for

19  Appointment of Receiver [On Pending Non-Judicial Foreclosure of Property Held by Debtor Anne

20  Kihagi's LLC(s)] filed in the action entitled Dale Duncan, etc. v. Anne Kihagi, etc., et al., San

21  Francisco County Superior Court Case No. CGC-15-545655 and, thereafter, to pay the remaining

22  proceeds of sale, if any, to XELAN Prop 1, LLC.

23  　　　　4.　　Sale Procedures To Be Employed By Receiver Prior To Hearing To Confirm Sale

24  　　　　The Receiver proposes to employ the following sale procedures prior to the public overbid

25  and sale confirmation hearing on February 21, 2019.

26  　　　　　　(a)　　Notice

27  　　　　　　　　(1)　　The Receiver shall have caused to have notified those parties that

28  heretofore have expressed an interest in purchasing the Filbert Street Property regarding the

JMBM | Jeffer Mangels Butler & Mitchell LLP

62892479v4

1   pending sale and have invited them to participate in the public overbid process by causing a notice

2   of sale complying with the provisions of California Code of Civil Procedure § 701.540(a) and of

3   the right to overbid ("Notice of Sale") in substantially the form attached as Exhibit 4 to the Singer

4   Decl. to be posted on the Filbert Street Property, at a public place in the City of San Francisco, and

5   published in a newspaper of general circulation for the City and County of San Francisco at least

6   three times prior to the hearing of this Motion and by emailing the Notice of Sale to all potential

7   buyers of the Filbert Street Property, as set forth in the Declaration of Edward Deleski filed in

8   support of the Motion, at least 20 days prior to the hearing of the Motion;

9                 (2)     The Receiver shall comply with all applicable procedures outlined in

10   the Code of Civil Procedure § 701.540 with respect to the sale of the Filbert Street Property,

11   including posting a notice on the Filbert Street Property, and at a public place in the City of San

12   Francisco, and shall file a reply Declaration prior to the hearing on this Motion to demonstrate

13   compliance with Code of Civil Procedure § 701.540;

14                 (3)     The Receiver shall have caused the Notice of Sale to be posted in

15   the San Francisco Association of Realtors Multiple Listing Service; and

16                 (4)     The Receiver shall have caused to have served this Notice of Motion

17   and Motion and Notice of Sale on Defendant XELAN Prop 1, LLC's and its attorneys of record by

18   mail and on the attorneys of record for the holders of the Liens (or the holders of the Liens if there

19   are no attorneys of record) at least 20 calendar days before the date of the hearing scheduled in this

20   Court to approve the PSA.

21          (b)    Date and Procedures for Public Overbid. The Receiver has set February 21,

22   2019 at 9:30 a.m., in Department 501 of this Court as the date, time, and place for public overbids

23   for the Filbert Street Property to be made before the Court so that there can be an immediate

24   evaluation and determination of the best and highest public overbid made for the Filbert Street

25   Property by a qualified bidder, and an order made and entered confirming the sale. The proposed

26   date, time, and location is convenient to the Court and the parties because the parties already are

27   scheduled to come before the Court at that date, time, and location for further hearing on the

28   Receiver's request for instructions and hearing on this Motion.

5

62892479v4

NOTICE OF MOTION AND MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL ETC. [XELAN-
FILBERT]

1  With regard to the public overbid sale, the Receiver requests that parties interested

2  in participating be proven to the Receiver and to the Court to be financially qualified, able to make

3  any deposits required under the PSA, and prepared to make overbids in increments of $200,000

4  initially, with subsequent overbids of $200,000 thereafter until a winning bidder is determined.

5  (c)  Date for Hearing re Confirmation of Sale.  A receiver's sale is not final until

6  confirmed by the Court. The public overbid sale process will be used in this case in order to

7  determine if there is a person willing to make a better and higher bid for purchase of the Filbert

8  Street Property.  It is a way to test the sale of the Filbert Street Property in the marketplace and

9  insures that the sale is made at arm's length and in good faith.

10  The Receiver has also set February 21, 2019, at 9:30 a.m., in Department 501 of this

11  Court, or as soon thereafter as the public overbid process has been concluded by the Court, as the

12  date and time for hearing to confirm the sale of Filbert Street Property as described herein to the

13  best and highest qualified bidder. The proposed date, time, and location is convenient to the Court

14  and the parties because the parties already are scheduled to come before the Court at that date,

15  time, and location for further hearing on the Receiver's request for instructions and hearing on this

16  Motion.

17  WHEREFORE, the Bank requests that this Motion be granted, pursuant to the proposed

18  Order attached hereto as Exhibit 1[1] and that the Receiver be instructed, authorized, and

19  empowered to sell the Filbert Street Property as set forth herein, with a public overbid to be

20  conducted before the court on February 21, 2019 at 9:30 a.m., with a hearing to confirm the sale of

21  Filbert Street Property based on the best and highest bid, to immediately follow the public overbid.

22  ///

23

24  [1] The proposed Order has been prepared to account for the possibility that a successful overbid is
25  made at the time of the February 21, 2019 hearing on this Motion and that the successful over
bidder has signed a purchase and sale agreement in favor of the Receiver. The alternative
26  provisions of the proposed Order which will apply to a successful over bidder are set forth in
boldface inserts. Moreover, the Bank reserves the right to make edits to their proposed Order prior
27  to the hearing scheduled on the Motion, once the proposed Order has been reviewed by Orange
Coast Title Company.
28

6

NOTICE OF MOTION AND MOTION FOR ORDER:  (1) INSTRUCTING RECEIVER TO SELL ETC. [XELAN-FILBERT]

509

1    DATED: January 18, 2019        JEFFER MANGELS BUTLER & MITCHELL LLP.

2

3                            By: _____

4                                  ROBERT B. KAPLAN
                            Attorneys for Plaintiff UMPQUA BANK

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

62892479v4

7

NOTICE OF MOTION AND MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL ETC. [XELAN-
FILBERT]

510

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JMBM | Jeffer Mangels Butler & Mitchell LLP

# **EXHIBIT 1**

62892475v4

NOTICE OF MOTION AND MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL ETC. [XELAN-FILBERT]

1    JEFFER MANGELS BUTLER & MITCHELL LLP
      ROBERT B. KAPLAN, P.C. (Bar No. 76950)
2    *rbk@jmbm.com*
      Two Embarcadero Center, 5th Floor
3    San Francisco, California 94111-3813
      Telephone:    (415) 398-8080
4    Facsimile:     (415) 398-5584

5    Attorneys for Plaintiff UMPQUA BANK

6

7

8             SUPERIOR COURT OF THE STATE OF CALIFORNIA

9         COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10

11    UMPQUA BANK, a state chartered bank,       Case No. CGC-18-564941

12            Plaintiff,               **[PROPOSED] ORDER ON MOTION FOR
                                           ORDER:**

