1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **COOK COLLECTION ATTORNEYS**
2  **A PROFESSIONAL LAW CORPORATION**
   165 Fell Street, San Francisco, CA  94102-5106
3  P.O. Box 270, San Francisco, CA  94104-0270
   Telephone: (415) 989-4730
4  Facsimile: (415) 989-0491
   Email: Cook@cookcollectionattorneys.com
5  File No. 57,290

6  Attorneys for Creditor
   CITY AND COUNTY OF SAN FRANCISCO AND
7  THE PEOPLE OF THE STATE OF CALIFORNIA BY AND
   THROUGH DENNIS HERRERA, CITY ATTORNEY FOR
8  THE CITY AND COUNTY OF SAN FRANCISCO

9

                    UNITED STATES BANKRUPTCY COURT
10
                    CENTRAL DISTRICT OF CALIFORNIA
11
                        LOS ANGELES DIVISION
12

13  In re                              )   CASE NO.  2:19-bk-14626 NB
                                       )   DECLARATION OF PETER J. KEITH, Esq.
14      XELAN PROP 1, LLC,             )   IN SUPPORT OF JOINDER TO MOTION
                                       )   BROUGHT BY UMPQUA BANK TO
15          Debtor.                    )   DISMISS CHAPTER 11 FILED BY XELAN
                                       )   PROP 1, LLC PROPERTY AND REQUEST
16  _____)   FOR JUDICIAL NOTICE UNDER FEDERAL
                                           EVIDENCE RULE 402
17
                                           Date:   April 30, 2019
18                                         Time:   2:00 p.m.
                                           Courtroom:  1545
19                                         Judge:  Hon. NEIL W. BASON

20

21      I, PETER J. KEITH, declare as follows:

22      1. 1 am an attorney duly sworn to practice law in the State of California. I am over the age

23  of eighteen. I have personal knowledge of the following facts except for those stated on

24  information and belief. As to those facts, I believe them to be true.

25      2. This declaration is made in support of dismissal of the Chapter 11 petition filed by

26  Debtor Xelan Prop 1, LLC, on behalf of Creditor City and County of San Francisco and Creditor

27  People of the State of California.  (hereinafter "Creditors").

28

DECLARATION OF PETER J. KEITH, Esq.  IN SUPPORT OF JOINDER TO MOTION BROUGHT BY UMPQUA BANK TO
DISMISS CHAPTER 11 FILED BY XELAN PROP 1, LLC PROPERTY AND REQUEST FOR JUDICIAL NOTICE UNDER
FEDERAL EVIDENCE RULE 402
                                       1

Since September 2016, I have been the Chief Attorney for the Neighborhood & Residential Safety Division of the San Francisco City Attorney's Office, counsel of record for Creditors City and County of San Francisco and the People of the State of California in the action *City & County of San Francisco & People of the State of California vs. Anne Kihagi, Julia Mwangi, Christine Mwangi, Xelan Prop 1, LLC, Renka Prop, LLC, Nozari 2, LLC, and Zoriall, LLC*, ("Defendants") San Francisco Superior Court Case No. 15-CGC-546-152. Creditors prosecuted this case to final judgment against Debtor and the other defendants, based on their misconduct surrounding their ownership and management of seven apartment buildings in San Francisco, two of which are owned by Debtor in this Chapter 11 proceeding.

3.  In June 2017 after protracted and extensively litigated proceedings, the Defendants were found liable for $2,729,529 in penalties, with approximately $1.1 million payable to San Francisco and approximately $1.6 payable to the People of the State of California. These penalties arose from defendants' prolific violations of San Francisco's anti-tenant harassment ordinance, fraudulent evictions, and violations of state and local building and housing codes that substantially endangered San Francisco residents. In addition, arising out of the State Court proceedings, a Permanent Injunction was entered against defendants voiding their fraudulent evictions, requiring substantial disclosures, and requiring them to turn over management of their properties to an independent property manager.

4.  The judgment and injunction were affirmed on appeal, California Court of Appeal No. A151719. More information is available from the appellate opinion, a true and correct a copy of which is attached as *Exhibit "A"* which is attached hereto and incorporated by reference.

5.  On the question whether Debtor's petition is filed in bad faith or otherwise to abuse the privilege of the automatic stay, San Francisco respectfully submits the following evidence for the Court to consider.  Debtor's previous improper bankruptcy petition was filed in pro per on December 29, 2017 by manager Anne Kihagi, dismissed by court order, and the timing of that petition was consistent with a purpose to interfere with a December 26, 2017 Superior Court order

DECLARATION OF PETER J. KEITH, Esq.  IN SUPPORT OF JOINDER TO MOTION BROUGHT BY UMPQUA BANK TO DISMISS CHAPTER 11 FILED BY XELAN PROP 1, LLC PROPERTY AND REQUEST FOR JUDICIAL NOTICE UNDER FEDERAL EVIDENCE RULE 402

2

assigning Debtor's rents to San Francisco for purpose of enforcement of the judgment. This is referenced in the hearing transcript before Judge Blumenstiel, which is attached to the Declaration of David J. Cook, Esq, marked *Exhibit "C."*

6.      The automatic stay of proceedings against Debtor Xelan Prop LLC will severely prejudice San Francisco, because it will delay resolution and increase governmental litigation expenses for four significant pending matters that involve substantial investments of attorney time and money as follows:

**First.** In addition to the above penalty judgment, in October 2017 Debtor and defendants were ordered to pay San Francisco its attorney's fees and costs of $2,737,276.54 (later reduced by about $30,000). Debtor and defendants separately appealed this fee award, California Court of Appeal No. A152933. The case is fully briefed, and on April 15, 2019 the Court of Appeal sent its Oral Argument Notice (a true and correct copy is attached as *Exhibit "B"* and incorporated by reference as though fully set forth herein) setting argument for June 5, 2019. If the automatic stay remains in effect, it will delay oral argument and resolution of the appeal as to Debtor. The other six defendants are also parties to the appeal, which will cause the Court of Appeal to incur efforts in the rescheduling of the hearing date.

**Second.** One hour before Debtor's petition was filed, San Francisco filed a motion in Superior Court for an award of attorney's fees incurred in defending the judgment and injunction in Appeal No. A151719. The motion seeks $329,611.00 against Debtor and the other defendants. The hearing is set for May 24, 2019. If the automatic stay remains in effect, it will delay hearing and resolution of this motion as to Debtor, which will cause the San Francisco Superior Court to incur efforts in the rescheduling of the hearing date. It will also delay fixing San Francisco's recoverable costs on appeal of $1,545.33 as reflected in its April 22, 2019 memorandum of costs.

**Third.** Next week, San Francisco had intended to file a motion in Superior Court to recover its attorney's fees and costs incurred in enforcing the Amended Judgment (a true and authentic copy is attached as *Exhibit "C"* and incorporated by reference as though fully set forth

DECLARATION OF PETER J. KEITH, Esq. IN SUPPORT OF JOINDER TO MOTION BROUGHT BY UMPQUA BANK TO DISMISS CHAPTER 11 FILED BY XELAN PROP I, LLC PROPERTY AND REQUEST FOR JUDICIAL NOTICE UNDER FEDERAL EVIDENCE RULE 402

3

herein) against Debtor and the other defendants, per California Code of Civil Procedure Section 685.080. The amount San Francisco expects to recover by this motion exceeds $375,000. So long as the automatic stay remains in effect, then San Francisco will be unable to file this motion against the Debtor, and will instead have to proceed piecemeal, increasing costs.

**Fourth.** All of the foregoing debts owed by defendants to San Francisco are secured by a bond on appeal for approximately $8.1 million. Defendants' total current debt to San Francisco arising from this litigation, including all of the foregoing debts and interest thereon, is approximately $7.1 million. If the automatic stay remains in effect, it would preclude San Francisco from making demands on the Debtor as a precursor to collecting on the bond, complicating the proceedings of collecting against the other defendants. This delay would prejudice San Francisco, as the $7.1 million owed here are public funds comprising penalties that fund civil law enforcement, and reimbursement for attorney's fees and costs already incurred by San Francisco.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 26th of April 2019, at San Francisco, California.

PETER J. KEITH

DECLARATION OF PETER J. KEITH, Esq.  IN SUPPORT OF JOINDER TO MOTION BROUGHT BY UMPQUA BANK TO DISMISS CHAPTER 11 FILED BY XELAN PROP 1, LLC PROPERTY AND REQUEST FOR JUDICIAL NOTICE UNDER FEDERAL EVIDENCE RULE 402

4

# EXHIBIT "A"

COPY

Filed 12/3/18

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

CITY AND COUNTY OF SAN
FRANCISCO et al.,

    Plaintiffs and Respondents,

v.

ANNE KIHAGI et al.,

    Defendants and Appellants.

Court of Appeal, First Appellate District
**FILED**
DEC - 3 2018
Charles D. Johnson, Clerk
by _____ Deputy Clerk

A151719

(City and County of San Francisco
Super. Ct. No. CGC-15-546152)

The City and County of San Francisco sued appellant landlords for illegally harassing their tenants and violating state and local building and housing laws. During discovery, the landlords were extremely uncooperative, and they violated at least 10 court orders. The trial court declined to enter default against the landlords as a sanction, but it imposed issue and evidentiary sanctions. After a nearly month-long trial, the court ruled against the landlords, awarded the City substantial penalties, and required the landlords to hire an independent entity to manage the properties for five years. The landlords challenge these rulings. We affirm.

1

After the landlords disobeyed at least 10 discovery orders, the City asked the trial court to impose terminating sanctions by striking the landlords' answer and entering default against them. The trial court found that there had been "a continuous, repeated willful failure to follow and comply with numerous Court orders," but it declined to issue terminating sanctions. Instead, as discussed in more detail below, the court limited the evidence the landlords were permitted to introduce at trial.

Following a court trial that spanned about 28 days, the trial court issued a 151-page statement of decision on May 23, 2017, concluding that the landlords harassed tenants in bad faith; fraudulently evicted tenants; and facilitated hazardous, unpermitted construction at their apartment buildings. The court ordered the landlords to pay civil penalties.

The court also issued an injunction against the landlords. The court (1) ordered the landlords to disclose to the City all San Francisco properties they own, as well as an accurate rent roll for each property, (2) ordered the landlords to hire a City-approved independent management company to be responsible for day-to-day management of the properties for 60 months, (3) invalidated certain pending evictions, and (4) barred the landlords from initiating any new evictions without the independent manager's authorization.

The court entered judgment in June 2017, and the landlords appealed. The landlords filed a petition in this court asking that their disclosure obligations be stayed, but this court denied the petition. (*City and County of San Francisco et al. v. Kihagi et al.* (Aug. 16, 2017, A151719 [petn. den.].) The City, meanwhile, sought calendar preference in this court because the injunction had been at least partially stayed pending the appeal, and the court granted the request. It later filed a motion to dismiss, arguing that this appeal as well as the landlords' appeal of the trial court's order awarding attorney fees (A152933) should be dismissed based on the disentitlement doctrine. This court denied the motion on June 19, 2018, and we now address the merits of A151719.

3

evidence was heavily disputed such that it would be inappropriate to grant an injunction based on witness declarations.

In March 2016, shortly after the denial of the preliminary injunction, the City filed an amended case management statement requesting a trial date in September 2016. On the same day the statement was filed, and presumably before reading the City's request for a September trial date, the trial court issued a case-management order setting trial for the following year (February 6, 2017), and directed any party that objected to file written notice of the objection. Within a month (in April 2016), the City filed a motion to advance the trial date to September 9, 2016, or another date that was convenient for the court before October 11, 2016. The City argued that the landlords continued their unlawful practices, and the only way to protect the tenants in the absence of a preliminary injunction was to try the case as soon as possible. The landlords opposed the City's motion, arguing, among other things, that they would need additional time to review the nearly 8,000 pages of documents that the City had produced during discovery. The landlords also disputed that there were ongoing violations, and pointed to the portion of the order denying a preliminary injunction stating that most of landlords' violations were historical, as opposed to ongoing.

A hearing was held on the City's motion on May 3, but no transcript of the hearing appears in the record on appeal. The trial court granted the City's motion and set the matter for trial on October 17, 2016, which at the time of the court's order was more than five months away. The court found there was good cause to advance the trial date based on "the evidence presented, the complete file in this matter, [and] the oral argument of the parties." (Cal. Rules of Court, rule 3.1335(b) [motion to advance trial date must establish good cause].)

                    b. Discussion.

The landlords argue that there was no good cause to advance the date of trial. We review the trial court's decision for abuse of discretion (*Jurado v. Toys "R" Us, Inc.* (1993) 12 Cal.App.4th 1615, 1617-1618 [determination of whether good cause supports motion for trial continuance]), and it is the landlords' burden to demonstrate from the

5

record that such abuse occurred (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 985).
They have failed to satisfy this burden.

The landlords argue that this was a complex case with several witnesses, factors
that the trial court no doubt took into account when ruling on the City's motion. They
also repeat the claim that the City had "acknowledged on the record" that they had cured
most violations, meaning that the claim of ongoing harm warranting an advanced trial
date was "untrue," but the only support for their argument is the briefing on the earlier
request for a preliminary injunction. And without a transcript of the hearing on the
motion (which apparently was unreported), we have no way of knowing what other
evidence the trial court might have considered.

We cannot conclude on this record that the trial court violated any legal principle
or otherwise abused its discretion. (*Forthmann v. Boyer, supra*, 97 Cal.App.4th at
p. 984.) Because we conclude that the trial court acted within its discretion, we need not
consider the landlords' argument that they suffered prejudice as a result of advancing the
trial date.

> 2. The Trial Court Made Appropriate Rulings Related to the Landlords'
> Failure to Comply with Discovery Orders.
>
> a. Additional background.

After the trial court advanced the trial date, the parties continued to engage in
discovery, but the landlords repeatedly violated orders for them to comply with "even the
most basic discovery." They repeatedly refused entry to any of their units for inspection,
failed to show up for scheduled depositions despite multiple court orders, and declined to
respond to written discovery or to produce responsive documents.[2] When some of the

---

[2] Among the discovery sought were documents regarding "the LLC's membership,
management records, writings between the LCC and the Secretary of State,
communications with various types of contractors and the tenants relating to the subject
properties, writings relating to constructional repair work on each of the properties since
2013 . . . , communications in any way relating to owner or relative move-in evictions
relating to the subject properties . . . , [and] writings regarding any work performed
without permit."

landlords did appear for their depositions, defense counsel would make repeated
objections and direct the landlords not to respond to questions, resulting in the discovery
referee having to issue an order establishing rules for the depositions. And when Kihagi
appeared for her deposition, she refused to answer almost every single question,
including one about what her full name was as it appeared on her birth certificate. The
landlords also delayed noticing any depositions of their own. As of mid-September 2016,
they had willfully failed to comply with at least 10 court orders regarding discovery. A
discovery referee provided the landlords with additional time to comply, but they again
failed to do so. At one point, the discovery referee warned the landlords' counsel that if
the landlords failed to provide tenant information by September 22 and thereafter failed
to allow site inspections on September 26, the court could interpret these actions to
constitute intentional noncompliance with discovery orders that could result in monetary,
evidentiary, or terminating sanctions. The landlords still did not comply.