13        v.                             **(1) INSTRUCTING RECEIVER TO SELL
14    XELAN PROP 1, LLC, a California limited     REAL PROPERTY ASSET OF
      liability company; and DOES 1-30, inclusive,   RECEIVERSHIP ESTATE; AND**

15
           Defendants.                     **(2) CONFIRMING SALE OF REAL
16                                         PROPERTY [1000-1022 FILBERT
                                          STREET, SAN FRANCISCO, CA]**

17

18                                 Date:             February 21, 2019
                                Time:             9:30 a.m.
19                                 Dept.:            501

20                                 Action Filed:      March 12, 2018
                                Trial Date:       None Set

21        The Motion of Plaintiff Umpqua Bank ("Bank") for an Order: (1) Instructing Receiver to

22    Sell Real Property Assets of Receivership Estate; and (2) Confirming Sale of Real Property Asset

23    (the "Motion"), came on regularly for hearing on February 21, 2019 at 9:30 a.m. in Department

24    501 of the above-entitled Court. Robert B. Kaplan, Esq. of Jeffer Mangels Butler & Mitchell LLP

25    appeared for Plaintiff Bank and other appearances were as noted in the record at the time of the

26    hearing.

27    ///

28    ///

                                            1
62868009v4
    [PROPOSED] ORDER ON MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL, ETC.
                                   [XELAN-FILBERT]

1    The Court, having reviewed the Motion, makes the following findings, conclusions and

2  order.[1]

3         1.    Notice.  Based upon the evidence before the Court, the Court finds that the Bank:

4              (a)    Timely served the Notice of Motion and Motion on XELAN Prop 1, LLC,

5  on its counsel of record; and

6  .           (b)    The Receiver has caused to be notified those parties that heretofore have expressed

7  an interest in purchasing 1000-1022 Filbert Street, San Francisco, California (the "Filbert Street

8  Property"), legally described in Exhibit A attached hereto and incorporated herein by this

9  reference as though set forth in full, regarding the pending sale and has invited them to participate

10  in the public overbid process by having a notice of sale complying with the provisions of

11  California Code of Civil Procedure § 701.540(a) and of the right to overbid ("Notice of Sale")

12  served on Defendant XELAN Prop 1, LLC and its attorneys of record and on all persons having

13  recorded liens, encumbrances and interests on the Filbert Street Property as of January 4, 2019 by

14  at least 20 calendar days before the date of the hearing scheduled in this Court on this Motion and

15  has caused the Notice of Sale to be posted on the Filbert Street Property, at a public place in the

16  City of San Francisco, and published in a newspaper of general circulation for the City and County

17  of San Francisco at least three times prior to the hearing of this Motion and by emailing the Notice

18  of Sale to all potential buyers of the Filbert Street Property, as set forth in the Declaration of

19  Edward Deleski filed in support of the Motion, at least 20 days prior to the hearing of the Motion.

20         Based upon the foregoing findings, the Court concludes that the Receiver has employed all

21  procedures and given all notices required by law to effect the sale of the Filbert Street Property

22  and shall convey good and clear title to the assets to Kenneth M. Kaplan, and/or assignee, and

23  Brandon Kaplan, and/or assignee (the "Original Buyer") [_____, **who was the**

24  **highest over bidder (the "Overbid Buyer) for the purchase price of $_____ (the**

25  **Overbid Purchase Price").]**  In the event Original Buyer does not close the sale within the time

26  _____

27
[1] All terms not defined in this Order shall have the meanings ascribed to them in the Motion.

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    limits provided for in the PSA (as that term is defined below), the over bidder which submitted the

2    last overbid immediately prior the successful over bid made by the Original Buyer to purchase the

3    Filbert Street Property shall have the right to purchase the Filbert Street Property for its final

4    overbid by executing the Original Buyer's PSA, as modified by its last over bid and this Order, and

5    shall close the sale within 20 calendar days of the Receiver cancelling in writing the Original

6    Buyer's PSA.

7          2.     Best Interests. The Court further finds that:

8                 (a)     The proposed sale of the Filbert Street Property as set forth in the Motion

9    was negotiated in good faith and at arm's length between the Receiver the Original Buyer

10   [Overbid Buyer] and upon the closing of escrow for the sale of the Filbert Street Property, the

11   Receiver shall be authorized to pay the amounts owed to holders of any liens, encumbrances and

12   interests which have been recorded against the Filbert Street Property as set forth in the

13   Preliminary Title Report attached as Exhibit 6 to the Declaration of Kevin Singer in support of the

14   Motion ("Singer Decl.") and to transfer title to the Filbert Street Property as provided for in the

15   San Francisco Purchase Agreement dated December 5, 2018, Addendum No. 1 dated December 5,

16   2018, Buyer's Intent to Exchange Supplement dated December 5, 2018, Disclosure Regarding

17   Real Estate Agency Relationship dated December 5, 2018, Disclosure Regarding Real Estate

18   Agency Relationship dated December 5, 2018, Possible Representation of More Than One Buyer

19   or Seller – Disclosure and Consent dated December 5, 2018, "As-Is" Addendum dated December

20   5, 2018, Counter Offer No. 1 dated December 8, 2018, Addendum to San Francisco Purchase

21   Agreement dated December 8, 2018, Contingency Removal #1 dated January 11, 2019, and

22   Addendum A (Addendum to Contingency Removal and Approval of Documents) dated January

23   15, 2019  (collectively, the "PSA") attached as Exhibit 3 to the Singer Decl. for the purchase price

24   of $4,975,000 set forth in the PSA (the "Purchase Price") [as provided for in the San Francisco

25   Purchase Agreement dated December 5, 2018, Addendum No. 1 dated December 5, 2018,

26   Buyer's Intent to Exchange Supplement dated December 5, 2018, Disclosure Regarding Real

27   Estate Agency Relationship dated December 5, 2018, Disclosure Regarding Real Estate

28   Agency Relationship dated December 5, 2018, Possible Representation of More Than One

62868009v4
[PROPOSED] ORDER ON MOTION FOR ORDER:  (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-FILBERT]

1    Buyer or Seller – Disclosure and Consent dated December 5, 2018, "As-Is" Addendum dated

2    December 5, 2018, Counter Offer No. 1 dated December 8, 2018, Addendum to San

3    Francisco Purchase Agreement dated December 8, 2018, Contingency Removal #1 dated

4    January 11, 2019, and Addendum A (Addendum to Contingency Removal and Approval of

5    Documents) dated January 15, 2019 (the "Overbid PSA") for the Overbid Purchase Price.

6    The Overbid Buyer shall purchase the Filbert Street Property on the same terms as the

7    Original Buyer as set forth in the Overbid PSA with no contingencies.];

8          (b)    The offer of the Original Buyer [Overbid Buyer] on the terms set forth in

9    PSA [Overbid PSA] is the best and highest bid for the Filbert Street Property. No better or higher

10   bids for the assets to be sold by the receiver were made during the public overbid conducted by the