Kihagi fired her attorney of record in August 2016 and substituted herself in
propria persona in September, yet the attorney continued to represent the other landlords,
and Kihagi continued to file motions that "were clearly prepared by counsel." A different
law firm briefly associated in as counsel but also left. A new attorney substituted in for
the landlords in October 2016.

Also in October, the City filed a motion requesting terminating sanctions,
monetary sanctions, and reimbursement for the City's discovery costs. Specifically, the
City asked that the court strike the landlords' answer to the City's first amended
complaint and enter the landlords' default as a remedy for their persistent misuse of the
discovery process "by refusing to comply with their discovery obligations or [the trial
court's] orders." The City contended that lesser sanctions would not adequately address
the prejudice to them, because the landlords had not responded to previous monetary and
evidentiary sanctions or the court's repeated threat of terminating sanctions. The
landlords opposed the motion.

At a hearing on October 28, 2016, the trial court first considered a number of
defense motions that had been submitted before the landlords' new attorney had

7

substituted in. Among them was a motion to continue the trial date. The landlords' new attorney argued that the landlords' previous attorney had been able to work on the case for only about one week during July and August because she had been out of the country helping her family. Now that the new attorney was on the case, he was faced with a complex case involving 80 witnesses and 25,000 documents. Counsel further explained that he and four other attorneys were working on "fully responding to all the discovery, 35 sets of discovery and a production of documents that I think probably go—14 inches tall." Counsel requested "a short continuance, or some continuance in order to at least have me be able to get up to speed sufficiently in order to help my clients properly." He further acknowledged that "[i]f I was there at the beginning, it [discovery] would have been handled differently, and I would just request that, at least some time be allowed so that we can depose these witnesses, properly have the City be able to review and be ready to litigate based upon the discovery I've set, to depose my clients, which they want to do."

The City opposed a continuance, arguing that the landlords failed to establish good cause. Counsel noted that the landlords' previous attorney had scheduled her vacation before the motion to advance the trial date and had not cited scheduled time away as a reason to schedule a later trial. And counsel further argued that the landlords should not be permitted to rely on their own lack of diligence in pursuing discovery as good cause to continue trial. The City would be prejudiced if trial were delayed, counsel argued, because "extreme effort" had gone into ensuring that witnesses were available, and it would be "very challenging to put back together" if trial were continued.

The trial court concluded that the landlords had failed to establish good cause for a continuance under rule 3.1332 given all their delays and abuses of the discovery process, and denied their motion. The court acknowledged, however, that the landlords' new attorney had worked hard to get up to speed on the case, and as a courtesy allowed extra time for counsel "to get up to speed." The court therefore continued the trial for two weeks, so that opening statements would begin on November 15 instead of October 31.

8

After hearing a number of other motions, the trial court considered the City's motion for terminating sanctions. The landlords' counsel again stressed the efforts he was making to comply with outstanding discovery, he attributed deficiencies to previous counsel's lack of diligence, and he represented that Kihagi was being cooperative with him. Counsel for the City countered that Kihagi was responsible for the discovery abuse and not the former attorney, because Kihagi had refused access to her properties when she was represented by a second attorney, and she had refused to answer deposition questions when she was representing herself.

The trial court found that there had been "a continuous, repeated[,] willful failure to follow and comply with numerous Court orders regarding discovery as to documents, requests for admissions, interrogatories, site inspections and depositions." As for an appropriate penalty, the trial court said it was "well within [its] discretion to terminate the entire case and strike the answer," but that it would not impose such a "drastic penalty." Instead, the court imposed the following evidentiary and issue sanctions:

- Because the landlords had disregarded repeated court orders allowing the City to timely inspect the properties, the court ordered that if the City met its burden at trial of proving its claims that the landlords created unlawful, substandard, or unsafe conditions, the court would find that such conditions still existed at the time of trial, and that the landlords would be prohibited from presenting evidence that any such unlawful conditions had been cured or abated.

- Because the landlords failed to permit meaningful depositions, each landlord would be precluded from testifying at trial unless the City elected to call any of them as an adverse witness.

- Because the landlords failed to comply with various requests for admission, they would not be permitted to dispute that Kihagi did not receive any monetary compensation from Zoriall, Nozari, or Xelan.

- Because the landlords failed to produce various documents, they would be prohibited from introducing any documents that had not been produced as of the date of the hearing.

9

- Because the landlords failed to produce categories of financial documents, the court gave the LLCs until 2:00 p.m. on November 1, 2016, to provide documents regarding their financial information. After they failed to provide the documents by that deadline, the court imposed an issue sanction that each landlord's assets and net worth would be jointly and severally deemed to be at least $25 million (the amount they were alleged to have paid for the subject properties) for purposes of calculating any civil penalties under the Business and Professions Code.

After the trial court issued its ruling, counsel for the City then asked the trial court for clarification and for further issue sanctions. The court asked for input from the landlords' attorney, who stated, "Your Honor, all I can say is that your sanctions were very serious, and I understand that completely. [¶] I would request that you stay with— you know, do nothing other than stay with what you already thought out and not go on to consider any more sanctions. [¶] I think they are rather severe for my clients and what they can do at trial." Counsel for the City again asked for further clarification, and the landlords' attorney stated, "Your honor gave her order, and my request is simply [to] leave it at that." The trial court confirmed there would be no additional issue sanctions, the parties proceeded to discuss issues relating to the upcoming trial, and the hearing ended a short time later without further discussion of the sanctions order.

> b. The trial court did not abuse its discretion when it denied the landlords' requested continuance.

The landlords argue that the trial court abused its discretion in denying their request for a continuance. We disagree. The trial court's order denying the continuance detailed all the ways the landlords had obstructed basic discovery obligations. It also weighed factors for granting a continuance set forth in rule 3.1332(c) and (d), such as the fact the landlords had not exercised diligence (*id.*, subd. (c)(6)), the case was entitled to preference (*id.*, subd. (d)(6)), and the interests of justice favored the City (*id.*, subd. (d)(10)). On appeal, the landlords do not address any of the court's findings. Instead, they state that their trial attorneys "were scrambling to meet their discovery obligations while trying to deal with the eighty (80) witnesses and 25,000 documents

10

related to the case," but they ignore the trial court's specific findings that they had defied discovery orders and had failed to exercise diligence in seeking their own discovery. In their reply brief and at oral argument, counsel for the landlords suggested that the landlords were falsely led to believe that they would receive a continuance, but the record does not support this suggestion. True, the appointed referee stated during a hearing with the parties on August 25, 2016, that he would recommend to the assigned judge that the trial date be postponed until the following January, because Kihagi had just fired her attorney and the referee wanted to give a new attorney time to comply with discovery. But the attorney representing the City said he would oppose any such continuance because there were insufficient assurances that a change in attorney would end Kihagi's resistance to legitimate discovery. We see no abuse of discretion by the judge who ultimately agreed with the City that a continuance was unwarranted.

The landlords' reliance on *Hamilton v. Orange County Sheriff's Dept.* (2017) 8 Cal.App.5th 759 is misplaced. There, citing the plaintiff's lack of diligence, the trial court rejected the parties' stipulation to continue a hearing on a motion for summary judgment so that the plaintiff could take depositions of witnesses who had submitted declarations in support of the pending motion. (*Id.* at pp. 761, 766.) *Hamilton* concluded that the trial court abused its discretion, because the plaintiff's lack of diligence was "relatively minor," and the denial of a continuance resulted in a "substantial injustice" because the grant of summary judgment was based not on the merits but on plaintiff's inability to take depositions. (*Id.* at p. 766.) Here, by contrast, in addition to there being no stipulation to continue, the landlords' lack of diligence was extreme, and the interests of justice favored the City. We have little trouble concluding that the trial court acted well within its discretion in denying the motion to continue, especially considering that the court had substantially narrowed the scope of the trial with the evidentiary and issue sanctions, which meant there was less preparation needed, and had given the landlords two additional weeks for such preparation.

11

    c. The landlords' objections to the evidentiary and issue sanctions
were forfeited and lack merit.

The landlords argue for the first time on appeal that evidentiary and issue
sanctions were imposed "without any notice to Appellants whatsoever," which denied the
landlords their right to a fair trial and constituted "per se reversible error." They contend
that because they were only on notice that they faced possible terminating sanctions, the
sanctions actually imposed amounted to a penalty issued sua sponte with **"zero notice"** to
them. We are not persuaded. To begin with, the landlords' counsel never raised such a
due process challenge below; instead, the attorney asked only that the trial court go no
further than what it imposed. Having failed to object below, the landlords forfeited the
objection. (*Reedy v. Bussell* (2007) 148 Cal.App.4th 1272, 1288-1289.)[3]

Furthermore, even if the landlords had preserved the argument, we would reject it.
True enough, a trial court may not order discovery sanctions ex parte, "and an order
purporting to do so is void." (*Sole Energy Co. v. Hodges* (2005) 128 Cal.App.4th 199,
208.) When two defendants in *Sole Energy* twice failed to appear at their depositions,
plaintiffs applied ex parte for orders shortening time for a hearing on motions to compel
the defendants to attend the depositions and produce documents, and for sanctions. (*Id.*
at pp. 203-204.) Plaintiffs served the motions by mail on the same day of an ex parte
hearing where the trial court conducted the hearing on sanctions and ordered that the two
defendants' answers be stricken along with the answer of a third defendant, and ordered
the entry of their defaults. (*Id.* at p. 204.) The trial court later held a prove-up hearing
and entered default judgments against all three defendants. (*Id.* at p. 205.) The appellate
court held that the defaults were void because the sanctions motions did not include all
the information required by the statute governing sanctions (former Code Civ. Proc.,

---

[3] Since the issue was forfeited, we need not reach the landlords' argument that
they were prejudiced by the sanctions imposed. We likewise need not address the
landlords' two challenges to specific provisions of the sanctions ruling that they raised
for the first time in their reply brief. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656
[raising issue for first time in reply brief deprives opposing party of an opportunity to
respond].)

§ 2023, now § 2023.030), provided insufficient notice as to two defendants, and provided no notice whatsoever to the third defendant who was not even named in the sanctions motions. (*Sole Energy*, at pp. 207-209; see also *O'Brien v. Cseh* (1983) 148 Cal.App.3d 957, 961 [application for sanctions "is not an ex parte matter"].)

Here, by contrast, the landlords do not contend that the motion for terminating sanctions was procedurally defective, and they acknowledge that the trial court had the authority to grant the City's motion. But while they concede that they had adequate notice of the sanctions motion, they contend that they had no notice of the specific discovery and issue sanctions that the court ultimately imposed. In their opposition to the City's motion, however, the landlords themselves recognized the possibility of sanctions less severe than terminating sanctions by pointing out that a sanctions order "may go no further than necessary to achieve the purpose of discovery." They expressly asked the trial court not to "deny Defendants their day in court when *lesser remedies will suffice,* and where the entry [of a] default judgment would not suffice to protect Defendants' constitutional rights to due process." (Italics added.) In other words, the landlords recognized that the trial court could take measures less severe than striking their answer, and they suggested it do so. Their position was entirely consistent with the principle that, absent a manifest abuse of discretion exceeding the bounds of reason, a trial court may choose from various options when imposing a discovery sanction. (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 388; *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1545.)

On appeal, the landlords rely on the general rule that "the trial court may consider only the grounds stated in the notice of motion." (*Luri v. Greenwald* (2003) 107 Cal.App.4th 1119, 1125 [trial court not required to consider sua sponte granting relief not requested in motion brought under Code Civ. Proc., § 473]; see also Code Civ. Proc., § 1010 [notice of motion must state grounds upon which motion is made].) In doing so, they confuse grounds for granting relief with forms of relief. The City set forth all the *grounds* for sanctions in its moving papers by detailing all the ways the landlords repeatedly had abused the discovery process. The City thus "sufficiently define[d] the

13

issues for the information and attention of the adverse party and the court;" as the landlords stress the City was required to do. (*Hernandez v. National Dairy Products* (1954) 126 Cal.App.2d 490, 493 [trial court was limited to considering only whether defendant was not corporation licensed in state and had not been served; motion cannot be expanded by affidavits or oral argument].) *Gonzales v. Superior Court* (1987) 189 Cal.App.3d 1542, another case upon which the landlords rely, also is distinguishable because it did not involve a motion for terminating or other discovery sanctions and was governed by a specific statutory scheme that is inapplicable here. (*Id.* at pp. 1544-1546 [reversible error to summarily adjudicate issues of fact where defendants had moved only for summary judgment and Code Civ. Proc., § 437c, subd. (f) requires notice that summary adjudication is sought].)

The long-established principle is that a demand for relief in a complaint necessarily includes a prayer for lesser relief. (See *West v. U.L.C. Corp.* (1965) 232 Cal.App.2d 85, 89 ["The greater relief demanded necessarily included a prayer to carry lesser relief into effect"]; *Hurt v. Pico Inv. Co.* (1932) 127 Cal.App. 106, 114 [" '[T]here is no rule that would prevent the court from granting less relief than that demanded' "].) This principle applies here, and there is no basis for us to conclude that the trial court erred in awarding evidentiary and issue sanctions in lieu of finding the landlords to be in default.

> *B. The Landlords' Belated Objections to Expert Testimony Is Meritless.*

Citing *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), the landlords argue for the first time on appeal that an expert witness's testimony violated their due process rights under the Fifth and Fourteenth Amendment as well as their right to confrontation guaranteed under the Sixth Amendment. These issues were forfeited and lack merit in any event.

The chief housing inspector for the City's Department of Building Inspection testified as an expert in the area of code enforcement. She testified, without objection, about various code violations at the landlords' properties based on documents prepared by others, as she had not personally inspected the properties. Relying on *Sanchez*, the

14

landlords on appeal contend that this testimony was hearsay admitted in violation of their due process and confrontation rights because it was "case-specific, fact-based opinion . . . based on the complied [*sic*] reports of others." But *Sanchez* was issued months before the trial here, and counsel had both the opportunity and obligation to assert any *Sanchez* objection at the trial. (See *People v. Black* (2007) 41 Cal.4th 799, 811 ["In determining whether the significance of a change in the law excuses counsel's failure to object at trial, we consider the 'state of the law as it would have appeared to competent and knowledgeable counsel at the time of the trial.' "]) Because counsel failed to object below, the landlords' challenges were forfeited. (*Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 113.)