11   Court;

12         (c)    The proposed sale of the Filbert Street Property is in the best interests of the

13   parties to this action and the receivership estate;

14         (d)    By closing escrow and taking title to the Filbert Street Property, the

15   Original Buyer [Overbid Buyer] acknowledges that: (i) the Original Buyer [Overbid Buyer] has

16   no recourse against the Receiver (or his agents) for any claim or cause of action; (ii) the Original

17   Buyer [Overbid Buyer]'s sole and only recourse is against the Original Buyer [Overbid Buyer]'s

18   title insurance policy, if applicable; and (iii) any actions taken by the Receiver to sell the Filbert

19   Street Property shall not constitute a representation and warranty by the Receiver as to any aspects

20   of the sale of the Filbert Street Property and the sale shall be "as is", "where is" with no

21   representations and/or warranties, shall not be subject to the provisions of Civil Code §§ 896 and

22   897, and shall be without risk or liability to the Receiver and/or the receivership estate. The

23   above-entitled Court retains jurisdiction over any dispute that may arise involving the Receiver

24   with the sale of the Filbert Street Property pursuant to the terms of the PSA [Overbid PSA]

25   approved of by the Court; and

26         (e)    That certain Order Granting Motion of Umpqua Bank for Order:

27   (1) Instructing and Authorizing Receiver to Sell Real Property Assets of Receivership Estate; and

28   (2) Confirming Sale Procedures filed on October 12, 2018 (the "Sale Order") is hereby modified

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1   to authorize overbids of at least $200,000 above the Purchase Price, with subsequent overbids to

2   be at least $200,000 in excess of the prior bid, with the Original Buyer having the right to match

3   any overbid.

4           Based upon the foregoing findings, the Court concludes that sale of the Filbert Street

5   Property as proposed by the Receiver's Motion should be confirmed by the Court.

6           3.      Receiver's Actions.  The Court further finds that the Receiver has acted in good

7   faith and pursuant to the instructions of the Court in carrying out the duties of his office in relation

8   to the proposed sale.

9           4.      Orders and Instructions.  Based upon the foregoing findings and conclusions, the

10  Court instructs, authorizes, and orders as follows:

11          (a)     The Motion is granted, any opposition to the Motion has been withdrawn or

12  is overruled and the sale to the Original Buyer [**Overbid Buyer**] on the terms set forth in the PSA

13  [**Overbid PSA**] is confirmed.

14          (b)     The Original Buyer's [**Overbid Buyer's**] purchase of the Filbert Street

15  Property was conducted as authorized by this Court pursuant to the Sale Order.

16          (c)     The Receiver shall execute any and all documents necessary to complete the

17  sale to the Original Buyer [**Overbid Buyer**] pursuant to the PSA [**Overbid PSA**] and shall pay the

18  proceeds of sale paid by the Original Buyer [**Overbid Buyer**] pursuant to the PSA [**Overbid**

19  **PSA**] as follows: (i) the unpaid delinquent real estate taxes and pro-rata real estate taxes owed by

20  XELAN Prop 1, LLC to the City and County of San Francisco on the Filbert Street Property; (ii)

21  to pay real estate commissions payable to Vanguard Properties in the amount equal to 5.0% of the

22  Purchase Price at closing of escrow; (iii) for reasonable closing costs and escrow fees and title fees

23  owed with respect to the sale of the Filbert Street Property pursuant to the PSA [**Overbid PSA**];

24  (iv) the amounts owed by XELAN Prop 1, LLC to Umpqua Bank secured by that certain Deed of

25  Trust and Assignment of Rents and Security Agreement (and Fixture Filing) dated as of July 31,

26  2013 executed by XELAN Prop 1, LLC and recorded on August 14, 2013 in the Official Records

27  of the San Francisco County Recorder's Office as Document No. DOC-2013-J729297-00; (v) the

28  amounts owed to the holders of the following liens, encumbrances, and interests recorded against

1  the Filbert Street Property: (A) Abstract of Judgment recorded by David and Caroline Green on

2  April 23, 2018 in the Official Records of the San Francisco County Recorder's Office as DOC-

3  2018-K604682-00; (B) Abstract of Judgment recorded by the City and County of San Francisco

4  and the People of the State of California on June 7, 2018 in the Official Records of the San

5  Francisco County Recorder's Office as Document No. DOC-2018-K623991-00; and (C) Abstract

6  of Judgment recorded by City and County of San Francisco and the People of the State of

7  California on October 17, 2018 in the Official Records of the San Francisco County Recorder's

8  Office as Document No. DOC-2018-K683730-00; and (vi) any other liens which the Receiver

9  determines, in the exercise of his business judgment, must be paid in order to close the sale of the

10  Filbert Street Property to the Original Buyer [**Overbid Buyer**] on the terms set forth in the PSA

11  [**Overbid PSA**], with the remaining proceeds of sale to be held by the Receiver until further order

12  of this Court to, inter alia, pay all allowed claims filed against the receivership estate, to pay all

13  unpaid Receiver's fees and expenses due and owing to the Receiver until discharge of the Receiver

14  and approval of his final accounting pursuant to California Rule of Court 3.1184, , to pay all

15  amounts, if any, ordered by this Court to Dale Duncan and Marta Munoz Mendoza pursuant to

16  that certain Order on Motion for Charging Orders, Assignment Orders, Restraining Order and for

17  Appointment of Receiver [on judicial foreclosure of two properties held by Debtor Anne Kihagi's

18  LLC: XELAN Prop 1, LLC] and that certain Order on Motion for Charging Orders, Assignment

19  Orders, Restraining Order and for Appointment of Receiver [on pending non-judicial foreclosure

20  of property held by Debtor Anne Kihagi's LLC(s) filed in the action entitled Dale Duncan, etc. v.

21  Anne Kihagi, etc., et al., San Francisco County Superior Court Case No. CGC-15-545655 and,

22  thereafter, to pay the remaining proceeds of sale, if any, to XELAN Prop 1, LLC.

23            (d)    The Original Buyer [**Overbid Buyer**] shall take good and clear title to the

24  Filbert Street Property sold by the Receiver.

25            (e)    The Receiver is instructed, authorized, and ordered to forthwith complete

26  the sale of assets to the Original Buyer [**Overbid Buyer**] pursuant to the terms of the PSA

27  [**Overbid PSA**].

28            (f)    Original Buyer's [**Overbid Buyer's**] purchase of the Filbert Street Property

JMBM  Jeffer Mangels
Butler & Mitchell LLP

62868009v4

6

[PROPOSED] ORDER ON MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-FILBERT]

1  results from a legally authorized properly noticed, non-collusive, non-fraudulent arms' length

2  transaction, the Purchase Price [**Overbid Purchase Price**] for the Filbert Street Property

3  (including under the terms of the PSA [**Overbid PSA**]) is fair and reasonable and constitutes the

4  highest and best Purchase Price [**Overbid Purchase Price**] for the Filbert Street Property and the

5  Original Buyer [**Overbid Buyer**] is a good faith purchaser for value of the Filbert Street Property.

6          (g)      The Receiver is instructed, authorized, and ordered to forthwith complete

7  the sale of assets to the Original Buyer [**Overbid Buyer**] pursuant to the terms of the PSA

8  [**Overbid PSA**]. The PSA [**Overbid PSA**] or any documents or instruments related thereto

9  maybe amended, or supplemented by the Original Buyer [**Overbid Buyer**] and the Receiver

10  without further order of this Court, provided such modifications, amendments or supplements do

11  not have a material adverse effect on the receivership estate.