Even if the objections had not been forfeited, they lack merit. The trial court ruled that the complaints upon which the expert relied were not hearsay because they were business records and official records under Evidence Code sections 1271 and 1280, a ruling the landlords do not challenge in their opening brief.[4] We reject the landlords' challenge to the expert's testimony.

---

[4] In a lengthy argument in the landlords' reply brief, they claim that their hearsay objections to another witness's testimony about the records sufficiently put the trial court on notice regarding their constitutional confrontation rights. We disagree and reject this belatedly raised argument. (*Keyes v. Bowen, supra,* 189 Cal.App.4th at p. 656.)

*C. The Trial Court Properly Awarded Civil Penalties.*

    1. Additional Background.

The San Francisco Building Code (hereafter Building Code) defines what constitutes an "unsafe" building.[5] The Building Code further provides that any property owner who violates the code shall be liable for a civil penalty not to exceed $500 for each day such violation is committed or permitted to continue. (Build. Code, § 103A.) The San Francisco Housing Code (hereafter Housing Code) defines 12 conditions, including a "[s]ubstandard building," as nuisances. (Hous. Code, § 400.) Section 1001, subdivision (a) of the Housing Code, in turn, lists several conditions that constitute a substandard building when that condition "endangers the life, limb, health, property, safety[,] or welfare of the public or the occupants" of the building. The Housing Code provides for civil penalties of up to $1,000 for each day that a violation is committed or permitted to continue. (Hous. Code, § 204, subd. (c)(2).)

Building Code section 102A.3 authorizes a City building official to inspect buildings to determine whether they are unsafe under section 102A. If, after a building inspection, a building official determines a building is unsafe, the official shall serve the building owner with a written notice of violation and post a copy of the notice at the building. (Build. Code, § 102A.4, subd. (c).) If the unsafe condition is not corrected within the period specified in the notice, the matter shall be set for hearing. Hearings currently are governed by Building Code section 105A.5. Building Code section 103A

---

[5] Specifically, the Building Code provides: "All buildings, structures, property, or parts thereof, regulated by this code that are structurally unsafe or not provided with adequate egress, or that constitute a fire hazard, or are otherwise dangerous to human life, safety, or health of the occupants or the occupants of adjacent properties or the public by reason of inadequate maintenance, dilapidation, obsolescence or abandonment, or by reason of occupancy or use in violation of law or ordinance, or were erected, moved, altered, constructed or maintained in violation of law or ordinance are, for purpose of this chapter, unsafe. [¶] . . . [¶] All such unsafe buildings, structures, property, or portions thereof, are hereby declared to be public nuisances and shall be vacated, repaired, altered or demolished as hereinafter provided." (Build. Code, § 102A.)

16

authorizes civil penalties of up to $500 a day "for each day such violation is committed or permitted to continue."

Under the current version of the Building Code, the remedies recoverable through the administrative hearing process for unsafe buildings procedure are nonexclusive and "the City Attorney may institute civil proceedings for injunctive and monetary relief, *including civil penalties*, against a building owner for violations of the Municipal Code under any circumstances, without regard to whether a complaint has been filed or the Building Official has issued a NOV [notice of violation] or an Administrative Order." (Build. Code, § 102A.8, italics added.)

The Housing Code, meanwhile, provides that abatement procedures to cure violations shall be done under the same procedures as under the Building Code. (Hous. Code, § 201, subd. (e).) The Housing Code further provides that people who violate the code shall be liable for fines, and that remedies in the code "are in addition to any other remedies provided by law." (Hous. Code, § 204, subds. (a), (c)(3).)

The City's complaint as amended did not allege causes of action under the Building Code or the Housing Code, and its 16 prayers for relief did not specifically mention fines under the codes. But the complaint's allegations heavily relied on their provisions. The second cause of action in the City's amended complaint was for violations of the State Housing Law (Health & Saf. Code, § 17920 et seq.). The cause of action included allegations that the landlords had been maintaining properties in substandard, unsafe conditions "in violation of San Francisco Building Code Sections 102A and 103A and/or San Francisco Housing Code Sections 204, 401 and 1001" by failing to secure required construction permits on their properties, performing work exceeding the scope of issued permits, and failing to timely cure cited conditions. According to the complaint, the landlords repeatedly refused to obtain proper permits before performing construction work, and the unpermitted work, which was performed by unlicensed workers, violated Building Code sections 102A and 103A. The City's third cause of action, for public nuisance, was brought "pursuant to the San Francisco Housing and Building Codes." The amended complaint summarized Building Code

17

section 102A and Housing Code sections 401 and 1001, and alleged that the landlords
had maintained one or more of their properties as unsafe buildings and public nuisances
in violation of those sections. And the City's fourth cause of action, for violation of the
Unfair Competition law, alleged that various unfair, unlawful, and fraudulent conduct by
the landlords amounted to unfair business practices. This conduct included allegedly
remodeling units without obtaining required building, plumbing, and electrical permits;
refusing to comply with several notices and orders issued by the City's Department of
Building Inspection; refusing inspections after complaints of work being done without
permits or in excess of issued permits; and impeding, interrupting, and attempting to
disrupt lawful and noticed health and safety inspections.

The City sought a permanent injunction; statutory damages of $1,000 for each
violation of the Rent Ordinance; punitive damages under the Rent Ordinance; civil
penalties of $2,500 for each unfair or unlawful business practice alleged under the Unfair
Competition Law (Bus. & Prof. Code, §§ 17206, 17206.1); restitution; costs of
enforcement and attorney fees under Health and Safety Code section 17980.7,
subdivision (d) and the Rent Ordinance (Admin. Code § 37.10B, subd. (c)(5)); and
"[o]ther and further relief . . . as this Court should find just and proper."

The trial court bifurcated trial so that punitive damages would be heard after the
first phase of trial, and the City reserved its right to have a jury consider punitive
damages. On the first day of two court days of closing arguments following the first
phase of trial, the City filed a "Trial Brief Re Notice of Election of Remedies" stating it
elected to pursue civil remedies instead of punitive damages under the Rent Ordinance.
The City argued that where the purpose of civil penalties and punitive damages is the
same, a plaintiff may plead both but must eventually elect between them. (*Marshall v.
Brown* (1983) 141 Cal.App.3d 408, 418-419.) According to the City, the civil penalties
the City sought served both punitive and deterrent purposes, and the City elected the civil
penalties, which would eliminate the need for a jury trial. Specifically, the City sought
civil penalties under the Building Code, the Housing Code, and the Business and
Professions Code.

18

At the beginning of closing argument, an attorney for the City listed the City's causes of action and noted that prevailing on the claim of public nuisance would entitle plaintiffs to injunctive relief as well as daily civil penalties under the Building Code and the Housing Code. At the start of the defense closing arguments, the landlords' attorney objected to any penalties under the Housing Code or the Building Code, because "[n]one of that is alleged anywhere in the complaint." An attorney for the City countered that the relevant Housing Code and Building Code sections had been cited in the City's amended complaint in relation to the cause of action for public nuisance.

Toward the end of closing argument on the following day, the City again argued that it was "entitled to recover both under the San Francisco housing and building code for civil penalties there, as well as under the unfair competition law, which is in the plain language of both the unfair competition law and the San Francisco housing code." After some discussion about assessing penalties, the trial court returned to the issue of the City's entitlement to penalties and stated that "as far as I can tell from looking at the complaint, there is no actual prayer for penalties under the San Francisco building or housing code requested as a separate item, even though there is no doubt that they were discussed as predicate acts, as well as they were—they were pled as both predicate acts under the unfair business practices act and they were also pled as constituting a nuisance under the third cause of action." The court said it would return to the issue at the close of argument.

After argument ended, the court reiterated that the City's proposed penalties were not specifically included in the amended complaint's prayer for relief but noted that both pertinent sections of the Building Code and the Housing Code "were quoted and cited extensively" in the complaint in both the second and third causes of action (for violations of the State Housing Law and for public nuisance). The City then made an oral motion to amend the complaint to add to the prayer for relief daily penalties under the Building Code and the Housing Code, "as supported by the remainder of the complaint's allegations as well as the testimony in court and the evidentiary record." Over the landlords' objection, the trial court granted the City's motion to amend. It noted that the

19

trial court has broad discretion to permit amendment of pleadings before judgment and concluded that the amendment did not change the facts or legal theories in the case. The court further observed that "the issues raised by the proposed amendment were fully tried. All the evidence is before the court. It doesn't involve any new evidence, any new legal theories, nothing."

The trial court's statement of decision was roughly divided into two sections. One section made findings of fact as to the landlords' harassment of tenants, which we discuss in more detail in section II.D.

The other section addressed the notices of code violations as to each property. The trial court noted that the City had pleaded its cause of action for public nuisance in two counts. As for the count for public nuisance per se, the court stated that the Building Code defines work done without a permit as a public nuisance (Build. Code, § 102A), and Housing Code section 401 also defines what constitutes a nuisance. As for the count for general public nuisance, the trial court noted that the Civil Code defines a nuisance as "[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." (Civ. Code, § 3479; see also *id.*, § 3480 ["A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."].) The trial court made findings of fact as to the code violations at each property and concluded that they amounted to public nuisances. As to each property, the trial court calculated how many days the building was out of compliance and concluded that being out of compliance amounted to public nuisances as well as violations of the Unfair Competition Law.

Based on all its findings of fact regarding the code violations, the trial court proceeded to calculate the civil penalties the landlords owed. The trial court concluded that the City was entitled to recover penalties for violations of the Building Code and Housing Code under the causes of action for violations of the State Housing Law and for public nuisance. The court noted that the City's Building Code, Electrical Code,

20

Plumbing Code, and Mechanical Code each included provisions for awarding up to $500 in mandatory daily civil penalties; and the Housing Code provided for civil penalties of up to $1,000 for each day a violation was committed or permitted to continue. The City sought a penalty of $500 per day that a building was out of compliance with the City's Building, Plumbing, Mechanical, or Electrical Codes. The trial court found that the landlords' buildings were noncompliant with state and municipal laws for 4,470 days and assessed $250 per day in civil penalties (half of what the City sought) under the municipal codes for a total of $1,117,500. The trial court also found 29 violations of the Unfair Competition Law for the same offenses. Because penalties under the Unfair Competition Law were mandatory, the court awarded a nominal and additional $1 penalty for each violation, for a total of $29.[6]

The trial court found the total penalties awarded to be a "relatively small percentage" (between 10 and 11 percent) of the landlords' net worth, which had been deemed to be at least $25 million. The court specifically noted that the amount did not violate the excessive fines clause of the Eight Amendment. (*City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1319, 1322 (*Sainez*).)

> ### 2.  The Trial Court Did Not Abuse Its Discretion When It Permitted the Amendment.

The landlords argue that the trial court erred when it allowed the City to amend the complaint at the close of trial to include penalties, a question we review for an abuse of discretion. (*Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1377.) The trial court may allow "an amendment to any pleading or proceeding in other particulars." (Code Civ. Proc., § 473, subd. (a)(1).) The court must liberally allow amendments at any stage of proceedings, including during trial, unless there is unwarranted delay or the opposing party would be prejudiced. (*Duchrow*, at p. 1377.) A party may amend a pleading to

---

[6] Separate from the penalties under the Building Code and Housing Code, the trial court also found 1,612 additional violations of the Unfair Competition Law related to the landlords' unlawful, harassing, and retaliatory conduct against their tenants. It calculated $1,000 per violation, for a total penalty under the Unfair Competition Law of $1,612,000, meaning the total awarded in penalties was $2,729,529.

conform to proof at trial unless the variance between a pleading's allegation and proof "has actually misled the adverse party to his or her prejudice in maintaining his or her action or defense upon the merits." (Code Civ. Proc., § 469.) Amendments of pleadings to conform to proof should not be allowed when they raise new issues and the adverse party had no opportunity to defend against those issues. (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; *Duchrow*, at p. 1378.) " 'The cases on amending pleadings during trial suggest trial courts should be guided by two general principles: (1) whether facts or legal theories are being changed and (2) whether the opposing party will be prejudiced by the proposed amendment. Frequently, each principle represents a different side of the same coin: If new facts are being alleged, prejudice may easily result because of the inability of the other party to investigate the validity of the factual allegations while engaged in trial or to call rebuttal witnesses. If the same set of facts supports merely a different theory . . . no prejudice can result.' [Citation.] 'The basic rule applicable to amendments to conform to proof is that the amended pleading must be based upon the same general set of facts as those upon which the cause of action or defense as originally pleaded was grounded.' " (*Garcia v. Roberts* (2009) 173 Cal.App.4th 900, 910.)

The landlords' arguments here are misplaced because the City did not seek to change a single allegation in its amended complaint following trial. The City specifically alleged that the landlords' properties were substandard and unsafe as defined by the Building Code and the Housing Code and that this conduct violated the State Housing Law and constituted a public nuisance. The landlords' arguments on appeal fall flat that they somehow had no notice of the claims and were "deprived" of their ability to "properly prepare for the case."

What the City clarified after trial was its intent to seek the statutory *penalties* it was entitled to seek if it prevailed on its claims. We first reject the landlords' argument that the City "affirmatively represented" that it was not seeking penalties under the Building Code or the Housing Code. True, in its opposition to the landlords' motion to strike certain allegations in the first amended complaint, the City noted that it had not pleaded a separate cause of action for violating the Housing Code and the Building Code.

22

But it did not, as the landlords now claim, specifically represent that it was not seeking (or would not seek) penalties under those codes. And since the landlords' original motion to strike does not appear in our record, we are unable in any event to evaluate fully the context of the City's response.

The landlords contend that had they known before trial that the City would seek penalties under the Building Code and the Housing Code, "the facts and evidence would likely have been very different," but we disagree. They claim that they "would have engaged in detailed questioning of the inspectors and Building Department officials about the actual length of time in abating each of the violations, the reasons for that time period, the typical time periods for abating similar conditions, and the reasonable time period required. That evidence could have made a huge difference in the number of penalty days the Court could legitimately count, and hence the penalty totals." We are unpersuaded. Given the trial court's sanctions order, much of this questioning would have been disallowed. Even so, the landlords had strong incentives to question the witnesses as best they could within the contours of the discovery order because they faced significant other penalties and legal liabilities from an adverse ruling.