12

13  DATED:                              JUDGE OF THE SUPERIOR COURT

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

62868009v4

7

[PROPOSED] ORDER ON MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-FILBERT]

518

**LEGAL DESCRIPTION OF**
**1000-1022 Filbert Street, San Francisco, California**

Beginning at a point of intersection of the Northerly line of Filbert Street and the Westerly line of Jones Street; running thence Westerly along said line of Filbert Street 106 and 3 inches; thence at a right angle Northerly 52 feet; thence at a right angle Easterly 36 feet and 3 inches; thence at a right angle Southerly 25 feet; thence at a right angle Easterly 70 feet to the Westerly line of Jones Street; thence at a right angle Southerly along said line of Jones Street 27 feet to the point of beginning, in the City of San Francisco, County of San Francisco, State of California.

Being part of Vara Block No. 237.

# **EXHIBIT A**

62868009v4

[PROPOSED] ORDER ON MOTION FOR ORDER:  (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-FILBERT]

519

# EXHIBIT 10

1   PAUL MANASIAN, State Bar No.: 130855
    1310 65th Street
2   Emeryville, CA 94608
    Telephone: (415) 730-3419
3   manasian@mrlawsf.com

4

5   Attorneys for Defendant XELAN PROP 1, LLC

6              SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                  FOR THE COUNTY OF SAN FRANCISCO

8   UMPQUA BANK, a state-chartered bank,          CASE NO. CGC-18-564941

9                  Plaintiff,                      OPPOSITON TO MOTION FOR
                                                   ORDER: (1) INSTRUCTING
10        v.                                       RECEIVER TO SELL REAL PROPERTY
                                                   ASSET OF RECEIVERSHIP ESTATE;
11  XELAN PROP 1, LLC, a California limited        AND (2) CONFIRMING SALE OF REAL
                                                   PROPERTY ASSET
12  liability company; and Does 1-30, inclusive,

13                 Defendants.                     Hearing Date:    February 21, 2019
                                                   Time:            9:30 a.m.
14                                                 Dept:            501

15                                                 Action Filed:    March 12, 2018
16                                                 Trial Date:      None Set

17

18

19                          __INTRODUCTION__

20       Defendant Xelan Prop 1, LLC ("Xelan" or "Defendant") opposes the Motion for Order:

21  (1) Instructing Receiver to Sell Real Property Asset of Receivership Estate; and (2) Confirming

22  Sale of Real Property Asset (the "Motion") filed by Umpqua Bank ("Umpqua" or the "Bank").

23  The proposed sale is for an inadequate price, is contrary to the well-established statutory scheme

24  for sale of real property to satisfy an obligation secured by the real property, and is unnecessary as

25  Xelan will be able to fully satisfy Umpqua's debt through refinancing in the next several weeks.

26  The Motion seeks to sell the Filbert St. property for less than $5 million, which was listed at

27  $5.75, and which is worth at least $6.0 million per a broker's opinion of value, in order to satisfy

28  the Bank's debt of approximately $2.0 million. This "shadow" foreclosure sale is contrary to the

_____
            OPPOSITION TO MOTION FOR ORDER TO SELL REAL PROPERTY

1  foreclosure procedures under California law – which the Bank has never invoked through the

2  recording of a notice of default (an "NOD"). Moreover, Xelan has arranged financing to fully

3  satisfy the Bank but will need several weeks – and the cooperation of the Receiver – to close the

4  transaction in a manner which will discharge the receiver concurrently with the funding of the

5  take-out loan.

6  **ARGUMENT**

7  **The Sale Price is Inadequate**

8  The proposed sale price of $4,975,00 is far less than the listing price of $5,750,000. As

9  noted in the Bank's Memorandum of Points and Authorities in support of the Motion (the

10  "MPA") the Court's order which authorized the Receiver's retention of the broker specified the

11  listing price of $5,750,000. MPA, page 3, lines 15-19. The order authorizing the listing was

12  entered on October 12, 2018. At approximately the same time the Defendant's managing

13  member, Anna Kihagi, consulted a prominent real estate broker specializing in apartment

14  building sales in San Francisco, Adam Lilly, who prepared an analysis and report which opined

15  that the value of the Filbert Street property is $6,000,000. See, Declaration of Anna Kihagi,

16  submitted herewith ("Kihagi Decl."), paragraph 11 and Exhibit A attached thereto. Thus, the

17  proposed sale price is more than **one million dollars** less than the market value of the property.

18  Moreover, the sale price was obtained in a manner that is essentially a forced sale: the period

19  from the entry of the order authorizing the listing to the filing of the motion to confirm the sale

20  was less than 90 days. Given that the Bank is owed approximately $2,000,000 there is virtually

21  no risk that the Bank will not be paid: the risk of an inadequately low price is entirely being borne

22  by Xelan. Given that the Receiver has fiduciary duties to all interested parties, the harm to Xelan

23  from the proposed sale should far outweigh the desire of the Bank to be paid (notwithstanding

24  that it has taken no steps to actually foreclose on the property).

25  **The Sale is Contrary to California's Statutory Foreclosure Scheme**

26  In support of the Motion Umpqua cites <u>People v. Riverside University.</u>, 35 Cal.App.3d

27  572, 583 (1973), which holds that a court has authority to order a receiver to sell real or personal

property in the receiver's possession. But the <u>Riverside</u> opinion expressly acknowledges that a

- 2 -

**OPPOSITION TO MOTION FOR ORDER TO SELL REAL PROPERTY**

1   court's power to authorize a receiver to sell a property is limited by statute. **"In the absence of a**

2   **statute otherwise providing,** the court may authorize a receiver to sell property in his hands at

3   either a private or public sale [citation omitted, emphasis added]." Id. at 583. On the same page,

4   the Riverside opinion goes on to state: "Consequently, **unless regulated by statute,** the court

5   has full power to order the receiver to dispose of property in such a manner as the court may

6   deem to be for the best interest of the parties concerned and the advice of the receiver and his

7   opinion in regard to the value of the property, the manner, time and place of its disposition are

8   entitled to great respect and weight [citations omitted, emphasis added]." Id.