The landlords further strain credulity by claiming that had they been aware that the City would seek civil penalties under the Building Code and the Housing Code, they would have sought additional discovery and might have changed their "overall approach to the case and even their settlement strategy." But their actions in the trial court proceedings speak louder than their appellate assertions. Given their extreme defiance of discovery obligations and court orders, we simply cannot accept that they would have conducted themselves differently had they been specifically told that the City was opting against seeking punitive damages and instead would seek penalties under the Building Code and Housing Code if it prevailed on the claims alleged in the amended complaint.

The calculation of the penalties was discussed at length during closing argument. On appeal, the landlords argue that they were prejudiced by the amendment of the complaint because it increased the *potential* damages they faced. But the only support they cite is the portion of the City's closing argument where the attorney argued that the

23

landlords should pay more than $10 million in civil penalties.[7] Again, though, the trial court ordered far less than that: $2,729,529, $1,117,500 of which was attributable to penalties under the Building Code and Housing Code. Given that the City elected to forego seeking punitive damages, the landlords have not even established that they faced *potentially* more damages with the amendment of the complaint, let alone that they were prejudiced by the amount in fact awarded.

The landlords' reliance on *Duchrow v. Forrest, supra*, 215 Cal.App.4th 1359, is misplaced. In *Duchrow*, a plaintiff sued his former client for breach of a specific paragraph of the parties' retainer agreement that provided plaintiff was entitled to a combined hourly and contingency based rate for work on a lawsuit. (*Id.* at p. 1362.) After plaintiff presented evidence at a jury trial and then rested, he sought to amend his complaint based on a new theory of liability on a different paragraph of the retainer agreement (stating he was entitled to recover for all time spent on the lawsuit) that was not mentioned in the original complaint. (*Ibid.*) The trial court granted the motion to amend, but the appellate court reversed, concluding that there was no reason given for the delay and that the defendant client was prejudiced because he was severely limited in how to respond to the new theory of the case. (*Id.* at p. 1363.) Here, by contrast, the City did not change the theory of its case but merely stated it would seek penalties under codes that were cited in its amended complaint.

Finally, we reject the landlords' brief argument that the penalties levied against them somehow were barred by the doctrine of the election of remedies. "Broadly speaking, election of remedies is the act of choosing between two or more concurrent but inconsistent remedies based upon the same state of facts. Ordinarily a plaintiff need not

---

[7] Counsel argued: "So $6,557,500 [for tenant-harassment claims]. [¶] So we believe it's within this Court's discretion to give a [Business and Professions Code section] 17200 penalty for violations of the building and housing codes, yielding a penalty of around $2 million, in addition to the tenant harassment violations. So the recommended penalty payable to the People of the State of California is $8,684,000. And the recommended penalty to the City and County, which we have already discussed, is around $2 million."

elect, and cannot be compelled to elect, between inconsistent remedies during the course of a trial prior to judgment. [Citations.] However, if a plaintiff has unequivocally and knowledgeably elected to proceed on one of the remedies he is pursuing, he may be barred recourse to the other." (*Roam v. Koop* (1974) 41 Cal.App.3d 1035, 1039.) Such a situation arises, for example, where a plaintiff permissibly files a complaint sounding in both tort and contract but then secures the issuance of a writ of attachment, available only as a remedy in a contract action, thus gaining an advantage over the defendant and equitably estopping plaintiff from later seeking the inconsistent remedy of punitive damages under a tort theory. (*Id.* at pp. 1039-1040; but see *id.* at p. 1044 [equitable estoppel barred defense of election of remedies where defense was not raised in trial court].) Here, at no time did the City take an action or assert a legal position that was inconsistent with pursuing penalties under the Building Code and the Housing Code.

   3. The City Is Entitled to Recover Daily Penalties.

  The landlords also apparently contend that either the penalties were calculated improperly or the City followed improper procedures in obtaining them. They advance this contention in a brief section titled "The City Is Estopped From Claiming Daily Civil Penalties for Time Periods When [the Department of Building Inspection], In Failing to Set a Director's Hearing, Necessarily Implied Defendants Were Making Substantial Progress Toward Abatement." (Bold omitted.) They first cite to *City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 912-913 (*Gonzalez*), which held that an enforcement agency's failure to fully comply with notice requirements under the state's statutory scheme to remedy substandard residential housing did not invalidate the receivership orders that followed. There can be no doubt here that the landlords were provided ample notice of the present lawsuit and the opportunity to defend themselves.

  What the landlords really appear to contend is that the penalties against them cannot be upheld because the City's Department of Building Inspection "implicitly found substantial progress toward abatement." According to the landlords, such a finding can be implied because they were never given notice of an administrative hearing, and no administrative hearing was held, as required under the State Housing Law. (Health &

Saf. Code, § 17980.6.) They contend that for the Department of Building Inspection "to find a violation and impose penalties, it was necessary to follow these hearing and decision procedures."

The City counters that section 102A.8 of the Building Code and Housing Code section 204, subdivision (c), state that their remedies are not exclusive. For the first time in their reply brief, the landlords complain that the portion of the Building Code that permits the City Attorney to seek civil penalties against a building owner whether or not an administrative order has been secured (Build. Code, § 102A.8) only became effective on January 1, 2017, and appears to have been passed in response to the present lawsuit. In support of this belatedly raised argument, they ask the court to augment the record with a City and County of San Francisco Tails Ordinance, passed November 15, 2016, and effective January 1, 2017. The document is an improper subject of augmentation because it was not filed or lodged in the superior court. (Cf. Rule 8.155(a)(1)(A).) We nonetheless judicially notice the document. (Evid. Code, §§ 451, subd. (a) [judicial notice of public law], 459, subd. (a).) And we also, on our own motion, take judicial notice of the two exhibits submitted in support of the City's opposition to the landlords' motion to augment, which provide more context to the amendments to the Building Code. As the landlords' own "tails ordinance" explains, the state adopts a new Building Standards Code every three years. In response to this cycle, the San Francisco Board of Supervisors repealed the 2013 Building Code and enacted the 2016 Building Code. The new Code included the 2016 version code that had been effective since June 1, 2016 (before trial started in this case). As set forth in a City exhibit that we judicially notice, that 2016 version of the Building Code included section 102A.8, regarding the non-exclusivity of remedies.

Notwithstanding the effective date of section 102A.8, there is nothing in the former Building Code to suggest that the administrative process was the exclusive means for the City to seek penalties. (E.g., *Sainez, supra,* 77 Cal.App.4th at pp. 1306-1308 [penalties imposed under Housing Code and Building Code at trial based on code violations constituting unfair business practices, not at administrative hearing]; see also

26

*Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 531-532 [violation of local ordinance may be used as basis for finding violation of Unfair Competition Law].)

The landlords' argument here is similar to one rejected in *Sainez*. The landlords claim they were put in a worse position than they would have been if an administrative hearing had been held because they were "made worse off by continuing their voluntary abatement than they would have been if a hearing had been held. The City is thus estopped from seeking daily penalties for periods of time during which [the Department of Building Inspection]'s decision not to send [notices of violation] for a Director's hearing was an implied finding that 'substantial progress' on abatement had commenced." The court in *Sainez* observed: "Defendants depict themselves as victims of a system in which one can become trapped by whimsical or capricious inaction by the City between the time that [a notice of violation] issues and a certificate of completion issues—the period during which the clock runs on mounting, confiscatory penalties of $1,000 a day. They even urge that this poses a hopeless conflict of interest for the City, which both controls the extent of penalties and gains from them. We find this interesting in theory and showing some *potential* for abuse. However, in the end defendants point to no instances *on this record* where any good faith efforts at remediation or compliance were impeded by unreasonable inaction or demands by the City." (*Sainez, supra,* 77 Cal.App.4th at p. 1314.) This is all the more true here, where the landlords repeatedly refused inspection of their properties. We reject their claim of error.

We also reject the landlords' related contention that failure to hold administrative hearings deprived them of the due process protections afforded under the State Housing Law. They were provided ample notice and an opportunity to be heard in a trial on the merits before the trial court issued its statement of decision and imposed penalties.

　　　　4. The Landlords' Reliance on a Statute Governing Attorney Fees Is Misplaced.

The landlords also claim that the City was not entitled to penalties for violations that were already abated at the time of trial. This argument is based on the State Housing Law's procedure to abate code violations and nuisances, which is unrelated to the awards

27

of civil penalties at issue here.  An enforcement agency shall provide notice of violation
and shall "institute appropriate action or proceeding to prevent, restrain, correct, or abate
the violation or nuisance" after providing 30 days' notice to abate.  (Health & Saf. Code,
§ 17980, subd. (a).)  Where violations are so extensive and "of such a nature that the
health and safety of residents or the public is substantially endangered," an enforcement
agency may issue an order or notice to repair or abate.  (Health & Saf. Code, § 17980.6.)
Notice under the statute must be given to property residents.  (*Ibid.*)  If the owner fails to
comply the enforcement agency may seek the appointment of a receiver.  (Health & Saf.
Code, § 17980.7, subd. (c).)  And if the trial court finds that a building is in a condition
that substantially endangers the health and safety of residents under Health and Safety
Code section 17980.6, the trial court shall take various actions, including award
reasonable attorney fees.  (Health & Saf. Code, § 17980.7, subd. (d)(1).)

　　　The trial court did not award civil penalties under section 17980.7.  Instead, it
concluded that the conditions at the landlords' buildings substantially endangered the
safety or welfare of the occupants and the general public, entitling the City to recover
their attorney fees and other costs under Health and Safety Code section 17980.7,
subdivision (d).  But instead of challenging the City's entitlement to attorney fees and
costs, the landlords argue that the City was barred from seeking penalties for code
violations that were already abated because "[t]he State Housing Law statutes show that a
present endangerment is required at the time suit is filed."  They argue that the State
Housing Law's procedural mechanism for seeking abatement of code violations applies
where violations "are" (as opposed to "were") so extensive that residents' safety "is" (as
opposed to "was") substantially endangered.  The argument is unavailing because the
City was not awarded penalties under Health and Safety Code section 17980.7.

　　　In any event, the landlords' argument is another way of challenging the trial
court's sanctions order, which we already have rejected.  Again, after the landlords
repeatedly failed to allow inspections at their properties, the court ruled that if the City
met its burden at trial of proving that the landlords created unlawful, substandard, or
unsafe conditions at the subject properties, the court would determine that such

conditions still existed at the time of trial. Thus, the sanctions order precludes the landlords from claiming that the City was required and failed to prove that the substandard conditions remained unabated at the time of trial.

### 5.  The City Is Entitled to Penalties Through the End of Trial.

The landlords briefly challenge the City's entitlement to penalties calculated as of the date of the close of evidence instead of as of the opening day of trial. We reject their argument. Without providing a pin citation, they claim that *Sainez, supra,* 77 Cal.App.4th, provided a "directive" to calculate penalties as of the opening day of trial, but they are mistaken. It is unclear whether the trial court in *Sainez* calculated penalties based on the opening or closing day of trial, and the appellate court did not address the issue in any event. (*County of Riverside v. Public Employment Relations Bd.* (2016) 246 Cal.App.4th 20, 32 [well established that cases are not authority for propositions not addressed].)  And the general rule is that damages may be awarded in a judicial proceeding "for detriment resulting *after* the commencement thereof." (Civ. Code, § 3283, italics added.)

### 6.  The Landlords Forfeited Constitutional Challenges to the Award of Penalties.

For the first time, the landlords also claim that the penalties imposed are unconstitutionally excessive under both the federal and state constitutions and that this excessiveness also violated their due process rights, but they have forfeited these claims. On appeal, they briefly contend, without citation to the record, that the combined amount of penalties and attorney fees awarded represented around a quarter of their net worth, contrary to the trial court's findings that the total amount was between 10 and 11 percent of their net worth. They then provide a lengthy, general overview of Eighth Amendment jurisprudence, followed by a summary of due process jurisprudence under the Fourteenth Amendment. But we already have upheld the trial court's issue sanction determining that each landlord's assets and net worth were jointly and severally deemed to be at least $25 million. (*Ante,* § II.A.2.c.)  And because the landlords never raised their constitutional concerns below and failed to move for a new trial to challenge the

29

excessiveness of the award—even after the trial court specifically noted that the award met constitutional muster under *Sainez, supra,* 77 Cal.App.4th 1302—we are precluded from considering the issue. (*Campbell v. McClure* (1986) 182 Cal.App.3d 806, 808, 811-812.)

### 7. The Landlords' Challenge to the Calculation of Penalties Fails.

The landlords also challenge the calculation of penalties. We review the facts supporting the imposition of penalties for substantial evidence (*People ex rel. Van de Kamp v. Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 765) and the trial court's decision to award penalties for abuse of discretion (*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 523). But the landlords mostly stop short of arguing that insufficient evidence supports the findings supporting the award of penalties or that the trial court abused its discretion when it awarded them. Instead, they argue that the court's findings of fact "were contrary to the very records the Court purported to rely on" and that therefore "the penalties were substantially overstated." As we explain, the challenges essentially are repackaged legal challenges to the awards, which we again reject.

### a. The 18th Street Property.

Kihagi owns an apartment building on 18th Street in the City's Castro neighborhood. One of the apartments was gutted "down to the studs" without permits, in violation of the City's Building, Housing, Plumbing, and Electrical Codes. A resident testified that the gutting took place in June 2014, and the trial court treated the start date as June 15. The Department of Building Inspection issued a notice of violation on October 10, 2014, citing the landlords for proceeding with construction work without a permit and gave them a 90-day grace period (until January 8, 2015) to obtain permits and to complete work to abate code violations. The landlords did not abate the violations until August 3, 2015—207 days after the abatement deadline. The court concluded that the landlords maintained the property as a public nuisance in violation of municipal law and the State Housing Law for a total of 324 days, calculated as follows: the property was out of compliance from June 15, 2014, through August 3, 2015 (414 days), minus a

30

90-day grace period to cure violations that were not counted as days in violation (so 117 days before the Department of Building Inspection cited the landlords, and 207 days after the 90-day grace period expired).

On appeal, the landlords contend that a court may not find a violation of the Building Code unless a building official personally observes it and the property owner is provided with notice under Building Code section 102A.3, which did not happen here until October 10, 2014, meaning that the trial court improperly found that the property was out of compliance for 117 days. This is another way of arguing that the only way to find a violation of the municipal codes was to follow the administrative procedures set forth in the Building Code, which we already have rejected. (*Ante*, § II.C.3.) And their contention that an inspector must personally observe the violation is deeply disingenuous given their pattern of refusing lawful inspections of their property. We are satisfied that the trial court properly calculated penalties in relation to this property.