9        In fact, the sale of real property to satisfy secured debts, such as Umpqua's, **is** regulated

10  by statue. Under California law, the sole form of legal action for recovery of any debt secured by

11  mortgage or deed of trust on real property is judicial foreclosure. In re Pajaro Dunes Rental

12  Agency, Inc., 142 B.R. 383 (Bankr. N.D. Cal. 1992), aff'd, 156 B.R. 263 (1993), affi'd, 46 F.3d

13  1143 (9th Cir. 1995). This legal doctrine is called the "one-form-of-action rule," which provides

14  that the only legal action available to enforce a debt secured by a real property mortgage or deed

15  of trust is a judicial foreclosure action. E.g., Ghirado v. Antonoli, 14 Cal.4th 39, 47-48 (1996);

16  Paykar Const., Inc. v. Spilat Const. Corp., 92 Cal.App.4th 488, 495-96 (2001). The one-form-of-

17  action rule is embodied in California Code of Civil Procedure section 726(a), which provides:

18        There can be but one form of action for the recovery of any debt or the enforcement of

19        any right secured by mortgage upon real property or an estate for years therein, which

20        action shall be in accordance with the provisions of this chapter.

21

22  Cal.Civ.Proc.Code § 726. Despite only referring to mortgages, Section 726 applies to both debts

23  secured by mortgages upon real property as well as debts secured by deeds of trust. E.g.,

24  Security Pac. Nat'l Bank v. Wozab, 51 Cal.3d 991, 996-98 (1990); Ghirado, 14 Cal.4th at 47;

25  Walker v. Cmty. Bank, 10 Cal.3d 729, 732 n.1 (1974); Paykar Const., 92 Cal.App.4th at 495-96;

26  Cal.Civ.Proc.Code § 729.010(a) (recognizing the possibility of a "decree of foreclosure of a

27  mortgage or deed of trust on real property pursuant to Section 726").

- 3 -

OPPOSITION TO MOTION FOR ORDER TO SELL REAL PROPERTY

1    In the instant case, the debt to Umpqua at issue is secured by deeds of trust on the Filbert

2    Property.  Thus, according to California Code of Civil Procedure section 726 and case law, any

3    action for recovery of any debt secured by mortgage or deed of trust must be enforced "in

4    accordance with the provisions of this chapter [i.e., Chapter 1 "Actions for the Foreclosure of

5    Mortgages," which spans California Code of Civil Procedure section 725(a) to 730.5]." The

6    Motion seeks an order authorizing the Receiver to sell the Properties which does not provide for

7    the sale of these Properties according to the protections applicable to judicial foreclosures, which

8    are provided by California Code of Civil Procedure sections 725(a) through 730.5. Among those

9    protections, for example,  are a statutory right of redemption.

10    Of course, Umpqua could always choose to proceed through non-judicial foreclosure, by

11    recording a Notice of Default and subsequently recording a Notice of Sale, which it has chosen

12    not to do. Again, such a non-judicial foreclosure sale is also regulated by statute, namely Civil

13    Code Section 2924.

14    Rather than complying with the statutory foreclosure scheme, Umpqua is attempting to

15    use the receivership to effect a quick sale which will benefit only itself and potentially cause a

16    huge loss to Xelan.  Notably, the Motion was filed not by the Receiver, but by Umpqua.  While

17    the Receiver is in theory a neutral third party, he appears to be acting largely as Umpqua's agent

18    in this instance (he has never consulted the owner of the property – Xelan – regarding the

19    proposed sale or refinancing prospects).  This Court should not countenance the attempted end-

20    run of the statutory scheme foreclosure scheme by Umpqua, which is free to pursue foreclosure

21    under the methods provided but has chosen not to do so.

22    <u>**The Sale is Unnecessary and Inappropriate as Xelan is Able to Refinance**</u>
<u>**the Umpqua Debt Shortly**</u>

23

24    Xelan has located a lender who is willing to satisfy the debt to Umpqua through a

25    refinancing as set forth in the Kihagi Decl.  As also set forth in the Kihagi Decl. the lender will

26

27

- 4 -

OPPOSITION TO MOTION FOR ORDER TO SELL REAL PROPERTY

1    require that the Receiver relinquish the property and be discharged upon funding of the loan.[1] As

2    Ms. Kihagi states in her declaration, she has had numerous frustrations in dealing with Umpqua

3    to get the appropriate payoff amount to provide to lenders, and as such has lost one potential

4
5    lender due to those frustrations. The loan broker who obtained the original lender and has

6    secured another lender, Brett D. Everett sets forth the need for an addition period of time to close

7    the takeout loan in his declaration which is submitted herewith. While the funding of the take-out

8    loan and discharge of the Receiver will require several weeks, and perhaps a month, Xelan

9    submits that there is no urgency which would require the proposed sale in a shorter time frame;

10
11   Umpqua is clearly overly collateralized (with a $2 million debt secured by a $6 million property),

12   and the Receiver has been paid current all of his fees and costs. Approving a sale over the

13   objection of Xelan serves to confer no meaningful benefit on Umpqua (which essentially has no

14   risk of non-payment), requires no risk on the part of the Receiver who has been paid, and shifts

15   an enormous risk and potential loss to Xelan which it can avoid if it is permitted a relatively short

16   period to satisfy the Umpqua debt.

17

18                              **CONCLUSION**

19            The proposed sale should not be approved and authorized by the Court as the sale price is

20   clearly inadequate, there is no urgency to sell the property to satisfy Umpqua's debt given the

21   loan to value ratio, the procedure for the sale is in direct conflict with the statutory foreclosure

22   scheme, and Xelan will shortly be able to satisfy Umpqua's debt. Xelan respectfully submits that

23   the Motion should be denied.

24

25

26

27

---

[1] The loan would fund concurrently with a take-out loan of the other property owned by Xelan, located at 19th Street, so that the Receiver can be entirely discharged and this case closed. Coordinating the two closings with the discharge of the Receiver will require the cooperation of the Receiver and, ideally, Umpqua..

OPPOSITION TO MOTION FOR ORDER TO SELL REAL PROPERTY

1  Dated: February 6, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

_Paul E. Manasian_

PAUL E. MANASIAN

Counsel for XELAN PROP I, LLC

- 6 -

OPPOSITION TO MOTION FOR ORDER TO SELL REAL PROPERTY

# EXHIBIT 11

1  JEFFER MANGELS BUTLER & MITCHELL LLP
   ROBERT B. KAPLAN, P.C. (Bar No. 76950)
2  rbk@jmbm.com
   Two Embarcadero Center, 5th Floor
3  San Francisco, California 94111-3813
   Telephone:  (415) 398-8080
4  Facsimile:  (415) 398-5584

5  Attorneys for Plaintiff UMPQUA BANK

FILED
San Francisco County Superior Court
FEB 21 2019
CLERK OF THE COURT
BY: _____
Deputy Clerk