### b. The 19th Street Property.

Xelan owns a six-apartment residential building on 19th Street in the Castro. A former resident testified at trial that when he toured the building as a prospective tenant in 2014, the two units he was shown appeared to be in the process of being remodeled because the "[f]inishings were new" and "[t]here were certain things that didn't look like they were completely done yet in terms of the apartments being finished." The work appeared to be "potentially still being done, but close to completion." When asked if he would have been able to move into the unit that day, the resident testified, "I probably would not be able to say that. I can't recall the details specifically. Seems like there was still work going on in all the units. Cosmetic maybe only at that point." No permit was applied for or obtained to perform work for those units. The resident noticed shortly after moving in that the heater did not work, and it was not completely fixed for about six months. The building also included a basement unit that was accessible from the back of the building, and it was vacant and under construction for most of the time the tenant was a resident of one of the upstairs units for about a year. An application to legalize a unit in the basement area was filed on April 1, 2016, but no permit was issued.

31

The trial court found that the landlords performed remodeling work in one of the apartments of the building beginning in June 2014 without the required permits and as of the time of trial still had not obtained them, in violation of the Building, Housing, Electrical, and Plumbing Codes. The court treated the start date of construction as June 15, 2014, and found that the landlords had maintained code violations at the property through the end of trial on January 12, 2017, a total of 943 days. The court further concluded that the landlords also performed construction on the basement of the property without permits in violation of the Building, Housing, Electrical, and Plumbing Codes between June 2014 and June 2015. The court treated the start date of construction as July 15, 2015 and found that the landlords maintained code violations through the conclusion of evidence, for a total of 548 days. The court concluded that the property was out of compliance with municipal codes from at least June 15, 2014, through at least January 12, 2017, for a total of 943 days.

On appeal, the landlords acknowledge that "lay and expert testimony" was presented to support the dates the property was out of compliance, but they argue that the trial court erred because no notices of violation were issued and because the City did not follow the proper administrative procedures, an argument that, again, this court already has rejected. (*Ante*, § II.C.3.)

The landlords also contend that the evidence presented did not support a finding of a violation because "[m]any types of 'remodeling work,' such as installation of appliances, new cabinets, and a long list of other improvements do not require permits" under "[s]ection R105 of the California Building Code." (Underline and bold omitted.) But the landlords apparently did not claim below that permits were not required for the remodeling work. Indeed, the resident of the building who testified about remodeling was never questioned on cross-examination about the work. In light of the fact the landlords repeatedly failed to allow inspection of their properties, we reject their argument that the tenant's testimony about what he observed in the apartment where he lived for a year was insufficient to establish that unpermitted remodeling work took place in the unit.

32

c.  The Filbert Street Property.

Xelan owns a seven-apartment building on Filbert Street in the Russian Hill neighborhood.  The trial court found that seven violations of the Unfair Competition Law occurred at the property because the building's units were out of compliance with various municipal codes for hundreds of days, mostly because of work performed without, or in excess of, required permits.  The court determined that the landlords maintained the Filbert Street property as a public nuisance in violation of municipal law and the State Housing Law for a total of 632 days, which excluded any days while permits were suspended pending a determination by the City's Board of Appeals, any grace periods, and any days in violation that preceded the one-year statute of limitations.  The landlords take issue with the calculation of the number of days they were in violation, claiming that the trial court did not exclude additional "permit suspensions" in effect pending a tenant's appeal of those permits to the Board of Permit Appeals.  They fail, however, to demonstrate reversible error.

First, the landlords sometimes fail to cite to the record when they claim error.  For example, they state without citation to the record that the testimony of the chief electrical inspector established that violations in four units were corrected in June 2014 and in another unit in April 2015.  (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [where there are no citations to the record to support an argument, we treat issue as waived].)  Elsewhere they cite to "Ex.  P. ___" to support statements about electric permits.

Second, even when they cite to the record, the landlords fail to connect their statements with a particular claim of error.  They summarize correspondence that they claim show when permits were suspended and terminated.  But then they simply assert that permit appeals "resulted in permit suspensions, which in turn required corrective work and new permits" and thus the trial court "should not have counted penalty days."  They do not, however, specify precisely how many days should be subtracted from the total for the purpose of calculating penalties.  And it is unclear whether subtracting days would matter in any event since the trial court aggregated the total number of days the building was out of compliance instead of calculating penalties cumulatively.  (*City of*

33

*Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286-287 [no error warrants reversal unless appellant can show injury from the error].)

d.  The Eureka Street Property.

Renka owns a five-unit apartment building on Eureka Street in the Castro.  Citing to trial exhibits and testimony, the trial court found five violations of the Unfair Competition Law and that the property was maintained as a public nuisance and in violation of municipal law and the State Housing Law for a total of 920 days.

As for one of the violations of the Unfair Competition Law, the trial court noted that the Department of Building Inspection's building division issued a notice of violation at the property on March 19, 2014, for being an "unsafe building" under the Building Code.  The department gave the landlords a 28-day grace period to obtain a structural engineer's report, then issued a second notice of violation on August 21, 2014, after the landlords failed to comply with the first notice.  The landlords failed to abate the violations until February 24, 2015, which meant that violations of the Building Code existed at the property for 314 days (excluding the department's grace period).  Citing only to a complaint data sheet, and without addressing the testimony cited by the trial court, the landlords claim that no penalties should have been awarded for this notice of violation because "there never was any physical defect or hazard."  The landlords have not established that the finding is unsupported by substantial evidence.

The landlords' challenges to the other findings as to this property suffer the same deficiencies.  Citing only various complaint data sheets and notices of violations, they claim that the trial court miscalculated the days the property was in violation.  They go so far as to claim that a tenant lied under oath, yet they do not provide a citation to the tenant's testimony.  And nowhere do the landlords explain how any miscalculation of some days would even matter given that the trial court did not calculate the penalties cumulatively.

e.  The Guerrero Street Property.

Renka owns a six-unit apartment building on Guerrero Street in the Mission district.  The trial court concluded that nine violations of the Unfair Competition Law

34

occurred on the property and that the property was a public nuisance and in violation of municipal laws and the State Housing Law for a total of 830 days. Once again, the landlords attack these factual findings but fail to provide citations to the record or to address the testimony on which the trial court relied. For example, they assert that the "heating system work was essential and done with permits." The only record citation they provide is a complaint data sheet regarding "Unsafe Flues For Water Heaters And Wall Heaters" whose dates and notations do not match what the landlords represent in their brief. They also claim, without citation to the record, that "to the extent this construction had any impact on the tenants, it was a temporary and minor one, for installation of a vital building component, the furnace." The landlords again fail to establish error.

> f.  The Hill Street Property.

Finally, we reject the landlords' challenge to the trial court's findings regarding a five-unit apartment building on Hill Street in the Castro owned by Zoriall. Again, the landlords do not address all the evidence presented below, make various assertions without citation to the record, and repeat legal arguments we already have rejected.

> *D. The Law and Substantial Evidence Support the Trial Court's Findings of Tenant Harassment.*

The trial court concluded that the City proved by clear and convincing evidence that the landlords had "engaged in conduct that violated municipal and state tenant harassment laws and evictions laws, and therefore, also California's unfair business practices law." The court listed the acts of harassment that occurred at each property and totaled the violations of the Unfair Competition Law. The landlords challenge the award as both a matter of law and fact.

35

1. The Trial Court Applied the City's Rent Ordinance Consistent with Its
   Terms.

   The landlords first challenge whether certain conduct actually amounted to
harassment, a question of law we review de novo. (*Golden Gateway Center v. San
Francisco Residential Rent Stabilization & Arbitration Bd.* (1999) 73 Cal.App.4th 1204,
1207.) "Our primary duty when interpreting a statute is to determine and effectuate the
Legislature's intent. [Citations.] 'When the language of a statute is clear and
unambiguous, there is no need for interpretation and we must apply the statute as
written.' " (*Bohbot v. Santa Monica Rent Control Bd.* (2005) 133 Cal.App.4th 456, 462.)
"However, if the statutory language is not so clear, '[i]t is our task to construe, not to
amend, the statute.' [Citation.] In construing a statute, it is the role of the judiciary to
simply ascertain and declare what is in terms or in substance contained in the statute, not
to insert what has been omitted or omit what has been included. In other words, the
courts 'may not, under the guise of construction, rewrite the law or give the words an
effect different from the plain and direct import of the terms used.' " (*Scripps Health v.
Marin* (1999) 72 Cal.App.4th 324, 331.) " 'The same rules of statutory interpretation that
apply to statutory provisions also apply to local charter provisions.' " (*Bohbot*, at p. 462.)

   The Rent Ordinance defines "housing services" as including "repairs;
replacement; maintenance; painting; light; heat; water; elevator service; laundry facilities
and privileges; janitor service; refuse removal; furnishings; telephone; parking; rights
permitted the tenant by agreement, including the right to have a specific number of
occupants, whether express or implied, and whether or not the agreement prohibits
subletting and/or assignment; and any other benefits, privileges or facilities." (Admin.
Code, § 37.2, subd. (g).) By voters' passage of Proposition M in November 2008, this
definition was expanded to include "quiet enjoyment of the premises, without harassment
by the landlord as provided in Section 10B." (*Ibid.*; see *Larson v. City and County of San
Francisco* (2011) 192 Cal.App.4th 1263, 1272-1273.) Section 37.10B of the Rent
Ordinance, in turn, lists 15 activities that amount to tenant harassment when done "in bad
faith or with ulterior motive or without honest intent." (Admin. Code, § 37.10B,

36

subd. (a); but see *Larson*, at pp. 1283, 1296 [subd. (a)(7) impermissibly restricts constitutionally protected speech].) The City is authorized under the code to file a superior court action for any acts of harassment and to recover damages therefor. (Admin. Code, § 37.10B, subd. (c)(5); *Larson*, at p. 1282.)

The landlords contend that tenant harassment under the Rent Ordinance must be conduct that is "substantial and continuing" so as to avoid "an 'absurd or anomalous result.' " True, where two statutes are in conflict, the court should construe a statute with reference to the whole system of law so as to harmonize it and to "seek to avoid absurd or anomalous results." (*Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 531.) The courts should not blindly apply the plain meaning of a statute where literal interpretation would defeat the Legislature's purpose. (*Id.* at p. 532.) "To put it another way, the ' "language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." ' " (*Ibid.*) But the landlords identify no such literal interpretation that would lead to absurd consequences absent a requirement that conduct be "substantial and continuing" to amount to harassment.

For example, the landlords point to the part of the Rent Ordinance that provides that a landlord shall not "[i]nterrupt, terminate or fail to provide housing services required by contract or by State, County or local housing, health or safety laws." (Admin. Code § 37.10B, subd. (a)(1).) The landlords claim it would be absurd to construe this subdivision as including a single interruption in housing services, because a relatively minor event such as a single power failure would amount to harassment. But the ordinance specifies that the landlord may not interrupt services "in bad faith or with ulterior motive or without honest intent." (Admin. Code, § 37.10B, subd. (a).) Such a requirement of ill motive would preclude liability where a tenant's power was interrupted because of a single power outage that was accidental or outside the landlord's control. But if a landlord caused a power failure at one of its properties in bad faith or with ill intent, we would not hesitate to conclude that this amounted to harassment, even if it were a single occurrence.

37

Cases interpreting "harassment" as that term is defined in statutes other than the Rent Ordinance do not help the landlords. For example, before someone may secure a civil anti-harassment injunction, a petitioner must establish that a person has engaged in a "course of conduct" of unlawful violence or threats of violence, which is "a series of acts over a period of time." (Code Civ. Proc., § 527.6, subd. (b)(1), (3).) Given this statutory definition, it is not surprising that courts have required more than one act before the issuance of an injunction. (E.g., *Leydon v. Alexander* (1989) 212 Cal.App.3d 1, 4 [because statute explicitly states that multiple acts are required, single incident insufficient to show harassment].) This is consistent with the purpose of the an anti-harassment statute, which is to protect an individual against future harm. (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 401, 403.) Because an injunction is aimed at future and not past conduct, establishing a course of conduct is probative of whether it is likely to continue absent an injunction. (*Id.* at p. 403; but see *id.* at p. 404 ["There may well be cases in which the circumstances surrounding *a single act* of violence may support a conclusion that future harm is highly probable."], italics added.) By contrast, the purpose of the Rent Ordinance is to impose penalties on past conduct that interferes with a tenant's enjoyment of his or her housing.

The landlords also stress that in order for an employee to prove harassment under the Fair Employment and Housing Act (FEHA, Gov. Code, § 12900 et seq.), he or she must prove that the harassment was " 'sufficiently severe or pervasive' to alter the conditions of the victim's employment." (*Etter v. Veriflo Corp.* (1998) 67 Cal.App.4th 457, 463.) In order to prove harassment under FEHA, a plaintiff must prove that the conduct was more than "occasional, isolated, sporadic, or trivial." (*Id.* at p. 466.) There is nothing inconsistent with this standard and the standard we apply with respect to the Rent Ordinance. Because the ordinance requires a showing of bad faith or ill motive, no liability would flow from a "trivial" incident. If, on the other hand, a single act were "sufficiently severe" to establish harassment, the court may well find there was harassment. We reject the landlords' argument that a court must necessarily find that a

landlord committed multiple acts over a period of time in order to conclude that the landlord engaged in harassment.

### 2. Substantial Evidence Supports the Trial Court's Findings.

The landlords next challenge the trial court's individual findings regarding tenant harassment. We review the trial court's factual determinations for substantial evidence. (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489.)

#### a. The 18th Street Property.

A former resident of the 18th Street property testified, without objection, about eviction notices that both he and another former resident, Darcy Harris, received while living at the property. Harris, who at the time of trial lived on the East Coast, did not testify. The resident who testified at trial paid $1,628 in monthly rent in summer 2014 for his unit, and Harris paid monthly rent of around $1,423.26 in June 2014 for her separate unit. Harris had lived in her apartment at that point for at least six to seven years, and she worked for Wells Fargo. In August 2013, the two residents were both served with 60-day notices of termination of tenancy for their separate units. The notices stated that one unit was being vacated so an owner could move in, and the other was being vacated so that a relative could move in. Both residents were offered different units in the same building with a rent of $4,250, an increase of more than $2,600 each. The residents both paid for an attorney to fight the notices, and the notices were withdrawn. The resident who testified received another notice of termination in February 2014 based on owner move-in, again consulted with an attorney, and again had the notice withdrawn. Harris also received an eviction notice around this time, but hers was an unlawful-detainer eviction based on "a missed rent payment and she was also being accused of running a business out of her apartment." No evidence was presented at trial that Harris was in fact running a business out of her apartment. Harris lost her case and moved to North Carolina or South Carolina because she could no longer afford to live in San Francisco. The process "turned [her life] upside down" and was "[v]ery intrusive" because "her financial situation, her personal situation" was "totally investigated."