6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10

11  UMPQUA BANK, a state chartered bank,          Case No. CGC-18-564941

12                  Plaintiff,                     [PROPOSED] ORDER ON MOTION FOR
                                                   ORDER:
13          v.
                                                   (1) INSTRUCTING RECEIVER TO SELL
14  XELAN PROP 1, LLC, a California limited        REAL PROPERTY ASSET OF
    liability company; and DOES 1-30, inclusive,  RECEIVERSHIP ESTATE; AND
15
                    Defendants.                    (2) CONFIRMING SALE OF REAL
16                                                 PROPERTY [1000-1022 KILBERT
                                                   STREET, SAN FRANCISCO, CA]
17
                                                   Date:        February 21, 2019
18                                                 Time:        9:30 a.m.
                                                   Dept.:       501
19
                                                   Action Filed:   March 12, 2018
20                                                 Trial Date:     None Set

21       The Motion of Plaintiff Umpqua Bank ("Bank") for an Order:  (1) Instructing Receiver to

22  Sell Real Property Assets of Receivership Estate; and (2) Confirming Sale of Real Property Asset

23  (the "Motion"), came on regularly for hearing on February 21, 2019 at 9:30 a.m. in Department

24  501 of the above-entitled Court.  Robert B. Kaplan, Esq. of Jeffer Mangels Butler & Mitchell LLP

25  appeared for Plaintiff Bank, Kevin Singer appeared as the Receiver and other appearances were as

26  noted in the record at the time of the hearing.

27  ///

28  ///

63474377v1                                        1
         [PROPOSED] ORDER ON MOTION FOR ORDER:  (1) INSTRUCTING RECEIVER TO SELL, ETC.
                        [XELAN-FILBERT] [OVER BID BUYER]

528

1    The Court, having reviewed the Motion, makes the following findings, conclusions and

2    order.[1]

3        1.    Notice.  Based upon the evidence before the Court, the Court finds that the Bank:

4            (a)    Timely served the Notice of Motion and Motion on XELAN Prop 1, LLC,

5    on its counsel of record; and

6            (b)    The Receiver has caused to be notified those parties that heretofore have

7    expressed an interest in purchasing 1000-1022 Filbert Street, San Francisco, California (the

8    "Filbert Street Property"), legally described in Exhibit A attached hereto and incorporated herein

9    by this reference as though set forth in full, regarding the pending sale and has invited them to

10    participate in the public overbid process by having a notice of sale complying with the provisions

11    of California Code of Civil Procedure § 701.540(a) and of the right to overbid ("Notice of Sale")

12    served on Defendant XELAN Prop 1, LLC and its attorneys of record and on all persons having

13    recorded liens, encumbrances and interests on the Filbert Street Property as of January 4, 2019 by

14    at least 20 calendar days before the date of the hearing scheduled in this Court on this Motion and

15    has caused the Notice of Sale to be posted on the Filbert Street Property, at a public place in the

16    City of San Francisco, and published in a newspaper of general circulation for the City and County

17    of San Francisco at least three times prior to the hearing of this Motion and by emailing the Notice

18    of Sale to all potential buyers of the Filbert Street Property, as set forth in the Declaration of

19    Edward Deleski filed in support of the Motion, at least 20 days prior to the hearing of the Motion.

20        Based upon the foregoing findings, the Court concludes that the Receiver has employed all

21    procedures and given all notices required by law to effect the sale of the Filbert Street Property

22    and shall convey good and clear title to the assets to Craig Knight or Assignee who was

23    the highest over bidder (the "Overbid Buyer") for the purchase price of $ 5,175,000

24    (the Overbid Purchase Price").  In the event Overbid Buyer does not close the sale within the time

25    limits provided for in the Overbid PSA (as that term is defined below), Kenneth M. Kaplan, and/or

26    Assignee may purchase for $4,975,000.

27    [1] All terms not defined in this Order shall have the meanings ascribed to them in the Motion.

28

1  assignee and Brandon Kaplan, and/or assignee ("Original Buyer") may purchase the Filbert Street

2  Property for $4,975,000.00, and shall close the sale within 20 calendar days of the Receiver

3  cancelling in writing the Overbid Buyer's PSA.

4      2.   Best Interests.  The Court further finds that:

5         (a)   The proposed sale of the Filbert Street Property as set forth in the Motion

6  was negotiated in good faith and at arm's length between the Receiver the Overbid Buyer and

7  upon the closing of escrow for the sale of the Filbert Street Property, the Receiver shall be

8  authorized to pay the amounts owed to holders of any liens, encumbrances and interests which

9  have been recorded against the Filbert Street Property as set forth in the Preliminary Title Report

10  attached as Exhibit 6 to the Declaration of Kevin Singer in support of the Motion ("Singer Decl.")

11  and to transfer title to the Filbert Street Property as provided for in the San Francisco Purchase

12  Agreement dated December 5, 2018, Addendum No. 1 dated December 5, 2018, Buyer's Intent to

13  Exchange Supplement dated December 5, 2018, Disclosure Regarding Real Estate Agency

14  Relationship dated December 5, 2018, Disclosure Regarding Real Estate Agency Relationship

15  dated December 5, 2018, Possible Representation of More Than One Buyer or Seller – Disclosure

16  and Consent dated December 5, 2018, "As-Is" Addendum dated December 5, 2018, Counter Offer

17  No. 1 dated December 8, 2018, Addendum to San Francisco Purchase Agreement dated December

18  8, 2018, Contingency Removal #1 dated January 11, 2019, and Addendum A (Addendum to

19  Contingency Removal and Approval of Documents) dated January 15, 2019 (the "Overbid PSA")

20  for the Overbid Purchase Price. The Overbid Buyer shall purchase the Filbert Street Property on

21  the same terms as the Original Buyer as set forth in the Overbid PSA with no contingencies;

22         (b)   The offer of the Overbid Buyer on the terms set forth in the Overbid PSA is

23  the best and highest bid for the Filbert Street Property. No better or higher bids for the assets to be

24  sold by the receiver were made during the public overbid conducted by the Court;

25         (c)   The proposed sale of the Filbert Street Property is in the best interests of the

26  parties to this action and the receivership estate;

27         (d)   By closing escrow and taking title to the Filbert Street Property, the Overbid

28  Buyer acknowledges that: (i) the Overbid Buyer has no recourse against the Receiver (or his

63474377v1

3

[PROPOSED] ORDER ON MOTION FOR ORDER:  (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-FILBERT] [OVER BID BUYER]

JMBM  Jeffer Mangels Butler & Mitchell LLP

1  agents) for any claim or cause of action; (ii) the Overbid Buyer's sole and only recourse is against

2  the Overbid Buyer's title insurance policy, if applicable; and (iii) any actions taken by the

3  Receiver to sell the Filbert Street Property shall not constitute a representation and warranty by the

4  Receiver as to any aspects of the sale of the Filbert Street Property and the sale shall be "as is",

5  "where is" with no representations and/or warranties, shall not be subject to the provisions of Civil

6  Code §§ 896 and 897, and shall be without risk or liability to the Receiver and/or the receivership

7  estate. The above-entitled Court retains jurisdiction over any dispute that may arise involving the

8  Receiver with the sale of the Filbert Street Property pursuant to the terms of the Overbid PSA

9  approved of by the Court; and

10          (e)    That certain Order Granting Motion of Umpqua Bank for Order:

11  (1) Instructing and Authorizing Receiver to Sell Real Property Assets of Receivership Estate; and

12  (2) Confirming Sale Procedures filed on October 12, 2018 (the "Sale Order") is hereby modified

13  to authorize overbids of at least $200,000 above the Purchase Price, with subsequent overbids to

14  be at least $200,000 in excess of the prior bid, with the Original Buyer having the right to match

15  any overbid.