39

Based on this testimony, the trial court found that Kihagi served Harris with a notice of eviction for having run a commercial business out of her apartment and for having missed a rent payment, but that "the unrefuted evidence shows that Harris worked at Wells Fargo Bank at the time, and there was not a scintilla of evidence that she was engaging in any unlawful commercial business out of her apartment." The court concluded that the eviction was "unlawful, unfair, and fraudulent" and imposed penalties under the Unfair Competition Law for each month Harris was out of possession of her apartment from June 2014 through January 2017 (31 months).

Although the landlords did not object below to any of the former resident's testimony, they claim on appeal that it was "ridiculous hearsay" that could not support the trial court's conclusions. Having failed to object below, the landlords forfeited any hearsay objections. (*People v. Nugent* (1971) 18 Cal.App.3d 911, 917.)

The landlords further complain that the trial court did not address Harris's alleged failure to pay rent as a basis to evict her, a valid ground for eviction under both the Rent Ordinance (Admin. Code, § 37.9, subd. (a)(1)(A)) and Code of Civil Procedure section 1161, subdivision 2. We are not persuaded. Harris had a regular income from her work at Wells Fargo. Even if we assume that she withheld a rent payment, her attempted eviction could still have been unfair and fraudulent for purposes of the Unfair Competition Law given the evidence of Kihagi's repeated and improper efforts to evict her and increase the rent. Substantial evidence supports the trial court's findings.

b. The 19th Street Property.

The same resident who testified about remodeling at the 19th Street property also testified about the conditions at his apartment when he and his wife lived there, as well as his "trying" and "confrontational" relationship with Kihagi. The trial court concluded several acts of harassment by Kihagi amounted to a constructive eviction of the tenant and his wife: the couple went without adequate central heat for eight months and Kihagi ignored several requests for repairs, thus failing to exercise due diligence in violation of the Rent Ordinance's harassment provision; two of the landlords' workers entered the apartment without prior notice or consent in October 2014 in violation of the Rent

40

Ordinance's harassment provisions and Civil Code section 1954, subdivision (d)(1) [landlord may enter residence only if given proper notice]; Kihagi and another man also entered the apartment without prior notice or consent in October 2014 in violation of harassment provisions and the Civil Code; the apartment lacked a working doorbell during their entire tenancy, and Kihagi ignored requests to repair it in violation of harassment provisions; Kihagi listed the apartment for rent after the residents said they intended to move but before they moved out and did not provide notice to the couple that it was listed as available for showings, in violation of harassment provisions; and during one open house, Kihagi told the husband he could not sit on the front steps of the building in violation of harassment provisions.

On appeal, the landlords do not dispute any of these facts and only quibble about whether they amounted to harassment. But in so doing, they fail to even cite to the harassment provisions they were found to have violated. For example, they acknowledge that the heater did not work properly for about six months and that the doorbell never worked. But they do not address the trial court's finding that these deficiencies violated the Rent Ordinance (Admin. Code § 31.10B, subds. (a)(1) [failure to provide housing services], (a)(2) [failure to perform repairs and maintenance], (a)(3) [failure to exercise due diligence in completing repairs], and (a)(10) [interference with tenant's right to quiet use and enjoyment of rental housing]). Instead, they claim that "[a]ny fair reading of [the resident's] testimony shows that he was a good tenant who left for his and [his] wife's own reasons." We disagree. Substantial evidence supports the trial court's findings, and we decline to set them aside. (*Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [court may disregard conclusory argument that is unsupported by relevant legal authority].)

c. The Eureka Street Property.

The trial court found that there were 143 predicate acts of harassment at the Eureka Street property for which it would assess civil penalties under the Unfair Competition Law. These acts were sometimes directed to all tenants collectively and sometimes directed to individual tenants. The acts aimed at all tenants included:

41

(1) requiring all tenants to remove stored items out of the garage, a privilege permitted
by the previous owner, without a downward adjustment in rent, (2) reducing the garbage,
composting, and recycling services by half, (3) engaging in unpermitted construction in
one of the units that "ripped out the whole apartment" and involved frequently cutting off
power to the other units, (4) dumping construction debris from the illegal construction in
the already overflowing trash receptacles, (5) interrupting water services three or four
times, with each interruption lasting several hours, in retaliation for the tenants exercising
protected rights, and (6) dumping a large amount of construction debris near the water
heater in retaliation for exercising protected rights. The acts aimed at individual tenants
were identified in a listing covering 11 pages of the trial court's statement of decision.

On appeal, the only act directed against all the tenants challenged by the landlords
is the finding that they decreased housing services for the entire building by requiring the
tenants to move their stored items out of the garage without a downward adjustment of
rent. They do not dispute that the previous owner permitted the storage. They simply
contend that the tenants' access to the garage was not provided for in the written leases
and that "[a]s a matter of law, any verbal permission by the previous owner did not alter
the lease obligations or create new rights for the tenants. (Citation)."[8]  To the contrary,
" 'in some cases a court will imply that the tenant also has such additional easements in
the property owned by the landlord as are reasonably necessary for the tenant's beneficial
enjoyment of the premises leased. . . . The easements may be implied even though they
are outside of the demised premises described in the lease, but they are not implied if the
express provisions of the lease exclude them.' " (*Dubin v. Robert Newhall Chesebrough
Trust* (2002) 96 Cal.App.4th 465, 473, italics omitted.) True, the leases here apparently
stated that storage was not allowed outside of the tenants' living units. But "[w]hen one

---

[8] The landlords later contend it "is virtually hornbook law that a contract provision
requiring changes be made only in writing cannot be waived or orally modified," but they
rely on a case distinguishing private contracts and *public contracts*, where written change
orders cannot be modified orally through the parties' conduct. (*G. Voskanian
Construction, Inc. v. Alhambra Unified School Dist.* (2012) 204 Cal.App.4th 981, 990.)

42

party has, through oral representations and conduct or custom, subsequently behaved in a manner antithetical to one or more terms of an express written contract, he or she has induced the other party to rely on the representations and conduct or custom. In that circumstance, it would be equally inequitable to deny the relying party the benefit of the other party's apparent modification of the written contract." (*Wagner v. Glendale Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1388.) The landlords do not address the inequity in denying the tenants a use they previously enjoyed or in not offering a rent reduction when the use was taken away. We reject their arguments.

Of the dozens of acts of harassment of individual tenants at the Eureka Street property, the landlords challenge only a few. These involved findings about Kihagi questioning a tenant about such things as an agreement with the previous landlord about keeping a dog and whether the other tenant in the unit was the tenant's registered domestic partner. The landlords claim that Kihagi's questions were "perfectly reasonable" and "normal for a new owner." But these acts are properly considered in the context of all the evidence presented. After having previously argued that a plaintiff must prove a course of conduct of harassment (*ante*, § II.D.1.), the landlords now appear to complain that harassment cannot be inferred from earlier acts even though they concede that later acts constituted harassment, such as making an explicit threat. The landlords essentially ask this court to reweigh the evidence and the inferences to be drawn from it, an inappropriate task for the appellate court.

d. The Filbert Street Property.

The trial court found that the landlords committed 102 predicate acts of tenant harassment at the Filbert Street property. The landlords purport to challenge the sufficiency of the evidence as to three of them, but their challenge is more accurately characterized as another request for us to improperly reweigh the evidence.

The landlords first point to the trial court's findings that when the landlords bought the property in mid-August 2013 they falsely claimed that three tenants had not paid their August 2013 rent, and that one of the tenants (a 65-year-old disabled woman) made a second payment out of an abundance of caution but was never reimbursed for it.

43

The court found that these acts amounted to harassment in violation of the Rent Ordinance. (Admin. Code § 37.10B, subds. (a)(11) [refusal to accept or acknowledge receipt of tenant's lawful rent payment], (a)(12) [refusal to cash a rent check for more than 30 days].) On appeal, the landlords do not dispute the findings, but claim, without citation to legal authority, that it is "obvious that errors about tenant payments can happen in a change of ownership," and that there was "no basis for inferring that Defendant's claim for rent was 'false,' nor was the failure to correct the double payment." Because the trial court drew reasonable inferences from the evidence, we reject the landlords' argument.

The same goes for their challenge to two incidents where the trial court found that Kihagi harassed her elderly, disabled tenant to move and later yanked the screen door from her apartment. Again, the landlords simply assert that these incidents did not amount to harassment, a characterization we reject.

e. The Guerrero Street Property.

The trial court found that the landlords engaged in 890 acts of harassment at the Guerrero Street property, including against tenants who were elderly and disabled. The landlords claim that the penalties imposed were "arrived at in large part by imposing double punishments for the same conduct." As examples, they point to the trial court's finding that the Guerrero Street tenants lost electrical service in the common area for 11 to 15 days in September 2014 after the landlords failed to pay the electrical bill for which they were responsible, creating an unsafe environment, especially for older and mobility-impaired tenants who were forced to navigate the stairs to their apartments in the dark. The tenants reported the outage to the landlords several times in writing and by phone but received no response, and eventually reported the problem to the Department of Building Inspection. The landlords do not dispute these findings but claim it amounted to "double punishment" for the trial court to also impose penalties for the fact that the building's alarm system went off constantly for 11 to 15 days as a result of the power outage. But they do not cite any authority for the conclusory statement that the penalties were "double punishment for the same conduct since the loss of electricity and the alarm going off are

44

two consequences of the same power outage." We are not persuaded that loss of light and exposure to alarm noises are truly the "same conduct." Given that the landlords present this argument so perfunctorily, "[w]e will not develop the appellants' arguments for them." (*Dills v. Redwoods Associates, Ltd., supra*, 28 Cal.App.4th at p. 890, fn. 1.) The same is true for additional examples the landlords cite as double punishment, given that they do not provide legal authority or anything more than conclusory arguments.

The landlords likewise perfunctorily address the trial court's finding that the tenants' electrical service was shut off on a separate occasion. The trial court found that the electrical service to the common areas "was shut off" in retaliation for the tenants exercising their protected rights. The landlords assert that the trial court failed to point to "evidence that this was an act by Defendants, let alone that it was in retaliation for anything," and thus there was not substantial evidence to support the resulting penalty assessment. But a statement of decision "need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124-1125; see also Code Civ. Proc., § 632.) The landlords fall far short of overcoming the presumption of the judgment's correctness and establishing that insufficient evidence supported the court's findings. At most, they merely note that the statement of decision might not have listed all evidentiary facts, when in fact all that is required are ultimate facts. (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.)

The trial court also found that within a month of buying the Guerrero Street property, the landlords, without notice or a rent reduction, denied the tenants access to a common area that was previously usable. They did so by locking the access door and throwing away the tenants' patio furniture and barbeque pit. As they did in relation to their argument about the Eureka Street property, the landlords focus on the fact that the leases did not specifically provide for access to the area. But again, the trial court could properly find that it was inequitable for the landlords to take away a privilege previously

45

established through an oral modification to a written agreement without providing a decrease in rent.

Finally, the landlords challenge the trial court's finding that three roommates (one of whom was disabled) were forced to leave their unit because of the constant interruptions in utilities and basic services, reductions of services, and the landlords' repeated refusals to respond. One of the three roommates testified at trial over two days about her tenancy after Renka purchased the building from the previous landlord. The new landlord provided new house rules that were inconsistent with the tenants' existing leases and started unpermitted construction in the basement that shook the building and often woke up the resident. She testified that it affected her sleep and "was just stressful, not knowing what was happening in your house." The tenant described the loss of electricity in the common area, the alarm that sounded nonstop for several days, the fact she lost access to her mailbox for a couple months because the landlord removed the key to the mailbox, an insect infestation that started after construction began, and other issues. She further testified that the landlord installed a camera pointed at her apartment's interior front door, which made her feel as if she was being watched.

When asked why she left the Guerrero Street property, the tenant testified, "After all the complaints, not having heat, not having water, paying the amount of rent I paid, not being able to sleep, not ever really knowing—it was a really stressful situation. I am sorry." After the trial judge asked the witness whether she would like to take a break, the witness responded, "I'm okay. I think, thinking about it now, it was a really stressful situation. [¶] My ex-partner [one of the women who also lived at the apartment] broke up with me. [¶] I mean, constantly, constantly trying to communicate things that needed to be fixed. And living in San Francisco for 20-something years and having to be displaced and getting to the point where I was like, I can't live like this. [¶] And not being able to have a job and work and just kind of trying to get back on my feet. I just needed to get back and healthy and go back to work. And having a living situation being stressful and having everybody else in the building be stressed about it was kind of a really scary thing. Something that I read about; oh, my God, I am one of these people. [¶] So it was

46

one of those things where it's just like, what do you do? And integrity-wise it was just kind of like, it wasn't worth it to me living in a situation like that, knowing that every time I sent a rent check, was she going to cash it or was I going to get a notice on my door and be evicted for something that—when I didn't do anything wrong." She further testified that "I had to choose to either fight or cut my losses and just focus on me getting healthy. So that's what I did. So I moved. [¶] I had nowhere to go, but, you know, I couched for a few months," meaning she stayed with friends because she did not have another place to live right away. The tenant was asked on cross-examination whether the reason she moved out was because she broke up with her girlfriend. The tenant acknowledged that her girlfriend broke up with her but explained that she wanted to keep the apartment but "wouldn't have been able to under the circumstances we were living under." She further explained that her girlfriend also "didn't want to live under those circumstances" and that "[t]he living situation caused a lot of stress in our relationship." When pressed further about the stress they were under, the resident testified that sometimes her ex-girlfriend did not have a good night's sleep because of the construction noise. In response to the question, "So her irritability caused you to move out?" the resident testified, "My relationship was a whole separate issue. We were grownups. It was about having a healthy living situation, and for her, she felt moving out would be healthy."

On appeal, the landlords pluck selective quotes from the foregoing testimony and claim that the tenant's testimony "shows she chose to leave after breakup of a romantic relationship" and that as to the other roommate, "there is no evidence as to her motivation for leaving, and it would be speculation to assume it was because of building conditions rather than because the other two were going their separate ways." We believe that the resident's full testimony, in context, speaks for itself. She described stressful living conditions caused by the landlords' actions at the Guerrero Street property and testified that all residents in the building were affected by the conditions there. Substantial evidence supports the trial court's findings.

47

f.   The Hill Street Property.