16       Based upon the foregoing findings, the Court concludes that sale of the Filbert Street

17  Property as proposed by the Receiver's Motion should be confirmed by the Court.

18      3.   Receiver's Actions.  The Court further finds that the Receiver has acted in good

19  faith and pursuant to the instructions of the Court in carrying out the duties of his office in relation

20  to the proposed sale.

21      4.   Orders and Instructions.  Based upon the foregoing findings and conclusions, the

22  Court instructs, authorizes, and orders as follows:

23          (a)    Notice of the Motion was proper to Defendant XELAN Prop 1, LLC and all

24  other parties in interest. The Motion is granted, any opposition to the Motion has been withdrawn

25  or is overruled and the sale to the Overbid Buyer on the terms set forth in the Overbid PSA is

26  confirmed.

27          (b)   The Overbid Buyer's purchase of the Filbert Street Property was conducted

28  as authorized by this Court pursuant to the Sale Order.

63474377v1

4

JMBM | Jeffer Mangels Butler & Mitchell LLP

531

1       (c)     The Receiver shall execute any and all documents necessary to complete the

2    sale to the Overbid Buyer pursuant to the Overbid PSA and shall pay the proceeds of sale paid by

3    the Overbid Buyer pursuant to the Overbid PSA as follows: (i) the unpaid delinquent real estate

4    taxes and pro-rata real estate taxes owed by XELAN Prop 1, LLC to the City and County of San

5    Francisco on the Filbert Street Property; (ii) to pay real estate commissions payable to Vanguard

6    Properties in the amount equal to 5.0% of the Purchase Price at closing of escrow; (iii) for

7    reasonable closing costs and escrow fees and title fees owed with respect to the sale of the Filbert

8    Street Property pursuant to the Overbid PSA; (iv) the amounts owed by XELAN Prop 1, LLC to

9    Umpqua Bank secured by that certain Deed of Trust and Assignment of Rents and Security

10   Agreement (and Fixture Filing) dated as of July 31, 2013 executed by XELAN Prop 1, LLC and

11   recorded on August 14, 2013 in the Official Records of the San Francisco County Recorder's

12   Office as Document No. DOC-2013-J729297-00; (v) the amounts owed to the holders of the

13   following liens, encumbrances, and interests recorded against the Filbert Street Property: (A)

14   Abstract of Judgment recorded by David and Caroline Green on April 23, 2018 in the Official

15   Records of the San Francisco County Recorder's Office as DOC-2018-K604682-00; (B) Abstract

16   of Judgment recorded by the City and County of San Francisco and the People of the State of

17   California on June 7, 2018 in the Official Records of the San Francisco County Recorder's Office

18   as Document No. DOC-2018-K623991-00; and (C) Abstract of Judgment recorded by City and

19   County of San Francisco and the People of the State of California on October 17, 2018 in the

20   Official Records of the San Francisco County Recorder's Office as Document No. DOC-2018-

21   K683730-00; and (vi) any other liens which the Receiver determines, in the exercise of his

22   business judgment, must be paid in order to close the sale of the Filbert Street Property to the

23   Overbid Buyer on the terms set forth in the Overbid PSA, with the remaining proceeds of sale to

24   be held by the Receiver until further order of this Court to, inter alia, pay all allowed claims filed

25   against the receivership estate, to pay all unpaid Receiver's fees and expenses due and owing to the

26   Receiver until discharge of the Receiver and approval of his final accounting pursuant to

27   California Rule of Court 3.1184, to pay all amounts, if any, ordered by this Court to Dale Duncan

28   and Marta Munoz Mendoza pursuant to that certain Order on Motion for Charging Orders,

63474377v1

[PROPOSED] ORDER ON MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-FILBERT] [OVER BID BUYER]

1    Assignment Orders, Restraining Order and for Appointment of Receiver [on judicial foreclosure

2    of two properties held by Debtor Anne Kihagi's LLC: XELAN Prop 1, LLC] and that certain

3    Order on Motion for Charging Orders, Assignment Orders, Restraining Order and for

4    Appointment of Receiver [on pending non-judicial foreclosure of property held by Debtor Anne

5    Kihagi's LLC(s)] filed in the action entitled Dale Duncan, etc. v. Anne Kihagi, etc., et al., San

6    Francisco County Superior Court Case No. CGC-15-545655 and, thereafter, to pay the remaining

7    proceeds of sale, if any, to XELAN Prop 1, LLC.

8              (d)      Overbid Buyer shall take good and clear title to the Filbert Street Property

9    sold by the Receiver.

10              (e)      The Receiver is instructed, authorized, and ordered to forthwith complete

11    the sale of assets to the Overbid Buyer pursuant to the terms of the Overbid PSA.

12              (f)      Overbid Buyer's purchase of the Filbert Street Property results from a

13    legally authorized properly noticed, non-collusive, non-fraudulent arms' length transaction, the

14    Overbid Purchase Price for the Filbert Street Property (including under the terms of the Overbid

15    PSA) is fair and reasonable and constitutes the highest and best Overbid Purchase Price for the

16    Filbert Street Property and the Overbid Buyer is a good faith purchaser for value of the Filbert

17    Street Property.

18              (g)      The Receiver is instructed, authorized, and ordered to forthwith complete

19    the sale of assets to the Overbid Buyer pursuant to the terms of the Overbid PSA.  The Overbid

20    PSA or any documents or instruments related thereto maybe amended, or supplemented by the

21    Overbid Buyer and the Receiver without further order of this Court, provided such modifications,

22    amendments or supplements do not have a material adverse effect on the receivership estate.

23              (h)      Any licensed title insurer and the Overbid Buyer may rely on this Order as

24    authorizing the Receiver to transfer legal title to the Filbert Street Property free and clear of all

25    liens and encumbrances.

26    ///

27    ///

28    ///

63474877v1
[PROPOSED] ORDER ON MOTION FOR ORDER:  (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-FILBERT] [OVER BID BUYER]

533

1       (i)   In the event a timely and proper appeal is filed from this Order, the

2    Receiver is authorized and directed to defend any such appeal, without further order of Court if he

3    elects to do so in the exercise of his business judgment.