The trial court concluded that the landlords committed 281 predicate acts of
harassment at the Hill Street property. The landlords challenge only the finding that the
landlords, without a corresponding rent reduction, reduced the number of recycling bins
at the property by 50 percent, from two bins to one bins for all nine tenants, causing the
single bin to overflow and forcing tenants to save their recyclables in their apartments for
later disposal. The trial court found that the unilateral reduction in services violated the
Rent Ordinance. (Admin. Code § 37.10B, subds. (a)(1) [termination of housing services
required by health laws], (a)(10) [interference with tenants' right to quiet use and
enjoyment of housing unit].)

The landlords ignore the finding that the single recycling bin overflowed and that
residents were forced to keep their recyclables in their apartments and argue there was
insufficient evidence because no one from "Recology, the City Health Department or
other sources" testified that one bin was inadequate. Given the substantial evidence that
was presented, additional evidence was unnecessary. The landlords also point to Health
and Safety Code section 17920.3, subdivision (a)(16), which provides that a building is
substandard if it lacks "adequate garbage and rubbish storage and removal facilities as
determined by a health officer." The landlords claim that because there was "no such
finding by a health officer," there was no substantial evidence to support the trial court's
finding. Even if we accept that the lack of finding by a health officer means, as a matter
of law, that the trial court could not find that the landlords ended a housing service
required by health laws, the landlords do not address the alternative basis for assessing
penalties: that the conduct interfered with tenants' right to the quiet use and enjoyment of
the building. Sufficient evidence was presented that the reduction in recycling bins,
without a corresponding reduction in rent, amounted to an interference with the tenants'
rights.

Having rejected the landlords' evidentiary challenges to the award of penalties, we
also reject their related, but baseless, argument that the harassment allegations were part
of a "concerted and ethically dubious effort to drive [the landlords] out of business in San

48

Francisco." (Unnecessary capitalization and bold omitted.) They cite a series of emails that they claim showed that the City Attorney's Office "became an active participant" in a "private agenda of destroying Defendants' business." Given our conclusion that the residents' claims of harassment were supported by substantial evidence in the record, we need not further address the landlords' claims that the City or the tenants were driven by an improper motive.

*E. The Trial Court Correctly Held the Mwangis Liable for Their Wrongdoing.*

1. Additional Background.

As set forth above, Kihagi had a role in all four of the landlord LLCs. J. Mwangi and C. Mwangi's roles, on the other hand, were more limited. J. Mwangi and Kihagi were members of Renka, and C. Mwangi and Kihagi were members in Zoriall. C. Mwangi also was a manager (along with Kihagi) of Xelan.

When the trial court made its specific findings about tenant harassment and code violations, it specified which defendant was responsible for which violation. For example, the trial court found that Xelan and Nozari were liable for the acts of tenant harassment, retaliation, and wrongful evictions during their respective periods of ownership of the 18th Street property, and that Kihagi was liable for all acts of tenant harassment, retaliation, and wrongful evictions committed at the property while she owned it, as well as during Xelan and Nozari's period of ownership, in addition to those she personally committed or participated in.

Commensurate with their smaller roles in the landlord LLCs, there were fewer findings of liability as to the Mwangis.

a. The Eureka Street Property.

Renka (of which J. Mwangi was a member) purchased the Eureka Street property in December 2013. Renka transferred 25 percent of its ownership interest to J. Mwangi in September 2014, which gave her sufficient individual ownership to perform an owner move-in eviction. In November 2014, two residents of one of the units at the property were served with a 60-day notice of termination of tenancy, purportedly so that J. Mwangi could move into their unit, even though two comparable units were vacant at

49

the property. The landlords fraudulently changed the date of the notice as well as the proof of service to cut short the residents' 60 days. And they falsely represented to the City's rent board that J. Mwangi was not a member of Renka, which also owned six apartments at the Guerrero Street property. Moreover, J. Mwangi did not in good faith intend to use the apartment as her principal residence for a minimum of 36 consecutive months, as required for a lawful owner move-in eviction under the Rent Ordinance. In fact, her principal place of residence was in Fremont, and she had applied for a one-year residency program in Portland in April 2016 that she would have had to apply for much earlier, at a time when she would have known that she would not be planning to live at the Eureka Street property. The residents were evicted from their apartment on January 10, 2015. The following month, February 2015, J. Mwangi transferred her 25 percent ownership of Eureka Street back to Renka. The trial court found that J. Mwangi's owner move-in eviction was an unlawful, unfair, and fraudulent eviction, and that there had been 48 violations of the Unfair Competition Law (two for each of the tenants who were wrongfully evicted, multiplied by 24 for each of the months the tenants were out of possession of the apartment).

Of the 143 total predicate acts of harassment that violated the Unfair Competition Law at the Eureka Street property, the court found that there was joint and several liability for Kihagi, Renka, and J. Mwangi for 94 of them (those acts during J. Mwangi's periods of ownership, as well as those she committed or participated in).

As for code violations, the court found Kihagi (as agent) and Renka (as owner of record) were jointly and severally liable for 758 of the days the Eureka Street property was out of compliance. Kihagi (as agent) and Renka and J. Mwangi (as owners of record) were found to be jointly and severally liable for far fewer days—162.

### b. The Hill Street Property.

Zoriall purchased the Hill Street property in July 2014. After enduring several acts of harassment, the tenants of the property formed a tenants' union by December 2014. In March 2015, Zoriall transferred 27 percent of its ownership interest to C. Mwangi. On April 7, 2015, the tenants' union wrote the landlords a letter, signed

by all then-current residents of the property, that they were aware that the landlords had transferred title from Zoriall to C. Mwangi, and that two residents were leaving one of the units in response to Kihagi's threat of an owner move-in eviction. The tenants wrote that any owner move-in eviction by C. Mwangi would show a lack of good faith and an improper ulterior motive, given that one of the units at the property would soon be vacant. C. Mwangi nonetheless served a couple and their eight-year-old daughter a 60-day notice of termination of tenancy for an owner move-in eviction. She falsely represented to the City's rent board that she had been living at the 18th Street property for the previous two years, when in fact her principal residence was in Fremont, and she also falsely represented that the other apartment that recently had been vacated was not immediately available for the family to rent as an alternative to having to vacate the building. The family was forced to vacate at the end of August 2015 and was not paid a second relocation payment of $10,177 that they had been promised, and the unit was left vacant for at least a year after the family moved out. C. Mwangi transferred her 27 percent ownership interest back to Zoriall in September 2015. The trial court found that C. Mwangi's owner move-in eviction was an unlawful, unfair, and fraudulent eviction, and that there had been 48 violations of the Unfair Competition Law (three for each of the tenants who were wrongfully evicted, multiplied by 16 for each of the months the tenants were out of possession of the apartment).

Of the 281 predicate acts of harassment that violated the Unfair Competition Law at the Hill Street property, the court found that there was joint and several liability for Kihagi, Zoriall, and C. Mwangi for 135 violations (those acts during C. Mwangi's period of ownership as well as those she committed or participated in).

As for code violations, the trial court found that Kihagi (as agent) and Zoriall (as owner of record) were jointly and severally liable for 633 days the property was out of compliance. Kihagi (as agent) and Zoriall and C. Mwangi (as owners of record) were found to be jointly and severally liable for far fewer days—188.

### c. Failure to Register Businesses.

The trial court also found that the landlords failed to register their businesses with the City, in violation of the City's Business and Tax Regulations Code, and it assessed one violation of the Unfair Competition Law for each property for each year that the landlords failed to register. Kihagi, Renka, and J. Mwangi thus were held jointly and severally liable for two of the three violations for the Eureka Street property; and Kihagi, Zoriall, and C. Mwangi were held jointly and severally liable for one of the three violations for the Hill Street property.

### d. Trial Court's Conclusions.

After the trial court made its findings as to each of the various properties for harassment and code violations, it summarized the law as follows: " '[P]arties may be held jointly and severally liable for unfair competition and for making false and misleading statements.' [(*People v. First Federal Credit Corp.* (2002) 104 Cal.App.4th 721, 734.)] Every defendant that owned part of a building is jointly and severally liable for the penalties associated with the property. [(*People v. Witzerman* (1972) 29 Cal.App.3d 169, 180-181; *First Federal*, at p. 735] [finding that defendants need not participate in a wrongful act directly; allowing it to occur from a 'position of control' is sufficient to trigger joint and several liability]; *Myrick v. Mastagni* (2010) 185 Cal.App.4th 1082, 1091 [explaining that defendants are liable for all obligations of partnership or object of joint venture, regardless of share of ownership].) Further, liability under the [Unfair Competition Law] may be imposed where a defendant aided and abetted one or more other defendants. [(*People v. Toomey* (1984) 157 Cal.App.3d 1, 15.)] A defendant who aids and abets is equally liable with those who directly violate the UCL, even if that defendant takes only a small profit or leaves the actual unlawful acts to others. [(*People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 918-919.)]"

As a factual matter, the trial court concluded that because Kihagi was a manager, agent, or owner of every defendant LLC and had engaged in "virtually all of the harassing conduct testified to at trial," she was individually liable for all penalties while she was the sole owner of record of a property, and jointly and severally liable for all

other penalties. As for J. Mwangi and C. Mwangi, the trial court concluded that they were "jointly and severally liable for all penalties the Court imposes as to unlawful acts that they contributed to or participated in, as well as all penalties associated with a property during their periods of ownership." Kihagi was ordered to pay far more than J. Mwangi and C. Mwangi, based on the latter two women's smaller role. Out of the total $1,117,500 ordered to be paid to the City, J. Mwangi was ordered to pay $40,500 (jointly and severally with Kihagi and Renka), and C. Mwangi was ordered to pay $47,000 (jointly and severally with Kihagi and Zoriall). Out of the total $1,612,029 ordered to be paid to the State of California, J. Mwangi was ordered to pay $96,002 (jointly and severally with Kihagi and Renka), and C. Mwangi was ordered to pay $136,001 (jointly and severally with Kihagi and Zoriall).

  2. The Trial Court Did Not Err in Holding the Mwangis Liable.

  The landlords contend that the Mwangis cannot be held jointly and severally liable for the City's claims against Kihagi or the other LLC defendants because "they were mere passive holders of equity who did not participate in the control or management of the buildings at issue." They acknowledge that J. Mwangi and C. Mwangi had ownership interests in the landlord LLCs, but they assert that the women lacked the requisite control over the relevant LLCs to be held liable for the actions committed by co-owner Kihagi. As with so many of the landlords' arguments, they do not tie their complaints to any specific finding that the trial court made. They claim that they lacked the ability to "interact with the City," without addressing the factual findings that both J. Mwangi and C. Mwangi made false statements to the City's rent board in connection with their fraudulent owner move-in evictions. They further claim the Mwangis were "mere passive minority stake holders in the equity," without addressing the fact they transferred ownership back and forth between the relevant landlord LLCs in order to qualify for the owner move-in evictions. And it is simply not the case, given those fraudulent evictions, that the Mwangis were held liable for Kihagi's torts or those of the landlord LLCs "simply by virtue of co-ownership, without more."

53

The landlords' reliance on *Connor v. Grosso* (1953) 41 Cal.2d 229 is misplaced. There, the court concluded that a defendant could not be held liable for her spouse's tort of dumping on adjacent land simply by virtue of the fact they were spouses and held property together as joint tenants, without evidence that she actively participated in the tort or ratified her spouse's conduct. (*Id.* at p. 230.) First, the nature of spouses holding property in joint tenancy is distinguishable from partners co-owning a limited liability corporation. Second, and more importantly, the trial court did not hold the Mwangis liable solely because of their ownership interests, given their fraudulent owner move-in evictions. The landlords complain that there was no evidence as to any conduct by the Mwangis "[o]ther than" those two evictions, but given their fraudulent statements to the rent board and the transfer of ownership interests in their LLCs to qualify for the move-ins, we can hardly discount this conduct as the basis for finding joint and several liability.

     3. Substantial Evidence Supports the Trial Court's Factual Findings.

The landlords also claim that neither of the Mwangis participated in an owner move-in in bad faith. They point to various pieces of evidence that are favorable to them. The City, for its part, points to overwhelming evidence favorable to the judgment. It is settled that we must view the evidence in the light most favorable to the prevailing party and give it the benefit of every reasonable inference, resolving all conflicts in its favor. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.) This is true whether or not the evidence below was contradicted or uncontradicted. (*Ibid.*) Given this standard of review and the overwhelming evidence that supports the trial court's findings, we will not disturb them.

  *F. The Trial Court's Injunction Was Not an Abuse of Discretion.*

    1. The Injunction Does Not Violate the Landlords' Due Process Rights.

The landlords challenge the portion of the permanent injunction entered after trial that directs an independent entity to assume management duties at the landlords' properties. The injunction stated it was entered under the authority granted by (1) the State Housing Law (Health & Saf. Code, § 17980, subd. (a)) [enforcement action to cure code violations], (2) the Unfair Competition Law (Bus. & Prof. Code, § 17203

[injunctive relief]), (3) Civil Code sections 3491 and 3494 [abatement of a public nuisance], and (4) the Rent Ordinance (Admin. Code § 37.10B, subd. (c)(4) [injunction to prevent tenant harassment]). The landlords argue that the trial court violated their right to due process "by appointing the functional equivalent of a receiver in the guise of a property manager," but they are mistaken.

The landlords are correct insofar as they summarize the law regarding receiverships under the State Housing Law. That is, "[s]ections 17980.6 and 17980.7 of the Health and Safety Code com[prise] a statutory scheme providing certain remedies to address substandard residential housing that is unsafe to occupy. Pursuant to section 17980.6, an enforcement agency may issue a notice to an owner to repair or abate property conditions that violate state or local building standards and substantially endanger the health and safety of residents or the public. Section 17980.7 provides that, if the owner fails to comply with the notice despite having been afforded a reasonable opportunity to do so, the enforcement agency may seek judicial appointment of a receiver to assume control over the property and remediate the violations or take other appropriate action." (*Gonzalez, supra*, 43 Cal.4th at p. 912, fn. omitted.) The powers of a receiver are set by statute (Health & Saf. Code, § 17980.7, subd. (c)) and include all the powers granted to receivers under Code of Civil Procedure section 568. (Health & Saf. Code, § 17980.7, subd. (c)(4)(H).) A receiver is the agent of the court and not of any party and as such (1) is neutral, (2) acts for the benefit of all who may have an interest in the subject property, and (3) holds assets for the court and not for the plaintiff or defendant. (Cal. Rules of Court, rule 3.1179(a).)