4    

5    DATED: 2/2/19          _____
                       JUDGE OF THE SUPERIOR COURT

6                             RICHARD ULMER

7    

8    APPROVED AS TO FORM:

9    

10   PAUL MANASIAN, ESQ.
    Attorney for Defendant XELAN PROP 1, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

63474377v1

7

[PROPOSED] ORDER ON MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-FILBERT] [OVER BID BUYER]

JMBM | Jeffer Mangels Butler & Mitchell LLP

**LEGAL DESCRIPTION OF**
**1000-1022 Filbert Street, San Francisco, California**

Beginning at a point of intersection of the Northerly line of Filbert Street and the Westerly line of Jones Street; running thence Westerly along said line of Filbert Street 106 and 3 inches; thence at a right angle Northerly 52 feet; thence at a right angle Easterly 36 feet and 3 inches; thence at a right angle Southerly 25 feet; thence at a right angle Easterly 70 feet to the Westerly line of Jones Street; thence at a right angle Southerly along said line of Jones Street 27 feet to the point of beginning, in the City of San Francisco, County of San Francisco, State of California.

Being part of Vara Block No. 237.

# EXHIBIT A

63474377v1

8

[PROPOSED] ORDER ON MOTION FOR ORDER: (1) INSTRUCTING RECEIVER TO SELL, ETC.
[XELAN-FILBERT] [OVER BID BUYER]

535

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

**F I L E D**
San Francisco County Superior Court

FEB 2 1 2019

CLERK OF THE COURT
BY: R Michael Dil
Deputy Clerk

UMPQUA BANK,

           Plaintiff,

vs,

XELAN PROP 1, LLC, et al.,

           Defendants.

Case No. CGC-18-564941

**ORDER RE SALE OF 1000-1022
FILBERT STREET**

Plaintiff Umpqua Bank moves for an order (1) instructing court-appointed receiver Kevin Singer to sell a real property asset of a receivership estate and (2) confirming sale of that asset: 1000-1022 Filbert Street in San Francisco. The motion is granted in a separate order being filed with this one.[1] The following sets out my rationale for entering that order.

**Factual and Procedural Background**

On March 12, 2018, plaintiff sued Xelan Prop 1, LLC for specific performance on a promissory note and for appointment of a receiver. Anna Kihagi is Xelan's managing partner. This is one of several lawsuits involving Kihagi, whom the City has deemed one of San Francisco's most notorious landlords.

On April 6, 2018, the court issued an order in this case appointing a receiver and granting a preliminary injunction in support of the receiver. That order gave the receiver the "right to file

[1] That order is titled: "Order on Motion for Order: (1) Instructing Receiver to Sell Real Property Asset of Receivership Estate; and (2) Confirming Sale of Real Property [1000-1022 Filbert Street, San Francisco, CA]."

1

536

an application with this Court for the sale of the Subject Properties," which included the Filbert Street property.

On September 13, 2018, plaintiff moved for an order instructing the receiver to sell the Filbert Street property. On October 12, 2018, the court entered the sale order, authorizing the receiver to retain a real estate broker to market the property using procedures specified in the court order.[2]

On December 3, 2018, the Court of Appeal affirmed a multi-million judgment against Kihagi and others in a case the City brought. The Court of Appeal affirmed findings that "the landlords maintained the Filbert Street property as a public nuisance in violation of municipal laws and the State Housing Law for a total of 632 days" and "the landlords committed 102 predicate acts of tenant harassment at the Filbert Street property."

The receiver negotiated a $4,975,000 purchase and sale agreement with a buyer. However, another bidder – Craig Knight – overbid $5,175,000 at the February 21, 2019 sale and was declared the winning bidder.

### Legal Analysis

Xelan and Kihagi oppose the motion on three grounds, all unavailing.

**Receiver's Powers.** It is asserted that a receiver cannot legally sell the property and instead foreclosure proceedings must be instituted. This argument is much-belated. As detailed above, the receiver was given "the right to file an application with this Court for the sale of the Subject Properties" ten months ago and specific sale instructions for the Filbert Street property were ordered four months ago. Any objection should have been made at those times. Defendants' opposition is effectively an untimely reconsideration motion. (See CCP §1008.)

---

[2] Among other marketing efforts, the broker listed the property in the multiple listing service, advertised it for sale in the San Francisco Chronicle and on the sfgate website, Facebook and Instagram, made e-mail blasts to more than 500 real estate agents and investors, and held four open houses.

2

In any event, court-appointed receivers may, as here, be given rights to sell real property.
(CCP §§568, 568.5; *Cal-American Income Property Fund VII v. Brown Development Corp.*
(1982) 138 Cal.App.3d 268, 274; *People v. Riverside University* (1973) 35 Cal.App.3d 572, 583;
*City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 931.)

**Adequacy of Price.** Kihagi argues that a $4,975,000 sale price is "inadequate."
However, as detailed above, a well-qualified real estate broker marketed the Filbert Street
property extensively. Kihagi relies on a thin "analysis and report" that takes no account of
comparable sales or the damage she has caused the property's value by her illegal conduct -- the
irate tenants, the highly publicized multi-million-dollar judgment affirmed by the Court of
Appeal, recordation of three abstracts of judgment, a permanent injunction and a lis pendens
against the property, and so on. Moreover, if bidders believed the negotiated price too low, they
could overbid. As detailed above, this is what in fact happened at the February 21, 2019 sale.

**Purported Refinance.** Finally, Kihagi says the sale is unnecessary because she can
refinance the bank debt in "perhaps a month." This too is much-belated. Xelan has been in
default on the Filbert Street property for almost a year – time Kihagi could have used to pay or
refinance.

Dated: February 21, 2019

Richard B. Ulmer Jr.
Judge of the Superior Court

3

538

1   Umpqua Bank v. Xelan Prop 1, LLC et al.          Case No: CGC-18-564951

2

3              CERTIFICATE OF SERVICE BY MAIL (C.C.P. §1013)

4   The undersigned certifies, under penalty of perjury, that: I am employed in the city and
    County of San Francisco, California, am over the age of 18 years, and am not a party to
5   the within action. I served the attached Order re Sale of 1000-1022 Filbert Street by
    enclosing a true copy thereof in an envelope(s) addressed as shown below and placing
6   the envelope(s) for collection and mailing on February 21, 2019 in San Francisco,
    California following the Court's ordinary practices. I am readily familiar with the Court's
7   practice for collecting and processing correspondence for mailing. On the same day
    that correspondence is placed for collection and mailing, it is deposited in the ordinary
8   course of business with the United States Postal Service in a sealed envelope with
    postage fully prepaid.

9
    Robert B. Kaplan, Esq.              Paul E. Manasian, Esq.
10  Jeffer Mangels Butler & Mitchell    Law Office of Paul E. Manasian
    2 Embarcadero Center, 5th Floor     1310 65th Street
11  San Francisco, CA 94111             Emeryville, CA 94608

12

13

14  Dated: February 21, 2019        By: _R. Michael Diles_
                                         R. Michael Diles
15                                       Deputy Court Clerk

16

17

18

19

20

21

22

23

24

25

                                                                                  1