The landlords contend that provisions of the permanent injunction were "tantamount to appointment of a receiver." Even if we accept that as true, no error flows from this premise. The landlords stress that the statutory scheme governing receiverships "seeks to ensure that property owners are afforded due process *before* judicial appointment of a receiver." (*Gonzalez, supra*, 43 Cal.4th at p. 926, italics added.) The landlords do not suggest, however, that they were deprived of notice and an opportunity to be heard before the entry of the injunction. Instead, they claim that the portion of the

55

injunction governing its enforcement creates a "fast-track path to a receiver." Section IV of the injunction is titled "**ENFORCEMENT**." Paragraph A provides that a violation of the injunction constitutes contempt of court and that if the trial court determines "after [a] hearing" that the landlords violated the injunction, the landlords shall be liable for civil penalties. Paragraph C provides that if the landlords fail to comply with the injunction, the City "may return to [the trial court] to seek appropriate relief, including, but not limited to, seeking the appointment of a receiver to manage any of the PROPERTIES and abate the violations and the nuisance, and/or sell any of the PROPERTIES." The landlords claim that this provision requires "[n]o specified notice, opportunity to cure, or other due process protections . . . just ask for the relief." (Bold omitted.) But the injunction specifically provides that the City must return to court in order to seek further relief—i.e., that the landlords shall receive notice and an opportunity to be heard.

The landlords do not specifically address the notion that the egregious actions they took against their tenants justify an injunction that delegates management of their properties to an independent manager. The trial court has broad discretion to issue injunctive relief to enjoin acts found to have violated the Unfair Competition Law, as the trial court did here, and the landlords have failed to establish that the trial court abused that discretion. (*People ex rel. Harris v. Aguayo* (2017) 11 Cal.App.5th 1150, 1161.)

      2.  The Trial Court Properly Enjoined the Landlords from Pursuing
            Pending Evictions.

The landlords also challenge two portions of the injunction that prohibit the landlords from proceeding with pending evictions. The first challenged provision addresses temporary evictions for capital improvements. The trial court found that the landlords had "engaged in multiple unlawful and/or deceptive independent acts in connection with alleged Temporary Evictions for Capital Improvements," and it declared invalid all such pending notices or evictions and enjoined the landlords from proceeding with any such pending notices or evictions. The other challenged provision addresses pending owner move-in evictions, relative move-in evictions, and evictions under the Ellis Act (Gov. Code, § 7060 et seq.). The trial court found that the landlords had

engaged in multiple unlawful and deceptive acts with respect to these types of evictions, and it declared invalid "all such pending notices or evictions" and enjoined the landlords from proceeding with them.

On appeal, the landlords claim that the trial court lacked authority to enjoin a legal process, because the injunction violated "the general rule that one trial court judge may not reconsider and overrule an interim ruling of another judge." (*Ziller Electronics Lab GmbH v. Superior Court* (1988) 206 Cal.App.3d 1222, 1232; see also *Morite of California v. Superior Court* (1993) 19 Cal.App.4th 485, 492-493 [court lacked authority to order case to trial when it did not revisit previous order staying the case]; *Ford v. Superior Court* (1986) 188 Cal.App.3d 737, 741-742 [superior court is one tribunal, and one department lacks jurisdiction to interfere with power of different department that ruled in same case].) The landlords do not, however, identify any interim rulings with which the injunction interferes. They point to three units at the Guerrero Street property identified in the statement of decision where eviction notices were pending as of the effective date of the pending-evictions provisions. But each of those notices was in the *pre-litigation* phase as of the issuance of the statement of decision, as the landlords acknowledge. The people living in the three units at issue had been served with eviction notices but were still in possession of their apartments as of the time of trial, and no lawsuit had yet been filed with respect to those notices. Again, the landlords fall far short of demonstrating that the trial court abused its vast discretion when entering the injunction. (*People ex rel. Harris v. Aguayo, supra*, 11 Cal.App.5th at p. 1161; *Hernandez v. Stabach* (1983) 145 Cal.App.3d 309, 313, 315 [upholding preliminary injunction that restrained landlord evicting tenants without prior showing of good cause being made the superior court].)

Finally, we reject as forfeited the argument raised for the first time in the landlords' reply brief that the injunction was overly broad. (*Keyes v. Bowen, supra*, 189 Cal.App.4th at p. 656.)

57

### G. No "Cumulative Error" Occurred.

Finally, we reject the landlords' argument that the errors they identify amounted to cumulative error requiring reversal. Because we have rejected their individual errors, we reject their argument based on cumulative error as well.

### III.
### DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

58

_____

Humes, P.J.

We concur:


_____

Banke, J.


_____

Kelly, J. *


*Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*City and County of San Francisco et al. v. Kihagi et al.*  A151719

59

**EXHIBIT "B"**

COURT OF APPEAL FIRST APPELLATE DISTRICT
350 McALLISTER STREET
SAN FRANCISCO, CA  94102
DIVISION 1

April 15, 2019

CITY AND COUNTY OF SAN FRANCISCO,
Plaintiff and Respondent,
v.
ANNE KIHAGI et al.,
Defendants and Appellants.

A152933
San Francisco County Super. Ct. No. CGC15546152

### ORAL ARGUMENT NOTICE

BY THE COURT:

This case is set for oral argument before Division 1 of the First Appellate District on **Wednesday, June 5, 2019** at 350 McAllister Street - Fourth Floor - San Francisco, CA 94102. **A notice containing the time of oral argument will be sent in a separate notice 20 days before the argument date.** Before then, the party or parties who asked for oral argument may still waive it by informing the clerk that oral argument is no longer desired. The court attaches no significance to waiving oral argument, and it understands that oral argument is often unnecessary when the parties' positions have been fully briefed.

The court has fully reviewed the briefs and knows the issues. Parties should not use oral argument to repeat points that were made in the briefs.

If a party intends to rely at oral argument on new authority that was unavailable to it during briefing, the party should inform the court and opposing counsel of the authority in accordance with rule 8.254 of the California Rules of Court.

Please notify the clerk before the argument date if an attorney other than the attorney identified on the request for oral argument intends to present argument. If a party has made arrangements with the clerk of the court to argue by telephone, the party must be available when the case is called at the telephone number provided to the clerk. The case could be called anytime during the court's scheduled session.

Electronic devices must be silenced and placed in "airplane mode" while in the courtroom, and they may not be used to display evidence or to record the proceedings, except in compliance with California Rules of Court, rule 1.150. The First District's full policy on electronic devices in the courtroom is available at http://www.courts.ca.gov/documents/1DCA-e-devices-policy.pdf.

Jim Humes
Presiding Justice

The assigned judicial panel is:

Humes, J. / Margulies, J. / Sanchez, J.

**EXHIBIT "C"**

1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  PETER J. KEITH, State Bar #206482
   Chief Attorney
3  Neighborhood and Resident Safety Division
   MICHAEL S. WEISS, State Bar #168378
4  VICTORIA L. WEATHERFORD, State Bar #267499
   Deputy City Attorneys
5  Fox Plaza
   1390 Market Street, Sixth Floor
6  San Francisco, California 94102-5408
   Telephone:    (415) 554-4287
7  Facsimile:    (415) 437-4644
   E-Mail:        michael.weiss@sfgov.org
8  E-Mail:        victoria.weatherford@sfgov.org

9  Attorneys for Plaintiffs
   CITY AND COUNTY OF SAN FRANCISCO and
10 PEOPLE OF THE STATE OF CALIFORNIA

**FILED**
San Francisco County Superior Court

OCT 2 6 2017

CLERK OF THE COURT
BY: _K. Michael Dil_
                     Deputy Clerk

11           SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                    COUNTY OF SAN FRANCISCO

13                      UNLIMITED JURISDICTION

14 CITY AND COUNTY OF SAN          Case No. CGC-15-546152
   FRANCISCO, a Municipal Corporation, and
15 the PEOPLE OF THE STATE OF
   CALIFORNIA, by and through DENNIS J.
16 HERRERA, City Attorney for the CITY AND
   COUNTY OF SAN FRANCISCO,
17
18           Plaintiffs,              [~~PROPOSED~~] AMENDED JUDGMENT

19           vs.                      Judge:        Hon. Angela Bradstreet
                                      Place:        Dept. 624
20 ANNE KIHAGI aka ANNA KIHAGI aka
   ANNA SWAIN aka ANNE KIHAGI SWAIN    Date Action Filed:    June 4, 2015
21 aka ANNA KIHAGI SWAIN, JULIA        Trial Date:           October 31, 2016
   MWANGI aka JULIA MUNENE,
22 CHRISTINE MWANGI aka CHRISTINA
   MWANGI aka CHRISTINE JOHNSON,
23 XELAN PROP 1, LLC, RENKA PROP, LLC,
   NOZARI 2, LLC, ZORIALL, LLC, and DOE
24 ONE through DOE FIFTY,

25           Defendants.

26

27

28

                                      1

1    The Court having entered its original judgment on June 12, 2017 with the proviso that said

2 judgment may be amended for the sole purpose of including the amounts of attorneys' fees and costs,

3 and the Court having issued its Order Order Granting Plaintiff City and County of San Francisco's

4 Motion for Attorneys' Fees on October 18, 2017, which awarded attorneys fees and costs to and in

5 favor of Plaintiff CITY AND COUNTY OF SAN FRANCISCO, to have and recover an award of

6 $2,737,276.54 (the sum of $2,503,141 in attorneys' fees and $234,135.54 in costs) against Defendant

7 ANNE KIHAGI, an individual, against Defendant JULIA MWANGI aka JULIA MUNENE, an

8 individual, against Defendant CHRISTINE MWANGI aka CHRISTINA MWANGI aka CHRISTINE

9 JOHNSON, an individual, against Defendant XELAN PROP 1, LLC, a California Limited Liability

10 Company, against Defendant RENKA PROP, LLC, a California Limited Liability Company, against

11 Defendant NOZARI 2, LLC, a California Limited Liability Company; and against Defendant

12 ZORIALL, LLC, a California Limited Liability Company, jointly and severally, the Court hereby

13 enters this Amended Judgment.

14    IT IS HEREBY ORDERED ADJUDGED AND DECREED THAT Plaintiff CITY AND

15 COUNTY OF SAN FRANCISCO shall recover judgment totaling $3,854,776.54, as follows:

16    (1) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant

17 ANNE KIHAGI, an individual, against Defendant JULIA MWANGI aka JULIA MUNENE, an

18 individual, against Defendant CHRISTINE MWANGI aka CHRISTINA MWANGI aka CHRISTINE

19 JOHNSON, an individual, against Defendant XELAN PROP 1, LLC, a California Limited Liability

20 Company, against Defendant RENKA PROP, LLC, a California Limited Liability Company, against

21 Defendant NOZARI 2, LLC, a California Limited Liability Company, and against Defendant

22 ZORIALL, LLC, a California Limited Liability Company, jointly and severally, the sum of

23 $2,503,141 in attorneys' fees and $234,135.54 in costs, for a total amount of $2,737,276.54;

24    (2) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant

25 ANNE KIHAGI aka ANNA KIHAGI aka ANNA SWAIN aka ANNE KIHAGI SWAIN aka ANNA

26 KIHAGI SWAIN, an individual, alone, the amount of $23,000.00;

27

28

2

1    (3) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant

2  ANNE KIHAGI, an individual, and against Defendant XELAN PROP 1, LLC, a California Limited

3  Liability Company, jointly and severally, the amount of $393,750.00;

4    (4) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant

5  ANNE KIHAGI, an individual, and against Defendant RENKA PROP, LLC, a California Limited

6  Liability Company, jointly and severally, the amount of $397,000.00;

7    (5) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant

8  ANNE KIHAGI, an individual, against Defendant JULIA MWANGI aka JULIA MUNENE, an

9  individual, and against Defendant RENKA PROP, LLC, a California Limited Liability Company,

10  jointly and severally, the amount of $40,500.00;

11    (6) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant

12  ANNE KIHAGI, an individual, and against Defendant ZORIALL, LLC, a California Limited Liability

13  Company, jointly and severally, the amount of $158,250.00;

14    (7) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant

15  ANNE KIHAGI, an individual, against Defendant CHRISTINE MWANGI aka CHRISTINA

16  MWANGI aka CHRISTINE JOHNSON, an individual, and against Defendant ZORIALL, LLC, a

17  California Limited Liability Company, jointly and severally, the amount of $47,000.00;

18    (8) Plaintiff CITY AND COUNTY OF SAN FRANCISCO shall recover against Defendant

19  ANNE KIHAGI, an individual, and against Defendant NOZARI 2, LLC, a California Limited

20  Liability Company, jointly and severally, the amount of $58,000.00.

21    IT IS FURTHER ORDERED, ADJUDGED AND DECREED THAT Plaintiff PEOPLE OF

22  THE STATE OF CALIFORNIA, by and through Dennis J. Herrera, City Attorney for the City and

23  County of San Francisco, shall recover judgment totaling $1,612,029.00 as follows:

24    (1) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera,

25  City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI aka ANNA

26  KIHAGI aka ANNA SWAIN aka ANNE KIHAGI SWAIN aka ANNA KIHAGI SWAIN, an

27  individual, alone, the amount of $5000.00;

28

3

n:\codenf\li2016\151349\01196624.docx

1       (2) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera,

2 City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual, and

3 against Defendant XELAN PROP 1, LLC, a California Limited Liability Company, jointly and

4 severally, the amount of $178,009.00;

5       (3) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera,

6 City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual, and

7 against Defendant RENKA PROP, LLC, a California Limited Liability Company, jointly and

8 severally, the amount of $945,012.00;

9       (4) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera,

10 City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual,

11 against Defendant JULIA MWANGI aka JULIA MUNENE, an individual, and against Defendant

12 RENKA PROP, LLC, a California Limited Liability Company, jointly and severally, the amount of

13 $96,002.00;

14      (5) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera,

15 City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual, and

16 against Defendant ZORIALL, LLC, a California Limited Liability Company, jointly and severally, the

17 amount of $149,004.00;

18      (6) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera,

19 City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual,

20 against Defendant CHRISTINE MWANGI aka CHRISTINA MWANGI aka CHRISTINE

21 JOHNSON, an individual, and against Defendant ZORIALL, LLC, a California Limited Liability

22 Company, jointly and severally, the amount of $136,001.00;

23      (7) Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis Herrera,

24 City Attorney for San Francisco, shall recover against Defendant ANNE KIHAGI, an individual, and

25 against Defendant NOZARI 2, LLC, a California Limited Liability Company, jointly and severally,

26 the amount of $103,001.00.

27      Interest shall accrue on the total amount of the amended judgment, including the principal of

28 the June 12, 2017 judgment and the award of costs and pre-judgment attorneys' fees herein, from June

1  12, 2017 to the date of entry of an amended judgment, at the rate of 10% per annum pursuant to C.C.P.

2  section 685.010(a).

3

4

5  Dated: October 26 2017

6

7                              HON. ANGELA BRADSTREET

8                              JUDGE OF THE SUPERIOR COURT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5